# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS – WACO DIVISION

**FILED**

September 18, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ cap

DEPUTY

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 992-7104

Email: atpg-tech@charter.net

---

LARRY GOLDEN,

            Plaintiff,

                    V.

GOOGLE LLC

            Defendants.

CIVIL CASE NO: ___6:25-CV-00434___

**JURY TRIAL DEMANDED**

**(Joint Patent Infringement)**
**(Direct Patent Infringement),**
**(Willful Patent Infringement),**

September 15, 2025

---

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action of patent infringement in which plaintiff, Larry Golden ("Golden", "Plaintiff" or "Patent Owner"), hereby asserts the following claims for patent infringement of United States Patent Nos. 11,645,898 ('898 Patent); 10,984,619 ('619 Patent); and 10,163,287 ('287 Patent), for alleged "joint infringement"; and  11,645,898 ('898 Patent); US43,891 ('891 Patent), and 8,334,761 ('761 Patent) for alleged "direct infringement" ("claim charts": attached hereto as *Exhibits A - B*) ("patents-in-suit": attached hereto as *Exhibits C - G*) against Defendant GOOGLE LLC ("Google" or "Defendant"), and alleges as follows:

Upon information and belief, Plaintiff alleges the patents-in-suit, that were issued with the presumption of validity, under 35 U.S. Code § 282 – "Presumption of validity; (a) In General", is Plaintiff's evidence that Plaintiff is the inventor of Central Processing Units (CPUs) for both mobile and consumer devices i.e., smartphones, laptops, tablets, etc.; and a stall, stop, vehicle slow-down system.

1

Upon information and belief, Plaintiff alleges that the defendant Google, has in the past and continues to do so, makes, uses, offer to sell, or sells Google's Tensor Central Processing Units (CPUs) and Google's Tensor Processing Units (TPUs); and Google's Self-Drive Vehicles that comprises Google's Advanced Driver Assistance Systems (ADAS) that Plaintiff believes infringes at least one of the claims in the patents-in-suit under 35 U.S.C. § 271, "anyone who makes, uses, offers to sell, or sells any patented invention domestically, or imports a patented invention into the United States during the term of the patent, is infringing the patent."

## THE PARTIES

Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

On information and belief, Google is incorporated in the State of Delaware with a principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043 and does business in this judicial district by, among other things, committing joint (divided) infringement and/or direct—literal patent infringement or infringement under the "doctrine of equivalents"—giving rise to this complaint. Plaintiff also alleges Google's infringement is willful because Google had knowledge of Plaintiff's patents-in-suit and acted with the intent to infringe, since at least the date of service 10/05/2022 in *Golden v. Google LLC* NDC Case No. 22-5246

Google may be served at The Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. Google does business in the State of Texas and in the district.

Google LLC is one of the largest technology companies in the world and conducts product sales, and operations in the District of South Carolina. Google LLC jointly and/or directly, distributes, markets, offers to sell, sells, and/or imports the alleged infringing Google's Tensor Central Processing Units (CPUs) and Google's Tensor Processing Units (TPUs); and Google's Self-Drive Vehicles that comprises Google's Advanced Driver Assistance Systems (ADAS).

## STANDARD FOR REVIEW

Twelve federal judges (nine from the appellate court) stated infringement occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability. Thereby, infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device; but only when a third-party "modifies" the connectivity i.e.,

software apps, Bluetooth, NFC, cellular, internet, GPS, WiFi, etc. of the Google device in order for the device to function.

Therefore, Twelve Federal Judges inadvertently ruled without intension a claim of "joint infringement". Modification of an alleged infringing product by an actor or multiple actors creates grounds for infringement in the alternative of "joint infringement".

Twelve Federal Judges determined by default, "joint infringement" is established when Google is found to have controlled the "manner or timing" of the third-party's modification or performance.

Plaintiff has stated a plausible claim for direct infringement by specifically identifying the Defendant's products and alleging that they perform the same unique function as Plaintiff's patented inventions. The Defendant in this case is allegedly liable for infringement of the asserted patents-in-suit under 35 U.S.C. § 271.

Plaintiff maintains he has additional factual allegations to support his claim in the form claim charts readily available by order of this Court.

## JURISDICTION AND VENUE

This is a civil action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§§ 1331, 1332(a) and 1338(a).

On May 22, 2017, the U.S. Supreme Court narrowed the scope of proper venue for patent infringement actions for domestic corporations. *See TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, No. 16-341 (May 22, 2017). The *TC Heartland* decision reverses the approach to venue previously adopted by the U.S. Court of Appeals for the Federal Circuit.

The special venue statute for patent infringement actions, 28 U.S.C. § 1400(b), has two provisions permitting venue: "[1] where the defendant resides, or [2] where the defendant has committed acts of infringement and has a regular and established place of business."

Since the enactment of that statute, the Supreme Court consistently has interpreted Section 1400(b)'s first provision of proper venue— "where the defendant resides". *E.g., Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 226 (1957). As a result, a domestic corporation may now be sued for patent infringement only in its state of incorporation or where it has committed acts of infringement and has a regular and established place of business.

**TWELVE FEDERAL JUDGES DETERMINED IT'S "JOINT INFRINGEMENT"**

Twelve Federal Judges determined "joint infringement" is established when Google was found to have controlled the "manner or timing" of the third-party's modification or performance. Twelve federal judges (nine from the appellate court) stated infringement occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability.

In a 2015 decision of the United States Court of Appeals for the Federal Circuit, *Akamai Techs., Inc. v. Limelight Networks, Inc.* the court expanded the doctrine [of joint infringement] and explained the current meaning of the term, "[w]e conclude, on the facts of this case, that liability under § 271(a) can also be found when an alleged infringer conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and *establishes the manner or timing of that performance*."

*Akamai V* held that direction or control does not require that a single mastermind direct all the entities' action; instead, direction and control can include establishing the time or manner of performance or conditioning participation of an activity or receipt of a benefit on performing the patented method.

Google allegedly directs control of the manner and/or timing of an actor(s) because it is Google who controls its alleged infringing Google Tensor Series G1-G5 CPUs and Google Android Open-Source Operating Systems'; release of source codes that describes and controls the third-party's performance [modification] parameters.

The manner or timing of the source code release could be yearly; every other year; or with the release of each new Google device model.

Google enables the performance [modification] of the Google devices. According to twelve federal judges, "modification in order to infringe" is established through various means: modified by connecting any outside devices; modified by adding software; modified by wirelessly connecting through NFC, Bluetooth, WiFi [Internet-of-Things], Cellular, or GPS; and modified if the camera performs any other function beyond that of simply taking a picture.

The above list of modifications was reviewed by twelve federal judges. They all agree that infringement (joint) occurs when a third-party modifies the Google mobile device in order for the phone to function as a CBRNE-H sensing device. The twelve federal judges described [construed] away from Google's alleged direct infringement, onto Google's joint infringement.

4

## GOOGLE CONSTRUED GOLDEN'S PATENT CLAIMS AWAY FROM DIRECT INFRINGEMENT, BUT ONTO JOINT INFRINGEMENT

### History of Construed Claim Terms

Google should have been precluded from relitigating the construction of patent claims' limitations on where, and even how, the CBRNE device(s) can be found "within" the mobile devices. In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

"In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below.

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain relevant after the amendment, we see no reason to modify them.

We further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10–11. Based on the record adduced during trial, we see no need to construe any other terms."

The District Court Judge erred in allowing Google the opportunity to re-litigate claim terms that had already been adjudicated and a final decision was issued. Also, the PTAB determined "communication device" is likewise the same as "monitoring equipment" when used to function as a mobile sensing device".

