# Exhibits A - I

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS – WACO DIVISION

**FILED**

September 18, 202:

CLERK, U.S. DISTRICT COUR
WESTERN DISTRICT OF TEX/

BY: _____ cap

DEPUT

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 992-7104

Email: atpg-tech@charter.net

---

LARRY GOLDEN,

          Plaintiff,

          V.

GOOGLE LLC

          Defendants.

---

CIVIL CASE NO: _____ **6:25-CV-00434**

**JURY TRIAL DEMANDED**

**(Joint Patent Infringement)**
**(Direct Patent Infringement),**
**(Willful Patent Infringement),**

September 15, 2025

## COMPLAINT FOR PATENT INFRINGEMENT

      This is an action of patent infringement in which plaintiff, Larry Golden ("Golden", "Plaintiff" or "Patent Owner"), hereby asserts the following claims for patent infringement of United States Patent Nos. 11,645,898 ('898 Patent); 10,984,619 ('619 Patent); and 10,163,287 ('287 Patent), for alleged "joint infringement"; and 11,645,898 ('898 Patent); US43,891 ('891 Patent), and 8,334,761 ('761 Patent) for alleged "direct infringement" ("claim charts": attached hereto as *Exhibits A - B*) ("patents-in-suit": attached hereto as *Exhibits C - G*) against Defendant GOOGLE LLC ("Google" or "Defendant"), and alleges as follows:

      Upon information and belief, Plaintiff alleges the patents-in-suit, that were issued with the presumption of validity, under 35 U.S. Code § 282 – "Presumption of validity; (a) In General", is Plaintiff's evidence that Plaintiff is the inventor of Central Processing Units (CPUs) for both mobile and consumer devices i.e., smartphones, laptops, tablets, etc.; and a stall, stop, vehicle slow-down system.

Upon information and belief, Plaintiff alleges that the defendant Google, has in the past and continues to do so, makes, uses, offer to sell, or sells Google's Tensor Central Processing Units (CPUs) and Google's Tensor Processing Units (TPUs); and Google's Self-Drive Vehicles that comprises Google's Advanced Driver Assistance Systems (ADAS) that Plaintiff believes infringes at least one of the claims in the patents-in-suit under 35 U.S.C. § 271, "anyone who makes, uses, offers to sell, or sells any patented invention domestically, or imports a patented invention into the United States during the term of the patent, is infringing the patent."

## THE PARTIES

Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

On information and belief, Google is incorporated in the State of Delaware with a principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043 and does business in this judicial district by, among other things, committing joint (divided) infringement and/or direct—literal patent infringement or infringement under the "doctrine of equivalents"— giving rise to this complaint. Plaintiff also alleges Google's infringement is willful because Google had knowledge of Plaintiff's patents-in-suit and acted with the intent to infringe, since at least the date of service 10/05/2022 in *Golden v. Google LLC* NDC Case No. 22-5246

Google may be served at The Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. Google does business in the State of Texas and in the district.

Google LLC is one of the largest technology companies in the world and conducts product sales, and operations in the District of South Carolina. Google LLC jointly and/or directly, distributes, markets, offers to sell, sells, and/or imports the alleged infringing Google's Tensor Central Processing Units (CPUs) and Google's Tensor Processing Units (TPUs); and Google's Self-Drive Vehicles that comprises Google's Advanced Driver Assistance Systems (ADAS).

## STANDARD FOR REVIEW

Twelve federal judges (nine from the appellate court) stated infringement occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability. Thereby, infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device; but only when a third-party "modifies" the connectivity i.e.,

2

software apps, Bluetooth, NFC, cellular, internet, GPS, WiFi, etc. of the Google device in order for the device to function.

Therefore, Twelve Federal Judges inadvertently ruled without intension a claim of "joint infringement". Modification of an alleged infringing product by an actor or multiple actors creates grounds for infringement in the alternative of "joint infringement".

Twelve Federal Judges determined by default, "joint infringement" is established when Google is found to have controlled the "manner or timing" of the third-party's modification or performance.

Plaintiff has stated a plausible claim for direct infringement by specifically identifying the Defendant's products and alleging that they perform the same unique function as Plaintiff's patented inventions. The Defendant in this case is allegedly liable for infringement of the asserted patents-in-suit under 35 U.S.C. § 271.

Plaintiff maintains he has additional factual allegations to support his claim in the form claim charts readily available by order of this Court.

## JURISDICTION AND VENUE

This is a civil action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(a) and 1338(a).

On May 22, 2017, the U.S. Supreme Court narrowed the scope of proper venue for patent infringement actions for domestic corporations. *See TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, No. 16-341 (May 22, 2017). The *TC Heartland* decision reverses the approach to venue previously adopted by the U.S. Court of Appeals for the Federal Circuit.

The special venue statute for patent infringement actions, 28 U.S.C. § 1400(b), has two provisions permitting venue: "[1] where the defendant resides, or [2] where the defendant has committed acts of infringement and has a regular and established place of business."

Since the enactment of that statute, the Supreme Court consistently has interpreted Section 1400(b)'s first provision of proper venue— "where the defendant resides". *E.g., Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 226 (1957). As a result, a domestic corporation may now be sued for patent infringement only in its state of incorporation or where it has committed acts of infringement and has a regular and established place of business.

3

**TWELVE FEDERAL JUDGES DETERMINED IT'S "JOINT INFRINGEMENT"**

Twelve Federal Judges determined "joint infringement" is established when Google was found to have controlled the "manner or timing" of the third-party's modification or performance. Twelve federal judges (nine from the appellate court) stated infringement occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability.

In a 2015 decision of the United States Court of Appeals for the Federal Circuit, *Akamai Techs., Inc. v. Limelight Networks, Inc.* the court expanded the doctrine [of joint infringement] and explained the current meaning of the term, "[w]e conclude, on the facts of this case, that liability under § 271(a) can also be found when an alleged infringer conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and *establishes the manner or timing of that performance*."

*Akamai V* held that direction or control does not require that a single mastermind direct all the entities' action; instead, direction and control can include establishing the time or manner of performance or conditioning participation of an activity or receipt of a benefit on performing the patented method.

Google allegedly directs control of the manner and/or timing of an actor(s) because it is Google who controls its alleged infringing Google Tensor Series G1-G5 CPUs and Google Android Open-Source Operating Systems'; release of source codes that describes and controls the third-party's performance [modification] parameters.

The manner or timing of the source code release could be yearly; every other year; or with the release of each new Google device model.

Google enables the performance [modification] of the Google devices. According to twelve federal judges, "modification in order to infringe" is established through various means: modified by connecting any outside devices; modified by adding software; modified by wirelessly connecting through NFC, Bluetooth, WiFi [Internet-of-Things], Cellular, or GPS; and modified if the camera performs any other function beyond that of simply taking a picture.

The above list of modifications was reviewed by twelve federal judges. They all agree that infringement (joint) occurs when a third-party modifies the Google mobile device in order for the phone to function as a CBRNE-H sensing device. The twelve federal judges described [construed] away from Google's alleged direct infringement, onto Google's joint infringement.

4

## GOOGLE CONSTRUED GOLDEN'S PATENT CLAIMS AWAY FROM DIRECT INFRINGEMENT, BUT ONTO JOINT INFRINGEMENT

**History of Construed Claim Terms**

Google should have been precluded from relitigating the construction of patent claims' limitations on where, and even how, the CBRNE device(s) can be found "within" the mobile devices. In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

> "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below.

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

> Dec. to Inst. 11–16.
>
> No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain relevant after the amendment, we see no reason to modify them.
> We further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10–11. Based on the record adduced during trial, we see no need to construe any other terms."

The District Court Judge erred in allowing Google the opportunity to re-litigate claim terms that had already been adjudicated and a final decision was issued. Also, the PTAB determined "communication device" is likewise the same as "monitoring equipment" when used to function as a mobile sensing device".

The NDC Judge reversed the final decision of the PTAB court and construed Golden's patent claims to mean just the opposite. The NDC Judge ruled in a way that signals, any and all means of connectivity is cancelled. Golden presented five (5) infringement theories to the NDC Court that describes various means of connectivity. See the following charts:

# "Built-in, Embedded"

Draper designed a chemical, biological, radiological and nuclear (CBRN) Plugin to enable users to integrate CBRN sensors into TAK, collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, WinTAK and WebTAK are operational in the field. https://www.draper.com/explore-solutions/tak

**ATAK-CIV (CBRN):** "The Tactical Assault Kit is DoD nomenclature for the Team Awareness Kit (TAK) application: a mission planning, geospatial, Full Motion Video (FMV), and system administrator tool that reduces the operational footprint from a tactical laptop, to a commercial mobile device. Data can be pre-loaded into ATAK or downloaded from the network when available." https://play.google.com/store/apps/details?id=com. atakmap.app.civ&hl=en_US&gl=US



**Near-Field Communication (NFC) Smartphone Sensor:** Nascent technology embedded in modern smartphones—near-field communication (NFC)—for wireless electronic, portable, non-line-of-sight selective detection of gas-phase chemicals *(Fig. 1)*

National Institutes of Health (NIH). *"Wireless gas detection with a smartphone via rf nfc communication"* Published online 2014 Dec 8. doi: 10.1073/pnas. 1415403111 Retrieved from: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4280584/



*Figure 1*

Conversion of an NFC tag into a CARD enables wireless rf detection of chemical analytes with a smartphone. NFC-enabled smartphones communicate with NFC tags by simultaneously energizing the NFC tag with an alternating magnetic field ($f = 13.56$ MHz) through inductive coupling and transferring data by signal modulation.

**Camera Sensor**: Camera lens in cell phone with microfluidic lens functions as camera; uses microscope to focus on a chemical sensor. A *megapixel* camera captures the image from the array of nanopores uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the *pixel* resolution phone camera. *Megapixel* resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors tucked into cell phones could map airborne toxins in real time*. Source: https:// www .understanding nano.com/cell-phone-sensors-toxins.html

Hyperspectral imaging scans for light frequencies that humans can't see in order to identify the unique chemical signatures of different substances. They say their device, which can be mass produced, is compatible with all standard smartphone cameras. *These New Smartphone Cameras Could Tell You What an Object Is Made of* https://www.sciencealert.com/new-smartphone-cameras-



Smartphones provide hardware and software capability which can be incorporated with [CBR] sensors, enabling accurate on-site portable sensing. The camera, screen, and LED flashlight of the smartphone can be employed as components of the sensor. https://link. springer.com/article/10. 1007/s11468-022-01672-1

**Smartphone Biosensors**:

1. Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
2. Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
3. Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
4. Microfluidic cassette: Interchangeable cassettes with varying assays
5. VIS–NIR spectrometer: Food freshness; Melanoma
6. NNAP Electrodes: Toxic metals and Organic pollutants in water
7. Optical Waveguide: Pathogens in water and food
8. Back and front camera: Colorimetric analysis; Image analysis
9. Microphone: Voice recording stress levels



**Google Beacon: Bluetooth; GPS; Wi-Fi** Google Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals to calculate distance between detector and source. Filtering WiFi/ Bluetooth ranging functions and GPS location data. Filtering GPS derived distances based on jump in calculated position or when GPS reports jump in position but phone accelerometer sensors do not show rapid acceleration. Specific models in different categories of radiation instruments (dosimeters, survey meters, personal radiation detectors, backpacks, nuclide identifiers, and mobile systems).



Google Beacon is a type of Bluetooth technology with proximity-based triggers. These triggers affect both the physical and digital world. Using Bluetooth low energy (BLE) hardware technology, beacons communicate with nearby smart devices like smartphones, tablets, etc. Different types of beacons that perform different tasks.

Both Google and Judge Rita F. Lin knew the CBRNE devices allegedly infringes Golden's patents when combined [built-in, embedded] with the Google smartphones:

"Plaintiff's complaint alleges that ATAK is not made by Google, and he does not allege that ATAK comes pre-loaded on Google phones: "Through collaboration and innovation, the DTRA has integrated its powerful, hazard-awareness-and-response tools into the Android Tactical Assault Kit (ATAK). ATAK is a digital application available to warfighters throughout the DoD. Built on the Android operating system, ATAK offers warfighters geospatial mapping — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes (CBRN) plug-ins." *Golden v. Google* Case 3:22-cv-05246-RFL Document 41 Filed 08/10/23

"The FAC alleges five theories of direct infringement [] all of which suffer from the same defect for which the original complaint was dismissed: the theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit. ... "Mr. Golden's allegations, even if true, at best establish that [defendant's] smartphones might be modified post-sale to perform the accused detector/sensor functionality, []." *Golden v. Google* Case 3:22-cv-05246-RFL Dkt. 68 Filed 04/03/24

*ATAK application*: "finding that the defendants' products "do not infringe without modification—the modification of installing the required software". [gateway to the alleged infringing Draper CBRNE Plug-in sensors]

*NFC tags*: "Golden' second theory [] requires combining "Google's NFC sensor," which are allegedly embedded in the accused products, with external NFC tags that have been converted to detect certain chemicals in order for there to be alleged infringement."

*Camera sensors*: "The FAC also alleges that "[s]martphones provide hardware and software capability which can be incorporated with [CBR] sensors, enabling accurate on-site portable sensing," further confirming that the sensors are separate devices that may be "incorporated" into the smartphone. (Id.) Therefore, this theory of infringement also fails because the accused products do not infringe without modification."

*Smartphone biosensors*: "The diagram shows an "add on device" with the alleged biosensors (i.e., "capillary inlet," "microfluidic cassette," VIS-NIR spectrometer, and "NNAP electrodes") attached to a nondescript smartphone. (Id.) As such, this theory also requires modification to the accused smartphones to state an infringement claim."

*Google Beacon*: Golden's fifth theory (see Ex. G at 34–41) fails for the same reason, as it requires "Google Beacon," which the FAC's own illustrations show is a separate device from the accused smartphones." *Golden v. Google* Case 3:22-cv-05246-RFL Document 68 Filed 04/03/24

Twelve Federal Judges (including Judge Rita F. Lin of the NDC) determined "joint infringement" is established when Google was found to have controlled the "manner or timing" of the third-party's modification or performance. Twelve federal judges (including Judge Rita F. Lin of the NDC) stated infringement occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability.

In a 2015 decision of the United States Court of Appeals for the Federal Circuit, *Akamai Techs., Inc. v. Limelight Networks, Inc.* the court expanded the doctrine [of joint infringement] and explained the current meaning of the term, "[w]e conclude, on the facts of this case, that liability under § 271(a) can also be found when an alleged infringer conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and *establishes the manner or timing of that performance*."

*Akamai V* held that direction or control does not require that a single mastermind direct all the entities' action; instead, direction and control can include establishing the time or manner of performance or conditioning participation of an activity or receipt of a benefit on performing the patented method.

9

## THE ACCUSED GOOGLE PRODUCTS MUST COMPRISE THE REQUIRED CENTRAL PROCESSING UNIT (CPU) HARDWARE PRE-INSTALLED

Golden claims the Google smartphones' Tensor CPU allegedly infringes Golden's patented new, improved upon, and useful central processing unit (CPU) for mobile devices. Google has failed to defend; the lower court has failed to compel Google to answer the allegations; and the Circuit failed to rule in favor of Golden because Google has neither denied, defended, or challenged Golden's alleged claims of infringement.

Golden's CPU was invented specifically for Golden's patented new, improved upon, and useful cell phone (CMDC device). Google's Tensor CPUs; invented for mobile devices (i.e., Google smartphones) are recognized as the "brains" of the mobile, consumer, or cellular devices.

Both the Google Tensor CPUs and Golden's patented CPUs, are responsible for carrying out the functional and operational instructions of the computer (smartphone) programs. Golden has alleged the Google smartphone cannot operate/function without Golden's patented CPUs.



### The Google Tensor CPU and Google Android operating system (OS)

The Google Tensor CPU and Google Android operating system (OS) are essential components of Google's mobile devices, each fulfilling unique functions that enhance user experience. Golden claims Google is allegedly infringing his patented Central Processing Unit (CPU) [hardware], and Golden claims his "transceiver" is equivalent to the Google Android Operating Systems (OS) [software].

1. *Google Tensor CPUs [hardware]*

10

- Function: The Google Tensor CPU hardware is the primary processor that executes instructions and manages tasks within the device.
- Performance: Google Tensor CPUs are also designed for efficiency, balancing power consumption and processing speed to optimize battery life.

2. *Google Android Operating Systems (OS) [software]*
   - Function: The Google Android OS software manages hardware resources and provides a platform for applications to run.
   - User Interface: It offers the graphical interface that users interact with, enabling navigation and access to features.

3. *Complementary Roles*
   - Integration: The Google Tensor CPU and the Google android OS work together to ensure smooth operation of applications and system functions.
   - User Experience: A powerful Tensor CPU can enhance the performance of the Android OS, leading to faster app launches and smoother multitasking.

Understanding the distinct roles of mobile CPUs and operating systems helps in appreciating how they contribute to the overall functionality and performance of mobile devices.

## JOINT OR DIVIDED INFRINGEMENT

**Google directs or control others' performance with its alleged infringing Tensor CPUs and Android Operating Systems' Source Code**

In United States patent law, divided infringement is a form of patent infringement liability that occurs when multiple actors are involved in carrying out the claimed infringement of a system or method patent. In the case of a method patent, no single accused infringer can perform all of the steps of the method. In a 2015 decision of the United States Court of Appeals for the Federal Circuit, *Akamai Techs., Inc. v. Limelight Networks, Inc.* the court expanded the doctrine and explained the current meaning of the term.

The court said that the problem in divided infringement is determining, when "more than one actor is involved in practicing the steps" of a method claim of a patent, whether the acts of one actor are attributable to the other actor such that second one is to be held "responsible for the infringement." The court said that it would hold one entity responsible for another's performance of method steps in two sets of circumstances:

- "where that entity directs or controls others' performance", and
    - *Akamai V* held that direction or control does not require that a single mastermind direct all the entities' action; instead, direction

11

and control can include establishing the time or manner of
performance or conditioning participation of an activity or
receipt of a benefit on performing the patented method.

- "where the actors form a joint enterprise."

In past cases, the court noted that it had held that an actor liable for divided infringement
under 35 U.S.C. § 271(a) only when "it acts through an agent (applying traditional agency
principles) or contracts with another to perform one or more steps of a claimed method." To
those two circumstances, the court held that it would now add a third:

"We conclude, on the facts of this case, that liability under § 271(a) can also be
found when an alleged infringer conditions participation in an activity or receipt
of a benefit upon performance of a step or steps of a patented method and
*establishes the manner or timing of that performance*."

**Establishes the manner or timing of that performance**

Google allegedly directs control of the manner and/or timing of an actor(s) because it is
Google who controls its alleged infringing Google Tensor Series G1-G5 CPUs and Google
Android Open-Source Operating Systems', release of source codes that describes and controls
the third-party's performance [modification] parameters.

Example: Third-party actors may have been ready to integrate biometric fingerprint and
facial authentication with the Google device but were unable to do so before Google released its
Android Operating Systems' source code. The manner or timing of the source code release could
be yearly; every other year; or with the release of each new Google device model.

With that being said it is obvious Google has allegedly conditioned participation in the
third-party's activity. Also, Google also receives a tremendous benefit because the integration of
the biometric fingerprint and/or facial authentication contributes to the massive revenue Google
receives from the sales of Google devices.

***Akamai Technologies, Inc. v. Limelight Networks, Inc.***

On August 13, 2015, the Federal Circuit issued an en banc decision in *Akamai
Technologies, Inc. v. Limelight Networks, Inc.*, stating in a *per curiam* opinion that "we
unanimously set forth the law of divided infringement under 35 U.S.C. § 271(a)." In doing so,
the court held that liability for divided infringement "is not limited solely to principal-agent
relationships, contractual arrangements, and joint enterprise... the Federal Circuit explained that

12

"where two or more actors form a joint enterprise, all can be charged with the acts of the other, rendering each liable for the steps performed by the other as if each is a single actor."

Recognizing that the existence of a joint enterprise is a factual question, the court looked to the Restatement (Second) of Torts to tailor a four-factor test for analyzing the issue:

1. Is there an express or implied agreement among members of a group?
2. Is there a common purpose to be carried out by the group?
3. Is there a "community of pecuniary interest" in the common purpose among members of the group?
4. Is there an "equal right to a voice in the direction of the enterprise, which given an equal right of control"?

Turning to the specific facts of the case, the court held that substantial evidence supported the jury's verdict that the defendant was liable for direct infringement. The court noted that the defendant performed all the claimed steps except for "tagging" and "serving," which were performed by the defendant's customers. However, the court concluded that the customers' actions were "directed or controlled" by the defendant for two reasons.

First, through contractual obligations, the defendant "condition[ed] its customers' use of its content delivery network upon" performance of the claimed "tagging" and "serving" steps. Second, by "provid[ing] step-by-step instructions to its customers," defendant "establish[ed] the manner or timing of its customers' performance" of the claimed steps.

**The Government's actions were "directed or controlled" by the defendant—Google**

The Tactical Assault Kit (also TAK) for military uses is a suite of software that provides geospatial information and allows user collaboration over geography. There are numerous TAK Products in the TAK family, all developed at government expense.

The Team Awareness Kit for Google Android (ATAK) was originally developed by the Air Force Research Laboratory (AFRL) and is now maintained by a Joint Product Center.

ATAK is a Google Android smartphone geospatial infrastructure and situational awareness app. It allows for precision targeting, surrounding land formation intelligence, situational awareness, navigation, and data sharing.

All the Android variants of TAK are virtually identical and all are interoperable with each other and with other TAK products. There are small, military-specific additions in military versions of ATAK.

13

Android Team Awareness Kit, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents. *1st Theory*

**Joint Enterprise—Benefit to Google**

Three years ago [2022], tech giant Google placed a bet on government business, launching a new division — Google Public Sector — to better serve the massive market of federal, state and local, and defense customers that collectively spend more than $100 billion on IT each year.

Last week, Google Public Sector's cloud computing platform, Google Distributed Cloud, achieved a major milestone, meeting the Defense Department's Impact Level 6 security accreditation.

This accreditation means Google's cloud suite and a growing number of its AI tools are available to all feasible government customers. Everything from the least sensitive public data to the most sensitive, classified national security data exchanged over air-gapped defense and intelligence networks can now run on and through Google Cloud.

"This authorization comes at a crucial time, as the digital landscape is becoming increasingly complex, and the need for robust security measures is growing more urgent," Leigh Palmer, vice president of technology, delivery and operations for Google Public Sector said in a May 28 blog post. "Google Public Sector is now able to provide DOD customers with a secure, compliant, and cutting-edge cloud environment at IL6, enabling them to leverage the full power of GDC for their most sensitive Secret classified data and applications."

If Google Public Sector's growing number of government and defense customers is any indication, Dahut's efforts have been successful. Since 2022, Google has added each military branch and more than two dozen large federal agencies as customers, according to data from GovTribe, and it has snagged awards to compete with other cloud providers for task orders on two major multibillion dollar contracts: the intelligence community's C2E and the Pentagon's Joint Warfighter Cloud Capability contract.

Task orders on those vehicles are rarely made public, but contracting documents indicate Google Public Sector was awarded the U.S. Navy's ONENET contract in October to "provide highly specialized cloud services" for the U.S. Indo-Pacific Command. Google Public Sector does not publicly disclose revenue figures, but Google Cloud and its public sector cloud business have both experienced year-over-year revenue growth since 2022, with Google Cloud capturing $12.3 billion across all its business in the first quarter of 2025. https://www.nextgov.com/acquisition/2025/06/google-all-government-business/405769/

## TWELVE FEDERAL JUDGES CONFIRM INFRINGEMENT OCCURS WHEN THERE'S A MOBILE DEVICE INTERCONNECTED TO A CBRNE-H DETECTION CAPABILITY

**The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 22-1267; determined Direct Infringement by or for the Government, arises when there's a combined ATAK Software; CBRN Plugins; CPU; and Smartphone**

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court *again* concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" ... "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" ... "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features ... Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors allegedly infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent.

**The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* that Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; CPU; and Smartphone**

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: ...

"Samsung argued that Mr. Golden's complaint stated no alleged facts that went beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality. On that basis, Samsung said, there are no plausible allegations Samsung was engaged in directly infringing activities.

**The Northern District of California Court Judge Haywood S. Gilliam, Jr. in Case No. 22-5246; determined Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; CPU; and Smartphone**

15

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss with Leave to Amend" Document 41 Filed 08/10/23; the then presiding Judge Haywood S. Gilliam, Jr. agreed with the Defendant that the Google Pixel devices only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

**The Northern District of California Court Judge Rita F. Lin in Case No. 22-5246; determined Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; CPU, and Smartphone**

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68 Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

**The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 24-2024; determined Infringement occurs when there's a Mobile, Consumer, or Cellular device Integrated with, or Interconnected to a CBRNE Detection Capability.**

In the most recent case of *Golden v. Google LLC.*, Case No. 24-2024, Dkt. 41; filed 06/25/2025, three Federal Circuit judges again confirm, infringement of Plaintiff's patented CMDC device occurs when a mobile, consumer, or cellular device, is integrated with, or interconnected to a CBRNE detection capability. The Circuit's opinion includes the following:

> "We conclude that the district court did not err in finding that Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1;

> "Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1; see also *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding no infringement when the accused products "do not infringe without modification—the modification of installing the required software."). Mr. Golden's first theory of infringement requires the *use of the third-party app* "ATAK-CIV" for at least two limitations of each asserted claim. App'x 300–302 ¶¶ 56 63; see also App'x 400–407. Mr. Golden's second theory of infringement requires the use of "*NFC tags*," which are external to Google products. App'x 307 ("NFC-enabled smartphones communicate with NFC tags."); see also App'x 408–415. Mr. Golden's third theory of infringement requires using "Google's camera lens with [a] microfluidic lens" that "*uses [a] microscope* to focus on a chemical sensor." App'x 420–422 (emphasis added); see also App'x 416 423. Mr.

16

Golden's fourth theory of infringement requires *external sensors* that the complaint alleges must be added on to Google's device. App'x 308; see also App'x 424–431. Mr. Golden's fifth theory of infringement requires "Google Beacon," *a separate device*. App'x 308; see also App'x 432 439. Therefore, each of Mr. Golden's direct infringement theories solely against Google fails because Mr. Golden's infringement allegations require modification of the accused products to show infringement."

### GOOGLE IS THE "MASTERMIND"

The Northern District of California Court construed Golden's apparatus claims away from the components of what forms the Google device [apparatus], to defining a specific *method* process or series of steps to achieve a particular result.

In the "OPINION" of the Federal Circuit in *Golden v. Google LLC* CAFC Case: 24-2024 Document: 41 Page: 6 Filed: 06/25/2025, Golden's five infringement theories all require "installing the required software".

> "We conclude that the district court did not err in finding that Mr. Golden's five infringement "theories all require that the accused products be *modified* in some way for them to infringe on the patents-in-suit." Decision at *1; see also *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding no infringement when the accused products "do not infringe without *modification*—the *modification* of installing the required software.")." ...
>
> "Therefore, each of Mr. Golden's direct infringement theories solely against Google fails because Mr. Golden's infringement allegations require *modification* of the accused products to show infringement." *Golden v. Google LLC* CAFC Case: 24-2024 Document: 41 Page: 6 Filed: 06/25/2025

The term *modification* typically refers to changes made to something, which does not directly apply to the act of downloading an app. Downloading a mobile app is a process.

The Doctrine of Joint Infringement is an exception to the general rule that direct infringement only occurs if one actor performs all the steps of a method claim. The doctrine permits a patentee to attribute the actions of others to the alleged direct infringer so long as those other actors are working under the "direction or control" of the alleged infringer – The doctrine is designed to prevent an accused infringer from escaping liability by having someone else perform one or more of the required steps – Where parties are merely cooperating at arm's length

As the Federal Circuit noted in *Muniauction*: – "…where the actions of multiple parties combine to perform every step of a claimed method, the claim is directly infringed only if one party exercises 'control or direction' over the entire process such that every step is attributable to

17

the controlling party, i.e., the ***mastermind***.'" *Muniauction, Inc. v. Thomson Corp.* 532 F.3d 1318, 1329 (Fed. Cir. 2008) (emphasis added)

Golden alleges Google is the "mastermind" exercising 'control or direction' over the entire process of allegedly, jointly infringing Golden's central processing units (CPUs).

### GOOGLE ANDROID ECOSYSTEM

Google has inadvertently litigated itself into a situation of greater liability. Before, Google's liability was limited, but now because Google is the "mastermind" to an entire process that includes hundreds of "actors" performing one or more of the required steps, Google's potential liability has increased tremendously. Google's potential liability is an extension from all the Actors in Google's Android Ecosystem performing a required step.

The ecosystem of Android refers to the interconnected elements that form the Android platform, creating a rich environment for developers, users, manufacturers, and other stakeholders. This ecosystem encompasses hardware, software, developers, users, and various services that together contribute to the functioning and growth of the Android platform. These elements depend on each other to provide a seamless and integrated experience for users.



18

Android's open nature allows for seamless integration with a wide range of devices and services. From smartwatches to cars, Android supports cross-device connectivity and synchronization. Services like Google Assistant offer a unified experience across devices, leveraging machine learning to provide help and personalized interactions.

Android is a universal operating system as it is running on a wide range of devices including from cheaper ones to premium gadgets. Such devices differ in both hardware and screens – they range from low-cost, feature-packed feature phones to high-end, protective tablets and smartphones.

The beating heart of the Android ecosystem lies within the Android Operating System (OS). This powerful and intuitive platform is tailored for touchscreen devices like smartphones and tablets, offering a wide range of functional intricate computational tasks, with its user-friendly and seamless navigation. The Android OS empowers users to personalize their experience to match their unique preference.



As of 2023, there are approximately 3 billion active users of the Android operating system.
- Android share of the global smartphone market, estimated at around 70-75%.
- It is the most widely used mobile operating system worldwide.

19

## GOOGLE'S SELF-DRIVING VEHICLES

Waymo LLC, formerly known as the Google Self-Driving Car Project, is an American autonomous driving technology company headquartered in Mountain View, California. It is a subsidiary of Alphabet Inc., Google's parent company.

The company traces its origins to the Stanford Racing Team, which competed in the 2005 and 2007 Defense Advanced Research Projects Agency (DARPA) Grand Challenges.[2] Google's development of self-driving technology began in January 2009,[3][4] led by Sebastian Thrun, the former director of the Stanford Artificial Intelligence Laboratory (SAIL), and Anthony Levandowski, founder of 510 Systems and Anthony's Robots.[5][6] After almost two years of road testing, the project was revealed in October 2010.[7][8][9]

In fall 2015, Google provided "the world's first fully driverless ride on public roads ". [10] In December 2016, the project was renamed Waymo and spun out of Google as part of Alphabet.[11]

In October 2020, Waymo became the first company to offer service to the public without safety drivers in the vehicle.[12][13][14][15] Waymo, as of 2025, operates commercial robotaxi services in Phoenix (Arizona), San Francisco (California), Silicon Valley (California),[16] Los Angeles (California),[17] Atlanta (Georgia), Miami (Florida),[18] and Austin (Texas)[19] with new services planned in New York,[20] Washington, D.C., and Tokyo, Japan.

City mapping in preparation for new services, as of July 2025, is taking place in various cities in the United States including, Boston, Nashville, New Orleans, Dallas, Las Vegas, Philadelphia,[21] and San Diego, with pre-mapping preliminary work now in progress in Orlando, Houston, San Antonio.[22][23] As of April 2025, it offers over 250,000 paid rides per week, totaling over 1 million miles monthly.[16][24]

Waymo is run by co-CEOs Tekedra Mawakana and Dmitri Dolgov.[25] The company raised US$5.5 billion in multiple outside funding rounds[26] by 2022 and raised $5.6 billion funding in 2024.[27] Waymo has or had partnerships with multiple vehicle manufacturers, including Stellantis,[28] Mercedes-Benz Group AG,[29] Jaguar Land Rover,[30] and Volvo Cars.[31] (References are listed at the end of this complaint)

### Vehicular Automation

Vehicular automation is using technology to assist or replace the operator of a vehicle such as a car, truck, aircraft, rocket, military vehicle, or boat.  Assisted vehicles

20

are semi-autonomous, whereas vehicles that can travel without a human operator are autonomous. The degree of autonomy may be subject to various constraints such as conditions. Autonomy is enabled by advanced driver-assistance systems (ADAS) of varying capacity.

Related technology includes advanced software, maps, vehicle changes, and outside vehicle support.

Autonomy presents varying issues for road, air, and marine travel. Roads present the most significant complexity given the unpredictability of the driving environment, including diverse road designs, driving conditions, traffic, obstacles, and geographical/cultural differences.

Autonomy implies that the vehicle is responsible for all perception, monitoring, and control functions.

**Advanced Driver-Assistance Systems (ADAS)**

ADAS are technologies that assist drivers with the safe operation of a vehicle. ADAS may provide adaptive cruise control, assist in avoiding collisions, alert drivers to possible obstacles, warn of lane departure, assist in lane centering, incorporate satellite navigation, provide traffic warnings, provide navigational assistance through smartphones, automate lighting, or provide other features. Highway computers would manage the traffic and direct the cars to avoid crashes.

**Software**

Autonomous vehicle software generally contains several different modules that work together to enable self-driving capabilities. The perception module ingests and processes data from various sensors, such cameras, LIDAR, RADAR, and ultrasonic SONAR, to create a comprehensive understanding of the vehicle's surroundings. The localization module uses 3D point cloud data, GPS, IMU, and mapping information to determine the vehicle's precise position, including its orientation, velocity, and angular rate. The planning module takes inputs from both perception and localization to compute actions to take, such as velocity and steering angle outputs. These modules are typically supported by machine learning algorithms, particularly deep neural networks, which enable the vehicle to detect objects, interpret traffic patterns, and make real-time decisions. Furthermore, modern autonomous driving systems increasingly employ sensor fusion techniques that combine data from multiple sensors to improve accuracy and reliability in different environmental conditions.

21

**Perception**

The perception system is responsible for observing the environment. It must identify everything that could affect the trip, including other vehicles, pedestrians, cyclists, their movements, road conditions, obstacles, and other issues. Various makers use cameras, radar, lidar, sonar, and microphones that can collaboratively minimize errors.

**Navigation**

Navigation systems are a necessary element in autonomous vehicles. The Global Positioning System (GPS) is used for navigation by air, water, and land vehicles, particularly for off-road navigation.

For road vehicles, two approaches are prominent. One is to use maps that hold data about lanes and intersections, relying on the vehicle's perception system to fill in the details. The other is to use highly detailed maps that reduce the scope of real-time decision-making but require significant maintenance as the environment evolves. Some systems crowdsource their map updates, using the vehicles themselves to update the map to reflect changes such as construction or traffic used by the entire vehicle fleet.

Another potential source of information is the environment itself. Traffic data may be supplied by roadside monitoring systems and used to route vehicles to best use a limited road system. Additionally, modern GNSS enhancement technologies, such as real-time kinematic (RTK) and precise point positioning (PPP), enhance the accuracy of vehicle positioning to sub-meter level precision, which is crucial for autonomous navigation and decision-making.

**Applications for Google's Self-Drive Vehicles include the following:**

- Vehicle tracking system
- Rear-view alarm, to detect obstacles behind.
- Anti-lock braking system (ABS)
- Emergency Braking Assistance (EBA)
- Electronic brake force distribution (EBD)
- Traction control system (TCS)
- Four-wheel drive (AWD)

22

- Electronic Stability Control (ESC)
- Acceleration Slip Regulation (ASR)
- Electronic differential lock (EDL)
- Dynamic steering response (DSR)

These applications use various sensors to intervene when the car senses a possible loss of control. The car's control unit can reduce power from the engine and even apply the brakes on individual wheels to prevent the car from understeering or oversteering. Corrects the rate of power steering system to adapt it to vehicles speed and road conditions.

**Google's Self-Drive Vehicles; additional features include:** [1]

- Adaptive cruise control
- Lane departure warning system
- Assured Clear Distance Ahead
- Adaptive headlamps
- Advanced Automatic Collision Notification
- Intelligent Parking Assist System
- Automatic Parking
- Automotive night vision with pedestrian detection
- Blind spot monitoring
- Driver Monitoring System
- Precrash system
- Safe speed governing
- Traffic sign recognition
- Enhanced or Adaptive cruise control
- Distance control assist
- Automatic emergency braking systems

---

[1]   Plaintiff names the Google Self-Drive Vehicle as the alleged infringing product instead of listing the individual elements that enables the vehicle to function autonomously or semi-autonomously. Plaintiff will provide enough factual evidence to show Google's Self-Drive Vehicle can function without the inclusion of Plaintiff's stall, stop, or vehicle slow-down system.

## COUNT I:
## U.S. Patent No: 10,163,287

**1.**     Count I incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Google, LLC directs or control other actors' performance [namely direct or control other actors' "modification"] of Plaintiff's patented central processing units (CPUs); resulting in Google and the other actors are allegedly "jointly infringing" at least independent claims 4, 5, and 6 of Plaintiff's 10,163,287 ('287) patent.

**2.**     Upon information and belief, Plaintiff's patented central processing units (CPUs); claimed in independent claims 4, 5, and 6 of Plaintiff's 10,163,287 ('287) patent, has allegedly been "construed" by three district court judges and nine appellate court judges, away from that of a patented apparatus to that of a patented method; meaning the alleged infringing Google Tensor CPU Series G1, G2, G3, G4, and G5 must be "modified" by the other actors [third-parties] before the Google Tensor CPU Series G1, G2, G3, G4, and G5 can function as a central processing unit (CPU). This method describes the alleged "joint infringement" of Plaintiff's '287 patent asserted in this case.

**3.**     Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if it "directs or controls" another's action. Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claims 4, 5, and 6 of Plaintiff's 10,163,287 ('287) patent, asserted in the case because Google "directs or control" the actions of the other actors.

**4.**     Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if it "forms a joint enterprise" with the United States Government. Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claims 4, 5, and 6 of Plaintiff's 10,163,287 ('287) patent asserted in this case because Google has allegedly formed a "joint enterprise" with the United States Government.

**5.**     Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if it "conditions

participation" with the Google Android Open-Source Operating System source code and platform. Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claims 4, 5, and 6 of Plaintiff's 10,163,287 ('287) patent asserted in this case because Google has allegedly "conditioned participation" with the Google Android Open-Source Operating System source code and platform.

**6.** Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if Google "is in receipt of a benefit on performance of the patented method". Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claims 4, 5, and 6 of Plaintiff's 10,163,287 ('287) patent asserted in this case because Google has allegedly "received a benefit on performance of the patented method.

**7.** Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if Google "controls the manner and timing of the performance". Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claims 4, 5, and 6 of Plaintiff's 10,163,287 ('287) patent asserted in this case because Google has allegedly "control the manner and timing of the performance".

**8.** Golden realleges; incorporates herein the allegations set forth in Paragraphs 1-7. On information and belief Google is jointly infringing independent claims 4, 5, and 6 of Plaintiff's 10,163,287 ('287) patent. The alleged infringing products are: Google Tensor CPU Series G1, G2, G3, G4, and G5.

**9.** As set forth in Golden's infringement contentions that Google is making, using, offering for sale, selling and/or importing the alleged infringing Google Tensor CPU Series G1, G2, G3, G4, and G5; have at a minimum, jointly infringed the '287 patent, and Google is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Plaintiff, which infringement and damage will continue unless and until Google is enjoined.

**10.** The alleged infringement of Google identified in this Count has caused irreparable injury to Plaintiff for which remedies at law are inadequate. Considering the balance of the hardships

25

between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

**11.** Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

## COUNT II:
### U.S. Patent No: 10,984,619

**12.** Count II incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Google, LLC directs or control other actors' performance [namely direct or control other actors' "modification"] of Plaintiff's patented central processing units (CPUs); resulting in Google and the other actors are allegedly "jointly infringing" at least independent claims 1 & 11, and dependent claims 2-10 & 12-20 of Plaintiff's 10,984,619 ('619) patent.

**13.** Upon information and belief, Plaintiff's patented central processing units (CPUs); claimed in independent claims 1 & 11, and dependent claims 2-10 & 12-20 of Plaintiff's 10,984,619 ('619) patent, has allegedly been "construed" by three district court judges and nine appellate court judges, away from that of a patented apparatus to that of a patented method; meaning the alleged infringing Google Tensor CPU Series G1, G2, G3, G4, and G5 must be "modified" by the other actors [third-parties] before the Google Tensor CPU Series G1, G2, G3, G4, and G5 can function as a central processing unit (CPU). This method describes the alleged "joint infringement" of Plaintiff's '619 patent asserted in this case.

**14.** Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if it "directs or controls" another's action. Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claims 1 & 11, and dependent claims 2-10 & 12-20 of Plaintiff's 10,984,619 ('619) patent, asserted in the case because Google "directs or control" the actions of the other actors.

**15.**    Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if it "forms a joint enterprise" with the United States Government. Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claims 1 & 11, and dependent claims 2-10 & 12-20 of Plaintiff's 10,984,619 ('619) patent asserted in this case because Google has allegedly formed a "joint enterprise" with the United States Government.

**16.**    Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if it "conditions participation" with the Google Android Open-Source Operating System source code and platform. Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claims 1 & 11, and dependent claims 2-10 & 12-20 of Plaintiff's 10,984,619 ('619) patent asserted in this case because Google has allegedly "conditioned participation" with the Google Android Open-Source Operating System source code and platform.

**17.**    Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if Google "is in receipt of a benefit on performance of the patented method". Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claims 1 & 11, and dependent claims 2-10 & 12-20 of Plaintiff's 10,984,619 ('619) patent asserted in this case because Google has allegedly "received a benefit on performance of the patented method.

**18.**    Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if Google "controls the manner and timing of the performance". Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claims 1 & 11, and dependent claims 2-10 & 12-20 of Plaintiff's 10,984,619 ('619) patent asserted in this case because Google has allegedly "control the manner and timing of the performance".

**19.**    Golden realleges; incorporates herein the allegations set forth in Paragraphs 12-18. On information and belief Google is jointly infringing independent claims 1 & 11, and dependent

27

claims 2-10 & 12-20 of Plaintiff's 10,984,619 ('619) patent. The alleged infringing products are:
Google Tensor CPU Series G1, G2, G3, G4, and G5.

**20.**     As set forth in Golden's infringement contentions that Google is making, using, offering
for sale, selling and/or importing the alleged infringing Google Tensor CPU Series G1, G2, G3,
G4, and G5; have at a minimum, jointly infringed the '619 patent, and Google is thereby liable
for infringement of the '619 patent pursuant to 35 U.S.C. § 271. Google have caused damage to
Plaintiff, which infringement and damage will continue unless and until Google is enjoined.

**21.**     The alleged infringement of Google identified in this Count has caused irreparable injury
to Plaintiff for which remedies at law are inadequate. Considering the balance of the hardships
between the parties, a remedy in equity, such as a permanent injunction is warranted and such a
remedy would be in the public interest.

**22.**     Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544
(2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a
claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts
that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*,
556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable
expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

**COUNT III:**

**U.S. Patent No: 11,645,898**

**23.**     Count III incorporate all the pleadings and attachments of this complaint that precedes
this section which alleges Google, LLC directs or control other actors' performance [namely
direct or control other actors' "modification"] of Plaintiff's patented central processing units
(CPUs); resulting in Google and the other actors are allegedly "jointly infringing" at least
independent claim 1, of Plaintiff's 11,645,898 ('898) patent.

**24.**     Upon information and belief, Plaintiff's patented central processing units (CPUs);
claimed in independent claim 1, of Plaintiff's 11,645,898 ('898) patent, has allegedly been
"construed" by three district court judges and nine appellate court judges, away from that of a
patented apparatus to that of a patented method; meaning the alleged infringing Google Tensor
Processing Unit (TPU) Series TPUv1, TPUv2, TPUv3, TPUv4, TPUv5, TPUv6, TPUv7, and
Edge TPU, must be "modified" by the other actors [third-parties] before the Google Tensor

Processing Unit (TPU) Series TPUv1, TPUv2, TPUv3, TPUv4, TPUv5, TPUv6, TPUv7, and Edge TPU, can function as a central processing unit (CPU). This method describes the alleged "joint infringement" of Plaintiff's '898 patent asserted in this case.

**25.** Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if it "directs or controls" another's action. Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claim 1, of Plaintiff's 11,645,898 ('898) patent, asserted in the case because Google "directs or control" the actions of the other actors.

**26.** Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if it "forms a joint enterprise" with the United States Government. Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claim 1, of Plaintiff's 11,645,898 ('898) patent asserted in this case because Google has allegedly formed a "joint enterprise" with the United States Government.

**27.** Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if it "conditions participation" with the Google Android Open-Source Operating System source code and platform. Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claim 1, of Plaintiff's 11,645,898 ('898) patent asserted in this case because Google has allegedly "conditioned participation" with the Google Android Open-Source Operating System source code and platform.

**28.** Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if Google "is in receipt of a benefit on performance of the patented method". Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claim 1, of Plaintiff's 11,645,898 ('898) patent asserted in this case because Google has allegedly "received a benefit on performance of the patented method.

29

29.     Upon information and belief, a handful of U.S. Court of Appeals for the Federal Circuit decisions have been instrumental in shaping this area of law. The *Akamai v. Limelight Networks* case clarified that a single entity can be found liable for infringement if Google "controls the manner and timing of the performance". Plaintiff alleges Google, as a single entity, is liable for jointly infringing independent claim 1, of Plaintiff's 11,645,898 ('898) patent asserted in this case because Google has allegedly "control the manner and timing of the performance".

30.     Golden realleges; incorporates herein the allegations set forth in Paragraphs 23-29. On information and belief Google is jointly infringing independent claim 1, of Plaintiff's 11,645,898 ('898) patent. The alleged infringing products are: Google Tensor Processing Unit (TPU) Series TPUv1, TPUv2, TPUv3, TPUv4, TPUv5, TPUv6, TPUv7, and Edge TPU.

31.     As set forth in Golden's infringement contentions that Google is making, using, offering for sale, selling and/or importing the alleged infringing Google Tensor Processing Unit (TPU) Series TPUv1, TPUv2, TPUv3, TPUv4, TPUv5, TPUv6, TPUv7, and Edge TPU, have at a minimum, jointly infringed the '898 patent, and Google is thereby liable for infringement of the '898 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Plaintiff, which infringement and damage will continue unless and until Google is enjoined.

32.     The alleged infringement of Google identified in this Count has caused irreparable injury to Plaintiff for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

33.     Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

34.     Plaintiff allege certain limitations of Google's TPU: performs the same function; in substantially the same way; to achieve the same results. [doctrine of equivalents]. Both, Plaintiff's central processing unit (CPU), and Google's Tensor Processing Unit (TPU); are processors.

## COUNT IV:

### U.S. Patent No: 8,334,761

**35.** Count IV incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Google, LLC is "directly infringing" at least independent claim 1, of Plaintiff's 8,334,761 ('761) patent.

**36.** The '761 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '761 patent issued from U.S. Patent Application No. 12/802,001.

**37.** Google has and continues to directly infringe at least independent claim 1, of Plaintiff's 8,334,761 ('761) patent in this judicial district and elsewhere in the United States, including, among other things, making, having made, using, offering for sale, selling, and/or importing Google's Self-Drive Vehicles that incorporates Google's Advanced Driver Assistance Systems (ADAS), and incorporates the fundamental technologies covered by the '761 patent. These products are referred to as the "'761 Accused Products." Examples of the '761 Accused Products include, but are not limited to, the Google Self-Drive Vehicles that incorporates Google's Advanced Driver Assistance Systems (ADAS).

**38.** During discovery and development of Plaintiff's infringement contentions, Plaintiff may provide additional theories under which Google infringes the '761 patent besides the example provided above, including for the same product and using the same components identified above, and nothing in the example above is meant to limit the infringement allegations of Plaintiff or limit the interpretations of the claims or their terms.

**39.** At a minimum, Google has known that the '761 Accused Products infringe the '761 patent at least as early as the service date 10/05/2022 in *Golden v. Google LLC* NDC Case No. 22-5246. During that litigation, Plaintiff repeatedly and explicitly set forth Google's infringement of the '761 patent via its Tensor CPU and TPU Series. Despite that clear evidence of infringement, Google has refused to take a license to the '761 patent and continues to willfully infringe the '761 patent. Additionally, Google continued to release new products and did so despite its knowledge that such devices would infringe the '761 patent and without taking a license to the '761 patent. Google has made a business decision to ignore the patent rights of Plaintiff despite its knowing infringement of the '761 patent, presumably relying on the significant advantage in resources that Google holds over Plaintiff.

**40.** Thus, despite having knowledge of the '761 patent and knowledge that it is directly infringing independent claim 1, of Plaintiff's 8,334,761 ('761) patent, Google has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Google's infringing activities relative to the '761 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

**41.** Plaintiff has been damaged as a result of Google's infringing conduct described in this Count. Google is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff's for Google's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT V:

### U.S. Patent No: RE43,891

**42.** Count V incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Google, LLC is "directly infringing" at least independent claims 11 and 44, and dependent claims 47, 48, 49, 50, 51, & 53 of Plaintiff's RE43,891 ('891) patent.

**43.** The '891 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '891 patent issued from U.S. Patent Application No. 13/065,837.

**44.** Google has and continues to directly infringe at least independent claims 11 and 44, and dependent claims 47, 48, 49, 50, 51, & 53 of Plaintiff's RE43,891 ('891) patent in this judicial district and elsewhere in the United States, including, among other things, making, having made, using, offering for sale, selling, and/or importing Google's Self-Drive Vehicles that incorporates Google's Advanced Driver Assistance Systems (ADAS), and incorporates the fundamental technologies covered by the '891 patent. These products are referred to as the "'891 Accused Products." Examples of the '891 Accused Products include, but are not limited to, the Google Self-Drive Vehicles that incorporates Google's Advanced Driver Assistance Systems (ADAS).

**45.** During discovery and development of Plaintiff's infringement contentions, Plaintiff may provide additional theories under which Google infringes the '891 patent besides the example

32

provided above, including for the same product and using the same components identified above, and nothing in the example above is meant to limit the infringement allegations of Plaintiff or limit the interpretations of the claims or their terms.

**46.** At a minimum, Google has known that the '891 Accused Products infringe the '891 patent at least as early as the service date 10/05/2022 in *Golden v. Google LLC* NDC Case No. 22-5246. During that litigation, Plaintiff repeatedly and explicitly set forth Google's infringement of the '891 patent via its Tensor CPU and TPU Series. Despite that clear evidence of infringement, Google has refused to take a license to the '891 patent and continues to willfully infringe the '891 patent. Additionally, Google continued to release new products and did so despite its knowledge that such devices would infringe the '891 patent and without taking a license to the '891 patent. Google has made a business decision to ignore the patent rights of Plaintiff despite its knowing infringement of the '891 patent, presumably relying on the significant advantage in resources that Google holds over Plaintiff.

**47.** Thus, despite having knowledge of the '891 patent and knowledge that it is directly infringing independent claims 11 and 44, and dependent claims 47, 48, 49, 50, 51, & 53 of Plaintiff's RE43,891 ('891) patent, Google has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Google's infringing activities relative to the '891 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

**48.** Plaintiff has been damaged as a result of Google's infringing conduct described in this Count. Google is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff's for Google's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

### COUNT VI:
#### U.S. Patent No: 11,645,898

**49.** Count VI incorporate all the pleadings and attachments of this complaint that precedes this section which alleges Google, LLC is "directly infringing" at least independent claim 1, of Plaintiff's 11,645,898 ('898) patent.

33

**50.**      The '898 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '898 patent issued from U.S. Patent Application No. 17/300,230.

**51.**      Google has and continues to directly infringe at least independent claim 1, of Plaintiff's 11,645,898 ('898) patent in this judicial district and elsewhere in the United States, including, among other things, making, having made, using, offering for sale, selling, and/or importing Google's Self-Drive Vehicles that incorporates Google's Advanced Driver Assistance Systems (ADAS), and incorporates the fundamental technologies covered by the '898 patent. These products are referred to as the "'898 Accused Products." Examples of the '898 Accused Products include, but are not limited to, the Google Self-Drive Vehicles that incorporates Google's Advanced Driver Assistance Systems (ADAS).

**52.**      During discovery and development of Plaintiff's infringement contentions, Plaintiff may provide additional theories under which Google infringes the '898 patent besides the example provided above, including for the same product and using the same components identified above, and nothing in the example above is meant to limit the infringement allegations of Plaintiff or limit the interpretations of the claims or their terms.

**53.**      At a minimum, Google has known that the '898 Accused Products infringe the '898 patent at least as early as the service date 10/05/2022 in *Golden v. Google LLC* NDC Case No. 22-5246. During that litigation, Plaintiff repeatedly and explicitly set forth Google's infringement of the '898 patent via its Tensor CPU and TPU Series. Despite that clear evidence of infringement, Google has refused to take a license to the '898 patent and continues to willfully infringe the '898 patent. Additionally, Google continued to release new products and did so despite its knowledge that such devices would infringe the '898 patent and without taking a license to the '898 patent. Google has made a business decision to ignore the patent rights of Plaintiff despite its knowing infringement of the '898 patent, presumably relying on the significant advantage in resources that Google holds over Plaintiff.

**54.**      Thus, despite having knowledge of the '898 patent and knowledge that it is directly infringing independent claim 1, of Plaintiff's 11,645,898 ('898) patent, Google has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Google's infringing activities relative to the '898 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a

34

pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

**55.**     Plaintiff has been damaged as a result of Google's infringing conduct described in this Count. Google is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff's for Google's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## EXHIBITS OF CLAIM CHARTS AND PATENTS

**Exhibit A** is element-by-element claim charts of Plaintiff's alleged "joint" infringement and/or infringement under the doctrine of equivalents claims.

**Exhibit B** is element-by-element claim charts of Plaintiff's alleged "literal" infringement and/or infringement under the doctrine of equivalents claims.

**Exhibits C - G** are copies of Plaintiff's United States Patent Nos. asserted in this: 11,645,898 ('898 Patent); 10,984,619 ('619 Patent); and 10,163,287 ('287 Patent), for alleged "joint infringement"; and 11,645,898 ('898 Patent); US43,891 ('891 Patent), and 8,334,761 ('761 Patent) for alleged "direct infringement"

**Exhibit H**. Joint Infringement: 1- Google's direction and control; 2- Formation of joint enterprises; and 3- contractual arrangements

**Exhibit I**. "Fact Issues for a Jury": *Process v. Modification*

## PRAYER FOR RELIEF

Wherefore, Golden respectfully requests that this Court enter:

A.     A judgment in favor of Golden that the defendant has infringed claims of the '898 Patent, '619 Patent, the '287 Patent, the '891 Patent, and the '761 Patent as aforesaid;

B.     A permanent injunction enjoining the defendant, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, and all others acting in active concert or privity therewith from joint and/or direct infringement of the '898, '619, '287, '891, and '761 patents as aforesaid pursuant to 35 U.S.C. § 283;

C.      A judgment and order requiring the defendant to pay Golden its damages with pre- and post-judgment interest thereon pursuant to 35 U.S.C. § 284;

D.      As set forth in Golden's preliminary infringement contentions that the Defendant in this case is making, using, offering for sale, selling and/or importing the aforementioned alleged infringing devices that have at a minimum, jointly and directly infringed the '898, '619, '287, '891, and '761 patents. The Defendant is thereby liable for infringement of the '898, '619, '287, '891, and '761 patents pursuant to 35 U.S.C. § 271. The Defendant has caused damage to Golden, which infringement and damage will continue unless and until the Defendant is enjoined.

E.      Any and all further relief to which the Court may deem Golden entitled.

## DEMAND FOR JURY TRIAL

Golden requests a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P. 38. A right guaranteed under the Seventh Amendment of the Constitution.

Sincerely,

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

# References [page 20]

1.    *Chow, Andrew R. (June 26, 2025). "Waymo's Self-Driving Future Is Here". Time. Retrieved August 13, 2025.*

2.    *"How a robot lover pioneered the driverless car, and why he's selling his latest to Uber". The Guardian. August 19, 2016. Retrieved July 1, 2020.*

3.    *"Google's self-driving-car project becomes a separate company: Waymo". Associated Press. December 13, 2016. Retrieved June 13, 2018.*

4.    *Krafcik, John (January 17, 2019). "Our #tenyearchallenge has been building the world's most experienced driver. Thanks to two visionary @Google characters for getting us started & to the @Waymo One riders in #Phoenix we're serving. HBD #Waymo pic.twitter.com/Ew4fdXjM7c". John Krafcik's official Twitter account. Archived from the original on January 23, 2019. Retrieved January 17, 2019.*

5.    *"The Unknown Start-up That Built Google's First Self-Driving Car". IEEE Spectrum: Technology, Engineering, and Science News. November 19, 2014. Retrieved July 1, 2020. Though Google has portrayed Thrun as its "godfather" of self-driving, a review of the available evidence suggests that the motivating force behind the company's program was actually Levandowski*

6.    *"God Is a Bot, and Anthony Levandowski Is His Messenger | Backchannel". Wired. ISSN 1059-1028. Retrieved July 1, 2020.*

7.    *John Markoff (October 9, 2010). "Google Cars Drive Themselves, in Traffic". The New York Times. Retrieved October 11, 2010.*

8.    *Sebastian Thrun (October 9, 2010). "What we're driving at". The Official Google Blog. Retrieved October 11, 2010.*

9.    *"Anthony Levandowski pleads guilty to one count of trade secrets theft under plea deal". TechCrunch. March 20, 2020. Archived from the original on March 20, 2020. Retrieved June 30, 2020.*

10.    *Team, Waymo (December 13, 2016). "On the road with self-driving car user number one". Medium.*

11.    *"Journey". Waymo.*

12.    *"Waymo launches its first commercial self-driving car service". Engadget. Retrieved December 5, 2018.*

13. *White, Joseph (October 8, 2020). "Waymo opens driverless robo-taxi service to the public in Phoenix". Reuters. Retrieved October 20, 2020.*

14. *"Waymo Relaunches Driverless Ride Sharing". All About Arizona News. October 12, 2020. Retrieved October 18, 2020.*

15. *Hawkins, Andrew J. (December 9, 2019). "Waymo's driverless car: ghost-riding in the back seat of a robot taxi". The Verge.*

16. *Love, Julia (March 17, 2025). "Alphabet's Waymo to Offer Self-Driving Rides in Silicon Valley". Bloomberg. Retrieved March 13, 2025.*

17. *Knoll, Corina (March 20, 2024). "When Nobody Is Behind the Wheel in Car-Obsessed Los Angeles". The New York Times. Retrieved July 23, 2024.*

18. *"WAYMO IN MIAMI: EVERYTHING YOU NEED TO KNOW ABOUT SELF-DRIVING CARS IN THE MAGIC CITY". The Elser Hotel. April 3, 2025. Archived from the original on April 24, 2025. Retrieved April 24, 2025.*

19. *Muller, Joann (March 4, 2025). "Waymo autonomous vehicles launch on Uber network in Austin". Axios.*

20. *Elias, Jennifer (June 18, 2025). "Waymo cars are coming to New York, but with a driver behind the wheel". CNBC. Archived from the original on June 18, 2025. Retrieved June 18, 2025.*

21. *Elias, Jennifer (July 7, 2025). "Waymo to begin testing in Philadelphia with safety drivers behind the wheel". CNBC. Retrieved July 8, 2025.*

22. *"Uber Opens Up Its Waymo Robotaxi Waitlist in Atlanta". CNET.*

23. *Cohen, Ben (May 30, 2025). "It's Waymo's World. We're All Just Riding in It". Wall Street Journal. Archived from the original on May 31, 2025. Retrieved May 31, 2025.*

24. *Korosec, Kirsten (February 27, 2025). "Waymo has doubled its weekly robotaxi rides in less than a year". TechCrunch. Retrieved March 14, 2025.*

25. *"Waymo CEO John Krafcik steps aside as co-CEO's take over". CNBC. April 2, 2021. Retrieved April 2, 2021.*

26. *Fannin, Rebecca (May 21, 2022). "Where the billions spent on autonomous vehicles by U.S. and Chinese giants is heading". CNBC. Retrieved May 22, 2022.*

27. *Kolodny, Lora (October 25, 2024). "Alphabet's self-driving unit Waymo closes $5.6 billion funding round as robotaxi race heats up in the U.S." CNBC. Retrieved October 30, 2024.*

28.   *Andrew J. Hawkins (November 7, 2017). "Waymo is first to put fully self-driving cars on US roads without a safety driver". The Verge. Retrieved June 13, 2018.*

29.   Daimler Trucks partners with Waymo to build self-driving semi trucks, TechCrunch, October 27, 2020

30.   *Bergen, Mark; Naughton, Keith (April 2, 2018). "Waymo isn't going to slow down now". Bloomberg L.P. Retrieved June 12, 2018.*

31.   *Silver, David. "Waymo And Volvo Form Exclusive Self-Driving Partnership". Forbes. Retrieved July 1, 2020.*

32.   *Higgins, Jack Nicas and Tim (May 23, 2017). "Google vs. Uber: How One Engineer Sparked a War". The Wall Street Journal. ISSN 0099-9660. Retrieved July 1, 2020.*

U.S. POSTAGE PAID
PME
GREENVILLE, SC 29616
SEP 16, 2025

76701

$69.00

RDC 07

S2324K504191-13



UNITED STATES POSTAL SERVICE®

PRIORITY MAIL EXPRESS®

EI 935 866 617 US

**CUSTOMER USE ONLY**
FROM: (PLEASE PRINT) PHONE (864) 288-5605
LARRY GOLDEN
740 WOODRUFF RD.
# 1102
GREENVILLE, SC 29607

RECEIVED
SEP 18 2025

**DELIVERY OPTIONS (Customer Use Only)**
SIGNATURE REQUIRED

TO: (PLEASE PRINT) PHONE (254) 750-1501
CLERK'S OFFICE
U.S. DISTRICT COURT – WESTERN DIST., TEXAS–WACO
800 FRANKLIN AVE, ROOM 380
WACO, TEXAS

ZIP + 4® (U.S. ADDRESSES ONLY)
7 6 7 0 1 - _ _ _ _

**ORIGIN (POSTAL SERVICE USE ONLY)**
ZIP Code: 29615
Scheduled Delivery Date: 9-19-25
Date Accepted: 9-16-25
Time Accepted: 10:47 AM
Weight: 6 lbs. 70 oz.
Sunday/Holiday Premium Fee: $69.00
Acceptance Employee Initials: 8m

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

⬅ PEEL FROM THIS CORNER

LABEL 11-B, NOVEMBER 2023   PSN 7690-02-000-9996

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Larry Golden | Google, LLC |

| (b) County of Residence of First Listed Plaintiff _____ | County of Residence of First Listed Defendant _____ |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| 740 Woodruff Road, Apt. 1102<br>Greenville, SC 29607 | |

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [x] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[ ] 190 Other Contract<br>[ ] 195 Contract Product Liability<br>[ ] 196 Franchise | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Injury<br>[ ] 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>[ ] 365 Personal Injury - Product Liability<br>[ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881<br>[ ] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br>**INTELLECTUAL PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[x] 830 Patent<br>[ ] 835 Patent - Abbreviated New Drug Application<br>[ ] 840 Trademark<br>[ ] 880 Defend Trade Secrets Act of 2016 | [ ] 375 False Claims Act<br>[ ] 376 Qui Tam (31 USC 3729(a))<br>[ ] 400 State Reapportionment<br>[ ] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 480 Consumer Credit (15 USC 1681 or 1692)<br>[ ] 485 Telephone Consumer Protection Act<br>[ ] 490 Cable/Sat TV<br>[ ] 850 Securities/Commodities/ Exchange<br>[ ] 890 Other Statutory Actions<br>[ ] 891 Agricultural Acts<br>[ ] 893 Environmental Matters<br>[ ] 895 Freedom of Information Act<br>[ ] 896 Arbitration<br>[ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>[ ] 950 Constitutionality of State Statutes |
| **REAL PROPERTY**<br>[ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | **CIVIL RIGHTS**<br>[ ] 440 Other Civil Rights<br>[ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 445 Amer. w/Disabilities - Employment<br>[ ] 446 Amer. w/Disabilities - Other<br>[ ] 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>[ ] 463 Alien Detainee<br>[ ] 510 Motions to Vacate Sentence<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>**Other:**<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition<br>[ ] 560 Civil Detainee - Conditions of Confinement | **LABOR**<br>[ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Management Relations<br>[ ] 740 Railway Labor Act<br>[ ] 751 Family and Medical Leave Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Employee Retirement Income Security Act<br><br>**IMMIGRATION**<br>[ ] 462 Naturalization Application<br>[ ] 465 Other Immigration Actions | **SOCIAL SECURITY**<br>[ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609 | |

### V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
35 U.S.C. § 271

Brief description of cause:
Patent Infringement

### VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  [x] Yes  [ ] No

### VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 09/15/2025 | Larry Golden, ProSe |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# Exhibit A

# Claim Chart(s) for the Alleged "Joint Infringement" of Plaintiff's '287 Patent; '619 Patent; and '898 Patent

| Google Tensor CPUs Generations 1, 2, 3, 4 & 5 (2021 – 2025) | Patent #: 10,163,287; Independent Claim 4 | Google directs and controls the manner or timing of the actors, because Google controls the release of its Tensor CPUs and Android Operating Systems' Source Code for modifications |
|---|---|---|
| Google Tensor<br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | A communication device, comprising: | Est. Google Pixel phone sales that include the Google Tensor:<br><br>2021: 7M units; 2022: 8M units; 2023: 10M units; 2024: 12M units; 2025: 15M units<br><br>The number of Google phones issued with a CPU, an operating system, and an open-source code that enables the phones to be modified to function as a communication device. |
| Google Tensor<br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one central processing unit (CPU); | Est. Google Pixel phone sales that include the Google Tensor:<br><br>2021: 7M units; 2022: 8M units; 2023: 10M units; 2024: 12M units; 2025: 15M units<br><br>The number of Google phones issued with a CPU, an operating system, and an open-source code that enables the phones to be modified to function as a communication device. |
| Google Tensor<br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one motion sensor in communication with the at least one CPU; | Mobile Phone-Connected Wearable Motion Sensors to Assess Postoperative Mobilization. Wearable motion sensors measure movements over time … May be used to interpret the duration, intensity, frequency, and variations of the patient's physical activity https://pmc.ncbi.nlm.nih.gov/articles/PMC4705357/<br><br>Megapixel resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. Tiny sensors tucked into cell phones could map airborne toxins in real time. Source: https://www. understanding nano.com/cell-phone-sensors-toxins.html |

3

| | | |
|---|---|---|
| <br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one viewing screen for monitoring in communication with the at least one CPU; | Android Mobile Dicom (Diconde) Viewer application. Mobile DICOM viewer apps and cloud platforms let you open CT, MRI, ultrasound, and other medical images securely on your smartphone or tablet at anytime, anywhere. From quick case reviews to patient consultations, mobility is transforming how imaging fits into everyday healthcare. https://play.google.com/store/apps/details?id=dicom.feng.gao&hl=en-US&pli=1 |
| <br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one global positioning system (GPS) connection in communication with the at least one CPU; | Google Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals to calculate distance between detector and source. Filtering WiFi/Bluetooth ranging functions and GPS location data. Filtering GPS derived distances based on jump in calculated position or when GPS reports jump in position but phone accelerometer sensors do not show rapid acceleration. Specific models in different categories of radiation instruments (dosimeters, survey meters, personal radiation detectors, backpacks, nuclide identifiers, and mobile systems). 5th Theory |
| <br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | Google Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals to calculate distance between detector and source. Filtering WiFi/Bluetooth ranging functions and GPS location data. Filtering GPS derived distances based on jump in calculated position or when GPS reports jump in position but phone accelerometer sensors do not show rapid acceleration. Specific models in different categories of radiation instruments (dosimeters, survey meters, personal radiation detectors, backpacks, nuclide identifiers, and mobile systems). 5th Theory |

4

| | | |
|---|---|---|
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | Google Beacon is a type of Bluetooth technology with proximity-based triggers. These triggers affect both the physical and digital world. Using Bluetooth low energy (BLE) hardware technology, beacons communicate with nearby smart devices like smartphones, tablets, etc. Different types of beacons that perform different tasks. 5th Theory |
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock the phone, replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account.<br><br>Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. |
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | Pixel phones use USB-C with USB 2.0 power adapters and cables. To charge your phone with a USB-A power adapter, use a USB-C to USB-A cable.<br><br>To use wireless charging … acquire a wireless charging pad. Most wireless charging devices support the Qi standard: ensure the pad you buy is compatible with your Android phone. https://www.androidauthority.com/enable-wireless-charging-android-3328947/ |

5

| | | |
|---|---|---|
| Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris). Biometric Authentication is a way for users to authenticate using face or fingerprint recognition. It's very important especially for financial and healthcare apps that require authentication every time the user opens the app. |
| Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | Smartphones provide hardware and software capability which can be incorporated with [CBR] sensors, enabling accurate on-site portable sensing. The camera, screen, and LED flashlight of the smartphone can be employed as components of the sensor. https://link. springer.com/ article/10. 1007/s11468-022-01672-1 |
| Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | Conversion of an NFC tag into a CARD enables wireless rf detection of chemical analytes with a smartphone. NFC-enabled smartphones communicate with NFC tags by simultaneously energizing the NFC tag with an alternating magnetic field ($f$ = 13.56 MHz) through inductive coupling and transferring data by signal modulation. NFC Reader is a simple and efficient tool letting you to read contact-less tags on your smartphones and tablets. |

6

| | | |
|---|---|---|
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | … a transmitter or a transceiver in communication with … one CPU configured to send signals to monitor … a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect … chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., *heart rate*) or a device mounted on a drone to detect chemical warfare agents. *1st Theory* |

7

| Google Tensor CPUs Generations 1, 2, 3, 4 & 5 (2021 – 2025) | Patent #: 10,163,287; Independent Claim 5 | Google directs and controls the manner or timing of the actors, because Google controls the release of its Tensor CPUs and Android Operating Systems' Source Code for modifications |
|---|---|---|
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | A monitoring device, comprising: | Est. Google Pixel phone sales that include the Google Tensor: 2021: 7M units; 2022: 8M units; 2023: 10M units; 2024: 12M units; 2025: 15M units The number of Google phones issued with a CPU, an operating system, and an open-source code that enables the phones to be modified to function as a monitoring device. |
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one central processing unit (CPU); | Est. Google Pixel phone sales that include the Google Tensor: 2021: 7M units; 2022: 8M units; 2023: 10M units; 2024: 12M units; 2025: 15M units The number of Google phones issued with a CPU, an operating system, and an open-source code that enables the phones to be modified to function as a monitoring device. |
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | "[W]e will describe 10 Temperature Apps for Android devices that measure room (indoors and outdoors) temperature, and apps that work as body temperature records (i.e. to store your body temperature values in order to monitor the fluctuations of your body temperature)." https://www.tech21century.com/ android-temperature-mobile-apps/ |

8

| | | |
|---|---|---|
| <br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one motion sensor in communication with the at least one CPU; | Mobile Phone-Connected Wearable Motion Sensors to Assess Postoperative Mobilization. Wearable motion sensors measure movements over time and transmit this data wirelessly, which has the potential to monitor patient recovery … May be used to interpret the duration, intensity, frequency, and variations of the patient's physical activity https://pmc.ncbi.nlm.nih.gov/articles/PMC4705357/<br><br>Megapixel resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. Tiny sensors tucked into cell phones could map airborne toxins in real time. Source: https://www. understanding nano.com/cell-phone-sensors-toxins.html |
| <br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one viewing screen for monitoring in communication with the at least one CPU; | Android Mobile Dicom (Diconde) Viewer application. Mobile DICOM viewer apps and cloud platforms let you open CT, MRI, ultrasound, and other medical images securely on your smartphone or tablet at anytime, anywhere. From quick case reviews to patient consultations, mobility is transforming how imaging fits into everyday healthcare. https://play.google.com/store/apps/details?id=dicom.feng.gao&hl=en-US&pli=1 |
| <br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one global positioning system (GPS) connection in communication with the at least one CPU; | Google Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals to calculate distance between detector and source. Filtering WiFi/Bluetooth ranging functions and GPS location data. Filtering GPS derived distances based on jump in calculated position or when GPS reports jump in position but phone accelerometer sensors do not show rapid acceleration. Specific models in different categories of radiation instruments (dosimeters, survey meters, personal radiation detectors, backpacks, nuclide identifiers, and mobile systems). 5th Theory |

| | | |
|---|---|---|
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | Google Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals to calculate distance between detector and source. Filtering WiFi/ Bluetooth ranging functions and GPS location data. Filtering GPS derived distances based on jump in calculated position or when GPS reports jump in position but phone accelerometer sensors do not show rapid acceleration. Specific models in different categories of radiation instruments (dosimeters, survey meters, personal radiation detectors, backpacks, nuclide identifiers, and mobile systems). 5th Theory |
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | Google Beacon is a type of Bluetooth technology with proximity-based triggers. These triggers affect both the physical and digital world. Using Bluetooth low energy (BLE) hardware technology, beacons communicate with nearby smart devices like smartphones, tablets, etc. Different types of beacons that perform different tasks. 5th Theory |
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock the phone, replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account.<br><br>Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. |

| | | |
|---|---|---|
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | Pixel phones use USB-C with USB 2.0 power adapters and cables. To charge your phone with a USB-A power adapter, use a USB-C to USB-A cable. <br><br> To use wireless charging … acquire a wireless charging pad. Most wireless charging devices support the Qi standard: ensure the pad you buy is compatible with your Android phone. https://www.androidauthority.com/enable-wireless-charging-android-3328947/ |
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris). <br><br> Biometric Authentication is a way for users to authenticate using face or fingerprint recognition. It's very important especially for financial and healthcare apps that require authentication every time the user opens the app. |
| Google Tensor <br> Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., **heart rate**) or a device mounted on a drone to detect chemical warfare agents. *1st Theory* <br><br> ATAK has various end-user versions: ATAK - Civilian (ATAK-CIV); ATAK - Government (ATAK-GOV); and, ATAK - Military (ATAK-MIL). |

11

| | | |
|---|---|---|
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | Smartphones provide hardware and software capability which can be incorporated with [CBR] sensors, enabling accurate on-site portable sensing. The camera, screen, and LED flashlight of the smartphone can be employed as components of the sensor. https://link. springer.com/ article/10. 1007/s11468-022-01672-1 |
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU... | Conversion of an NFC tag into a CARD enables wireless rf detection of chemical analytes with a smartphone. NFC-enabled smartphones communicate with NFC tags by simultaneously energizing the NFC tag with an alternating magnetic field (f = 13.56 MHz) through inductive coupling and transferring data by signal modulation. NFC Reader is a simple and efficient tool letting you to read contact-less tags on your smartphones and tablets. |
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | ... a transmitter or a transceiver in communication with ... one CPU configured to send signals to monitor ... a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or... detect ... chemical biological... agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., *heart rate*) or a device mounted on a drone to detect chemical warfare agents. *1st Theory* |

12

| Google Tensor CPUs Generations 1, 2, 3, 4 & 5 (2021 – 2025) | Patent #: 10,163,287; Independent Claim 6 | Google directs and controls the manner or timing of the actors, because Google controls the release of its Tensor CPUs and Android Operating Systems' Source Code for modifications |
|---|---|---|
| Google Tensor<br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | A monitoring equipment, comprising: | Est. Google Pixel phone sales that include the Google Tensor:<br><br>2021: 7M units; 2022: 8M units; 2023: 10M units; 2024: 12M units; 2025: 15M units<br><br>The number of Google phones issued with a CPU, an operating system, and an open-source code that enables the phones to be modified to function as a monitoring equipment. |
| Google Tensor<br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one central processing unit (CPU); | Est. Google Pixel phone sales that include the Google Tensor:<br><br>2021: 7M units; 2022: 8M units; 2023: 10M units; 2024: 12M units; 2025: 15M units<br><br>The number of Google phones issued with a CPU, an operating system, and an open-source code that enables the phones to be modified to function as a monitoring equipment. |
| Google Tensor<br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one motion sensor in communication with the at least one CPU; | Mobile Phone-Connected Wearable Motion Sensors to Assess Postoperative Mobilization. Wearable motion sensors measure movements over time … May be used to interpret the duration, intensity, frequency, and variations of the patient's physical activity https://pmc.ncbi.nlm.nih.gov/articles/PMC4705357/<br><br>Megapixel resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. Tiny sensors tucked into cell phones could map airborne toxins in real time. Source: https://www. understanding nano.com/cell-phone-sensors-toxins.html |

13

| | | |
|---|---|---|
| <br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one light indicator in communication with the at least one CPU; | Turn on Flash notifications<br>• On your device, go to Settings Flash Notifications.<br>• Turn on Camera or Screen flash.<br>• To change the screen flash color, tap Screen flash.<br>• To choose your desired color, tap the color.<br>• To view the color changes, tap Preview.<br>• Flash notifications still follow your "Do not disturb" settings.<br>• If you set your alarm to still work in "Do not disturb" mode, your device still flashes for alarms.<br>• Flash notifications still work in silent mode. Turn on silent mode, and turn off vibration, device will flash when receive notification. |
| <br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one viewing screen for monitoring in communication with the at least one CPU; | Android Mobile Dicom (Diconde) Viewer application. Mobile DICOM viewer apps and cloud platforms let you open CT, MRI, ultrasound, and other medical images securely on your smartphone or tablet at anytime, anywhere. From quick case reviews to patient consultations, mobility is transforming how imaging fits into everyday healthcare.<br>https://play.google.com/store/apps/details?id=dicom.feng.gao&hl=en-US&pli=1 |
| <br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one global positioning system (GPS) connection in communication with the at least one CPU; | Google Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals to calculate distance between detector and source. Filtering WiFi/Bluetooth ranging functions and GPS location data. Filtering GPS derived distances based on jump in calculated position or when GPS reports jump in position but phone accelerometer sensors do not show rapid acceleration. Specific models in different categories of radiation instruments (dosimeters, survey meters, personal radiation detectors, backpacks, nuclide identifiers, and mobile systems). 5th Theory |

| | | |
|---|---|---|
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | Google Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals to calculate distance between detector and source. Filtering WiFi/Bluetooth ranging functions and GPS location data. Filtering GPS derived distances based on jump in calculated position or when GPS reports jump in position but phone accelerometer sensors do not show rapid acceleration. Specific models in different categories of radiation instruments (dosimeters, survey meters, personal radiation detectors, backpacks, nuclide identifiers, and mobile systems). 5th Theory |
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | Google Beacon is a type of Bluetooth technology with proximity-based triggers. These triggers affect both the physical and digital world. Using Bluetooth low energy (BLE) hardware technology, beacons communicate with nearby smart devices like smartphones, tablets, etc. Different types of beacons that perform different tasks. 5th Theory |
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock the phone, replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account.<br><br>Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. |

15

| | | |
|---|---|---|
| Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | Pixel phones use USB-C with USB 2.0 power adapters and cables. To charge your phone with a USB-A power adapter, use a USB-C to USB-A cable.<br><br>To use wireless charging … acquire a wireless charging pad. Most wireless charging devices support the Qi standard: ensure the pad you buy is compatible with your Android phone. https://www.androidauthority.com/enable-wireless-charging-android-3328947/ |
| Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).<br><br>Biometric Authentication is a way for users to authenticate using face or fingerprint recognition. It's very important especially for financial and healthcare apps that require authentication every time the user opens the app. |
| Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | Smartphones provide hardware and software capability which can be incorporated with [CBR] sensors, enabling accurate on-site portable sensing. The camera, screen, and LED flashlight of the smartphone can be employed as components of the sensor. https://link. springer.com/ article/10. 1007/s11468-022-01672-1 |

16

| | | |
|---|---|---|
| <br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | Conversion of an NFC tag into a CARD enables wireless rf detection of chemical analytes with a smartphone. NFC-enabled smartphones communicate with NFC tags by simultaneously energizing the NFC tag with an alternating magnetic field (f = 13.56 MHz) through inductive coupling and transferring data by signal modulation. NFC Reader is a simple and efficient tool letting you to read contact-less tags on your smartphones and tablets. |
| <br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | … a transmitter or a transceiver in communication with … one CPU configured to send signals to monitor … a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect … chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit, ATAK* (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., *heart rate*) or a device mounted on a drone to detect chemical warfare agents. *1st Theory* |

| Google Tensor CPUs Generations 1, 2, 3, 4 & 5 (2021 – 2025) | Patent #: 10,984,619; Independent Claim 1 | Google directs and controls the manner or timing of the actors, because Google controls the release of its Tensor CPUs and Android Operating Systems' Source Code for modifications |
|---|---|---|
| Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of: | Est. Google Pixel phone sales that include the Google Tensor: 2021: 7M units; 2022: 8M units; 2023: 10M units; 2024: 12M units; 2025: 15M units The number of Google phones issued with a CPU, an operating system, and an open-source code that enables the phones to be modified to function as a communication device. |
| Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | processing instructions to lock, unlock, or disable the lock of the communication device; | Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock the phone, replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account. Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. |
| Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob; | Two-way communication key fobs for Google Android devices enable users to interact with their smartphones or other connected devices remotely. These key fobs typically utilize Bluetooth technology for seamless communication. Examples: Smart car keys that allow for keyless entry and engine start. Smart home key fobs that control lighting, security systems, and appliances. Remote Control Functions: Users can lock/unlock doors, start vehicles, or control smart home devices. |

18

| | | |
|---|---|---|
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system; | Android digital car key lets you unlock and start your vehicle with your phone, similar to Apple's CarKey. The feature relies on NFC or UWB tech in newer smartphones, supporting quick entry and remote controls. It's compatible with select Android phones and numerous vehicles from various automakers. Google introduced the feature in 2021 alongside Android 12. |
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle; | Google's Android devices utilized unmanned aerial vehicles (UAVs) apps. for navigation, control, data processing. Android's open-source nature allows for customization and flexibility in developing UAV applications. Android devices can integrate with various sensors (GPS, cameras, etc.) to enhance UAV functionality. Devices like the Google Pixel series are used for their processing power and display quality. Rugged Devices: Specialized rugged Android tablets are available for harsh environments, ensuring durability during operations. |
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition; | BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris). Biometric Authentication is a way for users to authenticate using face or fingerprint recognition. It's very important especially for financial and healthcare apps that require authentication every time the user opens the app. |

19

| | | |
|---|---|---|
| <br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC); | Conversion of an NFC tag into a CARD enables wireless rf detection of chemical analytes with a smartphone. NFC-enabled smartphones communicate with NFC tags by simultaneously energizing the NFC tag with an alternating magnetic field ($f = 13.56$ MHz) through inductive coupling and transferring data by signal modulation. NFC Reader is a simple and efficient tool letting you to read contact-less tags on your smartphones and tablets |
| <br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor; | Megapixel resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. Tiny sensors tucked into cell phones could map airborne toxins in real time. Source: https://www. understanding nano.com/cell-phone-sensors-toxins.html<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., *heart rate*) or a device mounted on a drone to detect chemical warfare agents. *1st Theory* |
| <br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); | Google android mobile apps, developed specifically to provide guidance to emergency response personnel during hazardous materials (HAZMAT) /chemical, biological, radiological, nuclear, and explosive (CBRNE) events. These apps are able to integrate with many features on Android mobile devices, enabling them to capitalize on the functionality of GPS technology, e-mail, built-in cameras, and notification systems. https://www.dhs.gov/sites/default/files/ publications/HazMat-CBRNE-Apps-HLT_0813-508.pdf |

| | | |
|---|---|---|
| <br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; | Google Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals to calculate distance between detector and source. Filtering WiFi/Bluetooth ranging functions and GPS location data. Filtering GPS derived distances based on jump in calculated position or when GPS reports jump in position but phone accelerometer sensors do not show rapid acceleration. Specific models in different categories of radiation instruments (dosimeters, survey meters, personal radiation detectors, backpacks, nuclide identifiers, and mobile systems). 5th Theory |
| <br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and, | Google offers several Android-based solutions for Internet of Things (IoT) applications, primarily through its Android Things platform; designed for building IoT devices. Integrates with Android Things for device management and data processing. Offers tools for data analytics, machine learning, and real-time processing. Facilitates connectivity and management of IoT devices through Google Cloud services. Supports a wide range of devices, from small sensors to complex systems. Use Cases: Smart home devices, industrial automation, and health monitoring systems. |
| <br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory. | Google Android devices' CPUs (Central Processing Units) manage tasks and processes efficiently. The CPU is the primary component that executes instructions from applications and the operating system. Developers can optimize applications to utilize CPU resources effectively, enhancing performance and user experience. The CPU processes data and executes commands by performing arithmetic, logic, control, and input/output operations. The Android operating system manages CPU resources through scheduling and prioritization of tasks. |

21

**Independent Claim 1 of the '619 Patent: Dependent Claims 2 thru 10**

2. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of processing operational instructions for at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner.

3. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal to lock, unlock, or disable the lock of the communication device.

4. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition.

5. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of at least short-range wireless radio frequency near-field communication (NFC).

6. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

7. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal from at least one of chemical, biological, radiological, nuclear, or explosives detection.

8. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection.

9. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device.

10. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of the operational and functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.

| Google Tensor CPUs Generations 1, 2, 3, 4 & 5 (2021 – 2025) | Patent #: 10,984,619; Independent Claim 11 | Google directs and controls the manner or timing of the actors, because Google controls the release of its Tensor CPUs and Android Operating Systems' Source Code for modifications |
|---|---|---|
| Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: | Est. Google Pixel phone sales that include the Google Tensor: 2021: 7M units; 2022: 8M units; 2023: 10M units; 2024: 12M units; 2025: 15M units The number of Google phones issued with a CPU, an operating system, and an open-source code that enables the phones to be modified to function as a communication device. |
| Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | processing instructions to lock, unlock, or disable the lock of the communication device; | Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock the phone, replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account. Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. |
| Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob; | Two-way communication key fobs for Google Android devices enable users to interact with their smartphones or other connected devices remotely. These key fobs typically utilize Bluetooth technology for seamless communication. Examples: Smart car keys that allow for keyless entry and engine start. Smart home key fobs that control lighting, security systems, and appliances. Remote Control Functions: Users can lock/unlock doors, start vehicles, or control smart home devices. |

23

| | | |
|---|---|---|
| <br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system; | Android digital car key lets you unlock and start your vehicle with your phone, similar to Apple's CarKey. The feature relies on NFC or UWB tech in newer smartphones, supporting quick entry and remote controls. It's compatible with select Android phones and numerous vehicles from various automakers. Google introduced the feature in 2021 alongside Android 12. |
| <br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle; | Google's Android devices utilized unmanned aerial vehicles (UAVs) apps. for navigation, control, data processing. Android's open-source nature allows for customization and flexibility in developing UAV applications. Android devices can integrate with various sensors (GPS, cameras, etc.) to enhance UAV functionality. Devices like the Google Pixel series are used for their processing power and display quality. Rugged Devices: Specialized rugged Android tablets are available for harsh environments, ensuring durability during operations. |
| <br><br>Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition; | BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).<br><br>Biometric Authentication is a way for users to authenticate using face or fingerprint recognition. It's very important especially for financial and healthcare apps that require authentication every time the user opens the app. |

24

| | | |
|---|---|---|
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC); | Conversion of an NFC tag into a CARD enables wireless rf detection of chemical analytes with a smartphone. NFC-enabled smartphones communicate with NFC tags by simultaneously energizing the NFC tag with an alternating magnetic field (f = 13.56 MHz) through inductive coupling and transferring data by signal modulation. NFC Reader is a simple and efficient tool letting you to read contact-less tags on your smartphones and tablets |
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor; | Megapixel resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. Tiny sensors tucked into cell phones could map airborne toxins in real time. Source: https://www. understanding nano.com/cell-phone-sensors-toxins.html<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., *heart rate*) or a device mounted on a drone to detect chemical warfare agents. *1st Theory* |
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); | Google android mobile apps, developed specifically to provide guidance to emergency response personnel during hazardous materials (HAZMAT) /chemical, biological, radiological, nuclear, and explosive (CBRNE) events. These apps are able to integrate with many features on Android mobile devices, enabling them to capitalize on the functionality of GPS technology, e-mail, built-in cameras, and notification systems. https://www.dhs.gov/sites/default/files/ publications/HazMat-CBRNE-Apps-HLT_0813-508.pdf |

| | | |
|---|---|---|
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; | Google Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals to calculate distance between detector and source. Filtering WiFi/ Bluetooth ranging functions and GPS location data. Filtering GPS derived distances based on jump in calculated position or when GPS reports jump in position but phone accelerometer sensors do not show rapid acceleration. Specific models in different categories of radiation instruments (dosimeters, survey meters, personal radiation detectors, backpacks, nuclide identifiers, and mobile systems). 5th Theory |
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and, | Google offers several Android-based solutions for Internet of Things (IoT) applications, primarily through its Android Things platform; designed for building IoT devices. Integrates with Android Things for device management and data processing. Offers tools for data analytics, machine learning, and real-time processing. Facilitates connectivity and management of IoT devices through Google Cloud services. Supports a wide range of devices, from small sensors to complex systems. Use Cases: Smart home devices, industrial automation, and health monitoring systems. |
|  Google's Tensor CPUs are recognized as the "brains" of the mobile device. The CPU carries out the operational and functional instructions of the device | whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory. | Google Android devices' CPUs (Central Processing Units) manage tasks and processes efficiently. The CPU is the primary component that executes instructions from applications and the operating system. Developers can optimize applications to utilize CPU resources effectively, enhancing performance and user experience. The CPU processes data and executes commands by performing arithmetic, logic, control, and input/output operations. The Android operating system manages CPU resources through scheduling and prioritization of tasks. |

**Independent Claim 11 of the '619 Patent: Dependent Claims 12 thru 20**

12. The central processing unit (CPU) of claim 11, capable of processing operational instructions for at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner.

13. The central processing unit (CPU) of claim 11, capable of processing operational instructions to lock, unlock, or disable the lock of the communication device.

14. The central processing unit (CPU) of claim 11, capable of processing operational instructions of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition.

15. The central processing unit (CPU) of claim 11, capable of processing operational instructions from short-range wireless radio frequency near-field communication (NFC).

16. The central processing unit (CPU) of claim 11, capable of processing operational instructions from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

17. The central processing unit (CPU) of claim 11, capable of processing operational instructions from at least chemical, biological, radiological, nuclear, or explosives detection.

18. The central processing unit (CPU) of claim 11, capable of processing operational instructions through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection.

19. The central processing unit (CPU) of claim 11, capable of processing operational instructions of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device.

20. The central processing unit (CPU) of claim 11, capable of processing operational instructions of functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.

| Google's Tensor Processing Unit (TPU) | Patent #: 11,645,898; Independent Claim 1 | Google directs and controls the manner or timing of the actors, because Google controls the release of its Tensor TPUs and Android Operating Systems' Source Code for modifications |
|---|---|---|
| Google's Tensor Processing Units (TPUs) are recognized as the "brains" of Google's Self-Drive Vehicles. The TPU carries out the operational and functional instructions of the vehicle | 1. A pre-programmed stall, stop, vehicle slow-down system, that comprises at least one central processing unit (CPU), capable of: | Modern Google CPUs are influenced by the Reduced Instruction Set Computer (RISC) design style. The idea of RISC is to define simple instructions (load, store, add, multiply) and execute them as fast as possible. Google's TPUs use Complex Instruction Set Computer (CISC) style as an instruction set. CISC focus on implementing high-level instructions that run complex tasks such as multiply-and-add many times with each instruction. |
| Google's Tensor Processing Units (TPUs) are recognized as the "brains" of Google's Self-Drive Vehicles. The TPU carries out the operational and functional instructions of the vehicle | processing instructions to stall, stop, or slow-down a vehicle when the vehicle receives a signal from at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, a tablet, a PDA, or a handheld; | Android digital car key lets you unlock and start your vehicle with your phone, similar to Apple's CarKey. The feature relies on NFC or UWB tech in newer smartphones, supporting quick entry and remote controls. It's compatible with select Android phones and numerous vehicles from various automakers. Google introduced the feature in 2021 alongside Android 12. |
| Google's Tensor Processing Units (TPUs) are recognized as the "brains" of Google's Self-Drive Vehicles. The TPU carries out the operational and functional instructions of the vehicle | processing instructions to stall, stop, or slow-down a vehicle when the vehicle receives a signal from at least one of cellular, satellite, or radio-frequency (RF); | "[i]f the situation calls for it, the autonomous car can even summon a member of the corporate team to report to the scene … the vehicles "understand" when they've been involved in an accident, and can immediately send a message to headquarters. Once it detects that its airbags have gone off, the self-driving car will also automatically disengage from autonomous mode, brake until it reaches a full stop, then call for help. https://www.dmv.org/articles/waymo-provides-emergency-response-guide-for-autonomous-riders |

28

| | | |
|---|---|---|
| <br><br>Google's Tensor Processing Units (TPUs) are recognized as the "brains" of Google's Self-Drive Vehicles. The TPU carries out the operational and functional instructions of the vehicle | processing instructions to stall, stop, or slow-down a vehicle when the vehicle is experiencing unintended acceleration | Google develops self-driving vehicles which focuses on autonomous driving technology. Google utilizes advanced hardware and software systems, including the Google Tensor Processing Unit (TPU), to enhance the performance of its self-driving algorithms. Autonomous Vehicles: Google operates a fleet of self-driving cars that use a combination of sensors, cameras, and navigation. TPUs enhance perception, decision-making, and navigation for autonomous driving. |
| <br><br>Google's Tensor Processing Units (TPUs) are recognized as the "brains" of Google's Self-Drive Vehicles. The TPU carries out the operational and functional instructions of the vehicle | processing instructions to stall, stop, or slow-down a vehicle when the vehicle is experiencing lane departure; | Google develops self-driving vehicles through Waymo, which focuses on autonomous driving technology. The company utilizes advanced hardware and software systems, including the Google Tensor Processing Unit (TPU), to enhance the performance of its self-driving algorithms. Autonomous Vehicles: Google operates a fleet of self-driving cars that use a combination of sensors, cameras, and navigation. TPUs are specialized hardware designed to accelerate machine learning tasks. TPUs enhance perception, decision-making, and navigation for autonomous driving. |
| <br><br>Google's Tensor Processing Units (TPUs) are recognized as the "brains" of Google's Self-Drive Vehicles. The TPU carries out the operational and functional instructions of the vehicle | processing instructions to stall, stop, or slow-down a vehicle when a collision or crash is detected; | Google develops self-driving vehicles through Waymo, which focuses on autonomous driving technology. The company utilizes advanced hardware and software systems, including the Google Tensor Processing Unit (TPU), to enhance the performance of its self-driving algorithms. Autonomous Vehicles: Waymo operates a fleet of self-driving cars that use a combination of sensors, cameras, and navigation. TPUs are specialized hardware designed to accelerate machine learning tasks, making them ideal for processing the vast amounts of data generated by self-driving vehicles. TPUs enhance perception, decision-making, and navigation for autonomous driving. |

29

| | | |
|---|---|---|
|  Google's Tensor Processing Units (TPUs) are recognized as the "brains" of Google's Self-Drive Vehicles. The TPU carries out the operational and functional instructions of the vehicle | processing instructions to stall, stop, or slow-down a vehicle when the vehicle has been reported as stolen; | Google develops self-driving vehicles which focuses on autonomous driving technology. The company utilizes advanced hardware and software systems, including the Google Tensor Processing Unit (TPU), to enhance the performance of its self-driving algorithms. Autonomous Vehicles: Waymo operates a fleet of self-driving cars that use a combination of sensors, cameras, and navigation. TPUs are specialized hardware designed to accelerate machine learning tasks, making them ideal for processing the vast amounts of data generated by self-driving vehicles. TPUs enhance perception, decision-making, and navigation for autonomous driving. |
|  Google's Tensor Processing Units (TPUs) are recognized as the "brains" of Google's Self-Drive Vehicles. The TPU carries out the operational and functional instructions of the vehicle | processing instructions to stall, stop, or slow-down a vehicle when the vehicle has moved outside a pre-programmed designated perimeter; | Google develops self-driving vehicles which focuses on autonomous driving technology. The company utilizes advanced hardware and software systems, including the Google Tensor Processing Unit (TPU), to enhance the performance of its self-driving algorithms. Autonomous Vehicles: Waymo operates a fleet of self-driving cars that use a combination of sensors, cameras, and navigation. TPUs are specialized hardware designed to accelerate machine learning tasks, making them ideal for processing the vast amounts of data generated by self-driving vehicles. TPUs enhance perception, decision-making, and navigation for autonomous driving. |
|  Google's Tensor Processing Units (TPUs) are recognized as the "brains" of Google's Self-Drive Vehicles. The TPU carries out the operational and functional instructions of the vehicle | processing instructions to stall, stop, or slow-down a vehicle when at least one of a chemical hazard, a biological hazard, a radiological hazard; a nuclear hazard; or explosives have been detected; | Google android mobile apps, developed specifically to provide guidance to emergency response personnel during hazardous materials (HAZMAT) /chemical, biological, radiological, nuclear, and explosive (CBRNE) events. These apps are able to integrate with many features on Android mobile devices, enabling them to capitalize on the functionality of GPS technology, e-mail, built-in cameras, and notification systems. https://www.dhs.gov/sites/default/files/ publications/HazMat-CBRNE-Apps-HLT_0813-508.pdf |

30

| | | |
|---|---|---|
|  Google's Tensor Processing Units (TPUs) are recognized as the "brains" of Google's Self-Drive Vehicles. The TPU carries out the operational and functional instructions of the vehicle | processing instructions to stall, stop, or slow-down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; and, | Google develops self-driving vehicles through Waymo, which focuses on autonomous driving technology. The company utilizes advanced hardware and software systems, including the Google Tensor Processing Unit (TPU), to enhance the performance of its self-driving algorithms. Autonomous Vehicles: Waymo operates a fleet of self-driving cars that use a combination of sensors, cameras, and navigation. TPUs are specialized hardware designed to accelerate machine learning tasks, making them ideal for processing the vast amounts of data generated by self-driving vehicles. TPUs enhance perception, decision-making, and navigation for autonomous driving. |
|  Google's Tensor Processing Units (TPUs) are recognized as the "brains" of Google's Self-Drive Vehicles. The TPU carries out the operational and functional instructions of the vehicle | Wherein, when the central processing unit (CPU) processes instructions to stall, stop, or slow-down a vehicle, a distress signal is sent to at least one of a monitoring site, a control center, or is recorded for storage. | Google develops self-driving vehicles through Waymo, which focuses on autonomous driving technology. The company utilizes advanced hardware and software systems, including the Google Tensor Processing Unit (TPU), to enhance the performance of its self-driving algorithms. Autonomous Vehicles: Waymo operates a fleet of self-driving cars that use a combination of sensors, cameras, and navigation. TPUs are specialized hardware designed to accelerate machine learning tasks, making them ideal for processing the vast amounts of data generated by self-driving vehicles. TPUs enhance perception, decision-making, and navigation for autonomous driving. |

31

# Exhibit B

# Claim Chart(s) for the Alleged "Direct Infringement" of Plaintiff's '761 Patent; '891 Patent; and '898 Patent

| Google's Self-Drive Vehicles for (Autonomous and Semi-Autonomous) | Patent #: 8,334,761; Independent Claim 1 |
|---|---|
| Remote Monitoring: A team of safety operators monitors the vehicles remotely. Operators can intervene if necessary, providing an additional layer of safety. Google [Waymo] recently added the ability of remote operators to do low-speed remote drive to do things like move cars off the road, or out of trouble situations like blocked streets and emergency vehicles. These monitoring systems work together to ensure that Google's self-driving vehicles operate safely and effectively on public roads. | 1. A vehicle adapted for receipt of a signal from a remote location to remotely control the vehicles' stall-to-stop means or vehicle slowdown means, comprising: |
| Google's Self-Drive Vehicle comprises: Automatic emergency braking systems; Enhanced or Adaptive cruise control; Distance Control Assists Rear-view alarm, to detect obstacles behind; Anti-lock braking system (ABS); Emergency Braking Assistance (EBA); Electronic Stability Control (ESC); Electronic brake force distribution (EBD) … | at least one of a brake, a foot peddle, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; |
| Google's Self-Drive Vehicle comprises: Automatic emergency braking systems; Enhanced or Adaptive cruise control; Distance Control Assists Rear-view alarm, to detect obstacles behind; Anti-lock braking system (ABS); Emergency Braking Assistance (EBA); Electronic Stability Control (ESC); Electronic brake force distribution (EBD) … | an electrical system in electrical communication with at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| Google's Self-Drive Vehicle comprises: Automatic emergency braking systems; Enhanced or Adaptive cruise control; Distance Control Assists Rear-view alarm, to detect obstacles behind; Anti-lock braking system (ABS); Emergency Braking Assistance (EBA); Electronic Stability Control (ESC); Electronic brake force distribution (EBD) … | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |

3

| | |
|---|---|
| Remote Monitoring: A team of safety operators monitors the vehicles remotely. Operators can intervene if necessary, providing an additional layer of safety. Google [Waymo] recently added the ability of remote operators to do low-speed remote drive to do things like move cars off the road, or out of trouble situations like blocked streets and emergency vehicles. These monitoring systems work together to ensure that Google's self-driving vehicles operate safely and effectively on public roads. | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means; |
| Remote Monitoring: A team of safety operators monitors the vehicles remotely. Operators can intervene if necessary, providing an additional layer of safety. Google [Waymo] recently added the ability of remote operators to do low-speed remote drive to do things like move cars off the road, or out of trouble situations like blocked streets and emergency vehicles. These monitoring systems work together to ensure that Google's self-driving vehicles operate safely and effectively on public roads. | a receiver in computer communication with the computer system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means; and |
| Google's Self-Drive Vehicle comprises: Automatic emergency braking systems; Enhanced or Adaptive cruise control; Distance Control Assists Rear-view alarm, to detect obstacles behind; Anti-lock braking system (ABS); Emergency Braking Assistance (EBA); Electronic Stability Control (ESC); Electronic brake force distribution (EBD) … | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| Remote Monitoring: A team of safety operators monitors the vehicles remotely. Operators can intervene if necessary, providing an additional layer of safety. Google [Waymo] recently added the ability of remote operators to do low-speed remote drive to do things like move cars off the road, or out of trouble situations like blocked streets and emergency vehicles. These monitoring systems work together to ensure that Google's self-driving vehicles operate safely and effectively on public roads. | wherein a user determines that the vehicle has been stolen and in response initiates a distress signal communication over a communication network that causes communication between the vehicle and the remote location and that then causes the at least one control signal to be sent from the remote location via the communication network that includes at least one of a cell phone tower and a satellite. |

| Google's Self-Drive Vehicles for (Autonomous and Semi-Autonomous) | Patent #: RE43,891; Independent Claim 11 |
|---|---|
| Remote Monitoring: A team of safety operators monitors the vehicles remotely. Operators can intervene if necessary, providing an additional layer of safety. Google [Waymo] recently added the ability of remote operators to do low-speed remote drive to do things like move cars off the road, or out of trouble situations like blocked streets and emergency vehicles. These monitoring systems work together to ensure that Google's self-driving vehicles operate safely and effectively on public roads. | 11. A vehicle adapted for receipt of a signal from a remote location to control the vehicle's stall-to-stop means or vehicle slowdown means, comprising: |
| Google's Self-Drive Vehicle comprises: Automatic emergency braking systems; Enhanced or Adaptive cruise control; Distance Control Assists Rear-view alarm, to detect obstacles behind; Anti-lock braking system (ABS); Emergency Braking Assistance (EBA); Electronic Stability Control (ESC); Electronic brake force distribution (EBD) … | at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; |
| Google's Self-Drive Vehicle comprises: Automatic emergency braking systems; Enhanced or Adaptive cruise control; Distance Control Assists Rear-view alarm, to detect obstacles behind; Anti-lock braking system (ABS); Emergency Braking Assistance (EBA); Electronic Stability Control (ESC); Electronic brake force distribution (EBD) … | an electrical system in electrical communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| Google's Self-Drive Vehicle comprises: Automatic emergency braking systems; Enhanced or Adaptive cruise control; Distance Control Assists Rear-view alarm, to detect obstacles behind; Anti-lock braking system (ABS); Emergency Braking Assistance (EBA); Electronic Stability Control (ESC); Electronic brake force distribution (EBD) … | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |

| | |
|---|---|
| Remote Monitoring: A team of safety operators monitors the vehicles remotely. Operators can intervene if necessary, providing an additional layer of safety. Google [Waymo] recently added the ability of remote operators to do low-speed remote drive to do things like move cars off the road, or out of trouble situations like blocked streets and emergency vehicles. These monitoring systems work together to ensure that Google's self-driving vehicles operate safely and effectively on public roads. | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means to stall or slow down the vehicle; |
| Remote Monitoring: A team of safety operators monitors the vehicles remotely. Operators can intervene if necessary, providing an additional layer of safety. Google [Waymo] recently added the ability of remote operators to do low-speed remote drive to do things like move cars off the road, or out of trouble situations like blocked streets and emergency vehicles. These monitoring systems work together to ensure that Google's self-driving vehicles operate safely and effectively on public roads. | a receiver in computer communication with the computer system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means to stall or slow down the vehicle; and |
| Google's Self-Drive Vehicle comprises: Automatic emergency braking systems; Enhanced or Adaptive cruise control; Distance Control Assists Rear-view alarm, to detect obstacles behind; Anti-lock braking system (ABS); Emergency Braking Assistance (EBA); Electronic Stability Control (ESC); Electronic brake force distribution (EBD) … | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| Remote Monitoring: A team of safety operators monitors the vehicles remotely. Operators can intervene if necessary, providing an additional layer of safety. Google [Waymo] recently added the ability of remote operators to do low-speed remote drive to do things like move cars off the road, or out of trouble situations like blocked streets and emergency vehicles. These monitoring systems work together to ensure that Google's self-driving vehicles operate safely and effectively on public roads. | wherein the at least one control signal is sent due to unauthorized use of the vehicle, and wherein an originating first signal that eventually causes the at least one control signal to be sent is generated upon initial verification of the unauthorized use of the vehicle; |

6

| | |
|---|---|
| Remote Monitoring: A team of safety operators monitors the vehicles remotely. Operators can intervene if necessary, providing an additional layer of safety. Google [Waymo] recently added the ability of remote operators to do low-speed remote drive to do things like move cars off the road, or out of trouble situations like blocked streets and emergency vehicles. These monitoring systems work together to ensure that Google's self-driving vehicles operate safely and effectively on public roads. | at least one mobile, portable, or fixed device capable of sending the at least one control signal from the remote location that is of electromagnet pulse, electrostatic discharge, microwave beam or radio frequency, to disable the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and horsepower of the motor. |

| Google's Self-Drive Vehicles for (Autonomous and Semi-Autonomous) | Patent #: RE43,891; Independent Claim 44 |
|---|---|
| Google's Self-Drive Vehicle comprises: Automatic emergency braking systems; Enhanced or Adaptive cruise control; Distance Control Assists Rear-view alarm, to detect obstacles behind; Anti-lock braking system (ABS); Emergency Braking Assistance (EBA); Electronic Stability Control (ESC); Electronic brake force distribution (EBD) … | 44. A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising: |
| Google's Self-Drive Vehicle comprises: Automatic emergency braking systems; Enhanced or Adaptive cruise control; Distance Control Assists Rear-view alarm, to detect obstacles behind; Anti-lock braking system (ABS); Emergency Braking Assistance (EBA); Electronic Stability Control (ESC); Electronic brake force distribution (EBD) … | an electrical system in electrical communication with at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; |
| Google's Self-Drive Vehicle comprises: Automatic emergency braking systems; Enhanced or Adaptive cruise control; Distance Control Assists Rear-view alarm, to detect obstacles behind; Anti-lock braking system (ABS); Emergency Braking Assistance (EBA); Electronic Stability Control (ESC); Electronic brake force distribution (EBD) … | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| Google's Self-Drive Vehicle comprises: Automatic emergency braking systems; Enhanced or Adaptive cruise control; Distance Control Assists Rear-view alarm, to detect obstacles behind; Anti-lock braking system (ABS); Emergency Braking Assistance (EBA); Electronic Stability Control (ESC); Electronic brake force distribution (EBD) … | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means; |

8

| | |
|---|---|
| Remote Monitoring: A team of safety operators monitors the vehicles remotely. Operators can intervene if necessary, providing an additional layer of safety. Google [Waymo] recently added the ability of remote operators to do low-speed remote drive to do things like move cars off the road, or out of trouble situations like blocked streets and emergency vehicles. These monitoring systems work together to ensure that Google's self-driving vehicles operate safely and effectively on public roads. | a receiver in computer communication with the computer system and adapted to receive at least one control signal in response to one of the vehicle's operating systems for monitoring the vehicle's condition upon exceeding a pre-programmed vehicle operating system parameter from the pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means such that the speed of the vehicle is initially decreased immediately after activation of the means upon initial receipt of the at least one control signal; and |
| Google's Self-Drive Vehicle comprises: Automatic emergency braking systems; Enhanced or Adaptive cruise control; Distance Control Assists Rear-view alarm, to detect obstacles behind; Anti-lock braking system (ABS); Emergency Braking Assistance (EBA); Electronic Stability Control (ESC); Electronic brake force distribution (EBD) … | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor. |

| Google's Self-Drive Vehicles for (Autonomous and Semi-Autonomous) | Patent #: RE43,891; Dependent Claims 47, 48, 49, 50, 51, & 53 |
|---|---|
| Google's ADAS are technologies that assist drivers with the safe operation of a vehicle. ADAS may provide adaptive cruise control, assist in avoiding collisions, alert drivers to possible obstacles or hazards, warn of lane departure, assist in lane centering, incorporate satellite navigation, provide traffic warnings, provide navigational assistance through smartphones, automate lighting, or provide other features. | 47. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a brake override system for stopping or slowing a vehicle experiencing unintended acceleration. |

| | |
|---|---|
| Google's ADAS are technologies that assist drivers with the safe operation of a vehicle. ADAS may provide adaptive cruise control, assist in avoiding collisions, alert drivers to possible obstacles or hazards, warn of lane departure, assist in lane centering, incorporate satellite navigation, provide traffic warnings, provide navigational assistance through smartphones, automate lighting, or provide other features. | 48. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a pre-crash system for stopping or slowing a vehicle to prevent a crash. |
| Google's ADAS are technologies that assist drivers with the safe operation of a vehicle. ADAS may provide adaptive cruise control, assist in avoiding collisions, alert drivers to possible obstacles or hazards, warn of lane departure, assist in lane centering, rear-view alarm, incorporate satellite navigation, provide traffic warnings, provide navigational assistance through smartphones, automate lighting, or provide other features. | 49. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a reverse acceleration slow-down system for stopping or slowing a vehicle traveling in reverse. |
| Google's ADAS are technologies that assist drivers with the safe operation of a vehicle. ADAS may provide adaptive cruise control, assist in avoiding collisions, alert drivers to possible obstacles or hazards, warn of lane departure, assist in lane centering, electronic stability control, incorporate satellite navigation, provide traffic warnings, provide navigational assistance through smartphones, automate lighting, or provide other features. | 50. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a stabilization system for stopping or slowing a vehicle to prevent a vehicle turnover. |
| Google's ADAS are technologies that assist drivers with the safe operation of a vehicle. ADAS may provide adaptive cruise control, assist in avoiding collisions, alert drivers to possible obstacles or hazards, warn of lane departure, assist in lane centering, incorporate satellite navigation, provide traffic warnings, provide navigational assistance through smartphones, automate lighting, or provide other features. | 51. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a lane departure system for stopping or slowing a vehicle to prevent or minimize accidents when the vehicle begins to move out of its lane. |

| | |
|---|---|
| Google's ADAS are technologies that assist drivers with the safe operation of a vehicle. ADAS may provide adaptive cruise control, assist in avoiding collisions, alert drivers to possible obstacles or hazards, warn of lane departure, assist in lane centering, incorporate satellite navigation, provide traffic warnings, provide navigational assistance through smartphones, automate lighting, or provide other features. | 53. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as an adjusted cruise control system for stopping or slowing a vehicle to prevent a crash. |

11

| Google's Self-Drive Vehicles for (Autonomous and Semi-Autonomous) | Patent #: 11,645,898; Independent Claim 2 |
|---|---|
| Google's Self-Drive Vehicle comprises: Automatic emergency braking systems; Enhanced or Adaptive cruise control; Distance Control Assists Rear-view alarm, to detect obstacles behind; Anti-lock braking system (ABS); Emergency Braking Assistance (EBA); Electronic Stability Control (ESC); Electronic brake force distribution (EBD) … | 2. A vehicle, that comprises at least one onboard computer system, electronic system, fuel system, air system, braking system, ignition system, transmission system, or PowerDrive system, capable of: |
| Remote Monitoring: A team of safety operators monitors the vehicles remotely. Operators can intervene if necessary, providing an additional layer of safety. Google [Waymo] recently added the ability of remote operators to do low-speed remote drive to do things like move cars off the road, or out of trouble situations like blocked streets and emergency vehicles. These monitoring systems work together to ensure that Google's self-driving vehicles operate safely and effectively on public roads. | stalling, stopping, or slowing down a vehicle when the vehicle receives a signal from at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, a tablet, a PDA, or a handheld; |
| Remote Monitoring: A team of safety operators monitors the vehicles remotely. Operators can intervene if necessary, providing an additional layer of safety. Google [Waymo] recently added the ability of remote operators to do low-speed remote drive to do things like move cars off the road, or out of trouble situations like blocked streets and emergency vehicles. These monitoring systems work together to ensure that Google's self-driving vehicles operate safely and effectively on public roads. | stalling, stopping, or slowing down a vehicle when the vehicle receives a signal from at least one of cellular, satellite, or radio-frequency (RF); |
| Google's ADAS are technologies that assist drivers with the safe operation of a vehicle. ADAS may provide adaptive cruise control, assist in avoiding collisions, alert drivers to possible obstacles or hazards, warn of lane departure, assist in lane centering, incorporate satellite navigation, provide traffic warnings, provide navigational assistance through smartphones, automate lighting, or provide other features. | stalling, stopping, or slowing down a vehicle when the vehicle is experiencing unintended acceleration; |

12

| | |
|---|---|
| Google's ADAS are technologies that assist drivers with the safe operation of a vehicle. ADAS may provide adaptive cruise control, assist in avoiding collisions, alert drivers to possible obstacles or hazards, warn of lane departure, assist in lane centering, incorporate satellite navigation, provide traffic warnings, provide navigational assistance through smartphones, automate lighting, or provide other features. | stalling, stopping, or slowing down a vehicle when the vehicle is experiencing lane departure; |
| Google's ADAS are technologies that assist drivers with the safe operation of a vehicle. ADAS may provide adaptive cruise control, assist in avoiding collisions, alert drivers to possible obstacles or hazards, warn of lane departure, assist in lane centering, incorporate satellite navigation, provide traffic warnings, provide navigational assistance through smartphones, automate lighting, or provide other features. | stalling, stopping, or slowing down a vehicle when a pedestrian, obstacle, collision or crash is detected; stalling, stopping, or slowing down a vehicle when the vehicle has been reported as stolen; |
| Google's ADAS are technologies that assist drivers with the safe operation of a vehicle. ADAS may provide adaptive cruise control, assist in avoiding collisions, alert drivers to possible obstacles or hazards, warn of lane departure, assist in lane centering, incorporate satellite navigation, provide traffic warnings, provide navigational assistance through smartphones, automate lighting, or provide other features. | stalling, stopping, or slowing down a vehicle when the vehicle has moved outside a pre-programmed designated perimeter; |
| Google's ADAS are technologies that assist drivers with the safe operation of a vehicle. ADAS may provide adaptive cruise control, assist in avoiding collisions, alert drivers to possible obstacles or hazards, warn of lane departure, assist in lane centering, incorporate satellite navigation, provide traffic warnings, provide navigational assistance through smartphones, automate lighting, or provide other features. | stalling, stopping, or slowing down a vehicle when at least one of a chemical hazard, a biological hazard, a radiological hazard; a nuclear hazard; or explosives have been detected; |

13

| | |
|---|---|
| Google's Vehicular Automation System is using technology to assist or replace the operator of a vehicle such as a car, truck, aircraft, rocket, military vehicle, or boat. Assisted vehicles are semi-autonomous, whereas vehicles that can travel without a human operator are autonomous. Roads present the most significant complexity given the unpredictability of the driving environment, including diverse road designs, driving conditions, traffic, obstacles, and geographical/cultural differences. Autonomy implies that the vehicle is responsible for all perception, monitoring, and control functions. | stalling, stopping, or slowing down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; and, |
| Remote Monitoring: A team of safety operators monitors the vehicles remotely. Operators can intervene if necessary, providing an additional layer of safety. Google [Waymo] recently added the ability of remote operators to do low-speed remote drive to do things like move cars off the road, or out of trouble situations like blocked streets and emergency vehicles. These monitoring systems work together to ensure that Google's self-driving vehicles operate safely and effectively on public roads. | Wherein, the vehicle is stalled, stopped, or slowed down, a distress signal is sent to at least one of a monitoring site, a control center, or is recorded for storage. |

14

## GOOGLE'S SELF-DRIVE VEHICLE [SPECIFICATIONS AND FEATURES]

## Vehicular Automation

Vehicular automation is using technology to assist or replace the operator of a vehicle such as a car, truck, aircraft, rocket, military vehicle, or boat. Assisted vehicles are semi-autonomous, whereas vehicles that can travel without a human operator are autonomous. The degree of autonomy may be subject to various constraints such as conditions. Autonomy is enabled by advanced driver-assistance systems (ADAS) of varying capacity.

Related technology includes advanced software, maps, vehicle changes, and outside vehicle support.

Autonomy presents varying issues for road, air, and marine travel. Roads present the most significant complexity given the unpredictability of the driving environment, including diverse road designs, driving conditions, traffic, obstacles, and geographical/cultural differences.

Autonomy implies that the vehicle is responsible for all perception, monitoring, and control functions.

## Advanced Driver-Assistance Systems (ADAS)

ADAS are technologies that assist drivers with the safe operation of a vehicle. ADAS may provide adaptive cruise control, assist in avoiding collisions, alert drivers to possible obstacles, warn of lane departure, assist in lane centering, incorporate satellite navigation, provide traffic warnings, provide navigational assistance through smartphones, automate lighting, or provide other features. Highway computers also manage the traffic and direct the cars to avoid crashes.

## Software

Autonomous vehicle software generally contains several different modules that work together to enable self-driving capabilities. The perception module ingests and processes data from various sensors, such cameras, LIDAR, RADAR, and ultrasonic SONAR, to create a comprehensive understanding of the vehicle's surroundings. The localization module uses 3D point cloud data, GPS, IMU, and mapping information to determine the vehicle's precise position, including its orientation, velocity, and angular rate. The planning module takes inputs from both perception and localization to compute actions to take, such as velocity and steering angle outputs. These modules are typically supported by machine learning algorithms,

15

particularly deep neural networks, which enable the vehicle to detect objects, interpret traffic patterns, and make real-time decisions. Furthermore, modern autonomous driving systems increasingly employ sensor fusion techniques that combine data from multiple sensors to improve accuracy and reliability in different environmental conditions.

**Perception**

The perception system is responsible for observing the environment. It must identify everything that could affect the trip, including other vehicles, pedestrians, cyclists, their movements, road conditions, obstacles, and other issues. Various makers use cameras, radar, lidar, sonar, and microphones that can collaboratively minimize errors.

**Navigation**

Navigation systems are a necessary element in autonomous vehicles. The Global Positioning System (GPS) is used for navigation by air, water, and land vehicles, particularly for off-road navigation.

For road vehicles, two approaches are prominent. One is to use maps that hold data about lanes and intersections, relying on the vehicle's perception system to fill in the details. The other is to use highly detailed maps that reduce the scope of real-time decision-making but require significant maintenance as the environment evolves. Some systems crowdsource their map updates, using the vehicles themselves to update the map to reflect changes such as construction or traffic used by the entire vehicle fleet.

Another potential source of information is the environment itself. Traffic data may be supplied by roadside monitoring systems and used to route vehicles to best use a limited road system. Additionally, modern GNSS enhancement technologies, such as real-time kinematic (RTK) and precise point positioning (PPP), enhance the accuracy of vehicle positioning to sub-meter level precision, which is crucial for autonomous navigation and decision-making.

**Applications for Google's Self-Drive Vehicles include the following:**

- Vehicle tracking system
- Rear-view alarm, to detect obstacles behind.
- Anti-lock braking system (ABS)
- Emergency Braking Assistance (EBA)

- Electronic brake force distribution (EBD)
- Traction control system (TCS)
- Four-wheel drive (AWD)
- Electronic Stability Control (ESC)
- Acceleration Slip Regulation (ASR)
- Electronic differential lock (EDL)
- Dynamic steering response (DSR)

These applications use various sensors to intervene when the car senses a possible loss of control. The car's control unit can reduce power from the engine and even apply the brakes on individual wheels to prevent the car from understeering or oversteering. Corrects the rate of power steering system to adapt it to vehicles speed and road conditions.

**Google's Self-Drive Vehicles; additional features include:** [1]
- Adaptive cruise control
- Lane departure warning system
- Assured Clear Distance Ahead
- Adaptive headlamps
- Advanced Automatic Collision Notification
- Intelligent Parking Assist System
- Automatic Parking
- Automotive night vision with pedestrian detection
- Blind spot monitoring
- Driver Monitoring System
- Precrash system
- Safe speed governing
- Traffic sign recognition
- Enhanced or Adaptive cruise control
- Distance control assist
- Automatic emergency braking systems

17

# Exhibit C

US011645898B2

(12) **United States Patent**
Golden

(10) **Patent No.:** US 11,645,898 B2
(45) **Date of Patent:** *May 9, 2023

(54) **MULTI SENSOR DETECTION, STALL TO STOP, AND LOCK DISABLING SYSTEM**

(71) Applicant: **Larry Golden**, Greenville, SC (US)

(72) Inventor: **Larry Golden**, Greenville, SC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 19 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/300,230**

(22) Filed: **Apr. 19, 2021**

(65) **Prior Publication Data**
US 2021/0256787 A1    Aug. 19, 2021

**Related U.S. Application Data**

(60) Continuation of application No. 16/350,683, filed on Dec. 19, 2018, now Pat. No. 10,984,619, which is a
(Continued)

(51) **Int. Cl.**
*G08B 15/00* (2006.01)
*B60R 25/102* (2013.01)
(Continued)

(52) **U.S. Cl.**
CPC ............ *G08B 15/00* (2013.01); *B60R 25/102* (2013.01); *G08B 13/2491* (2013.01); *B60R 25/018* (2013.01); *B60R 25/04* (2013.01); *B60R 25/104* (2013.01); *B60R 25/24* (2013.01); *G07C 9/00174* (2013.01); *G07C 9/00563* (2013.01); *G07C 9/00912* (2013.01); *G07C 9/20* (2020.01);
(Continued)

(58) **Field of Classification Search**
CPC .... G08B 15/00; G08B 15/001; G08B 15/004; G08B 25/009; G08B 25/00; B60R 25/00; B60R 25/01; B60R 25/018; B60R 25/04; B60R 25/0405; B60R 25/0415; B60R 25/10; B60R 25/102
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,385,469 A | 5/1983 | Scheuerpflug et al. |
| 4,544,267 A | 10/1985 | Schiller |

(Continued)

OTHER PUBLICATIONS

NPL search {May 6, 2022).*
(Continued)

*Primary Examiner* — Van T Trieu

(57) **ABSTRACT**

A multi sensor detection and disabling lock system includes detector cases for holding interchangeable detectors that sample for chemical, biological and radiological compounds, agents and elements, with each detector case disposed in or upon the monitored product. The detector case transmits detection information to a monitoring computer terminal and transmits a signal to a lock disabler engaged to the product to lock or disable the product's lock thereby preventing untrained, unauthorized and unequipped individuals from gaining access and entry to the product, and also preventing further contamination of the area. The detection system can be interconnected to surveillance towers scanning detector cases disposed at seaport docks, freight depots and rail terminals for monitoring containers being prepared for shipment or sitting on docks for long periods of time.

**2 Claims, 13 Drawing Sheets**



US 11,645,898 B2

Page 2

### Related U.S. Application Data

continuation of application No. 15/530,839, filed on Mar. 6, 2017, now Pat. No. 10,163,287, which is a continuation of application No. 14/806,988, filed on Jul. 23, 2015, now Pat. No. 9,589,439, which is a continuation of application No. 14/021,693, filed on Sep. 9, 2013, now Pat. No. 9,096,189, which is a continuation of application No. 13/288,065, filed on Nov. 3, 2011, now Pat. No. 8,531,280, which is a division of application No. 12/802,001, filed on May 27, 2010, now Pat. No. 8,334,761, which is a continuation of application No. 12/657,356, filed on Jan. 20, 2010, now Pat. No. 8,106,752, which is a continuation of application No. 12/155,573, filed on Jun. 6, 2008, now Pat. No. 7,636,033, which is a continuation-in-part of application No. 11/397,118, filed on Apr. 5, 2006, now Pat. No. 7,385,497.

(51) **Int. Cl.**

| | |
|---|---|
| *G08B 13/24* | (2006.01) |
| *B60R 25/01* | (2013.01) |
| *B60R 25/04* | (2013.01) |
| *B60R 25/104* | (2013.01) |
| *G08B 25/00* | (2006.01) |
| *H04W 4/80* | (2018.01) |
| *G07C 9/20* | (2020.01) |
| *G07C 9/00* | (2020.01) |
| *G08B 21/12* | (2006.01) |
| *B60R 25/24* | (2013.01) |

(52) **U.S. Cl.**

CPC ............ *G08B 21/12* (2013.01); *G08B 25/009* (2013.01); *H04W 4/80* (2018.02)

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,586,441 A | 5/1986 | Zekich |
| 4,792,226 A | 12/1988 | Fishbine et al. |
| 5,222,152 A | 6/1993 | Fishbine et al. |
| 5,223,844 A | 6/1993 | Mansell et al. |
| 5,233,404 A | 8/1993 | Lougheed et al. |
| 5,557,254 A | 9/1996 | Johnson et al. |
| 5,682,133 A | 10/1997 | Johnson et al. |
| 5,766,956 A | 6/1998 | Groyer et al. |
| 5,938,706 A | 8/1999 | Feldman |
| 5,959,529 A | 9/1999 | Kail |
| 5,963,657 A | 10/1999 | Bowker et al. |
| 5,986,543 A | 11/1999 | Johnson |
| 5,990,785 A | 11/1999 | Suda |
| 6,049,269 A | 4/2000 | Byrd et al. |
| 6,078,265 A | 6/2000 | Bonder et al. |
| 6,236,365 B1 * | 5/2001 | LeBlanc ............... G01C 21/206 342/457 |
| 6,262,656 B1 | 7/2001 | Byrd et al. |
| 6,271,745 B1 | 8/2001 | Anzai et al. |
| 6,374,652 B1 | 4/2002 | Hwang |
| 6,411,887 B1 | 6/2002 | Martens et al. |
| 6,470,260 B2 | 10/2002 | Martens et al. |
| 6,542,076 B1 | 4/2003 | Joao |
| 6,542,077 B2 | 4/2003 | Joao |
| 6,588,635 B2 | 7/2003 | Vor Keller et al. |
| 6,610,977 B2 | 8/2003 | Megerle |
| 6,613,571 B2 | 9/2003 | Cordery et al. |
| 6,628,813 B2 | 9/2003 | Scott et al. |
| 6,647,328 B2 | 11/2003 | Walker |
| 6,738,697 B2 | 5/2004 | Breed |
| 6,923,509 B1 | 8/2005 | Barnett |
| 6,980,092 B2 | 12/2005 | Turnbull et al. |
| 6,988,026 B2 | 1/2006 | Breed et al. |
| 7,005,982 B1 | 2/2006 | Frank |

| | | |
|---|---|---|
| 7,034,677 B2 | 4/2006 | Steinthal et al. |
| 7,034,683 B2 | 4/2006 | Ghazarian |
| 7,103,460 B1 | 9/2006 | Breed |
| 7,116,798 B1 | 10/2006 | Chawla |
| 7,148,484 B2 | 12/2006 | Craig et al. |
| 7,164,117 B2 | 1/2007 | Breed et al. |
| 7,171,312 B2 | 1/2007 | Steinthal et al. |
| 7,243,945 B2 | 6/2007 | Breed et al. |
| 7,339,469 B2 | 3/2008 | Braun |
| 7,346,439 B2 | 3/2008 | Bodin |
| 7,350,608 B2 | 4/2008 | Fernandez |
| 7,385,497 B2 | 6/2008 | Golden |
| 7,397,363 B2 | 7/2008 | Joao |
| 7,636,033 B2 | 12/2009 | Golden |
| 7,647,180 B2 | 1/2010 | Breed |
| 7,844,505 B1 | 11/2010 | Arneson et al. |
| 7,868,912 B2 | 1/2011 | Venetianer et al. |
| 7,872,575 B2 | 1/2011 | Tabe |
| 7,880,767 B2 | 2/2011 | Chinigo |
| 7,961,094 B2 | 6/2011 | Breed |
| 8,120,459 B2 | 2/2012 | Kwak |
| 8,274,377 B2 | 9/2012 | Smith et al. |
| 8,531,521 B2 | 9/2013 | Romanowich |
| 8,564,661 B2 | 10/2013 | Lipton et al. |
| 8,615,290 B2 | 12/2013 | Lin et al. |
| 2002/0145666 A1 | 10/2002 | Seaman |
| 2003/0063004 A1 | 4/2003 | Anthony et al. |
| 2003/0093187 A1 * | 5/2003 | Walker .................... B64C 13/20 701/1 |
| 2003/0137426 A1 | 7/2003 | Anthony et al. |
| 2003/0179073 A1 | 9/2003 | Ghazarian |
| 2003/0206102 A1 | 11/2003 | Joao |
| 2004/0107028 A1 | 6/2004 | Catalano |
| 2004/0222092 A1 | 11/2004 | Musho |
| 2005/0195069 A1 | 9/2005 | Dunand |
| 2006/0164239 A1 | 7/2006 | Loda |
| 2006/0176169 A1 | 8/2006 | Doolia et al. |
| 2006/0181413 A1 | 8/2006 | Mostov |
| 2006/0248941 A1 * | 11/2006 | Maresca, Jr. .......... G01M 3/30 73/23.2 |
| 2006/0250235 A1 | 11/2006 | Astrin |
| 2006/0261931 A1 * | 11/2006 | Cheng ................... B60R 25/102 340/426.1 |
| 2007/0023665 A1 * | 2/2007 | Gallagher ............ G01V 5/0091 250/358.1 |
| 2007/0093200 A1 | 4/2007 | Dobosz |
| 2007/0171042 A1 | 7/2007 | Metes et al. |
| 2007/0257774 A1 | 11/2007 | Stumpert et al. |
| 2008/0045156 A1 | 2/2008 | Sakhpara |
| 2008/0122595 A1 | 5/2008 | Yamamichi et al. |
| 2008/0234907 A1 | 9/2008 | Labuhn et al. |
| 2009/0289780 A1 * | 11/2009 | Tenorio-Fox .......... B60R 25/04 340/425.5 |
| 2010/0159983 A1 | 5/2010 | Golden |
| 2011/0178655 A1 | 6/2011 | Golden |

#### OTHER PUBLICATIONS

Letter from Applicant, Larry Golden regarding Written Description dated Dec. 3, 2019.

Deignan, abstract, Wearable Chemical Sensors: Characterization of Heart Rate Electrodes Using Electrochemical Impedance Spectroscopy, 12th Ann. BodySensor Network Con. Jun. 9-Dec. 15.

My Tutor website, "How does the body increase heart rate in response to exercise?" https://www.mytutor.co.uk/answers/8802/A-Level/Biology, printed Dec. 3, 2019.

Portions of Moore, Jason, "HRV Demographics: Part 1—Age & Gender," HRVcourse.com, https://hrvcourse.com/hrv-demographics-age-gender/, copyright 2017, portion printed Dec. 2, 2019.

Hernandez, et al., abstract, "Wearable Motion-Based Heart Rate at Rest: A Workplace Evaluation," IEEE J BiomedHealth Inform, Sep. 2019; pp. 1920-1927.

Kalnoskas, A., Biometric Sensors Include Advanced Heart Monitoring & ECG, Nov. 30, 2017, www.microcontrollertips.com/biometric-sensors-include-advanced-heart-monitoring-and-ecg/.

(56)        References Cited

OTHER PUBLICATIONS

Holder, et al., pportions of "Using What You Get: Dynamic Physiologic Signatures of Critical Illness," Crit Care Clin, Jan. 2015: 31 (1): 133-164. p. 1 of 35.
Brain Signs website,webpage entitled: "ElectroCardioGaphy(ECG) & Heart Rate (HR)," copyrighted 2018, printed Dec. 2, 2019, www.brainsigns.com/en/science/s2/technologies/hr.
Johnson,Carolyn Y., "Spotting a Terrorist," article, Boston Globe, pub. Sep. 18, 2009.
Letter, from applicant, Larry Golden, ATPG Technology, LLC, to Bruce Sewell, SVP 7 General Counsel, Apple, Inc. dated Nov. 11, 2010.
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and dated Jan. 13, 2012, pp. 1-34, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent application, U.S. Appl. No. 13/288,065 (34 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and dated Dec. 2, 2011, pp. 1-27, publisher United States Patent ana Trademark Office, Alexandria, Virginia, USA; parent application, U.S. Appl. No. 13/288,065 (27 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and dated Nov. 1, 2011, pp. 1-18, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent application, U.S. Appl. No. 13/288,065 (18 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 11/397,118; dated Nov. 14, 2007; Alexandria, Virginia, USA; pp. 1-12; parent application, U.S. Appl. No. 13/288,065 (12 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; dated Apr. 9, 2009; Alexandria, Virginia, USA; pp. 1-7; parent application, U.S. Appl. No. 13/288,065 (7 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; dated Jul. 30, 2009; Alexandria, Virginia, USA; pp. 1-9; parent application, U.S. Appl. No. 13/288,065 (9 pages).
United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/155,573; dated Oct. 28, 2009; Alexandria, Virginia, USA; pp. 1-5; parent application, U.S. Appl. No. 13/288,065 (5 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/657,356; dated Jul. 12, 2010; Alexandria, Virginia, USA; pp. 1-14; parent application, U.S. Appl. No. 13/288,065 (14 pages).
United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/657,356; dated Mar. 10, 2011; Alexandria, Virginia, USA; pp. 1-4; parent application, U.S. Appl. No. 13/288,065 (4 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 13/065,837; dated Jul. 18, 2011; Alexandria, Virginia, USA, pp. 1-9; parent application, U.S. Appl. No. 13/288,065 (9 pages).
A newspaper article of Mr. Melvin Sullivan and his family that references the date, Mar. 6, 2001, parent application, U.S. Appl. No. 13/288,065.
A letter of response Mr. Sullivan received from Pfeiffer & Gantt, PA, dated Sep. 16, 2002. parent application, U.S. Appl. No. 13/288,065. A "Certificate of Existance" Bright Idea Inventor, LLC. Nov. 6, 2002. parent application, U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Honorable Congressman from Maryland, Elijah E. Cummings, dated Dec. 16, 2002; parent application, U.S. Appl. No. 13/288,065.
A newspaper article of Mr. Melvin Sullivan and Mr. Larry Golden, dated. Feb. 27-Mar. 5, 2003; parent application, U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings. dated May 21, 2003; parent application, U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Office of the Vice President, Dick Cheney, dated Jun. 3, 2003; parent application, U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated Oct. 1, 2003; parent application, U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Honorable Senator from South Carolina, Lindsey O. Graham, dated Oct. 21, 2003; parent application, U.S. Appl. No. 13/288,065.
A letter sent to the President of the United States George W Bush, the President's Cabinet, the United States Senate and the Congressional Black Caucus, dated May 23, 2005; parent application, U.S. Appl. No. 13/288,065.
On Nov. 17, 2005, an "Inventor's Official Record of Invention", was filed in my name (Golden) at "The Law Office of David P. Gaudio, P.C.; the Inventors Network."; parent application, U.S. Appl. No. 13/288,065.
On Aug. 23, 2005, the "Disclosure Document Registration"; parent application, U.S. Appl. No. 13/288,065.
On Apr. 5, 2006, the "Patent Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; parent application, U.S. Appl. No. 13/288,065.
On Jun. 6, 2008, the "Continuance-In-Part, (CIP) Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; parent application, U.S. Appl. No. 13/288,065.
On Jan. 20, 2010, a "Continuation Application" (U.S. Appl. No. 12/657.356) was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; parent application, U.S. Appl. No. 13/288,065.
Reissue of U.S. Pat. No. 7,636,033;"Swear Back"; in accordance to Title 37 --Code of Federal Regulations Patents, Trademarks, and Copyrights; Apr. 8, 2011; parent application, U.S. Appl. No. 13/288,065. Reissue of U.S. Pat. No. 7,636,033; "Swearback—History of Work"; Apr. 8, 2011; parent application, U.S. Appl. No. 13/288,065.
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; dated Apr. 14, 2011, 2011; Alexandria, Virginia, USA; pp. 1-16; parent application, U.S. Appl. No. 13/288,065 (16 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; dated May 27, 2011; Alexandria, Virginia, USA; pp. 1-14; parent application, U.S. Appl. No. 13/288,065 (14 pages).
United States Department of Homeland Security; Petition for Inter Partes Review of U.S. Pat. No. Re. 43,990 Under 35 U.S.C. §312 and 37 C.F.R. §42.104; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-57; parent application, U.S. Appl. No. 14/806,988 (57 pages).
United States Department of Homeland Security; Declaration of Dr. Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington. D.C., USA; pp. 1-44; parent application, U.S. Appl. No. 14/806,988 (44 pages).
Richard R Brooks and S.S. Iyengar; Multi-Sensor Fusion Fundamentals and Applications with Software; published 1998; Copyright Prentice Hall PTR; Upper Saddle River, New Jersey, USA; pp. 1-20; (20 pages), parent application, U.S. Appl. No. 14/806,988 (20 pages).
Ramanarayanan Viswanathan and Pramod K Varshney; Distriubted Detection with Multiple Sensors: Part I—Fundamentals; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-11; vol. 85; No. 1; Southern Illinois University Carbondale OpenSIUC; Illinois, USA; pp. 1-11; parent application, U.S. Appl. No. 14/806,988 (11 pages).
Blum; Distributed Detection with Multiple Sensors: Part II—Advanced Topics; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-16; vol. 85, No. 1; Southern Illinois University Carbondale OpenSIUC; Illinois, USA; parent application, U.S. Appl. No. 14/806,988 (16 pages).
Victor Lesser; Distributed Sensor Networks a Multiagent Perspective; 2003; pp. 1, 2, 5, 6, 22, 26, 27, 36. 275, 320; copyright 2003 Kluwer Academic Publishers; AH Dordrecht, The Netherlands; parent application, U.S. Appl. No. 14/806,988 (10 pages).
Samuel Blackman and Robert Popoli; Design and Analysis of Modern Tracking Systems; 1999; pp. 1, 2, 6, 472; copyright 1999

## US 11,645,898 B2

Page 4

(56)                **References Cited**

OTHER PUBLICATIONS

Artech House; Norwood, Massachusetts, USA; parent application, U.S. Appl. No. 14/806,988 (4 pages).

Jean-Francois Chamberland; Decentralized Detection in Sensor Networks; 2003; pp. 407-416; IEEE Transactions on Signal Processing; vol. 51, No. 2; Urbana, Illinois, USA; parent application, U.S. Appl. No. 14/806,988 (10 pages).

Oleg Kachirski and Ratan Guha; Effective Intrusion Detection Using Multiple Sensors in Wireless Ad Hoc Networks; pp. 1-8; Proceedings of the 36.sup.th Hawaii International Conference on System Sciences; copyright 2003; Orlando, Florida, USA; parent application, U.S. Appl. No. 14/806,988 (8 pages).

Lawrence A Klein; Sensor and Data Fusion A Tool for Information Assessment and Decision Making; 2004; pp. 1-4, 6, 81, 87-89; copyright 2004 The Society of Photo-Optical Instrumentation Engineers; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; parent application, U.S. Appl. No. 14/806,988 (12 pages).

Dale Ferriere and Khgstyna Pysareva and Andrzej Rucinski; Using Technology to Bridge Maritime Security Gaps; Aug. 1, 2005; Sea Technology; pp. 1-6; copyright Compass Publications, Inc. Jan. 2009; Portsmouth, New Hampshire, USA; parent application, U.S. Appl. No. 14/806,988 (6 pages).

Corie Lok; Cargo Security; MIT Technology Review; Jun. 2004; No. 107; pp. 74-75; publisher is Massachusetts Institute of Technology; Cambridge, Massachusetts, USA; parent application U.S. Appl. No. 14/806,988 (2 pages).

Thomas C Chen; RFID and Sensor-based Container Content Visibility and Seaport Security Monitoring system; Proceedings of SPIE, vol. 5778; pp. 151-159; Mar. 28, 2005; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; parent application U.S. Appl. No. 14/806,988 (10 pages).

United States Department of Homeland Security; The University of Texas at Austin College of Engineering Standard Resume of Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-21; parent application U.S. Appl. No. 14/806,988 (21 pages).

Operating Agreement of Bright Idea Inventor, LLC received from Pfeiffer & Gantt, PA, dated Nov. 13, 2002; parent application, U.S. Appl. No. 13/288,065.

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; dated Oct. 20, 2011; Alexandria, Virginia, USA; pp. 1-5; parent U.S. Appl. No. 13/288,065 (5 pages); parent application, U.S. Appl. No. 13/288,065 (5 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright and dated Dec. 12, 2011, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S Appl. No 13/288,065 (9 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright and dated Mar. 26, 2012, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent application, U.S. Appl. No. 13/288,065 (12 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and dated Feb. 22, 2012, pp. 1-38, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent application, U.S. Appl. No. 13/288,065 (38 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and dated Feb. 22, 2012, pp. 1-25, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent application, U.S. Appl. No. 13/288,065 (25 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and dated Aug. 24, 2012, pp. 1-4, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent application, U.S. Appl. No. 13/288,065 (4 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and dated Nov. 28, 2012, pp. 1-11, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent application, U.S. Appl. No. 13/288,065 (11 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and dated Apr. 16, 2013, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent application, U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and dated Apr. 20, 2015, pp. 1-20, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent application, U.S. Appl. No. 14/021,693 (20 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and dated Jan. 20, 2015, pp. 1-17, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent application, U.S. Appl. No. 14/021,693 (17 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and dated Sep. 5, 2014, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent application, U.S. Appl. No. 14/021,693 (12 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/806,988; copyright and dated Jul. 5, 2015, pp. 1-5, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 14/806,988 (5 pages).

United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 14/806,988; dated Jan. 3, 2017; Alexandria, Virginia, USA; pp. 1-8; parent application, U.S. Appl. No. 14/806,988 (8 pages).

United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 14/021,693; dated Jun. 19, 2015; Alexandria, Virginia, USA; pp. 1-8; parent application, U.S. Appl. No. 14/021,693 (8 pages).

United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 13/288,065; dated May 24, 2013; Alexandria, Virginia, USA; pp. 1-8; parent application, U.S. Appl. No. 13/288,065 (8 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 15/530,839; copyright and dated Sep. 26, 2018, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 15/530,839 (9 pages).

United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 15/530,839; copyrighted and dated May 16, 2018; Alexandria, Virginia, USA; pp. 1-7; parent application, U.S. Appl. No. 15/530,839 (7 pages).

* cited by examiner

U.S. Patent       May 9, 2023       Sheet 1 of 13       US 11,645,898 B2



Fig. 1

Fig. 2



**Fig. 3a**



**Fig. 3b**



**Fig. 4**



**Fig. 5**



**Fig. 6**

**Fig. 7**



**Fig. 8**



**Fig. 9**



**Fig. 10**



**Fig. 11**



76

**AGENT DETECTED?**

88

NO

YES

82    LIGHT ALARM

80    SOUND ALARM

84    READINGS

90    DETECTOR RESET

78    SENSING MODE

**STOP**

**Fig. 12**

76

46    DETECTOR

40

12    CASE

92

94    LOCK/DISABLE LOCK SIGNAL

96    DISARM AND RESET

98    DETECTION MODE

**Fig. 13**



Fig. 14

Fig. 15



**Fig. 16**



Fig. 17



**Fig. 18**



**Fig. 19**

US 11,645,898 B2

1

# MULTI SENSOR DETECTION, STALL TO STOP, AND LOCK DISABLING SYSTEM

## CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 16/350,683 titled "Multi Sensor Detection, Stall to Stop, and Lock Disabling System" filed on Dec. 19, 2018, the entire contents and complete subject matter of which is incorporated by reference herein in its entirety for all purposes. U.S. patent application Ser. No. 16/350,683 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 15/530,839 filed on Mar. 6, 2017, issued as U.S. Pat. No. 10,163,287, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. patent application Ser. No. 15/530,839 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 14/806,988 filed on Jul. 23, 2015, issued as U.S. Pat. No. 9,589,439, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. patent application Ser. No. 14/806,988 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 14/021,693 filed on Sep. 9, 2013, issued as U.S. Pat. No. 9,096,189, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. patent application Ser. No. 14/021,693 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 13/288,065 filed on Nov. 3, 2011, issued as U.S. Pat. No. 8,531,280, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. patent application Ser. No. 13/288,065 is a divisional application and claims the filing date and benefit of U.S. patent application Ser. No. 12/802,001 filed on May 27, 2010, issued as U.S. Pat. No. 8,334,761, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. patent application Ser. No. 12/802,001 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 12/657,357 filed on Jan. 20, 2010, issued as U.S. Pat. No. 8,106,752, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. The present application also claims the filing dates and benefits of and incorporates the entire contents of U.S. patent application Ser. Nos. 15/530,839; 14/806,988; 14/021,693; 13/288,065; 12/802,001; 12/657,356, 12/155,573, and 11/397,118 herein by reference for all purposes.

## FIELD OF THE INVENTION

The present invention pertains to anti-terrorist detection and prevention systems, and more particularly pertains to a disabling lock mechanism combined with a chemical/biological/radiological detection system for use with products grouped together by similar characteristics in order to prevent unauthorized entry, contamination and terrorist activity.

## BACKGROUND

Terrorist activity is a continuous, daily, worldwide threat to the stability, prosperity, security and peace within nations and between and among nations. Its danger lies in its

2

arbitrary destructiveness as much as in its unpredictability, and the constant threat of terrorist activity compels measures and actions that cause strain and contention in free, democratic societies as security concerns and civil liberty concerns must be balanced so that both public safety and civil liberties are maintained. Safety and security concerns can be addressed through numerous proactive steps and measures, many of which cause only minimal interference with and disruption of the daily routines of work, travel, commerce and entertainment. However, because modern industrial societies afford almost limitless places, locations, and opportunities for terrorist activities, no safety measure or security protocol will be foolproof, but many security measures, systems and protocols can be implemented that greatly minimize specific threats through fingerprint identification procedures, chemical, biological, and radiological hazard detections, bomb and explosive detection, and controlling the access to everything from shipping containers to school lockers. Thus, the prior art discloses a wide range of security measures and systems.

For example, the Fishbine et al. patent (U.S. Pat. No. 4,792,226) discloses an optical fingerprinting system that includes an optics/processor unit, a video monitor, a data terminal, and a printer for collecting and storing data characteristics of all ten individual fingerprints for printing demographic information and fingerprint images as desired on a standard booking or applicant card.

The Schiller patent (U.S. Pat. No. 4,544,267) discloses a finger identification unit that includes a fingerprint scanning apparatus using a collimated beam of light to interrogate the fingerprint of a finger placed against a platen so that successive scan positions produce signals containing fingerprint information.

The Fishbine et al. patent (U.S. Pat. No. 5,222,152) discloses a portable fingerprint scanning apparatus for optically scanning and recording fingerprint images and wirelessly transmitting such images to a mobile processing unit for verification and background checking.

The Lougheed et al. patent (U.S. Pat. No. 5,233,404) discloses an optical scanning apparatus that uses a linear charge coupled device (CCD) for recording the image of a fingerprint on the viewing surface.

The Groger et al. patent (U.S. Pat. No. 5,766,956) discloses a diode laser-based sensor for undertaking optical, chemical, immunological or nucleic acid-based assay or other chemical analysis.

The Feldman patent (U.S. Pat. No. 5,938,706) discloses a multi element security system for preventing the unauthorized use of an automotive vehicle, and which includes numerous locking and control features interconnected to an onboard cpu.

The Bowker et al. patent (U.S. Pat. No. 5,963,657) discloses a safety access control for doors, handles, locks, etc., wherein the surface relief of a finger is read and verified to either allow or prevent access by the individual to the door, handle, lock, etc.

The Bonder et al. patent (U.S. Pat. No. 6,078,265) discloses a fingerprint identification security system wherein a key lock operated security system utilizes the fingerprint of the individual to control user access to the security system, such as the ignition system of an automotive vehicle.

The Anzai et al. patent (U.S. Pat. No. 6,271,745 B1) discloses a keyless authorization system for use of a motor vehicle that includes fingerprint reading units located on the exterior or interior of the motor vehicle and which are

US 11,645,898 B2

3

coupled to a control unit for scanning, comparing and matching fingerprints to allow or disallow access to the motor vehicle.

The Hwang patent (U.S. Pat. No. 6,374,652 B1) discloses a fingerprint-activated doorknob in which a detecting sensor for a fingerprint is placed on the doorknob for measuring and searching the fingerprint against previously stored fingerprint inputs to control access to the door.

The Vor Keller et al. patent (U.S. Pat. No. 6,588,635 B2) discloses a safety holster for a firearm that includes a pivotally mounted retaining member and a fingerprint sensor for scanning fingerprint information so that only authorized users can withdraw the firearm from the holster.

The Cordery et al. patent (U.S. Pat. No. 6,613,571 B2) discloses a method and system for detecting biological and chemical hazards in the mail that includes sensors placed within the mail box for sampling and testing ambient air and so that mail can be safely transported through the mail system.

The Nagata patent (U.S. Pat. No. 6,628,213 B2) discloses a coding method for digital signal coding and decoding that includes a CMI (code-marked inversion) method of signal coding.

Nonetheless, despite the ingenuity of the above devices, methods, and systems, there remains a need for a multi-detector and disabling lock system for use with various types of products collected together by common characteristics into product groupings for detecting chemical, biological and radiological agents and compounds and for selectively disabling and activating the product locks thereby preventing unauthorized entry and further contamination and preventing and thwarting terrorist activities.

## SUMMARY

The present invention comprehends a chemical/biological/radiological detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes and lockers; while the products grouped into what may be referred to as Product grouping 2 include, but are not limited to, chemical, biological, radiological, and nuclear detectors, motion sensors and door sensors. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements. In addition, the multi sensor detection and lock disabling system is capable of transmitting a signal to lock or disable a lock on the product, and is also capable of transmitting signals to a monitoring computer terminal or PC so that appropriate defensive and safeguarding actions can be undertaken and an authorized individual can disarm and reset the locking system and the

4

multi sensor detection system. The detector case includes a power source (battery or electrical), interior compartments, Internet and GPS connections and a cpu interconnected with the Internet and GPS connections, and also interconnected with one or more off site monitoring computer terminals or PCs. The detector case includes one or more light alarm indicators that are externally visible and that light up when the chemical, biological, or radiological agent or compound is detected, and the light alarm indicators (which can be indicator lights or panels on the front of the detector case) can be color coded for denoting the specific agent or compound detected, i.e., separate and distinct colors for indicating detection of the chemical, biological, or radiological agent or compound.

The detector case is designed to hold within the interior compartments one or more interchangeable detectors, and each detector is adapted and set up to sample a specific compound or agent. Each detector includes a sound alarm, a sensor, a light alarm, and a readings panel, and is electrically interconnected (either by wire or wirelessly) to the cpu of the detector case so that information regarding the detection of the particular agent or compound can be conveyed from the detectors to the detector case cpu. Each detector can also be used as a manual, stand-alone hand-held scanner.

The multi sensor detection and lock disabling system can be interconnected to a surveillance watchtower, as well as monitoring computer terminals or PCs, with the watchtower scanning shipping and cargo crates and containers being prepared for shipment or sitting for extended periods of time on a dock or at a port, at a railway site, or at an industrial storage facility. The watchtower will scan the cargo and shipping crates and containers for the light alarm indicators on detector cases that are mounted in or upon the crates and containers, and thus continuous security surveillance of the crates and containers can be maintained.

An enhanced version of the multi sensor detection and lock disabling system can be employed to prevent car and vehicle bombings. Coupling the multi sensor detection and lock disabling system with satellite service will enable the detection system to detect explosives and transmit an alert signal by satellite to monitoring equipment at a monitoring site. Upon receiving the alert signal at the monitoring site the monitoring equipment activates a stall-to-stop process for disabling the air, fuel, electrical and/or computer system of the vehicle. Moreover, upon receiving the alert signal at the monitoring site the car or vehicle will be locked by transmission of a satellite signal that disables the vehicle's electrical and ignition system thereby preventing escape of the terrorist.

It is an objective of the present invention to provide a multi sensor detection and disabling lock system for securing news racks and vending machines in order to prevent theft, unauthorized use and terrorist activity.

It is another objective of the present invention to provide a multi sensor detection and disabling lock system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist solutions.

It is still yet another objective of the present invention to provide a multi sensor detection and disabling lock system that is capable of disabling an existing lock or activating a lock inside any of the products of the product grouping lists when a detector or sensor of the system is activated.

It is still yet a further objective of the present invention to provide a multi sensor detection and disabling lock system

US 11,645,898 B2

5

wherein the disabling lock system prevents the unauthorized entry, access and further contamination of the products included in the several product groupings.

A still further objective of the present invention is to provide a multi sensor detection and lock disabling system that utilizes a multi-task device for preventing terrorist activity to vulnerable products that are collected or arranged by product grouping categories.

Yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system to secure cargos and containers, especially cargo and shipping containers, against chemical, biological, radiological and nuclear terrorist activity.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system capable of detecting chemical, biological and radiological agents and compounds.

Still yet another objective of the present invention is to provide a multi sensor detection and disabling lock system that includes interchangeable detectors that operate in conjunction to detect chemical, biological and radiological agents and compounds.

Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.

Another objective of the present invention is to provide a multi sensor detection and disabling lock system that accurately and reliably detects harmful agents, compounds and elements, and prevents the placement and storage of weapons and bombs in the range of storage containers and facilities currently available.

Still another objective of the present invention is to provide a multi sensor detection and lock disabling system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners.

These and other objects, features, and advantages will become apparent to those skilled in the art upon a perusal of the following detailed description read in conjunction with the accompanying drawing figures and appended claims.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the primary features of the system which include a detector case, several interchangeable detectors, an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler;

FIG. 2 is a front elevational view of the multi sensor detection and lock disabling system of the present invention illustrating one of the interchangeable detectors first shown in FIG. 1;

FIG. 3a is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one lock disabler to the lock of a product, such as a container, and disengaged from the lock of the container;

FIG. 3b is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the engagement of the lock disabler to the lock of the product for locking or disabling the lock of the product so that unauthorized access is prevented;

FIG. 4 is a side elevational view of the multi sensor detection and lock disabling system of the present invention

6

illustrating the detector case mounted to the product, such as the container, with the light alarm indicators externally visible;

FIG. 5 is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of detector cases with a surveillance watchtower and a monitoring PC terminal;

FIG. 6 is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the placement of detector cases upon containers different from the containers of FIG. 5, and wherein the detectors case are interconnected to a surveillance watchtower and a monitoring PC terminal;

FIG. 7 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one automatic/mechanical lock disabler to the lock of a standalone news rack;

FIG. 8 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating one interchangeable detector placed within the standalone news rack;

FIG. 9 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case having color coded front panels for specifically indicating the agents, compounds or elements that have been detected;

FIG. 10 is a rear elevational view of the multi sensor detection and lock disabling system of the present invention illustrating the GPS, Internet and power source connections;

FIG. 11 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector with the detector case and the steps undertaken by the system when an agent or compound is detected;

FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a stand-alone scanner for detecting an agent or compound;

FIG. 13 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector case with the automatic/mechanical lock disabler for activating the lock disabler upon detection by the system of an agent or compound;

FIG. 14 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating interconnection of the detector case with the fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public upon detection of the agent or compound;

FIG. 15 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the system with a surveillance watchtower and a monitoring PC or computer terminal for monitoring containers, such as shipping or cargo containers, that may sit for extended time periods on docks, at rail yards, and at industrial storage facilities;

FIG. 16 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the integration of the detection system with a satellite and monitoring equipment at a monitoring site for detecting explosives placed in a vehicle and then transmitting signals to the satellite and then to the monitoring site for disabling and locking the vehicle;

US 11,645,898 B2

7

FIG. 17 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case;

FIG. 18 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of a GPS satellite, a monitoring site and a cell phone tower for communicating to and with an electronic device such as a laptop computer or a cell phone for transmitting signals to a vehicle for activating an onboard stall-to-stop device for bringing the vehicle to a halt; and

FIG. 19 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the use of a GPS satellite in conjunction with the monitoring site and monitoring equipment to relay commands and signals to the cpu or transceiver of the vehicle for stopping or locking the vehicle in response to a signal that a certain type of event (detection of a bomb, engine failure or malfunction or unauthorized use) has occurred or is in process.

DETAILED DESCRIPTION OF
REPRESENTATIVE EMBODIMENTS

Illustrated in FIGS. 1-19 is a multi-sensor detection and lock disabling system 10 for preventing terrorist activity by monitoring, detecting, and securing those critical areas; sites, and facilities vulnerable to terrorist activity. The first step is the identification of critical areas, sites, locations and facilities that are vulnerable to terrorist activity as convenient places to store and plant explosives and bombs and spread biological, chemical or radiological agents and compounds, followed by the disposition of the multi sensor detection and lock disabling system 10 for monitoring, detecting, and securing the particular location or site. Vulnerable sites, locations, facilities and areas are nearly limitless in their variety; in order to categorize the protection the present invention provides an anti-terrorist product grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design, and products presenting the same or similar security problems are grouped together with the multi sensor detection and lock disabling system 10 for preventing terrorist activity. For example, two preferred product groupings can be Product Grouping I: cargo containers, shipping containers, cargo planes, freight train cars, tractor trailers, mail carriers (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans and utility vehicles. Product Grouping II: chemical detectors, biological detectors, radiological detectors, nuclear detectors, motion sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems. In addition to grouping products together by features, designs and materials, the multi sensor detection system 10 includes a lock disabling capability for disabling an existing lock or activating a lock on or inside any of the aforementioned products when a detector or sensor of the system is activated. The lock disabling feature is a crucial component of the invention in so far as it prevents unauthorized, unequipped or untrained individuals from gaining access and entry to the site and causing further contamination of the site.

8

As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one—and preferably many—detector case 12 that can be placed in, on, upon or adjacent the product, such as the shipping containers 14 of FIGS. 4 and 5 resting upon a platform 16 or the cargo container 18 of FIG. 6 sitting upon a seaport dock or pier 20. The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30. The rear side 30 has connections or contacts that can include an Internet connection 32, a GPS connection 34 and a power connection 36 for a power source. The power source for the detector system 10 can be any conventional battery or electrical source. The detector case 12 includes an interior chamber divided into a number of compartments 38 for holding therein agent or compound detection means hereinafter further described. A cpu 40 is mounted within the detector case 12 and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates with a monitoring site and monitoring equipment. The front side 28 of the detector case 12 includes indicator means for visually indicating that a specific agent, compound or element has been detected. The indicator means can include color coded indicator lights 42 in panel form, as shown in FIG. 9, with each indicator light panel 42 lighting up with a specific color corresponding to the detection of a specific agent or compound; or color coded indicator lights 44, as shown FIG. 1, that correspond to and individually light up on the detection of a specific agent or compound (chemical, biological, or radiological).

As shown in FIGS. 1, 2 and 9-13, the multi sensor detection and lock disabling system 10 includes a plurality of detectors 46 with each detector 46 adapted for and set up to sample for a specific agent or compound (biological, chemical, or radiological); and the detectors 46 are interchangeable for adapting to the needs and demands of future technology. The detectors 46 can also be used as stand-alone scanners. In the preferred embodiment of the invention, at least three detectors 46 are placed within the detector case 12 with one detector 46 for specifically sampling biological agents or compounds, one detector 46 for sampling chemical agents or compounds, and one detector 46 for sampling radiological agents or compounds. The detectors 46 are interconnected to the cpu 40 of the detection system 10 by conventional connections that can be wire or wireless for transmitting the appropriate signals to the cpu 40 upon detection of the particular agent or compound. As shown in FIG. 2, each detector 46 includes on its front plate or facing surface a sound alarm indicator 48, a readings panel 50 comprising a plastic shield and LED lights for displaying the various read-out messages, a sensor 52 for detecting the specific agent, element or compound, and a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand-alone scanner. Each detector 46 includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu 40 of the detector case 12.

As shown in FIGS. 1, 3a, 3b, 9, and 13-15, used in conjunction with the multi sensor detection and lock disabling system 10 is at least one automatic/mechanical lock disabler 56—and depending upon the number of products being monitored there can be one lock disabler 56 for each product. The automatic/mechanical lock disabler 56 is physically connected to the detector case 12 by a wire or cable 58 for receiving signals therefrom for disabling an existing lock or activating a lock inside a product to prevent

US 11,645,898 B2

9

access to the product. By way of example, FIG. 3a shows the automatic/mechanical lock disabler 56 mounted—by any conventional means—to the lock 60 of the shipping container 14 shown in FIGS. 4 and 5 and connected by wire 58 to the cpu 40 of the detector case 12. The lock disabler 56 is in the non-activated or disengaged state in FIG. 3a. FIG. 3b shows the automatic/mechanical lock disabler 56 mounted to the lock 60 of the shipping container 14 and in the activated or engaged state after detection of an agent or compound by the system 10 thereby for locking or disabling the lock 60 of the shipping container 14 and preventing unauthorized entry and access by unauthorized, untrained and unequipped individuals. In FIGS. 3a and 3b the lock 60 secures doors of the shipping container 14 that can be slidably or pivotably opened and closed.

In addition to the automatic/mechanical lock disabler 56, the multi sensor detection and lock disabling system 10 can also utilize a fingerprint biometric lock with disabler 62 as shown in FIGS. 1 and 14. The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40 of the detector case 12 for receiving transmissions therefrom after detection of an agent or compound has occurred so that the lock on the product can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56 by turning the manual lock disabler 66. The fingerprint biometric lock with disabler 62`is mounted to the lock of the product in a manner similar to the mounting of the automatic/mechanical lock disabler 56 that is shown in FIGS. 3 and 3b.

FIGS. 4 and 5 show one manner of disposition or placement of the detector case 12 in relation to the product, i.e., the shipping container 14, with the color coded indicator lights 42 externally viewable; FIG. 5 shows a number of shipping containers 14 each equipped with a detector case 12 and integrated with elements hereinafter further described for continuously monitoring the shipping containers 14 as they sit for an extended period of time on the truck or rail platform 16. FIG. 6 illustrates several cargo containers 18 sitting on the shipping dock or pier 20, with each cargo container 18 having a detector case 12 mounted thereon and integrated with and monitored by elements shown in FIG. 5 and hereinafter further described.

FIG. 7 illustrates a typical product from product grouping 1 that is monitored by the multi sensor detection and lock disabling system 10 of the present invention; specifically, FIG. 7 shows a news rack 68 with one automatic/mechanical lock disabler 56 mounted to and interconnected with the locking mechanism of the news rack 68. As long as there is no detection of any agent or compound, the lock disabler 56 is in the disengaged state, and the individual can deposit the coin amount in the chute and then freely open the glass panel 70 by the handle 72 for removing a paper. However, the lock disabler 56 would be activated upon detection of the harmful agent or compound and receipt of a signal from the cpu 40 for locking or disabling the locking mechanism thereby denying access to the interior of the news rack 68 from all untrained, unauthorized and unequipped individuals.

FIG. 8 illustrates one detector 46 disposed within the news rack 68 and which is visible through the panel 70 for detecting one specific agent, compound or element. The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment.

10

FIG. 11 illustrates a representative schematic 74 for describing the signal transmission process from the detector 46 to the cpu 40 of the detector case 12. The external stimulus 76 would be the chemical, biological or radiological agent or compound. If there is no detection of the agent or compound, the detector 46 will stay in the sensing mode 78. However, detection of the specific agent will trigger the sound alarm 80 and the light alarm 82, and instant transmittal of a signal to the cpu 40. The readings 84 can be stored by the cpu 40 for verification and future review and evaluation. After all the appropriate corrective and preventative measures have been undertaken by the trained and authorized personal, and the site has been cleansed of the contamination, authorized and equipped personal can then reset the system 10.

FIG. 12 illustrates a representative schematic 88 for the detector 46 when used as stand-alone scanner. The detector 46 undergoes the same essential steps as illustrated in FIG. 11, with the exception of the signal transmission to the cpu 40. The detector 46 remains in detection mode 78 until an agent is detected, and then the various functions-light alarm 82, sound alarm 80, storage of readings 84, and, after the appropriate security and safety steps have been carried out by authorized personal, detector reset 90 by authorized personal can occur thereby placing the detector 46 back in detection or sensing mode 78.

FIG. 13 is a representative schematic 92 that illustrates the steps undertaken by the system 10 to lock or disable a lock, such as the lock 60 for the shipping container 14 shown in FIGS. 3a and 3b. Upon detection of the agent (chemical, biological, radiological) the alarm light indicators 42 or 44 will light up providing external indication that an agent has been detected. In addition, the system 10—the cpu 40—will transmit a lock/disable lock signal 94 to the automatic/mechanical lock disabler 56 to lock or disable the lock on the product, such as the lock 60 on the shipping container 14 of FIGS. 3a-5. This prevents unauthorized, unequipped, or untrained individuals from entering or gaining access to the product for which a dangerous and perhaps lethal agent has been detected. After the proper authorities and authorized personal have been notified and all the appropriate security, preventative and clean up measures have been undertaken, the authorized individual can perform the disarm and reset function 96 for the system 10 placing the system 10 in back in the detection mode 98.

FIG. 14 is a representative schematic 100 illustrating the use of the fingerprint biometric lock with disabler 62 with the system 10. Upon detection of the agent or compound by the detector, the various alarms would sound and light up (shown in previous figures), and the cpu 40 would then transmit a signal to the fingerprint biometric lock with disabler 62 to lock or disable the lock on the product, such as the lock 60 on the shipping containers 14 shown in FIGS. 3a-5. The shipping containers 60 would remain locked and in an access denied mode 101 should an attempt be made to gain access to the container 60 by opening the lock 60 with an unauthorized fingerprint. However, a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock 60 of the shipping container 14. The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety, cleanup, and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108.

FIG. 15 is a schematic representation 110 that illustrates the integration of a surveillance watchtower 112 and a monitoring terminal or PC 114 for monitoring products such

US 11,645,898 B2

11

as the shipping containers 14 or cargo containers 16 that sit for extended periods of time of docks, piers 20, truck terminals, rail yards, shipping platforms 16 and industrial sites as shown in FIGS. 5 and 6. The watchtower 112 would maintain continuous surveillance over a number of shipping containers 60, for example, with detector cases 12 mounted in or on each container 14 and set in detection mode 116 with one or more detectors 46 disposed in each detector case 12. The watchtower 112 would continuously scan for light alarm indicators 42 and 44 on the products, such as the containers 14 or 18, and the watchtower 112 would be interconnected and integrated with the monitoring terminal or PC 114. Upon detection 118 of an agent or compound in one or more of the shipping containers 14, the appropriate light alarm indicators 42 or 44 would light providing visible confirmation of the detection of the specific agent or compound. The cpu 40 would transmit a lock/disable signal 120 to the lock 60 on each respective shipping container 14 to lock or disable the lock 60 thus preventing access to that respective shipping container 14. In addition, signal transmissions would be sent to the monitoring terminal or PC 114 (which could be off site) thereby alerting authorized security personal of the contamination event. With the information received at the monitoring terminal 114, authorized personal would then be notified and dispatched to the area to undertake the appropriate safety and cleanup measures 122. Such measures would also include disarming the lock disabling system in order to gain access to the shipping container 14. After all the cleanup and security measures are completed by the trained and properly equipped authorities, the detection system and the lock disabling feature would reset 124 and the detection system would again be placed in detection mode 116.

FIG. 16 is a schematic representation 126 that illustrates an enhanced version of the multi sensor detection and lock disabling system 10 for preventing car and vehicle attacks and bombings. The lock disabling system 10 would be interconnected to the locking system and mechanism 128 of the vehicle 130. In addition, a stall to stop disabling link 132 can be made with the fuel, air, and electrical system 134 of the vehicle 130. The enhanced version incorporates a satellite 136 for signal receipt and transmission from the vehicle 130 in which the detector system 10 is placed to a monitoring site and monitoring equipment 138. As shown in FIG. 16, a detection signal 140 would be sent to the satellite 136 by the detection system 10 upon detection of a bomb or explosive 142 hidden in the vehicle 130. The satellite 136 would than transmit an alert signal 144 to the monitoring site 138 with the signal 144 containing the relevant data to evaluate the nature of the threat. The monitoring site 138 would then transmit a stall to stop signal 146 to the detection system 10 to lock the vehicle 130 and/or disable the electrical system of the vehicle 130 thereby disabling the vehicle 130, preventing access to the vehicle 130 by locking the vehicle 130, and preventing any terrorist in the vehicle 130 from escaping.

The detector case 12 can be modified and adapted for inclusion with cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases; and briefcases. In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring.

The system 10 and the watchtower 112, along with the satellite 136 and the monitoring site 138 can be adapted or incorporated with cell phone towers and satellites for use

12

with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, or a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. The aforementioned telecommunication and radio communication means can be interactive with any type of motive vehicle that includes but is not limited to cars, trucks, vans, SUVs, trains, subways, boats, ships and airplanes, and which is reported stolen, experiences a loss of brakes, or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted to the vehicle and which detection causes an automatic signal transmission or a signal transmission is activated when a call is made to the monitoring station by an authorized person. The authorized individual includes but is not limited to the owner, pilot, conductor, captain, police highway patrol, security guard and military personnel to the monitoring equipment for activating a vehicle slowdown or stall-to-stop disabling system that similar to the disabling system 126 shown in FIG. 16, or incorporating features of the system 126 shown in FIG. 16, from the monitoring equipment to the vehicle. The activation of the stall-to-stop disabling means or the vehicle slowdown disables or engages the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.

In addition, the basic stall-to-stop disabling means or the vehicle slowdown means and device can be adapted, modified or designed to include: an open bust or open platform for integrating any new and innovative technology; warning lights indicators; sound alarm indicators; voice alarm indicators; a cell phone to transmit to the vehicle a signal for slowing and halting the vehicle; and a lock disabling system or means to lock a thief or terrorist inside the vehicle after a transmission is received or sent. Open bust or open platform also refers to the compatibility of the detector case 12, or the incorporation of its features in cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, briefcases, and suitcases, etc., with other communication, transmission and surveillance systems whereupon the detector case 12, and its features, can be seamlessly integrated with other new and emerging systems and technologies.

Thus, as shown more specifically in FIG. 17, by way of a representative example the features and elements of the detector case 12 are shown as being incorporated into cell phone detector case 150 and associated cell phone monitor 152. The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174. The power source for the cell phone detector case 150 can be any conventional rechargeable battery source or standard electrical power from a standard electrical receptacle or outlet.

As shown in FIG. 17, the cell phone detector case 150 includes one or more sensor/detector units, cells, or com-

13

ponents 176 built into and incorporated into the case 150. The detector 176 includes generally disposed at the front 162 of the case 150 the following types of indicators: a sound alarm indicator 178, a readings panel 180, a sensor 182 for detecting one or more specific types of agents, elements, chemicals, compounds, etc., and a light alarm indicator 184. The sensor/detector 176 will be interconnected to the power source 174. In addition, mounted on and externally visible on the sides 168 or front 162 of the case 150 are a plurality of color coded indicator lights 186 with each light 186 corresponding to a specific agent, element, chemical, compound, etc., and lighting up when that agent is detected by the sensor/detector 176. The color coded indicator lights 186 will be electrically interconnected to the sensor/detectors 176 via any standard microprocessor. The cell phone detector case 150 and cell phone monitor 152 thus comprise a hand-held, easily portable and transportable detection means that is both effective and unobtrusive in its disposition and use.

FIGS. 18 and 19 illustrate representative examples of the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188, and operating in conjunction with either a satellite and/or a cell phone tower 190 to transmit and receive signals and commands among each other and to a vehicle 192, such as a truck, as part of a stall-to-stop disabling system for slowing and stopping the vehicle 192 and locking a thief, terrorist, or unauthorized individual in the vehicle 192 if needed. A wide range of events can trigger and initiate the stall-to-stop system and the locking or lock disabling system and mechanism, and the event doesn't have to be limited to the detection of a bomb or a chemical, biological, or radiological agent, element, or compound. The events can include, but is not limited to, detection of an engine problem to engine failure to the unauthorized use (stealing) of the vehicle 192. The vehicle 192 includes an electromotive system 194 that comprises, among other components, an onboard computer(s), electrical, fuel and air systems, as well as brakes, ignition, steering, and transmission. Also integrated with and capable of communicating with the vehicle's 192 electromotive system 194 is a stall-to-stop system while a lock disabling mechanism 196 is able to engage and disengage or disable the vehicle's 192 locking mechanism 198 upon receipt of the appropriate commands via a lock disabling communication channel or link 200. This link 200 can also accommodate the stall-to-stop system commands and signals, and thus is a multi-channel communication link. A CPU or a transceiver 202 is programmed to receive signals from the cell phone tower 190 and/or to a GPS satellite 204 and is interconnected with the stall-to-stop system and the lock disabling system 196 via link 200 for engaging the electromotive system 194 and actuating the lock disabling system 196 to stop the vehicle 192 and lock inside the vehicle 192 anyone such as a thief, terrorist or other unauthorized individual.

A representative example for stopping, disabling, and locking the vehicle 192 that utilizes the cell phone tower 190 wherein the activation and/or distress signal 206 originates from the cell phone 187a or the laptop 187b and such activation signal 206 travels to the cell phone tower 190 that is nearest the current location of the vehicle 192. A signal 208 is then transmitted to the monitoring site 188 and specific monitoring equipment 138 that can also include but is not limited to cell phones, laptops, desktop PC's, notebook PC's and LCD monitors. The monitoring site 138 then

14

communicates by signal 210 to the GPS satellite 204 that an original or activation signal has been received and then the GPS satellite 204 locates and communicates by multiplex signal 212 with the CPU or transceiver 202 on the vehicle 192 and exchanges information on the type of problem, situation, location, and vehicle speed. The monitoring equipment 138 then transmits a signal 214 to the cell phone tower 190 that communicates with the transceiver 202 and/or CPU of the vehicle 192 to initiate or execute any commands that will actuate the stall-to-stop disabling link 200 and lock disabling system 196 for bringing the vehicle 192 to a halt and actuating the vehicle's 192 locking mechanism 198 for locking the thief, terrorist, or other unauthorized person inside the vehicle 192 if needed.

FIG. 19 illustrates a representative example wherein the stall-to-stop system and the lock disabling system 196 are utilized in conjunction with the GPS satellite 204. In FIG. 19 a signal has traveled to the satellites nearest the vehicle's 192 current location and then the signal 218 has traveled to the monitoring equipment 138 and monitoring site 188 which can include but is not limited to satellite cell phones, satellite monitors, cell phones, laptops, desktop PC's, notebook PC's, and LCD monitors. The GPS satellite 204 then locates and communicates with the CPU and/or transceiver 202 on the vehicle 192 via a multiplex (two-way) signal 220 in order to exchange information on such distress and danger event parameters as the specific problem situation, location, and vehicle speed. The monitoring equipment 138 then transmits a signal 222 back to the GPS satellite 204 that in turn communicates via another signal 224 with the CPU and/or transceiver 202 to execute any commands to the stall-to-stop system for executing the disengagement of the vehicle's 192 electromotive system 194 for bringing the vehicle 192 to a halt and for actuating the lock disabling system 196 to direct the lock disabling link 200 to actuate the locking mechanism 198 thereby locking the vehicle 192 and anyone inside the vehicle 192.

The present invention comprehends a chemical/biological/radiological/nuclear/explosive/human/contraband detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars, United Parcel Services™ (UPS™), Federal Express™ (FedEx™), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans, unmanned aerial vehicles (UAVs), unmanned ground vehicles (UGVs), and utility vehicles; the products grouped into what may be referred to as Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, speed sensors, biometric sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems, detection of humans, detection of contraband, temperature, and shock levels; the products grouped into what may be referred to as Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases,

US 11,645,898 B2

15

PDA cases, carry-on cases, suitcases, eyeglass, briefcases, detector cases of locks, detector cases of tags, detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to; the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite cell phones, cell phones, Universal Mobile Telecommunications System (UMTS) phones, personal digital assistants (PDAs), liquid crystal display (LCD) monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds; the products grouped into what may be referred to as Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max. Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS), Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS); the products grouped into what may be referred to as Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature. the products grouped into what may be referred to as Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside or outside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

While the invention has been shown and described in a preferred embodiment, it will be apparent to those skilled in the art that numerous alterations, modifications, and variations will possible and practicable without departing from the spirit and scope of the invention as set forth by the appended claims.

What is claimed:

1. A pre-programmed stall, stop, vehicle slow-down system, that comprises at least one central processing unit (CPU), capable of:
    processing instructions to stall, stop, or slow-down a vehicle when the vehicle receives a signal from at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, a tablet, a PDA, or a handheld;

16

    the processing instructions to stall, stop, or slow-down a vehicle when the vehicle receives a signal from at least one of cellular, satellite, or radio-frequency (RF);
    the processing instructions to stall, stop, or slow-down a vehicle when the vehicle is experiencing unintended acceleration;
    the processing instructions to stall, stop, or slow-down a vehicle when the vehicle is experiencing lane departure;
    the processing instructions to stall, stop, or slow-down a vehicle when a collision or crash is detected;
    the processing instructions to stall, stop, or slow-down a vehicle when the vehicle has been reported as stolen;
    the processing instructions to stall, stop, or slow-down a vehicle when the vehicle has moved outside a pre-programmed designated perimeter;
    the processing instructions to stall, stop, or slow-down a vehicle when at least one of a chemical hazard, a biological hazard, a radiological hazard; a nuclear hazard; or explosives have been detected;
    the processing instructions to stall, stop, or slow-down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; and,
    Wherein, when the central processing unit (CPU) processes instructions to stall, stop, or slow-down a vehicle, a distress signal is sent to at least one of a monitoring site, a control center, or is recorded for storage.

2. A vehicle, that comprises at least one onboard computer system, electronic system, fuel system, air system, braking system, ignition system, transmission system, or Power-Drive system, capable of:
    stalling, stopping, or slowing down a vehicle when the vehicle receives a signal from at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, a tablet, a PDA, or a handheld;
    the stalling, stopping, or slowing down a vehicle when the vehicle receives a signal from at least one of cellular, satellite, or radio-frequency (RF);
    the stalling, stopping, or slowing down a vehicle when the vehicle is experiencing unintended acceleration;
    the stalling, stopping, or slowing down a vehicle when the vehicle is experiencing lane departure;
    the stalling, stopping, or slowing down a vehicle when a pedestrian, obstacle, collision or crash is detected;
    the stalling, stopping, or slowing down a vehicle when the vehicle has been reported as stolen;
    the stalling, stopping, or slowing down a vehicle when the vehicle has moved outside a pre-programmed designated perimeter;
    the stalling, stopping, or slowing down a vehicle when at least one of a chemical hazard, a biological hazard, a radiological hazard; a nuclear hazard; or explosives have been detected;
    the stalling, stopping, or slowing down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; and,
    Wherein, the vehicle is stalled, stopped, or slowed down, a distress signal is sent to at least one of a monitoring site, a control center, or is recorded for storage.

\* \* \* \* \*

# Exhibit D

US010984619B2

(12) **United States Patent**
Golden

(10) Patent No.: **US 10,984,619 B2**
(45) Date of Patent: **\*Apr. 20, 2021**

(54) **MULTI SENSOR DETECTION, STALL TO STOP, AND LOCK DISABLING SYSTEM**

(71) Applicant: **Golden Larry**, Greenville, SC (US)

(72) Inventor: **Larry Golden**, Greenville, SC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/350,683**

(22) Filed: **Dec. 19, 2018**

(65) **Prior Publication Data**

US 2019/0130679 A1 May 2, 2019

**Related U.S. Application Data**

(60) Continuation of application No. 15/530,839, filed on Mar. 6, 2017, now Pat. No. 10,163,287, which is a
(Continued)

(51) **Int. Cl.**
*G07C 9/00* (2020.01)
*B60R 25/04* (2013.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... *G07C 9/00563* (2013.01); *B60R 25/01* (2013.01); *B60R 25/04* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .... G07C 9/00; G07C 9/0007; G07C 9/00174; G07C 9/00309; G07C 9/00388;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,385,469 A 5/1983 Scheuerpflug et al.
4,544,267 A 10/1985 Schiller
(Continued)

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright dated Jan. 13, 2012, pp. 1-34, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (34 pages).

(Continued)

*Primary Examiner* — Van T Trieu

(57) **ABSTRACT**

A multi sensor detection and disabling lock system includes detector cases for holding interchangeable detectors that sample for chemical, biological and radiological compounds, agents and elements, with each detector case disposed in or upon the monitored product. The detector case transmits detection information to a monitoring computer terminal and transmits a signal to a lock disabler engaged to the product to lock or disable the product's lock thereby preventing untrained, unauthorized and unequipped individuals from gaining access and entry to the product, and also preventing further contamination of the area. The detection system can be interconnected to surveillance towers scanning detector cases disposed at seaport docks, freight depots and rail terminals for monitoring containers being prepared for shipment or sitting on docks for long periods of time.

**20 Claims, 13 Drawing Sheets**



## US 10,984,619 B2

Page 2

### Related U.S. Application Data

continuation of application No. 14/806,988, filed on Jul. 23, 2015, now Pat. No. 9,589,439, which is a continuation of application No. 14/021,693, filed on Sep. 9, 2013, now Pat. No. 9,096,189, which is a continuation of application No. 13/288,065, filed on Nov. 3, 2011, now Pat. No. 8,531,280, which is a division of application No. 12/802,001, filed on May 27, 2010, now Pat. No. 8,334,761, which is a continuation of application No. 12/657,356, filed on Jan. 20, 2010, now Pat. No. 8,106,752, which is a continuation of application No. 12/155,573, filed on Jun. 6, 2008, now Pat. No. 7,636,033, which is a continuation-in-part of application No. 11/397,118, filed on Apr. 5, 2006, now Pat. No. 7,385,497.

(51) **Int. Cl.**

| | |
|---|---|
| *B60R 25/01* | (2013.01) |
| *B60R 25/102* | (2013.01) |
| *G08B 13/24* | (2006.01) |
| *B60R 25/104* | (2013.01) |
| *G08B 25/00* | (2006.01) |
| *H04W 4/80* | (2018.01) |
| *G07C 9/20* | (2020.01) |
| *G08B 15/00* | (2006.01) |
| *G08B 21/12* | (2006.01) |
| *B60R 25/24* | (2013.01) |

(52) **U.S. Cl.**
CPC ........ *B60R 25/102* (2013.01); *G08B 13/2491* (2013.01); *B60R 25/018* (2013.01); *B60R 25/104* (2013.01); *B60R 25/24* (2013.01); *G07C 9/00174* (2013.01); *G07C 9/00912* (2013.01); *G07C 9/20* (2020.01); *G08B 15/00* (2013.01); *G08B 21/12* (2013.01); *G08B 25/009* (2013.01); *H04W 4/80* (2018.02)

(58) **Field of Classification Search**
CPC .. G07C 9/00563; G08B 27/00; G08B 27/005; G08B 27/006; G08B 15/00; G08B 15/001; G08B 15/004; G08B 15/009; B60R 25/018; B60R 25/04; B60R 25/10; B60R 25/102; B60R 25/0405; B60R 25/104
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,586,441 | A | 5/1986 | Zekich |
| 4,792,226 | A | 12/1988 | Fishbine et al. |
| 5,222,152 | A | 6/1993 | Fishbine et al. |
| 5,223,844 | A | 6/1993 | Mansell et al. |
| 5,233,404 | A | 8/1993 | Lougheed et al. |
| 5,557,254 | A | 9/1996 | Johnson et al. |
| 5,682,133 | A | 10/1997 | Johnson et al. |
| 5,766,956 | A | 6/1998 | Groger et al. |
| 5,938,706 | A | 8/1999 | Feldman |
| 5,959,529 | A | 9/1999 | Kail |
| 5,963,657 | A | 10/1999 | Bowker et al. |
| 5,986,543 | A | 11/1999 | Johnson |
| 5,990,785 | A | 11/1999 | Suda |
| 6,049,269 | A | 4/2000 | Byrd et al. |
| 6,078,265 | A | 6/2000 | Bonder et al. |
| 6,236,365 | B1 * | 5/2001 | LeBlanc ............. G01C 21/206 342/457 |
| 6,262,656 | B1 | 7/2001 | Byrd et al. |
| 6,271,745 | B1 | 8/2001 | Anzai et al. |
| 6,374,652 | B1 | 4/2002 | Hwang |
| 6,411,887 | B1 | 6/2002 | Martens et al. |

| | | | |
|---|---|---|---|
| 6,470,260 | B2 | 10/2002 | Martens et al. |
| 6,542,076 | B1 | 4/2003 | Joao |
| 6,542,077 | B2 | 4/2003 | Joao |
| 6,588,635 | B2 | 7/2003 | Vor Keller et al. |
| 6,610,977 | B2 | 8/2003 | Megerle |
| 6,613,571 | B2 | 9/2003 | Cordery et al. |
| 6,628,813 | B2 | 9/2003 | Scott et al. |
| 6,647,328 | B2 | 10/2003 | Walker |
| 6,738,697 | B2 | 5/2004 | Breed |
| 6,923,509 | B1 | 8/2005 | Barnett |
| 6,980,092 | B2 | 12/2005 | Turnbull et al. |
| 6,988,026 | B2 | 1/2006 | Breed et al. |
| 7,005,982 | B1 | 2/2006 | Frank |
| 7,034,677 | B2 | 4/2006 | Steinthal et al. |
| 7,034,683 | B2 | 4/2006 | Ghazarian |
| 7,103,460 | B1 | 9/2006 | Breed |
| 7,116,798 | B1 | 10/2006 | Chawla |
| 7,148,484 | B2 | 12/2006 | Craig et al. |
| 7,164,117 | B2 | 1/2007 | Breed et al. |
| 7,171,312 | B2 | 1/2007 | Steinthal et al. |
| 7,243,945 | B2 | 6/2007 | Breed et al. |
| 7,339,469 | B2 | 3/2008 | Braun |
| 7,346,439 | B2 | 3/2008 | Bodin |
| 7,350,608 | B2 | 4/2008 | Fernandez |
| 7,385,497 | B2 | 6/2008 | Golden |
| 7,397,363 | B2 | 7/2008 | Joao |
| 7,636,033 | B2 | 12/2009 | Golden |
| 7,647,180 | B2 | 1/2010 | Breed |
| 7,844,505 | B1 | 11/2010 | Arneson et al. |
| 7,868,912 | B2 | 1/2011 | Venetianer et al. |
| 7,872,575 | B2 | 1/2011 | Tabe |
| 7,880,767 | B2 | 2/2011 | Chinigo |
| 7,961,094 | B2 | 6/2011 | Breed |
| 8,120,459 | B2 | 2/2012 | Kwak |
| 8,274,377 | B2 | 9/2012 | Smith et al. |
| 8,531,521 | B2 | 9/2013 | Romanowich |
| 8,564,661 | B2 | 10/2013 | Lipton et al. |
| 8,615,290 | B2 | 12/2013 | Lin et al. |
| 2002/0145666 | A1 | 10/2002 | Scaman |
| 2003/0063004 | A1 | 4/2003 | Anthony et al. |
| 2003/0093187 | A1 * | 5/2003 | Walker .................. B64C 13/20 701/1 |
| 2003/0137426 | A1 | 7/2003 | Anthony et al. |
| 2003/0179073 | A1 | 9/2003 | Ghazarian |
| 2003/0206102 | A1 | 11/2003 | Joao |
| 2004/0107028 | A1 | 6/2004 | Catalano |
| 2004/0222092 | A1 | 11/2004 | Musho |
| 2005/0195069 | A1 | 9/2005 | Dunand |
| 2006/0164239 | A1 | 7/2006 | Loda |
| 2006/0176169 | A1 | 8/2006 | Doolin et al. |
| 2006/0181413 | A1 | 8/2006 | Mostov |
| 2006/0250235 | A1 | 11/2006 | Astrin |
| 2006/0261931 | A1 * | 11/2006 | Cheng .................. B60R 25/102 340/426.1 |
| 2007/0093200 | A1 | 4/2007 | Dobosz |
| 2007/0171042 | A1 | 7/2007 | Metes et al. |
| 2007/0257774 | A1 | 11/2007 | Stumpert et al. |
| 2008/0045156 | A1 | 2/2008 | Sakhpara |
| 2008/0123595 | A1 | 5/2008 | Yamamichi et al. |
| 2008/0234907 | A1 | 9/2008 | Lahuhn et al. |
| 2009/0289780 | A1 * | 11/2009 | Tenorio-Fox ........... B60R 25/04 340/425.5 |
| 2010/0159983 | A1 | 5/2010 | Golden |
| 2010/0265068 | A1 * | 10/2010 | Brackmann .............. B60P 3/14 340/572.1 |
| 2011/0178655 | A1 | 6/2011 | Golden |

### OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright dated Dec. 2, 2011, pp. 1-27, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (27 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright dated Nov. 1, 2011, pp. 1-18, publisher United States Patent and Trademark

US 10,984,619 B2

Page 3

(56)      **References Cited**

OTHER PUBLICATIONS

Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (18 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 11/397,118; dated Nov. 14, 2007; Alexandria, Virginia, USA; pp. 1-12; U.S. Appl. No. 13/288,065 (12 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; dated Apr. 9, 2009; Alexandria, Virginia, USA; pp. 1-7; U.S. Appl. No. 13/288,065 (7 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; dated Jul. 30, 2009; Alexandria, Virginia, USA; pp. 1-9; U.S. Appl. No. 13/288,065 (9 pages).
United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/155,573; dated Oct. 28, 2009; Alexandria, Virginia, USA; pp. 1-5; U.S. Appl. No. 13/288,065 (5 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/657,356; dated Jul. 12, 2010; Alexandria, Virginia, USA; pp. 1-14; U.S. Appl. No. 13/288,065 (14 pages).
United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/657,356; dated Mar. 10, 2011; Alexandria, Virginia, USA; pp. 1-4; U.S. Appl. No. 13/288,065 (4 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 13/065,837; dated Jul. 18, 2011; Alexandria, Virginia, USA, pp. 1-9; U.S. Appl. No. 13/288,065 (9 pages).
A newspaper article of Mr. Melvin Sullivan and his family that references the date. Mar. 6, 2001. U.S. Appl. No. 13/288,065.
A letter of response Mr. Sullivan received from Pfeiffer & Gantt, PA, dated Sep. 16, 2002. U.S. Appl. No. 13/288,065.
A "Certificate of Existance" Bright Idea Inventor, LLC. Nov. 6, 2002. U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Honorable Congressman from Maryland, Elijah E. Cummings, dated Dec. 16, 2002; U.S. Appl. No. 13/288,065.
A newspaper article of Mr. Melvin Sullivan and Mr. Larry Golden, dated, Feb. 27-Mar. 5, 2003; U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated May 21, 2003; U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Office of the Vice President, Dick Cheney, dated Jun. 3, 2003; U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated Oct. 1, 2003; U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Honorable Senator from South Carolina, Lindsey O. Graham, dated Oct. 21, 2003; U.S. Appl. No. 13/288,065.
A letter sent to the President of the United States George W Bush, the President's Cabinet, the United States Senate and the Congressional Black Caucus, dated May 23, 2005; U.S. Appl. No. 13/288,065.
On Nov. 17, 2005, an "Inventor's Official Record of Invention", was filed in my name (Golden) at "The Law Office of David P. Gaudio, P.C.; the Inventors Network."; U.S. Appl. No. 13/288,065.
On Aug. 23, 2005, the "Disclosure Document Registration"; U.S. Appl. No. 13/288,065.
On Apr. 5, 2006, the "Patent Application" was filed in my name (Golden) at the United Staets Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.
On Jun. 6, 2008, the "Continuance-In-Part, (CIP) Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.
On Jan. 20, 2010, a "Continuation Application" (U.S. Appl. No. 12/657,356) was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.
Reissue of U.S. Pat. No. 7,636,033; "Swear Back"; in accordance to Title 37—Code of Federal Regulations Patents, Trademarks, and Copyrights; Apr. 8, 2011; U.S. Appl. No. 13/288,065.
Reissue of U.S. Pat. No. 7,636,033; "Swearback—History of Work"; Apr. 8, 2011; U.S. Appl. No. 13/288,065.

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; dated Apr. 14, 2011, 2011; Alexandria, Virginia, USA; pp. 1-16; U.S. Appl. No. 13/288,065 (16 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; dated May 27, 2011; Alexandria, Virginia, USA; pp. 1-14; U.S. Appl. No. 13/288,065 (14 pages).
United States Department of Homeland Security; Petition for Inter Partes Review of U.S. Pat. No. 43,990 Under 35 U.S.C. §312 and 37 C.F.R. §42.104; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-57, U.S. Appl. No. 14/806,988 (57 pages).
United States Department of Homeland Security; Declaration of Dr. Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-44; U.S. Appl. No. 14/806,988 (44 pages).
Richard R Brooks and S.S. Iyengar; Multi-Sensor Fusion Fundamentals and Applications with Software; published 1998; Copyright Prentice Hall PTR; Upper Saddle River, New Jersey, USA; pp. 1-20; (20 pages). U.S. Appl. No. 14/806,988 (20 pages).
Ramanarayanan Viswanathan and Pramod K Varshney; Distribuent Detection with Multiple Sensors: Part 1—Fundamentals; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-11; vol. 85; No. 1; Southern Illinois University Carbondale OpenSIUC; Illinois, USA; pp. 1-11; U.S. Appl. No. 14/806,988 (11 pages).
Blum; Distributed Detection with Multiple Sensors: Part II—Advanced Topics; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-16; vol. 85, No. 1; Southern Illinois University Carbondale OpenSIUC; Illinois, USA; U.S. Appl. No. 14/806,988 (16 pages).
Victor Lesser; Distributed Sensor Networks a Multiagent Perspective; 2003; pp. 1, 2, 5, 6, 22, 26, 27, 36, 275, 320; copyright 2003 Kluwer Academic Publishers; AH Dordrecht, The Netherlands; U.S. Appl. No. 14/806,988 (10 pages).
Samuel Blackman and Robert Popoli; Design and Analysis of Modern Tracking Systems; 1999; pp. 1, 2, 6, 472; copyright 1999 Artech House; Norwood, Massachusetts, USA; U.S. Appl. No. 14/806,988 (4 pages).
Jean-Francois Chamberland; Decentralized Detection in Sensor Networks; 2003; pp. 407-416; IEEE Transactions on Signal Processing; vol. 51, No. 2; Urbana, Illinois, USA; U.S. Appl. No. 14/806,988 (10 pages).
Oleg Kachirski and Ratan Guha; Effective Intrusion Detection Using Multiple Sensors in Wireless Ad Hoc Networks; pp. 1-8; Proceedings of the 36.sup.th Hawaii International Conference on System Sciences; copyright 2003; Orlando, Florida, USA; U.S. Appl. No. 14/806,988 (8 pages).
Lawrence A Klein; Sensor and Data Fusion A Tool for Information Assessment and Decision Making; 2004; pp. 1-4, 6, 81, 87-89; copyright 2004 The Society of Photo-Optical Instrumentation Engineers; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; U.S. Appl. No. 14/806,988 (12 pages).
Dale Ferriere and Khrystyna Pysareva and Andrzej Rucinski; Using Technology to Bridge Maritime Security Gaps; Aug. 1, 2005; Sea Technology; pp. 1-6; copyright Compass Publications, Inc. Jan. 2009; Portsmouth, New Hampshire, USA; U.S. Appl. No. 14/806,988 (6 pages).
Corie Lok; Cargo Security; MIT Technology Review; Jun. 2004; No. 107; pp. 74-75; publisher is Massachusetts Institute of Technology; Cambridge, Massachusetts, USA; U.S. Appl. No. 14/806,988 (2 pages).
Thomas C Chen; RFID and Sensor-based Container Content Visibility and Seaport Security Monitoring system; Proceedings of SPIE, vol. 5778; pp. 151-159; Mar. 28, 2005; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; U.S. Appl. No. 14/806,988 (10 pages).
United States Department of Homeland Security; The University of Texas at Austin College of Engineering Standard Resume of Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-21; U.S. Appl. No. 14/806,988 (21 pages).
Operating Agreement of Bright Idea Inventor, LLC received from Pfeiffer & Gantt, PA, dated Nov. 13, 2002; U.S. Appl. No. 13/288,065.

# US 10,984,619 B2
Page 4

(56)           References Cited

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; dated Oct. 20, 2011; Alexandria, Virginia, USA; pp. 1-5; parent U.S. Appl. No. 13/288,065 (5 pages); U.S. Appl. No. 13/288,065 (5 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802 001; copyright dated Dec. 12, 2011, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright dated Mar. 26, 2012, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (12 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright dated Feb. 22, 2012, pp. 1-38, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (38 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright dated Feb. 22, 2012, pp. 1-25, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (25 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright dated Aug. 24, 2012, pp. 1-4, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (4 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright dated Nov. 28, 2012, pp. 1-11, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (11 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright dated Apr. 16, 2013, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright dated Apr. 20, 2015, pp. 1-20, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 14/021,693 (20 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright dated Jan. 20, 2015, pp. 1-17, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 14/021,693 (17 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright dated Sep. 5, 2014, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 14/021,693 (12 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/806,988; copyright dated Jul. 5, 2015, pp. 1-5, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 14/806,988 (5 pages).

United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 14/806,988; dated Jan. 3, 2017; Alexandria, Virginia, USA; pp. 1-8; U.S. Appl. No. 14/806,988 (8 pages).

United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 14/021,693; dated Jun. 19, 2015; Alexandria, Virginia, USA; pp. 1-8; U.S. Appl. No. 14/021,693 (8 pages).

United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 13/288,065; dated May 24, 2013; Alexandria, Virginia, USA; pp. 1-8; U.S. Appl. No. 13/288,065 (8 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 15/530,839; copyright dated Sep. 26, 2018, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 15/530,839 (9 pages).

United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 15/530,839; copyrighted dated May 16, 2018; Alexandria, Virginia, USA; pp. 1-7; U.S. Appl. No. 15/530,839 (7 pages).

Letter from Applicant, Larry Golden regarding Written Description dated Dec. 3, 2019.

Deignan, abstract, Wearable Chemical Sensors: Characterization of Heart Rate Electrodes Using Electrochemical Impedance Spectroscopy, 12th Ann. BodySensor Network Con. Jun. 9-12, 2015.

My Tutor website, "How does the body increase heart rate in response to exercise?" https://www.mytutor.co.uk/answers/8802/A-Level/Biology, printed Dec. 3, 2019.

Portions of Moore, Jason, "HRV Demographics: Part 1—Age & Gender," HRVcourse.com, https://hrvcourse.com/hrv-demographics-age-gender/, copyright 2017, portion printed Dec. 2, 2019.

Hernandez, et al., abstract, "Wearable Motion-Based Heart Rate at Rest: A Workplace Evaluation," IEEE J BiomedHealth Inform, Sep. 2019; pp. 1920-1927.

Kalnoskas, A., Biometric Sensors Include Advanced Heart Monitoring & ECG, Nov. 30, 2017, www.microcontrollertips.com/biometric-sensors-include-advanced-heart-monitoring-and-ecg/.

Holder, et al., pportions of "Using What You Get: Dynamic Physiologic Signatures of Critical Illness," Crit Care Clin, Jan. 2015: 31 (1): 133-164, p. 1 of 35

Brain Signs website, webpage entitled: "ElectroCardioGaphy(ECG) & Heart Rate (HR)," copyrighted 2018, printed Dec. 2, 2019, www.brainsigns.com/en/science/s2/technologies/hr.

Johnson, Carolyn Y., "Spotting a Terrorist," article, Boston Globe, pub. Sep. 18, 2009.

Letter, from applicant, Larry Golden, ATPG Technology, LLC, to Bruce Sewell, • SVP 7 General Counsel, Apple. Inc. dated Nov. 11, 2010.

* cited by examiner



Fig. 1

Fig. 2

Case 3:26-cv-00804-LS Document 1-5 Filed 09/18/25 Page 123 of 291



**Fig. 3a**



**Fig. 3b**

Case 3:26-cv-00804-LS Document 19-5 Filed 12/23/25 Page 124 of 291
Case 6:25-cv-00434-LS Document 1-5 Filed 09/18/25 Page 8 of 27



Fig. 4



Fig. 5



Fig. 6

Fig. 7



**Fig. 8**



**Fig. 9**



**Fig. 10**



**Fig. 11**



Fig. 12

Fig. 13



Fig. 14

Fig. 15



**Fig. 16**



Fig. 17



**Fig. 18**



**Fig. 19**

US 10,984,619 B2

1

# MULTI SENSOR DETECTION, STALL TO STOP, AND LOCK DISABLING SYSTEM

## CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 15/530,839 titled "Multi Sensor Detection, Stall to Stop, and Lock Disabling System" filed on Mar. 6, 2017, the entire contents and complete subject matter of which is incorporated by reference herein in its entirety for all purposes. U.S. patent application Ser. No. 15/530,839 issued as U.S. Pat. No. 10,163,287, is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 14/806,988 filed on Jul. 23, 2015, issued as U.S. Pat. No. 9,589,439, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. patent application Ser. No. 14/806,988 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 14/021,693 filed on Sep. 9, 2013, issued as U.S. Pat. No. 9,096,189, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. patent application Ser. No. 14/021,693 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 13/288,065 filed on Nov. 3, 2011, issued as U.S. Pat. No. 8,531,280, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. patent application Ser. No. 13/288,065 is a divisional application and claims the filing date and benefit of U.S. patent application Ser. No. 12/802,001 filed on May 27, 2010, issued as U.S. Pat. No. 8,334,761, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. patent application Ser. No. 12/802,001 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 12/657,357 filed on Jan. 20, 2010, issued as U.S. Pat. No. 8,106,752, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. The present application also claims the filing dates and benefits of and incorporates the entire contents of U.S. patent application Ser. Nos. 14/806,988; 14/021,693; 13/288,065; 12/802,001; 12/657,356, 12/155,573, issued as U.S. Pat. No. 7,636,033, and Ser. No. 11/397,118, issued as U.S. Pat. No. 7,385,497, herein by reference for all purposes.

## FIELD OF THE INVENTION

The present invention pertains to anti-terrorist detection and prevention systems, and more particularly pertains to a disabling lock mechanism combined with a chemical/biological/radiological detection system for use with products grouped together by similar characteristics in order to prevent unauthorized entry, contamination and terrorist activity.

## BACKGROUND

Terrorist activity is a continuous, daily, worldwide threat to the stability, prosperity, security and peace within nations and between and among nations. Its danger lies in its arbitrary destructiveness as much as in its unpredictability, and the constant threat of terrorist activity compels measures and actions that cause strain and contention in free, democratic societies as security concerns and civil liberty concerns must be balanced so that both public safety and civil liberties are maintained. Safety and security concerns can be addressed through numerous proactive steps and measures, many of which cause only minimal interference with and disruption of the daily routines of work, travel, commerce and entertainment. However, because modern industrial societies afford almost limitless places, locations, and opportunities for terrorist activities, no safety measure or security protocol will be foolproof, but many security measures, systems and protocols can be implemented that greatly minimize specific threats through fingerprint identification procedures, chemical, biological, and radiological hazard detections, bomb and explosive detection, and controlling the access to everything from shipping containers to school lockers. Thus, the prior art discloses a wide range of security measures and systems.

For example, the Fishbine et al. patent (U.S. Pat. No. 4,792,226) discloses an optical fingerprinting system that includes an optics/processor unit, a video monitor, a data terminal, and a printer for collecting and storing data characteristics of all ten individual fingerprints for printing demographic information and fingerprint images as desired on a standard booking or applicant card.

The Schiller patent (U.S. Pat. No. 4,544,267) discloses a finger identification unit that includes a fingerprint scanning apparatus using a collimated beam of light to interrogate the fingerprint of a finger placed against a platen so that successive scan positions produce signals containing fingerprint information.

The Fishbine et al. patent (U.S. Pat. No. 5,222,152) discloses a portable fingerprint scanning apparatus for optically scanning and recording fingerprint images and wirelessly transmitting such images to a mobile processing unit for verification and background checking.

The Lougheed et al. patent (U.S. Pat. No. 5,233,404) discloses an optical scanning apparatus that uses a linear charge coupled device (CCD) for recording the image of a fingerprint on the viewing surface.

The Groger et al. patent (U.S. Pat. No. 5,766,956) discloses a diode laser based sensor for undertaking optical, chemical, immunological or nucleic acid-based assay or other chemical analysis.

The Feldman patent (U.S. Pat. No. 5,938,706) discloses a multi element security system for preventing the unauthorized use of an automotive vehicle, and which includes numerous locking and control features interconnected to an onboard cpu.

The Bowker et al. patent (U.S. Pat. No. 5,963,657) discloses a safety access control for doors, handles, locks, etc., wherein the surface relief of a finger is read and verified to either allow or prevent access by the individual to the door, handle, lock, etc.

The Bonder et al. patent (U.S. Pat. No. 6,078,265) discloses a fingerprint identification security system wherein a key lock operated security system utilizes the fingerprint of the individual to control user access to the security system, such as the ignition system of an automotive vehicle.

The Anzai et al. patent (U.S. Pat. No. 6,271,745 B1) discloses a keyless authorization system for use of a motor vehicle that includes fingerprint reading units located on the exterior or interior of the motor vehicle and which are coupled to a control unit for scanning, comparing and matching fingerprints to allow or disallow access to the motor vehicle.

The Hwang patent (U.S. Pat. No. 6,374,652 B1) discloses a fingerprint-activated doorknob in which a detecting sensor for a fingerprint is placed on the doorknob for measuring and

3

searching the fingerprint against previously stored fingerprint inputs to control access to the door.

The Vor Keller et al. patent (U.S. Pat. No. 6,588,635 B2) discloses a safety holster for a firearm that includes a pivotally mounted retaining member and a fingerprint sensor for scanning fingerprint information so that only authorized users can withdraw the firearm from the holster.

The Cordery et al. patent (U.S. Pat. No. 6,613,571 B2) discloses a method and system for detecting biological and chemical hazards in the mail that includes sensors placed within the mail box for sampling and testing ambient air and so that mail can be safely transported through the mail system.

The Nagata patent (U.S. Pat. No. 6,628,213 B2) discloses a coding method for digital signal coding and decoding that includes a CMI (code-marked inversion) method of signal coding.

Nonetheless, despite the ingenuity of the above devices, methods, and systems, there remains a need for a multi-detector and disabling lock system for use with various types of products collected together by common characteristics into product groupings for detecting chemical, biological and radiological agents and compounds and for selectively disabling and activating the product locks thereby preventing unauthorized entry and further contamination and preventing and thwarting terrorist activities.

SUMMARY

The present invention comprehends a chemical/biological/radiological detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes and lockers; while the products grouped into what may be referred to as Product grouping 2 include, but are not limited to, chemical, biological, radiological, and nuclear detectors, motion sensors and door sensors. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements. In addition, the multi sensor detection and lock disabling system is capable of transmitting a signal to lock or disable a lock on the product, and is also capable of transmitting signals to a monitoring computer terminal or PC so that appropriate defensive and safeguarding actions can be undertaken and an authorized individual can disarm and reset the locking system and the multi sensor detection system. The detector case includes a power source (battery or electrical), interior compartments, Internet and GPS connections and a cpu interconnected with the Internet and GPS connections, and also interconnected with one or more off site monitoring computer terminals or PCs. The detector case includes one or more light alarm

4

indicators that are externally visible and that light up when the chemical, biological, or radiological agent or compound is detected, and the light alarm indicators (which can be indicator lights or panels on the front of the detector case) can be color coded for denoting the specific agent or compound detected, i.e., separate and distinct colors for indicating detection of the chemical, biological, or radiological agent or compound.

The detector case is designed to hold within the interior compartments one or more interchangeable detectors, and each detector is adapted and set up to sample a specific compound or agent. Each detector includes a sound alarm, a sensor, a light alarm, and a readings panel, and is electrically interconnected (either by wire or wirelessly) to the cpu of the detector case so that information regarding the detection of the particular agent or compound can be conveyed from the detectors to the detector case cpu. Each detector can also be used as a manual, stand-alone hand held scanner.

The multi sensor detection and lock disabling system can be interconnected to a surveillance watchtower, as well as monitoring computer terminals or PCs, with the watchtower scanning shipping and cargo crates and containers being prepared for shipment or sitting for extended periods of time on a dock or at a port, at a railway site, or at an industrial storage facility. The watchtower will scan the cargo and shipping crates and containers for the light alarm indicators on detector cases that are mounted in or upon the crates and containers, and thus continuous security surveillance of the crates and containers can be maintained.

An enhanced version of the multi sensor detection and lock disabling system can be employed to prevent car and vehicle bombings. Coupling the multi sensor detection and lock disabling system with satellite service will enable the detection system to detect explosives and transmit an alert signal by satellite to monitoring equipment at a monitoring site. Upon receiving the alert signal at the monitoring site the monitoring equipment activates a stall-to-stop process for disabling the air, fuel, electrical and/or computer system of the vehicle. Moreover, upon receiving the alert signal at the monitoring site the car or vehicle will be locked by transmission of a satellite signal that disables the vehicle's electrical and ignition system thereby preventing escape of the terrorist.

It is an objective of the present invention to provide a multi sensor detection and disabling lock system for securing news racks and vending machines in order to prevent theft, unauthorized use and terrorist activity.

It is another objective of the present invention to provide a multi sensor detection and disabling lock system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist solutions.

It is still yet another objective of the present invention to provide a multi sensor detection and disabling lock system that is capable of disabling an existing lock or activating a lock inside any of the products of the product grouping lists when a detector or sensor of the system is activated.

It is still yet a further objective of the present invention to provide a multi sensor detection and disabling lock system wherein the disabling lock system prevents the unauthorized entry, access and further contamination of the products included in the several product groupings.

A still further objective of the present invention is to provide a multi sensor detection and lock disabling system that utilizes a multi-task device for preventing terrorist

US 10,984,619 B2

5

activity to vulnerable products that are collected or arranged by product grouping categories.

Yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system to secure cargos and containers, especially cargo and shipping containers, against chemical, biological, radiological and nuclear terrorist activity.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system capable of detecting chemical, biological and radiological agents and compounds.

Still yet another objective of the present invention is to provide a multi sensor detection and disabling lock system that includes interchangeable detectors that operate in conjunction to detect chemical, biological and radiological agents and compounds.

Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.

Another objective of the present invention is to provide a multi sensor detection and disabling lock system that accurately and reliably detects harmful agents, compounds and elements, and prevents the placement and storage of weapons and bombs in the range of storage containers and facilities currently available.

Still another objective of the present invention is to provide a multi sensor detection and lock disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners.

These and other objects, features, and advantages will become apparent to those skilled in the art upon a perusal of the following detailed description read in conjunction with the accompanying drawing figures and appended claims.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the primary features of the system which include a detector case, several interchangeable detectors, an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler;

FIG. 2 is a front elevational view of the multi sensor detection and lock disabling system of the present invention illustrating one of the interchangeable detectors first shown in FIG. 1;

FIG. 3a is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one lock disabler to the lock of a product, such as a container, and disengaged from the lock of the container;

FIG. 3b is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the engagement of the lock disabler to the lock of the product for locking or disabling the lock of the product so that unauthorized access is prevented;

FIG. 4 is a side elevational view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case mounted to the product, such as the container, with the light alarm indicators externally visible;

FIG. 5 is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of detector cases with a surveillance watchtower and a monitoring PC terminal;

6

FIG. 6 is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the placement of detector cases upon containers different from the containers of FIG. 5, and wherein the detectors case are interconnected to a surveillance watchtower and a monitoring PC terminal;

FIG. 7 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one automatic/mechanical lock disabler to the lock of a standalone news rack;

FIG. 8 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating one interchangeable detector placed within the stand-alone news rack;

FIG. 9 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case having color coded front panels for specifically indicating the agents, compounds or elements that have been detected;

FIG. 10 is a rear elevational view of the multi sensor detection and lock disabling system of the present invention illustrating the GPS, Internet and power source connections;

FIG. 11 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector with the detector case and the steps undertaken by the system when an agent or compound is detected;

FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a stand-alone scanner for detecting an agent or compound;

FIG. 13 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector case with the automatic/mechanical lock disabler for activating the lock disabler upon detection by the system of an agent or compound;

FIG. 14 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating interconnection of the detector case with the fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public upon detection of the agent or compound;

FIG. 15 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the system with a surveillance watchtower and a monitoring PC or computer terminal for monitoring containers, such as shipping or cargo containers, that may sit for extended time periods on docks, at rail yards, and at industrial storage facilities;

FIG. 16 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the integration of the detection system with a satellite and monitoring equipment at a monitoring site for detecting explosives placed in a vehicle and then transmitting signals to the satellite and then to the monitoring site for disabling and locking the vehicle;

FIG. 17 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case;

FIG. 18 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of a GPS satellite, a monitoring site and a cell phone tower for communicating to and with an

7

electronic device such as a laptop computer or a cell phone for transmitting signals to a vehicle for activating an onboard stall-to-stop device for bringing the vehicle to a halt; and

FIG. 19 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the use of a GPS satellite in conjunction with the monitoring site and monitoring equipment to relay commands and signals to the cpu or transceiver of the vehicle for stopping or locking the vehicle in response to a signal that a certain type of event (detection of a bomb, engine failure or malfunction or unauthorized use) has occurred or is in process.

DETAILED DESCRIPTION OF
REPRESENTATIVE EMBODIMENTS

Illustrated in FIGS. 1-19 is a multi-sensor detection and lock disabling system 10 for preventing terrorist activity by monitoring, detecting, and securing those critical areas; sites, and facilities vulnerable to terrorist activity. The first step is the identification of critical areas, sites, locations and facilities that are vulnerable to terrorist activity as convenient places to store and plant explosives and bombs and spread biological, chemical or radiological agents and compounds, followed by the disposition of the multi sensor detection and lock disabling system 10 for monitoring, detecting, and securing the particular location or site. Vulnerable sites, locations, facilities and areas are nearly limitless in their variety; in order to categorize the protection the present invention provides an anti-terrorist product grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design, and products presenting the same or similar security problems are grouped together with the multi sensor detection and lock disabling system 10 for preventing terrorist activity. For example, two preferred product groupings can be Product Grouping I: cargo containers, shipping containers, cargo planes, freight train cars, tractor trailers, mail carriers (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans and utility vehicles. Product Grouping II: chemical detectors, biological detectors, radiological detectors, nuclear detectors, motion sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems. In addition to grouping products together by features, designs and materials, the multi sensor detection system 10 includes a lock disabling capability for disabling an existing lock or activating a lock on or inside any of the aforementioned products when a detector or sensor of the system is activated. The lock disabling feature is a crucial component of the invention in so far as it prevents unauthorized, unequipped or untrained individuals from gaining access and entry to the site and causing further contamination of the site.

As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one—and preferably many—detector case 12 that can be placed in, on, upon or adjacent the product, such as the shipping containers 14 of FIGS. 4 and 5 resting upon a platform 16 or the cargo container 18 of FIG. 6 sitting upon a seaport dock or pier 20. The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30. The rear side 30 has connec-

8

tions or contacts that can include an Internet connection 32, a GPS connection 34 and a power connection 36 for a power source. The power source for the detector system 10 can be any conventional battery or electrical source. The detector case 12 includes an interior chamber divided into a number of compartments 38 for holding therein agent or compound detection means hereinafter further described. A cpu 40 is mounted within the detector case 12 and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates with a monitoring site and monitoring equipment. The front side 28 of the detector case 12 includes indicator means for visually indicating that a specific agent, compound or element has been detected. The indicator means can include color coded indicator lights 42 in panel form, as shown in FIG. 9, with each indicator light panel 42 lighting up with a specific color corresponding to the detection of a specific agent or compound; or color coded indicator lights 44, as shown in FIG. 1, that correspond to and individually light up on the detection of a specific agent or compound (chemical, biological, or radiological).

As shown in FIGS. 1, 2 and 9-13, the multi sensor detection and lock disabling system 10 includes a plurality of detectors 46 with each detector 46 adapted for and set up to sample for a specific agent or compound (biological, chemical, or radiological); and the detectors 46 are interchangeable for adapting to the needs and demands of future technology. The detectors 46 can also be used as stand-alone scanners. In the preferred embodiment of the invention, at least three detectors 46 are placed within the detector case 12 with one detector 46 for specifically sampling biological agents or compounds, one detector 46 for sampling chemical agents or compounds, and one detector 46 for sampling radiological agents or compounds. The detectors 46 are interconnected to the cpu 40 of the detection system 10 by conventional connections that can be wire or wireless for transmitting the appropriate signals to the cpu 40 upon detection of the particular agent or compound. As shown in FIG. 2, each detector 46 includes on its front plate or facing surface a sound alarm indicator 48, a readings panel 50 comprising a plastic shield and LED lights for displaying the various read-out messages, a sensor 52 for detecting the specific agent, element or compound, and a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand-alone scanner. Each detector 46 includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu 40 of the detector case 12.

As shown in FIGS. 1, 3a, 3b, 9, and 13-15, used in conjunction with the multi sensor detection and lock disabling system 10 is at least one automatic/mechanical lock disabler 56—and depending upon the number of products being monitored there can be one lock disabler 56 for each product. The automatic/mechanical lock disabler 56 is physically connected to the detector case 12 by a wire or cable 58 for receiving signals therefrom for disabling an existing lock or activating a lock inside a product to prevent access to the product. By way of example, FIG. 3a shows the automatic/mechanical lock disabler 56 mounted—by any conventional means—to the lock 60 of the shipping container 14 shown in FIGS. 4 and 5 and connected by wire 58 to the cpu 40 of the detector case 12. The lock disabler 56 is in the non-activated or disengaged state in FIG. 3a. FIG. 3b shows the automatic/mechanical lock disabler 56 mounted to the lock 60 of the shipping container 14 and in the activated or engaged state after detection of an agent or

9

compound by the system 10 thereby for locking or disabling the lock 60 of the shipping container 14 and preventing unauthorized entry and access by unauthorized, untrained and unequipped individuals. In FIGS. 3a and 3b the lock 60 secures doors of the shipping container 14 that can be slidably or pivotally opened and closed.

In addition to the automatic/mechanical lock disabler 56, the multi sensor detection and lock disabling system 10 can also utilize a fingerprint biometric lock with disabler 62 as shown in FIGS. 1 and 14. The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40 of the detector case 12 for receiving transmissions therefrom after detection of an agent or compound has occurred so that the lock on the product can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56 by turning the manual lock disabler 66. The fingerprint biometric lock with disabler 62 is mounted to the lock of the product in a manner similar to the mounting of the automatic/mechanical lock disabler 56 that is shown in FIGS. 3 and 3b.

FIGS. 4 and 5 show one manner of disposition or placement of the detector case 12 in relation to the product, i.e., the shipping container 14, with the color coded indicator lights 42 externally viewable; FIG. 5 shows a number of shipping containers 14 each equipped with a detector case 12 and integrated with elements hereinafter further described for continuously monitoring the shipping containers 14 as they sit for an extended period of time on the truck or rail platform 16. FIG. 6 illustrates several cargo containers 18 sitting on the shipping dock or pier 20, with each cargo container 18 having a detector case 12 mounted thereon and integrated with and monitored by elements shown in FIG. 5 and hereinafter further described.

FIG. 7 illustrates a typical product from product grouping 1 that is monitored by the multi sensor detection and lock disabling system 10 of the present invention; specifically, FIG. 7 shows a news rack 68 with one automatic/mechanical lock disabler 56 mounted to and interconnected with the locking mechanism of the news rack 68. As long as there is no detection of any agent or compound, the lock disabler 56 is in the disengaged state, and the individual can deposit the coin amount in the chute and then freely open the glass panel 70 by the handle 72 for removing a paper. However, the lock disabler 56 would be activated upon detection of the harmful agent or compound and receipt of a signal from the cpu 40 for locking or disabling the locking mechanism thereby denying access to the interior of the news rack 68 from all untrained, unauthorized and unequipped individuals.

FIG. 8 illustrates one detector 46 disposed within the news rack 68 and which is visible through the panel 70 for detecting one specific agent, compound or element. The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment.

FIG. 11 illustrates a representative schematic 74 for describing the signal transmission process from the detector 46 to the cpu 40 of the detector case 12. The external stimulus 76 would be the chemical, biological or radiological agent or compound. If there is no detection of the agent or compound, the detector 46 will stay in the sensing mode 78. However, detection of the specific agent will trigger the sound alarm 80 and the light alarm 82, and instant transmittal of a signal to the cpu 40. The readings 84 can be stored by the cpu 40 for verification and future review and evalu-

10

ation. After all the appropriate corrective and preventative measures have been undertaken by the trained and authorized personal, and the site has been cleansed of the contamination, authorized and equipped personal can then reset 86 the system 10.

FIG. 12 illustrates a representative schematic 88 for the detector 46 when used as stand-alone scanner. The detector 46 undergoes the same essential steps as illustrated in FIG. 11, with the exception of the signal transmission to the cpu 40. The detector 46 remains in detection mode 78 until an agent is detected, and then the various functions-light alarm 82, sound alarm 80, storage of readings 84, and, after the appropriate security and safety steps have been carried out by authorized personal, detector reset 90 by authorized personal can occur thereby placing the detector 46 back in detection or sensing mode 78.

FIG. 13 is a representative schematic 92 that illustrates the steps undertaken by the system 10 to lock or disable a lock, such as the lock 60 for the shipping container 14 shown in FIGS. 3a and 3b. Upon detection of the agent (chemical, biological, radiological) the alarm light indicators 42 or 44 will light up providing external indication that an agent has been detected. In addition, the system 10—the cpu 40—will transmit a lock/disable lock signal 94 to the automatic/mechanical lock disabler 56 to lock or disable the lock on the product, such as the lock 60 on the shipping container 14 of FIGS. 3a-5. This prevents unauthorized, unequipped, or untrained individuals from entering or gaining access to the product for which a dangerous and perhaps lethal agent has been detected. After the proper authorities and authorized personal have been notified and all the appropriate security, preventative and clean up measures have been undertaken, the authorized individual can perform the disarm and reset function 96 for the system 10 placing the system 10 in back in the detection mode 98.

FIG. 14 is a representative schematic 100 illustrating the use of the fingerprint biometric lock with disabler 62 with the system 10. Upon detection of the agent or compound by the detector, the various alarms would sound and light up (shown in previous figures), and the cpu 40 would then transmit a signal to the fingerprint biometric lock with disabler 62 to lock or disable the lock on the product, such as the lock 60 on the shipping containers 14 shown in FIGS. 3a-5. The shipping containers 60 would remain locked and in an access denied mode 101 should an attempt be made to gain access to the container 60 by opening the lock 60 with an unauthorized fingerprint. However, a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock 60 of the shipping container 14. The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety, cleanup, and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108.

FIG. 15 is a schematic representation 110 that illustrates the integration of a surveillance watchtower 112 and a monitoring terminal or PC 114 for monitoring products such as the shipping containers 14 or cargo containers 16 that sit for extended periods of time of docks, piers 20, truck terminals, rail yards, shipping platforms 16 and industrial sites as shown in FIGS. 5 and 6. The watchtower 112 would maintain continuous surveillance over a number of shipping containers 60, for example, with detector cases 12 mounted in or on each container 14 and set in detection mode 116 with one or more detectors 46 disposed in each detector case 12. The watchtower 112 would continuously scan for light alarm indicators 42 and 44 on the products, such as the containers

11

14 or 18, and the watchtower 112 would be interconnected and integrated with the monitoring terminal or PC 114. Upon detection 118 of an agent or compound in one or more of the shipping containers 14, the appropriate light alarm indicators 42 or 44 would light providing visible confirmation of the detection of the specific agent or compound. The cpu 40 would transmit a lock/disable signal 120 to the lock 60 on each respective shipping container 14 to lock or disable the lock 60 thus preventing access to that respective shipping container 14. In addition, signal transmissions would be sent to the monitoring terminal or PC 114 (which could be off site) thereby alerting authorized security personal of the contamination event. With the information received at the monitoring terminal 114, authorized personal would then be notified and dispatched to the area to undertake the appropriate safety and cleanup measures 122. Such measures would also include disarming the lock disabling system in order to gain access to the shipping container 14. After all the cleanup and security measures are completed by the trained and properly equipped authorities, the detection system and the lock disabling feature would reset 124 and the detection system would again be placed in detection mode 116.

FIG. 16 is a schematic representation 126 that illustrates an enhanced version of the multi sensor detection and lock disabling system 10 for preventing car and vehicle attacks and bombings. The lock disabling system 10 would be interconnected to the locking system and mechanism 128 of the vehicle 130. In addition, a stall to stop disabling link 132 can be made with the fuel, air, and electrical system 134 of the vehicle 130. The enhanced version incorporates a satellite 136 for signal receipt and transmission from the vehicle 130 in which the detector system 10 is placed to a monitoring site and monitoring equipment 138. As shown in FIG. 16, a detection signal 140 would be sent to the satellite 136 by the detection system 10 upon detection of a bomb or explosive 142 hidden in the vehicle 130. The satellite 136 would then transmit an alert signal 144 to the monitoring site 138 with the signal 144 containing the relevant data to evaluate the nature of the threat. The monitoring site 138 would then transmit a stall to stop signal 146 to the detection system 10 to lock the vehicle 130 and/or disable the electrical system of the vehicle 130 thereby disabling the vehicle 130, preventing access to the vehicle 130 by locking the vehicle 130, and preventing any terrorist in the vehicle 130 from escaping.

The detector case 12 can be modified and adapted for inclusion with cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases; and briefcases. In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring.

The system 10 and the watchtower 112, along with the satellite 136 and the monitoring site 138 can be adapted or incorporated with cell phone towers and satellites for use with satellite communication and/or a cell tower. wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, or a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. The aforementioned telecommunication and radio communication means can be interactive with any type of motive vehicle that includes but is not limited to cars, trucks, vans, SUVs, trains, subways, boats, ships and air-

12

planes, and which is reported stolen, experiences a loss of brakes, or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted to the vehicle and which detection causes an automatic signal transmission or a signal transmission is activated when a call is made to the monitoring station by an authorized person. The authorized individual includes but is not limited to the owner, pilot, conductor, captain, police highway patrol, security guard and military personnel to the monitoring equipment for activating a vehicle slowdown or stall-to-stop disabling system that similar to the disabling system 126 shown in FIG. 16, or incorporating features of the system 126 shown in FIG. 16, from the monitoring equipment to the vehicle. The activation of the stall-to-stop disabling means or the vehicle slowdown disables or engages the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.

In addition, the basic stall-to-stop disabling means or the vehicle slowdown means and device can be adapted, modified or designed to include: an open bust or open platform for integrating any new and innovative technology; warning lights indicators; sound alarm indicators; voice alarm indicators; a cell phone to transmit to the vehicle a signal for slowing and halting the vehicle; and a lock disabling system or means to lock a thief or terrorist inside the vehicle after a transmission is received or sent. Open bust or open platform also refers to the compatibility of the detector case 12, or the incorporation of its features in cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, briefcases, and suitcases, etc., with other communication, transmission and surveillance systems whereupon the detector case 12, and its features, can be seamlessly integrated with other new and emerging systems and technologies.

Thus, as shown more specifically in FIG. 17, by way of a representative example the features and elements of the detector case 12 are shown as being incorporated into cell phone detector case 150 and associated cell phone monitor 152. The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174. The power source for the cell phone detector case 150 can be any conventional rechargeable battery source or standard electrical power from a standard electrical receptacle or outlet.

As shown in FIG. 17, the cell phone detector case 150 includes one or more sensor/detector units, cells, or components 176 built into and incorporated into the case 150. The detector 176 includes generally disposed at the front 162 of the case 150 the following types of indicators: a sound alarm indicator 178, a readings panel 180, a sensor 182 for detecting one or more specific types of agents, elements, chemicals, compounds, etc., and a light alarm indicator 184. The sensor/detector 176 will be interconnected to the power source 174. In addition, mounted on and externally visible on the sides 168 or front 162 of the case 150 are a plurality of color coded indicator lights 186 with

13

each light 186 corresponding to a specific agent, element, chemical, compound, etc., and lighting up when that agent is detected by the sensor/detector 176. The color coded indicator lights 186 will be electrically interconnected to the sensor/detectors 176 via any standard microprocessor. The cell phone detector case 150 and cell phone monitor 152 thus comprise a hand-held, easily portable and transportable detection means that is both effective and unobtrusive in its disposition and use.

FIGS. 18 and 19 illustrate representative examples of the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188, and operating in conjunction with either a satellite and/or a cell phone tower 190 to transmit and receive signals and commands among each other and to a vehicle 192, such as a truck, as part of a stall-to-stop disabling system for slowing and stopping the vehicle 192 and locking a thief, terrorist, or unauthorized individual in the vehicle 192 if needed. A wide range of events can trigger and initiate the stall-to-stop system and the locking or lock disabling system and mechanism, and the event doesn't have to be limited to the detection of a bomb or a chemical, biological, or radiological agent, element, or compound. The events can include, but is not limited to, detection of an engine problem to engine failure to the unauthorized use (stealing) of the vehicle 192. The vehicle 192 includes an electromotive system 194 that comprises, among other components, an onboard computer(s), electrical, fuel and air systems, as well as brakes, ignition, steering, and transmission. Also integrated with and capable of communicating with the vehicle's 192 electromotive system 194 is a stall-to-stop system while a lock disabling mechanism 196 is able to engage and disengage or disable the vehicle's 192 locking mechanism 198 upon receipt of the appropriate commands via a lock disabling communication channel or link 200. This link 200 can also accommodate the stall-to-stop system commands and signals, and thus is a multi-channel communication link. A CPU or a transceiver 202 is programmed to receive signals from the cell phone tower 190 and/or to a GPS satellite 204 and is interconnected with the stall-to-stop system and the lock disabling system 196 via link 200 for engaging the electromotive system 194 and actuating the lock disabling system 196 to stop the vehicle 192 and lock inside the vehicle 192 anyone such as a thief, terrorist or other unauthorized individual.

A representative example for stopping, disabling, and locking the vehicle 192 that utilizes the cell phone tower 190 wherein the activation and/or distress signal 206 originates from the cell phone 187a or the laptop 187b and such activation signal 206 travels to the cell phone tower 190 that is nearest the current location of the vehicle 192. A signal 208 is then transmitted to the monitoring site 188 and specific monitoring equipment 138 that can also include but is not limited to cell phones, laptops, desktop PC's, notebook PCs and LCD monitors. The monitoring site 138 then communicates by signal 210 to the GPS satellite 204 that an original or activation signal has been received and then the GPS satellite 204 locates and communicates by multiplex signal 212 with the CPU or transceiver 202 on the vehicle 192 and exchanges information on the type of problem, situation, location, and vehicle speed. The monitoring equipment 138 then transmits a signal 214 to the cell phone tower 190 that communicates with the transceiver 202 and/or CPU of the vehicle 192 to initiate or execute any commands that will actuate the stall-to-stop disabling link 200 and lock

14

disabling system 196 for bringing the vehicle 192 to a halt and actuating the vehicle's 192 locking mechanism 198 for locking the thief, terrorist, or other unauthorized person inside the vehicle 192 if needed.

FIG. 19 illustrates a representative example wherein the stall-to-stop system and the lock disabling system 196 are utilized in conjunction with the GPS satellite 204. In FIG. 19 a signal has traveled to the satellites nearest the vehicle's 192 current location and then the signal 218 has traveled to the monitoring equipment 138 and monitoring site 188 which can include but is not limited to satellite cell phones, satellite monitors, cell phones, laptops, desktop PC's, notebook PC's, and LCD monitors. The GPS satellite 204 then locates and communicates with the CPU and/or transceiver 202 on the vehicle 192 via a multiplex (two-way) signal 220 in order to exchange information on such distress and danger event parameters as the specific problem situation, location, and vehicle speed. The monitoring equipment 138 then transmits a signal 222 back to the GPS satellite 204 that in turn communicates via another signal 224 with the CPU and/or transceiver 202 to execute any commands to the stall-to-stop system for executing the disengagement of the vehicle's 192 electromotive system 194 for bringing the vehicle 192 to a halt and for actuating the lock disabling system 196 to direct the lock disabling link 200 to actuate the locking mechanism 198 thereby locking the vehicle 192 and anyone inside the vehicle 192.

The present invention comprehends a chemical/biological/radiological/nuclear/explosive/human/contraband detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars, United Parcel Services™ (UPS™), Federal Express™ (FedEx™), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans, unmanned aerial vehicles (UAVs), unmanned ground vehicles (UGVs), and utility vehicles; the products grouped into what may be referred to as Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, speed sensors, biometric sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems, detection of humans, detection of contraband, temperature, and shock levels; the products grouped into what may be referred to as Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, eyeglass, briefcases, detector cases of locks, detector cases of tags, detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to; the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless

US 10,984,619 B2

15

communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite cell phones, cell phones, Universal Mobile Telecommunications System (UMTS) phones, personal digital assistants (PDAs), liquid crystal display (LCD) monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds; the products grouped into what may be referred to as Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS), Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS); the products grouped into what may be referred to as Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature. the products grouped into what may be referred to as Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside or outside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

While the invention has been shown and described in a preferred embodiment, it will be apparent to those skilled in the art that numerous alterations, modifications, and variations will possible and practicable without departing from the spirit and scope of the invention as set forth by the appended claims.

What is claimed:

1. A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of:

processing instructions to lock, unlock, or disable the lock of the communication device;

processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;

processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;

processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;

processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition,

16

biometric facial recognition, biometric iris recognition, or biometric retina recognition;

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and,

whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

2. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of processing operational instructions for at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner.

3. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal to lock, unlock, or disable the lock of the communication device.

4. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition.

5. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of at least short-range wireless radio frequency near-field communication (NFC).

6. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

7. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal from at least one of chemical, biological, radiological, nuclear, or explosives detection.

8. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection.

9. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device.

10. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of the operational and functional execution of instruc-

17

18

tions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.

**11.** A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of:

processing instructions to lock, unlock, or disable the lock of the communication device;

processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;

processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;

processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;

processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and,

whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, and is

capable of providing feedback of the execution, and storing the feedback into memory.

**12.** The central processing unit (CPU) of claim **11**, capable of processing operational instructions for at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner.

**13.** The central processing unit (CPU) of claim **11**, capable of processing operational instructions to lock, unlock, or disable the lock of the communication device.

**14.** The central processing unit (CPU) of claim **11**, capable of processing operational instructions of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition.

**15.** The central processing unit (CPU) of claim **11**, capable of processing operational instructions from short-range wireless radio frequency near-field communication (NFC).

**16.** The central processing unit (CPU) of claim **11**, capable of processing operational instructions from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

**17.** The central processing unit (CPU) of claim **11**, capable of processing operational instructions from at least chemical, biological, radiological, nuclear, or explosives detection.

**18.** The central processing unit (CPU) of claim **11**, capable of processing operational instructions through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection.

**19.** The central processing unit (CPU) of claim **11**, capable of processing operational instructions of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device.

**20.** The central processing unit (CPU) of claim **11**, capable of processing operational instructions of functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.

\* \* \* \* \*

# Exhibit E

US010163287B2

(12) **United States Patent**
Golden

(10) **Patent No.:**  US 10,163,287 B2
(45) **Date of Patent:**  Dec. 25, 2018

(54) **MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM**

(71) Applicant: **Larry Golden**, Greenville, SC (US)

(72) Inventor: **Larry Golden**, Greenville, SC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/530,839**

(22) Filed: **Mar. 6, 2017**

(65) **Prior Publication Data**

US 2017/0186259 A1    Jun. 29, 2017

**Related U.S. Application Data**

(60) Continuation of application No. 14/806,988, filed on Jul. 23, 2015, now Pat. No. 9,589,439, which is a continuation of application No. 14/021,693, filed on Sep. 9, 2013, now Pat. No. 9,096,189, which is a continuation of application No. 13/288,065, filed on Nov. 3, 2011, now Pat. No. 8,531,280, which is a

(Continued)

(51) **Int. Cl.**
| | |
|---|---|
| *G08B 27/00* | (2006.01) |
| *G07C 9/00* | (2006.01) |
| *B60R 25/24* | (2013.01) |
| *B60R 25/04* | (2013.01) |

(52) **U.S. Cl.**
CPC .......... *G07C 9/00174* (2013.01); *B60R 25/04* (2013.01); *B60R 25/24* (2013.01); *G07C 9/00007* (2013.01); *G07C 9/00563* (2013.01)

(58) **Field of Classification Search**
CPC .. G07C 9/00; G07C 9/00007; G07C 9/00174; G07C 9/00309; G07C 9/00388; G07C

9/00563; G08B 27/00; G08B 27/005; G08B 27/006; B60R 25/018; B60R 25/04; B60R 25/10; B50R 25/102
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,385,469 A | 5/1983 | Scheuerpflug et al. |
| 4,544,267 A | 10/1985 | Schiller |
| | (Continued) | |

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and dated Jan. 13, 2012, pp. 1-34, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (34 pages).

(Continued)

*Primary Examiner* — Van Trieu

(57) **ABSTRACT**

A multi sensor detection and disabling lock system includes detector cases for holding interchangeable detectors that sample for chemical, biological and radiological compounds, agents and elements, with each detector case disposed in or upon the monitored product. The detector case transmits detection information to a monitoring computer terminal and transmits a signal to a lock disabler engaged to the product to lock or disable the product's lock thereby preventing untrained, unauthorized and unequipped individuals from gaining access and entry to the product, and also preventing further contamination of the area. The detection system can be interconnected to surveillance towers scanning detector cases disposed at seaport docks, freight depots and rail terminals for monitoring containers being prepared for shipment or sitting on docks for long periods of time.

**6 Claims, 13 Drawing Sheets**



### Related U.S. Application Data

division of application No. 12/802,001, filed on May 27, 2010, now Pat. No. 8,334,761, which is a continuation of application No. 12/657,356, filed on Jan. 20, 2010, now Pat. No. 8,106,752, which is a continuation of application No. 12/155,573, filed on Jun. 6, 2008, now Pat. No. 7,636,033, which is a continuation-in-part of application No. 11/397,118, filed on Apr. 5, 2006, now Pat. No. 7,385,497.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,586,441 A | 5/1986 | Zekich |
| 4,792,226 A | 12/1988 | Fishbine et al. |
| 5,222,152 A | 6/1993 | Fishbine et al. |
| 5,223,844 A | 6/1993 | Mansell et al. |
| 5,233,404 A | 8/1993 | Lougheed et al. |
| 5,557,254 A | 9/1996 | Johnson et al. |
| 5,682,133 A | 10/1997 | Johnson et al. |
| 5,766,956 A | 6/1998 | Groger et al. |
| 5,938,706 A | 8/1999 | Feldman |
| 5,959,529 A | 9/1999 | Kail |
| 5,963,657 A | 10/1999 | Bowker et al. |
| 5,986,543 A | 11/1999 | Johnson |
| 5,990,785 A | 11/1999 | Suda |
| 6,049,269 A | 4/2000 | Byrd et al. |
| 6,078,265 A | 6/2000 | Bonder et al. |
| 6,262,656 B1 | 7/2001 | Byrd et al. |
| 6,271,745 B1 | 8/2001 | Anzai et al. |
| 6,374,622 B2 | 4/2002 | Hwang |
| 6,411,887 B1 | 6/2002 | Martens et al. |
| 6,470,260 B2 | 10/2002 | Martens et al. |
| 6,542,076 B1 | 4/2003 | Joao |
| 6,542,077 B2 | 4/2003 | Joao |
| 6,588,635 B2 | 7/2003 | Vor Keller et al. |
| 6,610,977 B2 | 8/2003 | Megerle |
| 6,613,571 B2 | 9/2003 | Cordery et al. |
| 6,628,813 B2 | 9/2003 | Scott et al. |
| 6,647,328 B2 | 10/2003 | Walker |
| 6,738,697 B2 | 5/2004 | Breed |
| 6,923,509 B1 | 8/2005 | Barnett |
| 6,980,092 B2 | 12/2005 | Turnbull et al. |
| 6,988,026 B1 | 1/2006 | Breed et al. |
| 7,005,982 B1 | 2/2006 | Frank |
| 7,034,677 B2 | 4/2006 | Steinthal et al. |
| 7,034,683 B2 | 4/2006 | Ghazarian |
| 7,103,460 B1 | 9/2006 | Breed |
| 7,116,798 B1 | 10/2006 | Chawla |
| 7,148,484 B2 | 12/2006 | Craig et al. |
| 7,171,312 B2 | 1/2007 | Steinthal et al. |
| 7,184,117 B2 | 1/2007 | Breed et al. |
| 7,243,945 B2 | 7/2007 | Breed et al. |
| 7,339,469 B2 | 3/2008 | Braun |
| 7,346,439 B2 | 3/2008 | Bodin |
| 7,350,608 B2 * | 4/2008 | Fernandez ............... B60L 1/00 |
| | | 180/65.1 |
| 7,385,497 B2 | 6/2008 | Golden |
| 7,397,363 B2 | 7/2008 | Joao |
| 7,636,033 B2 | 12/2009 | Golden |
| 7,647,180 B2 | 1/2010 | Breed |
| 7,844,505 B1 | 11/2010 | Arneson et al. |
| 7,868,912 B2 | 1/2011 | Venetianer et al. |
| 7,872,575 B2 | 1/2011 | Tabe |
| 7,880,767 B2 | 2/2011 | Chinigo |
| 7,961,094 B2 | 6/2011 | Breed |
| 8,120,459 B2 * | 2/2012 | Kwak ............... G07C 9/00309 |
| | | 340/5.2 |
| 8,274,377 B2 | 9/2012 | Smith et al. |
| 8,531,521 B2 | 9/2013 | Romanowich |
| 8,564,661 B2 | 10/2013 | Lipton et al. |
| 2002/0145666 A1 | 10/2002 | Scaman |
| 2003/0063004 A1 | 4/2003 | Anthony et al. |
| 2003/0137426 A1 | 7/2003 | Anthony et al. |
| 2003/0179073 A1 * | 9/2003 | Ghazarian ............... E05B 47/00 |
| | | 340/5.6 |

| | | |
|---|---|---|
| 2003/0206102 A1 | 11/2003 | Joao |
| 2004/0107028 A1 | 6/2004 | Catalano |
| 2004/0222092 A1 | 11/2004 | Musho |
| 2005/0195069 A1 | 9/2005 | Dunand |
| 2006/0164239 A1 | 7/2006 | Loda |
| 2006/0176169 A1 | 8/2006 | Doolin et al. |
| 2006/0184413 A1 | 8/2006 | Mostov |
| 2006/0250235 A1 | 11/2006 | Astrin |
| 2007/0093200 A1 * | 4/2007 | Dobosz ............... H04B 7/18565 |
| | | 455/3.02 |
| 2007/0171042 A1 | 7/2007 | Metes et al. |
| 2007/0257774 A1 * | 11/2007 | Stumpert ............... G06Q 10/08 |
| | | 340/7.1 |
| 2008/0045156 A1 | 2/2008 | Sakhpara |
| 2008/0122595 A1 | 5/2008 | Yamamichi et al. |
| 2008/0234907 A1 | 9/2008 | Labuhn et al. |
| 2010/0159983 A1 | 5/2010 | Golden |
| 2011/0178655 A1 | 6/2011 | Golden |

#### OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and dated Dec. 2, 2011, pp. 1-27, publisher United States and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (27 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and dated Nov. 1, 2011, pp. 1-18. publisher United States Patent and Trademark Office, Alexandria, Virgina, USA; U.S. Appl. No. 13/288,065 (18 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 11/397,118; dated Nov. 14, 2007; Alexandria, Virgina, USA; pp. 1-12; U.S. Appl. No. 13/288,065 (12 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; dated Apr. 9, 2009; Alexandria, Virgina, USA; pp. 1-7; U.S. Appl. No. 13/288,065 (7 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; dated Jul. 30, 2009; Alexandria, Virgina, USA; pp. 1-9; U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/155,573; dated Oct. 28, 2009; Alexandria, Virgina, USA; pp. 1-5; U.S. Appl. No. 13/288,065 (5 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/657,356; dated Jul. 12, 2010; Alexandria, Virgina, USA; pp. 1-14; U.S. Appl. No. 13/288,065 (14 pages).

United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/657,356; dated Mar. 10, 2011; Alexandria, Virginia, USA; pp. 1-4; U.S. Appl. No. 13/288,065 (4 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 13/065,837; dated Jul. 18, 2011; Alexandria, Virgina, USA, pp. 1-9; U.S. Appl. No. 13/288,065 (9 pages).

A newspaper article of Mr. Melvin Sullivan and his family that references the date, Mar. 5, 2001, U.S. Appl. No. 13/288,065.

A letter of response Mr. Sullivan received from Pfeiffer & Gantt, PA, dated Sep. 16, 2002, U.S. Appl. No. 13/288,065.

A "Certificate of Existance" Bright Idea Inventor, LLC. Nov. 6, 2002, U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Congressman from Maryland, Elijah E. Cummings, dated Dec. 16, 2002; U.S. Appl. No. 13/288,065.

A newspaper article of Mr. Melvin Sullivan and Mr. Larry Golden, dated Feb. 27-Mar. 5, 2003; U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated May 21, 2003; U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Office of the Vice President, Dick Cheney, dated Jun. 3, 2003; U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated Oct. 1, 2003; U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Lindsey O. Graham, dated Oct. 21, 2003; U.S. Appl. No. 13/288,065.

**US 10,163,287 B2**

Page 3

(56)             **References Cited**

OTHER PUBLICATIONS

A letter sent to the President of the United States George W Bush, the President's Cabinet, the United States Senate and the Congressional Black Caucus, dated May 23, 2005; U.S. Appl. No. 13/288,065.
On Nov. 17, 2005, an "Inventor's Office Record of Invention", was filed in my name (Golden) at "The Law Office of David P. Gaudio,P.C.; the Inventors Network."; U.S. Appl. No. 13/288,065.
On Aug. 23, 2005, the "Disclosure Document Registration"; U.S. Appl. No. 13/288,065.
On Apr. 5, 2006, the "Patent Application" was filed in my name (Golden) at the United Staets Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.
On Jun. 6, 2008, the "Continuance-In-Part, (CIP) Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.
On Jan. 20, 2010, a "Continuation Application" (U.S. Appl. No. 12/657,356) was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.
Reissue of U.S. Pat. No. 7,636,033,"Swear Back"; in accordance to Title 37—Code of Federal Regulations Patents, Trademarks, and Copyrights; Apr. 8, 2011; U.S. Appl. No. 13/288,065.
Reissue of U.S. Pat. No. 7,636,033, "Swearback-History of Work"; Apr. 8, 2011; U.S. Appl. No. 13/288,065.
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001, dated Apr. 14, 2011, 2011; Alexandria, Virginia, USA; pp. 1-16; U.S. Appl. No. 13/288,065 (16 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; dated May 27, 2011; Alexandria, Virginia, USA; pp. 1-14, U.S. Appl. No. 13/288,065 (14 pages).
United States Department of Homeland Security; Petition for Inter Partes Review of U.S. Pat. No. Re. 43,990 Under 35 U.S.C. §312 and 37 C.F.R. §42.104; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-57; U.S. Appl. No. 14/806,988 (57 pages).
United States Department of Homeland Security; Declaration of Dr. Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington D.C., USA; pp. 1-44; U.S. Appl. No. 14/806,988 (44 pages).
Richard R Brooks and S.S. Iyengar; Multi-Sensor Fusion Fundamentals and Applications with Software: published 1998; Copyright Prentice Hall PTR; Upper Saddle River, New Jersey, USA; pp. 1-20; copy enclosed (20 pages), U.S. Appl. No. 14/806,988 (20 pages).
Ramanarayanan Viswanathan and Pramod K Varshney; Distriubted Detection with Multiple Sensors: Part 1—Fundamentals; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-11; vol. 85; No. 1; Southern Illinois University Carbondale OpenSIUC: Illinois. USA; pp. 1-11; U.S. Appl. No. 14/806,988 (11 pages).
Blum; Distributed Detection with Multiple Sensors: Part II—Advanced Topics: Proceedings of the IEEE; Jan. 1, 1997; pp. 1-16; vol. 85, No. 1; Southern Illinois University Carbondale OpenSIUC; Illinois, USA; U.S. Appl. No. 14/806,988 (16 pages).
Victor Lesser; Distributed Sensor Networks a Multragent Perspective; 2003; pp. 1, 2, 5, 6322, 26, 27, 36, 275, 320: copyright 2003 Kluwer Academic Publishers; AH Dordrecht, The Netherlands; U.S. Appl. No. 14/806,988 (10 pages).
Samuel Blackman and Robert Popoli; Design and Analysis of Modern Tracking Systems; 1999; pp. 1, 2, 6, 472; copyright 1999 Artech House; Norwood, Massachusetts, USA; U.S. Appl. No. 14/806,988 (4 pages).
Jean-Francois Chamberland; Decentralized Detection in Sensor Networks; 2003; pp. 407-416 IEEE Transactions on Signal Processing; vol. 51, No. 2; Urbana, Illinois, USA; U.S. Appl. No. 14/806,988 (10 pages).
Oleg Kachirski and Ratan Guha; Effective Intrusion Detection Using Multiple Sensors in Wireless Ad Hoc Networks; pp. 1-8; Proceedings of the 36.sup.th Hawaii International Conference on System Sciences; copyright 2003; Orlando, Florida. USA; U.S. Appl. No. 14/806,988 (8 pages).

Lawrence A Klein; Sensor and Data Fusion a Tool for Information Assessment and Decision Making; 2004; pp. 1-4, 6, 81, 87-89; copyright 2004 The Society of Photo-Optical Instrumentation Engineers; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Waehington, USA; U.S. Appl. No. 14/806,988.
Dale Ferriere and Khrystyna Pysareva and Andrzej Rucinski; Using Technology to Bridge Maritime Security Gaps; Aug. 1, 2005; Sea Technology; pp. 1-6; copyright Compass Publications, Inc. Jan. 2009; Portsmouth, New Hampshire. USA; U.S. Appl. No. 14/806,988 (6 pages).
Corie Lok; Cargo Security; MIT Technology Review; Jun. 2004; No. 107; pp. 74-75; publisher is Massachusetts institute of Technology; Cambridge, Massachusetts, USA; USPASN14/806988 (2 pages).
Thomas C Chen; RFID and Sensor-based Container Content Visibility and Seaport Security Monitoring system; Proceedings of SPIE, vol. 5778; pp. 151-159; Mar. 28, 2005; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; USPASN14/806988 (10 pages).
United States Department of Homeland Security; The University of Texas at Austin College of Engineering Standard Resume of Sriram Vishwanath; CaseIPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-21; USPASN14/806988 (21 pages).
Operating Agreement of Bright Idea Inventor, LLC received from Pfeiffer & Gantt. PA, dated Nov. 13, 2002; U.S. Appl. No. 13/288,065.
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; dated Oct. 20, 2011; Alexandria, Virginia, USA; pp. 1-5; parent U.S. Appl. No. 13/288,065 (5 pages); U.S. Appl. No. 13/288,065 (5 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright and dated Dec. 12, 2011. pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA, parent U.S. Appl. No. 13/288,065 (9 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright and dated Mar. 26, 2012, pp. 1-12, publisher United States Patent and Trademark Office; Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (12 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and dated Feb. 22, 2012, pp. 1-38, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (38 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and dated Feb. 22, 2012, pp. 1-25, publisher United States Patent and Trademark office, Alexandria, USA, U.S. Appl. No. 13/288,065 (25 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and dated Aug. 24, 2012, pp. 1-4, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (4 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and dated Nov. 28, 2012, pp. 1-11, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (11 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and dated Apr. 16, 2013, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virgina, USA; U.S. Appl. No. 13/288,065 (9 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and dated Apr. 20, 2015, pp. 1-20, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 14/021,693 (20 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and dated Jan.

(56)         **References Cited**

OTHER PUBLICATIONS

20, 2015, pp. 1-17, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 14/021,693 (17 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and dated Sep. 5, 2014, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 14/021,693 (12 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/806,988; copyright and dated Jul. 5, 2015, pp. 1-5, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 14/806,988 (5 pages).

United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 14/806,988; dated Jan. 3, 2017; Alexandria, Virgina, USA; pp. 1-8; U.S. Appl. No. 14/806,988 (8 pages).

United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 14/021,693; dated Jun. 19, 2015; Alexandria, Virginia, USA; pp. 1-8; U.S. Appl. No. 14/021,693 (8 pages).

United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 13/288,065; dated May 24, 2013; Alexandria, Virgina, USA; pp. 1-8; U.S. Appl. No. 13/288,065 (8 pages).

* cited by examiner



Fig. 1

Fig. 2



**Fig. 3a**



**Fig. 3b**



**Fig. 4**



POWER SOURCE

**Fig. 5**



Fig. 6

Fig. 7



**Fig. 8**



**Fig. 9**



**Fig. 10**



**Fig. 11**



Fig. 12

Fig. 13



Fig. 14

Fig. 15



**Fig. 16**



**Fig. 17**



**Fig. 18**



**Fig. 19**

US 10,163,287 B2

1

# MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM

## CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 14/806,988 title "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Jul. 23, 2015 that issued on Mar. 7, 2017 as U.S. Pat. No. 9,589,439, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. Pat. No. 9,589,439 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 14/021,693 title "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Sep. 9, 2013 that issued on Aug. 4, 2015 as U.S. Pat. No. 9,096,189, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. Pat. No. 9,096,189 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 13/288,065 title "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Nov. 3, 2011 that issued on Sep. 10, 2013 as U.S. Pat. No. 8,531,280, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. patent application Ser. No. 13/288,065 that will issue as U.S. Pat. No. 8,531,280 is a divisional application and claims the filing date and benefit of U.S. patent application Ser. No. 12/802,001 title "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on May 27, 2010, that issued on Dec. 18, 2012 as U.S. Pat. No. 8,334,761, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. Pat. No. 8,334,761 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 12/657,356 title "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Jan. 20, 2010 that issued on Jan. 31, 2012 as U.S. Pat. No. 8,106,752 the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. Pat. No. 8,106,752 is a continuation of and claims priority to U.S. Pat. No. 7,636,033. U.S. Pat. No. 7,636,033 is a continuation-in-part of and claims priority to U.S. Pat. No. 7,385,497. U.S. patent application Ser. No. 13/288,065 that will issue as U.S. Pat. No. 8,531,280 also claims the filing date and benefit of and incorporates the entire contents of U.S. patent application Ser. No. 12/657,356, now U.S. Pat. No. 8,106,752 herein by reference for all purposes. The present application also claims the filing date and benefit of and incorporates the entire contents of U.S. Pat. Nos. 9,096,189; 8,531,280; 8,334,761; 8,106,752; 7,636,033; and 7,385,497 by reference herein in their entireties for all purposes.

## FIELD OF THE INVENTION

The present invention pertains to anti-terrorist detection and prevention systems, and more particularly pertains to a disabling lock mechanism combined with a chemical/biological/radiological detection system for use with products grouped together by similar characteristics in order to prevent unauthorized entry, contamination and terrorist activity.

## BACKGROUND

Terrorist activity is a continuous, daily, worldwide threat to the stability, prosperity, security and peace within nations

2

and between and among nations. Its danger lies in its arbitrary destructiveness as much as in its unpredictability, and the constant threat of terrorist activity compels measures and actions that cause strain and contention in free, democratic societies as security concerns and civil liberty concerns must be balanced so that both public safety and civil liberties are maintained. Safety and security concerns can be addressed through numerous proactive steps and measures, many of which cause only minimal interference with and disruption of the daily routines of work, travel, commerce and entertainment. However, because modern industrial societies afford almost limitless places, locations, and opportunities for terrorist activities, no safety measure or security protocol will be foolproof, but many security measures, systems and protocols can be implemented that greatly minimize specific threats through fingerprint identification procedures, chemical, biological, and radiological hazard detections, bomb and explosive detection, and controlling the access to everything from shipping containers to school lockers. Thus, the prior art discloses a wide range of security measures and systems.

For example, the Fishbine et al. patent (U.S. Pat. No. 4,792,226) discloses an optical fingerprinting system that includes an optics/processor unit, a video monitor, a data terminal, and a printer for collecting and storing data characteristics of all ten individual fingerprints for printing demographic information and fingerprint images as desired on a standard booking or applicant card.

The Schiller patent (U.S. Pat. No. 4,544,267) discloses a finger identification unit that includes a fingerprint scanning apparatus using a collimated beam of light to interrogate the fingerprint of a finger placed against a platen so that successive scan positions produce signals containing fingerprint information.

The Fishbine et al. patent (U.S. Pat. No. 5,222,152) discloses a portable fingerprint scanning apparatus for optically scanning and recording fingerprint images and wirelessly transmitting such images to a mobile processing unit for verification and background checking.

The Lougheed et al. patent (U.S. Pat. No. 5,233,404) discloses an optical scanning apparatus that uses a linear charge coupled device (CCD) for recording the image of a fingerprint on the viewing surface.

The Groger et al. patent (U.S. Pat. No. 5,766,956) discloses a diode laser based sensor for undertaking optical, chemical, immunological or nucleic acid-based assay or other chemical analysis.

The Feldman patent (U.S. Pat. No. 5,938,706) discloses a multi element security system for preventing the unauthorized use of an automotive vehicle, and which includes numerous locking and control features interconnected to an onboard cpu.

The Bowker et al. patent (U.S. Pat. No. 5,963,657) discloses a safety access control for doors, handles, locks, etc., wherein the surface relief of a finger is read and verified to either allow or prevent access by the individual to the door, handle, lock, etc.

The Bonder et al. patent (U.S. Pat. No. 6,078,265) discloses a fingerprint identification security system wherein a key lock operated security system utilizes the fingerprint of the individual to control user access to the security system, such as the ignition system of an automotive vehicle.

The Anzai et al. patent (U.S. Pat. No. 6,271,745 B1) discloses a keyless authorization system for use of a motor vehicle that includes fingerprint reading units located on the exterior or interior of the motor vehicle and which are

US 10,163,287 B2

3

coupled to a control unit for scanning, comparing and matching fingerprints to allow or disallow access to the motor vehicle.

The Hwang patent (U.S. Pat. No. 6,374,652 B1) discloses a fingerprint-activated doorknob in which a detecting sensor for a fingerprint is placed on the doorknob for measuring and searching the fingerprint against previously stored fingerprint inputs to control access to the door.

The Vor Keller et al. patent (U.S. Pat. No. 6,588,635 B2) discloses a safety holster for a firearm that includes a pivotally mounted retaining member and a fingerprint sensor for scanning fingerprint information so that only authorized users can withdraw the firearm from the holster.

The Cordery et al. patent (U.S. Pat. No. 6,613,571 B2) discloses a method and system for detecting biological and chemical hazards in the mail that includes sensors placed within the mail box for sampling and testing ambient air and so that mail can be safely transported through the mail system.

The Nagata patent (U.S. Pat. No. 6,628,213 B2) discloses a coding method for digital signal coding and decoding that includes a CM1 (code-marked inversion) method of signal coding.

Nonetheless, despite the ingenuity of the above devices, methods, and systems, there remains a need for a multi-detector and disabling lock system for use with various types of products collected together by common characteristics into product groupings for detecting chemical, biological and radiological agents and compounds and for selectively disabling and activating the product locks thereby preventing unauthorized entry and further contamination and preventing and thwarting terrorist activities.

## SUMMARY

The present invention comprehends a chemical/biological/radiological detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes and lockers; while the products grouped into what may be referred to as Product grouping 2 include, but are not limited to, chemical, biological, radiological, and nuclear detectors, motion sensors and door sensors. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements. In addition, the multi sensor detection and lock disabling system is capable of transmitting a signal to lock or disable a lock on the product, and is also capable of transmitting signals to a monitoring computer terminal or PC so that appropriate defensive and safeguarding actions can be undertaken and an authorized individual can disarm and reset the locking system and the

4

multi sensor detection system. The detector case includes a power source (battery or electrical), interior compartments, Internet and GPS connections and a cpu interconnected with the Internet and GPS connections, and also interconnected with one or more off site monitoring computer terminals or PCs. The detector case includes one or more light alarm indicators that are externally visible and that light up when the chemical, biological, or radiological agent or compound is detected, and the light alarm indicators (which can be indicator lights or panels on the front of the detector case) can be color coded for denoting the specific agent or compound detected, i.e., separate and distinct colors for indicating detection of the chemical, biological, or radiological agent or compound.

The detector case is designed to hold within the interior compartments one or more interchangeable detectors, and each detector is adapted and set up to sample a specific compound or agent. Each detector includes a sound alarm, a sensor, a light alarm, and a readings panel, and is electrically interconnected (either by wire or wirelessly) to the cpu of the detector case so that information regarding the detection of the particular agent or compound can be conveyed from the detectors to the detector case cpu. Each detector can also be used as a manual, stand-alone hand held scanner.

The multi sensor detection and lock disabling system can be interconnected to a surveillance watchtower, as well as monitoring computer terminals or PCs, with the watchtower scanning shipping and cargo crates and containers being prepared for shipment or sitting for extended periods of time on a dock or at a port, at a railway site, or at an industrial storage facility. The watchtower will scan the cargo and shipping crates and containers for the light alarm indicators on detector cases that are mounted in or upon the crates and containers, and thus continuous security surveillance of the crates and containers can be maintained.

An enhanced version of the multi sensor detection and lock disabling system can be employed to prevent car and vehicle bombings. Coupling the multi sensor detection and lock disabling system with satellite service will enable the detection system to detect explosives and transmit an alert signal by satellite to monitoring equipment at a monitoring site. Upon receiving the alert signal at the monitoring site the monitoring equipment activates a stall-to-stop process for disabling the air, fuel, electrical and/or computer system of the vehicle. Moreover, upon receiving the alert signal at the monitoring site the car or vehicle will be locked by transmission of a satellite signal that disables the vehicle's electrical and ignition system thereby preventing escape of the terrorist.

It is an objective of the present invention to provide a multi sensor detection and disabling lock system for securing news racks and vending machines in order to prevent theft, unauthorized use and terrorist activity.

It is another objective of the present invention to provide a multi sensor detection and disabling lock system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist solutions.

It is still yet another objective of the present invention to provide a multi sensor detection and disabling lock system that is capable of disabling an existing lock or activating a lock inside any of the products of the product grouping lists when a detector or sensor of the system is activated.

It is still yet a further objective of the present invention to provide a multi sensor detection and disabling lock system

US 10,163,287 B2

5

wherein the disabling lock system prevents the unauthorized entry, access and further contamination of the products included in the several product groupings.

A still further objective of the present invention is to provide a multi sensor detection and lock disabling system that utilizes a multi-task device for preventing terrorist activity to vulnerable products that are collected or arranged by product grouping categories.

Yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system to secure cargos and containers, especially cargo and shipping containers, against chemical, biological, radiological and nuclear terrorist activity.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system capable of detecting chemical, biological and radiological agents and compounds.

Still yet another objective of the present invention is to provide a multi sensor detection and disabling lock system that includes interchangeable detectors that operate in conjunction to detect chemical, biological and radiological agents and compounds.

Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.

Another objective of the present invention is to provide a multi sensor detection and disabling lock system that accurately and reliably detects harmful agents, compounds and elements, and prevents the placement and storage of weapons and bombs in the range of storage containers and facilities currently available.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners.

These and other objects, features, and advantages will become apparent to those skilled in the art upon a perusal of the following detailed description read in conjunction with the accompanying drawing figures and appended claims.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the primary features of the system which include a detector case, several interchangeable detectors, an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler;

FIG. 2 is a front elevational view of the multi sensor detection and lock disabling system of the present invention illustrating one of the interchangeable detectors first shown in FIG. 1;

FIG. 3a is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one lock disabler to the lock of a product, such as a container, and disengaged from the lock of the container;

FIG. 3b is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the engagement of the lock disabler to the lock of the product for locking or disabling the lock of the product so that unauthorized access is prevented;

FIG. 4 is a side elevational view of the multi sensor detection and lock disabling system of the present invention

6

illustrating the detector case mounted to the product, such as the container, with the light alarm indicators externally visible;

FIG. 5 is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of detector cases with a surveillance watchtower and a monitoring PC terminal;

FIG. 6 is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the placement of detector cases upon containers different from the containers of FIG. 5, and wherein the detectors case are interconnected to a surveillance watchtower and a monitoring PC terminal;

FIG. 7 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one automatic/mechanical lock disabler to the lock of a standalone news rack;

FIG. 8 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating one interchangeable detector placed within the standalone news rack;

FIG. 9 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case having color coded front panels for specifically indicating the agents, compounds or elements that have been detected;

FIG. 10 is a rear elevational view of the multi sensor detection and lock disabling system of the present invention illustrating the GPS, Internet and power source connections;

FIG. 11 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector with the detector case and the steps undertaken by the system when an agent or compound is detected;

FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a stand alone scanner for detecting an agent or compound;

FIG. 13 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector case with the automatic/mechanical lock disabler for activating the lock disabler upon detection by the system of an agent or compound;

FIG. 14 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating interconnection of the detector case with the fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public upon detection of the agent or compound;

FIG. 15 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the system with a surveillance watchtower and a monitoring PC or computer terminal for monitoring containers, such as shipping or cargo containers, that may sit for extended time periods on docks, at rail yards, and at industrial storage facilities;

FIG. 16 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the integration of the detection system with a satellite and monitoring equipment at a monitoring site for detecting explosives placed in a vehicle and then transmitting signals to the satellite and then to the monitoring site for disabling and locking the vehicle;

US 10,163,287 B2

7

FIG. 17 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case;

FIG. 18 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of a GPS satellite, a monitoring site and a cell phone tower for communicating to and with an electronic device such as a laptop computer or a cell phone for transmitting signals to a vehicle for activating an onboard stall-to-stop device for bringing the vehicle to a halt; and

FIG. 19 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the use of a GPS satellite in conjunction with the monitoring site and monitoring equipment to relay commands and signals to the cpu or transceiver of the vehicle for stopping or locking the vehicle in response to a signal that a certain type of event (detection of a bomb, engine failure or malfunction or unauthorized use) has occurred or is in process.

DETAILED DESCRIPTION OF
REPRESENTATIVE EMBODIMENTS

Illustrated in FIGS. 1-19 is a multi sensor detection and lock disabling system 10 for preventing terrorist activity by monitoring, detecting, and securing those critical areas; sites, and facilities vulnerable to terrorist activity. The first step is the identification of critical areas, sites, locations and facilities that are vulnerable to terrorist activity as convenient places to store and plant explosives and bombs and spread biological, chemical or radiological agents and compounds, followed by the disposition of the multi sensor detection and lock disabling system 10 for monitoring, detecting, and securing the particular location or site. Vulnerable sites, locations, facilities and areas are nearly limitless in their variety; in order to categorize the protection the present invention provides an anti-terrorist product grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design, and products presenting the same or similar security problems are grouped together with the multi sensor detection and lock disabling system 10 for preventing terrorist activity. For example, two preferred product groupings can be Product Grouping I: cargo containers, shipping containers, cargo planes, freight train cars, tractor trailers, mail carriers (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans and utility vehicles. Product Grouping II: chemical detectors, biological detectors, radiological detectors, nuclear detectors, motion sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems. In addition to grouping products together by features, designs and materials, the multi sensor detection system 10 includes a lock disabling capability for disabling an existing lock or activating a lock on or inside any of the aforementioned products when a detector or sensor of the system is activated. The lock disabling feature is a crucial component of the invention in so far as it prevents unauthorized, unequipped or untrained individuals from gaining access and entry to the site and causing further contamination of the site.

8

As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one—and preferably many—detector case 12 that can be placed in, on, upon or adjacent the product, such as the shipping containers 14 of FIGS. 4 and 5 resting upon a platform 16 or the cargo container 18 of FIG. 6 sitting upon a seaport dock or pier 20. The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30. The rear side 30 has connections or contacts that can include an Internet connection 32, a GPS connection 34 and a power connection 36 for a power source. The power source for the detector system 10 can be any conventional battery or electrical source. The detector case 12 includes an interior chamber divided into a number of compartments 38 for holding therein agent or compound detection means hereinafter further described. A cpu 40 is mounted within the detector case 12 and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates with a monitoring site and monitoring equipment. The front side 28 of the detector case 12 includes indicator means for visually indicating that a specific agent, compound or element has been detected. The indicator means can include color coded indicator lights 42 in panel form, as shown in FIG. 9, with each indicator light panel 42 lighting up with a specific color corresponding to the detection of a specific agent or compound; or color coded indicator lights 44, as shown FIG. 1, that correspond to and individually light up on the detection of a specific agent or compound (chemical, biological, or radiological).

As shown in FIGS. 1, 2 and 9-13, the multi sensor detection and lock disabling system 10 includes a plurality of detectors 46 with each detector 46 adapted for and set up to sample for a specific agent or compound (biological, chemical, or radiological); and the detectors 46 are interchangeable for adapting to the needs and demands of future technology. The detectors 46 can also be used as stand alone scanners. In the preferred embodiment of the invention, at least three detectors 46 are placed within the detector case 12 with one detector 46 for specifically sampling biological agents or compounds, one detector 46 for sampling chemical agents or compounds, and one detector 46 for sampling radiological agents or compounds. The detectors 46 are interconnected to the cpu 40 of the detection system 10 by conventional connections that can be wire or wireless for transmitting the appropriate signals to the cpu 40 upon detection of the particular agent or compound. As shown in FIG. 2, each detector 46 includes on its front plate or facing surface a sound alarm indicator 48, a readings panel 50 comprising a plastic shield and LED lights for displaying the various read-out messages, a sensor 52 for detecting the specific agent, element or compound, and a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand alone scanner. Each detector 46 includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu 40 of the detector case 12.

As shown in FIGS. 1, 3a, 3b, 9, and 13-15, used in conjunction with the multi sensor detection and lock disabling system 10 is at least one automatic/mechanical lock disabler 56—and depending upon the number of products being monitored there can be one lock disabler 56 for each product. The automatic/mechanical lock disabler 56 is physically connected to the detector case 12 by a wire or cable 58 for receiving signals therefrom for disabling an existing lock or activating a lock inside a product to prevent

US 10,163,287 B2

9                                                      10

access to the product. By way of example, FIG. 3a shows the automatic/mechanical lock disabler 56 mounted—by any conventional means—to the lock 60 of the shipping container 14 shown in FIGS. 4 and 5 and connected by wire 58 to the cpu 40 of the detector case 12. The lock disabler 56 is in the non-activated or disengaged state in FIG. 3a. FIG. 3b shows the automatic/mechanical lock disabler 56 mounted to the lock 60 of the shipping container 14 and in the activated or engaged state after detection of an agent or compound by the system 10 thereby for locking or disabling the lock 60 of the shipping container 14 and preventing unauthorized entry and access by unauthorized, untrained and unequipped individuals. In FIGS. 3a and 3b the lock 60 secures doors of the shipping container 14 that can be slidably or pivotably opened and closed.

In addition to the automatic/mechanical lock disabler 56, the multi sensor detection and lock disabling system 10 can also utilize a fingerprint biometric lock with disabler 62 as shown in FIGS. 1 and 14. The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40 of the detector case 12 for receiving transmissions therefrom after detection of an agent or compound has occurred so that the lock on the product can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56 by turning the manual lock disabler 66. The fingerprint biometric lock with disabler 62 is mounted to the lock of the product in a manner similar to the mounting of the automatic/mechanical lock disabler 56 that is shown in FIGS. 3 and 3b.

FIGS. 4 and 5 show one manner of disposition or placement of the detector case 12 in relation to the product, i.e., the shipping container 14, with the color coded indicator lights 42 externally viewable; FIG. 5 shows a number of shipping containers 14 each equipped with a detector case 12 and integrated with elements hereinafter further described for continuously monitoring the shipping containers 14 as they sit for an extended period of time on the truck or rail platform 16. FIG. 6 illustrates several cargo containers 18 sitting on the shipping dock or pier 20, with each cargo container 18 having a detector case 12 mounted thereon and integrated with and monitored by elements shown in FIG. 5 and hereinafter further described.

FIG. 7 illustrates a typical product from product grouping 1 that is monitored by the multi sensor detection and lock disabling system 10 of the present invention; specifically, FIG. 7 shows a news rack 68 with one automatic/mechanical lock disabler 56 mounted to and interconnected with the locking mechanism of the news rack 68. As long as there is no detection of any agent or compound, the lock disabler 56 is in the disengaged state, and the individual can deposit the coin amount in the chute and then freely open the glass panel 70 by the handle 72 for removing a paper. However, the lock disabler 56 would be activated upon detection of the harmful agent or compound and receipt of a signal from the cpu 40 for locking or disabling the locking mechanism thereby denying access to the interior of the news rack 68 from all untrained, unauthorized and unequipped individuals.

FIG. 8 illustrates one detector 46 disposed within the news rack 68 and which is visible through the panel 70 for detecting one specific agent, compound or element. The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to off site monitoring equipment.

FIG. 11 illustrates a representative schematic 74 for describing the signal transmission process from the detector 46 to the cpu 40 of the detector case 12. The external stimulus 76 would be the chemical, biological or radiological agent or compound. If there is no detection of the agent or compound, the detector 46 will stay in the sensing mode 78. However, detection of the specific agent will trigger the sound alarm 80 and the light alarm 82, and instant transmittal of a signal to the cpu 40. The readings 84 can be stored by the cpu 40 for verification and future review and evaluation. After all the appropriate corrective and preventative measures have been undertaken by the trained and authorized personal, and the site has been cleansed of the contamination, authorized and equipped personal can then reset 86 the system 10.

FIG. 12 illustrates a representative schematic 88 for the detector 46 when used as stand-alone scanner. The detector 46 undergoes the same essential steps as illustrated in FIG. 11, with the exception of the signal transmission to the cpu 40. The detector 46 remains in detection mode 78 until an agent is detected, and then the various functions-light alarm 82, sound alarm 80, storage of readings 84, and, after the appropriate security and safety steps have been carried out by authorized personal, detector reset 90 by authorized personal can occur thereby placing the detector 46 back in detection or sensing mode 78.

FIG. 13 is a representative schematic 92 that illustrates the steps undertaken by the system 10 to lock or disable a lock, such as the lock 60 for the shipping container 14 shown in FIGS. 3a and 3b. Upon detection of the agent (chemical, biological, radiological) the alarm light indicators 42 or 44 will light up providing external indication that an agent has been detected. In addition, the system 10—the cpu 40—will transmit a lock/disable lock signal 94 to the automatic/mechanical lock disabler 56 to lock or disable the lock on the product, such as the lock 60 on the shipping container 14 of FIGS. 3a-5. This prevents unauthorized, unequipped, or untrained individuals from entering or gaining access to the product for which a dangerous and perhaps lethal agent has been detected. After the proper authorities and authorized personal have been notified and all the appropriate security, preventative and clean up measures have been undertaken, the authorized individual can perform the disarm and reset function 96 for the system 10 placing the system 10 in back in the detection mode 98.

FIG. 14 is a representative schematic 100 illustrating the use of the fingerprint biometric lock with disabler 62 with the system 10. Upon detection of the agent or compound by the detector, the various alarms would sound and light up (shown in previous figures), and the cpu 40 would then transmit a signal to the fingerprint biometric lock with disabler 62 to lock or disable the lock on the product, such as the lock 60 on the shipping containers 14 shown in FIGS. 3a-5. The shipping containers 60 would remain locked and in an access denied mode 101 should an attempt be made to gain access to the container 60 by opening the lock 60 with an unauthorized fingerprint. However, a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock 60 of the shipping container 14. The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety, cleanup, and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108.

FIG. 15 is a schematic representation 110 that illustrates the integration of a surveillance watchtower 112 and a monitoring terminal or PC 114 for monitoring products such

11                                                              12

as the shipping containers 14 or cargo containers 16 that sit for extended periods of time of docks, piers 20, truck terminals, rail yards, shipping platforms 16 and industrial sites as shown in FIGS. 5 and 6. The watchtower 112 would maintain continuous surveillance over a number of shipping containers 60, for example, with detector cases 12 mounted in or on each container 14 and set in detection mode 116 with one or more detectors 46 disposed in each detector case 12. The watchtower 112 would continuously scan for light alarm indicators 42 and 44 on the products, such as the containers 14 or 18, and the watchtower 112 would be interconnected and integrated with the monitoring terminal or PC 114. Upon detection 118 of an agent or compound in one or more of the shipping containers 14, the appropriate light alarm indicators 42 or 44 would light providing visible confirmation of the detection of the specific agent or compound. The cpu 40 would transmit a lock/disable signal 120 to the lock 60 on each respective shipping container 14 to lock or disable the lock 60 thus preventing access to that respective shipping container 14. In addition, signal transmissions would be sent to the monitoring terminal or PC 114 (which could be off site) thereby alerting authorized security personal of the contamination event. With the information received at the monitoring terminal 114, authorized personal would then be notified and dispatched to the area to undertake the appropriate safety and cleanup measures 122. Such measures would also include disarming the lock disabling system in order to gain access to the shipping container 14. After all the cleanup and security measures are completed by the trained and properly equipped authorities, the detection system and the lock disabling feature would reset 124 and the detection system would again be placed in detection mode 116.

FIG. 16 is a schematic representation 126 that illustrates an enhanced version of the multi sensor detection and lock disabling system 10 for preventing car and vehicle attacks and bombings. The lock disabling system 10 would be interconnected to the locking system and mechanism 128 of the vehicle 130. In addition, a stall to stop disabling link 132 can be made with the fuel, air, and electrical system 134 of the vehicle 130. The enhanced version incorporates a satellite 136 for signal receipt and transmission from the vehicle 130 in which the detector system 10 is placed to a monitoring site and monitoring equipment 138. As shown in FIG. 16, a detection signal 140 would be sent to the satellite 136 by the detection system 10 upon detection of a bomb or explosive 142 hidden in the vehicle 130. The satellite 136 would then transmit an alert signal 144 to the monitoring site 138 with the signal 144 containing the relevant data to evaluate the nature of the threat. The monitoring site 138 would then transmit a stall to stop signal 146 to the detection system 10 to lock the vehicle 130 and/or disable the electrical system of the vehicle 130 thereby disabling the vehicle 130, preventing access to the vehicle 130 by locking the vehicle 130, and preventing any terrorist in the vehicle 130 from escaping.

The detector case 12 can be modified and adapted for inclusion with cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases; and briefcases. In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring.

The system 10 and the watchtower 112, along with the satellite 136 and the monitoring site 138 can be adapted or incorporated with cell phone towers and satellites for use

with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, or a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. The aforementioned telecommunication and radio communication means can be interactive with any type of motive vehicle that includes but is not limited to cars, trucks, vans, SUVs, trains, subways, boats, ships and airplanes, and which is reported stolen, experiences a loss of brakes, or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted to the vehicle and which detection causes an automatic signal transmission or a signal transmission is activated when a call is made to the monitoring station by an authorized person. The authorized individual includes but is not limited to the owner, pilot, conductor, captain, police highway patrol, security guard and military personnel to the monitoring equipment for activating a vehicle slowdown or stall-to-stop disabling system that similar to the disabling system 126 shown in FIG. 16, or incorporating features of the system 126 shown in FIG. 16, from the monitoring equipment to the vehicle. The activation of the stall-to-stop disabling means or the vehicle slowdown disables or engages the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.

In addition, the basic stall-to-stop disabling means or the vehicle slowdown means and device can be adapted, modified or designed to include: an open bust or open platform for integrating any new and innovative technology; warning lights indicators; sound alarm indicators; voice alarm indicators; a cell phone to transmit to the vehicle a signal for slowing and halting the vehicle; and a lock disabling system or means to lock a thief or terrorist inside the vehicle after a transmission is received or sent. Open bust or open platform also refers to the compatibility of the detector case 12, or the incorporation of its features in cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, briefcases, and suitcases, etc., with other communication, transmission and surveillance systems whereupon the detector case 12, and its features, can be seamlessly integrated with other new and emerging systems and technologies.

Thus, as shown more specifically in FIG. 17, by way of a representative example the features and elements of the detector case 12 are shown as being incorporated into cell phone detector case 150 and associated cell phone monitor 152. The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174. The power source for the cell phone detector case 150 can be any conventional rechargeable battery source or standard electrical power from a standard electrical receptacle or outlet.

As shown in FIG. 17, the cell phone detector case 150 includes one or more sensor/detector units, cells, or com-

US 10,163,287 B2

13                                                    14

ponents 176 built into and incorporated into the case 150. The detector 176 includes generally disposed at the front 162 of the case 150 the following types of indicators: a sound alarm indicator 178, a readings panel 180, a sensor 182 for detecting one or more specific types of agents, elements, chemicals, compounds, etc., and a light alarm indicator 184. The sensor/detector 176 will be interconnected to the power source 174. In addition, mounted on and externally visible on the sides 168 or front 162 of the case 150 are a plurality of color coded indicator lights 186 with each light 186 corresponding to a specific agent, element, chemical, compound, etc., and lighting up when that agent is detected by the sensor/detector 176. The color coded indicator lights 186 will be electrically interconnected to the sensor/detectors 176 via any standard microprocessor. The cell phone detector case 150 and cell phone monitor 152 thus comprise a hand-held, easily portable and transportable detection means that is both effective and unobtrusive in its disposition and use.

FIGS. 18 and 19 illustrate representative examples of the integration of portable electronic communication or telecommuncation devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188, and operating in conjunction with either a satellite and/or a cell phone tower 190 to transmit and receive signals and commands among each other and to a vehicle 192, such as a truck, as part of a stall-to-stop disabling system for slowing and stopping the vehicle 192 and locking a thief, terrorist, or unauthorized individual in the vehicle 192 if needed. A wide range of events can trigger and initiate the stall-to-stop system and the locking or lock disabling system and mechanism, and the event doesn't have to be limited to the detection of a bomb or a chemical, biological, or radiological agent, element, or compound. The events can include, but is not limited to, detection of an engine problem to engine failure to the unauthorized use (stealing) of the vehicle 192. The vehicle 192 includes an electromotive system 194 that comprises, among other components, an onboard computer(s), electrical, fuel and air systems, as well as brakes, ignition, steering, and transmission. Also integrated with and capable of communicating with the vehicle's 192 electromotive system 194 is a stall-to-stop system while a lock disabling mechanism 196 is able to engage and disengage or disable the vehicle's 192 locking mechanism 198 upon receipt of the appropriate commands via a lock disabling communication channel or link 200. This link 200 can also accommodate the stall-to-stop system commands and signals, and thus is a multi-channel communication link. A CPU or a transceiver 202 is programmed to receive signals from the cell phone tower 190 and/or to a GPS satellite 204 and is interconnected with the stall-to-stop system and the lock disabling system 196 via link 200 for engaging the electromotive system 194 and actuating the lock disabling system 196 to stop the vehicle 192 and lock inside the vehicle 192 anyone such as a thief, terrorist or other unauthorized individual.

A representative example for stopping, disabling, and locking the vehicle 192 that utilizes the cell phone tower 190 wherein the activation and/or distress signal 206 originates from the cell phone 187a or the laptop 187b and such activation signal 206 travels to the cell phone tower 190 that is nearest the current location of the vehicle 192. A signal 208 is then transmitted to the monitoring equipment 138 and specific monitoring equipment 138 that can also include but is not limited to cell phones, laptops, desktop PC's, notebook PC's and LCD monitors. The monitoring site 138 then

communicates by signal 210 to the GPS satellite 204 that an original or activation signal has been received and then the GPS satellite 204 locates and communicates by multiplex signal 212 with the CPU or transceiver 202 on the vehicle 192 and exchanges information on the type of problem, situation, location, and vehicle speed. The monitoring equipment 138 then transmits a signal 214 to the cell phone tower 190 that communicates with the transceiver 202 and/or CPU of the vehicle 192 to initiate or execute any commands that will actuate the stall-to-stop disabling link 200 and lock disabling system 196 for bringing the vehicle 192 to a halt and actuating the vehicle's 192 locking mechanism 198 for locking the thief, terrorist, or other unauthorized person inside the vehicle 192 if needed.

FIG. 19 illustrates a representative example wherein the stall-to-stop system and the lock disabling system 196 are utilized in conjunction with the GPS satellite 204. In FIG. 19 a signal has traveled to the satellites nearest the vehicle's 192 current location and then the signal 218 has traveled to the monitoring equipment 138 and monitoring site 188 which can include but is not limited to satellite cell phones, satellite monitors, cell phones, laptops, desktop PC's, notebook PC's, and LCD monitors. The GPS satellite 204 then locates and communicates with the CPU and/or transceiver 202 on the vehicle 192 via a multiplex (two-way) signal 220 in order to exchange information on such distress and danger event parameters as the specific problem situation, location, and vehicle speed. The monitoring equipment 138 then transmits a signal 222 back to the GPS satellite 204 that in turn communicates via another signal 224 with the CPU and/or transceiver 202 to execute any commands to the stall-to-stop system for executing the disengagement of the vehicle's 192 electromotive system 194 for bringing the vehicle 192 to a halt and for actuating the lock disabling system 196 to direct the lock disabling link 200 to actuate the locking mechanism 198 thereby locking the vehicle 192 and anyone inside the vehicle 192.

The present invention comprehends a chemical/biological/radiological/nuclear/explosive/human/contraband detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars, United Parcel Services™ (UPS™), Federal Express™ (FedEx™), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans, unmanned aerial vehicles (UAVs), unmanned ground vehicles (UGVs), and utility vehicles; the products grouped into what may be referred to as Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, speed sensors, biometric sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems, detection of humans, detection of contraband, temperature, and shock levels; the products grouped into what may be referred to as Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases,

US 10,163,287 B2

15

16

PDA cases, carry-on cases, suitcases, eyeglass, briefcases, detector cases of locks, detector cases of tags, detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to; the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite cell phones, cell phones, Universal Mobile Telecommunications System (UMTS) phones, personal digital assistants (PDAs), liquid crystal display (LCD) monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds; the products grouped into what may be referred to as Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS), Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS); the products grouped into what may be referred to as Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature. the products grouped into what may be referred to as Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside or outside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

While the invention has been shown and described in a preferred embodiment, it will be apparent to those skilled in the art that numerous alterations, modifications, and variations will be possible and practicable without departing from the spirit and scope of the invention as set forth by the appended claims.

What is claimed:

1. Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a lock for communication therebetween; the monitoring equipment comprising:

   at least one of a central processing unit (CPU), a network processor, or a front end processor for communication between the monitoring equipment and the lock;

   a transmitter for transmitting signals and messages to at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock;

   a receiver for receiving signals from at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock;

   a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

   a short-range radio frequency (RF) connection that is near-field communication (NFC);

   at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver,

   at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; and

   the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the remote lock, electrical lock, mechanical lock, or automatic lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

2. Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to at least one of a home lock, a building lock, or a cargo container lock for communication therebetween; the monitoring equipment comprising:

   at least one of a central processing unit (CPU), a network processor, or a front end processor for communication between the monitoring equipment and the lock;

   a transmitter for transmitting signals and messages to at least one of a home lock, a building lock, or a cargo container lock;

   a receiver for receiving signals from at least one of a home lock, a building lock, or a cargo container lock;

   a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

   a short-range radio frequency (RE) connection that is near-field communication (NFC);

   at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RE) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver,

   at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; and

   the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a home lock, a building lock, or a cargo container lock whereupon a

US 10,163,287 B2

17

signal is sent to the receiver of the monitoring equipment from at least one of the home lock, building lock, or cargo container lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

3. Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal, digital assistant (PDA) or smart phone interconnected to a vehicle lock for communication therebetween; the monitoring equipment comprising:

at least one of a central processing unit (CPU), a network processor, or a front end processor for communication between the monitoring equipment and the lock;

a transmitter for transmitting signals and messages to at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock;

a receiver for receiving signals from at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock;

a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

a short-range radio frequency (RF) connection that is near-field communication (NFC);

at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver;

at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; and

the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the manned or unmanned aerial vehicle lock, manned or unmanned ground vehicle lock, or manned or unmanned sea vehicle lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

4. A communication device comprising:

at least one central processing unit (CPU);

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication

18

device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

5. A monitoring device, comprising:

at least one central processing unit (CPU);

at least one temperature sensor in communication with the at least one CPU for monitoring temperature;

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device;

at least one sensor for chemical, biological, or human detection in communication with the at least one CPU;

one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to

US 10,163,287 B2

19

detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

6. A monitoring equipment, comprising:

at least one central processing unit (CPU);

at least one motion sensor in communication with the at least one CPU;

at least one light indicator in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

20

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

* * * * *

# Exhibit F

US00RE43891E

(19) **United States**
(12) **Reissued Patent**
    Golden

(10) Patent Number: **US RE43,891 E**
(45) Date of Reissued Patent: **Jan. 1, 2013**

(54) **MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM**

(76) Inventor: **Larry Golden**, Mauldin, SC (US)

(21) Appl. No.: **13/065,837**

(22) Filed: **Mar. 31, 2011**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **7,636,033**
    Issued: **Dec. 22, 2009**
    Appl. No.: **12/155,573**
    Filed: **Jun. 6, 2008**

U.S. Applications:
(63) Continuation-in-part of application No. 11/397,118, filed on Apr. 5, 2006, now Pat. No. 7,385,497.

(51) **Int. Cl.**
    *B60R 25/10*      (2006.01)
    *G08B 1/08*       (2006.01)
(52) **U.S. Cl.** .......... 340/426.11; 340/426.16; 340/539.11
(58) **Field of Classification Search** .............. 340/425.5, 340/426.11–426.19, 426.25, 521, 522, 539.1, 340/539.11, 539.13, 539.22, 539.26, 540, 340/545.3, 600; 701/29, 32, 36, 2, 29.1, 701/31.5, 32.2, 32.4, 32.9; 702/22; 307/10.2, 307/10.3
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,385,469 A | 5/1983 | Scheuerpflug |
| 4,544,267 A | 10/1985 | Schiller |
| 4,586,441 A | 5/1986 | Zekich |
| 4,792,226 A | 12/1988 | Fishbine et al. |
| 5,222,152 A | 6/1993 | Fishbine et al. |
| 5,223,844 A | 6/1993 | Mansell et al. |
| 5,233,404 A | 8/1993 | Lougheed et al. |
| 5,557,254 A | 9/1996 | Johnson |

| | | | |
|---|---|---|---|
| 5,682,133 A | 10/1997 | Johnson |
| 5,766,956 A | 6/1998 | Groger et al. |
| 5,938,706 A | 8/1999 | Feldman |
| 5,963,657 A | 10/1999 | Bowker et al. |
| 5,986,543 A | 11/1999 | Johnson |
| 6,078,265 A | 6/2000 | Bonder et al. |
| 6,271,745 B1 | 8/2001 | Anzai et al. |
| 6,374,652 B1 | 4/2002 | Hwang |
| 6,542,076 B1 | 4/2003 | Joao |
| 6,542,077 B2 | 4/2003 | Joao |
| 6,588,635 B2 | 7/2003 | Vor Keller et al. |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 12/802,001, filed May 27, 2010, Golden.

(Continued)

*Primary Examiner* — Van T. Trieu

(57)          **ABSTRACT**

A multi sensor detection and disabling lock system includes detector cases for holding interchangeable detectors that sample for chemical, biological and radiological compounds, agents and elements, with each detector case disposed in or upon the monitored product whereupon light alarm indicators (color coded) on the detector case light up when a specific compound or agent is detected whereupon the detector case transmits detection information to a monitoring computer terminal and transmits a signal to a lock disabler engaged to the product to lock or disable the product's lock thereby preventing untrained, unauthorized and unequipped individual's from gaining access and entry to the product, and also preventing further contamination of the area. An authorized individual resets the detection system, and the system's power source is electrical, battery or computer generated. In addition, the detection system can be interconnected to surveillance towers scanning detector cases disposed at seaport docks, freight depots and rail terminals for monitoring containers being prepared for shipment or sitting on docks for long periods of time.

**75 Claims, 13 Drawing Sheets**



# US RE43,891 E

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,610,977 | B2 | 8/2003 | Megerle |
| 6,613,571 | B2 | 9/2003 | Cordery et al. |
| 6,628,813 | B2 | 9/2003 | Scott et al. |
| 6,647,328 | B2 | 11/2003 | Walker |
| 6,738,697 | B2 * | 5/2004 | Breed ..................... 701/31.5 |
| 6,923,509 | B1 | 8/2005 | Barnett |
| 6,980,092 | B1 | 12/2005 | Turnbull et al. |
| 7,005,982 | B1 | 2/2006 | Frank |
| 7,034,683 | B2 | 4/2006 | Ghazarian |
| 7,103,460 | B1 | 9/2006 | Breed |
| 7,109,859 | B2 | 9/2006 | Peeters |
| 7,116,798 | B1 | 10/2006 | Chawla |
| 7,346,439 | B2 | 3/2008 | Bodin |
| 7,385,497 | B2 | 6/2008 | Golden |
| 7,397,363 | B2 | 7/2008 | Joao |
| 7,636,033 | B2 | 12/2009 | Golden |
| 2003/0206102 | A1 | 11/2003 | Joao |
| 2004/0107028 | A1 | 6/2004 | Catalano |
| 2005/0195069 | A1 | 9/2005 | Dunand |
| 2006/0250235 | A1 | 11/2006 | Astrin |
| 2008/0122595 | A1 | 5/2008 | Yamamichi |
| 2008/0234907 | A1 | 9/2008 | Labuhn |
| 2010/0159983 | A1 | 6/2010 | Golden |
| 2011/0178655 | A1 | 7/2011 | Golden |

## OTHER PUBLICATIONS

A newspaper article of Mr. Melvin Sullivan and his family that references the date, Mar. 6, 2001.
A letter of response Mr. Sullivan received from Pfeiffer & Gantt, PA, dated Sep. 16, 2002.
A "Certificate of Existence" Bright Idea Inventor, LLC. Nov. 6, 2002. Operating Agreement of Bright Idea Inventor, LLC received from Pfeiffer & Gantt, PA, dated Nov. 13, 2002.
A "Membership Certificate" received from Bright Idea Inventor, LLC dated Nov. 13, 2002.
A letter of response Golden received from the Honorable Congressman from Maryland, Elijah E. Cummings, dated Dec. 16, 2002.
A newspaper article of Mr. Melvin Sullivan and Mr. Larry Golden, dated, Feb. 27-Mar. 5, 2003.
A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated May 21, 2003.
A letter of response Golden received from the Office of the Vice President, Dick Cheney, dated Jun. 3, 2003.
A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated Oct. 1, 2003.
A letter of response Golden received from the Honorable Senator from South Carolina, Lindsey O. Graham, dated Oct. 21, 2003.
A letter sent to the President of the United States George W. Bush, the President's Cabinet, the United States Senate and the Congressional Black Caucus, dated May 23, 2005.
On Nov. 17, 2004, "Disclosure Document Registration" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.

On Jul. 10, 2005, an "Inventor's Official Record of Invention", was filed in my name (Golden) at "The Law Office of David P. Gaudio, P.C.; The Inventors Network."
On Aug. 23, 2005, "Disclosure Document Registration".
On Apr. 5, 2006, "Patent Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.
On Jun. 06, 2008, "Continuance-In-Part, (CIP) Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.
On Jun. 10, 2008, Golden was issued a Patent (7,385,497) the "Multi sensor detection and lock disabling system."
On Dec. 22, 2009, Golden was issued a Patent (7,636,033) the "Multi sensor detection, stall-to-stop, and lock disabling system."
On Jan. 20, 2010, a "Continuation Application" (U.S. Appl. No. 12/657,356) was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.
On May 27, 2010, a "Continuation Application" (U.S. Appl. No. 12/802,001) was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.
Reissue of U.S. Patent No. 7,636,033; "Swear Back"; In accordance to Title 37—Code of Federal Regulations Patents, Trademarks, and Copyrights; Apr. 8, 2011.
Reissue of U.S. Patent No. 7,636,033; "Swearback—History of Work"; Apr. 8, 2011.
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 11/397,118; mailed Nov. 14, 2007; Alexandria, Virginia, USA; pp. 1-12; (12 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; mailed Apr. 9, 2009; Alexandria, Virginia, USA; pp. 1-7; (7 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; mailed Jul. 30, 2009; Alexandria, Virginia, USA; pp. 1-9; (9 pages).
United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/155,573; mailed Oct. 28, 2009; Alexandria, Virginia, USA; pp. 1-5; (5 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/657,356; mailed Jul. 12, 2010; Alexandria, Virginia, USA; pp. 1-14; (14 pages).
United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/657,356; mailed Mar. 10, 2011; Alexandria, Virginia, USA; pp. 1-4; (4 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; mailed May 27, 2010; Alexandria, Virginia, USA; pp. 1-16; (16 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; mailed May 27, 2011; Alexandria, Virginia, USA; pp. 1-14; (14 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright and mailing date Dec. 12, 2011, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; (9 pages).

* cited by examiner

Case 3:26-cv-00831-BJC_S Document 18-17 Filed 12/23/25 Page 175 of 291



Fig. 1

Fig. 2

Case 3:26-cv-00901-LS Document 1-17 Filed 09/18/25 Page 176 of 291
Case 6:25-cv-00434-LS Document 1-17 Filed 09/18/25 Page 5 of 23



**Fig. 3a**



**Fig. 3b**

Case 6:25-cv-00484-LS Document 1-7 Filed 09/18/25 Page 6 of 23



**Fig. 4**



**Fig. 5**

POWER SOURCE



Fig. 6

POWER SOURCE

Fig. 7

Case 3:26-cv-00831-JC_S Document 18-17 Filed 12/23/25 Page 179 of 291



**Fig. 8**



**Fig. 9**

Case 3:25-cv-00434-LCS    Document 1-7    Filed 09/18/25    Page 181 of 291



**Fig. 10**



**Fig. 11**



Fig. 12

Fig. 13



**Fig. 14**

**Fig. 15**



**Fig. 16**

Case 3:25-cv-00434-LCS   Document 18-7   Filed 09/18/25   Page 185 of 291



**Fig. 17**



**Fig. 18**

Case 3:26-cv-00831-JC   Document 18-1    Filed 12/23/25    Page 187 of 291



**Fig. 19**

US RE43,891 E

1

# MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.

## RELATED APPLICATIONS

[This application] *More than one reissue application has been filed for the reissue of U.S. Pat. No. 7,636,033 B2. The reissue applications are application Ser. No. 13/199,853 filed Sep. 9, 2011 which is a divisional reissue of U.S. Pat. No. 7,636,033 B2, and the present application Ser. No. 13/065, 837 filed Mar. 31, 2011 which is a reissue of U.S. Pat. No. 7,636,033 B2. The present application is a reissue of U.S. Pat. No. 7,636,033 B2 and claims priority to this patent the entire contents of which are incorporated by reference in their entirety herein for all purposes. U.S. Pat. No. 7,636,033 B2* is a continuation-in-part of U.S. patent application Ser. No. 11/397,118 titled "Muti Sensor Detection and Lock Disabling System" filed on Apr. 5, 2006 and is now U.S. Pat. No. 7,385,497, the complete subject matter of which is incorporated by reference herein in its entirety. [This application] *U.S. Pat. No. 7,636,033 B2* is a continuation-in-part of U.S. patent application Ser. No. 11/397,118 and names as the inventor, Larry Golden, being the same inventor named in the aforedescribed prior application having the Ser. No. of 11/397,118, and thus [this application] *U.S. Pat. No. 7,636, 033 B2* constitutes a continuation-in-part as set forth in 35 U.S.C. 120 and claims the effective filing date of prior application having Ser. No. 11/397,118 and is now U.S. Pat. No. 7,385,497.

## FIELD OF THE INVENTION

The present invention pertains to anti-terrorist detection and prevention systems, and more particularly pertains to a disabling lock mechanism combined with a chemical/biological/radiological detection system for use with products grouped together by similar characteristics in order to prevent unauthorized entry, contamination and terrorist activity.

## BACKGROUND OF THE INVENTION

Terrorist activity is a continuous, daily, worldwide threat to the stability, prosperity, security and peace within nations and between and among nations. Its danger lies in its arbitrary destructiveness as much as in its unpredictability, and the constant threat of terrorist activity compels measures and actions that cause strain and contention in free, democratic societies as security concerns and civil liberty concerns must be balanced so that both public safety and civil liberties are maintained. Safety and security concerns can be addressed through numerous proactive steps and measures, many of which cause only minimal interference with and disruption of the daily routines of work, travel, commerce and entertainment. However, because modern industrial societies afford almost limitless places, locations, and opportunities for terrorist activities, no safety measure or security protocol will be foolproof, but many security measures, systems and protocols can be implemented that greatly minimize specific threats through fingerprint identification procedures, chemical, biological, and radiological hazard detections, bomb and explosive detection, and controlling the access to everything

2

from shipping containers to school lockers. Thus, the prior art discloses a wide range of security measures and systems.

For example, the Fishbine et al. patent (U.S. Pat. No. 4,792, 226) discloses an optical fingerprinting system that includes an optics/processor unit, a video monitor, a data terminal, and a printer for collecting and storing data characteristics of all ten individual fingerprints for printing demographic information and fingerprint images as desired on a standard booking or applicant card.

The Schiller patent (U.S. Pat. No. 4,544,267) discloses a finger identification unit that includes a fingerprint scanning apparatus using a collimated beam of light to interrogate the fingerprint of a finger placed against a platen so that successive scan positions produce signals containing fingerprint information.

The Fishbine et al. patent (U.S. Pat. No. 5,222,152) discloses a portable fingerprint scanning apparatus for optically scanning and recording fingerprint images and wirelessly transmitting such images to a mobile processing unit for verification and background checking.

The Lougheed et al. patent (U.S. Pat. No. 5,233,404) discloses an optical scanning apparatus that uses a linear charge coupled device (CCD) for recording the image of a fingerprint on the viewing surface.

The Groger et al. patent (U.S. Pat. No. 5,766,956) discloses a diode laser based sensor for undertaking optical, chemical, immunological or nucleic acid-based assay or other chemical analysis.

The Feldman patent (U.S. Pat. No. 5,938,706) discloses a multi element security system for preventing the unauthorized use of an automotive vehicle, and which includes numerous locking and control features interconnected to an onboard cpu.

The Bowker et al. patent (U.S. Pat. No. 5,963,657) discloses a safety access control for doors, handles, locks, etc., wherein the surface relief of a finger is read and verified to either allow or prevent access by the individual to the door, handle, lock, etc.

The Bonder et al. patent (U.S. Pat. No. 6,078,265) discloses a fingerprint identification security system wherein a key lock operated security system utilizes the fingerprint of the individual to control user access to the security system, such as the ignition system of an automotive vehicle.

The Anzai et al. patent (U.S. Pat. No. 6,271,745 B1) discloses a keyless authorization system for use of a motor vehicle that includes fingerprint reading units located on the exterior or interior of the motor vehicle and which are coupled to a control unit for scanning, comparing and matching fingerprints to allow or disallow access to the motor vehicle.

The Hwang patent (U.S. Pat. No. 6,374,652 B1) discloses a fingerprint-activated doorknob in which a detecting sensor for a fingerprint is placed on the doorknob for measuring and searching the fingerprint against previously stored fingerprint inputs to control access to the door.

The Vor Keller et al. patent (U.S. Pat. No. 6,588,635 B2) discloses a safety holster for a firearm that includes a pivotally mounted retaining member and a fingerprint sensor for scanning fingerprint information so that only authorized users can withdraw the firearm from the holster.

The Corday et al. patent (U.S. Pat. No. 6,613,571 B2) discloses a method and system for detecting biological and chemical hazards in the mail that includes sensors placed within the mail box for sampling and testing ambient air and so that mail can be safely transported through the mail system.

US RE43,891 E

3

The Nagata patent (U.S. Pat. No. 6,628,213 B2) discloses a coding method for digital signal coding and decoding that includes a CMI (code-marked inversion) method of signal coding.

Nonetheless, despite the ingenuity of the above devices, methods, and systems, there remains a need for a multi-detector and disabling lock system for use with various types of products collected together by common characteristics into product groupings for detecting chemical, biological and radiological agents and compounds and for selectively disabling and activating the product locks thereby preventing unauthorized entry and further contamination and preventing and thwarting terrorist activities.

## SUMMARY OF THE INVENTION

The present invention comprehends a chemical/biological/radiological detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes and lockers; while the products grouped into what may be referred to as Product grouping 2 include, but are not limited to, chemical, biological, radiological, and nuclear detectors, motion sensors and door sensors. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements. In addition, the multi sensor detection and lock disabling system is capable of transmitting a signal to lock or disable a lock on the product, and is also capable of transmitting signals to a monitoring computer terminal or PC so that appropriate defensive and safeguarding actions can be undertaken and an authorized individual can disarm and reset the locking system and the multi sensor detection system. The detector case includes a power source (battery or electrical), interior compartments, Internet and GPS connections and a cpu interconnected with the Internet and GPS connections, and also interconnected with one or more off site monitoring computer terminals or PCs. The detector case includes one or more light alarm indicators that are externally visible and that light up when the chemical, biological, or radiological agent or compound is detected, and the light alarm indicators (which can be indicator lights or panels on the front of the detector case) can be color coded for denoting the specific agent or compound detected, i.e., separate and distinct colors for indicating detection of the chemical, biological, or radiological agent or compound.

The detector case is designed to hold within the interior compartments one or more interchangeable detectors, and each detector is adapted and set up to sample a specific compound or agent. Each detector includes a sound alarm, a sensor, a light alarm, and a readings panel, and is electrically interconnected (either by wire or wirelessly) to the cpu of the detector case so that information regarding the detection of

4

the particular agent or compound can be conveyed from the detectors to the detector case cpu. Each detector can also be used as a manual, stand-alone hand held scanner.

The multi sensor detection and lock disabling system can be interconnected to a surveillance watchtower, as well as monitoring computer terminals or PCs, with the watchtower scanning shipping and cargo crates and containers being prepared for shipment or sitting for extended periods of time on a dock or at a port, at a railway site, or at an industrial storage facility. The watchtower will scan the cargo and shipping crates and containers for the light alarm indicators on detector cases that are mounted in or upon the crates and containers, and thus continuous security surveillance of the crates and containers can be maintained.

An enhanced version of the multi sensor detection and lock disabling system can be employed to prevent car and vehicle bombings. Coupling the multi sensor detection and lock disabling system with satellite service will enable the detection system to detect explosives and transmit an alert signal by satellite to monitoring equipment at a monitoring site. Upon receiving the alert signal at the monitoring site the monitoring equipment activates a stall-to-stop process for disabling the air, fuel, electrical and/or computer system of the vehicle. Moreover, upon receiving the alert signal at the monitoring site the car or vehicle will be locked by transmission of a satellite signal that disables the vehicle's electrical and ignition system thereby preventing escape of the terrorist.

It is an objective of the present invention to provide a multi sensor detection and disabling lock system for securing news racks and vending machines in order to prevent theft, unauthorized use and terrorist activity.

It is another objective of the present invention to provide a multi sensor detection and disabling lock system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist solutions.

It is still yet another objective of the present invention to provide a multi sensor detection and disabling lock system that is capable of disabling an existing lock or activating a lock inside any of the products of the product grouping lists when a detector or sensor of the system is activated.

It is still yet a further objective of the present invention to provide a multi sensor detection and disabling lock system wherein the disabling lock system prevents the unauthorized entry, access and further contamination of the products included in the several product groupings.

A still further objective of the present invention is to provide a multi sensor detection and lock disabling system that utilizes a multi-task device for preventing terrorist activity to vulnerable products that are collected or arranged by product grouping categories.

Yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system to secure cargos and containers, especially cargo and shipping containers, against chemical, biological, radiological and nuclear terrorist activity.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system capable of detecting chemical, biological and radiological agents and compounds.

Still yet another objective of the present invention is to provide a multi sensor detection and disabling lock system that includes interchangeable detectors that operate in conjunction to detect chemical, biological and radiological agents and compounds.

5

Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.

Another objective of the present invention is to provide a multi sensor detection and lock disabling lock system that accurately and reliably detects harmful agents, compounds and elements, and prevents the placement and storage of weapons and bombs in the range of storage containers and facilities currently available.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners.

These and other objects, features, and advantages will become apparent to those skilled in the art upon a perusal of the following detailed description read in conjunction with the accompanying drawing figures and appended claims.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the primary features of the system which include a detector case, several interchangeable detectors, an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler;

FIG. 2 is a front elevational view of the multi sensor detection and lock disabling system of the present invention illustrating one of the interchangeable detectors first shown in FIG. 1;

FIG. 3a is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one lock disabler to the lock of a product, such as a container, and disengaged from the lock of the container;

FIG. 3b is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the engagement of the lock disabler to the lock of the product for locking or disabling the lock of the product so that unauthorized access is prevented;

FIG. 4 is a side elevational view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case mounted to the product, such as the container, with the light alarm indicators externally visible;

FIG. 5 is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of detector cases with a surveillance watchtower and a monitoring PC terminal;

FIG. 6 is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the placement of detector cases upon containers different from the containers of FIG. 5, and wherein the detectors case are interconnected to a surveillance watchtower and a monitoring PC terminal;

FIG. 7 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one automatic/mechanical lock disabler to the lock of a standalone news rack;

FIG. 8 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating one interchangeable detector placed within the standalone news rack;

FIG. 9 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating

6

the detector case having color coded front panels for specifically indicating the agents, compounds or elements that have been detected;

FIG. 10 is a rear elevational view of the multi sensor detection and lock disabling system of the present invention illustrating the GPS, Internet and power source connections;

FIG. 11 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector with the detector case and the steps undertaken by the system when an agent or compound is detected;

FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a stand alone scanner for detecting an agent or compound;

FIG. 13 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector case with the automatic/mechanical lock disabler for activating the lock disabler upon detection by the system of an agent or compound;

FIG. 14 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating interconnection of the detector case with the fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public upon detection of the agent or compound;

FIG. 15 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the system with a surveillance watchtower and a monitoring PC or computer terminal for monitoring containers, such as shipping or cargo containers, that may sit for extended time periods on docks, at rail yards, and at industrial storage facilities;

FIG. 16 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the integration of the detection system with a satellite and monitoring equipment at a monitoring site for detecting explosives placed in a vehicle and then transmitting signals to the satellite and then to the monitoring site for disabling and locking the vehicle;

FIG. 17 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case;

FIG. 18 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of a GPS satellite, a monitoring site and a cell phone tower for communicating to and with an electronic device such as a laptop computer or a cell phone for transmitting signals to a vehicle for activating an onboard stall-to-stop device for bringing the vehicle to a halt; and

FIG. 19 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the use of a GPS satellite in conjunction with the monitoring site and monitoring equipment to relay commands and signals to the cpu or transceiver of the vehicle for stopping or locking the vehicle in response to a signal that a certain type of event (detection of a bomb, engine failure or malfunction or unauthorized use) has occurred or is in process.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Illustrated in FIGS. 1-19 is a multi sensor detection and lock disabling system 10 for preventing terrorist activity by

monitoring, detecting, and securing those critical areas, sites, and facilities vulnerable to terrorist activity. The first step is the identification of critical areas, sites, locations and facilities that are vulnerable to terrorist activity as convenient places to store and plant explosives and bombs and spread biological, chemical or radiological agents and compounds, followed by the disposition of the multi sensor detection and lock disabling system 10 for monitoring, detecting, and securing the particular location or site. Vulnerable sites, locations, facilities and areas are nearly limitless in their variety; in order to categorize the protection the present invention provides an anti-terrorist product grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design, and products presenting the same or similar security problems are grouped together with the multi sensor detection and lock disabling system 10 for preventing terrorist activity. For example, two preferred product groupings can be Product Grouping I: cargo containers, shipping containers, cargo planes, freight train cars, tractor trailers, mail carriers (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans and utility vehicles. Product Grouping II: chemical detectors, biological detectors, radiological detectors, nuclear detectors, motion sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems. In addition to grouping products together by features, designs and materials, the multi sensor detection system 10 includes a lock disabling capability for disabling an existing lock or activating a lock on or inside any of the aforementioned products when a detector or sensor of the system is activated. The lock disabling feature is a crucial component of the invention in so far as it prevents unauthorized, unequipped or untrained individuals from gaining access and entry to the site and causing further contamination of the site.

As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one—and preferably many—detector case 12 that can be placed in, on, upon or adjacent the product, such as the shipping containers 14 of FIGS. 4 and 5 resting upon a platform 16 or the cargo container 18 of FIG. 6 sitting upon a seaport dock or pier 20. The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30. The rear side 30 has connections or contacts that can include an Internet connection 32, a GPS connection 34 and a power connection 36 for a power source. The power source for the detector system 10 can be any conventional battery or electrical source. The detector case 12 includes an interior chamber divided into a number of compartments 38 for holding therein agent or compound detection means hereinafter further described. A cpu 40 is mounted within the detector case 12 and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates with a monitoring site and monitoring equipment. The front side 28 of the detector case 12 includes indicator means for visually indicating that a specific agent, compound or element has been detected. The indicator means can include color coded indicator lights 42 in panel form, as shown in FIG. 9, with each indicator light panel 42 lighting up with a specific color corresponding to the detection of a specific agent or compound; or color coded indicator lights 44, as shown FIG. 1, that correspond to and

individually light up on the detection of a specific agent or compound (chemical, biological, or radiological).

As shown in FIGS. 1, 2 and 9-13, the multi sensor detection and lock disabling system 10 includes a plurality of detectors 46 with each detector 46 adapted for and set up to sample for a specific agent or compound (biological, chemical, or radiological); and the detectors 46 are interchangeable for adapting to the needs and demands of future technology. The detectors 46 can also be used as stand alone scanners. In the preferred embodiment of the invention, at least three detectors 46 are placed within the detector case 12 with one detector 46 for specifically sampling biological agents or compounds, one detector 46 for sampling chemical agents or compounds, and one detector 46 for sampling radiological agents or compounds. The detectors 46 are interconnected to the cpu 40 of the detection system 10 by conventional connections that can be wire or wireless for transmitting the appropriate signals to the cpu 40 upon detection of the particular agent or compound. As shown in FIG. 2, each detector 46 includes on its front plate or facing surface a sound alarm indicator 48, a readings panel 50 comprising a plastic shield and LED lights for displaying the various read-out messages, a sensor 52 for detecting the specific agent, element or compound, and a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand alone scanner. Each detector 46 includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu 40 of the detector case 12.

As shown in FIGS. 1, 3a, 3b, 9, and 13-15, used in conjunction with the multi sensor detection and lock disabling system 10 is at least one automatic/mechanical lock disabler 56—and depending upon the number of products being monitored there can be one lock disabler 56 for each product. The automatic/mechanical lock disabler 56 is physically connected to the detector case 12 by a wire or cable 58 for receiving signals therefrom for disabling an existing lock or activating a lock inside a product to prevent access to the product. By way of example, FIG. 3a shows the automatic/mechanical lock disabler 56 mounted—by any conventional means—to the lock 60 of the shipping container 14 shown in FIGS. 4 and 5 and connected by wire 58 to the cpu 40 of the detector case 12. The lock disabler 56 is in the non-activated or disengaged state in FIG. 3a. FIG. 3b shows the automatic/mechanical lock disabler 56 mounted to the lock 60 of the shipping container 14 and in the activated or engaged state after detection of an agent or compound by the system 10 thereby for locking or disabling the lock 60 of the shipping container 14 and preventing unauthorized entry and access by unauthorized, untrained and unequipped individuals. In FIGS. 3a and 3b the lock 60 secures doors of the shipping container 14 that can be slidably or pivotably opened and closed.

In addition to the automatic/mechanical lock disabler 56, the multi sensor detection and lock disabling system 10 can also utilize a fingerprint biometric lock with disabler 62 as shown in FIGS. 1 and 14. The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40 of the detector case 12 for receiving transmissions therefrom after detection of an agent or compound has occurred so that the lock on the product can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56 by turning the manual lock disabler 66. The fingerprint biometric lock with

US RE43,891 E

9

disabler 62 is mounted to the lock of the product in a manner similar to the mounting of the automatic/mechanical lock disabler 56 that is shown in FIGS. 3 and 3b.

FIGS. 4 and 5 show one manner of disposition or placement of the detector case 12 in relation to the product, i.e., the shipping container 14, with the color coded indicator lights 42 externally viewable; FIG. 5 shows a number of shipping containers 14 each equipped with a detector case 12 and integrated with elements hereinafter further described for continuously monitoring the shipping containers 14 as they sit for an extended period of time on the truck or rail platform 16. FIG. 6 illustrates several cargo containers 18 sitting on the shipping dock or pier 20, with each cargo container 18 having a detector case 12 mounted thereon and integrated with and monitored by elements shown in FIG. 5 and hereinafter further described.

FIG. 7 illustrates a typical product from product grouping 1 that is monitored by the multi sensor detection and lock disabling system 10 of the present invention; specifically, FIG. 7 shows a news rack 68 with one automatic/mechanical lock disabler 56 mounted to and interconnected with the locking mechanism of the news rack 68. As long as there is no detection of any agent or compound, the lock disabler 56 is in the disengaged state, and the individual can deposit the coin amount in the chute and then freely open the glass panel 70 by the handle 72 for removing a paper. However, the lock disabler 56 would be activated upon detection of the harmful agent or compound and receipt of a signal from the cpu 40 for locking or disabling the locking mechanism thereby denying access to the interior of the news rack 68 from all untrained, unauthorized and unequipped individuals.

FIG. 8 illustrates one detector 46 disposed within the news rack 68 and which is visible through the panel 70 for detecting one specific agent, compound or element. The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to off site monitoring equipment.

FIG. 11 illustrates a representative schematic 74 for describing the signal transmission process from the detector 46 to the cpu 40 of the detector case 12. The external stimulus 76 would be the chemical, biological or radiological agent or compound. If there is no detection of the agent or compound, the detector 46 will stay in the sensing mode 78. However, detection of the specific agent will trigger the sound alarm 80 and the light alarm 82, and instant transmittal of a signal to the cpu 40. The readings 84 can be stored by the cpu 40 for verification and future review and evaluation. After all the appropriate corrective and preventative measures have been undertaken by the trained and authorized personal, and the site has been cleansed of the contamination, authorized and equipped personal can then reset 86 the system 10.

FIG. 12 illustrates a representative schematic 88 for the detector 46 when used as stand-alone scanner. The detector 46 undergoes the same essential steps as illustrated in FIG. 11, with the exception of the signal transmission to the cpu 40. The detector 46 remains in detection mode 78 until an agent is detected, and then the various functions—light alarm 82, sound alarm 80, storage of readings 84, and, after the appropriate security and safety steps have been carried out by authorized personal, detector reset 90 by authorized personal can occur thereby placing the detector 46 back in detection or sensing mode 78.

FIG. 13 is a representative schematic 92 that illustrates the steps undertaken by the system 10 to lock or disable a lock, such as the lock 60 for the shipping container 14 shown in FIGS. 3a and 3b. Upon detection of the agent (chemical, biological, radiological) the alarm light indicators 42 or 44 will light up providing external indication that an agent has

10

been detected. In addition, the system 10—the cpu 40—will transmit a lock/disable lock signal 94 to the automatic/mechanical lock disabler 56 to lock or disable the lock on the product, such as the lock 60 on the shipping container 14 of FIGS. 3a-5. This prevents unauthorized, unequipped, or untrained individuals from entering or gaining access to the product for which a dangerous and perhaps lethal agent has been detected. After the proper authorities and authorized personal have been notified and all the appropriate security, preventative and clean up measures have been undertaken, the authorized individual can perform the disarm and reset function 96 for the system 10 placing the system 10 in back in the detection mode 98.

FIG. 14 is a representative schematic 100 illustrating the use of the fingerprint biometric lock with disabler 62 with the system 10. Upon detection of the agent or compound by the detector, the various alarms would sound and light up (shown in previous figures), and the cpu 40 would then transmit a signal to the fingerprint biometric lock with disabler 62 to lock or disable the lock on the product, such as the lock 60 on the shipping containers 14 shown in FIGS. 3a-5. The shipping containers 60 would remain locked and in an access denied mode 101 should an attempt be made to gain access to the container 60 by opening the lock 60 with an unauthorized fingerprint. However, a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock 60 of the shipping container 14. The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety, cleanup, and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108.

FIG. 15 is a schematic representation 110 that illustrates the integration of a surveillance watchtower 112 and a monitoring terminal or PC 114 for monitoring products such as the shipping containers 14 or cargo containers 16 that sit for extended periods of time at docks, piers 20, truck terminals, rail yards, shipping platforms 16 and industrial sites as shown in FIGS. 5 and 6. The watchtower 112 would maintain continuous surveillance over a number of shipping containers 60, for example, with detector cases 12 mounted in or on each container 14 and set in detection mode 116 with one or more detectors 46 disposed in each detector case 12. The watchtower 112 would continuously scan for light alarm indicators 42 and 44 on the products, such as the containers 14 or 18, and the watchtower 112 would be interconnected and integrated with the monitoring terminal or PC 114. Upon detection 118 of an agent or compound in one or more of the shipping containers 14, the appropriate light alarm indicators 42 or 44 would light providing visible confirmation of the detection of the specific agent or compound. The cpu 40 would transmit a lock/disable signal 120 to the lock 60 on each respective shipping container 14 to lock or disable the lock 60 thus preventing access to that respective shipping container 14. In addition, signal transmissions would be sent to the monitoring terminal or PC 114 (which could be off site) thereby alerting authorized security personal of the contamination event. With the information received at the monitoring terminal 114, authorized personal would then be notified and dispatched to the area to undertake the appropriate safety and cleanup measures 122. Such measures would also include disarming the lock disabling system in order to gain access to the shipping container 14. After all the cleanup and security measures are completed by the trained and properly equipped authorities, the detection system and the lock disabling feature would reset 124 and the detection system would again be placed in detection mode 116.

US RE43,891 E

11

FIG. 16 is a schematic representation 126 that illustrates an enhanced version of the multi sensor detection and lock disabling system 10 for preventing car and vehicle attacks and bombings. The lock disabling system 10 would be interconnected to the locking system and mechanism 128 of the vehicle 130. In addition, a stall to stop disabling link 132 can be made with the fuel, air, and electrical system 134 of the vehicle 130. The enhanced version incorporates a satellite 136 for signal receipt and transmission from the vehicle 130 in which the detector system 10 is placed to a monitoring site and monitoring equipment 138. As shown in FIG. 16, a detection signal 140 would be sent to the satellite 136 by the detection system 10 upon detection of a bomb or explosive 142 hidden in the vehicle 130. The satellite 136 would then transmit an alert signal 144 to the monitoring site 138 with the signal 144 containing the relevant data to evaluate the nature of the threat. The monitoring site 138 would then transmit a stall to stop signal 146 to the detection system 10 to lock the vehicle 130 and/or disable the electrical system of the vehicle 130 thereby disabling the vehicle 130, preventing access to the vehicle 130 by locking the vehicle 130, and preventing any terrorist in the vehicle 130 from escaping.

The detector case 12 can be modified and adapted for inclusion with cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, and briefcases. In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring.

The system 10 and the watchtower 112, along with the satellite 136 and the monitoring site 138 can be adapted or incorporated with cell phone towers and satellites for use with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, or a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. The aforementioned telecommunication and radio communication means can be interactive with any type of motive vehicle that includes but is not limited to cars, trucks, vans, SUVs, trains, subways, boats, ships and airplanes, and which is reported stolen, experiences a loss of brakes, or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted to the vehicle and which detection causes an automatic signal transmission or a signal transmission is activated when a call is made to the monitoring station by an authorized person. The authorized individual includes but is not limited to the owner, pilot, conductor, captain, police highway patrol, security guard and military personnel to the monitoring equipment for activating a vehicle slowdown or stall-to-stop disabling system that similar to the disabling system 126 shown in FIG. 16, or incorporating features of the system 126 shown in FIG. 16, from the monitoring equipment to the vehicle. The activation of the stall-to-stop disabling means or the vehicle slowdown disables or engages the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.

In addition, the basic stall-to-stop disabling means or the vehicle slowdown means and device can be adapted, modified or designed to include: an open bust or open platform for integrating any new and innovative technology; warning

12

lights indicators; sound alarm indicators; voice alarm indicators; a cell phone to transmit to the vehicle a signal for slowing and halting the vehicle; and a lock disabling system or means to lock a thief or terrorist inside the vehicle after a transmission is received or sent. Open bust or open platform also refers to the compatibility of the detector case 12, or the incorporation of its features in cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, briefcases, and suitcases, etc., with other communication, transmission and surveillance systems whereupon the detector case 12, and its features, can be seamlessly integrated with other new and emerging systems and technologies.

Thus, as shown more specifically in FIG. 17, by way of a representative example the features and elements of the detector case 12 are shown as being incorporated into cell phone detector case 150 and associated cell phone monitor 152. The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174. The power source for the cell phone detector case 150 can be any conventional rechargeable battery source or standard electrical power from a standard electrical receptacle or outlet.

As shown in FIG. 17, the cell phone detector case 150 includes one or more sensor/detector units, cells, or components 176 built into and incorporated into the case 150. The detector 176 includes generally disposed at the front 162 of the case 150 the following types of indicators: a sound alarm indicator 178, a readings panel 180, a sensor 182 for detecting one or more specific types of agents, elements, chemicals, compounds, etc., and a light alarm indicator 184. The sensor/detector 176 will be interconnected to the power source 174. In addition, mounted on and externally visible on the sides 168 or front 162 of the case 150 are a plurality of color coded indicator lights 186 with each light 186 corresponding to a specific agent, element, chemical, compound, etc., and lighting up when that agent is detected by the sensor/detector 176. The color coded indicator lights 186 will be electrically interconnected to the sensor/detectors 176 via any standard microprocessor. The cell phone detector case 150 and cell phone monitor 152 thus comprise a hand-held, easily portable and transportable detection means that is both effective and unobtrusive in its disposition and use.

FIGS. 18 and 19 illustrate representative examples of the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188, and operating in conjunction with either a satellite and/or a cell phone tower 190 to transmit and receive signals and commands among each other and to a vehicle 192, such as a truck, as part of a stall-to-stop disabling system for slowing and stopping the vehicle 192 and locking a thief, terrorist, or unauthorized individual in the vehicle 192 if needed. A wide range of events can trigger and initiate the stall-to-stop system and the locking or lock disabling system and mechanism, and the event doesn't have to be limited to the detection of a bomb or a chemical, biological, or radiological agent, element, or compound. The events can include, but is not limited to, detection of an engine problem to engine failure to the unauthorized use (stealing) of the vehicle 192. The vehicle 192 includes an

US RE43,891 E

13

electromotive system 194 that comprises, among other components, an onboard computer(s), electrical, fuel and air systems, as well as brakes, ignition, steering, and transmission. Also integrated with and capable of communicating with the vehicle's 192 electromotive system 194 is a stall-to-stop system while a lock disabling mechanism 196 is able to engage and disengage or disable the vehicle's 192 locking mechanism 198 upon receipt of the appropriate commands via a lock disabling communication channel or link 200. This link 200 can also accommodate the stall-to-stop system commands and signals, and thus is a multi-channel communication link. A CPU or a transceiver 202 is programmed to receive signals from the cell phone tower 190 and/or to a GPS satellite 204 and is interconnected with the stall-to-stop system and the lock disabling system 196 via link 200 for engaging the electromotive system 194 and actuating the lock disabling system 196 to stop the vehicle 192 and lock inside the vehicle 192 anyone such as a thief, terrorist or other unauthorized individual.

A representative example for stopping, disabling, and locking the vehicle 192 that utilizes the cell phone tower 190 wherein the activation and/or distress signal 206 originates from the cell phone 187a or the laptop 187b and such activation signal 206 travels to the cell phone tower 190 that is nearest the current location of the vehicle 192. A signal 208 is then transmitted to the monitoring site 188 and specific monitoring equipment 138 that can also include but is not limited to cell phones, laptops, desktop PC's, notebook PC's and LCD monitors. The monitoring site 138 then communicates by signal 210 to the GPS satellite 204 that an original or activation signal has been received and then the GPS satellite 204 locates and communicates by multiplex signal 212 with the CPU or transceiver 202 on the vehicle 192 and exchanges information on the type of problem, situation, location, and vehicle speed. The monitoring equipment 138 then transmits a signal 214 to the cell phone tower 190 that communicates with the transceiver 202 and/or CPU of the vehicle 192 to initiate or execute any commands that will actuate the stall-to-stop disabling link 200 and lock disabling system 196 for bringing the vehicle 192 to a halt and actuating the vehicle's 192 locking mechanism 198 for locking the thief, terrorist, or other unauthorized person inside the vehicle 192 if needed.

FIG. 19 illustrates a representative example wherein the stall-to-stop system and the lock disabling system 196 are utilized in conjunction with the GPS satellite 204. In FIG. 19 a signal has traveled to the satellites nearest the vehicle's 192 current location and then the signal 218 has traveled to the monitoring equipment 138 and monitoring site 188 which can include but is not limited to satellite cell phones, satellite monitors, cell phones, laptops, desktop PC's, notebook PC's, and LCD monitors. The GPS satellite 204 then locates and communicates with the CPU and/or transceiver 202 on the vehicle 192 via a multiplex (two-way) signal 220 in order to exchange information on such distress and danger event parameters as the specific problem situation, location, and vehicle speed. The monitoring equipment 138 then transmits a signal 222 back to the GPS satellite 204 that in turn communicates via another signal 224 with the CPU and/or transceiver 202 to execute any commands to the stall-to-stop system for executing the disengagement of the vehicle's 192 electromotive system 194 for bringing the vehicle 192 to a halt and for actuating the lock disabling system 196 to direct the lock disabling link 200 to actuate the locking mechanism 198 thereby locking the vehicle 192 and anyone inside the vehicle 192.

While the invention has been shown and described in a preferred embodiment, it will be apparent to those skilled in

14

the art that numerous alterations, modifications, and variations will possible and practicable without departing from the spirit and scope of the invention as set forth by the appended claims.

I claim:

1. A stall-to-stop [and lock disabling] *or vehicle slow-down* system for slowing and stopping a vehicle [and locking passengers inside the vehicle] wherein the vehicle includes a transceiver *carried by the vehicle, and* a stall-to-stop *or vehicle slow-down* system [and a lock disabling system] that are interconnected to the electromotive system [and the locking mechanism] of the vehicle, comprising:

monitoring equipment located at a determinate monitoring site *that is remote from the vehicle and that is free from contact with the vehicle;*

at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom;

at least one [GPS] satellite capable of sending signals to the monitoring equipment and receiving signals from the monitoring equipment;

[the GPS] *wherein the at least one* satellite *or the at least one cell phone tower is* capable of [two-way] signal communication with the transceiver on the vehicle; and

whereupon a distress signal *made due to unauthorized use of the vehicle or an uncontrollable vehicle in use* sent by a *mobile,* portable, *or fixed* communication device to the cell phone tower *or satellite* causes a signal to be sent to the monitoring equipment which then communicates [with the GPS satellite so that the GPS satellite can locate and communicate] with the transceiver on the vehicle regarding specifics of the distress event parameters so that the monitoring equipment [and] *can send a signal to* the cell phone tower [can exchange signals] *or satellite* whereby the cell phone tower *or satellite* transmits to the transceiver so that the transceiver can execute commands that actuate the stall-to-stop *or vehicle slow-down* system [and the lock disabling system for stopping the vehicle and locking the vehicle so that anyone inside the vehicle remains in the vehicle], *wherein the communication device is remote from both the vehicle and the monitoring site and is free from contact with both the vehicle and the monitoring site.*

2. The stall-to-stop [and lock disabling] *or vehicle slow-down* system of claim 1 wherein the [portable] *mobile* communication device is a cell phone, *a smart phone or handheld for the activating or deactivating of the stall-to-stop system; capable of locking or unlocking the vehicle doors and/or starting the vehicle.*

3. The stall-to-stop [and lock disabling] *or vehicle slow-down* system of claim [2] *1* wherein the portable communication device is a laptop computer.

4. The stall-to-stop [and lock disabling] *or vehicle slow-down* system of claim [3] *1* wherein the vehicle is an [airplane] *automobile.*

5. The stall-to-stop [and lock disabling] *or vehicle slow-down* system of claim [4] *1* wherein the vehicle is a railway train *or airplane.*

6. The stall-to-stop [and lock disabling] *or vehicle slow-down* system of claim [5] *1* wherein the vehicle is a ship.

7. A stall-to-stop and lock disabling system for slowing and stopping a vehicle and locking passengers inside the vehicle wherein the vehicle includes a transceiver *carried by the vehicle,* a stall-to-stop system and a lock disabling system that are interconnected to the electromotive system and the locking mechanism of the vehicle, comprising:

US RE43,891 E

15

monitoring equipment located at a determinate monitoring site *that is remote from the vehicle and that is free from contact with the vehicle*;

at least one [GPS] satellite *or at least one cell phone tower* capable of sending and receiving signals to and from the monitoring equipment and the transceiver of the vehicle[;] *such that the*

[the GPS] *at least one satellite or at least one cell phone tower* capable of two-way signal communication with the transceiver of the vehicle; and

whereupon a distress signal *made due to unauthorized use of the vehicle* sent from a *mobile*, portable, *or fixed* telecommunication device to [the GPS] *a cell phone tower or a* satellite causes a signal to be sent to the monitoring equipment [followed by the GPS satellite locating and communicating with the transceiver of the vehicle] for exchanging information on the problem situation, location, and speed of the vehicle resulting in the monitoring equipment transmitting a signal to [the GPS] *a cell phone tower or a* satellite [and the GPS satellite] *for* communicating with the transceiver of the vehicle for executing commands that actuate the stall-to-stop system and the lock disabling system for stopping the vehicle and locking the vehicle so that anyone inside the vehicle must remain inside the vehicle *or locking the vehicle ignition to prevent the restarting of the vehicle*;

*wherein the telecommunication device is remote from both the vehicle and the monitoring site and is free from contact with both the vehicle and the monitoring site.*

**8.** The stall-to-stop and lock disabling system of claim 7 wherein the [portable] *mobile* communication device is a cell phone, *a smart phone or handheld for the activating or deactivating of the stall-to-stop system; capable of locking or unlocking the vehicle doors and/or starting the vehicle.*

**9.** The stall-to-stop and lock disabling system of claim [8] 7 wherein the portable communication device is a laptop computer.

**10.** The stall-to-stop and lock disabling system of claim [9] 7 wherein the [portable] *fixed* communication device is a [desktop PC] *telephone*.

*11. A vehicle adapted for receipt of a signal from a remote location to control the vehicle's stall-to-stop means or vehicle slowdown means, comprising:*

*at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;*

*an electrical system in electrical communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;*

*a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;*

*a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means to stall or slow down the vehicle;*

*a receiver in computer communication with the computer system and adapted to receive at least one control signal*

16

*from a remote location to activate a stall-to-stop means or vehicle slowdown means to stall or slow down the vehicle; and*

*wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;*

*wherein the at least one control signal is sent due to unauthorized use of the vehicle, and wherein an originating first signal that eventually causes the at least one control signal to be sent is generated upon initial verification of the unauthorized use of the vehicle;*

*at least one mobile, portable, or fixed device capable of sending the at least one control signal from the remote location that is of electromagnet pulse, electrostatic discharge, microwave beam or radio frequency, to disable the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and horsepower of the motor.*

*12. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 11, further including a global positioning system (GPS) receiver adapted for communication with at least one satellite.*

*13. The stall-to-stop disabling and slowdown system of claim 11 wherein the stall-to-stop and slowdown means can be activated by an authorized individual which includes but is not limited to the owner, pilot, conductor, captain, police, highway patrol, security guard, port security and military personnel to the monitoring equipment from a fixed, portable or mobile communication device for activating the system.*

*14. The stall-to-stop disabling and slowdown system of claim 11 wherein a communication device; that of a cell phone, smart phone or handheld; capable of sending signals to the vehicle's operating equipment systems of at least one of, but not limited to, an ignition for starting and stopping, a lock for unlocking and locking, a horn for sounding; capable of receiving data and diagnostic information of the vehicle's operating equipment systems.*

*15. The stall-to-stop disabling and slowdown system of claim 11 wherein the disabling and slowdown means activation engages the computer, electrical, fuel, and/or air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to vehicle brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.*

*16. The stall-to-stop disabling and slowdown system of claim 11 wherein the system can be adapted, modified or designed to include: an open bust or open platform for integrating any new and innovative technology that includes but is not limited to; warning lights indicators; sound alarm indicators; voice alarm indicators; a vehicle's electrical, mechanical or computer system for locking and unlocking of doors, windows, sun-roofs, trunks or hoods; applications for unlocking or locking a vehicle using a smart phone, cell phone or PDA.*

*17. The stall-to-stop disabling and slowdown system of claim 11 wherein the disabling and slowdown means reduces the speed of the vehicle to an idle speed and eventually stops the vehicle or to an advanced reduced stall and an immediate stop when the vehicle is in forward movement, backward or reverse movement, side movement, cruise control movement, or lane departure movement.*

US RE43,891 E

**17**

18. The stall-to-stop disabling and slowdown system of claim 11 wherein the disabling and slowdown means both have a flexible sequence of signals that includes a warning signal of flashing the vehicle lights or the locking of the doors can happened before or after the signal to stall-to-stop or signal to slowdown the vehicle is sent.

19. The stall-to-stop disabling and slowdown system of claim 11 wherein the disabling and slowdown means both have the ability to slowdown or stall the vehicle naturally and without any action on the brakes, door locks, or steering wheel, and both have the ability to slowdown or stall the vehicle through unnatural means where there may be action on the brakes, door locks, and steering for navigation to a safe stop.

20. The stall-to-stop disabling and slowdown system of claim 11 wherein the disabling and slowdown means including the devices that is monitoring, communication devices, communication equipment can be grouped into anti-terrorist product groupings based on the categories of similarities of design, of at least one of; sensors, software, interfaces, detector cases, locks, mobile communication devices, handheld communication devices, vehicle slowing and stopping devices, specification, development and implementation; similarities in material composition of at least one of: steel, stainless steel, composites, brass, copper, aluminum, fiber, silicon, plastic, combining of materials parts or elements to form a whole; similarities in security problems of at least one of: theft, detection for chemical, biological, radiological, nuclear, explosive compounds and agents, detection for weapons of mass destruction, biometrics for identifying terrorist, scanning to identify a terrorist threat; grouping security devices to form a network of ubiquitous sensing and detecting.

21. The stall-to-stop disabling and slowdown system of claim 11 wherein the disabling and slowdown means is designed to be used with or without biometrics for authentication and identification, thereby allowing access to the product by authorized, trained and equipped individuals and preventing access to the products by unauthorized, untrained, and unequipped individuals.

22. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 11, wherein a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom monitoring equipment and a central processing unit (CPU) or a transceiver on the vehicle.

23. A vehicle adapted for receipt of a signal from a pre-programmed automated system to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising:

at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;

an electrical system in electrical communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a receiver in electrical communication with the electrical system and adapted to receive at least one control signal

**18**

from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means to stall or slow down the vehicle;

a receiver in computer communication with the computer system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means to stall or slow down the vehicle; and

wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

wherein the receivers, the computer system, and the electrical system are part of at least one pre-programmed operating system of unintended acceleration, pre-crash, reverse acceleration, stabilization, lane departure, cruise control, driverless vehicle, and chemical biological radiological nuclear explosive (CBRNE) detection;

wherein the control signal to activate the stall-to-stop or vehicle slowdown is not remote from the vehicle and the signal to activate is initiated when at least one of the vehicle's operating systems for monitoring the vehicle's condition exceeds a pre-programmed vehicle operating system parameter.

24. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 23, further including a global positioning system (GPS) receiver adapted for communication with at least one satellite.

25. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 23, pre-programmed automated system further including a cellular communication device adapted for communication with at least one cell phone tower; further including, at least one satellite connection capable of communicating with the pre-programmed automated system; further including, at least one modem connection for short and long range radio frequency transmissions with the pre-programmed automated system.

26. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 23, where-in the at least one control signal is sent to the pre-programmed automated system for bringing a vehicle experiencing unintended acceleration to a slowdown, idle or stop.

27. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 23, further includes vehicles pre-programmed to automatically activate the stall-to-stop means or vehicle slowdown means when sensors of at least one of: navigation, camera, radar, guidance, motion, distance, weight, height are interconnected to the vehicles onboard electrical system and/or computer system for controlling at least one of a brake, a brake override system, an electronic throttle, a foot peddle, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor.

28. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 23, further includes vehicles pre-programmed to automatically activate the stall-to-stop means or vehicle slowdown means; when the vehicle is electric, a car, truck, ship, boat, train, or plane.

29. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 23, further includes vehicles pre-programmed to automatically activate the stall-to-stop means or vehicle slowdown means; when it is determined an emergency exist for the vehicle, driver, passenger(s), pedestrians or surrounding environment.

**19**

*30. The vehicles' stall-to-stop means or the vehicles' slow-down means of claim 23, further includes vehicles pre-programmed to automatically activate the stall-to-stop means or vehicle slowdown means; when there is an in-vehicle notification warning of: crash, vehicle parking, speeding; driving too fast for conditions; construction zone; school zone; accident ahead; brake failure; acceleration/deceleration failure; acceleration/deceleration cruise control.*

*31. The vehicles' stall-to-stop means or the vehicles' slow-down means of claim 23, further includes vehicles pre-programmed to automatically activate the stall-to-stop means or vehicle slowdown means; when the vehicle is in forward movement, backward or reverse movement, side movement, cruise control movement, or lane departure movement or when the vehicle moves outside a designated perimeter or zone.*

*32. The vehicles' stall-to-stop means or the vehicles' slow-down means of claim 23, further includes vehicles pre-programmed to automatically activate the stall-to-stop means or vehicle slowdown means; when there is a detection of a bomb, weapon of mass destruction, chemical or biological agents, located in, on, or adjacent to a vehicle.*

*33. The vehicles' stall-to-stop means or the vehicles' slow-down means of claim 23, pre-programmed automated system is designed to be used with or without biometrics for authentication and identification, thereby allowing access to the vehicle by authorized, trained and equipped individuals and preventing access to the vehicle by unauthorized, untrained, and unequipped individuals.*

*34. The stall-to-stop disabling and slowdown system of claim 23 wherein the pre-programmed automated system can be grouped into anti-terrorist product groupings based on the categories of similarities of design, of at least one of; sensors, software, interfaces, detector cases, locks, mobile communication devices, handheld communication devices, vehicle slowing and stopping devices, specification, development and implementation; similarities in material composition of at least one of: steel, stainless steel, composites, brass, copper, aluminum, fiber, silicon, plastic, combining of materials parts or elements to form a whole; similarities in security problems of at least one of; theft, detection for chemical, biological, radiological, nuclear, explosive compounds and agents, detection for weapons of mass destruction, biometrics for identifying terrorist, scanning to identify a terrorist threat; grouping security devices to form a network of ubiquitous sensing and detecting.*

*35. The vehicles' stall-to-stop means or the vehicles' slow-down means of claim 23, wherein a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom monitoring equipment and a central processing unit (CPU) or a transceiver on the vehicle.*

*36. Multi sensor detection, stall-to-stop, lock disabling system wherein the security systems can be grouped into anti-terrorist product groupings based on the categories of similarities of design of at least one of; sensors, software, interfaces, detector cases, locks, mobile communication devices, handheld communication devices, vehicle slowing and stopping devices, specification, development and implementation: similarities in material composition of at least one of; steel, stainless steel, composites, brass, copper, aluminum, fiber, silicon, plastic, combining of materials parts or elements to form a whole: similarities in security problems of at least one of; theft, detection for chemical, biological, radiological, nuclear, explosive compounds and agents,*

**20**

detection for weapons of mass destruction, biometrics for identifying terrorist, scanning to identify a terrorist threat; grouping security devices to form a network of ubiquitous sensing and detecting; comprising:

a multi sensor detection system with a plurality of interchangeable and integrable sensors detecting for chemical, biological, radiological, nuclear, explosive, human, contraband; camera, light and video sensors allow the user to access, review and respond to network multi sensor detection systems and view the environment from a cell phone, PDA, handheld, laptop, desktop, workstation or monitoring site;

a built-in, embedded multi sensor detection system for monitoring products with a plurality of interchangeable and integrable sensors detecting for chemical, biological, radiological, nuclear, explosive, human, contraband; camera, light and video sensors allow the user to access, review and respond to network multi sensor detection systems and view the environment from a cell phone, PDA, handheld, laptop, desktop, workstation or monitoring site; sensors for motion, locks, perimeter, temperature, tampering and breach for the prevention of terrorist activity and theft;

a cell phone; cell phone detection system with a plurality of interchangeable and integrable sensors detecting for chemical, biological, radiological, nuclear, explosive, contraband; camera, light and video sensors allow the user to access, review and respond to network cell phone detection systems and view the environment from a cell phone, PDA, handheld, laptop, desktop, workstation or monitoring site;

a stall-to-stop system with a stall to stop means and/or slowdown to idle means interconnected to a plurality of interchangeable and integrable sensors for speed, navigation, brakes, electrical, computer, air, fuel, motion, locks; camera, light and video sensors allow the user to access, review and respond to network stall-to-stop systems and view the environment from a cell phone, PDA, handheld, laptop, desktop, workstation or monitoring site;

an external automatic/mechanical lock disabler system with a plurality of interchangeable and integrable sensors detecting for chemical, biological, radiological, nuclear, explosive, contraband, perimeter, motion, tampering, temperature, breach; camera, light and video sensors allow the user to access, review and respond to network automatic/mechanical lock disabler systems and view the environment from a cell phone, PDA, handheld, laptop, desktop, workstation or monitoring site; capable of receiving and sending at least one signal of lock/unlock; wired or wireless; battery, solar or electrical; monitoring equipment and devices; communication equipment and devices; and/or biometrics to prevent entry or exit of unauthorized or untrained persons, thus locking any unauthorized or untrained persons, thief or terrorist inside any of the products listed in any of the product groupings categories; and

an internal automatic/mechanical lock disabler system with a plurality of interchangeable and integrable sensors detecting for chemical, biological, radiological, nuclear, explosive, contraband, human, perimeter, motion, tampering, temperature, breach; camera, light and video sensors allow the user to access, review and respond to network internal automatic/mechanical lock disabler systems and view the environment from a cell phone, PDA, handheld, laptop, desktop, workstation or monitoring site; capable of receiving and sending at

US RE43,891 E

**21**

least one signal of lock/unlock; wired or wireless; battery, solar or electrical; monitoring equipment and devices; communication equipment and devices; and/or biometrics to prevent entry or exit of unauthorized or untrained persons, thus locking any unauthorized or untrained persons, thief or terrorist inside any of the products listed in any of the product groupings categories.

37. The internal automatic/mechanical lock disabler system of claim 36 is interconnected to the multi sensor detection system.

38. The internal automatic/mechanical lock disabler system of claim 36 is interconnected to the built-in multi sensor detection system.

39. The internal automatic/mechanical lock disabler system of claim 36 is interconnected to the cell phone; cell phone detection system.

40. The internal automatic/mechanical lock disabler system of claim 36 is interconnected to the stall-to-stop system.

41. The internal automatic/mechanical lock disabler system of claim 36 is interconnected to the external automatic/mechanical lock disabler system.

42. At least two of the security systems of claim 36; the multi sensor detection system; the built-in, embedded multi sensor detection system; the cell phone detection system; the stall-to-stop system; the external automatic/mechanical lock disabler system; the internal automatic/mechanical lock disabler system; the communication equipment, means and devices; the monitoring equipment, means and devices are operating independent of each other or interconnected with each other; capable of communicating therebetween; operating under at least one network and under at least one central control center.

43. Multi sensor detection, stall-to-stop, lock disabling system of claim 36, wherein a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom the monitoring equipment and a central processing unit (CPU) or a transceiver on the vehicle.

44. A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising:

an electrical system in electrical communication with at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;

a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means;

a receiver in computer communication with the computer system and adapted to receive at least one control signal in response to one of the vehicle's operating systems for monitoring the vehicle's condition upon exceeding a pre-programmed vehicle operating system parameter from the pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means such

**22**

that the speed of the vehicle is initially decreased immediately after activation of the means upon initial receipt of the at least one control signal; and

wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor.

45. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a global positioning system (GPS) receiver adapted for communication with at least one satellite.

46. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a cellular communication device adapted for communication with at least one cell phone tower; further including, at least one satellite connection capable of communicating with the pre-programmed automated system; further including, at least one modem connection for short and long range radio frequency transmissions to and from the pre-programmed automated system.

47. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a brake override system for stopping or slowing a vehicle experiencing unintended acceleration.

48. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a pre-crash system for stopping or slowing a vehicle to prevent a crash.

49. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a reverse acceleration slow-down system for stopping or slowing a vehicle traveling in reverse.

50. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a stabilization system for stopping or slowing a vehicle to prevent a vehicle turnover.

51. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a lane departure system for stopping or slowing a vehicle to prevent or minimize accidents when the vehicle begins to move out of its lane.

52. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a remote vehicle slowdown system for stopping or slowing a vehicle by remote means.

53. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as an adjusted cruise control system for stopping or slowing a vehicle to prevent a crash.

54. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a door lock and unlocking system for stopping or slowing the vehicle and locking a terrorist, thief, or user trying to elude the law inside the vehicle.

55. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or

US RE43,891 E

23

designed to include a vehicle designed to perform as a driverless or autonomous vehicle for stopping or slowing a vehicle that is in operation with or without a user, driver or operator inside the vehicle.

56. The vehicles' stall-to-stop means or the vehicles' slow-down means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a chemical, biological, radiological, nuclear and explosives detection system for stopping or slowing a vehicle when a harmful, hazardous, or dangerous compound or agent is detected.

57. The vehicles' stall-to-stop means or the vehicles' slow-down means of claim 44, wherein a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom monitoring equipment and a central processing unit (CPU) or a transceiver on the vehicle.

58. A stall-to-stop or vehicle slow-down system for slowing and stopping a vehicle wherein the vehicle includes a transceiver carried by the vehicle, and a stall-to-stop or vehicle slow-down system that are interconnected to the electromotive system of the vehicle, comprising:

  at least one cell phone tower that sends a signal to the vehicle;
  at least one satellite that sends a signal to the vehicle and receives a signal from the vehicle;
  wherein the at least one satellite or the at least one cell phone tower is capable of signal communication with the transceiver on the vehicle; and
  a communication device that is a cell phone, a smart phone, or a PDA that causes the signal to be sent from the cell phone tower to the vehicle that actuates the stall-to-stop or vehicle slow-down system due to unauthorized use of the vehicle, wherein the communication device is remote from the vehicle and free from contact with the vehicle.

59. The stall-to-stop or vehicle slow-down system of claim 58 wherein the at least one satellite or the at least one cell phone tower is capable of signal communication with the transceiver on the vehicle that is two-way signal communication.

60. The stall-to-stop or vehicle slow-down system of claim 58 wherein the communication device is a cell phone or a laptop computer.

61. The stall-to-stop or vehicle slow-down system of claim 58, further including a global positioning system (GPS) receiver adapted for communication with at least one satellite.

62. The stall-to-stop or vehicle slow-down system of claim 58, wherein a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom the monitoring equipment and a central processing unit (CPU) or the transceiver on the vehicle.

63. A stall-to-stop or vehicle slow-down system for slowing and stopping a vehicle wherein the vehicle includes a transceiver carried by the vehicle, and a stall-to-stop or vehicle slow-down system that are interconnected to the electromotive system of the vehicle, comprising:

  monitoring equipment located at a determinate monitoring site that is remote from the vehicle and that is free from contact with the vehicle;

24

  at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom;
  at least one satellite capable of sending signals to the monitoring equipment and receiving signals from the monitoring equipment;
  wherein the at least one satellite or the at least one cell phone tower is capable of signal communication with the transceiver or communication device on the vehicle; and
  whereupon a distress signal made due to unauthorized use of the vehicle or an uncontrollable vehicle in use sent by a mobile, portable, or fixed communication device to the cell phone tower or satellite causes a signal to be sent to the monitoring equipment which then communicates with the transceiver on the vehicle regarding specifics of the distress event parameters so that the monitoring equipment can send a signal to the cell phone tower or satellite whereby the cell phone tower or satellite transmits to the transceiver so that the transceiver can execute commands that actuate the stall-to-stop or vehicle slow-down system,
  wherein the communication device is remote the vehicle and is free from contact with the vehicle.

64. The stall-to-stop or vehicle slow-down system of claim 63 further including a global positioning system (GPS) receiver adapted for communication with at least one satellite.

65. The stall-to-stop or vehicle slow-down system of claim 63 wherein the at least one satellite or the at least one cell phone tower is capable of signal communication with the transceiver on the vehicle that is two-way signal communication.

66. The stall-to-stop or vehicle slow-down system of claim 63 wherein the specifics of the distress event parameters is the location of the vehicle.

67. The stall-to-stop or vehicle slow-down system of claim 63 wherein the distress signal is made by an owner of the vehicle.

68. The stall-to-stop or vehicle slow-down system of claim 63 wherein the distress signal is made by police.

69. The stall-to-stop or vehicle slow-down system of claim 63 wherein the monitoring equipment communicates automatically with the transceiver upon receipt of the signal caused by the distress signal.

70. The stall-to-stop or vehicle slow-down system of claim 63 wherein the distress signal is a signal that gives the location of the vehicle.

71. The stall-to-stop or vehicle slow-down system of claim 63 wherein the distress signal is a signal that gives information on the identity of the user of the vehicle.

72. The stall-to-stop or vehicle slow-down system of claim 63, wherein a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom the monitoring equipment and a central processing unit (CPU) or the transceiver on the vehicle.

73. A stall-to-stop and lock disabling system for slowing and stopping a vehicle and locking passengers inside the vehicle wherein the vehicle includes a transceiver carried by the vehicle, a stall-to-stop system and a lock disabling system that are interconnected to the electromotive system and the locking mechanism of the vehicle, comprising:

US RE43,891 E

25

26

monitoring equipment located at a determinate monitoring site that is remote from the vehicle and that is free from contact with the vehicle;

at least one satellite or at least one cell phone tower capable of sending and receiving signals to and from the monitoring equipment and the transceiver of the vehicle such that the

at least one satellite or at least one cell phone tower capable of two-way signal communication with the transceiver of the vehicle; and

whereupon a distress signal made due to unauthorized use of the vehicle sent from a mobile, portable, or fixed communication device to a cell phone tower or a satellite causes a signal to be sent to the monitoring equipment for exchanging information on the problem situation, location, and speed of the vehicle resulting in the monitoring equipment transmitting a signal to a cell phone tower or a satellite for communicating with the transceiver of the vehicle for executing commands that actuate the stall-to-stop system and the lock disabling

system for stopping the vehicle and locking the vehicle so that anyone inside the vehicle must remain inside the vehicle or locking the vehicle ignition to prevent the restarting of the vehicle;

wherein the communication device is remote from the vehicle and is free from contact with the vehicle.

74. The stall-to-stop or vehicle slow-down and lock disabling system of claim 73, further including a global positioning system (GPS) receiver adapted for communication with at least one satellite.

75. The stall-to-stop and lock disabling system of claim 73, wherein a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom the monitoring equipment and a central processing unit (CPU) or transceiver on the vehicle.

* * * * *

# Exhibit G

US008334761B2

(12) **United States Patent**
    Golden

(10) Patent No.: **US 8,334,761 B2**
(45) Date of Patent: **Dec. 18, 2012**

(54) **MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM**

(76) Inventor: **Larry Golden**, Mauldin, SC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/802,001**

(22) Filed: **May 27, 2010**

(65) **Prior Publication Data**

US 2011/0178655 A1 Jul. 21, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 12/657,356, filed on Jan. 20, 2010, now Pat. No. 8,106,752.

(51) Int. Cl.
*B60R 25/10* (2006.01)
*G06F 19/00* (2006.01)

(52) U.S. Cl. ......... 340/426.11; 340/426.12; 340/426.16; 701/115

(58) Field of Classification Search ............ 340/426.11, 340/426.12, 426.13, 426.16, 426.17, 426.18, 340/426.19, 426.25, 425.5, 521, 539.1, 539.11, 340/429.18, 429.19; 701/29, 32, 29.1, 36, 701/115

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,385,469 A | 5/1983 | Scheuerpflug | |
| 4,544,267 A | 10/1985 | Schiller | |
| 4,586,441 A | 5/1986 | Zekich | |
| 4,792,226 A | 12/1988 | Fishbine et al. | |
| 5,222,152 A | 6/1993 | Fishbine et al. | |
| 5,223,844 A | 6/1993 | Mansell et al. | |
| 5,233,404 A | 8/1993 | Lougheed et al. | |
| 5,557,254 A | 9/1996 | Johnson | |
| 5,682,133 A | 10/1997 | Johnson | |
| 5,766,956 A | 6/1998 | Groger et al. | |
| 5,938,706 A | 8/1999 | Feldman | |
| 5,963,657 A | 10/1999 | Bowker et al. | |
| 5,986,543 A | 11/1999 | Johnson | |
| 6,049,269 A * | 4/2000 | Byrd et al. | 340/426.21 |
| 6,078,265 A | 6/2000 | Bonder et al. | |
| 6,262,656 B1 * | 7/2001 | Byrd et al. | 340/426.21 |
| 6,271,745 B1 | 8/2001 | Anzai et al. | |
| 6,374,652 B1 | 4/2002 | Hwang | |
| 6,411,887 B1 * | 6/2002 | Martens et al. | 701/115 |

(Continued)

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 11/397,118; mailed Nov. 14, 2007; Alexandria, Virginia, USA; pp. 1-12; (12 pages).

(Continued)

*Primary Examiner* — Van T. Trieu

(57) **ABSTRACT**

A multi sensor detection and disabling lock system includes detector cases for holding interchangeable detectors that sample for chemical, biological and radiological compounds, agents and elements, with each detector case disposed in or upon the monitored product whereupon light alarm indicators (color coded) on the detector case light up when a specific compound or agent is detected whereupon the detector case transmits detection information to a monitoring computer terminal and transmits a signal to a lock disabler engaged to the product to lock or disable the product's lock thereby preventing untrained, unauthorized and unequipped individual's from gaining access and entry to the product, and also preventing further contamination of the area. An authorized individual resets the detection system, and the system's power source is electrical, battery or computer generated. In addition, the detection system can be interconnected to surveillance towers scanning detector cases disposed at seaport docks, freight depots and rail terminals for monitoring containers being prepared for shipment or sitting on docks for long periods of time.

9 Claims, 13 Drawing Sheets



**US 8,334,761 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,470,260 | B2 * | 10/2002 | Martens et al. | 701/115 |
| 6,542,076 | B1 | 4/2003 | Joao | |
| 6,542,077 | B2 | 4/2003 | Joao | |
| 6,588,635 | B2 | 7/2003 | Vor Keller et al. | |
| 6,610,977 | B2 | 8/2003 | Megerie | |
| 6,613,571 | B2 | 9/2003 | Cordery et al. | |
| 6,628,813 | B2 | 9/2003 | Scott et al. | |
| 6,647,328 | B2 | 11/2003 | Walker | |
| 6,738,697 | B2 | 5/2004 | Breed | |
| 6,923,509 | B1 | 8/2005 | Barnett | |
| 6,980,092 | B2 * | 12/2005 | Turnbull et al. | 340/425.5 |
| 6,988,026 | B2 | 1/2006 | Breed et al. | |
| 7,005,982 | B1 | 2/2006 | Frank | |
| 7,034,683 | B2 | 4/2006 | Ghazarian | |
| 7,103,460 | B1 * | 9/2006 | Breed | 701/29 |
| 7,109,859 | B2 * | 9/2006 | Peeters | 340/539.11 |
| 7,116,798 | B1 | 10/2006 | Chawla | |
| 7,243,945 | B2 | 7/2007 | Breed et al. | |
| 7,346,439 | B2 * | 3/2008 | Bodin | 701/36 |
| 7,385,497 | B2 | 6/2008 | Golden | |
| 7,397,363 | B2 | 7/2008 | Joao | |
| 7,636,033 | B2 | 12/2009 | Golden | |
| 2003/0206102 | A1 * | 11/2003 | Joao | 340/539.1 |
| 2004/0107028 | A1 | 6/2004 | Catalano | |
| 2005/0195069 | A1 | 9/2005 | Dunand | |
| 2006/0250235 | A1 * | 11/2006 | Astrin | 340/539.22 |
| 2008/0122595 | A1 | 5/2008 | Yamamichi | |
| 2008/0234907 | A1 | 9/2008 | Labuhn | |
| 2010/0159983 | A1 | 6/2010 | Golden | |

## OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; mailed Apr. 9, 2009; Alexandria, Virginia, USA; pp. 1-7; (7 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; mailed Jul. 30, 2009; Alexandria, Virginia, USA; pp. 1-9; (9 pages).

United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/155,573; mailed Oct. 28, 2009; Alexandria, Virginia, USA; pp. 1-5; (5 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/657,356; mailed Jul. 12, 2010; Alexandria, Virginia, USA; pp. 1-14; (14 pages).

United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/657,356; mailed Mar. 10, 2011; Alexandria, Virginia, USA; pp. 1-4; (4 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 13/065,837; mailed Jul. 18, 2011; Alexandria, Virginia, USA; pp. 1-9; (9 pages).

A newspaper article of Mr. Melvin Sullivan and his family that references the date, Mar. 6, 2001.

A letter of response Mr. Sullivan received from Pfeiffer & Gantt, PA, dated Sep. 16, 2002.

A "Certificate of Existance" Bright Idea Inventor, LLC. Nov. 6, 2002. Operating Agreement of Bright Idea Inventor, LLC received from Pfeiffer & Gantt, PA, dated Nov. 13, 2002.

A letter of response Golden received from the Honorable Congressman from Maryland, Elijah E. Cummings, dated Dec. 16, 2002.

A newspaper article of Mr. Melvin Sullivan and Mr. Larry Golden, dated, Feb. 27-Mar. 5, 2003.

A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated May 21, 2003.

A letter of response Golden received from the Office of the Vice President, Dick Cheney, dated Jun. 3, 2003.

A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated Oct. 1, 2003.

A letter of response Golden received from the Honorable Senator from South Carolina, Lindsey O. Graham, dated Oct. 21, 2003.

A letter sent to the President of the United States George W Bush, the President's Cabinet, the United States Senate and the Congressional Black Caucus, date May 23, 2005.

On Nov. 17, 2005, an "Inventor's Official Record of Invention", was filed in my name (Golden) at "The Law Office of David P. Gaudio, P.C.; the Inventors Network."

On Aug. 23, 2005, "Disclosure Document Registration".

On Apr. 5, 2006, "Patent Application" was filed in my name (Golden) at the United Staets Patent & Trademark Office in Washington, D.C.

On Jun. 6, 2008, the "Continuance-In-Part, (CIP) Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.

On Jan. 20, 2010, a "Continuation Application" (U.S. Appl. No. 12/657,356) was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.

Reissue of U.S. Patent No. 7,636,033; "SWEAR BACK"; in accordance to Title 37—Code of Federal Regulations Patents, Trademarks, and Copyrights; Apr. 8, 2011.

Reissue of U.S. Patent No. 7,636,033; "SWEARBACK—History of Work"; Apr. 8, 2011.

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and mailing date Jan. 13, 2012, pp. 1-34, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; (34 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Dec. 2, 2011, pp. 1-27, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; (27 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Nov. 1, 2011, pp. 1-18, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; (18 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and mailing date Feb. 22, 2012, pp. 1-38, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; (38 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Feb. 22, 2012, pp. 1-25, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; (25 pages).

* cited by examiner



Fig. 1

Fig. 2



**Fig. 3a**



**Fig. 3b**



**Fig. 4**



**Fig. 5**

Case 3:25-cv-00434-LS   Document 1-8   Filed 09/18/25   Page 207 of 291



**Fig. 6**

**Fig. 7**



**Fig. 8**



**Fig. 9**



**Fig. 10**



**Fig. 11**



**Fig. 12**

**Fig. 13**



Fig. 14

Fig. 15

Case 3:26-cv-00634-JCS   Document 18-1   Filed 02/23/25   Page 213 of 291



Fig. 16

Case 6:25-cv-00434-JLS    Document 18-8    Filed 09/28/25    Page 214 of 291



**Fig. 17**



**Fig. 18**



**Fig. 19**

US 8,334,761 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM

This application is a continuation of U.S. patent application Ser. No. 12/657,356 titled "Multi Sensor Detection, Stall to Stop, and Lock Disabling System" filed on now U.S. Pat. No. 8,106,752 Jan. 20, 2010, the complete subject matter of which is incorporated by reference herein in its entirety. This application is a continuation of U.S. patent application Ser. No. 12/657,356 and names as the inventor, Larry Golden, being the same inventor named in the aforedescribed prior application having the Ser. No. 12/657,356, and thus this application constitutes a continuation as set forth in 35 U.S.C. 120 and claims the effective filing date of prior application having Ser. No. 12/657,356.

## FIELD OF THE INVENTION

The present invention pertains to anti-terrorist detection and prevention systems, and more particularly pertains to a disabling lock mechanism combined with a chemical/biological/radiological detection system for use with products grouped together by similar characteristics in order to prevent unauthorized entry, contamination and terrorist activity.

## BACKGROUND OF THE INVENTION

Terrorist activity is a continuous, daily, worldwide threat to the stability, prosperity, security and peace within nations and between and among nations. Its danger lies in its arbitrary destructiveness as much as in its unpredictability, and the constant threat of terrorist activity compels measures and actions that cause strain and contention in free, democratic societies as security concerns and civil liberty concerns must be balanced so that both public safety and civil liberties are maintained. Safety and security concerns can be addressed through numerous proactive steps and measures, many of which cause only minimal interference with and disruption of the daily routines of work, travel, commerce and entertainment. However, because modern industrial societies afford almost limitless places, locations, and opportunities for terrorist activities, no safety measure or security protocol will be foolproof, but many security measures, systems and protocols can be implemented that greatly minimize specific threats through fingerprint identification procedures, chemical, biological, and radiological hazard detections, bomb and explosive detection, and controlling the access to everything from shipping containers to school lockers. Thus, the prior art discloses a wide range of security measures and systems.

For example, the Fishbine et al. patent (U.S. Pat. No. 4,792, 226) discloses an optical fingerprinting system that includes an optics/processor unit, a video monitor, a data terminal, and a printer for collecting and storing data characteristics of all ten individual fingerprints for printing demographic information and fingerprint images as desired on a standard booking or applicant card.

The Schiller patent (U.S. Pat. No. 4,544,267) discloses a finger identification unit that includes a fingerprint scanning apparatus using a collimated beam of light to interrogate the fingerprint of a finger placed against a platen so that successive scan positions produce signals containing fingerprint information.

The Fishbine et al. patent (U.S. Pat. No. 5,222,152) discloses a portable fingerprint scanning apparatus for optically scanning and recording fingerprint images and wirelessly transmitting such images to a mobile processing unit for verification and background checking.

The Lougheed et al. patent (U.S. Pat. No. 5,233,404) discloses an optical scanning apparatus that uses a linear charge coupled device (CCD) for recording the image of a fingerprint on the viewing surface.

The Groger et al. patent (U.S. Pat. No. 5,766,956) discloses a diode laser based sensor for undertaking optical, chemical, immunological or nucleic acid-based assay or other chemical analysis.

The Feldman patent (U.S. Pat. No. 5,938,706) discloses a multi element security system for preventing the unauthorized use of an automotive vehicle, and which includes numerous locking and control features interconnected via an onboard cpu.

The Bowker et al. patent (U.S. Pat. No. 5,963,657) discloses a safety access control for doors, handles, locks, etc., wherein the surface relief of a finger is read and verified to either allow or prevent access by the individual to the door, handle, lock, etc.

The Bonder et al. patent (U.S. Pat. No. 6,078,265) discloses a fingerprint identification security system wherein a key lock operated security system utilizes the fingerprint of the individual to control user access to the security system, such as the ignition system of an automotive vehicle.

The Anzai et al. patent (U.S. Pat. No. 6,271,745 B1) discloses a keyless authorization system for use of a motor vehicle that includes fingerprint reading units located on the exterior or interior of the motor vehicle and which is coupled to a control unit for scanning, comparing and matching fingerprints to allow or disallow access to the motor vehicle.

The Hwang patent (U.S. Pat. No. 6,374,652 B1) discloses a fingerprint-activated doorknob in which a detecting sensor for a fingerprint is placed on the doorknob for measuring and searching the fingerprint against previously stored fingerprint inputs to control access to the door.

The Vor Keller et al. patent (U.S. Pat. No. 6,588,635 B2) discloses a safety holster for a firearm that includes a pivotally mounted retaining member and a fingerprint sensor for scanning fingerprint information so that only authorized users can withdraw the firearm from the holster.

The Cordery et al. patent (U.S. Pat. No. 6,613,571 B2) discloses a method and system for detecting biological and chemical hazards in the mail that includes sensors placed within the mail box for sampling and testing ambient air and so that mail can be safely transported through the mail system.

The Nagata patent (U.S. Pat. No. 6,628,213 B2) discloses a coding method for digital signal coding and decoding that includes a CMI (code-marked inversion) method of signal coding.

Nonetheless, despite the ingenuity of the above devices, methods, and systems, there remains a need for a multidetector and disabling lock system for use with various types of products collected together by common characteristics into product groupings for detecting chemical, biological and radiological agents and compounds and for selectively disabling and activating the product locks thereby preventing unauthorized entry and further contamination and preventing and thwarting terrorist activities.

## SUMMARY OF THE INVENTION

The present invention comprehends a chemical/biological/radiological/nuclear/explosive/human/contraband detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance

US 8,334,761 B2

3

and weapons. The products grouped into what may be referred to as Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars, (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans, UAVs, UGVs, and utility vehicles; the products grouped into what may be referred to as Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, speed sensors, biometric sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems, detection of humans, detection of contraband, temperature, and shock levels; the products grouped into what may be referred to as Product grouping 3 (detector case: modified and adapted) include, but are not limited to, cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, eyeglass, briefcases, detector cases of locks, detector cases of tags, detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to; the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop PCs, notebook PCs, laptops, satellite cell phones, cell phones, UMTS phones, PDAs, LCD monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds; the products grouped into what may be referred to as Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS), Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS); the products grouped into what may be referred to as Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature. The products grouped into what may be referred to as Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, HAZMAT, CIA, FBI, Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside or outside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unautho-

4

rized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements. In addition, the multi sensor detection and lock disabling system is capable of transmitting a signal to lock or disable a lock on the product, and is also capable of transmitting signals to a monitoring computer terminal or PC so that appropriate defensive and safeguarding actions can be undertaken and an authorized individual can disarm and reset the locking system and the multi sensor detection system. The detector case includes a power source (battery or electrical), interior compartments, Internet and GPS connections and a cpu interconnected with the Internet and GPS connections, and also interconnected with one or more off site monitoring computer terminals or PCs. The detector case includes one or more light alarm indicators that are externally visible and that light up when the chemical, biological, or radiological agent or compound is detected, and the light alarm indicators (which can be indicator lights or panels on the front of the detector case) can be color coded for denoting the specific agent or compound detected, i.e., separate and distinct colors for indicating detection of the chemical, biological, or radiological agent or compound.

The detector case is designed to hold within the interior compartments one or more interchangeable detectors, and each detector is adapted and set up to sample a specific compound or agent. Each detector includes a sound alarm, a sensor, a light alarm, and a readings panel, and is electrically interconnected (either by wire or wirelessly) to the cpu of the detector case so that information regarding the detection of the particular agent or compound can be conveyed from the detectors to the detector case cpu. Each detector can also be used as a manual, stand-alone hand held scanner.

The multi sensor detection and lock disabling system can be interconnected to a surveillance watchtower, as well as monitoring computer terminals or PCs, with the watchtower scanning shipping and cargo crates and containers being prepared for shipment or sitting for extended periods of time on a dock or at a port, at a railway site, or at an industrial storage facility. The watchtower will scan the cargo and shipping crates and containers for the light alarm indicators on detector cases that are mounted in or upon the crates and containers, and thus continuous security surveillance of the crates and containers can be maintained.

An enhanced version of the multi sensor detection and lock disabling system can be employed to prevent car and vehicle bombings. Coupling the multi sensor detection and lock disabling system with satellite service will enable the detection system to detect explosives and transmit an alert signal by satellite to monitoring equipment at a monitoring site. Upon receiving the alert signal at the monitoring site the monitoring equipment activates a stall-to-stop process for disabling the air, fuel, electrical and/or computer system of the vehicle. Moreover, upon receiving the alert signal at the monitoring site the car or vehicle will be locked by transmission of a satellite signal that disables the vehicle's electrical and ignition system thereby preventing escape of the terrorist.

It is an objective of the present invention to provide a multi sensor detection and disabling lock system for securing news racks and vending machines in order to prevent theft, unauthorized use and terrorist activity.

It is another objective of the present invention to provide a multi sensor detection and disabling lock system for prevent-

US 8,334,761 B2

5

ing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist solutions.

It is still yet another objective of the present invention to provide a multi sensor detection and disabling lock system that is capable of disabling an existing lock or activating a lock inside any of the products of the product grouping lists when a detector or sensor of the system is activated.

It is still yet a further objective of the present invention to provide a multi sensor detection and disabling lock system wherein the disabling lock system prevents the unauthorized entry, access and further contamination of the products included in the several product groupings.

A still further objective of the present invention is to provide a multi sensor detection and lock disabling system that utilizes a multi-task device for preventing terrorist activity to vulnerable products that are collected or arranged by product grouping categories.

Yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system to secure cargos and containers, especially cargo and shipping containers, against chemical, biological, radiological and nuclear terrorist activity.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system capable of detecting chemical, biological and radiological agents and compounds.

Still yet another objective of the present invention is to provide a multi sensor detection and disabling lock system that includes interchangeable detectors that operate in conjunction to detect chemical, biological and radiological agents and compounds.

Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.

Another objective of the present invention is to provide a multi sensor detection and disabling lock system that accurately and reliably detects harmful agents, compounds and elements, and prevents the placement and storage of weapons and bombs in the range of storage containers and facilities currently available.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners.

These and other objects, features, and advantages will become apparent to those skilled in the art upon a perusal of the following detailed description read in conjunction with the accompanying drawing figures and appended claims.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the primary features of the system which include a detector case, several interchangeable detectors, an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler;

FIG. 2 is a front elevation view of the multi sensor detection and lock disabling system of the present invention illustrating one of the interchangeable detectors first shown in FIG. 1;

FIG. 3a is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the

6

mounting of one lock disabler to the lock of a product, such as a container, and disengaged from the lock of the container;

FIG. 3b is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the engagement of the lock disabler to the lock of the product for locking or disabling the lock of the product so that unauthorized access is prevented;

FIG. 4 is a side elevation view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case mounted to the product, such as the container, with the light alarm indicators externally visible;

FIG. 5 is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of detector cases with a surveillance watchtower and a monitoring PC terminal;

FIG. 6 is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the placement of detector cases upon containers different from the containers of FIG. 5, and wherein the detectors case are interconnected to a surveillance watchtower and a monitoring PC terminal;

FIG. 7 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one automatic/mechanical lock disabler to the lock of a standalone news rack;

FIG. 8 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating one interchangeable detector placed within the standalone news rack;

FIG. 9 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case having color coded front panels for specifically indicating the agents, compounds or elements that have been detected;

FIG. 10 is a rear elevation view of the multi sensor detection and lock disabling system of the present invention illustrating the GPS, Internet and power source connections;

FIG. 11 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector with the detector case and the steps undertaken by the system when an agent or compound is detected;

FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a standalone scanner for detecting an agent or compound;

FIG. 13 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector case with the automatic/mechanical lock disabler for activating the lock disabler upon detection by the system of an agent or compound;

FIG. 14 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating interconnection of the detector case with the fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public upon detection of the agent or compound;

FIG. 15 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the system with a surveillance watchtower and a monitoring PC or computer terminal for monitoring containers, such as shipping or cargo containers, that may sit for extended time periods on docks, at rail yards, and at industrial storage facilities;

US 8,334,761 B2

7

8

FIG. 16 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the integration of the detection system with a satellite and monitoring equipment at a monitoring site for detecting explosives placed in a vehicle and then transmitting signals to the satellite and then to the monitoring site for disabling and locking the vehicle;

FIG. 17 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case;

FIG. 18 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of a GPS satellite, a monitoring site and a cell phone tower for communicating to and with an electronic device such as a laptop computer or a cell phone for transmitting signals to a vehicle for activating an onboard stall-to-stop device for bringing the vehicle to a halt; and

FIG. 19 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the use of a GPS satellite in conjunction with the monitoring site and monitoring equipment to relay commands and signals to the cpu or transceiver of the vehicle for stopping or locking the vehicle in response to a signal that a certain type of event (detection of a bomb, engine failure or malfunction or unauthorized use) has occurred or is in process

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Illustrated in FIGS. 1-19 is a multi sensor detection and lock disabling system 10 for preventing terrorist activity by monitoring, detecting, and securing those critical areas, sites, and facilities vulnerable to terrorist activity. The first step is the identification of critical areas, sites, locations and facilities that are vulnerable to terrorist activity as convenient places to store and plant explosives and bombs and spread biological, chemical or radiological agents and compounds, followed by the disposition of the multi sensor detection and lock disabling system 10 for monitoring, detecting, and securing the particular location or site. Vulnerable sites, locations, facilities and areas are nearly limitless in their variety; in order to categorize the protection the present invention provides an anti-terrorist product grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design, and products presenting the same or similar security problems are grouped together with the multi sensor detection and lock disabling system 10 for preventing terrorist activity. For example, two preferred product groupings can be Product Grouping I: cargo containers, shipping containers, cargo planes, freight train cars, tractor trailers, mail carriers (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans and utility vehicles. Product Grouping II: chemical detectors, biological detectors, radiological detectors, nuclear detectors, motion sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems. In addition to grouping products together by features, designs and materials, the multi sensor detection system 10 includes a lock disabling capability for disabling an existing lock or activating a lock on or inside any of the aforementioned products when a detector or sensor of the system is activated. The lock disabling feature is a crucial component of the invention in so far as it prevents unauthorized, unequipped or untrained individuals from gaining access and entry to the site and causing further contamination of the site.

As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one—and preferably many—detector case 12 that can be placed in, on, upon or adjacent the product, such as the shipping containers 14 of FIGS. 4 and 5 resting upon a platform 16 or the cargo container 18 of FIG. 6 sitting upon a seaport dock or pier 20. The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30. The rear side 30 has connections or contacts that can include an Internet connection 32, a GPS connection 34 and a power connection 36 for a power source. The power source for the detector system 10 can be any conventional battery or electrical source. The detector case 12 includes an interior chamber divided into a number of compartments 38 for holding therein agent or compound detection means hereinafter further described. A cpu 40 is mounted within the detector case 12 and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates with a monitoring site and monitoring equipment. The front side 28 of the detector case 12 includes indicator means for visually indicating that a specific agent, compound or element has been detected. The indicator means can include color coded indicator lights 42 in panel form, as shown in FIG. 9, with each indicator light panel 42 lighting up with a specific color corresponding to the detection of a specific agent or compound; or color coded indicator lights 44, as shown FIG. 1, that correspond to and individually light up on the detection of a specific agent or compound (chemical, biological, or radiological).

As shown in FIGS. 1, 2 and 9-13, the multi sensor detection and lock disabling system 10 includes a plurality of detectors 46 with each detector 46 adapted for and set up to sample for a specific agent or compound (biological, chemical, or radiological); and the detectors 46 are interchangeable for adapting to the needs and demands of future technology. The detectors 46 can also be used as standalone scanners. In the preferred embodiment of the invention, at least three detectors 46 are placed within the detector case 12 with one detector 46 for specifically sampling biological agents or compounds, one detector 46 for sampling chemical agents or compounds, and one detector 46 for sampling radiological agents or compounds. The detectors 46 are interconnected to the cpu 40 of the detection system 10 by conventional connections that can be wire or wireless for transmitting the appropriate signals to the cpu 40 upon detection of the particular agent or compound. As shown in FIG. 2, each detector 46 includes on its front plate or facing surface a sound alarm indicator 48, a readings panel 50 comprising a plastic shield and LED lights for displaying the various read-out messages, a sensor 52 for detecting the specific agent, element or compound, and a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand alone scanner. Each detector 46 includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu 40 of the detector case 12.

As shown in FIGS. 1, 3a, 3b, 9, and 13-15, used in conjunction with the multi sensor detection and lock disabling system 10 is at least one automatic/mechanical lock disabler 56—and depending upon the number of products being monitored there can be one lock disabler 56 for each product. The automatic/mechanical lock disabler 56 is physically connected to the detector case 12 by a wire or cable 58 for

US 8,334,761 B2

9

receiving signals therefrom for disabling an existing lock or activating a lock inside a product to prevent access to the product. By way of example, FIG. 3a shows the automatic/mechanical lock disabler 56 mounted—by any conventional means—to the lock 60 of the shipping container 14 shown in FIGS. 4 and 5 and connected by wire 58 to the cpu 40 of the detector case 12. The lock disabler 56 is in the non-activated or disengaged state in FIG. 3a. FIG. 3b shows the automatic/mechanical lock disabler 56 mounted to the lock 60 of the shipping container 14 and in the activated or engaged state after detection of an agent or compound by the system 10 thereby for locking or disabling the lock 60 of the shipping container 14 and preventing unauthorized entry and access by unauthorized, untrained and unequipped individuals. In FIGS. 3a and 3b the lock 60 secures doors of the shipping container 14 that can be slidably or pivotally opened and closed.

In addition to the automatic/mechanical lock disabler 56, the multi sensor detection and lock disabling system 10 can also utilize a fingerprint biometric lock with disabler 62 as shown in FIGS. 1 and 14. The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40 of the detector case 12 for receiving transmissions therefrom after detection of an agent or compound has occurred so that the lock on the product can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56 by turning the manual lock disabler 66. The fingerprint biometric lock with disabler 62 is mounted to the lock of the product in a manner similar to the mounting of the automatic/mechanical lock disabler 56 that is shown in FIGS. 3 and 3b.

FIGS. 4 and 5 show one manner of disposition or placement of the detector case 12 in relation to the product, i.e., the shipping container 14, with the color coded indicator lights 42 externally viewable; FIG. 5 shows a number of shipping containers 14 each equipped with a detector case 12 and integrated with elements hereinafter further described for continuously monitoring the shipping containers 14 as they sit for an extended period of time on the truck or rail platform 16. FIG. 6 illustrates several cargo containers 18 sitting on the shipping dock or pier 20, with each cargo container 18 having a detector case 12 mounted thereon and integrated with and monitored by elements shown in FIG. 5 and hereinafter further described.

FIG. 7 illustrates a typical product from product grouping 1 that is monitored by the multi sensor detection and lock disabling system 10 of the present invention; specifically, FIG. 7 shows a news rack 68 with one automatic/mechanical lock disabler 56 mounted to and interconnected with the locking mechanism of the news rack 68. As long as there is no detection of any agent or compound, the lock disabler 56 is in the disengaged state, and the individual can deposit the coin amount in the chute and then freely open the glass panel 70 by the handle 72 for removing a paper. However, the lock disabler 56 would be activated upon detection of the harmful agent or compound and receipt of a signal from the cpu 40 for locking or disabling the locking mechanism thereby denying access to the interior of the news rack 68 from all untrained, unauthorized and unequipped individuals.

FIG. 8 illustrates one detector 46 disposed within the news rack 68 and which is visible through the panel 70 for detecting one specific agent, compound or element. The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment.

10

FIG. 11 illustrates a representative schematic 74 for describing the signal transmission process from the detector 46 to the cpu 40 of the detector case 12. The external stimulus 76 would be the chemical, biological or radiological agent or compound. If there is no detection of the agent or compound, the detector 46 will stay in the sensing mode 78. However, detection of the specific agent will trigger the sound alarm 80 and the light alarm 82, and instant transmittal of a signal to the cpu 40. The readings 84 can be stored by the cpu 40 for verification and future review and evaluation. After all the appropriate corrective and preventative measures have been undertaken by the trained and authorized personal, and the site has been cleansed of the contamination, authorized and equipped personal can then reset 86 the system 10.

FIG. 12 illustrates a representative schematic 88 for the detector 46 when used as stand-alone scanner. The detector 46 undergoes the same essential steps as illustrated in FIG. 11, with the exception of the signal transmission to the cpu 40. The detector 46 remains in detection mode 78 until an agent is detected, and then the various functions—light alarm 82, sound alarm 80, storage of readings 84, and, after the appropriate security and safety steps have been carried out by authorized personal, detector reset 90 by authorized personal can occur thereby placing the detector 46 back in detection or sensing mode 78.

FIG. 13 is a representative schematic 92 that illustrates the steps undertaken by the system 10 to lock or disable a lock, such as the lock 60 for the shipping container 14 shown in FIGS. 3a and 3b. Upon detection of the agent (chemical, biological, radiological) the alarm light indicators 42 or 44 will light up providing external indication that an agent has been detected. In addition, the system 10—the cpu 40—will transmit a lock/disable lock signal 94 to the automatic/mechanical lock disabler 56 to lock or disable the lock on the product, such as the lock 60 on the shipping container 14 of FIGS. 3a-5. This prevents unauthorized, unequipped, or untrained individuals from entering or gaining access to the product for which a dangerous and perhaps lethal agent has been detected. After the proper authorities and authorized personal have been notified and all the appropriate security, preventative and clean up measures have been undertaken, the authorized individual can perform the disarm and reset function 96 for the system 10 placing the system 10 in back in the detection mode 98.

FIG. 14 is a representative schematic 100 illustrating the use of the fingerprint biometric lock with disabler 62 with the system 10. Upon detection of the agent or compound by the detector, the various alarms would sound and light up (shown in previous figures), and the cpu 40 would then transmit a signal to the fingerprint biometric lock with disabler 62 to lock or disable the lock on the product, such as the lock 60 on the shipping containers 14 shown in FIGS. 3a-5. The detector containers 60 would remain locked and in an access denied mode 101 should an attempt be made to gain access to the container 60 by opening the lock 60 with an unauthorized fingerprint. However, a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock 60 of the shipping container 14. The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety, cleanup, and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108.

FIG. 15 is a schematic representation 110 that illustrates the integration of a surveillance watchtower 112 and a monitoring terminal or PC 114 for monitoring products such as the shipping containers 14 or cargo containers 16 that sit for

US 8,334,761 B2

11

extended periods of time at docks, piers 20, truck terminals, rail yards, shipping platforms 16 and industrial sites as shown in FIGS. 5 and 6. The watchtower 112 would maintain continuous surveillance over a number of shipping containers 60, for example, with detector cases 12 mounted in or on each container 14 and set in detection mode 116 with one or more detectors 46 disposed in each detector case 12. The watchtower 112 would continuously scan for light alarm indicators 42 and 44 on the products, such as the containers 14 or 18, and the watchtower 112 would be interconnected and integrated with the monitoring terminal or PC 114. Upon detection 118 of an agent or compound in one or more of the shipping containers 14, the appropriate light alarm indicators 42 or 44 would light providing visible confirmation of the detection of the specific agent or compound. The cpu 40 would transmit a lock/disable signal 120 to the lock 60 on each respective shipping container 14 to lock or disable the lock 60 thus preventing access to that respective shipping container 14. In addition, signal transmissions would be sent to the monitoring terminal or PC 114 (which could be off site) thereby alerting authorized security personal of the contamination event. With the information received at the monitoring terminal 114, authorized personal would then be notified and dispatched to the area to undertake the appropriate safety and cleanup measures 122. Such measures would also include disarming the lock disabling system in order to gain access to the shipping container 14. After all the cleanup and security measures are completed by the trained and properly equipped authorities, the detection system and the lock disabling feature would reset 124 and the detection system would again be placed in detection mode 116.

FIG. 16 is a schematic representation 126 that illustrates an enhanced version of the multi sensor detection and lock disabling system 10 for preventing car and vehicle attacks and bombings. The lock disabling system 10 would be interconnected to the locking system and mechanism 128 of the vehicle 130. In addition, a stall to stop disabling link 132 can be made with the fuel, air, and electrical system 134 of the vehicle 130. The enhanced version incorporates a satellite 136 for signal receipt and transmission from the vehicle 130 in which the detector system 10 is placed to a monitoring site and monitoring equipment 138. As shown in FIG. 16, a detection signal 140 would be sent to the satellite 136 by the detection system 10 upon detection of a bomb or explosive 142 hidden in the vehicle 130. The satellite 136 would then transmit an alert signal 144 to the monitoring site 138 with the signal 144 containing the relevant data to evaluate the nature of the threat. The monitoring site 138 would then transmit a stall to stop signal 146 to the detection system 10 to lock the vehicle 130 and/or disable the electrical system of the vehicle 130 thereby disabling the vehicle 130, preventing access to the vehicle 130 by locking the vehicle 130, and preventing any terrorist in the vehicle 130 from escaping.

The detector case 12 can be modified and adapted for inclusion with cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, and briefcases. In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring.

The system 10 and the watchtower 112, along with the satellite 136 and the monitoring site 138 can be adapted or incorporated with cell phone towers and satellites for use with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, or a trans-

12

ceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. The aforementioned telecommunication and radio communication means can be interactive with any type of motive vehicle that includes but is not limited to cars, trucks, vans, SUVs, trains, subways, boats, ships and airplanes, and which is reported stolen, experiences a loss of brakes, or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted to the vehicle and which detection causes an automatic signal transmission or a signal transmission is activated when a call is made to the monitoring station by an authorized person. The authorized individual includes but is not limited to the owner, pilot, conductor, captain, police highway patrol, security guard and military personnel to the monitoring equipment for activating a vehicle slowdown or stall-to-stop disabling system that similar to the disabling system 126 shown in FIG. 16, or incorporating features of the system 126 shown in FIG. 16, from the monitoring equipment to the vehicle. The activation of the stall-to-stop disabling means or the vehicle slowdown disables or engages the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.

In addition, the basic stall-to-stop disabling means or the vehicle slowdown means and device can be adapted, modified or designed to include: an open bust or open platform for integrating any new and innovative technology; warning lights indicators; sound alarm indicators; voice alarm indicators; a cell phone to transmit to the vehicle a signal for slowing and halting the vehicle; and a lock disabling system or means to lock a thief or terrorist inside the vehicle after a transmission is received or sent. Open bust or open platform also refers to the compatibility of the detector case 12, or the incorporation of its features in cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, briefcases, and suitcases, etc., with other communication, transmission and surveillance systems whereupon the detector case 12, and its features, can be seamlessly integrated with other new and emerging systems and technologies.

Thus, as shown more specifically in FIG. 17, by way of a representative example the features and elements of the detector case 12 are shown as being incorporated into cell phone detector case 150 and associated cell phone monitor 152. The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174. The power source for the cell phone detector case 150 can be any conventional rechargeable battery source or standard electrical power from a standard electrical receptacle or outlet.

As shown in FIG. 17, the cell phone detector case 150 includes one or more sensor/detector units, cells, or components 176 built into and incorporated into the case 150. The detector 176 includes generally disposed at the front 162 of the case 150 the following types of indicators: a sound alarm indicator 178, a readings panel 180, a sensor 182 for detecting one or more specific types of agents, elements, chemicals,

US 8,334,761 B2

15                                                    16

tion between the vehicle and the remote location and that
then causes the at least one control signal to be sent from
the remote location via the communication network that
includes at least one of a cell phone tower and a satellite.

2. The vehicles' stall-to-stop means or the vehicles' slow-down means of claim 1, further including a global positioning system (GPS) receiver adapted for communication with at least one satellite.

3. The vehicles' stall-to-stop means or the vehicles' slow-down means of claim 1, further including a cellular communication device adapted for communication with at least one cell phone tower.

4. The vehicles' stall-to-stop means or the vehicles' slow-down means of claim 1, where-in the at least one control signal is sent from a monitoring device or site.

5. A vehicle adapted for receipt of a signal to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising:

at least one of a brake, a foot peddle, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;

an electrical system in electrical communication with at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a computer system in signal transmission communication with at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a receiver in electrical communication with the electrical system and adapted to receive at least one control signal to activate a stall-to-stop means or vehicle slowdown means;

a receiver in computer communication with the computer system and adapted to receive at least one control signal to activate a stall-to-stop means or vehicle slowdown means; and

wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

wherein the stall-to-stop means or vehicle slowdown means is pre-programmed to automatically activate without any action from a driver of the vehicle and without receiving a signal remote from the vehicle that was generated in response to manual actuation when sensors of navigation, guidance, motion, distance, weight, and/or height obtain sufficient input and are interconnected to the vehicles onboard electrical system and/or computer system for controlling at least one of the brake, a brake override system, an electronic throttle, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor.

6. The vehicles' stall-to-stop means or the vehicles' slow-down means of claim 5, wherein the vehicle is electric, a car, truck, ship, boat, train, or plane.

7. The vehicles' stall-to-stop means or the vehicles' slow-down means of claim 5, wherein the stall-to-stop means or vehicle slowdown means is pre-programmed to automatically activate when it is determined an emergency exist for the vehicle, driver, passenger(s), pedestrians or surrounding environment.

8. The vehicles' stall-to-stop means or the vehicles' slow-down means of claim 5, wherein the stall-to-stop means or vehicle slowdown means is pre-programmed to automatically activate when there is a sensed condition of: vehicle parking, speeding; driving too fast for conditions; construction zone; school zone; accident ahead; brake failure; acceleration/deceleration failure.

9. The vehicles' stall-to-stop means or the vehicles' slow-down means of claim 5, wherein the stall-to-stop means or vehicle slowdown means is pre-programmed to automatically activate when the vehicle moves outside a designated perimeter or zone.

* * * * *

# Exhibit H

# Joint Infringement:

## Formation of Joint Enterprises

## - and -

## Contractual Arrangements



**OFFICE OF THE SECRETARY OF DEFENSE**
5000 DEFENSE PENTAGON
WASHINGTON, DC 20301-5000

AUG 1 0 2022

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
COMMANDERS OF THE COMBATANT COMMANDS
DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT: Use of Non-Government Owned Mobile Devices

References: (a) DoD Instruction 5200.48, "Controlled Unclassified Information," March 6, 2020
(b) DISA Cloud Computing Security Requirements Guide v1R3, March 6, 2017
(c) DoD Instruction 8500.01, "Cybersecurity," October 7, 2019
(d) DoD Instruction 8510.01, "Risk Management Framework (RMF) for DoD Information Technology (IT)," December 29, 2020
(e) DoD Instruction 8520.03, "Identity Authentication for Information Systems," July 27, 2017
(f) DoD Manual 5200.01, Volume 3, "DoD Information Security Program: Protection of Classified Information," July 28, 2020
(g) DoD Chief Information Officer Memorandum, "Mobile Application Security Requirements," October 6, 2017
(h) DoD Chief Information Officer Memorandum, "DoD Mobile Public Key Infrastructure (PKI) Credentials," December 20, 2019
(i) OMB Circular No. A-130, "Managing Information as a Strategic Resource," July 28, 2016
(j) DoD Instruction 5400.11, "DoD Privacy and Civil Liberty Programs," January 29, 2019
(k) DoD Instruction 5015.02, "DoD Records Management Program," August 17, 2017

This memorandum and attachment establish minimum requirements for the use of non-government owned mobile devices (e.g., personally or commercially owned), hereinafter "Approved Mobile Device" (AMD), to store, process, transmit, or display up to Department of Defense (DoD) Controlled Unclassified Information (CUI). This memorandum's scope is limited to mobile device information technology (IT) with mobile operating systems (OS) (e.g., Apple iOS, Android) used to access and process up to DoD CUI (e.g., Impact Level 5 data), as defined in references (a) and (b). Additional guidance will be provided by the DoD Chief Information Officer (CIO) to expand the scope to additional types of non-government owned devices (e.g., laptops, desktops), OS types (e.g., macOS, Windows), and capabilities (e.g., voice applications).

The benefits associated with the use of AMDs must be balanced carefully with associated operations security and cybersecurity risks. This guidance provides technical and programmatic requirements for Components managing and configuring AMDs to store, process, transmit, access, or display DoD CUI. This memorandum does not supersede, cancel, or change existing requirements for safeguarding, storage, handling, or transmission of DoD CUI.

DoD Component Heads and Authorizing Officials, in collaboration with Component CUI Senior Agency Officials and the DoD Senior Information Security Officer, are responsible for safeguarding DoD systems and CUI under their purview in accordance with references (c) and (d).

DoD Components must ensure solutions meet the requirements in the Attachment prior to procurement, testing, and fielding AMDs and associated systems. Previously approved AMD solutions must be compliant with this guidance within one (1) year following the effective date of this memorandum.

My point of contact for this matter is Ms. Sudha Vyas, ████████████████████████
████████████.

Ronald S. Moultrie
Under Secretary of Defense for
Intelligence and Security

John B. Sherman
Chief Information Officer of the
Department of Defense

Attachment:
As stated

2


DoD Components shall ensure proper implementation of the controls outlined in this policy and appendix B. The point of contact for this memorandum is Patricia Janssen,

John B. Sherman

Attachments:
1. References
2. Mobile Application Security Requirements
3. Glossary

2



CHIEF INFORMATION OFFICER

**DEPARTMENT OF DEFENSE**
6000 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-6000

MAY 2 3 2024

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
COMMANDERS OF THE COMBATAN COMMANDS
DEFENSE AGENCIES AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT: DoD UNCLASSIFIED Wireless Mobile Services and Devices Spiral 4

References: (a) DoD Chief Management Officer Memorandum, "Wireless Device Management
Reform," September 28, 2018.
(b) OMB Memorandum M-16-20, "Category Management Policy 16-3: Improving
the Acquisition and Management of Common Information Technology: Mobile
Devices and Services," August 4, 2016.

This memorandum provides guidance to the Department of Defense (DoD) requiring all
Components to procure UNCLASSIFIED wireless mobile services and devices for use within the
50 United States and U.S. territories through a single department-wide contract vehicle - called
Spiral 4 - managed by the Department of the Navy's Wireless Mobility Program Office. This
contract vehicle replaces Spiral 3, which expires on May 7th, 2024, and complies with the OMB
Category Management policy on Mobile Devices and Services to consolidate agency
requirements, fully leverage the Government's buying power, and achieve cost savings.

Effective May 8th, 2024, all DoD Components, will use the Department of Defense
Wireless Services Spiral 4, Indefinite Delivery, Indefinite Quantity, Multiple Award Contracts
(IDIQ MACs) (N00244-24-D-0005, N00244-24-D-0006, N00244-24-D-0007, N00244-24-D-
0008, N00244-24-D-0009, N00244-24-D-0010, and N00244-24-D-0011) with Firm Fixed Price
(FFP) Task Orders for all new purchases. Spiral 4 provides a best value solution, and the
required cyber security profiles, for the procurement of UNCLASSIFIED Wireless Mobility
Telecommunications Services and Devices through a one-year base period and nine one-year
option periods, through May 7th, 2034, with a contract ceiling of $2.67 billion.

The Department of Navy Spiral 4 points of contact are Ms. Juana Perez,
and Ms. Tine Thompson .
The DoD CIO POC is Mr. Mike Taylor, .

John B. Sherman

Attachment:
As stated

cc: Joint Staff (J6)

**CLEARED**
**For Open Publication**

May 24, 2024

Department of Defense
OFFICE OF PREPUBLICATION AND SECURITY REVIEW

## MOBILITY PURCHASES CONSOLIDATION

1. **Action:** To streamline requirements and acquisition processes and enable visibility of wireless usage, inventory, and monthly spend, all organizations are directed to move their mobile services and devices acquisitions to the Department of Defense (DoD) Wireless Services Contracts Spiral 4 vehicle no later than at the end of their current order's period of performance.

2. **Scope and Applicability:**
   a. This memorandum establishes acquisition guidance for all UNCLASSIFIED up to Controlled Unclassified Information (CUI) mobile cellular services and devices in the Continental United States (CONUS) which includes the 50 States and U.S. Territories. Mobile devices are defined as "non-desktop, non-laptop, small form factor wireless end-user devices including hardware" that require cellular and data services.
   b. This memorandum applies to all DoD and Office of the Secretary (OSD) Components ("Components"). Services under this procurement cover usage in the 50 United States and U.S. Territories. This memorandum also applies to Military Members and Federal Civilians stationed within the 50 States and U.S. Territories who travel internationally.

3. **Intended Outcome of this Action:** This action will enable portfolio visibility, demand management, and proactive monitoring. Spiral 4 prices include the use of Telecom Expense Management (TEM) tools. The tool is able to track monthly spend, utilization, devices by category and type, and metrics (e.g. zero-use, overages, OCONUS roaming charges, etc.). In addition, vendors can be asked to provide monthly invoice analysis. Access to the TEM tools at both the Task Order (Customer) and Enterprise levels will empower DoD organizations to increase efficiency and further reduce wireless costs by up to 10% and are available for no additional cost.

Consolidating DoD mobility purchases will provide many benefits, including:
   a. Enabling the Department to leverage volume discounts with vendors;
   b. Standardized price ceilings for the Department;
   c. Streamlined acquisitions for mobile services and devices;
   d. Developing and enforcing consistent Terms and Conditions (T&C) with the vendors;
   e. Increased spend visibility, as well as expense and inventory management across the Department; and
   f. Access to Exhibit Line Items (ELINs) with no additional cost devices and asset refresh.

4. **Primary POC:** DoD Wireless Services Contracts-Spiral 4: Ms. Juana Perez, Procuring Contracting Officer, ███████████████████; and Ms. Tine Thompson, Program Manager, ███████████████. DoD CIO: Mr. Mike Taylor, C3I Wireless and Mobility Branch, ███████████████████.


About | Manage Agreements

## Contributor License Agreements

# Google Individual Contributor License Agreement

In order to clarify the intellectual property license granted with Contributions from any person or entity, Google LLC ("Google") must have a Contributor License Agreement ("CLA") on file that has been signed by each Contributor, indicating agreement to the license terms below. This license is for your protection as a Contributor as well as the protection of Google; it does not change your rights to use your own Contributions for any other purpose.

You accept and agree to the following terms and conditions for Your present and future Contributions submitted to Google. Except for the license granted herein to Google and recipients of software distributed by Google, You reserve all right, title, and interest in and to Your Contributions.

1. Definitions.

   "You" (or "Your") shall mean the copyright owner or legal entity authorized by the copyright owner that is making this Agreement with Google. For legal entities, the entity making a Contribution and all other entities that control, are controlled by, or are under common control with that entity are considered to be a single Contributor. For the purposes of this definition, "control" means (i) the power, direct or indirect, to cause the direction or management of such entity, whether by contract or otherwise, or (ii) ownership of fifty percent (50%) or more of the outstanding shares, or (iii) beneficial ownership of such entity.

   "Contribution" shall mean any original work of authorship, including any modifications or additions to an existing work, that is intentionally submitted by You to Google for inclusion in, or documentation of, any of the products owned or managed by Google (the "Work"). For the purposes of this definition, "submitted" means any form of electronic, verbal, or written communication sent to Google or its representatives, including but not limited to communication on electronic mailing lists, source code control systems, and issue tracking systems that are managed by, or on behalf of, Google for the purpose of discussing and improving the Work, but excluding communication that is conspicuously marked or otherwise designated in writing by You as "Not a Contribution."

2. Grant of Copyright License. Subject to the terms and conditions of this Agreement, You hereby grant to Google and to recipients of software distributed by Google a perpetual, worldwide, non-exclusive, no-charge, royalty-free, irrevocable copyright license to reproduce, prepare derivative works of, publicly display, publicly perform, sublicense, and distribute Your Contributions and such derivative works.

3. Grant of Patent License. Subject to the terms and conditions of this Agreement, You hereby grant to Google and to recipients of software distributed by Google a perpetual, worldwide, non-exclusive, no-charge, royalty-

free, irrevocable (except as stated in this section) patent license to make, have made, use, offer to sell, sell, import, and otherwise transfer the Work, where such license applies only to those patent claims licensable by You that are necessarily infringed by Your Contribution(s) alone or by combination of Your Contribution(s) with the Work to which such Contribution(s) was submitted. If any entity institutes patent litigation against You or any other entity (including a cross-claim or counterclaim in a lawsuit) alleging that your Contribution, or the Work to which you have contributed, constitutes direct or contributory patent infringement, then any patent licenses granted to that entity under this Agreement for that Contribution or Work shall terminate as of the date such litigation is filed.

4. You represent that you are legally entitled to grant the above license. If your employer(s) has rights to intellectual property that you create that includes your Contributions, you represent that you have received permission to make Contributions on behalf of that employer, that your employer has waived such rights for your Contributions to Google, or that your employer has executed a separate Corporate CLA with Google.

5. You represent that each of Your Contributions is Your original creation (see section 7 for submissions on behalf of others). You represent that Your Contribution submissions include complete details of any third-party license or other restriction (including, but not limited to, related patents and trademarks) of which you are personally aware and which are associated with any part of Your Contributions.

6. You are not expected to provide support for Your Contributions, except to the extent You desire to provide support. You may provide support for free, for a fee, or not at all. Unless required by applicable law or agreed to in writing, You provide Your Contributions on an "AS IS" BASIS, WITHOUT WARRANTIES OR CONDITIONS OF ANY KIND, either express or implied, including, without limitation, any warranties or conditions of TITLE, NON-INFRINGEMENT, MERCHANTABILITY, or FITNESS FOR A PARTICULAR PURPOSE.

7. Should You wish to submit work that is not Your original creation, You may submit it to Google separately from any Contribution, identifying the complete details of its source and of any license or other restriction (including, but not limited to, related patents, trademarks, and license agreements) of which you are personally aware, and conspicuously marking the work as "Submitted on behalf of a third-party: [named here]".

8. You agree to notify Google of any facts or circumstances of which you become aware that would make these representations inaccurate in any respect.

**Manage your Agreements**



About | Manage Agreements

Contributor License Agreements

# Google Software Grant and Corporate Contributor License Agreement

In order to clarify the intellectual property license granted with Contributions from any person or entity, Google LLC ("Google") must have a Contributor License Agreement (CLA) on file that has been signed by each Contributor, indicating agreement to the license terms below. This license is for your protection as a Contributor as well as the protection of Google and its users; it does not change your rights to use your own Contributions for any other purpose.

This version of the Agreement allows an entity (the "Corporation") to submit Contributions to Google, to authorize Contributions submitted by its designated employees to Google, and to grant copyright and patent licenses thereto.

You accept and agree to the following terms and conditions for Your present and future Contributions submitted to Google. Except for the license granted herein to Google and recipients of software distributed by Google, You reserve all right, title, and interest in and to Your Contributions.

1. Definitions.

"You" (or "Your") shall mean the copyright owner or legal entity authorized by the copyright owner that is making this Agreement with Google. For legal entities, the entity making a Contribution and all other entities that control, are controlled by, or are under common control with that entity are considered to be a single Contributor. For the purposes of this definition, "control" means (i) the power, direct or indirect, to cause the direction or management of such entity, whether by contract or otherwise, or (ii) ownership of fifty percent (50%) or more of the outstanding shares, or (iii) beneficial ownership of such entity.

"Contribution" shall mean the code, documentation or any original work of authorship, including any modifications or additions to an existing work, that is intentionally submitted by You to Google for inclusion in, or documentation of, any of the products owned or managed by Google (the "Work"). For the purposes of this definition, "submitted" means any form of electronic, verbal, or written communication sent to Google or its representatives, including but not limited to communication on electronic mailing lists, source code control systems, and issue tracking systems that are managed by, or on behalf of, Google for the purpose of discussing and improving the Work, but excluding communication that is conspicuously marked or otherwise designated in writing by You as "Not a Contribution."

2. **Grant of Copyright License.** Subject to the terms and conditions of this Agreement, You hereby grant to Google and to recipients of software distributed by Google a perpetual, worldwide, non-exclusive, no-charge, royalty-free, irrevocable copyright license to reproduce, prepare derivative works of, publicly display, publicly perform, sublicense, and distribute Your Contributions and such derivative works.

3. **Grant of Patent License.** Subject to the terms and conditions of this Agreement, You hereby grant to Google and to recipients of software distributed by Google a perpetual, worldwide, non-exclusive, no-charge, royalty-free, irrevocable (except as stated in this section) patent license to make, have made, use, offer to sell, sell, import, and otherwise transfer the Work, where such license applies only to those patent claims licensable by You that are necessarily infringed by Your Contribution(s) alone or by combination of Your Contribution(s) with the Work to which such Contribution(s) was submitted. If any entity institutes patent litigation against You or any other entity (including a cross-claim or counterclaim in a lawsuit) alleging that your Contribution, or the Work to which you have contributed, constitutes direct or contributory patent infringement, then any patent licenses granted to that entity under this Agreement for that Contribution or Work shall terminate as of the date such litigation is filed.

4. You represent that You are legally entitled to grant the above license. You represent further that each employee of the Corporation designated by You is authorized to submit Contributions on behalf of the Corporation.

5. You represent that each of Your Contributions is Your original creation (see section 7 for submissions on behalf of others).

6. You are not expected to provide support for Your Contributions, except to the extent You desire to provide support. You may provide support for free, for a fee, or not at all. Unless required by applicable law or agreed to in writing, You provide Your Contributions on an "AS IS" BASIS, WITHOUT WARRANTIES OR CONDITIONS OF ANY KIND, either express or implied, including, without limitation, any warranties or conditions of TITLE, NON-INFRINGEMENT, MERCHANTABILITY, or FITNESS FOR A PARTICULAR PURPOSE.

7. Should You wish to submit work that is not Your original creation, You may submit it to Google separately from any Contribution, identifying the complete details of its source and of any license or other restriction (including, but not limited to, related patents, trademarks, and license agreements) of which you are personally aware, and conspicuously marking the work as "Submitted on behalf of a third-party: [named here]".

8. It is your responsibility to notify Google when any change is required to the list of designated employees authorized to submit Contributions on behalf of the Corporation, or to the Corporation's Point of Contact with Google.

**Manage your Agreements**



# Google Play Developer Distribution Agreement

## Effective as of February 5, 2024 (view archived version)

## 1. Definitions

**Authorized Provider:** A third-party non-Google entity authorized by Google to provide services that enable Developers to receive payments for Products that are sold to users of Devices via Google Play.

**Brand Features:** The trade names, trademarks, service marks, logos, domain names, and other distinctive brand features of each party, respectively, as owned (or licensed) by such party from time to time.

**Developer or You:** Any person or company who provides Products for distribution through Google Play in accordance with the terms of this Agreement.

**Developer Account:** A publishing account issued to a Developer in connection with the distribution of Developer Products via Google Play.

**Device:** Any device that can access Google Play.

**Google:** Google LLC, a Delaware limited liability company with principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043, United States; Google Ireland Limited, a company incorporated in Ireland with principal place of business at Gordon House, Barrow Street, Dublin 4, Ireland; Google Commerce Limited, a company incorporated in Ireland with principal place of business at Gordon House, Barrow Street, Dublin 4, Ireland; or Google Asia Pacific Pte. Limited, a company incorporated in Singapore with principal place of business at 70 Pasir Panjang Road, #03-71, Mapletree Business City, Singapore 117371. Google may update the Google entities and their addresses from time to time.

**Google Play:** The software and services, including the Play Console, which allow Developers to distribute Products to users of Devices.

**Intellectual Property Rights:** All patent rights, copyrights, trademark rights, rights in trade secrets, database rights, moral rights, and any other intellectual property rights (registered or unregistered) throughout the world.

**Payments Profile:** A financial service account or profile provided by a Payment Processor to a Developer that enables a Payment Processor to collect and remit payments to the Developer on the Developer's behalf for Products sold via Google Play.

**Payment Processor(s):** A Google-affiliated entity providing services that enable Developers to receive payments for Products sold via Google Play.

**Play Console:** The Google Play Console and other online tools or services provided by Google to developers at https://play.google.com/apps/publish, as may be updated from time to time. The Play Console is also available through an app to developers.

**Products:** Software, content, digital materials, and other items and services as made available by Developers via the Play Console.

**Taxes:** All government-imposed charges, including taxes, duties, imposts, and withholdings. The term Taxes excludes communication taxes and similar fees and surcharges; property taxes; and taxes based on each Party's net income, franchise taxes, business and occupation taxes, and other similar tax types. Each Party is responsible for its own net income taxes. For the avoidance of doubt, the term Taxes includes Transaction Taxes.

**Transaction Taxes:** Any Taxes that are imposed on the purchase price or cost of goods or services, including value-added taxes (VAT), goods and services taxes (GST), sales taxes, government levies and transfer taxes.

# 2. Accepting this Agreement

**2.1** This agreement ("**Agreement**") forms a legally binding contract between You and Google in relation to Your use of Google Play to distribute Products. You are contracting with the applicable Google entity based on where You have selected to distribute Your Product (as set forth here). You acknowledge that Google will, solely at Your direction, and acting pursuant to the relationship identified in Section 3.1, display and make Your Products available for viewing, download, and purchase by users. In order to use Google Play to distribute Products, You accept this Agreement and will provide and maintain complete and accurate information in the Play Console.

**2.2** Google will not permit the distribution of Your Products through Google Play, and You may not accept the Agreement, unless You are verified as a Developer in good standing.

2.3 If You are agreeing to be bound by this Agreement on behalf of Your employer or other entity, You represent and warrant that You have full legal authority to bind Your employer or such entity to this Agreement. If You do not have the requisite authority, You may not accept the Agreement or use Google Play on behalf of Your employer or other entity.

# 3. Commercial Relationship, Pricing, Payments, and Taxes

3.1 You hereby appoint Google as Your agent or marketplace service provider as outlined here to make Your Products available in Google Play, and subject to the terms and conditions of this Agreement, Google will allow You to use Google Play for Your Products.

3.2 This Agreement covers both Products that users can access for free and Products that users pay a fee to access. In order for You to charge a fee for Your Products and to be paid for Products distributed via Google Play, You must have a valid Payments Profile under a separate agreement with a Payment Processor, be approved by a Payment Processor for a Payments Profile, and maintain that profile in good standing. If there is a conflict between Your Payment Processor agreement and this Agreement, the terms of this Agreement will apply.

3.3 Products are displayed to users at prices You establish in Your sole discretion. If You utilize Google Play's billing system or the Play Console to control settings related to any taxes (including taxes, fees, or surcharges that are outside the scope of this Agreement) on the sale of Products, or if Google believes that Taxes may be owed by You or Google on the sale of Products, You grant Google permission to charge, collect, and discharge any such taxes as required in accordance with applicable law. For the avoidance of doubt, You remain responsible for any such taxes, fees, or surcharges, including as provided under Section 3.5. You may set the price for Your Products in the currencies permitted by Google, the Payment Processor, and, where applicable, the Authorized Provider. Google may display the price of Products to users in their native currency, but Google is not responsible to You for the accuracy of currency rates or currency conversion.

3.4 Acting as Your agent, and with You acting as a principal, Google is the merchant of record for Products sold or made available to users in the countries/territories described here. You are the merchant of record for Products You sell or make available via Google Play to all other users. The sales price You set for Products will determine the amount of payment You will receive. A **"Service Fee"**, as set forth here (as may be revised by Google with notice to You in accordance with Section 15), will be calculated and charged on the sales price. The Service Fee is exclusive of Transaction Taxes of any and all kinds required by any applicable governmental tax authority to be charged, and Google is entitled to the Service Fee without reduction for any taxes or government levies, including any Taxes applicable to transactions described under Section 3.5 or Section 3.6. As per applicable law, to the extent Google is responsible to discharge Transaction Taxes arising on Service Fees, Google will charge You such Transaction Taxes, and You are responsible for paying

any Transaction Taxes arising on the Service Fee. More information about the Service Fee can be found here.

3.5 Except in certain countries/territories and subject to certain conditions as described here (which may be updated with notice to You), You are responsible for Transaction Taxes on the sale or provision of Products to users, including (but not limited to): (a) determining if the transaction is taxable; (b) charging and collecting the Transaction Taxes at the applicable rate; (c) remitting the Transaction Taxes to the applicable governmental tax authority; and (d) providing any required documentation to the user or applicable governmental tax authority. You are solely responsible for providing and maintaining accurate inputs that impact taxes on Products, including for any tax categorization of Products. Any adjustments that You make to the tax categorization of Products will take effect only for future sales of Products. Google will determine whether Google, the Payment Processor, or the Authorized Provider is obligated to collect or remit any Transaction Taxes in respect of any transaction and such Transaction Taxes may be recovered from You, deducted from payment due to You, or recovered from the user. Where Google collects and remits Transaction Taxes in applicable countries/territories, You may recognize a deemed supply from You to Google solely for Transaction Tax purposes if required by applicable law. You will be solely responsible for any Tax obligations arising from such deemed supply.

3.6 Where the Authorized Provider notifies Google that it or another Authorized Provider is required by applicable (local) legislation or by the applicable governmental tax authority to declare, charge, deduct, or withhold any taxes on a sale of Your Products, or where Google or a Payment Processor reasonably determines that it is required by applicable (local) legislation or by the applicable governmental tax authority to declare, charge, deduct, or withhold any taxes (in each case, "Withholding Taxes"), Google will also deduct the amount of such Withholding Taxes from the amount Google remits to You. Withholding Taxes include, but are not limited to, withholding tax obligations on cross-border payments or imposed by telecommunications taxes. You agree to timely provide, as soon as reasonably practicable, any tax documentation or certification requested by Google. Unless You are a resident of the United States or Singapore for income tax purposes, You hereby certify that any services that You provide to users through Your Product are not performed in the United States or Singapore, and furthermore You agree to provide written notification to Google at least ninety (90) days prior to any such services being performed in the United States or Singapore. Written notification on change in service location may be emailed to play-tax-notices@google.com.

3.7 You may also choose to make Products available for free. If the Product is free, You will not be charged a Service Fee. To avoid unexpected fees for users, You agree that Products that were initially offered free of charge to users will remain free of charge. Any additional charges will correlate with an alternative or supplemental version of the Product.

3.8 You authorize Google to give users refunds in accordance with the Google Play refund policies as located here or the local versions made available to You, and You agree that Google may deduct the amount of those refunds from payments to You. In all other respects, the Payment Processor's standard terms and conditions regarding refunds will apply. User refunds may be exclusive of taxes previously charged to users for Product purchases.

3.9 Users are allowed unlimited reinstalls of each Product distributed via Google Play without any additional fee, provided however, that if You remove any Product from Google Play due to a Legal Takedown (as defined in Section 8.2), that Product will be removed from all portions of Google Play, and users will no longer have a right or ability to reinstall the affected Product.

# 4. Use of Google Play by You

4.1 You and Your Product(s) must adhere to the Developer Program Policies.

4.2 You are responsible for uploading Your Products to Google Play, providing required Product information and support to users, and accurately disclosing the permissions necessary for the Product to function on user Devices.

4.3 You are responsible for maintaining the confidentiality of any developer credentials that Google may issue to You or that You may choose Yourself, and You are solely responsible for all Products that are developed under Your developer credentials. Google may limit the number of Developer Accounts issued to You or to the company or organization You work for.

4.4 Except for the license rights granted by You in this Agreement, Google agrees that it obtains no right, title, or interest from You (or Your licensors) under this Agreement in or to any of Your Products, including any Intellectual Property Rights in those Products.

4.5 You may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play.

4.6 You agree to use Google Play only for purposes that are permitted by this Agreement and any applicable law, regulation, or generally accepted practices or guidelines in the relevant jurisdictions (including any laws regarding the export of data or software to and from the United States or other relevant countries).

4.7 Users are instructed to contact You concerning any defects or performance issues in Your Products and You are responsible for undertaking or handling the support and maintenance of Your Products and any complaints about Your Products. You agree to supply and maintain valid and accurate contact information that will be displayed in each of Your Products' detail page and made available to users for customer support and legal purposes. For Your paid Products or in-app

transactions, You agree to respond to customer support inquiries within 3 business days, and within 24 hours to any support or Product concerns stated to be urgent by Google.

4.8 You agree that if You make Your Products available through Google Play, You will protect the privacy and legal rights of users. If the users provide You with, or Your Product accesses or uses, usernames, passwords, or other login information or personal information, You agree to make the users aware that the information will be available to Your Product, and You agree to provide legally adequate privacy notice and protection for those users. Further, Your Product may only use that information for the limited purposes for which the user has given You permission to do so. If Your Product stores personal or sensitive information provided by users, You agree to do so securely and only for as long as it is needed. However, if the user has opted into a separate agreement with You that allows You or Your Product to store or use personal or sensitive information directly related to Your Product (not including other products or applications), then the terms of that separate agreement will govern Your use of such information. If the user provides Your Product with Google Account information, Your Product may only use that information to access the user's Google Account when, and for the limited purposes for which, the user has given You permission to do so.

4.9 You will not engage in any activity with Google Play, including making Your Products available via Google Play, that interferes with, disrupts, damages, or accesses in an unauthorized manner the devices, servers, networks, or other properties or services of any third party including, but not limited to, Google or any Authorized Provider.

4.10 You are solely responsible for, and Google has no responsibility to You for, Your Products, including use of any Google Play APIs and for the consequences of Your actions, including any loss or damage which Google may suffer.

4.11 Google Play allows users to rate and review Products. Only users who download the applicable Product will be able to rate and review it on Google Play. For new Developers without Product history, Google may use or publish performance measurements such as uninstall and/or refund rates to identify or remove Products that are not meeting acceptable standards, as determined by Google. Google reserves the right to display Products to users in a manner that will be determined at Google's sole discretion. Your Products may be subject to user ratings and reviews to which You may not agree. If you have concerns regarding such ratings and reviews, you may report it via the Play Console.

# 5. Authorizations

5.1 Upon making Your Product available on Google Play, You authorize Google on a non-exclusive, worldwide, and royalty-free basis to: reproduce, perform, display, analyze, and use Your Products in connection with (a) the operation and marketing of Google Play; (b) the marketing of devices and services that support the use of the Products and the marketing of the Products on Google Play

and Devices; (c) the provision of hosting services to You and on Your behalf to allow for the storage of and user access to the Products and to enable third -party hosting of such Products; (d) making improvements to Google Play, Play Console, and Android platform; and (e) checking for compliance with this Agreement and the Developer Program Policies. The authorization in clause (e) is sublicensable to application security partners for the sole purpose of checking for compliance with this Agreement and the Developer Program Policies. You also authorize such application security partners to use the results of their review in their products and research that may be publicly available. For clarity, the authorizations provided under this Section will cease upon termination of the Agreement.

5.2 You authorize Google to perform the acts described in this section subject to Your control and direction in the manner indicated in the Play Console.

5.3 You grant to the user a nonexclusive, worldwide, and perpetual license to perform, display, and use the Product. The user may include, but is not limited to, a family group and family members whose accounts are joined together for the purpose of creating a family group. Family groups on Google Play will be subject to reasonable limits designed to prevent abuse of family sharing features. Users in a family group may purchase a single copy of the Product (unless otherwise prohibited, as for in-app and subscription Products) and share it with other family members in their family group. If, in the Play Console, You opt in to allowing users to share previously purchased Products, Your authorization of sharing of those purchases by those users is subject to this Agreement. If You choose, You may include a separate end user license agreement ("EULA") in Your Product that will govern the user's rights to the Product, but, to the extent that EULA conflicts with this Agreement, this Agreement will supersede the EULA. You acknowledge that the EULA for each of the Products is solely between You and the user. Google will not be responsible for, and will not have any liability whatsoever under, any EULA.

# 6. Brand Features and Publicity

6.1 Each party will own all right, title, and interest, including, without limitation, all Intellectual Property Rights, relating to its Brand Features. Except to the limited extent expressly provided in this Agreement, neither party grants, nor will the other party acquire, any right, title, or interest (including, without limitation, any implied license) in or to any Brand Features of the other party.

6.2 Subject to the terms and conditions of this Agreement, Developer grants to Google and its affiliates a limited, nonexclusive, royalty-free license during the term of this Agreement to display Developer Brand Features, submitted by Developer to Google, for use solely within Google Play, online or on Devices and in each case solely in connection with the distribution and sale of Developer's Product via Google Play or to otherwise fulfill its obligations under this Agreement.

 Google Play

  



## CBRNResponder

Attainx, inc

1K+
Downloads


Everyone ⓘ

Install

< Share     Add to wishlist



## About this app    →

CBRNResponder provides free software tools for logging, transmitting, storing, analyzing, and presenting environmental radiological, chemical, and biological monitoring data. Data is stored in a secure cloud environment accessible only by the user. To register for an account and to obtain further information, please go to www.cbrnresponder.net

The application has a Responder Tracking feature that allows a responder to track and share their location...

**Updated on**
Aug 23, 2024


Games


Apps


Movies & TV


Books


Kids

 Google Play

  



# CERES (Chemical Emergency Resp

**Vlahi Systems LLC**

In-app purchases

| 4.9★ | 5K+ |  |
|------|-----|---|
| 36 reviews | Downloads | Everyone ⓘ |

Install

 Share    🔖 Add to wishlist

     

## About this app                                                                 →

CERES (Chemical Emergency Response E-Service) is our chemical incident planning and response platform that brings together plume dispersion models with maps and real-time meteorological data and gas sensors data.

Our software can be used anywhere, anyplace, on any device, phone, tablet or PC. You get free access to a government approved model widely used to plan for and respond to chemical emergencies....

**Updated on**
May 24, 2024




Games


Apps


Movies & TV


Books


Kids

 Google Play

  



# SYGNAL

**SYGNAL**

In-app purchases

**50+**
Downloads

**Everyone** ⓘ

Install

< Share     🔖 Add to wishlist



## About this app →

SYGNAL is an innovative app for simulated HAZMAT and CBRNE detection training. It turns mobile devices into training tools, offering customizable sessions, real-time GPS tracking, geofencing, and instant messaging. Designed for first responders and confined space rescuers, SYGNAL enhances training with an intuitive interface and secure cloud-based connectivity, compatible with iOS and Android.

For more information, visit SYGNAL App.

**Updated on**
Sep 13, 2024


Games


Apps


Movies & TV


Books


Kids

 Google Play

  



# PlumeSIM-SMART

**Argon Electronics**

**500+**
Downloads


Everyone ⓘ

Install

 Share    📑 Add to wishlist

     

## About this app                                                              →

PlumeSIM-SMART Simulators (SMART-SIMs) available within this application are for use with PlumeSIM-SMART, a full feature Chemical, Biological, Radiological, Nuclear (CBRN) and Hazardous Material (HazMat) training system that enables you to implement single or multiple threat releases incorporating hazardous material, radionuclides and chemical warfare agents to generate virtual Tabletop exercises and wide area Live field exercises.

...

**Updated on**
Feb 29, 2024


Games


Apps


Movies & TV


Books


Kids



# Google Play

  

## Gas Detection

### Drägerwerk

| 2.4★ | 10K+ | E |
|------|------|---|
| 23 reviews | Downloads | Everyone ⓘ |

Install

< Share    🔖 Add to wishlist





## About this app                                                              →

The Dräger Gas Detection App provides a general overview of gas and vapor measurement technology. The basic principles of the Dräger-Tube, Dräger Sensor and Dräger Chip Measurement System are described and a complete listing of the Dräger-Tubes and chips are provided with all relevant measurement parameters. In addition, there is an introduction to portable monitors, including electrochemical, catalytic, and infrared sensor technology, as well as a complete list of Dräger sensors and monitors. The support section contains a sensor compatibility chart, how-to videos, error code charts and links to our new customer support pages.

**Updated on**
Apr 28, 2023

 Games     Apps     Movies & TV     Books     Kids

# Exhibit I

## FACT ISSUES FOR A JURY

Process

v.

Modification

**THE CIRCUIT CONFIRMS GOOGLE'S REQUIRED ANDROID OPERATING SYSTEM SOFTWARE ENABLES THE INFRINGEMENT OF GOLDEN'S PATENTS**

Copyright law protects code [Google Android Open-Source Code] while patents protect the underlying systems and processes tied to software. the Northern District of California held in 2008 in *Penpower Tech. Ltd. v. S.P.C. Tech.*, software is a "proper subject matter for copyright protection." Per the U.S. Copyright Act, software can be protected with a copyright as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result," and, further, because the *code* [Google Android Open-Source Code] can be fixed in any electronic, print, or other medium. (17 U.S.C. § 101). Copyright protection commences when the *code* [Google Android Open-Source Code] creation process begins. Keep in mind that the scope of a copyright is strictly limited to the *source code* [Google Android Source Code].

**Google's process of creating source code involves several key steps:**

1. *Planning and Design*
   - Identify user needs and project goals.
   - Create specifications and design documents.
2. *Development*
   - Write code using programming languages like Python, Java, or C++.
   - Utilize integrated development environments (IDEs) and version control systems (e.g., Git).
3. *Testing*
   - Conduct unit tests, integration tests, and system tests to ensure functionality.
   - Use automated testing frameworks to streamline the process.
4. *Code Review*
   - Collaborate with team members for peer reviews to improve code quality.
   - Implement feedback and make necessary adjustments.
5. *Deployment*
   - Deploy code to production environments using continuous integration/continuous deployment (CI/CD) practices.
   - Monitor performance and user feedback post-launch.
6. *Maintenance*
   - Regularly update and patch code to fix bugs and improve performance.
   - Adapt to changing user needs and technological advancements.

The Circuit confirms the lower court's determination that the accused devices function as a 'CBRNE sensing device' because Google has pre-installed the required Google Android Open-Source Operating System software. This is not about copyright infringement.

2

## THE ACCUSED GOOGLE PRODUCTS MUST COMPRISE THE REQUIRED CENTRAL PROCESSING UNIT (CPU) HARDWARE PRE-INSTALLED

Golden has continuously claimed, over and over again, that the Google smartphones' Tensor CPU allegedly infringes Golden's patented new, improved upon, and useful central processing unit (CPU). Google has failed to defend; the lower court has failed to compel Google to answer the allegations; and the Circuit failed to rule in favor of Golden because Google has neither denied, defended, or challenged Golden's alleged claims of infringement.

Golden's CPU was invented specifically for Golden's patented new, improved upon, and useful cell phone (CMDC device). Google's Tensor CPUs; invented for mobile devices (i.e., Google smartphones) are recognized as the "brains" of the mobile, consumer, or cellular devices.

Both the Google Tensor CPUs and Golden's patented CPUs, are responsible for carrying out the functional and operational instructions of the computer (smartphone) programs. Golden has alleged the Google smartphone cannot operate/function without Golden's patented CPUs.



**The Google Tensor CPU and Google Android operating system (OS)**

The Google Tensor CPU and Google Android operating system (OS) are essential components of Google's mobile devices, each fulfilling unique functions that enhance user experience. Golden claims Google is allegedly infringing his patented Central Processing Unit (CPU) [hardware], and Golden claims his "transceiver" is equivalent to the Google Android Operating Systems (OS) [software].

1. *Google Tensor CPUs [hardware]*

3

- Function: The Google Tensor CPU hardware is the primary processor that executes instructions and manages tasks within the device.
- Performance: Google Tensor CPUs are designed for efficiency, balancing power consumption and processing speed to optimize battery life.

2. *Google Android Operating Systems (OS) [software]*
   - Function: The Google Android OS software manages hardware resources and provides a platform for applications to run.
   - User Interface: It offers the graphical interface that users interact with, enabling navigation and access to features.

3. *Complementary Roles*
   - Integration: The Google Tensor CPU and the Google android OS work together to ensure smooth operation of applications and system functions.
   - User Experience: A powerful Tensor CPU can enhance the performance of the Android OS, leading to faster app launches and smoother multitasking.

Understanding the distinct roles of mobile CPUs and operating systems helps in appreciating how they contribute to the overall functionality and performance of mobile devices. Below is a chart of patent claims asserted in this case, demonstrating how Golden's patented CPU [hardware] is integrated with Golden's transceiver [equivalent operating systems-software], to enable Golden's patented multi-sensor detection system [hardware and software].

| Central Processing Unit Claims 4, 5, & 6, of the '287 Patent | | Multi-Sensor Detection Claim 8 of the '189 Patent |
|---|---|---|
| 4. A communication device comprising: at least one central processing unit (CPU); at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; … at least one CPU configured to send signals to monitor… send signals to detect at least one [] chemical biological, radiological, or explosive agent | *"transceiver"* [equivalent operating systems—software] | 8. A multi-sensor detection system for detecting at least one [], chemical, biological, human, or radiological agents and compounds, comprising: a plurality of sensors for detecting at least one chemical, biological, [] or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a [] detection device; |

The next chart, claim 1 of the Golden's '619 patent demonstrates Golden's patented CPU as an element of the communication device, whereby the alleged infringement is directed to the communication devices. Claim 11 of the Golden's '619 patent demonstrates Golden's patented CPU as a stand-alone device, whereby the alleged infringement is directed to the central processing unit (CPU).

4

| Central Processing Unit<br>Claim 1 of the '619 Patent | | Central Processing Unit<br>Claim 11, of the '619 Patent |
|---|:---:|---|
| 1.  A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of:<br>    processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;<br>    processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); | *'smartwatch'*<br>[standard sensors for i.e., heart rate and/or sensors for WMDs] | 11.  A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of:<br>    processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;<br>    processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |

Added to the list of alleged infringing products is Google's Pixel Smartwatches 1, 2, & 3, that Google has failed to defend; the lower court has failed to compel Google to answer the allegations; and the Circuit failed to rule in favor of Golden because Google has neither denied, defended, or challenged Golden's alleged claims of infringement. The Google smartwatch can stand alone [claim 23 of '439 patent and claim 8 of the '189 patent]; the smartwatch CPU can stand alone [claim 11 of the '619 patent]; and, the smartwatch that comprises the CPU can stand together [claims 4, 5, & 6, of the '287 patent and claim 1 of the '619 patent].



ATAK (built on the Google Android operating system) … controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) …

The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick https://www.defenseone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/

Studies reveal smartwatch biometrics can detect COVID-19: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" https://www.biometricupdate.com/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface

Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www.popular-mechanics.com/military/research/a18161/homeland-security -smartwatch-detect-nuclear-bombs/

In *Golden v. Google, LLC*, CAFC Case: 24-2024 Dkt: 24 Pages 338-482; Filed: 11/21/2024 "Informal Reply Brief". Google own Expert Witness [DAVID H. WILLIAMS] Declaration debunks the non-infringement theory of 'modification'. Key words: configured to, mobile phones, smartwatch, Bluetooth, NFC, GPS, operating system, processors, software, RF, cellular, WiFi, wireless adapters; biological-pulse, biometric, infrared, skin, light, optical, and EGG sensors, heart rate, … (Appx. VIII)

**"DO NOT INFRINGE WITHOUT MODIFICATION—THE MODIFICATION OF INSTALLING THE REQUIRED SOFTWARE."**

In the "OPINION" of the Federal Circuit in *Golden v. Google LLC* CAFC Case: 24-2024 Document: 41 Page: 6 Filed: 06/25/2025, Golden's five infringement theories all require "installing the required software".

> "We conclude that the district court did not err in finding that Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1; see also *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding no infringement when the accused products "do not infringe without modification—the modification of installing the required software.")." ...
>
> "Therefore, each of Mr. Golden's direct infringement theories solely against Google fails because Mr. Golden's infringement allegations require modification of the accused products to show infringement." *Golden v. Google LLC* CAFC Case: 24-2024 Document: 41 Page: 6 Filed: 06/25/2025

Golden agrees with the District Court and the Federal Circuit that infringement of Golden's patents-in-suit does exist; but, disagrees with the "installment of require software" and because this is a question of fact and not one of law, Golden disagrees with both the District Court and the Federal Circuit for depriving Golden of his guaranteed right to present the following factual evidence to a jury. [U.S. CONST. 7th Amend.]

The required software of the accused products of Google do not have to be installed; the required software is the "Google android open-source operating system (OS) and is already pre-installed by Google in the accused products. The optional software, or, species of the Android OS software, is not required and is developed compatible to the Android OS software; resulting from Google's release of an "open-source code" for the developers of the software to build upon.

The entire Android OS is available through APIs written in the Java language. The APIs form the building blocks needed to create Android apps by simplifying the reuse of core, modular system components and services, which include the following:

> 1- A view system that can be used to build an app's UI, including lists, grids, text boxes, buttons, and even an embeddable web browser; 2- A resource manager, providing access to non-code resources such as graphics, and layout files; 3- A notification manager that enables all apps to display custom alerts in the status bar; 4- An activity manager that manages the lifecycle of apps and provides a common navigation back stack; and, 5- Content providers that enable apps to access data from other apps, or to share their own data.

Developers have full access to the same framework APIs that Android system apps use.

An example of the "*process*", not modification, is illustrated here with Golden's first infringement theory: DoD DTRA-ATAK software.

✓     *Step 1 of the "process"*: Google releases an Android open-source.

✓     *Step 2 of the "process"*: DTRA developers builds the *Android Team Awareness Kit* [ATAK—software] on the Google Android operating system as a digital application available to warfighters throughout the DoD.

✓     *Step 3 of the "process"*: DTRA developers include the chemical, biological, radiological, and nuclear (CBRN) plug-ins, of Draper Laboratories.

✓     *Step 4 of the "process"*: The ATAK digital application is made available for download [without DoD restriction] to a billion phones and tablets' users of the Android operating system (OS).

> "The open-architecture Android platform has been tremendously successful at capturing the largest share of the smartphone market. Backed and acquired by Google in 2005, the Android operating system can be found in over a billion phones and tablets since it's unveiling in 2007, and it is poised to continue expanding its reach with the emergence of "Internet of Things" embedded solutions. There are over 2.6 million applications available from the official Google Play Store."



Once this "*process*" is completed, the user of the Google device will have an "enabled" Google CBRNE sensing device. But, there's nothing about this "*process*" that calls for 'modification' of any of the Google products.

The patents asserted in this case are referred to as "process patents", "method patents", or "utility patents", and whether the actions performed is a process or a modification, is a fact question. A claim of patent infringement is an issue-of-fact tried by a jury under the Seventh Amendment Clause of the United States Constitution. [U.S. CONST. 7th Amend.]

8

## GOOGLE'S HAND-HELD SCANNER, THAT INCLUDES THE GOOGLE CAMERA AND A NEAR-FIELD COMMUNICATIONS (NFC) SENSOR, ALLEGEDLY INFRINGES GOLDEN'S PATENTED CMDC HAND-HELD SCANNER

### Google's Smartphone Camera for Scanning QR Codes

Digital devices connected to the global network are rapidly finding their way into almost every facet of life. In addition to computers, smart phones, tablets, game consoles, new categories of connected devices such as fitness wearables, digital fashion accessories, Internet of Things (IOT) appliances, security systems, self-driving cars, robotics, smart toys, industrial control and home automation systems are coming on the market at an accelerating pace.

All of these connected devices have sensors of one kind or another (e.g. accelerometers, GPS, RF sensors, NFC sensors, *cameras* & microphones) so that it will be theoretically possible to "instrument" virtually the entire population of the U.S. in one form or another, and to use this synoptic instrumentation to swiftly detect and respond to CBRN events.

Mobile apps can combine sensor feeds from many handsets to create vast "synthetic apertures" to detect earthquakes (from accelerometer data), explosions (from microphones) and even *gamma radiation* (from activation of cell *cameras*).

Sensor activity from *cameras*, microphones, accelerometers in mobile devices, laptops, computers and IOT devices (home security/automation, municipal, industrial) can detect, localize and sometimes identify CBRN events, including those producing *ionizing radiation*.

*Retrieved from*: Homeland Security Science and Technology Advisory Committee, Quadrennial Homeland Security Review Subcommittee, Chemical, Biological, Radiological, and Nuclear Detection, chaired by Eric Haseltine with contributions from Dr. Gerald Parker, Dr. Yacov Haimes, Mr. Daniel Dubno as part of recommendations to the Department of Homeland Security, Under Secretary for Science and Technology, Robert Griffin

### Golden's Stand-alone hand-held scanner—Specifications

Each [] includes [] a sensor, [] and is electrically interconnected [] to the cpu []so that information regarding the detection of the particular agent or compound can be conveyed from the detectors to the [] cpu. Each [] can [] be used as a [], stand-alone hand-held scanner.

FIG. 12 is a representative schematic view [] of the present invention illustrating the sequence of steps undertaken [] when functioning as a stand-alone scanner for detecting an agent or compound

9

As shown in FIGS. 1, 2 and 9-13, the multi sensor detection []
system 10 includes a plurality of detectors 46 with each [] sample for a
specific agent or compound (biological, chemical, or radiological); [] The
detectors 46 can also be used as stand-alone scanners.

As shown in FIG. 2, [] a sensor 52 for detecting the specific agent,
element or compound, and [] for each specific agent [] which is [] visible
when [] used as a stand-alone scanner. Each [] includes a conventional
microprocessor for controlling the various functions and generating the
appropriate signals for transmission to the cpu 40 ... functions as a stand-
alone scanner and can be wirelessly interconnected to offsite monitoring
equipment.

FIG. 12 illustrates a representative schematic [] when used as stand-
alone scanner. The detector 46 undergoes the same essential steps as
illustrated in FIG. 11, with the exception of the signal transmission to the
cpu 40.

## Five (5) ways to scan a QR code on Google Android

Most modern Android devices, including Google smartphones, have built-in QR scanners
in the camera app, so you don't need a separate app. Simply point your camera at the code, and it
should work instantly.

1. Use the built-in Camera app to scan a QR code on Google Android. Google
Android devices have QR code scanning functionality integrated into the default camera
app. To use this feature, open the Camera app by locating its button on your Home
Screen or app drawer and tapping it.

2. Use Google Android's built-in scanner to read QR codes, including in
pictures or screenshots. Google Android devices, offer a quick action button to scan QR
codes directly from the Quick Settings panel. Swipe down from the top of the screen to
reveal the Quick Settings menu.

3. Use Google Lens to scan QR codes on Google Android. Google Lens is
integrated into Google Android devices and can scan QR codes with added functionality,
such as text translation and product searches. To use Google Lens, first open
the Google app.

4. Scan QR codes on Google Android with Gemini. Assistants such as
Google's Gemini can help scan QR codes quickly using voice commands. [voice
authentication for Google devices is claimed in Golden's patents] Activate Gemini by
saying "Hey Google!" Alternatively, you can press and hold the power button to wake
your assistant. Then, ask it to "Scan QR code."

10

5.  Scan QR codes on Google Android using Circle to Search. The Circle to Search feature from Google Android can also help you scan QR codes from your Google smartphone. Start by making sure that the QR code is visible on your smartphone's screen. It can be anywhere, whether that's a webpage, an app, a document, or a simple image. Then, once you have the QR code in view, enable the Circle to Search feature by touching and holding the navigation handle if you're using gesture navigation, or the Home button if you're using 3-button navigation mode.



**Google's smartphone camera scans QR codes**

Google's smartphone camera QR codes can be integrated with CBRNE (chemical, biological, radiological, nuclear, and explosives) detectors and/or sensors to enhance data sharing and operational efficiency.

- One of the benefits of integration is real-time data access. QR codes can link to live data from CBRNE sensors, providing immediate access to critical information.

- Scanning a QR code can simplify the process of retrieving sensor data, making it accessible to personnel without specialized training.

- QR codes can be printed on CBRNE equipment, allowing quick access to emergency protocols.

11

## Google's Smartphone NFC for Scanning Tags

NFC stands for near field communication. Google's NFC technology is a newer, more finely honed version of RFID. It operates at a maximum range of about 4 inches (10 centimeters) and can be set up for one- or two-way communications. Using your Google NFC smartphone, you can tap NFC smart tags that might appear in everything. Google's NFC duplicates RFID's feat by reading smart tags, thanks to its read/write operation mode. But in addition to read/write capabilities, Google's NFC has two other modes, both of which involve dynamic, two-way communication: card emulation and P2P (peer-to-peer).

That's where Google smartphones and other NFC-capable devices come into play. With Google's P2P mode, you can easily share information and pair all sorts of devices. Example of Chem/Bio monitoring: Your doctor affixes an NFC health monitoring tag to your skin. That tag will send streams of data on your body's temperature, sugar levels and much more right to your Google smartphone, which then relays that data to your nurse.

In order to determine what sort of information is to be exchanged between devices, the NFC standard currently has two distinct modes of operation for compliant devices.

The most common use in smartphones is the peer-to-peer mode, which allows two NFC-enabled devices to exchange various pieces of information between each other. In this mode both devices switch between active, when sending data, and passive states when receiving. Allowing the NFC device to exchange data with other NFC peers; this operation mode is used by Google Android Beam.

The read/write mode, on the other hand, is a one-way data transmission, where the active device, possibly your Google smartphone, links up with another (CBRNE detection) device in order to read information from it. This mode is used when you interact with an NFC tag.

### List of Google NFC-Enabled Smartphone Devices [Google Hand-Held Scanners]

| Brand | Model | Platform | First Released | NFC-Enabled | Availability | |
|-------|-------|----------|----------------|-------------|--------------|--|
| Google | Pixel 5 | Android | October 2020 | Yes | all versions | |
| Google | Pixel 6 | Android | October 2021 | Yes | all versions | |
| Google | Pixel 6 Pro | Android | October 2021 | Yes | all versions | |
| Google | Pixel 6a | Android | July 2022 | Yes | all versions | |
| Google | Pixel 7 | Android | October 2022 | Yes | all versions | |

12

| Google | Pixel 7 Pro | Android | October 2022 | Yes | all versions |
|--------|-------------|---------|--------------|-----|--------------|
| Google | Pixel 7a | Android | May 2023 | Yes | all versions |
| Google | Pixel 8 | Android | October 2023 | Yes | all versions |
| Google | Pixel 8 Pro | Android | October 2023 | Yes | all versions |
| Google | Pixel 8a | Android | May 2024 | Yes | all versions |
| Google | Pixel 9 | Android | October 2024 | Yes | all versions |
| Google | Pixel 9 Pro | Android | October 2024 | Yes | all versions |
| Google | Pixel 9 Pro XL | Android | October 2024 | Yes | all versions |

**Near-Field Communication (NFC) Smartphone Sensor:** Nascent technology embedded in modern smartphones—near-field communication (NFC)—for wireless electronic, portable, non-line-of-sight selective detection of gas-phase chemicals *(Fig. 1)*

National Institutes of Health (NIH). *"Wireless gas detection with a smartphone via rf nfc communication"* Published online 2014 Dec 8. doi: 10.1073/pnas. 1415403111 Retrieved from: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4280584/



*Figure 1*

Conversion of an NFC tag into a CARD enables wireless rf detection of chemical analytes with a smartphone. NFC-enabled smartphones communicate with NFC tags by simultaneously energizing the NFC tag with an alternating magnetic field (f = 13.56 MHz) through inductive coupling and transferring data by signal modulation.

Google's NFC antennas [inside the device] play a crucial role in enabling short-range wireless communication between devices. Their unique characteristics, such as operating frequency, size, range, and coupling, make them suitable for various applications, including, access control, product authentication, and device pairing. Understanding the different types of NFC antennas is essential for developing effective and efficient Google NFC-enabled devices.

As Google NFC technology continues to evolve and find new applications, the importance of Google's NFC antennas will only grow. By leveraging the capabilities of these small but powerful components, we can create seamless and secure wireless experiences that enhance convenience, efficiency, and sec. *Wireless communication is not "modification".*

13

## CLAIM CONSTRUCTION

Golden has pled for four years that Google's android open-source operating system (OS) is equivalent to Golden's "transceiver" [transmitter/receiver] described in Golden's patent specifications because the Android (OS) perform the same function as Golden's "transceiver"; operates in a similar way as Golden's "transceiver"; and, achieves the same result as Golden's "transceiver".

Certain of Google products, smartphones, smartwatches, laptops, etc., are pre-loaded with the Google android operating system (OS).



*Golden's patent specifications for the "transceiver"*: "The system 10 ... adapted [] with cell phone towers and satellites for use with ... a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as *cpu 40, or a transceiver* and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween."

14

"FIGS. 18 and 19 illustrate … [a] *CPU or a transceiver* 202 is programmed to receive signals from the cell phone tower 190 and/or to a GPS satellite 204 and is interconnected with …"

"FIG. 19 [] the use of a GPS satellite in conjunction with the monitoring site and monitoring equipment to relay commands and signals to the cpu or transceiver [] in response … (detection of a bomb…) has occurred or is in process. In FIG. 19 a signal [to the *cpu or transceiver*] … has traveled to the monitoring equipment 138 … which can include but is not limited to satellite cell phones, satellite monitors, cell phones, laptops, desktop PC's, notebook PC's, and LCD monitors."

"The monitoring equipment 138 then transmits a signal 222 back to the GPS satellite 204 that in turn communicates via another signal 224 with the *CPU and/or transceiver* 202 to execute any commands…"

ANDROID STUDIO
# Overview of Android Operating System



- Open Source: Android's open-source nature allows developers and manufacturers to customize it to suit their needs.
- Support for Multiple Devices: Android runs on smartphones, tablets, TVs, wearables, and even cars.
- Rich Application Framework: Android provides a robust framework for building innovative applications.
- Connectivity Options: Android supports Bluetooth, Wi-Fi, 4G/5G, and NFC for seamless connectivity.
- Hardware Support: Access to camera, GPS, accelerometer, and other device features.

The essential objective inquiry under the "doctrine of equivalents" is: "Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?" *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 40, 41 USPQ2d 1865, 1875 (1997). In determining equivalence, "[a]n analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute plays a role substantially different from the claimed element." 520 U.S. at 40, 41 USPQ2d at 1875.

In *Graver Tank & Mfg. Co. v. Linde Air Prods., Inc.*, the U.S. Supreme Court held that a patentee may invoke this doctrine to proceed against the producer of a device if it performs

15

substantially the same function in substantially the same way to obtain the same result. This is often referred to as the *Graver Tank* "triple identity" test for equivalence.

Below are three claim limitations taken from Golden's independent claim 23 of his '439 patent asserted in this case. We now know that the Android OS is running on Google Pixel Watch 3 [Google's Watch is equivalent to Golden's "cell phone detection device"]. We also know that the Android OS has connectivity options such as Bluetooth, and Wi-Fi, and a framework for building software apps to connect such devices as the Google Pixel Watch 3 [functions the same as Golden's "cell phone detection device"] and door locks. Lastly the Android OS provides hardware support for accessing the camera, GPS, and other device features.

"a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device;"

"at least one of a satellite connection, Bluetooth [], WiFi [], internet connection, [] (RF) [], cellular [], broadband [], long range [] short range radio frequency (RF) connection, or GPS connection;"

"whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, … to activate or deactivate the cell phone detection device;"



16

Google never disputed or challenged Golden's claim construction that the Google Android (OS) is equivalent to Golden's transceiver. Google never raised any factual disputes about the complaint allegations that certain limitations of the patent claims are satisfied when the Android (OS) is identified in the alleged infringing Google devices. "We accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). "Here, the government did not raise any factual disputes about the complaint's allegations in its 12(b)(6) motion to dismiss." *Cf. Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988).

The first complaint filed against Google was filed in the State of South Carolina District Court on January 26, 2026. *Golden v. Google LLC* Case No. 6:21-cv-00244-JD Date Filed 01/26/21 Entry Number 1 Pages 11 – 13. Below are the sensor types supported by the Google android platform that was filed in the first case.

### SENSOR TYPES SUPPORTED BY THE *"ANDROID"* PLATFORM

| | | | |
|---|---|---|---|
| **Type** **Accelerometer** | Hardware | Measures the acceleration force in $m/s^2$ that is applied to a device on all three physical axes (x, y, and z), including the force of gravity. | Motion detection (shake, tilt, etc.). |
| **Type** **Ambient Temperature** | Hardware | Measures the ambient room temperature in degrees Celsius (°C). See note below. | Monitoring air temperatures. |
| **Type** **Gravity** | Software or Hardware | Measures the force of gravity in $m/s^2$ that is applied to a device on all three physical axes (x, y, z). | Motion detection (shake, tilt, etc.). |
| **Type** **Gyroscope** | Hardware | Measures a device's rate of rotation in rad/s around each of the three physical axes (x, y, and z). | Rotation detection (spin, turn, etc.). |
| **Type** **Light** | Hardware | Measures the ambient light level (illumination) in lx. | Controlling screen brightness. |
| **Type** **Linear Acceleration** | Software or Hardware | Measures the acceleration force in $m/s^2$ that is applied to a device on all three physical axes (x, y, and z), excluding the force of gravity. | Monitoring acceleration along a single axis. |

17

| Type Magnetic Field | Hardware | Measures the ambient geomagnetic field for all three physical axes (x, y, z) in μT. | Creating a compass. |
|---|---|---|---|
| Type Orientation | Software | Measures degrees of rotation that a device makes around all three physical axes (x, y, z). As of API level 3 you can obtain the inclination matrix and rotation matrix for a device by using the gravity sensor and the geomagnetic field sensor in conjunction with the get Rotation Matric () method. | Determining device position. |
| Type Pressure | Hardware | Measures the ambient air pressure in hPa or mbar. | Monitoring air pressure changes. |
| Type Proximity | Hardware | Measures the proximity of an object in cm relative to the view screen of a device. This sensor is typically used to determine whether a handset is being held up to a person's ear. | Phone position during a call. |
| Type Relative Humidity | Hardware | Measures the relative ambient humidity in percent (%). | Monitoring dewpoint, absolute, and relative humidity. |
| Type Rotation Vector | Software or Hardware | Measures the orientation of a device by providing the three elements of the device's rotation vector. | Motion detection and rotation detection. |
| Type Temperature | Hardware | Measures the temperature of the device in degrees Celsius (°C). This sensor implementation varies across devices and this sensor was replaced with the Type—Ambient Temperature sensor in API Level 14 | Monitoring temperatures. |

❖ **BIOMETRICS**: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).

❖ **DISABLING LOCK MECHANISM:** Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. When setting the pattern, you must drag your finger along lines on the screen between different nodes. Afterward, to unlock the phone, you'll need to replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account. If you can't log in, you'll have to employ some other methods to restore control of your phone.

18

❖ **CHEMICAL, BIOLOGICAL, RADIOLOGICAL, AND NUCLEAR (CBRN) DETECTION:**
Through collaboration and innovation, the Defense Threat Reduction Agency has
integrated its powerful, hazard-awareness-and-response tools into the *Android Tactical
Assault Kit (or the Android Team Awareness Kit, ATAK)*. ATAK is a digital application
available to warfighters throughout the DoD. Built on the Android operating system, ATAK
offers warfighters geospatial mapping for situational awareness during combat — on an
end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now
includes chemical, biological, radiological, and nuclear (CBRN) plug-ins.

❖ **HEART RATE**: *Android Team Awareness Kit, ATAK* provides a single interface for viewing
and controlling different CBRN-sensing technologies, whether that is a wearable
smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a
drone to detect chemical warfare agents.

❖ **NEAR FIELD COMMUNICATION (NFC)**: Pixel™, Phone by Google - Turn NFC on/off.
Near Field Communication (NFC) allows the transfer of data between devices that are a
few centimeters apart, typically back-to-back. NFC must be turned on for NFC-based apps
(e.g., Tap to Pay) to function correctly. NFC is a set of short-range wireless technologies,
typically requiring a distance of 4cm or less to initiate a connection. NFC allows you to
share small payloads of data between an NFC tag and an Android-powered device, or
between two Android-powered devices. Tags can range in complexity.

❖ **WARFIGHTERS:** The U.S. armed forces and their interagency and coalition partners
value *Android Team Awareness Kit, ATAK* and the common operating picture it provides.
DTRA continues to develop CBRN-specific plug-in capabilities to support warfighters on
the battlefield.

---

**Question:** Is downloading a mobile app a process, method, procedure, or modification?

**Answer:** Downloading a mobile app is primarily a process.

Definition of Process

- A series of actions or steps taken to achieve a particular end.
- In this case, it involves steps like searching for the app, selecting it, and initiating the
  download.

Related Concepts

- Method: Refers to a systematic way of doing something, which can apply to how the
  download is executed (e.g., using an app store).
- Procedure: A set of established or official ways of doing something, which can describe
  the specific steps involved in downloading an app.
- Modification: This term typically refers to changes made to something, which does not
  directly apply to the act of downloading an app.

In summary, while downloading an app can involve methods and procedures, it is best

categorized as a process.

19



**Question**: Does the Google android operating systems (OS) process apps [DTRA-ATAK] through a structured framework that manages application execution and resource allocation?

**Answer**: Yes. The Google android operating system (OS) is responsible for processing the DTRA-ATAK app. The Android (OS) is also responsible for processing the DTRA-ATAK associated CBRNE plug-in sensors.

Application Lifecycle Management

- The Android (OS) uses a component-based architecture, where each app consists of components like Activities, Services, Broadcast Receivers, and Content Providers.
- The Android system manages the lifecycle of these components, determining when they are created, started, stopped, or destroyed.

Resource Management

- The operating system (OS) allocates system resources (CPU, etc.) to apps based on priority and user interaction.
- Android employs a process management system that runs apps in separate processes, ensuring stability and security.

Multitasking and Background Processing

- The Android (OS) supports multitasking, allowing multiple apps to run simultaneously.
- Background services can perform tasks without user interaction, but they are subject to restrictions to optimize battery life and performance.

Permissions and Security

- Apps must request permissions to access sensitive resources, ensuring user privacy and security.
- The Android security model isolates apps from each other, preventing unauthorized access to data.

Overall, the Google android operating system efficiently processes apps while balancing performance, security, and user experience.

20



## FIVE ALLEGED INFRINGEMENT THEORIES

The *"PROCESS"* of including the five alleged infringement theories is "a series of actions or steps taken to achieve a particular end". Included in the chart are the elements of the alleged infringing phone; the limitations of the alleged infringed upon patent claim; that includes the alleged infringing Google Tensor CPU; and, the alleged infringing Google smartwatch.

As indicated above, "downloading a mobile app is primary a process,[1] not a modification. The end result is a Google device capable of functioning as CBRNE-H detector. Both "process" and "modification" are issues of fact; *NOT* issues of law; decided by a jury, *NOT* a judge.

---

[1] One may hear the terms "system patent", process patent, method patent, product patent or device patent. These are not different types of patents; rather, these names refer to the subject matter that is defined in the claims of a utility patent.

In this case, Golden's utility patent protects the specific, functional process or method the mobile app [DTRA-ATAK] performs. To be eligible for the patent, this process must have meet three criteria established by the United States Patent and Trademark Office (USPTO): it must have been novel, non-obvious, and useful.

A process patent encompasses a series of steps or methods that lead to a specific outcome. This outcome can be the production of a product, or the execution of a particular task.

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of Texas ☑

| | |
|---|---|
| Larry Golden, ProSe ) | |
| ) | |
| ) | |
| _____ ) | |
| *Plaintiff(s)* ) | Civil Action No. |
| v. ) | **6:25-CV-00434** |
| ) | |
| Google, LLC ) | |
| ) | |
| _____ ) | |
| *Defendant(s)* ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Google, LLC
1600 Amphitheatre Parkway,
Mountain View, CA 94043

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Larry Golden
740 Woodruff Road
Apt. #1102
Greenville, S.C. 29607

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____   ____   ____   _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____ _____
was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

Generated: Sep 18, 2025 3:10PM                                                                 Page 1/1



# U.S. District Court

## Texas Western - Waco

Receipt Date: Sep 18, 2025 3:10PM

ATPG Technology, LLC
740 Woodruff Rd #1102
Greenville, SC 29607

| Rcpt. No: 2051 | Trans. Date: Sep 18, 2025 3:10PM | | | Cashier ID: #CP (6649) | |
|---|---|---|---|---|---|
| **CD** | **Purpose** | **Case/Party/Defendant** | **Qty** | **Price** | **Amt** |
| 200 | Civil Filing Fee- Non-Prisoner | | 1 | 405.00 | 405.00 |

| CD | Tender | | | Amt |
|---|---|---|---|---|
| CH | Check | #1105 | 09/15/2025 | $405.00 |
| | | | Total Due Prior to Payment: | $405.00 |
| | | | Total Tendered: | $405.00 |

**Comments:** Civil filing fee for Case #DTXW625CV000434 Golden vs Google, LLC

Clerk, United States District Court - Waco Division - 800 Franklin Ave, Rm 380, Waco, TX 76701 (254) 750-1501 - www.txwd.uscourts.gov

# Exhibits J

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| LARRY GOLDEN, | § | |
| | § | |
| Plaintiff, | § | Case No. 6:25-cv-00434-LS |
| | § | |
| v. | § | |
| | § | |
| GOOGLE LLC | § | |
| | § | |
| Defendant. | § | |

## **DEFENDANT GOOGLE LLC'S MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

A.    The Asserted Patents and Plaintiff's Litigation Campaign . . . . . . . . . . . . . . . . . . . . . . . .1

B.    Mr. Golden's Previous Litigation Against Google . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

C.    Mr. Golden's Current Litigation Against Google . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    The Court Should Dismiss Counts I and II of Plaintiff's Complaint . . . . . . . . . . . . . . . . 4

    A.    Res Judicata Bars Counts I and II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

    B.    The *Kessler* Doctrine Bars Counts I and II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

    C.    Counts I and II Fail to State a Claim of Joint Infringement . . . . . . . . . . . . . . . . . 8

II.    The Court Should Dismiss Counts III through VI of Plaintiff's Complaint . . . . . . . . . . 11

    A.    Counts IV Through VI Admit That Google Does Not Infringe . . . . . . . . . . . . . 11

    B.    Counts III Admits That Google Does Not Infringe . . . . . . . . . . . . . . . . . . . . . . . 12

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

## TABLE OF AUTHORITIES

*Cases*                                                                    Page

*Acumed LLC v. Stryker Corp.*,
    525 F.3d 1319 (Fed. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
    797 F.3d 1020 (Fed. Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Anderson v. 21st Mortg. Corp.*,
    No. 15-200, 2016 WL 11582928 (W.D. Tex. Sept. 26, 2016) . . . . . . . . . . . . . . . . . . . . 10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Askan v. FARO Techs., Inc.*,
    No. 22-2117, 2023 WL 4101351 (Fed. Cir. June 21, 2023) . . . . . . . . . . . . . . . . . . . . . 7, 8

*Avila v. Ocwen Loan Servicing, LLC*,
    No. 14-460, 2014 WL 12580450 (W.D. Tex. June 6, 2014) . . . . . . . . . . . . . . . . . . . . . . . 5

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Brain Life, LLC v. Elekta Inc.*,
    746 F.3d 1045 (Fed. Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Brown v. Felsen*,
    442 U.S. 127 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Centillion Data Sys. LLC v. Qwest Commc'ns Int'l Inc.*,
    631 F.3d 1279 (Fed. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Duffie v. United States*,
    600 F.3d 362 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Golden v. Google LLC*,
    No. 22-5246, 2023 WL 5154513 (N.D. Cal. Aug. 10, 2023) . . . . . . . . . . . . . . . . . . . . 2, 12

*Golden v. Google LLC*,
    No. 22-5246, 2024 WL 1880336 (N.D. Cal. Apr. 3, 2024) . . . . . . . . . . . . . . . . . . . . 2, 5, 7

*Golden v. Google LLC*,
    No. 24-2024, 2025 WL 1752485 (Fed. Cir. June 25, 2025) . . . . . . . . . . . . . . . . . . 2, 3, 10

## TABLE OF AUTHORITIES
*(continued)*

Page

*Golden v. Samsung Elecs. Am., Inc.,*
    2023 WL 3919466 (N.D. Cal. June 8, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Golden v. United States,*
    171 Fed. Cl. 33 (2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Golden v. United States,*
    No. 24-2256, 2025 WL 900873 (Fed. Cir. Mar. 24, 2025) . . . . . . . . . . . . . . . . . . . . . 6, 7

*Hall v. Hodgkins,*
    305 Fed. App'x 224 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Hemphill v. Johnson & Johnson,*
    550 F. App'x 890 (Fed. Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Herrmann v. Bridger,*
    No. 24-545, 2024 WL 4849079 (W.D. Tex. Nov. 20, 2024) . . . . . . . . . . . . . . . . . . . . 4, 5

*Kessler v. Eldred,*
    206 U.S. 285 (1907) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.,*
    590 U.S. 405 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Lyda v. CBS Corp.,*
    838 F.3d 1331 (Fed. Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Mars Inc. v. Nippon Conlux Kabushiki-Kaisha,*
    58 F.3d 616 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Matter of Vitro Asset Corp.,*
    656 F. App'x 717 (5th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Nazomi Commc'ns, Inc. v. Nokia Corp.,*
    739 F.3d 1339 (Fed. Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Nystrom v. Trex Co.,*
    580 F.3d 1281 (Fed. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In re PersonalWeb Techs. LLC,*
    961 F.3d 1365 (Fed. Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

**TABLE OF AUTHORITIES**
*(continued)*

Page

*Red Rock Analytics, LLC v. Apple Inc.,*
    No. 21-346, 2021 WL 5828368 (W.D. Tex. Dec. 8, 2021) . . . . . . . . . . . . . . . . . . . . . . .7, 8

*RFC Lenders of Texas, LLC v. Smart Chem. Sols., LLC,*
    743 F. Supp. 3d 911 (W.D. Tex. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Seven Networks, LLC v. Motorola Mobility LLC,*
    No. 21-1036, 2022 WL 426589 (N.D. Tex. Feb. 10, 2022) . . . . . . . . . . . . . . . . . . . . . . 7

*In re Southmark Corp.,*
    163 F.3d 925 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*SimpleAir, Inc. v. Google LLC*
    884 F.3d 1160 (Fed. Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co., Ltd.,*
    754 F.2d 345 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*Wade v. Household Fin. Corp,*
    No. 17-148, 2017 WL 2533535 (W.D. Tex. June 8, 2017) . . . . . . . . . . . . . . . . . . . . . . .5

*Wicker v. Seterus, Inc.,*
    No. 15-331, 2016 WL 2622017 (W.D. Tex. May 5, 2016) . . . . . . . . . . . . . . . . . . . . . . .4

*Windmann v. Sun Life Assurance Co. of Canada,*
    No. 16-61, 2016 WL 11591768 (W.D. Tex. Dec. 15, 2016) . . . . . . . . . . . . . . . . . . . .10, 11

*Wis. Alumni Rsch. Found. v. Apple Inc.,*
    112 F.4th 1364 (Fed. Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Xiaohua Huang v. Huawei Techs. Co.,*
    787 F. App'x 723 (Fed. Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 6

*Statutes*

35 U.S.C. § 286 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

28 U.S.C. § 1338(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

**TABLE OF AUTHORITIES**
*(continued)*

                                                                          *Page*

*Other Authorities*

18 Wright et al., *Federal Practice and Procedure* § 4407 (3d ed. 2016) . . . . . . . . . . . . . . . . . . . 6

*Golden v. Google LLC*,
        No. 22-5246, Docket No. 1 (N.D. Cal. Sept. 14, 2022) . . . . . . . . . . . . . . . . . . . . . . . . 2, 5

*Golden v. Google LLC*,
        No. 22-5246, Docket No. 11 (N.D. Cal. Oct. 26, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Golden v. Google LLC*,
        No. 22-5246, Docket No. 42 (N.D. Cal. Aug. 23, 2023) . . . . . . . . . . . . . . . . . . . . 2, 5, 8

*Golden v. Google LLC*,
        No. 22-5246, Docket No. 44 (N.D. Cal. Sept. 7, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Golden v. Google LLC*,
        No. 22-5246, Docket No. 76 (N.D. Cal. Sept. 9, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Golden v. Google LLC*,
        No. 24-2024, Docket No. 44 (Fed. Cir. Sept. 2, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . 3

Restatement (Second) of Torts § 491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## INTRODUCTION

Plaintiff Larry Golden sued Google in the Northern District of California, and lost.  Mr.

Golden now brings the same claims against Google in a new court—this Court.  But in any court,

Mr. Golden cannot avoid res judicata and the *Kessler* doctrine, which bar him from relitigating

the claims he has already lost.  Mr. Golden also brings claims against self-driving cars belonging

to Waymo.  But the complaint admits that Waymo is a different company from defendant Google

and has been since 2016, well before any period of possible damages from this action.  Mr.

Golden does not provide any indication why Google should be responsible for the actions of

Waymo.  None exists.  The Court should dismiss this action.

## BACKGROUND

### A.      The Asserted Patents and Plaintiff's Litigation Campaign

Plaintiff Larry Golden holds twelve patents including the five he asserts in this action,

U.S. Patent Nos. 8,334,761, 10,163,287, 10,984,619, 11,645,898, and RE43,891.  Since 2013,

Mr. Golden has asserted his portfolio in an unsuccessful litigation campaign, filing thirteen

complaints claiming infringement of eleven patents against the United States of America as well

as Apple, Google, Intel, Qualcomm, and Samsung.[1]  None of Mr. Golden's claims have made it

past the pleading stage.  *See* note 1.  Mr. Golden's patents generally concern anti-terrorism; the

patents-in-suit address "anti-terrorist detection and prevention systems," specifically, "a

---

[1] *Golden v. United States*, No. 13-307 (Fed. Cl. May 1, 2013); *Golden v. United States*, No. 19-104 (Fed. Cl. Jan. 17, 2019); *Golden v. Apple, Inc.*, No. 19-2557 (D.S.C. Sept. 11, 2019); *Golden v. Apple, Inc.*, No. 20-2270 (D.S.C. June 16, 2020); *Golden v. Apple, Inc.*, No. 20-4353 (D.S.C. Jan. 5, 2021); *Golden v. Google LLC*, No. 21-244 (D.S.C. Jan. 26, 2021); *Golden v. Qualcomm Inc.*, No. 22-3283 (N.D. Cal. June 6, 2022); *Golden v. Intel Corp.*, No. 22-3828 (N.D. Cal. June 28, 2022); *Golden v. Apple, Inc.*, No. 22-4152 (N.D. Cal. July 15, 2022); *Golden v. Google LLC*, No. 22-5246 (N.D. Cal. Sept. 14, 2022); *Golden v. Samsung Elecs. Am., Inc.*, No. 23-48 (N.D. Cal. Jan. 5, 2023); *Golden v. United States*, No. 23-185 (Fed. Cl. Feb. 7, 2023); *Golden v. United States*, No. 23-811 (Fed. Cl. May 31, 2023).

– 1 –

chemical/biological/radiological detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons." '287 patent at 1:57-63, 3:35-41; '761 patent at 1:19-24, 2:62 to 3:1; '619 patent at 1:52-57, 3:30-35; '898 patent at 1:56-61, 3:36-41; RE'891 patent at 1:39-44, 3:17-22.

## B. Mr. Golden's Previous Litigation Against Google

In 2022, Mr. Golden filed suit against Google in the Northern District of California, claiming infringement of three patents on "anti-terrorist detection and prevention systems," including the '287 patent at issue here. *Golden v. Google LLC*, No. 22-5246, Docket No. 1 at 2 (N.D. Cal. Sept. 14, 2022). Google moved to dismiss, arguing that the complaint did not allege that Google's "devices themselves infringe," but claimed only that its "devices could infringe his patents if a user added another application, 'ATAK,' made not by Google, but by the U.S. military." *Id.*, Docket No. 11 at 5:6-8. The Court granted Google's motion with leave to amend, holding "[t]hat a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement." *Golden v. Google LLC*, No. 22-5246, 2023 WL 5154513, at *1, *3 (N.D. Cal. Aug. 10, 2023).

Mr. Golden amended his complaint, providing additional allegations and adding a new patent, the '619 patent at issue here. *Id.*, Docket No. 42 at 2-3. Google filed a second motion to dismiss (*id.*, Docket No. 44), which the Court granted without leave to amend. *Id.*, 2024 WL 1880336, at *4-5 (N.D. Cal. Apr. 3, 2024). Mr. Golden appealed. *Golden v. Google LLC*, No. 24-2024, 2025 WL 1752485 (Fed. Cir. June 25, 2025). The Federal Circuit affirmed, finding no infringement because "Mr. Golden's infringement allegations require modification of the accused products to show infringement," and finding that "the district court did not err in finding that Mr.

Golden fails to adequately allege joint infringement." *Id.* at *3. Mr. Golden filed petitions for rehearing and rehearing *en banc*, which the Court denied. *Golden v. Google LLC*, No. 24-2024, Docket No. 44 (Fed. Cir. Sept. 2, 2025). On September 9, the Court of Appeals issued its mandate affirming the Northern District of California's complete dismissal of Mr. Golden's previous complaint. *Golden v. Google*, No. 22-5246, Docket No. 76 (N.D. Cal. Sept. 9, 2025).

## C.    Mr. Golden's Current Litigation Against Google

Nine days after the Federal Circuit issued its mandate in the previous action, Mr. Golden filed this action. Compl. Although his complaint acknowledges his previous losses in the Northern District of California and the Federal Circuit, *e.g.*, Compl. at 15, 16, 17, and although he previously asserted two of the pending five patents against Google in those cases, *see id.*, Mr. Golden filed this action here, rather than in the Northern District of California. *See id.*

In his complaint, Mr. Golden admits his losses in the previous action, but does not admit the effect of those losses. Instead, he claims that his previous losses enable, rather than preclude, his current claims. Mr. Golden alleges that, when the previous courts found no infringement because his "allegations require[d] modification of the accused products to show infringement" and that he "fail[ed] to adequately allege joint infringement," *Golden v. Google*, 2025 WL 1752485, at *3, what they actually meant was that "'joint infringement' is established when Google was found to have controlled the 'manner or timing' of the third-party's modification or performance," and that "infringement occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability," Mr. Golden's term for functionality he claims his patents cover. Compl. at 9. As a result, Mr. Golden alleges, "Google has inadvertently litigated itself into a situation of greater liability." *Id.* at 18. Mr. Golden claims that "Google's potential liability" includes "all the Actors in Google's Android Ecosystem

– 3 –

performing a required step." *Id.* Thus Mr. Golden now alleges that his claims, which the

Northern District dismissed because they required modification of Google's accused devices,

should proceed in this Court *because* they require modification of Google's accused devices.

**ARGUMENT**

**I.     The Court Should Dismiss Counts I and II of Plaintiff's Complaint**

**A.     Res Judicata Bars Counts I and II**

"Res judicata 'bars the litigation of claims that either have been litigated or should have

been raised in an earlier suit.'" *Matter of Vitro Asset Corp.*, 656 F. App'x 717, 723 (5th Cir.

2016) (quoting *In re Southmark Corp.*, 163 F.3d 925, 934 (5th Cir. 1999)). "The test for claim

preclusion has four elements: (1) the parties in the subsequent action are identical to, or in

privity with, the parties in the prior action; (2) the judgment in the prior case was rendered by a

court of competent jurisdiction; (3) there has been a final judgment on the merits; and (4) the

same claim or cause of action is involved in both suits." *Duffie v. United States*, 600 F.3d 362,

372 (5th Cir. 2010). "Claim preclusion in a patent case typically exists when a patentee attempts

to assert the same patent against the same party and the same subject matter.  Subject matter is

the same for claim preclusion purposes if the earlier accused devices and the devices accused in

the current action are 'essentially the same.'" *Xiaohua Huang v. Huawei Techs. Co.*, 787 F.

App'x 723, 726 (Fed. Cir. 2019) (citation omitted).  "[D]ismissal under Rule 12(b)(6) is proper if

the elements of res judicata are apparent 'based on the facts pleaded and judicially noticed,'" and

this Court can resolve "the issue of res judicata by relying only on the facts pleaded in Plaintiff's

Complaint and the judicially noticed record in the prior lawsuits." *Wicker v. Seterus, Inc.*, No.

15-331, 2016 WL 2622017, at *4 (W.D. Tex. May 5, 2016) (quoting *Hall v. Hodgkins*, 305 F.

App'x 224, 227-28 (5th Cir. 2008)); *see also, e.g., Herrmann v. Bridger*, No. 24-545, 2024 WL

– 4 –

4849079, at *3-4 (W.D. Tex. Nov. 20, 2024); *Avila v. Ocwen Loan Servicing, LLC*, No. 14-460, 2014 WL 12580450, at *2-3 (W.D. Tex. June 6, 2014).

All four elements are present here. The parties are identical: Mr. Golden and Google. *Compare* Compl. *with Golden v. Google*, No. 22-5246, Docket No. 1 (N.D. Cal. Sept. 14, 2022). The Northern District of California had jurisdiction over the previous case, 28 U.S.C. § 1338(a), and issued a final "[d]ismissal under 12(b)(6)," which "constitutes a final judgment on the merits." *Wade v. Household Fin. Corp.*, No. 17-148, 2017 WL 2533535, at *3 (W.D. Tex. June 8, 2017); *see Golden v. Google*, 2024 WL 1880336. That leaves only the question of whether "the same claim or cause of action is involved in both suits." *Duffie*, 600 F.3d at 372. For Counts I and II claiming infringement of the same '287 and '619 patents Mr. Golden asserted in the Northern District, the answer is yes. Courts evaluate a claim based on "the transactional facts from which it arises" and "the extent of the factual overlap between the two alleged claims at issue." *In re PersonalWeb Techs. LLC*, 961 F.3d 1365, 1375 (Fed. Cir. 2020). "For claim preclusion in a patent case, an accused infringer must show that the accused product or process in the second suit is 'essentially the same' as the accused product or process in the first suit." *Nystrom v. Trex Co.*, 580 F.3d 1281, 1285 (Fed. Cir. 2009). That is so here. In his previous California action, Mr. Golden claimed infringement of these patents by Android devices and Google Tensor chips. *E.g.*, *Golden v. Google*, No. 22-5246, Docket No. 42 at 16-17 ¶¶ 45-50; *id.*, Docket No. 42 Exs. B, C, D. In this action, Mr. Golden claims infringement of these patents by Android devices and Google Tensor chips. *E.g.*, Compl. at 10-18, 24-28. These allegations are the same. Mr. Golden seeks "to prove infringement of the same claim limitations as to the same features of the accused devices," which is "the exact situation that res judicata seeks to prevent." *Nystrom*, 580 F.3d at 1286. "Any alleged difference between the accused products in

each case is therefore unrelated to the limitations in the claim of the patents." *Huang*, 787 F.

App'x at 726 (citing *Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1324 (Fed. Cir. 2008)).

The Court can and should dismiss these claims for another reason as well. "[C]laim

preclusion prevents parties from raising issues that could have been raised and decided in a prior

action—even if they were not actually litigated. If a later suit advances the same claim as an

earlier suit between the same parties, the earlier suit's judgment 'prevents litigation of all grounds

for, or defenses to, recovery that were previously available to the parties, regardless of whether

they were asserted or determined in the prior proceeding.'" *Lucky Brand Dungarees, Inc. v.*

*Marcel Fashions Grp., Inc.*, 590 U.S. 405, 412 (2020) (quoting *Brown v. Felsen*, 442 U.S. 127,

131 (1979)). "It is well established that a party may not split a cause of action into separate

grounds of recovery and raise the separate grounds in successive lawsuits; instead, a party must

raise in a single lawsuit all the grounds of recovery arising from a single transaction or series of

transactions that can be brought together." *Mars Inc. v. Nippon Conlux Kabushiki-Kaisha*, 58

F.3d 616, 619 (Fed. Cir. 1995). Although Mr. Golden's current claims appear identical to those

in his previous action, *see supra*, to any extent they are not, they "could have been raised and

decided" in the Northern District action, and res judicata thus bars them. *Lucky Brand*, 590 U.S.

at 412. The Court should not allow Mr. Golden to seek "'a different judgment in the second

action [that] would impair or destroy rights or interests established by the judgment entered in

the first action.'" *Id.* at 413 (citing 18 Wright & Miller, *Federal Practice and Procedure* § 4407

(3d ed. 2016)). The Court should dismiss these claims for this reason as well.

## B.     The *Kessler* Doctrine Bars Counts I and II

"In *Kessler v. Eldred*, the Supreme Court adopted an enlargement of traditional claim and

issue preclusion doctrines to further preserve the utility of previous judgments of

non-infringement by holding that a prior judgment of non-infringement would bar new

infringement claims for post-judgment acts, against third parties, and covering very similar

accused devices." *Golden v. United States*, 171 Fed. Cl. 33, 37 (2024) (citing *Kessler v. Eldred*,

206 U.S. 285 (1907)), *aff'd*, No. 24-2256, 2025 WL 900873 (Fed. Cir. Mar. 24, 2025). "The

purpose of this doctrine is to '[allow] an adjudged non-infringer to avoid repeated harassment for

continuing its business as usual post-final judgment in a patent action where circumstances

justify that result.'" *Red Rock Analytics, LLC v. Apple Inc.*, No. 21-346, 2021 WL 5828368, at

*2 (W.D. Tex. Dec. 8, 2021) (alteration in original) (quoting *In re PersonalWeb Techs. LLC*, 961

F.3d at 1376). "A patent infringement claim is precluded under the *Kessler* doctrine when (1) the

defendant is an adjudged non-infringer and (2) 'the earlier judgment held that "essentially the

same" accused activity did not infringe the patent.'" *Red Rock*, 2021 WL 5828368, at *2

(quoting *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1170 (Fed. Cir. 2018)); *see also, e.g.*,

*Wis. Alumni Rsch. Found. v. Apple Inc.*, 112 F.4th 1364, 1386 (Fed. Cir. 2024). Courts routinely

dismiss under the *Kessler* doctrine at the pleading stage, including twice in cases involving Mr.

Golden. *E.g.*, *Golden v. United States*, 171 Fed. Cl. at 37; *Golden v. Samsung Elecs. Am., Inc.*,

No. 23-48, 2023 WL 3919466, at *2 (N.D. Cal. June 8, 2023). *See also Seven Networks, LLC v.

Motorola Mobility LLC,* No. 21-1036, 2022 WL 426589 (N.D. Tex. Feb. 10, 2022).

      Both elements of the *Kessler* doctrine are present here. The Northern District dismissed

Mr. Golden's prior action with prejudice, *Golden v. Google*, 2024 WL 1880336, at *4-5, which

was a "dismissal with prejudice" that "has a preclusive effect under the *Kessler* doctrine," making

Google an adjudged non-infringer. *Askan v. FARO Techs., Inc.*, No. 22-2117, 2023 WL 4101351,

at *3 (Fed. Cir. June 21, 2023); *see id.* at *3-4 (collecting cases). And the "earlier judgment" in

the Northern District of California "held that 'essentially the same' accused activity did not

infringe" Mr. Golden's patents asserted in this action. *Red Rock*, 2021 WL 5828368, at \*2. In

his previous California action, Mr. Golden claimed infringement by Android devices and Google

Tensor chips. *E.g.*, *Golden v. Google*, Case No. 22-5246, Docket No. 42 at 16-17 ¶¶ 45-50; *id.*,

Docket No. 42 Exs. B, C, D. In this action, Mr. Golden claims infringement by Android devices

and Google Tensor chips, which are either the "originally accused products" or "subsequent

versions" of those products with "'no material differences' between the accused products in each

suit"; the *Kessler* doctrine precludes both. *Wis. Alumni*, 112 F.4th at 1386 (quoting *Brain Life,*

*LLC v. Elekta Inc.*, 746 F.3d 1045, 1058 (Fed. Cir. 2014)); *see Askan*, 2023 WL 4101351, at \*5;

*see, e.g.*, Compl. at 10-18, 24-28. The Court should dismiss these claims.

### C.      Counts I and II Fail to State a Claim of Joint Infringement

Should the Court examine Counts I and II without considering res judicata or the *Kessler*

doctrine, it will nevertheless find that they fail to state a claim. A party may move to dismiss a

claim if the complaint has "fail[ed] to state a claim upon which relief can be granted." Fed. R.

Civ. P. 12(b)(6). To survive a motion to dismiss, "a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *RFC Lenders of*

*Texas, LLC v. Smart Chem. Sols., LLC*, 743 F. Supp. 3d 911, 915-16 (W.D. Tex. 2024) (quoting

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. Mr. Golden's do not.

Counts I and II allege joint infringement. *See* Compl. at 24-28. The asserted '619 and

'287 patents include only system claims, and claims of joint infringement can apply only to

method claims. *See* Compl. Exs. D, E; *Lyda v. CBS Corp.*, 838 F.3d 1331, 1339 (Fed. Cir. 2016)

(citing *Centillion Data Sys. LLC v. Qwest Commc'ns Int'l Inc.*, 631 F.3d 1279, 1284 (Fed. Cir.

2011)).  The complaint briefly acknowledges that it seeks to recast system claims as method

claims, *id.* at 17, but does not explain how this recasting would work or how the law allows it.

That is no surprise:  it doesn't work, and the law doesn't allow it.  *E.g., Lyda*, 838 F.3d at 1339.

Second, even assuming that the patents included method claims, the complaint admits

that it cannot allege joint infringement.  "While a typical claim of direct infringement requires

proof that a defendant performs each step of the claimed method, joint infringement requires

more." *Lyda*, 838 F.3d at 1338.  "To prove joint infringement, where multiple actors are involved

in practicing the claim steps, the patent owner must show that the acts of one party are

attributable to the other such that a single entity is responsible for the infringement.  This court

has held that an entity will be responsible for others' performance of method steps in two

circumstances:  '(1) where that entity directs or controls others' performance, and (2) where the

actors form a joint enterprise.'" *Id.* at 1338-39 (quoting *Akamai Techs., Inc. v. Limelight

Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015)).

Although the complaint spends many pages discussing joint infringement, *e.g.,* Compl. at

3-19, it does not provide the allegations necessary to support this claim.  To the contrary, the

complaint admits on its face that its allegations cannot suffice to claim joint infringement.  The

complaint states that "Google allegedly directs control of the manner and/or timing of an actor(s)

because it is Google who controls its allegedly infringing Google Tensor Series G1-G5 CPUs

and Google Android Open-Source Operating Systems', release of source codes that describes

and controls the third party's performance [modification] parameters." *Id.* at 12 (brackets in

original); *see also, e.g., id.* at 24 ¶ 1; *id.* at 26 ¶ 12.  In other words, Mr. Golden alleges that

Google makes products, publishes specifications and source code for those products, and by

doing so allows others to build allegedly infringing products. *See id.*  That is the same argument

Mr. Golden made in his previous litigation—and lost before the Northern District and the Federal Circuit. *See supra* § B. Mr. Golden cannot avoid those rulings by claiming that allowing interoperable products constitutes "direct[ing] or control[ling] others' performance" under *Akamai* and thus supports joint infringement, which would eviscerate the long-standing doctrine that there can be "no infringement when the accused products 'do not infringe without modification—the modification of installing the required software.'" *Golden v. Google*, 2025 WL 1752485, at *3 (quoting *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014)). Mr. Golden does not allege anything beyond interoperability, *e.g.*, Compl. at 4-12, nor could he; his allegations cannot suffice and the Court should dismiss them.

Finally, Mr. Golden briefly alleges a "joint enterprise" between Google and "the United States government." Compl. at 24 ¶ 4; 27 ¶ 15. These allegations also fail. To claim a joint enterprise, a plaintiff must allege: "(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Akamai*, 797 F.3d at 1023 (citing Restatement (Second) of Torts § 491 cmt. c). To meet these elements, Mr. Golden provides only a portion of an apparent news article stating that Google has participated in a government procurement process which, even assuming its truth, does not plausibly allege any of the facts necessary to make this showing. Compl. at 14. Beyond that, Mr. Golden provides only "conclusory allegations, unwarranted deductions, or legal conclusions," *Anderson v. 21st Mortg. Corp.*, No. 15-200, 2016 WL 11582928, at *2 (W.D. Tex. Sept. 26, 2016), the kind of "formulaic recitation of the elements of a cause of action" that "will not do.'" *Windmann v. Sun Life*

– 10 –

*Assurance Co. of Canada*, No. 16-61, 2016 WL 11591768, at *1 (W.D. Tex. Dec. 15, 2016)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## II.  The Court Should Dismiss Counts III through VI of Plaintiff's Complaint

### A.  Counts IV Through VI Admit That Google Does Not Infringe

Counts IV through VI accuse "Self Drive Vehicles." Compl. at 31-35; *id.* Ex. B.

Although the complaint refers to "Google Self Drive Vehicles" and accuses "Google, LLC," *e.g.,*

*id.* at 31 ¶¶ 35, 37, the complaint admits that any "Self Drive Vehicles" come from Waymo LLC,

a separate company. The complaint notes that "Waymo LLC, formerly known as the Google

Self-Driving Car Project, is an American autonomous driving technology company

headquartered in Mountain View, California. It is a subsidiary of Alphabet Inc., Google's parent

company." *Id.* at 20. The "References" section of the complaint refers to articles confirming that

Waymo and Google are separate companies. *See id.* at 37-39. The complaint notes that "[i]n

December 2016, the project was renamed Waymo and spun out of Google as part of Alphabet,"

and alleges that "Waymo, as of 2025, operates commercial robotaxi services" in various cities.

*Id.* at 20. And Mr. Golden's claim charts supporting these accounts accuse "Google [Waymo]"

of infringement. Compl. Ex. B. at 3, 4, 5, 6, 7, 9, 12, 14 (brackets in original).

The complaint therefore cannot state a claim against Google. Mr. Golden does not claim

that Google itself provides any "Self Drive Vehicles." Compl. at 20; *see supra.* Patent plaintiffs

may not recover "for any infringement committed more than six years prior to the filing of the

complaint," 35 U.S.C. § 286; Mr. Golden brought this case on September 18, 2025, and so any

allegations that Waymo vehicles infringed Mr. Golden's patents prior to the Waymo spinoff "[i]n

December 2016," Compl. at 20, are "properly dismissed by the district court." *Standard Oil Co.*

*v. Nippon Shokubai Kagaku Kogyo Co., Ltd.*, 754 F.2d 345, 348 (Fed. Cir. 1985); *see, e.g.,*

*Hemphill v. Johnson & Johnson*, 550 F. App'x 890 (Fed. Cir. 2014).  The complaint itself confirms that Mr. Golden cannot state a claim against defendant Google on Counts IV through VI, and the Court should therefore dismiss them.

### B.    Count III Admits That Google Does Not Infringe

Count III fails for two reasons.  First, it fails to allege joint infringement for the same reasons as Claims I and II.  *See supra* § I.C.  Second, it fails to allege direct infringement.  In Count III, Mr. Golden asserts the same '898 patent he also asserts in Count VI.  But while Count VI accuses Waymo's "Self Drive Vehicles," *see supra*, Count III accuses Google's Tensor chips, but does so by assuming the existence of other modifications, not from Google, that Mr. Golden admits are required for infringement.  Among other things, Mr. Golden claims that infringement requires an accused "Android digital car key" and "NFC or UWB tech in newer smartphones," which Mr. Golden claims work with "numerous vehicles from various automakers."  Compl. Ex. A at 28.  Mr. Golden does not claim that Google supplies any of these things, *see id.*, but his allegations depend on their addition to the accused "Tensor Processing Units" from Google.  *See id.*  Count III thus makes the same error Mr. Golden made in the previous action.  Alleging "[t]hat a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement." *Golden v. Google*, 2023 WL 5154513, at *3.  That was so in the previous case, and remains so now.  The Court should dismiss Count III for the same reasons that the Northern District of California dismissed Mr. Golden's prior action.

### CONCLUSION

For the foregoing reasons, Google respectfully requests that the Court dismiss this action.

Date:  December 1, 2025                                    Respectfully submitted,

                                                        */s/ Brian C. Banner*
                                                        Brian C. Banner (State Bar No. 24059416)

Valerie Barker (State Bar No. 24087141)
SLAYDEN GRUBERT BEARD PLLC
401 Congress Avenue, Suite 1650
Austin, Texas, 78701
+1 (512) 402-3569
+1 (512) 402-6865 facsimile
bbanner@sgbfirm.com
vbarker@sgbfirm.com

Matthew S. Warren
Erika H. Warren
WARREN KASH WARREN LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
25-434@cases.warrenlex.com

*Attorneys for Defendant Google LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2025, I served the foregoing Defendant Google

LLC's Motion to Dismiss on the plaintiff by First Class Mail at the following address:

Larry Golden
740 Woodruff Road, No. 1102
Greenville, South Carolina, 29607

by placing it in a sealed envelope with postage paid and placing the envelope in the exclusive

custody of the United States Postal Service.

On the same day, I also sent a courtesy copy of this document by electronic mail to Mr.

Golden at atpg-tech@charter.net.

Kailey Fung