Case 3:26-cv-00831-LJC   Document 20   Filed 12/30/25   Page 1 of 20

FILED
December 30, 2025
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: _____lad_____
              DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 992-7104

Email: atpg-tech@charter.net

| | |
|---|---|
| LARRY GOLDEN,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>GOOGLE LLC<br><br>　　　　Defendant. | CASE NO: 6:2025cv00434-LS<br><br>**JURY TRIAL DEMANDED**<br><br>**(Infringement: 35 U.S.C § 271(g))**<br>**(Joint Patent Infringement)**<br>**(Direct Patent Infringement),**<br>**(Willful Patent Infringement),** |

**PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR PERMANENT INJUNCTIVE RELIEF**

December 29, 2025

**Upon a Finding of Infringement**

Google campaigned on modification and got what they asked for, an improper dismissal. When the twelve Judges added, "the accused devices will have to be modified in order to infringe Plaintiff's patent"; "infringement does not occur without modification, the modification of the Google accused devices"; and "the Google accused devices will have to be modified in order to function as a sensing device"; the Judges derived by reasoning or concluded from evidence: "infringement of Plaintiff's CMDC device occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability."

Chief Justice Roberts joined the majority but also penned a concurrence, writing that since "at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases."

**Injunction Resembles Exclusion**

An exclusion order issued by the USITC resembles an injunction issued by a district court in that each can, in effect, prohibit an infringer from selling infringing articles in the United States by either injunction (district court) or exclusion order banning the articles from importation into the United States *ab initio* (USITC). The presumption favoring exclusion orders for patent infringement in the USITC thus appears consistent with the view that injunctions often are an appropriate remedy in district court litigation. *See, e.g., eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 395 (2006) (observing that, since "at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases") (Roberts, C.J., concurring); *see* also Statement of Interest of the United States of America, *Radian Memory Sys. LLC v. Samsung Elecs. Co.*, No. 2:24-cv-1073, ECF No. 52 (E.D. Tex., June 24, 2025).

*Exhibit A:* [Amicus Brief] "Statement of Interest of the United States of America"; *Radian Memory Sys. LLC v. Samsung Elecs. Co.*, No. 2:24-cv-1073, ECF No. 52 (E.D. Tex., June 24, 2025):

> The Supreme Court has held that, under well-established principles of equity, a patentee must satisfy the traditional four-factor test to receive an injunction. *eBay*, 547 U.S. at 392-93. For an injunction, the four-factor test requires a showing of (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm (with no adequate remedy at law); (3) the balance of the hardships is in favor of the party seeking injunction; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).
>
> Chief Justice Roberts joined the majority but also penned a concurrence, writing that since "at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases." *Id.* at 395 (Roberts, C.J. concurring). This "long tradition of equity practice is not surprising given the difficulty of protecting the right to exclude through monetary remedies that allow an infringer to use an invention against the patentee's wishes" —a difficulty that suggests irreparable harm. *Id.* (quotation marks omitted).
>
> After *eBay*, the Federal Circuit has recognized that "[w]hile a patentee is not entitled to an injunction in every case, it does not follow that courts should entirely ignore the fundamental nature of patents as property rights granting the owner the right to exclude," citing Chief Justice Roberts's concurrence. *Nichia Corp. v. Everlight Americas, Inc.*, 855 F.3d 1328, 1341 (Fed. Cir. 2017) (quoting

3

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1362 (Fed. Cir. 2012)). "Where the injury cannot be quantified, no amount of money damages is calculable, and therefore the harm cannot be adequately compensated and is irreparable." *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017). Moreover, the "[d]ifficulty in estimating monetary damages is evidence" of irreparable harm, i.e., "that remedies at law are inadequate." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010) (citing *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 703-04 (Fed. Cir. 2008)).