The NDC Judge reversed the final decision of the PTAB court and construed Golden's patent claims to mean just the opposite. The NDC Judge ruled in a way that signals, any and all means of connectivity is cancelled. Golden presented five (5) infringement theories to the NDC Court that describes various means of connectivity. See the following charts:

## "Built-in, Embedded"

Draper designed a chemical, biological, radiological and nuclear (CBRN) Plugin to enable users to integrate CBRN sensors into TAK, collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, WinTAK and WebTAK are operational in the field. https://www.draper. com/explore-solutions/tak

**ATAK-CIV (CBRN)**: "The Tactical Assault Kit is DoD nomenclature for the Team Awareness Kit (TAK) application: a mission planning, geospatial, Full Motion Video (FMV), and system administrator tool that reduces the operational footprint from a tactical laptop, to a commercial mobile device. Data can be pre-loaded into ATAK or downloaded from the network when available." https://play.google. com/store/apps/details?id=com. atakmap. app.civ&hl=en_US&gl=US



**Near-Field Communication (NFC) Smartphone Sensor:** Nascent technology embedded in modern smartphones—near-field communication (NFC)—for wireless electronic, portable, non-line-of-sight selective detection of gas-phase chemicals *(Fig. 1)*

National Institutes of Health (NIH). *"Wireless gas detection with a smartphone via rf nfc communication"* Published online 2014 Dec 8. doi: 10.1073/pnas. 1415403111 Retrieved from: https://www.ncbi.nlm.nih.gov/pmc/ articles/PMC4280584/



*Figure 1*

Conversion of an NFC tag into a CARD enables wireless rf detection of chemical analytes with a smartphone. NFC-enabled smartphones communicate with NFC tags by simultaneously energizing the NFC tag with an alternating magnetic field (f = 13.56 MHz) through inductive coupling and transferring data by signal modulation.

**Camera Sensor**: Camera lens in cell phone with microfluidic lens functions as camera; uses microscope to focus on a chemical sensor. A **megapixel** camera captures the image from the array of nanopores uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the **pixel** resolution phone camera. *Megapixel* resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors tucked into cell phones could map airborne toxins in real time*. Source: https:// www .understanding nano.com/cell-phone-sensors-toxins.html

Hyperspectral imaging scans for light frequencies that humans can't see in order to identify the unique chemical signatures of different substances. They say their device, which can be mass produced, is compatible with all standard smartphone cameras. *These New Smartphone Cameras Could Tell You What an Object Is Made of* https://www.sciencealert.com/new-smartphone-cameras-



Panache

Smartphones provide hardware and software capability which can be incorporated with [CBR] sensors, enabling accurate on-site portable sensing. The camera, screen, and LED flashlight of the smartphone can be employed as components of the sensor. https://link. springer.com/ article/10. 1007/s11468-022-01672-1

**Smartphone Biosensors**:
1. Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
2. Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
3. Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
4. Microfluidic cassette: Interchangeable cassettes with varying assays
5. VIS-NIR spectrometer: Food freshness; Melanoma
6. NNAP Electrodes: Toxic metals and Organic pollutants in water
7. Optical Waveguide: Pathogens in water and food
8. Back and front camera: Colorimetric analysis; Image analysis
9. Microphone: Voice recording stress levels



**Google Beacon: Bluetooth; GPS; Wi-Fi**
Google Android smart phones and
WiFi/Bluetooth beacons as detectors and
sources. Google smart phone sensors (GPS,
WiFi, Bluetooth) and beacon signals to
calculate distance between detector and
source. Filtering WiFi/ Bluetooth ranging
functions and GPS location data. Filtering
GPS derived distances based on jump in
calculated position or when GPS reports
jump in position but phone accelerometer
sensors do not show rapid acceleration.
Specific models in different categories of
radiation instruments (dosimeters, survey
meters, personal radiation detectors,
backpacks, nuclide identifiers, and mobile
systems).



Google Beacon is a type of Bluetooth
technology with proximity-based triggers.
These triggers affect both the physical and
digital world. Using Bluetooth low energy
(BLE) hardware technology, beacons
communicate with nearby smart devices like
smartphones, tablets, etc. Different types of
beacons that perform different tasks.

Both Google and Judge Rita F. Lin knew the CBRNE devices allegedly infringes
Golden's patents when combined [built-in, embedded] with the Google smartphones:

"Plaintiff's complaint alleges that ATAK is not made by Google, and he does not
allege that ATAK comes pre-loaded on Google phones: "Through collaboration and
innovation, the DTRA has integrated its powerful, hazard-awareness-and-response tools
into the Android Tactical Assault Kit (ATAK). ATAK is a digital application available to
warfighters throughout the DoD. Built on the Android operating system, ATAK offers
warfighters geospatial mapping — on an end-user device such as a smartphone or a tablet.
With DTRA's contribution, ATAK now includes (CBRN) plug-ins." *Golden v. Google* Case
3:22-cv-05246-RFL Document 41 Filed 08/10/23

"The FAC alleges five theories of direct infringement [] all of which suffer from
the same defect for which the original complaint was dismissed: the theories all require
that the accused products be modified in some way for them to infringe on the patents-in-
suit. ... "Mr. Golden's allegations, even if true, at best establish that [defendant's]
smartphones might be modified post-sale to perform the accused detector/sensor
functionality, []." *Golden v. Google* Case 3:22-cv-05246-RFL Dkt. 68 Filed 04/03/24

*ATAK application*: "finding that the defendants' products "do not infringe without modification—the modification of installing the required software". [gateway to the alleged infringing Draper CBRNE Plug-in sensors]

*NFC tags*: "Golden' second theory [] requires combining "Google's NFC sensor," which are allegedly embedded in the accused products, with external NFC tags that have been converted to detect certain chemicals in order for there to be alleged infringement."

*Camera sensors*: "The FAC also alleges that "[s]martphones provide hardware and software capability which can be incorporated with [CBR] sensors, enabling accurate on-site portable sensing," further confirming that the sensors are separate devices that may be "incorporated" into the smartphone. (Id.) Therefore, this theory of infringement also fails because the accused products do not infringe without modification."

*Smartphone biosensors*: "The diagram shows an "add on device" with the alleged biosensors (i.e., "capillary inlet," "microfluidic cassette," VIS-NIR spectrometer, and "NNAP electrodes") attached to a nondescript smartphone. (Id.) As such, this theory also requires modification to the accused smartphones to state an infringement claim."

*Google Beacon*: Golden's fifth theory (see Ex. G at 34–41) fails for the same reason, as it requires "Google Beacon," which the FAC's own illustrations show is a separate device from the accused smartphones." *Golden v. Google* Case 3:22-cv-05246-RFL Document 68 Filed 04/03/24

Twelve Federal Judges (including Judge Rita F. Lin of the NDC) determined "joint infringement" is established when Google was found to have controlled the "manner or timing" of the third-party's modification or performance. Twelve federal judges (including Judge Rita F. Lin of the NDC) stated infringement occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability.

In a 2015 decision of the United States Court of Appeals for the Federal Circuit, *Akamai Techs., Inc. v. Limelight Networks, Inc.* the court expanded the doctrine [of joint infringement] and explained the current meaning of the term, "[w]e conclude, on the facts of this case, that liability under § 271(a) can also be found when an alleged infringer conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and ***establishes the manner or timing of that performance***."

*Akamai V* held that direction or control does not require that a single mastermind direct all the entities' action; instead, direction and control can include establishing the time or manner of performance or conditioning participation of an activity or receipt of a benefit on performing the patented method.

## THE ACCUSED GOOGLE PRODUCTS MUST COMPRISE THE REQUIRED CENTRAL PROCESSING UNIT (CPU) HARDWARE PRE-INSTALLED

Golden claims the Google smartphones' Tensor CPU allegedly infringes Golden's patented new, improved upon, and useful central processing unit (CPU) for mobile devices. Google has failed to defend; the lower court has failed to compel Google to answer the allegations; and the Circuit failed to rule in favor of Golden because Google has neither denied, defended, or challenged Golden's alleged claims of infringement.

Golden's CPU was invented specifically for Golden's patented new, improved upon, and useful cell phone (CMDC device). Google's Tensor CPUs; invented for mobile devices (i.e., Google smartphones) are recognized as the "brains" of the mobile, consumer, or cellular devices.

Both the Google Tensor CPUs and Golden's patented CPUs, are responsible for carrying out the functional and operational instructions of the computer (smartphone) programs. Golden has alleged the Google smartphone cannot operate/function without Golden's patented CPUs.