**Difficulty in Estimating Monetary Damages is Evidence of Irreparable Harm**

Google admits infringement of Plaintiff's communicating, monitoring, detecting and controlling device is infringed when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability. "Therefore, each of Mr. Golden's direct infringement theories solely against Google fails because Mr. Golden's infringement allegations require modification of the accused products to show infringement." [*Golden v. Google* No. 24-2024]

In *Golden v. Google LLC.*, Case No. 24-2024, Dkt. 41; filed 06/25/2025, three Federal Circuit judges again confirm, infringement of Plaintiff's patented CMDC device occurs when a mobile, consumer, or cellular device, is integrated with, or interconnected to a CBRNE detection capability. The Circuit's opinion includes the following:

> "We conclude that the district court did not err in finding that Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1;

4

Google also admits infringement of Plaintiff's communicating, monitoring, detecting and controlling (CMDC) device is infringed when a mobile, consumer, or cellular device is "modified by a third party" to enable the integration of, or interconnection with, a CBRNE-H detection capability.

What Google failed to admit is: it is Google itself who is the party responsible for "modifying" the cell phone to function as a CBRNE-H detection device. Google was front row and center in "modifying" its cell phone; and is now being accused of "making" the alleged infringing products prior to importation.

The United States impliedly authorized and consented to Google "modifying" the cell phone to include a CBRNE-H detection capability. Under the Department of Homeland Security's Science and Technology Directorate (DHS S&T), BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative [published 10/30/2007], Google was impliedly authorized to commercialize (i.e., to use, offer for sell, sell, or import for sell) Plaintiff's patented CMDC device.

> "… biological and chemical sensors could be effectively integrated into common cell phone devices and made available to the American public on a voluntary basis, the Nation could potentially benefit from a sensor network with more than 240M sensors. Through this BAA, HSARPA is seeking to accelerate advances in miniaturized biological and chemical sensing (e.g. laboratories on a chip) with integration into common device(s) and a communication systems concept for large scale multi-sensor networks. This proof of concept should be capable of detecting hazardous biological and/or chemical materials with eventual expansion to the detection of explosive and eventually radiological materials…" "The proposed concept should develop a miniaturized sensor, device and system…"
> [DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical*

5

*Sensing*] Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks –



Google "android" and symbol top left corner of slide

"Qualcomm's role has been to develop a smartphone app and the associated network software for processing data. Smartphone users can download the app from Google Play and, eventually, from Apple's iTunes store, so Cell-All will be operational on all phones using either Google's Android or Apple's iPhone operating systems." [DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*] Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks –

Plaintiff own eight patents that collectively includes twenty-eight (28) independent patent claims, and eighteen (18) dependent patent claims for Plaintiff's patented communicating, monitoring, detecting and controlling (CMDC) device.

Plaintiff claims his CMDC devices are grouped together by common features and design similarities that include at least a cell phone, a smartphone, a PDA, a laptop, a PC desktop, a tablet, or a smartwatch.

According to IDC VP Francisco Jeronimo, Google Pixel has shipped 37.9 million phones between 2016 and 2023 – the entire life cycle of the Pixel lineup thus far. Jeronimo notes that sales have grown in "double digits" in recent years.

Since 2016, "the difficulty of estimating monetary damages for the alleged infringement of Plaintiff's CMDC devices of at least the Google cell phone, smartphone, laptop, tablet, and smartwatch is evidence of irreparable harm". Google launched its first smartphone Pixel series back in 2016. In the following years, Google Pixel smartphone unit shipments have rapidly increased.

"The difficulty of estimating monetary damages for the alleged infringement of Plaintiff's central processing units (CPUs) of at least the Google Pixel Tensor CPU/Chipset Series, that is a standard component of nearly 40 million Google Pixel phones prior to shipment, is evidence of irreparable harm".

"The difficulty of estimating monetary damages for the alleged infringement of Plaintiff's cell phone detection device of at least the Google Megapixel camera, capable of CBRNE-H detection as a biosensor, built-in QR scanner in the camera app., megapixel counts for sample clarity, and microscopic (zoom) technology. The fact that the camera(s) are standard components of nearly 40 million Google Pixel phones prior to shipment, is evidence of irreparable harm".

"The difficulty of estimating monetary damages for the alleged infringement of Plaintiff's multi-sensor detection device of at least the Google Pixel Watch

7

Series, capable of CBRNE-H detection; that according to the USPTO-PTAB's construction of the term "built-in, embedded" to mean "integrated with", "connected to", so that it is an integral part of [nearly 40 million Google Pixel phones]; the device, is evidence of irreparable harm".