### The Google Tensor CPU and Google Android operating system (OS)

The Google Tensor CPU and Google Android operating system (OS) are essential components of Google's mobile devices, each fulfilling unique functions that enhance user experience. Golden claims Google is allegedly infringing his patented Central Processing Unit (CPU) [hardware], and Golden claims his "transceiver" is equivalent to the Google Android Operating Systems (OS) [software].

1. *Google Tensor CPUs [hardware]*

- Function: The Google Tensor CPU hardware is the primary processor that executes instructions and manages tasks within the device.
- Performance: Google Tensor CPUs are also designed for efficiency, balancing power consumption and processing speed to optimize battery life.

2. *Google Android Operating Systems (OS) [software]*
   - Function: The Google Android OS software manages hardware resources and provides a platform for applications to run.
   - User Interface: It offers the graphical interface that users interact with, enabling navigation and access to features.

3. *Complementary Roles*
   - Integration: The Google Tensor CPU and the Google android OS work together to ensure smooth operation of applications and system functions.
   - User Experience: A powerful Tensor CPU can enhance the performance of the Android OS, leading to faster app launches and smoother multitasking.

Understanding the distinct roles of mobile CPUs and operating systems helps in appreciating how they contribute to the overall functionality and performance of mobile devices.

## JOINT OR DIVIDED INFRINGEMENT

**Google directs or control others' performance with its alleged infringing Tensor CPUs and Android Operating Systems' Source Code**

In United States patent law, divided infringement is a form of patent infringement liability that occurs when multiple actors are involved in carrying out the claimed infringement of a system or method patent. In the case of a method patent, no single accused infringer can perform all of the steps of the method. In a 2015 decision of the United States Court of Appeals for the Federal Circuit, *Akamai Techs., Inc. v. Limelight Networks, Inc.* the court expanded the doctrine and explained the current meaning of the term.

The court said that the problem in divided infringement is determining, when "more than one actor is involved in practicing the steps" of a method claim of a patent, whether the acts of one actor are attributable to the other actor such that second one is to be held "responsible for the infringement." The court said that it would hold one entity responsible for another's performance of method steps in two sets of circumstances:

- "where that entity directs or controls others' performance", and
  - *Akamai V* held that direction or control does not require that a single mastermind direct all the entities' action; instead, direction

> and control can include establishing the time or manner of performance or conditioning participation of an activity or receipt of a benefit on performing the patented method.

- "where the actors form a joint enterprise."

In past cases, the court noted that it had held that an actor liable for divided infringement under 35 U.S.C. § 271(a) only when "it acts through an agent (applying traditional agency principles) or contracts with another to perform one or more steps of a claimed method." To those two circumstances, the court held that it would now add a third:

> "We conclude, on the facts of this case, that liability under § 271(a) can also be found when an alleged infringer conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and *establishes the manner or timing of that performance*."

**Establishes the manner or timing of that performance**

Google allegedly directs control of the manner and/or timing of an actor(s) because it is Google who controls its alleged infringing Google Tensor Series G1-G5 CPUs and Google Android Open-Source Operating Systems', release of source codes that describes and controls the third-party's performance [modification] parameters.

Example: Third-party actors may have been ready to integrate biometric fingerprint and facial authentication with the Google device but were unable to do so before Google released its Android Operating Systems' source code. The manner or timing of the source code release could be yearly; every other year; or with the release of each new Google device model.

With that being said it is obvious Google has allegedly conditioned participation in the third-party's activity. Also, Google also receives a tremendous benefit because the integration of the biometric fingerprint and/or facial authentication contributes to the massive revenue Google receives from the sales of Google devices.

***Akamai Technologies, Inc. v. Limelight Networks, Inc.***

On August 13, 2015, the Federal Circuit issued an en banc decision in *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, stating in a *per curiam* opinion that "we unanimously set forth the law of divided infringement under 35 U.S.C. § 271(a)." In doing so, the court held that liability for divided infringement "is not limited solely to principal-agent relationships, contractual arrangements, and joint enterprise… the Federal Circuit explained that

"where two or more actors form a joint enterprise, all can be charged with the acts of the other, rendering each liable for the steps performed by the other as if each is a single actor."

Recognizing that the existence of a joint enterprise is a factual question, the court looked to the Restatement (Second) of Torts to tailor a four-factor test for analyzing the issue:

1. Is there an express or implied agreement among members of a group?
2. Is there a common purpose to be carried out by the group?
3. Is there a "community of pecuniary interest" in the common purpose among members of the group?
4. Is there an "equal right to a voice in the direction of the enterprise, which given an equal right of control"?

Turning to the specific facts of the case, the court held that substantial evidence supported the jury's verdict that the defendant was liable for direct infringement. The court noted that the defendant performed all the claimed steps except for "tagging" and "serving," which were performed by the defendant's customers. However, the court concluded that the customers' actions were "directed or controlled" by the defendant for two reasons.

First, through contractual obligations, the defendant "condition[ed] its customers' use of its content delivery network upon" performance of the claimed "tagging" and "serving" steps. Second, by "provid[ing] step-by-step instructions to its customers," defendant "establish[ed] the manner or timing of its customers' performance" of the claimed steps.

**The Government's actions were "directed or controlled" by the defendant—Google**

The Tactical Assault Kit (also TAK) for military uses is a suite of software that provides geospatial information and allows user collaboration over geography. There are numerous TAK Products in the TAK family, all developed at government expense.

The Team Awareness Kit for Google Android (ATAK) was originally developed by the Air Force Research Laboratory (AFRL) and is now maintained by a Joint Product Center.

ATAK is a Google Android smartphone geospatial infrastructure and situational awareness app. It allows for precision targeting, surrounding land formation intelligence, situational awareness, navigation, and data sharing.

All the Android variants of TAK are virtually identical and all are interoperable with each other and with other TAK products. There are small, military-specific additions in military versions of ATAK.

Android Team Awareness Kit, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents. *1st Theory*

### Joint Enterprise—Benefit to Google

Three years ago [2022], tech giant Google placed a bet on government business, launching a new division — Google Public Sector — to better serve the massive market of federal, state and local, and defense customers that collectively spend more than $100 billion on IT each year.

Last week, Google Public Sector's cloud computing platform, Google Distributed Cloud, achieved a major milestone, meeting the Defense Department's Impact Level 6 security accreditation.

This accreditation means Google's cloud suite and a growing number of its AI tools are available to all feasible government customers. Everything from the least sensitive public data to the most sensitive, classified national security data exchanged over air-gapped defense and intelligence networks can now run on and through Google Cloud.

"This authorization comes at a crucial time, as the digital landscape is becoming increasingly complex, and the need for robust security measures is growing more urgent," Leigh Palmer, vice president of technology, delivery and operations for Google Public Sector said in a May 28 blog post. "Google Public Sector is now able to provide DOD customers with a secure, compliant, and cutting-edge cloud environment at IL6, enabling them to leverage the full power of GDC for their most sensitive Secret classified data and applications."

If Google Public Sector's growing number of government and defense customers is any indication, Dahut's efforts have been successful. Since 2022, Google has added each military branch and more than two dozen large federal agencies as customers, according to data from GovTribe, and it has snagged awards to compete with other cloud providers for task orders on two major multibillion dollar contracts: the intelligence community's C2E and the Pentagon's Joint Warfighter Cloud Capability contract.

Task orders on those vehicles are rarely made public, but contracting documents indicate Google Public Sector was awarded the U.S. Navy's ONENET contract in October to "provide highly specialized cloud services" for the U.S. Indo-Pacific Command. Google Public Sector does not publicly disclose revenue figures, but Google Cloud and its public sector cloud business have both experienced year-over-year revenue growth since 2022, with Google Cloud capturing $12.3 billion across all its business in the first quarter of 2025. https://www.nextgov.com/acquisition/2025/06/google-all-government-business/405769/

### TWELVE FEDERAL JUDGES CONFIRM INFRINGEMENT OCCURS WHEN THERE'S A MOBILE DEVICE INTERCONNECTED TO A CBRNE-H DETECTION CAPABILITY

**The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 22-1267; determined Direct Infringement by or for the Government, arises when there's a combined ATAK Software; CBRN Plugins; CPU; and Smartphone**

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court ***again*** concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" … "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features … Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors allegedly infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent.