"The difficulty of estimating monetary damages for the alleged infringement under the doctrine of equivalents, of Plaintiff's transceiver[1] device that Plaintiff alleges "performs substantially the same function; in substantially the way; to achieve substantially the same results, of at least the Google android operating system, that is "built-in, embedded", and is a standard component of nearly 40 million Google Pixel phones, is evidence of irreparable harm".

"The difficulty of estimating monetary damages for the alleged contributory infringement under 35 U.S.C. § 271(c) of Plaintiff's transceiver device that Plaintiff alleges is equivalent to the Google android operating system; that Google offers for sell or sells within the United States, a component (i.e., android operating system) used in practicing a patented process, constituting a material part of the CMDC invention (i.e., smartphone, tablet, tablet); Google knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use; at least 1,750 smartphones [Plaintiff claims patent rights to the

---

[1] "The system 10 and the watchtower 112, along with the satellite 136 and the monitoring site 138 can be adapted or incorporated with cell phone towers and satellites for use with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, or a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween." (*Plaintiff Patent Specifications*)

smartphones] and other devices that run on Android,[2] an open-source operating system, is evidence of irreparable harm". *Exhibit B: List of Android Smartphones*

"The difficulty of estimating monetary damages for Plaintiff's alleged joint infringement, whereby Google is the controlling party because it is Google who owns Android; Google who induces the use of the android open-source operating system; Google who releases a source code for developers; Google who control the upgrades and updates to the android operating system; and Google who control the terms of licensing the android open-source operating system: for product grouping the alleged infringing products of multiple parties that include Plaintiff's patented

| ATAK | | | |
|---|---|---|---|
| **Google Pixel 10 Smartphone** | **Samsung Galaxy S21 Smartphone** | **LG V60 ThinQ 5G** | **Asus / Qualcomm Smartphone for Snapdragon Insiders** |
| OS: Google Android 16, 7 major Android upgrades | OS: Google Android 11, upgradable to Android 13 | OS: Google Android 10, upgradable to Android 13 | OS: Google Android 11 |
| **CBRNE PLUGINS** Draper Laboratory, Inc | **CBRNE PLUGINS** Draper Laboratory, Inc | **CBRNE PLUGINS** Draper Laboratory, Inc | **CBRNE PLUGINS** Draper Laboratory, Inc |

---

[2] Android, operating system for cellular telephones and tablet computers. Android began in 2003 as a project of the American technology company Android Inc., to develop an operating system for digital cameras. In 2004 the project changed to become an operating system for smartphones. Android Inc., was bought by the American search engine company Google Inc., in 2005. At Google, the Android team decided to base their project on Linux, an open-source operating system for personal computers.

CMDC devices (i.e., Google smartphones, smartwatches, tablets, laptops); Plaintiff's patented CPUs (i.e., Google CPU/Chipsets); Plaintiff's patented Transceivers[3] (i.e., Google android open-source operating system and DTRA Android Tactical Awareness Kit (ATAK)); Plaintiff's patented Multi-Sensor Detection devices (i.e., Google megapixel cameras for internal the Google smartphone; Google watch for external the Google smartphones; and Draper's CBRNE plug-ins); Plaintiff's patented remote and pre-programmed stall, stop, and vehicle slow-down system for self-drive and autonomous vehicles (Draper Laboratories, Inc.),

  

| ATAK is developed for the Android Operating System; does not require specific hardware and should run on any Android device that supports the other System Requirements. Tactical CBRN Operations utilizes the Android Tactical Assault Kit platform; utilizes a wearable smartwatch that measures a warfighter's vitals (heart rate) | Pictured is Draper's UAS on a CBRN reconnaissance mission as viewed on a TAK-enabled device. Credit: Draper. The TAK-enable devices include smartphones, laptops, PCs, smartwatches, etc. ATAK provides a single interface for viewing and controlling different CBRN-sensing technologies. | Draper's autonomous software on the aerial unmanned platform will be designed to operate with the command-and-control user interface for the U.S. Army's Nuclear, Biological and Chemical Reconnaissance Vehicle (NBCRV) Stryker platform developed by Teledyne FLIR. [a device mounted on a drone to detect chemical warfare agents.] |
|---|---|---|