**The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* that Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; CPU; and Smartphone**

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: …

"Samsung argued that Mr. Golden's complaint stated no alleged facts that went beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality. On that basis, Samsung said, there are no plausible allegations Samsung was engaged in directly infringing activities.

**The Northern District of California Court Judge Haywood S. Gilliam, Jr. in Case No. 22-5246; determined Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; CPU; and Smartphone**

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss with Leave to Amend" Document 41 Filed 08/10/23; the then presiding Judge Haywood S. Gilliam, Jr. agreed with the Defendant that the Google Pixel devices only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

**The Northern District of California Court Judge Rita F. Lin in Case No. 22-5246; determined Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; CPU, and Smartphone**

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68 Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

**The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 24-2024; determined Infringement occurs when there's a Mobile, Consumer, or Cellular device Integrated with, or Interconnected to a CBRNE Detection Capability.**

In the most recent case of *Golden v. Google LLC*., Case No. 24-2024, Dkt. 41; filed 06/25/2025, three Federal Circuit judges again confirm, infringement of Plaintiff's patented CMDC device occurs when a mobile, consumer, or cellular device, is integrated with, or interconnected to a CBRNE detection capability. The Circuit's opinion includes the following:

"We conclude that the district court did not err in finding that Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at \*1;

"Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at \*1; see also *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding no infringement when the accused products "do not infringe without modification—the modification of installing the required software."). Mr. Golden's first theory of infringement requires the ***use of the third-party app*** "ATAK-CIV" for at least two limitations of each asserted claim. App'x 300–302 ¶¶ 56 63; see also App'x 400–407. Mr. Golden's second theory of infringement requires the use of "***NFC tags***," which are external to Google products. App'x 307 ("NFC-enabled smartphones communicate with NFC tags."); see also App'x 408–415. Mr. Golden's third theory of infringement requires using "Google's camera lens with [a] microfluidic lens" that "***uses [a] microscope*** to focus on a chemical sensor." App'x 420–422 (emphasis added); see also App'x 416 423. Mr.

Golden's fourth theory of infringement requires **external sensors** that the complaint alleges must be added on to Google's device. App'x 308; see also App'x 424–431. Mr. Golden's fifth theory of infringement requires "Google Beacon," *a separate device*. App'x 308; see also App'x 432 439. Therefore, each of Mr. Golden's direct infringement theories solely against Google fails because Mr. Golden's infringement allegations require modification of the accused products to show infringement."

### GOOGLE IS THE "MASTERMIND"

The Northern District of California Court construed Golden's apparatus claims away from the components of what forms the Google device [apparatus], to defining a specific *method* process or series of steps to achieve a particular result.

In the "OPINION" of the Federal Circuit in *Golden v. Google LLC* CAFC Case: 24-2024 Document: 41 Page: 6 Filed: 06/25/2025, Golden's five infringement theories all require "installing the required software".

> "We conclude that the district court did not err in finding that Mr. Golden's five infringement "theories all require that the accused products be **modified** in some way for them to infringe on the patents-in-suit." Decision at *1; see also *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding no infringement when the accused products "do not infringe without **modification**—the **modification** of installing the required software.")." …
>
> "Therefore, each of Mr. Golden's direct infringement theories solely against Google fails because Mr. Golden's infringement allegations require **modification** of the accused products to show infringement." *Golden v. Google LLC* CAFC Case: 24-2024 Document: 41 Page: 6 Filed: 06/25/2025

The term **modification** typically refers to changes made to something, which does not directly apply to the act of downloading an app. Downloading a mobile app is a process.

The Doctrine of Joint Infringement is an exception to the general rule that direct infringement only occurs if one actor performs all the steps of a method claim. The doctrine permits a patentee to attribute the actions of others to the alleged direct infringer so long as those other actors are working under the "direction or control" of the alleged infringer – The doctrine is designed to prevent an accused infringer from escaping liability by having someone else perform one or more of the required steps – Where parties are merely cooperating at arm's length

As the Federal Circuit noted in *Muniauction*: – "…where the actions of multiple parties combine to perform every step of a claimed method, the claim is directly infringed only if one party exercises 'control or direction' over the entire process such that every step is attributable to

17

the controlling party, i.e., the ***mastermind***.'" *Muniauction, Inc. v. Thomson Corp.* 532 F.3d 1318, 1329 (Fed. Cir. 2008) (emphasis added)

Golden alleges Google is the "mastermind" exercising 'control or direction' over the entire process of allegedly, jointly infringing Golden's central processing units (CPUs).

### GOOGLE ANDROID ECOSYSTEM

Google has inadvertently litigated itself into a situation of greater liability. Before, Google's liability was limited, but now because Google is the "mastermind" to an entire process that includes hundreds of "actors" performing one or more of the required steps, Google's potential liability has increased tremendously. Google's potential liability is an extension from all the Actors in Google's Android Ecosystem performing a required step.

The ecosystem of Android refers to the interconnected elements that form the Android platform, creating a rich environment for developers, users, manufacturers, and other stakeholders. This ecosystem encompasses hardware, software, developers, users, and various services that together contribute to the functioning and growth of the Android platform. These elements depend on each other to provide a seamless and integrated experience for users.



Android's open nature allows for seamless integration with a wide range of devices and services. From smartwatches to cars, Android supports cross-device connectivity and synchronization. Services like Google Assistant offer a unified experience across devices, leveraging machine learning to provide help and personalized interactions.

Android is a universal operating system as it is running on a wide range of devices including from cheaper ones to premium gadgets. Such devices differ in both hardware and screens – they range from low-cost, feature-packed feature phones to high-end, protective tablets and smartphones.

The beating heart of the Android ecosystem lies within the Android Operating System (OS). This powerful and intuitive platform is tailored for touchscreen devices like smartphones and tablets, offering a wide range of functional intricate computational tasks, with its user-friendly and seamless navigation. The Android OS empowers users to personalize their experience to match their unique preference.



As of 2023, there are approximately 3 billion active users of the Android operating system.
- Android share of the global smartphone market, estimated at around 70-75%.
- It is the most widely used mobile operating system worldwide.

## GOOGLE'S SELF-DRIVING VEHICLES

Waymo LLC, formerly known as the Google Self-Driving Car Project, is an American autonomous driving technology company headquartered in Mountain View, California. It is a subsidiary of Alphabet Inc., Google's parent company.

The company traces its origins to the Stanford Racing Team, which competed in the 2005 and 2007 Defense Advanced Research Projects Agency (DARPA) Grand Challenges.[2] Google's development of self-driving technology began in January 2009,[3][4] led by Sebastian Thrun, the former director of the Stanford Artificial Intelligence Laboratory (SAIL), and Anthony Levandowski, founder of 510 Systems and Anthony's Robots.[5][6] After almost two years of road testing, the project was revealed in October 2010.[7][8][9]

In fall 2015, Google provided "the world's first fully driverless ride on public roads ". [10] In December 2016, the project was renamed Waymo and spun out of Google as part of Alphabet.[11]

In October 2020, Waymo became the first company to offer service to the public without safety drivers in the vehicle.[12][13][14][15] Waymo, as of 2025, operates commercial robotaxi services in Phoenix (Arizona), San Francisco (California), Silicon Valley (California),[16] Los Angeles (California),[17] Atlanta (Georgia), Miami (Florida),[18] and Austin (Texas)[19] with new services planned in New York,[20] Washington, D.C., and Tokyo, Japan.