---

[3] "… a central processing unit (cpu), such as cpu 40, or a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. The aforementioned telecommunication [] means can be interactive with any type of motive vehicle that includes but is not limited to cars, trucks, vans, SUVs, trains, subways, boats, ships and airplanes, and which is reported stolen, experiences a loss of brakes, or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted to the vehicle…"

therefore, with at least 1,750 smartphones "suitable for use" for integrating the Defense Threat Reduction Agency's ATAK software that is built on the Google android open-source operating system and the integration of Draper's CBRNE plugins, is evidence if irreparable harm".

### The Difficulty of Estimating Monetary Damages for Infringement Under Section 35 U.S.C. § 271(g), is Evidence of Irreparable Harm"

In a closely analogous situation involving section 271(a) itself, the Supreme Court in *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972), reaffirmed the principle of non-extraterritoriality.

In *Deepsouth*, which was decided before sections 271(f) and (g) were added to Title 35, the Court recognized that section 271(a), adopted as part of the Patent Act of 1952, did not change the law with respect to infringement. *Id.* at 530 & n. 10, 92 S.Ct. 1700. Instead, it merely codified the understanding of infringement present at the time it was enacted. *Id.* Furthermore, the Court held that direct infringement under section 271(a) — i.e., making, using or selling a patented invention — was limited to activity occurring within the United States. *Id.* at 522-23, 92 S.Ct. 1700. Thus, under the patent laws, "it [was] not an infringement to make or use a patented product outside of the United States." *Id.* at 527, 92 S.Ct. 1700.

Section 35 USC 271(g) was adopted, by Congress because "[i]n order to make patent protection of a process meaningful, it is ... necessary to consider the patented process and the resulting product as a whole, with the consequence that process protection is automatically extended to the resulting product even if the said product has not been claimed." S.Rep. No. 100-83, at 31 (1987) (citations omitted and emphasis added).

***To illustrate***: Had Google practiced the process overseas without bringing the resulting products back to the United States, there would be no direct

11

infringement of Golden's patent rights under § 271(a) or (g). As held in *NTP*, there would be no infringement under § 271(a) because all steps of the patented process were not carried out "within the United States." 418 F.3d 1282, 1318. There would be no § 271(g) infringement because none of the products made using the patented process were ever present in the United States as required by the statute. 35 U.S.C. § 271(g).

Infringement under 35 U.S.C. § 271(g) does not depend on use or manufacture in the United States but instead on the importation into the United States of a Google product created by a patented process performed abroad.

Section § 271(g) provides that "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer." *In Syngenta Crop Protection, LLC v. Willowood LLC, et al* (Fed. Cir. Dec. 18, 2019), the Federal Circuit considered whether 35 U.S.C. § 271(g) requires that every step of a claimed process be performed by a single entity.

The *Syngenta* case appears to demonstrably expand the range of foreign activities that may constitute infringement under 35 U.S.C. § 271(g), in that the section does not require a single entity to perform, direct, or control all of the steps of a patented process for infringement liability to arise from the importation or sale of products made by a process patented in the US.

The Federal Circuit stated that if Congress intended to limit liability under §271(g) to instances where the infringing patented process was entirely practiced by a single entity, then Congress "knew precisely how to do so."

§271(g) requires importation, sale, offer for sale, or use within the US of a Google product made by a patented process. "The different scope of protection offered under §271(a) and §271(g) demonstrates that there is no inconsistency between the two sections... Congress made clear that §271(g) 'is prompted by the

...
...
...
...

use of patented processes in other countries followed by the importation of the resulting production into this country' and simply 'extend[s] protection to the products' made by such processes."

Google's importation, sale, offer for sale, and use within the United States of Google's smartphone and smartwatch products created by Plaintiff's patented process performed abroad; is much too difficult to estimate over a decade of monetary damages for infringement under 35 U.S.C. § 271(g); and is evidence itself of irreparable harm.