City mapping in preparation for new services, as of July 2025, is taking place in various cities in the United States including, Boston, Nashville, New Orleans, Dallas, Las Vegas, Philadelphia,[21] and San Diego, with pre-mapping preliminary work now in progress in Orlando, Houston, San Antonio.[22][23] As of April 2025, it offers over 250,000 paid rides per week, totaling over 1 million miles monthly.[16][24]

Waymo is run by co-CEOs Tekedra Mawakana and Dmitri Dolgov.[25] The company raised US$5.5 billion in multiple outside funding rounds[26] by 2022 and raised $5.6 billion funding in 2024.[27] Waymo has or had partnerships with multiple vehicle manufacturers, including Stellantis,[28] Mercedes-Benz Group AG,[29] Jaguar Land Rover,[30] and Volvo Cars.[31] (References are listed at the end of this complaint)

### Vehicular Automation

Vehicular automation is using technology to assist or replace the operator of a vehicle such as a car, truck, aircraft, rocket, military vehicle, or boat. Assisted vehicles

are semi-autonomous, whereas vehicles that can travel without a human operator are autonomous. The degree of autonomy may be subject to various constraints such as conditions. Autonomy is enabled by advanced driver-assistance systems (ADAS) of varying capacity.

Related technology includes advanced software, maps, vehicle changes, and outside vehicle support.

Autonomy presents varying issues for road, air, and marine travel. Roads present the most significant complexity given the unpredictability of the driving environment, including diverse road designs, driving conditions, traffic, obstacles, and geographical/cultural differences.

Autonomy implies that the vehicle is responsible for all perception, monitoring, and control functions.

**Advanced Driver-Assistance Systems (ADAS)**

ADAS are technologies that assist drivers with the safe operation of a vehicle. ADAS may provide adaptive cruise control, assist in avoiding collisions, alert drivers to possible obstacles, warn of lane departure, assist in lane centering, incorporate satellite navigation, provide traffic warnings, provide navigational assistance through smartphones, automate lighting, or provide other features. Highway computers would manage the traffic and direct the cars to avoid crashes.

**Software**

Autonomous vehicle software generally contains several different modules that work together to enable self-driving capabilities. The perception module ingests and processes data from various sensors, such cameras, LIDAR, RADAR, and ultrasonic SONAR, to create a comprehensive understanding of the vehicle's surroundings. The localization module uses 3D point cloud data, GPS, IMU, and mapping information to determine the vehicle's precise position, including its orientation, velocity, and angular rate. The planning module takes inputs from both perception and localization to compute actions to take, such as velocity and steering angle outputs. These modules are typically supported by machine learning algorithms, particularly deep neural networks, which enable the vehicle to detect objects, interpret traffic patterns, and make real-time decisions. Furthermore, modern autonomous driving systems increasingly employ sensor fusion techniques that combine data from multiple sensors to improve accuracy and reliability in different environmental conditions.

**Perception**

The perception system is responsible for observing the environment. It must identify everything that could affect the trip, including other vehicles, pedestrians, cyclists, their movements, road conditions, obstacles, and other issues. Various makers use cameras, radar, lidar, sonar, and microphones that can collaboratively minimize errors.

**Navigation**

Navigation systems are a necessary element in autonomous vehicles. The Global Positioning System (GPS) is used for navigation by air, water, and land vehicles, particularly for off-road navigation.

For road vehicles, two approaches are prominent. One is to use maps that hold data about lanes and intersections, relying on the vehicle's perception system to fill in the details. The other is to use highly detailed maps that reduce the scope of real-time decision-making but require significant maintenance as the environment evolves. Some systems crowdsource their map updates, using the vehicles themselves to update the map to reflect changes such as construction or traffic used by the entire vehicle fleet.

Another potential source of information is the environment itself. Traffic data may be supplied by roadside monitoring systems and used to route vehicles to best use a limited road system. Additionally, modern GNSS enhancement technologies, such as real-time kinematic (RTK) and precise point positioning (PPP), enhance the accuracy of vehicle positioning to sub-meter level precision, which is crucial for autonomous navigation and decision-making.

**Applications for Google's Self-Drive Vehicles include the following:**

- Vehicle tracking system
- Rear-view alarm, to detect obstacles behind.
- Anti-lock braking system (ABS)
- Emergency Braking Assistance (EBA)
- Electronic brake force distribution (EBD)
- Traction control system (TCS)
- Four-wheel drive (AWD)

- Electronic Stability Control (ESC)
- Acceleration Slip Regulation (ASR)
- Electronic differential lock (EDL)
- Dynamic steering response (DSR)

These applications use various sensors to intervene when the car senses a possible loss of control. The car's control unit can reduce power from the engine and even apply the brakes on individual wheels to prevent the car from understeering or oversteering. Corrects the rate of power steering system to adapt it to vehicles speed and road conditions.

**Google's Self-Drive Vehicles; additional features include:** [1]

- Adaptive cruise control
- Lane departure warning system
- Assured Clear Distance Ahead
- Adaptive headlamps
- Advanced Automatic Collision Notification
- Intelligent Parking Assist System
- Automatic Parking
- Automotive night vision with pedestrian detection
- Blind spot monitoring
- Driver Monitoring System
- Precrash system
- Safe speed governing
- Traffic sign recognition
- Enhanced or Adaptive cruise control
- Distance control assist
- Automatic emergency braking systems

---

[1]  Plaintiff names the Google Self-Drive Vehicle as the alleged infringing product instead of listing the individual elements that enables the vehicle to function autonomously or semi-autonomously. Plaintiff will provide enough factual evidence to show Google's Self-Drive Vehicle can function without the inclusion of Plaintiff's stall, stop, or vehicle slow-down system.

## COUNT I:

## U.S. Patent No: 10,163,287

**1.**    Count I incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Google, LLC directs or control other actors' performance [namely direct or control other actors' "modification"] of Plaintiff's patented central processing units (CPUs); resulting in Google and the other actors are allegedly "jointly infringing" at least independent claims 4, 5, and 6 of Plaintiff's 10,163,287 ('287) patent.

**2.**    Upon information and belief, Plaintiff's patented central processing units (CPUs); claimed in independent claims 4, 5, and 6 of Plaintiff's 10,163,287 ('287) patent, has allegedly been "construed" by three district court judges and nine appellate court judges, away from that of a patented apparatus to that of a patented method; meaning the alleged infringing Google Tensor CPU Series G1, G2, G3, G4, and G5 must be "modified" by the other actors [third-parties] before the Google Tensor CPU Series G1, G2, G3, G4, and G5 can function as a central processing unit (CPU). This method describes the alleged "joint infringement" of Plaintiff's '287 patent asserted in this case.

**3.**    Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if it "directs or controls" another's action. Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claims 4, 5, and 6 of Plaintiff's 10,163,287 ('287) patent, asserted in the case because Google "directs or control" the actions of the other actors.

**4.**    Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if it "forms a joint enterprise" with the United States Government. Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claims 4, 5, and 6 of Plaintiff's 10,163,287 ('287) patent asserted in this case because Google has allegedly formed a "joint enterprise" with the United States Government.

**5.**    Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if it "conditions

participation" with the Google Android Open-Source Operating System source code and platform. Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claims 4, 5, and 6 of Plaintiff's 10,163,287 ('287) patent asserted in this case because Google has allegedly "conditioned participation" with the Google Android Open-Source Operating System source code and platform.

**6.**     Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if Google "is in receipt of a benefit on performance of the patented method". Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claims 4, 5, and 6 of Plaintiff's 10,163,287 ('287) patent asserted in this case because Google has allegedly "received a benefit on performance of the patented method.

**7.**     Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if Google "controls the manner and timing of the performance". Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claims 4, 5, and 6 of Plaintiff's 10,163,287 ('287) patent asserted in this case because Google has allegedly "control the manner and timing of the performance".

**8.**     Golden realleges; incorporates herein the allegations set forth in Paragraphs 1-7. On information and belief Google is jointly infringing independent claims 4, 5, and 6 of Plaintiff's 10,163,287 ('287) patent. The alleged infringing products are: Google Tensor CPU Series G1, G2, G3, G4, and G5.

**9.**     As set forth in Golden's infringement contentions that Google is making, using, offering for sale, selling and/or importing the alleged infringing Google Tensor CPU Series G1, G2, G3, G4, and G5; have at a minimum, jointly infringed the '287 patent, and Google is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Plaintiff, which infringement and damage will continue unless and until Google is enjoined.