***Exhibit C:*** [Amicus Brief] "Joint Comment on the Public Interest of the United States Patent and Trademark Office and the United States Department of Justice"; Docket No. 3854; In the Matter of Certain Dynamic Random Access Memory (Dram) Devices, Products Containing the Same, and Components Thereof:

> Supreme Court and Federal Circuit precedent affirms that one significant reason "the public interest . . . is dominant in the patent system" *Mercoid Corp. v. Mid-Continent Inv. Co.*, 320 U.S. 661, 665 (1944) is because intellectual property protection exists "to encourage invention." *Eldred v. Ashcroft*, 537 U.S. 186, 216 (2003) (quoting *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 229 (1964)). These decisions reflect the American view that the enforcement of patent rights is an "issue [] of great moment to the public," *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945) (internal quotation marks and citation omitted)) including the public's interest in the "encouragement of investment-based risk." *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006). As one Federal court aptly summarized more than six decades ago: "The enforcement of patent rights are

matters concerning far more than the interests of the adverse parties. They are issues of great public interest." *Hi-Lo TV Antenna Corp. v. Rogers*, 274 F.2d 661, 665 (7th Cir. 1960) (internal quotation marks and citation omitted)).

**It's Difficult to Estimate Google's Monetary Damages from Annual Revenue**

Googles revenue by year for the past five years is:

- Google's revenue for the twelve months ending Dec 31, 2024 was $350.02 billion, a 13.87% increase year over year.
- Google's annual revenue for Dec 31, 2023 was $307.39 billion, an 8.68% increase from 2022.
- Google's annual revenue for 2022 was $282.84 billion, a 9.78% increase from 2021.
- Google's annual revenue for 2021 was $257.64 billion, a 41.15% increase from 2020.
- Google's annual revenue for 2020 was $182.53 billion, a 12.77% increase from 2019.

India now supplies 44% of US-bound phones as brands shift production away from China due to higher trade risks.

## CONCLUSION

An exclusion order issued by the USITC resembles an injunction issued by a district court in that each can, in effect, prohibit an infringer from selling infringing articles in the United States by either injunction (district court) or exclusion order banning the articles from importation into the United States *ab initio* (USITC). The presumption favoring exclusion orders for patent infringement in the USITC thus appears consistent with the view that injunctions often are an appropriate remedy

in district court litigation. *See, e.g., eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 395 (2006) (observing that, since "at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases") (Roberts, C.J., concurring); *see* also Statement of Interest of the United States of America, *Radian Memory Sys. LLC v. Samsung Elecs. Co.*, No. 2:24-cv-1073, ECF No. 52 (E.D. Tex., June 24, 2025).

## RELIEF

Plaintiff is seeking an indefinite permanent injunction against the importation, sale, offer for sale, and use within the United States of Google's smartphone and smartwatch products created by Plaintiff's patented process performed abroad.

The smartphones and smartwatches included for permanent injunction relief all brands and models made abroad and shipped between the years 2022-2025; and the upcoming year 2026 for all of Google's smartphone and smartwatch brands and models.

Sincerely,

s/ *Larry Golden*

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(M) 8649927104
Email: atpg-tech@charter.net

## **VERIFICATION**

## Pursuant to 28 U.S.C. § 1746

I, Larry Golden, over the age of 18, competent to testify, and having firsthand knowledge of the facts stated herein, do hereby declare, certify, verify, affirm, and state under penalty of perjury under the laws of the United States of America, that the foregoing statements are true, correct, and complete to the best of my understanding, knowledge, and belief, and made in good faith.

Executed and signed this 29th day of December, 2025, with all rights reserved and without recourse and without prejudice; is this "verification" for "Plaintiff's Reply in Support of Plaintiff's Motion for Permanent Injunctive Relief".