**10.**     The alleged infringement of Google identified in this Count has caused irreparable injury to Plaintiff for which remedies at law are inadequate. Considering the balance of the hardships

between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

11.     Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

**COUNT II:**

**U.S. Patent No: 10,984,619**

12.     Count II incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Google, LLC directs or control other actors' performance [namely direct or control other actors' "modification"] of Plaintiff's patented central processing units (CPUs); resulting in Google and the other actors are allegedly "jointly infringing" at least independent claims 1 & 11, and dependent claims 2-10 & 12-20 of Plaintiff's 10,984,619 ('619) patent.

13.     Upon information and belief, Plaintiff's patented central processing units (CPUs); claimed in independent claims 1 & 11, and dependent claims 2-10 & 12-20 of Plaintiff's 10,984,619 ('619) patent, has allegedly been "construed" by three district court judges and nine appellate court judges, away from that of a patented apparatus to that of a patented method; meaning the alleged infringing Google Tensor CPU Series G1, G2, G3, G4, and G5 must be "modified" by the other actors [third-parties] before the Google Tensor CPU Series G1, G2, G3, G4, and G5 can function as a central processing unit (CPU). This method describes the alleged "joint infringement" of Plaintiff's '619 patent asserted in this case.

14.     Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if it "directs or controls" another's action. Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claims 1 & 11, and dependent claims 2-10 & 12-20 of Plaintiff's 10,984,619 ('619) patent, asserted in the case because Google "directs or control" the actions of the other actors.

**15.**     Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if it "forms a joint enterprise" with the United States Government. Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claims 1 & 11, and dependent claims 2-10 & 12-20 of Plaintiff's 10,984,619 ('619) patent asserted in this case because Google has allegedly formed a "joint enterprise" with the United States Government.

**16.**     Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if it "conditions participation" with the Google Android Open-Source Operating System source code and platform. Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claims 1 & 11, and dependent claims 2-10 & 12-20 of Plaintiff's 10,984,619 ('619) patent asserted in this case because Google has allegedly "conditioned participation" with the Google Android Open-Source Operating System source code and platform.

**17.**     Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if Google "is in receipt of a benefit on performance of the patented method". Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claims 1 & 11, and dependent claims 2-10 & 12-20 of Plaintiff's 10,984,619 ('619) patent asserted in this case because Google has allegedly "received a benefit on performance of the patented method.

**18.**     Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if Google "controls the manner and timing of the performance". Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claims 1 & 11, and dependent claims 2-10 & 12-20 of Plaintiff's 10,984,619 ('619) patent asserted in this case because Google has allegedly "control the manner and timing of the performance".

**19.**     Golden realleges; incorporates herein the allegations set forth in Paragraphs 12-18. On information and belief Google is jointly infringing independent claims 1 & 11, and dependent

27

claims 2-10 & 12-20 of Plaintiff's 10,984,619 ('619) patent. The alleged infringing products are: Google Tensor CPU Series G1, G2, G3, G4, and G5.

**20.**    As set forth in Golden's infringement contentions that Google is making, using, offering for sale, selling and/or importing the alleged infringing Google Tensor CPU Series G1, G2, G3, G4, and G5; have at a minimum, jointly infringed the '619 patent, and Google is thereby liable for infringement of the '619 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Plaintiff, which infringement and damage will continue unless and until Google is enjoined.

**21.**    The alleged infringement of Google identified in this Count has caused irreparable injury to Plaintiff for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

**22.**    Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

**COUNT III:**

**U.S. Patent No: 11,645,898**

**23.**    Count III incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Google, LLC directs or control other actors' performance [namely direct or control other actors' "modification"] of Plaintiff's patented central processing units (CPUs); resulting in Google and the other actors are allegedly "jointly infringing" at least independent claim 1, of Plaintiff's 11,645,898 ('898) patent.

**24.**    Upon information and belief, Plaintiff's patented central processing units (CPUs); claimed in independent claim 1, of Plaintiff's 11,645,898 ('898) patent, has allegedly been "construed" by three district court judges and nine appellate court judges, away from that of a patented apparatus to that of a patented method; meaning the alleged infringing Google Tensor Processing Unit (TPU) Series TPUv1, TPUv2, TPUv3, TPUv4, TPUv5, TPUv6, TPUv7, and Edge TPU, must be "modified" by the other actors [third-parties] before the Google Tensor

Processing Unit (TPU) Series TPUv1, TPUv2, TPUv3, TPUv4, TPUv5, TPUv6, TPUv7, and Edge TPU, can function as a central processing unit (CPU). This method describes the alleged "joint infringement" of Plaintiff's '898 patent asserted in this case.

**25.**     Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if it "directs or controls" another's action. Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claim 1, of Plaintiff's 11,645,898 ('898) patent, asserted in the case because Google "directs or control" the actions of the other actors.

**26.**     Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if it "forms a joint enterprise" with the United States Government. Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claim 1, of Plaintiff's 11,645,898 ('898) patent asserted in this case because Google has allegedly formed a "joint enterprise" with the United States Government.

**27.**     Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if it "conditions participation" with the Google Android Open-Source Operating System source code and platform. Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claim 1, of Plaintiff's 11,645,898 ('898) patent asserted in this case because Google has allegedly "conditioned participation" with the Google Android Open-Source Operating System source code and platform.

**28.**     Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if Google "is in receipt of a benefit on performance of the patented method". Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claim 1, of Plaintiff's 11,645,898 ('898) patent asserted in this case because Google has allegedly "received a benefit on performance of the patented method.

**29.**     Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if Google "controls the manner and timing of the performance". Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claim 1, of Plaintiff's 11,645,898 ('898) patent asserted in this case because Google has allegedly "control the manner and timing of the performance".

**30.**     Golden realleges; incorporates herein the allegations set forth in Paragraphs 23-29. On information and belief Google is jointly infringing independent claim 1, of Plaintiff's 11,645,898 ('898) patent. The alleged infringing products are: Google Tensor Processing Unit (TPU) Series TPUv1, TPUv2, TPUv3, TPUv4, TPUv5, TPUv6, TPUv7, and Edge TPU.

**31.**     As set forth in Golden's infringement contentions that Google is making, using, offering for sale, selling and/or importing the alleged infringing Google Tensor Processing Unit (TPU) Series TPUv1, TPUv2, TPUv3, TPUv4, TPUv5, TPUv6, TPUv7, and Edge TPU, have at a minimum, jointly infringed the '898 patent, and Google is thereby liable for infringement of the '898 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Plaintiff, which infringement and damage will continue unless and until Google is enjoined.

**32.**     The alleged infringement of Google identified in this Count has caused irreparable injury to Plaintiff for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

**33.**     Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

**34.**     Plaintiff allege certain limitations of Google's TPU: performs the same function; in substantially the same way; to achieve the same results. [doctrine of equivalents]. Both, Plaintiff's central processing unit (CPU), and Google's Tensor Processing Unit (TPU); are processors.

## COUNT IV:

## U.S. Patent No: 8,334,761

**35.**     Count IV incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Google, LLC is "directly infringing" at least independent claim 1, of Plaintiff's 8,334,761 ('761) patent.

**36.**     The '761 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '761 patent issued from U.S. Patent Application No. 12/802,001.

**37.**     Google has and continues to directly infringe at least independent claim 1, of Plaintiff's 8,334,761 ('761) patent in this judicial district and elsewhere in the United States, including, among other things, making, having made, using, offering for sale, selling, and/or importing Google's Self-Drive Vehicles that incorporates Google's Advanced Driver Assistance Systems (ADAS), and incorporates the fundamental technologies covered by the '761 patent. These products are referred to as the "'761 Accused Products." Examples of the '761 Accused Products include, but are not limited to, the Google Self-Drive Vehicles that incorporates Google's Advanced Driver Assistance Systems (ADAS).

**38.**     During discovery and development of Plaintiff's infringement contentions, Plaintiff may provide additional theories under which Google infringes the '761 patent besides the example provided above, including for the same product and using the same components identified above, and nothing in the example above is meant to limit the infringement allegations of Plaintiff or limit the interpretations of the claims or their terms.