*s/ Larry Golden*
Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-992-7104

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 29th day of December, 2025, a true and correct copy of the foregoing "Plaintiff's Reply in Support of Plaintiff's Motion for Permanent Injunctive Relief", was served upon the following Defendant via express mail:

>Brian C. Banner (State Bar No. 24059416)
>Valerie Barker (State Bar No. 24087141)
>SLAYDEN GRUBERT BEARD PLLC
>401 Congress Avenue, Suite 1650
>Austin, Texas, 78701
>+1 (512) 402-3569
>+1 (512) 402-6865
>facsimile bbanner@sgbfirm.com
>vbarker@sgbfirm.com

>s/ *Larry Golden*
>Larry Golden, Pro Se
>740 Woodruff Rd., #1102
>Greenville, South Carolina 29607
>atpg-tech@charter.net
>864-992-7104



**UNITED STATES POSTAL SERVICE®**

**PRIORITY MAIL EXPRESS®**

EI 908 310 762 US

**CUSTOMER USE ONLY**

**FROM:** (PLEASE PRINT)  PHONE (864) 288-5605

LARRY GOLDEN
740 WOODRUFF RD.
#1102
GREENVILLE, SC 29607

**DELIVERY OPTIONS (Customer Use Only)**

☒ **SIGNATURE REQUIRED** Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.
**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

**TO:** (PLEASE PRINT)  PHONE (254) 750-1501

CLERK'S OFFICE – U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS – WACO
CASE NO: 25-0434
800 FRANKLIN AVE., ROOM 380
WACO, TEXAS
ZIP + 4® (U.S. ADDRESSES ONLY)

7 6 7 0 1 - ____

- For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
- $100.00 insurance included.

**PEEL FROM THIS CORNER**

**PAYMENT BY ACCOUNT (if applicable)**
USPS® Corporate Acct. No. | Federal Agency Acct. No. or Postal Service™ Acct. No.

**ORIGIN (POSTAL SERVICE USE ONLY)**
☐ 1-Day  ☐ 2-Day  ☐ Military  ☐ DPO
PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage $
Date Accepted (MM/DD/YY) | Scheduled Delivery Time ☐ 6:00 PM | Insurance Fee $ | COD Fee $
Time Accepted ☐ AM ☐ PM | | Return Receipt Fee $ | Live Animal Transportation Fee $
Special Handling/Fragile $ | Sunday/Holiday Premium Fee $ | Total Postage & Fees
Weight ☐ Flat Rate  lbs. ozs. | Acceptance Employee Initials | $

**DELIVERY (POSTAL SERVICE USE ONLY)**
Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature
Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature

LABEL 11-B, MAY 2021    PSN 7690-02-000-9996

**Money-back Guarantee:** If the mailer submits an item at a designated USPS® Priority Mail Express® acceptance location by the acceptance time for that location, the Postal Service will deliver the item or make the first delivery attempt to the addressee or agent before the applicable delivery date and time. Mailer may request the addressee's signature from the addressee upon delivery of the item by checking the "signature required" box at the time of mailing. If the Postal Service does not deliver or attempt delivery by the specified time and the mailer files a valid claim for a refund, the Postal Service will refund the postage, unless an exception applies. See *Mailing Standards of the United States Postal Service, Domestic Mail Manual (DMM®)* 604.9.5.5 which is available at *pe.usps.com*.

## Customer Retains This Copy

*Note:* The Postal Service does not offer money-back guarantee for military or DPO shipments delayed due to customs inspections or the item was destined for an APO/FPO/DPO that was closed on the intended day of delivery or the delay was caused by one of the situations in DMM 604.9.5.5. Consult USPS.com® or your local Post Office for information on delivery commitments and Priority Mail Express Military Service (PMEMS). For details, see DMM 703.2.6, which is available at *pe.usps.com*.

When a mailer submits a Priority Mail Express item requiring a signature and the Postal Service cannot deliver the item on the first attempt, the Postal Service leaves a notice for the addressee. If the addressee does not claim the item within 5 calendar days, the Postal Service returns the item to the sender at no additional charge.