**39.**     At a minimum, Google has known that the '761 Accused Products infringe the '761 patent at least as early as the service date 10/05/2022 in *Golden v. Google LLC* NDC Case No. 22-5246. During that litigation, Plaintiff repeatedly and explicitly set forth Google's infringement of the '761 patent via its Tensor CPU and TPU Series. Despite that clear evidence of infringement, Google has refused to take a license to the '761 patent and continues to willfully infringe the '761 patent. Additionally, Google continued to release new products and did so despite its knowledge that such devices would infringe the '761 patent and without taking a license to the '761 patent. Google has made a business decision to ignore the patent rights of Plaintiff despite its knowing infringement of the '761 patent, presumably relying on the significant advantage in resources that Google holds over Plaintiff.

**40.**     Thus, despite having knowledge of the '761 patent and knowledge that it is directly infringing independent claim 1, of Plaintiff's 8,334,761 ('761) patent, Google has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Google's infringing activities relative to the '761 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

**41.**     Plaintiff has been damaged as a result of Google's infringing conduct described in this Count. Google is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff's for Google's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT V:**

**U.S. Patent No: RE43,891**

**42.**     Count V incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Google, LLC is "directly infringing" at least independent claims 11 and 44, and dependent claims 47, 48, 49, 50, 51, & 53 of Plaintiff's RE43,891 ('891) patent.

**43.**     The '891 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '891 patent issued from U.S. Patent Application No. 13/065,837.

**44.**     Google has and continues to directly infringe at least independent claims 11 and 44, and dependent claims 47, 48, 49, 50, 51, & 53 of Plaintiff's RE43,891 ('891) patent in this judicial district and elsewhere in the United States, including, among other things, making, having made, using, offering for sale, selling, and/or importing Google's Self-Drive Vehicles that incorporates Google's Advanced Driver Assistance Systems (ADAS), and incorporates the fundamental technologies covered by the '891 patent. These products are referred to as the "'891 Accused Products." Examples of the '891 Accused Products include, but are not limited to, the Google Self-Drive Vehicles that incorporates Google's Advanced Driver Assistance Systems (ADAS).

**45.**     During discovery and development of Plaintiff's infringement contentions, Plaintiff may provide additional theories under which Google infringes the '891 patent besides the example

provided above, including for the same product and using the same components identified above, and nothing in the example above is meant to limit the infringement allegations of Plaintiff or limit the interpretations of the claims or their terms.

46.    At a minimum, Google has known that the '891 Accused Products infringe the '891 patent at least as early as the service date 10/05/2022 in *Golden v. Google LLC* NDC Case No. 22-5246. During that litigation, Plaintiff repeatedly and explicitly set forth Google's infringement of the '891 patent via its Tensor CPU and TPU Series. Despite that clear evidence of infringement, Google has refused to take a license to the '891 patent and continues to willfully infringe the '891 patent. Additionally, Google continued to release new products and did so despite its knowledge that such devices would infringe the '891 patent and without taking a license to the '891 patent. Google has made a business decision to ignore the patent rights of Plaintiff despite its knowing infringement of the '891 patent, presumably relying on the significant advantage in resources that Google holds over Plaintiff.

47.    Thus, despite having knowledge of the '891 patent and knowledge that it is directly infringing independent claims 11 and 44, and dependent claims 47, 48, 49, 50, 51, & 53 of Plaintiff's RE43,891 ('891) patent, Google has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Google's infringing activities relative to the '891 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

48.    Plaintiff has been damaged as a result of Google's infringing conduct described in this Count. Google is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff's for Google's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT VI:
## U.S. Patent No: 11,645,898

49.    Count VI incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Google, LLC is "directly infringing" at least independent claim 1, of Plaintiff's 11,645,898 ('898) patent.

**50.**     The '898 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '898 patent issued from U.S. Patent Application No. 17/300,230.

**51.**     Google has and continues to directly infringe at least independent claim 1, of Plaintiff's 11,645,898 ('898) patent in this judicial district and elsewhere in the United States, including, among other things, making, having made, using, offering for sale, selling, and/or importing Google's Self-Drive Vehicles that incorporates Google's Advanced Driver Assistance Systems (ADAS), and incorporates the fundamental technologies covered by the '898 patent. These products are referred to as the "'898 Accused Products." Examples of the '898 Accused Products include, but are not limited to, the Google Self-Drive Vehicles that incorporates Google's Advanced Driver Assistance Systems (ADAS).

**52.**     During discovery and development of Plaintiff's infringement contentions, Plaintiff may provide additional theories under which Google infringes the '898 patent besides the example provided above, including for the same product and using the same components identified above, and nothing in the example above is meant to limit the infringement allegations of Plaintiff or limit the interpretations of the claims or their terms.

**53.**     At a minimum, Google has known that the '898 Accused Products infringe the '898 patent at least as early as the service date 10/05/2022 in *Golden v. Google LLC* NDC Case No. 22-5246. During that litigation, Plaintiff repeatedly and explicitly set forth Google's infringement of the '898 patent via its Tensor CPU and TPU Series. Despite that clear evidence of infringement, Google has refused to take a license to the '898 patent and continues to willfully infringe the '898 patent. Additionally, Google continued to release new products and did so despite its knowledge that such devices would infringe the '898 patent and without taking a license to the '898 patent. Google has made a business decision to ignore the patent rights of Plaintiff despite its knowing infringement of the '898 patent, presumably relying on the significant advantage in resources that Google holds over Plaintiff.

**54.**     Thus, despite having knowledge of the '898 patent and knowledge that it is directly infringing independent claim 1, of Plaintiff's 11,645,898 ('898) patent, Google has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Google's infringing activities relative to the '898 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a

pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

**55.**    Plaintiff has been damaged as a result of Google's infringing conduct described in this Count. Google is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff's for Google's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## EXHIBITS OF CLAIM CHARTS AND PATENTS

**Exhibit A** is element-by-element claim charts of Plaintiff's alleged "joint" infringement and/or infringement under the doctrine of equivalents claims.

**Exhibit B** is element-by-element claim charts of Plaintiff's alleged "literal" infringement and/or infringement under the doctrine of equivalents claims.

**Exhibits C - G** are copies of Plaintiff's United States Patent Nos. asserted in this: 11,645,898 ('898 Patent); 10,984,619 ('619 Patent); and 10,163,287 ('287 Patent), for alleged "joint infringement"; and 11,645,898 ('898 Patent); US43,891 ('891 Patent), and 8,334,761 ('761 Patent) for alleged "direct infringement"

**Exhibit H**. Joint Infringement: 1- Google's direction and control; 2- Formation of joint enterprises; and 3- contractual arrangements

**Exhibit I**. "Fact Issues for a Jury": *Process v. Modification*

## PRAYER FOR RELIEF

Wherefore, Golden respectfully requests that this Court enter:

A.    A judgment in favor of Golden that the defendant has infringed claims of the '898 Patent, '619 Patent, the '287 Patent, the '891 Patent, and the '761 Patent as aforesaid;

B.    A permanent injunction enjoining the defendant, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, and all others acting in active concert or privity therewith from joint and/or direct infringement of the '898, '619, '287, '891, and '761 patents as aforesaid pursuant to 35 U.S.C. § 283;

C.    A judgment and order requiring the defendant to pay Golden its damages with pre- and post-judgment interest thereon pursuant to 35 U.S.C. § 284;

D.    As set forth in Golden's preliminary infringement contentions that the Defendant in this case is making, using, offering for sale, selling and/or importing the aforementioned alleged infringing devices that have at a minimum, jointly and directly infringed the '898, '619, '287, '891, and '761 patents. The Defendant is thereby liable for infringement of the '898, '619, '287, '891, and '761 patents pursuant to 35 U.S.C. § 271. The Defendant has caused damage to Golden, which infringement and damage will continue unless and until the Defendant is enjoined.

E.    Any and all further relief to which the Court may deem Golden entitled.

## DEMAND FOR JURY TRIAL

Golden requests a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P. 38. A right guaranteed under the Seventh Amendment of the Constitution.