**Insurance coverage:** The Postal Service provides insurance only in accordance with postal regulations in the DMM, which is available at *pe.usps.com*. The DMM sets forth the specific types of losses that are covered, the limitations on coverage, terms of insurance, conditions of payment, and adjudication procedures. Certain items are not insurable. The DMM consists of federal regulations, and USPS personnel are not authorized to change or waive these regulations or grant exceptions. A mailer who requires information on Priority Mail Express insurance may contact the Postal Service before submitting an item. Limitations prescribed in the DMM provide, in part, that:

1. Insurance coverage extends to the actual value of the contents at the time of mailing or the cost of repairs, not to exceed the insured limit for the item.
2. The Postal Service insures the contents of Priority Mail Express "merchandise" items (with "merchandise" defined by postal regulations) against loss, damage, or missing contents. The Postal Service includes coverage up to $100 per mailpiece at no additional charge. Additional merchandise insurance up to $5,000 per mailpiece may be available for purchase. Additional insurance for Priority Mail Express items is not available unless a signature is required.
3. The Postal Service insures "nonnegotiable documents" (as defined by postal indemnity regulations) against loss, damage, or missing contents up to $100 per mailpiece for document reconstruction, subject to additional limitations for multiple pieces lost or damaged in a single catastrophic occurrence. Document reconstruction insurance provides reimbursement for the reasonable costs incurred in reconstructing duplicates of nonnegotiable documents mailed. Document reconstruction insurance coverage above $100 per mailpiece is not available. The mailer should not attempt to purchase additional document insurance, because additional document insurance is void.
4. The Postal Service insures "negotiable items" (defined by postal regulations as items that can be converted to cash without forgery), currency, or bullion up to a maximum of $15 per mailpiece.
5. The Postal Service does not provide coverage for consequential losses due to loss, damage, or delay of Priority Mail Express items or for concealed damage, spoilage of perishable items, and articles improperly packaged or too fragile to withstand normal handling in the mail.

*Coverage, terms, and limitations are subject to change.* For additional limitations and terms of coverage, consult the DMM, which is available at *pe.usps.com*.

**Indemnity Claims (Loss, Damaged or Missing Contents):** Either the mailer or the addressee may file an indemnity claim for loss, damaged or missing contents. The claimant may submit the claim online at *usps.com*, or by mail; for more information see Publication 122, *Domestic Claims, Customer Reference Guide*. The timelines for claims are as follows: claims for loss – no sooner than 7 days but no later than 60 days after the date of mailing; claims for damage or missing contents – immediately but no later than 60 days from the date of mailing. Retain the original USPS retail receipt or eReceipt/electronic receipt for claims purposes. For claims involving damage or missing contents, also retain the article, container, and packaging for Postal Service inspection when requested.

**Refund of Postage and Fees (Service Performance):** If delivery of a Priority Mail Express (PME) item does not meet the scheduled delivery commitment(s), online and commercial customers may submit a refund request by visiting *USPS.com*. Retail customers may submit a refund request either online at *USPS.com* or at retail locations. Refund requests for postage must be submitted no sooner than 2 days and no later than 30 days from the date of the mailing; Extra Services fees refund requests must be submitted no sooner than 30 days and no later than 60 days from the date of mailing. Each tracking number can only be submitted once for all applicable refunds. Refund requests for PME or PME with Extra Services must be combined into a single submission.

*Thank you for choosing Priority Mail Express service.*

**Tracking:** For USPS Tracking, scan the QR Code below or go to USPS.com or call 800-222-1811



EI 908 310 762 US
Priority Mail Express tracking number

EI 908 310 762 US

LABEL 11-B  MAY 2021   PSN 7690-02-000-9996

LARRY GOLDEN
(864) 992-7104
THE UPS STORE #8066
STE 90
27 S PLEASANTBURG DR
GREENVILLE SC 29607-2574

SHIP CLERKS OFFICE
TO: RM 380
    800 FRANKLIN AVE

2 LBS        1 OF 1
SHP WT: 2 LBS
DATE: 29 DEC 2025

WACO  TX 76701-1934



TX 767 0-12

UPS NEXT DAY AIR                1
TRACKING #: 1Z V56 70H 01 2589 3695



BILLING: P/P

RECEIVED
DEC 3 0 2025
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEPUTY CLERK

The UPS Store RFID Label
Tracking #
1ZV5670H012589 3695

Poly Bubble Mailer

CLERKS OFFICE
800 FRANKLIN AVE
RM 380
WACO TX 76701
P:BLUE   S:AAA
50A — 1300
1ZV5670H0126893695

UPS THE UPS STORE