Sincerely,

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

## References [page 20]

1.      *Chow, Andrew R. (June 26, 2025). "Waymo's Self-Driving Future Is Here". Time. Retrieved August 13, 2025.*

2.      *"How a robot lover pioneered the driverless car, and why he's selling his latest to Uber". The Guardian. August 19, 2016. Retrieved July 1, 2020.*

3.      *"Google's self-driving-car project becomes a separate company: Waymo". Associated Press. December 13, 2016. Retrieved June 13, 2018.*

4.      *Krafcik, John (January 17, 2019). "Our #tenyearchallenge has been building the world's most experienced driver. Thanks to two visionary @Google characters for getting us started & to the @Waymo One riders in #Phoenix we're serving. HBD #Waymo pic.twitter.com/Ew4fdXjM7c". John Krafcik's official Twitter account. Archived from the original on January 23, 2019. Retrieved January 17, 2019.*

5.      *"The Unknown Start-up That Built Google's First Self-Driving Car". IEEE Spectrum: Technology, Engineering, and Science News. November 19, 2014. Retrieved July 1, 2020. Though Google has portrayed Thrun as its "godfather" of self-driving, a review of the available evidence suggests that the motivating force behind the company's program was actually Levandowski*

6.      *"God Is a Bot, and Anthony Levandowski Is His Messenger | Backchannel". Wired. ISSN 1059-1028. Retrieved July 1, 2020.*

7.      *John Markoff (October 9, 2010). "Google Cars Drive Themselves, in Traffic". The New York Times. Retrieved October 11, 2010.*

8.      *Sebastian Thrun (October 9, 2010). "What we're driving at". The Official Google Blog. Retrieved October 11, 2010.*

9.      *"Anthony Levandowski pleads guilty to one count of trade secrets theft under plea deal". TechCrunch. March 20, 2020. Archived from the original on March 20, 2020. Retrieved June 30, 2020.*

10.     *Team, Waymo (December 13, 2016). "On the road with self-driving car user number one". Medium.*

11.     *"Journey". Waymo.*

12.     *"Waymo launches its first commercial self-driving car service". Engadget. Retrieved December 5, 2018.*

13.     White, Joseph (October 8, 2020). *"Waymo opens driverless robo-taxi service to the public in Phoenix"*. *Reuters*. Retrieved October 20, 2020.

14.     *"Waymo Relaunches Driverless Ride Sharing"*. *All About Arizona News*. October 12, 2020. Retrieved October 18, 2020.

15.     Hawkins, Andrew J. (December 9, 2019). *"Waymo's driverless car: ghost-riding in the back seat of a robot taxi"*. *The Verge*.

16.     Love, Julia (March 17, 2025). *"Alphabet's Waymo to Offer Self-Driving Rides in Silicon Valley"*. *Bloomberg*. Retrieved March 13, 2025.

17.     Knoll, Corina (March 20, 2024). *"When Nobody Is Behind the Wheel in Car-Obsessed Los Angeles"*. *The New York Times*. Retrieved July 23, 2024.

18.     *"WAYMO IN MIAMI: EVERYTHING YOU NEED TO KNOW ABOUT SELF-DRIVING CARS IN THE MAGIC CITY"*. *The Elser Hotel*. April 3, 2025. Archived from *the original* on April 24, 2025. Retrieved April 24, 2025.

19.     Muller, Joann (March 4, 2025). *"Waymo autonomous vehicles launch on Uber network in Austin"*. *Axios*.

20.     Elias, Jennifer (June 18, 2025). *"Waymo cars are coming to New York, but with a driver behind the wheel"*. *CNBC*. Archived from *the original* on June 18, 2025. Retrieved June 18, 2025.

21.     Elias, Jennifer (July 7, 2025). *"Waymo to begin testing in Philadelphia with safety drivers behind the wheel"*. *CNBC*. Retrieved July 8, 2025.

22.     *"Uber Opens Up Its Waymo Robotaxi Waitlist in Atlanta"*. *CNET*.

23.     Cohen, Ben (May 30, 2025). *"It's Waymo's World. We're All Just Riding in It"*. *Wall Street Journal*. Archived from *the original* on May 31, 2025. Retrieved May 31, 2025.

24.     Korosec, Kirsten (February 27, 2025). *"Waymo has doubled its weekly robotaxi rides in less than a year"*. *TechCrunch*. Retrieved March 14, 2025.

25.     *"Waymo CEO John Krafcik steps aside as co-CEO's take over"*. *CNBC*. April 2, 2021. Retrieved April 2, 2021.

26.     Fannin, Rebecca (May 21, 2022). *"Where the billions spent on autonomous vehicles by U.S. and Chinese giants is heading"*. *CNBC*. Retrieved May 22, 2022.

27.     Kolodny, Lora (October 25, 2024). *"Alphabet's self-driving unit Waymo closes $5.6 billion funding round as robotaxi race heats up in the U.S."* *CNBC*. Retrieved October 30, 2024.

28.     *Andrew J. Hawkins (November 7, 2017). "Waymo is first to put fully self-driving cars on US roads without a safety driver". The Verge. Retrieved June 13, 2018.*

29.     Daimler Trucks partners with Waymo to build self-driving semi trucks, TechCrunch, October 27, 2020

30.     *Bergen, Mark; Naughton, Keith (April 2, 2018). "Waymo isn't going to slow down now". Bloomberg L.P. Retrieved June 12, 2018.*

31.     *Silver, David. "Waymo And Volvo Form Exclusive Self-Driving Partnership". Forbes. Retrieved July 1, 2020.*

32.     *Higgins, Jack Nicas and Tim (May 23, 2017). "Google vs. Uber: How One Engineer Sparked a War". The Wall Street Journal. ISSN 0099-9660. Retrieved July 1, 2020.*

U.S. POSTAGE PAID
PME
GREENVILLE, SC 29616
SEP 16, 2025

*Retail*

76701    $69.00

RDC 07    S2324K504191-13



**UNITED STATES POSTAL SERVICE®**

**PRIORITY MAIL EXPRESS®**

EI 935 866 617 US

**CUSTOMER USE ONLY**

FROM: (PLEASE PRINT)    PHONE 864) 288-5605

Larry Golden
740 Woodruff Rd.
#1102
Greenville, SC 29607

**RECEIVED**
SEP 18 2025

**PAYMENT BY ACCOUNT (if applicable)**
Federal Agency Acct. No. or Postal Service™ Acct. No.

**ORIGIN (POSTAL SERVICE USE ONLY)**

☐ 1-Day    ☑ 2-Day    ☐ Military    ☐ DPO

PO ZIP Code    Scheduled Delivery Date (MM/DD/YY)    Postage
29615    9-19-25    $

Date Accepted (MM/DD/YY)    Scheduled Delivery Time    Insurance Fee    COD Fee
9-16-25    ☐ 6:00 PM    $    $

Time Accepted    ☐ AM ☑ PM    Return Receipt Fee    Live Animal Transportation Fee
10:47    $    $

**SIGNATURE REQUIRED** Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

Special Handling/Fragile    Sunday/Holiday Premium Fee
$    $ 69.00

TO: (PLEASE PRINT)    PHONE 254 750-1501

Clerk's Office
U.S. District Court = Western Dist, Texas-Waco
800 Franklin Ave, Room 380
Waco, Texas

ZIP + 4® (U.S. ADDRESSES ONLY)

7 6 7 0 1 - ___ ___ ___ ___

Weight    ☐ Flat Rate    Acceptance Employee Initials
6 lbs. 70 ozs.    8m

Total Postage & Fees
$

**DELIVERY (POSTAL SERVICE USE ONLY)**

Delivery Attempt (MM/DD/YY)    Time    ☐ AM ☐ PM    Employee Signature

Delivery Attempt (MM/DD/YY)    Time    ☐ AM ☐ PM    Employee Signature

- For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
- $100.00 insurance included.

**PEEL FROM THIS CORNER**

LABEL 11-B, NOVEMBER 2023    PSN 7690-02-000-9996

Office Depot is a trademark of The Office Club, Inc. OfficeMax is a trademark of OMX, Inc. © 2017 Office Depot, Inc. All rights reserved.