**FILED**

January 14, 2026

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ cap

DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS – WACO DIVISION

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 992-7104

Email: atpg-tech@charter.net

| | |
|---|---|
| LARRY GOLDEN, | CIVIL CASE NO: 6:2025cv00434-LS |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | **(Infringement under 35 U.S.C § 271(g)** |
| | **(Joint Patent Infringement)** |
| GOOGLE LLC | **(Direct Patent Infringement),** |
| Defendants. | **(Willful Patent Infringement),** |
| | January 12, 2026 |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

The Plaintiff can file the complaint in any U.S. judicial district where the defendant Google, regularly conducts business and knowingly profited from the sale of the allegedly infringing products.

Google's motion to dismiss Plaintiff's amended complaint is simply a repeat of the procedural disasters of Google, primarily to have Plaintiff prove, or attempt to prove infringement at the pleading stage; and without the demanded jury.

Google and the Northern District of California Court forced Plaintiff to prove infringement at the pleading stage. Google's affirmed its own defense that "infringement of Plaintiff's patented CMDC devices only occurs when there's a

mobile, cellular, or consumer device that is integrated with, or interconnected to, a CBRNEH detection capability." Three judges in the Northern District of California Court and nine federal circuit judges agreed with Google's theory of infringement.

## GOOGLE IS COLLATERAL ESTOPPEL FOR RE-LITIGATING SETTLED ISSUES

Twelve Federal Judges repeatedly confirmed Google's arguments that the integration of a CBRNE-H detection capability with a mobile device; infringes Plaintiff's patented CMDC invention.

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 22-1267; determined direct infringement arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court *again* concluded that Mr. Golden's

complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" … "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straight-forward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent.

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* Case No. 23-0048 that direct infringement arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Golden v. Samsung Electronics America, Inc*. Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024.

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: (1)

through the "Android Team Awareness Kit, ATAK," which is "[b]uilt on the Android operating system," involves "plug-ins" and "app specific software," was "[i]nitially created" by the "Air Force Research Laboratory" together with the "Defense Threat Reduction Agency," and is "available to warfighters throughout the DoD," Appx112 ¶ 55; Appx119, 127; (2) through add-on devices or modifications that utilize the smartphone's built-in camera, Appx111 ¶ 54, Appx124–25; and (3) through nine "standard sensors" which "can be used as 'biosensors,'" Appx126."

"Samsung moved to dismiss Mr. Golden's complaint, arguing that, among other things, Mr. Golden's complaint failed to plausibly state a patent-infringement claim. Appx146–48. More specifically, Samsung argued that Mr. Golden's complaint stated no alleged facts that went beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality. On that basis, Samsung said, there are no plausible allegations Samsung was engaged in directly infringing activities. Appx146–47."

"The district court agreed and dismissed Mr. Golden's complaint with prejudice, concluding, in part, that "[t]he allegations that his patents cover the identified functionalities included in Samsung's products are wholly unsupported and implausible on their face." Golden, 2023 WL 3919466, at *2."

"We reject Mr. Golden's appeal arguments and therefore affirm the district court's dismissal of his complaint."

The Northern District of California Court Judge Haywood S. Gilliam, Jr. in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Government arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss with Leave to Amend" Document 41 Filed 08/10/23; the then presiding Judge Haywood S. Gilliam, Jr. agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The Northern District of California Court Judge Rita F. Lin in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Gov't arises when there's a combined ATAK software; CBRN plugins; CPU, and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68 Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The United States Court of Appeals; Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 24-2024; determined infringement occurs when a [Google] mobile, consumer, or cellular device is integrated with, or interconnected to, Draper's CBRNE detection capability.

In *Golden v. Google LLC.*, Case No. 24-2024, Dkt. 41; filed 06/25/2025, three Federal Circuit judges again confirm, infringement of Plaintiff's patented CMDC device occurs when a mobile, consumer, or cellular device, is integrated with, or interconnected to a CBRNE detection capability. The Circuit's opinion includes the following:

"We conclude that the district court did not err in finding that Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1;

5

"Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1; see also *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding no infringement when the accused products "do not infringe without modification—the modification of installing the required software."). Mr. Golden's first theory of infringement requires the ***use of the third-party app*** "ATAK-CIV" for at least two limitations of each asserted claim. App'x 300–302 ¶¶ 56 63; see also App'x 400–407.

The burden placed on Plaintiff is Google's persistent fight to get back to the Northern District of California to have their judges overturn a decision they fought so hard and long for. It doesn't make sense to Plaintiff, Google got exactly what they asked for: a final decision that, "infringement of Plaintiff's patented CMDC devices only occurs when there's a mobile, cellular, or consumer device that is integrated with, or interconnected to, a CBRNE-H detection capability."

Google is reaching far outside the boundaries to have Plaintiff's current case dismissed for *res judicata* (issue and claim preclusion) and *Kessler*; it is Google, not Plaintiff, who is seeking to have this case transferred back to the NDC court, a court that lacks the ability to be unbiased, to be retried for the same issues.

Collateral estoppel, also called issue preclusion, is a doctrine in criminal law and civil procedure that prevents a party from re-litigating an issue of fact or law that has already been validly, finally, and necessarily determined in a prior proceeding.

In criminal law, it applies through the Double Jeopardy Clause of the Fifth Amendment, and under *Benton v. Maryland* (1969), binds both federal and state prosecutions via the Fourteenth Amendment's Due Process Clause.

In civil procedure, it is a form of *res judicata* that bars re-litigation of essential issues decided on the merits in a previous case. It includes defensive use (by a defendant to block a plaintiff from re-litigating an issue) and offensive

6

use (by a plaintiff to block a defendant), with courts having discretion over non-mutual offensive use as outlined in *Parklane Hosiery Co. v. Shore* (1979)

In this current case Plaintiff have not, and does not, opposed the decision of twelve federal judges who infer to say: "infringement of Plaintiff's patented CMDC devices occurs when there's a mobile, cellular, or consumer device that is integrated with, or interconnected to, a CBRNE-H detection capability.

The problem for Google arises when Plaintiff demonstrates Google's self-inflected liability for patented infringement that occurs upon importation or shipment of the Google accused instrumentalities; and after importation or shipment the sale of the Google accused instrumentalities into the United States.

## GOOGLE'S ALLEGED INFRINGEMENT UNDER 35 U.S.C. § 271(g)

BASICS: "Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent."

Plaintiff alleged the original design manufacturers (ODMs), and the original equipment manufacturers (OEMs), (i.e., Google, Samsung, Apple, LG, Qualcomm, and other third-party Government contractors—Rhevision, SeaCoast, NASA, Genel, Synkera), are responsible for *"modifying"* the cell phone into what is recognized today, throughout the world as the "smartphone".

The United States impliedly authorized and consented to Google *"modifying"* the cell phone to include a CBRNE-H detection capability. Under the Department of Homeland Security's Science and Technology Directorate (DHS S&T), BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative [published 10/30/2007], Google was authorized to *"modify"* the cell phone and

was also impliedly authorized to commercialize (i.e., to use, offer for sell, sell, or import for sell) Plaintiff's patented communicating, monitoring, detecting and controlling (CMDC) device (i.e., a new, improved upon, *"modified"* cell phone, or smartphone) for its own private benefit.

> "Qualcomm's role has been to develop a smartphone app and the associated network software for processing data. Smartphone users can download the app from Google Play and, eventually, from Apple's iTunes store, so *Cell-All* will be operational on all phones [including Google and Samsung phones] using either Google's Android or Apple's iPhone operating systems." [1]

In the related case, *Golden v. Samsung Electronics America, Inc.*, WDOT Case No. 25-0596-DAE filed on 12/22/2025, Golden alleges Samsung infringes valid patent claims of at least Golden's '619 patent; '287 patent; '439 patent; and, '189 patent that discloses a new, improved upon, and useful cell phone; and imports or uses the *"modified"* cell phones that are made by Plaintiff's patented process without authorization.

Plaintiff alleges both Google and Samsung, without authority imports into the United States, offers to sell, sells, and/or uses within the United States the accused " *'modified'* cell phone" products, which is made by a process patented in the United States [is] liable as infringers, if the importation, offer to sell, sale, or use of the accused " *'modified'* cell phone" products' occurs during the term of Plaintiff's process patent." (35 U.S.C. § 271(g))

---

[1] Torin Monahana & Jennifer T. Mokos, (2013, Mar. 7). *"Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks"*. Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA. Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-

A process patent is a form of utility patent that covers methods of changing the functionality or characteristics of a material during a particular use. Plaintiff alleges Google imports or ships into the United States *"modified"* cell phones that are made by Plaintiff's patented process without authorization.

## Google Need Not Perform, Direct or Control all Steps of the Patented Process

Because liability under section 271(g) is not predicated on Google's direct infringement of the patented process and "the statutory language as a whole is clear that practicing a patented process abroad cannot create liability under § 271(g), whether that process is practiced by Google, as a single entity is immaterial to the infringement analysis." *Syngenta Crop* (Fed. Cir. 12/18/19)

When Plaintiff alleges infringement under Sec. 271(g); if the court "finds-(1) that a substantial likelihood exists that the Google products was made by the patented process, and (2) that the Plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable so to determine, the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." 35 U.S.C. § 295; *see Creative Compounds* (Fed. Cir. 06/24/11) (aff'g Summ. J. of infringement where defendant failed to provide documentation on its foreign supplier's manufacturing process).

In *Syngenta Crop Protection, LLC v. Willowood LLC, et al* (Fed. Cir. Dec. 18, 2019) the Federal Circuit states: "[n]othing in this statutory language suggests that liability arises from practicing the patented process abroad. Rather, the focus is only on acts with respect to products resulting from the patented process. Thus, because the statutory language as a whole is clear that practicing a patented process abroad cannot create liability under §271(g), whether that process is practiced by a single entity is immaterial to the infringement analysis under that section."

On the other hand, §271(g) requires importation, sale, offer for sale, or use within the US of the accused Google products made by Plaintiff's patented process. "The different scope of protection offered under §271(a) and §271(g) demonstrates that there is no inconsistency between the two sections... Congress made clear that §271(g) 'is prompted by the use of patented processes in other countries followed by the importation of the resulting production into this country' and simply 'extend[s] protection to the products' made by such processes."

In this case, *Golden v. Google, LLC*, Plaintiff demonstrably expand the range of foreign activities that may constitute infringement under 35 U.S.C. § 271(g), because the section does not require a single entity to perform, direct, or control all of the steps of a patented process for infringement liability to arise from the importation or sale of products made by a process patented in the US.

'Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 … [T]his standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555 (citation omitted). Plaintiff have complied.

Plaintiff have alleged facts that give rise to "more than a sheer possibility that Google has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted) … the Supreme Court has explained that Plaintiff … "must plead 'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant [Google], is liable for the misconduct alleged'," likewise also under 35 U.S.C. § 271(g).

The Fed. Cir. explained that under *Iqbal/Twombly* a plaintiff need not "prove its case at the pleadings stage" and is not required to plead infringement on an element-by-element basis. The Circuit explained that it is enough "that a complaint

places the alleged infringer Google on notice of what activity… is being accused of infringement.

## THE NDC COURT IS COLLATURAL ESTOPPEL FROM REDEFINING THE CONSTRUED TERM "BUILT-IN EMBEDDED"

The NDC Court improperly construed "built-in, embedded" away from its true and ordinary meaning, and the construed meaning given by the USPTO-PTAB court. The NDC Court's unofficial construction of the term "built-in, embedded"; is to "modified". The NDC court's construction have a tendency to cause a person(s) skilled in the art to find a solution in another field, or a field-of-change.

The built-in, embedded Google android operating system, that is equivalent to Plaintiff's patented "transceiver", is designed specifically for Google smart-phones' embedded computer systems. These systems aim to enhance functionality and reliability to perform dedicated tasks.

One of the key features of the built-in, embedded Google android operating system is connectivity. Connectivity "provides a variety of connections such as cellular, Wi-Fi, Bluetooth, NFC (Near Field Communication) and others to facilitate the communication of the device with other devices and networks."

"Google's Fast Pair with Android Auto: With Bluetooth enabled, all you need to do is tap once on your phone screen, and your phone will automatically connect with your car. This allows you to quickly get going with Android Auto where you can navigate, call, chat, listen to media, and more."

[Your phone or tablet is using Android 6.0 or higher. Your phone or tablet has Bluetooth. Location turned on for Android 11 or below. Devices must be within Bluetooth sharing distance and have Wi-Fi enabled. Works with compatible devices. Requires vehicle with Android Auto. Works with compatible devices. Devices sold separately].

In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

"In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below.

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain relevant after the amendment, we see no reason to modify them.

We further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10–11. Based on the record adduced during trial, we see no need to construe any other terms." Patent Owner merely states that "a built-in component could be an embedded component" (Mot. to Amend 3) and "that the term (embedded) has been examined, reviewed and accepted by the patent Examiner and was found to have a genus, species relationship with the term (built-in)" (Mot. to Amend 7). We agree with Patent Owner's understanding that "built-in" reflects a broader genus of which "embedded" is a particular species. As we explained in the Decision to Institute, the term "built-in" generally means "constructed to form an integral part of a larger unit." Dec. to Inst. 12 (quoting OED ONLINE (OXFORD ENGLISH DICTIONARY (3d ed. 2003)) available at http://www.oed.com/view/Entry/24414 (accessed: Oct. 6, 2014) (Ex. 3003)). As also discussed in the Decision to Institute, the term "embedded" is alternatively defined as "to enclose closely in or as if in a matrix" and "to make something an integral part of." Dec. to Inst. 12 (quoting MERRIAM-WEBSTER.COM, available at http://www.merriam webster.com/dictionary/embedded (accessed: Aug. 24, 2015) (Ex. 3007)); see also OED ONLINE (OXFORD ENGLISH DICTIONARY (3d ed. 2003)) available at http://www.oed.com/view/Entry/60835 (accessed: Oct. 6, 2014) ("to enclose

firmly") (Ex. 3006). Thus, the ordinary meaning would suggest that something "embedded" necessarily is "built-in," and that something "built-in" could be, but is not necessarily, "embedded." As such, the term "built-in" alone would imply a broader genus than "built-in embedded."

The NDC Court Judge erred in allowing Google to re-litigate the claim term "built-in, embedded"; being the same as "modify, modified, or modification", that had already been construed at the PTAB and a final decision was issued.

The NDC Court only confused the construction of the PTAB court and construed Golden's patent claims to mean just the opposite of "built-in, embedded" to that of "change" necessary for "modification". Plaintiff presented five (5) infringement theories to the NDC Court that aligns with the Google "built-in, embedded" operating system *connectivity* feature. See the following charts:

| "Built-in, Embedded" |
| --- |
| Draper designed a chemical, biological, radiological and nuclear (CBRN) Plugin to enable users to integrate CBRN sensors into TAK, collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, WinTAK and WebTAK are operational in the field. https://www.draper.com/explore-solutions/tak<br><br>**ATAK-CIV (CBRN)**: "The Tactical Assault Kit is DoD nomenclature for the Team Awareness Kit (TAK) application: a mission planning, geospatial, Full Motion Video (FMV), and system administrator tool that reduces the operational footprint from a tactical laptop, to a commercial mobile device. Data can be pre-loaded into ATAK or downloaded from the network when available." https://play.google.com/store/apps/details?id=com. atakmap. app.civ&hl=en_US&gl=US  |

13

**Near-Field Communication (NFC) Smartphone Sensor:** Nascent technology embedded in modern smartphones—near-field communication (NFC)—for wireless electronic, portable, non-line-of-sight selective detection of gas-phase chemicals *(Fig. 1)*

National Institutes of Health (NIH). *"Wireless gas detection with a smartphone via rf nfc communication"* Published online 2014 Dec 8. doi: 10.1073/pnas. 1415403111 Retrieved from: https://www.ncbi.nlm.nih.gov/pmc/ articles/PMC4280584/



*Figure 1*

Conversion of an NFC tag into a CARD enables wireless rf detection of chemical analytes with a smartphone. NFC-enabled smartphones communicate with NFC tags by simultaneously energizing the NFC tag with an alternating magnetic field ($f = 13.56$ MHz) through inductive coupling and transferring data by signal modulation.

**Camera Sensor**: Camera lens in cell phone with microfluidic lens functions as camera; uses microscope to focus on a chemical sensor. A ***megapixel*** camera captures the image from the array of nanopores uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the ***pixel*** resolution phone camera. *Megapixel* resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors tucked into cell phones could map airborne toxins in real time*. Source: https:// www .understanding nano.com/cell-phone-sensors-toxins.html

Hyperspectral imaging scans for light frequencies that humans can't see in order to identify the unique chemical signatures of different substances. They say their device, which can be mass produced, is compatible with all standard smartphone cameras. *These New Smartphone Cameras Could Tell You What an Object Is Made of* https://www.sciencealert.com/new-smartphone-cameras-



Panache

Smartphones provide hardware and software capability which can be incorporated with [CBR] sensors, enabling accurate on-site portable sensing. The camera, screen, and LED flashlight of the smartphone can be employed as components of the sensor. https://link. springer.com/ article/10. 1007/s11468-022-01672-1

**Smartphone Biosensors**:

1. Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
2. Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
3. Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
4. Microfluidic cassette: Interchangeable cassettes with varying assays
5. VIS-NIR spectrometer: Food freshness; Melanoma
6. NNAP Electrodes: Toxic metals and Organic pollutants in water
7. Optical Waveguide: Pathogens in water and food
8. Back and front camera: Colorimetric analysis; Image analysis
9. Microphone: Voice recording stress levels

**Google Beacon: Bluetooth; GPS; Wi-Fi**

Google Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals to calculate distance between detector and source. Filtering WiFi/ Bluetooth ranging functions and GPS location data. Filtering GPS derived distances based on jump in calculated position or when GPS reports jump in position but phone accelerometer sensors do not show rapid acceleration. Specific models in different categories of radiation instruments (dosimeters, survey meters, personal radiation detectors, backpacks, nuclide identifiers, and mobile systems).



Google Beacon is a type of Bluetooth technology with proximity-based triggers. These triggers affect both the physical and digital world. Using Bluetooth low energy (BLE) hardware technology, beacons communicate with nearby smart devices like smartphones, tablets, etc. Different types of beacons that perform different tasks.

Google admits infringement of Plaintiff's communicating, monitoring, detecting and controlling device is infringed when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability.

Therefore, Google is admitting infringement of Plaintiff's communicating, monitoring, detecting and controlling (CMDC) device occurs when a mobile, consumer, or cellular device is "modified, under the construed term "built-in, embedded" to enable the integration of, or interconnection with, a CBRNE-H detection capability.

What Google failed to admit is: it is Google themself who is the party responsible for *"modifying"* the cell phone to function as a CBRNE-H detection device. Google is accused of "making" the CBRNE-H detection device.

The United States impliedly authorized and consented to Google *"modifying"* the cell phone to include a CBRNE-H detection capability. Under the Department of Homeland Security's Science and Technology Directorate (DHS S&T), BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative [published 10/30/2007], Google was impliedly authorized to commercialize (i.e., to use, offer for sell, sell, or import for sell) Plaintiff's patented CMDC device.

"… biological and chemical sensors could be effectively integrated into common cell phone devices and made available to the American public on a voluntary basis, the Nation could potentially benefit from a sensor network with more than 240M sensors. Through this BAA, HSARPA is seeking to accelerate advances in miniaturized biological and chemical sensing (e.g. laboratories on a chip) with integration into common device(s) and a communication systems concept for large scale multi-sensor networks. This proof of concept should be capable of detecting hazardous biological and/or chemical materials with eventual expansion to the detection of explosive and eventually radiological materials…" "***The proposed concept should develop a miniaturized sensor, device and system…***" [DHS S&T

BAA07-10 Cell-All Ubiquitous Biological and Chemical Sensing]
Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks - ScienceDirect

"[A]s a Qualcomm representative argued: "Let's take advantage of the 300 million cell phones that are out there today. They're always with us" (Hoffman, 2011) … "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a)" … "DHS presentations at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center event conveyed that *next generation, sensor-embedded phones* would roll out gradually over the next few years and, as with cameras in phones, would soon become standard (U.S. Department of Homeland Security, 2011a)." Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks - ScienceDirect

In 2014, the Department of Homeland Security (DHS) and the Department of Justice; "persons" not authorized to petition the PTAB to institute an *inter partes review* (IPR) to invalidate patents, *Return Mail v. The United States Postal Service*; petitioned the PTAB with three references that did not antedate Plaintiff's RE43,990 ('990) patent, to invalidate claim 74 of Plaintiff's '990 patent because the claim term was "indefinite and did not have a written description" in the patent specifications. Claim 74 and dependent claims 75-80 of Plaintiff's '990 patent, and patent specifications are duplicated below for illustration purposes only:

Claim 74 of '990 patent. "A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least one chemical, biological, radiological, nuclear, explosive, human, contraband agent;

17

comprising at least one built-in embedded sensor for detecting at least one of the following: motion, perimeter, temperature, tampering, breach, and theft;

comprising a built-in embedded sensor array or fixed detection device into the product that detects an agent that includes at least one of a chemical agent, a biological agent, a nuclear agent, an explosive agent, a human agent, contraband, or a radiological agent; and

wherein, when an alarm occurs, the built-in, embedded multi sensor detection system communicates the alarm by way of at least one of, product-to-product, product-to-satellite, product-to-cellular, product-to-long or short range radio frequency, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-monitoring site or central controlling station, product-to-WiFi or WiMax, product-to-authorized persons, product-to-handheld, or product-to-laptop or desktop."

75.    The built-in, embedded multi sensor detection system of claim 74 wherein the product is at least one of a maritime composite cargo container; truck tractor trailer; trailer; air composite cargo container; cargo container; and air cargo container.

76.    The built-in, embedded multi sensor detection system of claim 74 wherein the product is at least one of a mini storage building; warehouse; newspaper vending machine.

77.    The built-in, embedded multi sensor detection system of claim 74 wherein the product is at least one of a car, truck, bus, camper, train, ship, vessel, boat, plane, unmanned aerial vehicle, unmanned sea vehicle, unmanned ground vehicle.

78.    The built-in, embedded multi sensor detection system of claim 74 wherein the product includes at least one of a built-in, embedded internet component, a global positioning (GPS) component, a navigation component, a tracking component, a cellular component, a satellite component, a short- and long-range

radio frequency component, radio frequency (RF) sensor, radio frequency (RF) transceiver, Wi-Fi, antenna, Bluetooth, or interface/gateway component.

79.      The built-in, embedded multi sensor detection system of claim 74 wherein the product includes at least one of a built-in, embedded wireless and/or wired communication connection capable of sending signals and messages to a product; receiving signals and messages from a product; interconnected to at least one of a cell phone, a smart phone, a PDA, a handheld, a laptop, a desktop, a workstation, monitoring site or another product comprises a built-in, embedded wireless and/or wired communication connection.

80.      The built-in, embedded multi sensor detection system of claim 74 wherein the product includes at least one of a built-in, embedded detector case, sensor array, central processing unit (CPU), power source of fuel, electric, solar or battery, automatic/mechanical internal or external lock disabler, remote internal or external lock disabler, biometric reader, camera, light, video, or interface.

> *Patent Specifications:* "As shown in FIGS. 1-10, the multi sensor detection [] system 10 includes at least one—and preferably many— detector case 12 *that can be placed in, on, upon or adjacent the product*…" "The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 … "[C]onnections or contacts that can include an Internet connection 32, a GPS connection 34 and a power connection 36 for a power source." … "the products grouped into what may be referred to as *Product grouping 2 (sensors)* include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, speed sensors, biometric sensors, glass break sensors, plastic film on glass, high

security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems, detection of humans, detection of contraband, temperature, and shock levels; the products grouped into what may be referred to as ***Product grouping 3 (detector case; modified and adapted)*** include, but are not limited to, cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, eyeglass, briefcases, detector cases of locks, detector cases of tags, detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to; the products grouped into what may be referred to as ***Product grouping 4 (monitoring & communication devices)*** include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite cell phones, cell phones, Universal Mobile Telecommunications System (UMTS) phones, personal digital assistants (PDAs), liquid crystal display (LCD) monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds; the products grouped into what may be referred to as ***Product grouping 5 (communication methods)*** include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network

(WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS), Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS)" … "the products grouped into what may be referred to as ***Product grouping 7 (authorized person)*** include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel." (Patent Specifications)

After Google provided its own definition and meaning of the terms "modify, modified, and modification" to the claim language, and the NDC court accepted Google's fabricated definition and meaning of the terms "modify, modified, and modification"; we find that the fabricated definition and meaning of the terms conforms with the connectivity feature or functionality of the "built-in, embedded Google android operating system", and the PTAB's construction of the term "built-in, embedded" to mean: "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

The means justify the end, "infringement occurs when a cellular or mobile device is integrated with, or interconnected to, a CBRNE-H detection capability.

## GOOGLE'S UNDERLINE MOTIVE FOR TRANSFER

The NDC Court is collateral estoppel from re-litigating the same issue or theory of modification in order to infringe. Google failed to consider or provide the Court with the tools and software required for any Google "smartphone" modification to occur. Modification means a significant change.

There are several essential tools and software to carry out any modification process. First of all, modifiers must have a good text editor, such as Sublime Text or Visual Studio Code, which allows modifiers to make precise and efficient changes to the *source code* [the built-in, embedded Google android operating system *source code*]. These editors often offer features like syntax highlighting and autocompletion, which makes editing work much easier.

Another essential tool is a version control system, such as Git. This software allows modifiers to keep a detailed record of the changes made to the *source code*, as well as revert modifications or merge different versions. In addition, Git provides modifiers with a branching system, which is very useful when modifiers are making modifications in parallel or working as a team.

Finally, it is important to mention the usefulness of frameworks and libraries in the modification process. These tools provide modifiers with a solid foundation on which to work, saving modifiers time and effort. For example, if modifiers are modifying a web page, having a framework like Bootstrap will allow modifiers to take advantage of its predefined styles and customizable components, thus speeding up the modification process.

In summary, to carry out a successful modification, it is essential to have a good text editor, an efficient version control system and take advantage of the power of the available frameworks and libraries. These tools and software will allow modifiers to make accurate changes, maintain a proper record of modifications, and streamline the overall modification process.

Google also failed to show a significant change [modification] away from the original design of the Google *"modified"* cell phone. The Google *"modified"* cell phone was originally designed to process applications and connect with other devices by way of its built-in, embedded Google android operating system.

Google is seeking a transfer back to the NDC Court because Google realize it may have to defend these fact issues before a jury. Google is relying on the NDC Court to continue denying Plaintiff his guaranteed right to a trial by jury on claims of patent infringement, that are issues-of-facts [U.S. CONS'T 7th Amend.]

A legitimate non-frivolous affirmative defense for dismissal; for lack of subject matter jurisdiction or for failure to state a claim, will stand up in any District Court, including the U.S. District Court for the Western District of Texas-Waco Division. Why Google need to transfer; if not for bias and favoritism.

But, because Google does not have a legitimate non-frivolous affirmative defense for dismissal, they are seeking a transfer back to the U.S. District Court for the Northern District of California; a court that is known, and has shown in several cases adjudicated there that was brought by Plaintiff, including a case against Google; to be bias in favor of Google and against Plaintiff, and where judges there lack the ability to be fair and impartial.

## PLEADING STANDARDS SET FORTH IN *TWOMBLY* AND *IQBAL*

Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

23

The following claims of infringement in Plaintiff's amended complaint is plead under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

**Infringement Under U.S. Code Section 271(g)**

35 U.S. Code Section 271(g) provides that it is an act of infringement to import a product that is made abroad by a U.S. process patent. Prior to the enactment of Section 271(g), a manufacturer [Google] could often avoid infringing a U.S. process patent by performing the patented process overseas and importing the resulting product into the United States. But now, that is an infringing act under 271(g).

Although the patented process is performed abroad, Section 271(g) is not an extraterritorial application of U.S. patent law. Rather, the act of infringement is the act of importation into the United States. It's also interesting to note that Section 271(g) applies to products made within the United States as well, and the infringing act is the sale or use of the product. Following similar reasoning, a 2019 Federal Circuit case, *Syngenta*, recently clarified that divided infringement is not an issue under 271(g). In other words, the patented process can be performed by multiple entities, and implication of the product can still infringe 271(g). Part of the Federal Circuit's rationale was that the infringing act is the act of importation, not performance of the patented process.

Even if Google performed the patented process, but all of the steps of that process occurred as the Google product passes from one factory to another during manufacture, the importer or seller [Google] of the final product can still be held liable, because the infringing act is the importation, and the infringing product is defined as being made by the patented process.

There are two key exceptions to Google's alleged 271(g) liability that are expressly provided for by the statute: First, the Google product is not infringing if, after performing the patented process, the Google product is materially changed by subsequent processes. Google have not presented or provided evidence into this case of any Google products that have been materially changed by subsequent processes.

The second statutory exception provides that the Google product is not infringing if, after being made by the patented process, it becomes a trivial and nonessential component of another product.

There's another statute that Congress passed relating to proving infringement of a process patent, found under 35 U.S.C. Section 295. Plaintiff recently filed infringement allegations based on 271(g), while giving notice of the relevance of Section 295. Section 295 is a burden-shifting provision under which, if Plaintiff can prove, (1) a substantial likelihood exists that the Google product was made by the patented process, and, (2) Plaintiff made a reasonable effort to determine the process actually used, but was unable to so determine, the Plaintiff gets a presumption that the patented process was used.

Plaintiff alleges Google imports without authority into the United States products (Google Pixel phones, Google Pixel watches, and Google Tensor CPU/Chipsets) that are made by Plaintiff's process patents in the United States.

**Joint Infringement**

Google is liable for Samsung's performance of a method step if it (1) "contracts with Samsung to perform one or more steps of a claimed method," (2) "the actors (Google and Samsung) form a joint enterprise," or (3) Google "conditions participation in an activity or receipt of a benefit upon performance of

a step or steps of a patented method and establishes the manner or timing of that performance;" which are questions of fact. TechStory below:

"Google is preparing to launch its next-generation Tensor G5 processor with the upcoming Pixel 10 series. While the Tensor G5 marks a significant departure from past models by being fabricated by TSMC instead of Samsung Foundry, the relationship between Google and Samsung is far from over. In fact, the new chip and the Pixel 10 hardware as a whole still carries the unmistakable fingerprints of Samsung, despite headlines suggesting a full break.

Since 2021, Google's custom Tensor chips have been co-developed and manufactured by Samsung using its foundry and IP. However, Google has reportedly decided to move production to TSMC, the world's leading chip fabricator, starting with the Tensor G5 … TSMC's cutting-edge fabrication nodes are known for their power efficiency and performance, and Google appears eager to leverage these strengths.

Despite the change in fabrication, the Tensor G5 will still rely on a Samsung component critical to mobile performance its modem. Leaks suggest that the Pixel 10 Pro, powered by Tensor G5, will use Samsung's Exynos 5400 5G modem, the same hardware used in earlier Tensor chips and in Samsung's own Exynos 2400 platform found in the Galaxy S24 series.

Rather than a clean break from Samsung, Google seems to be pursuing a hybrid approach diversifying suppliers while maintaining continuity in proven areas like modem technology and memory. This hybrid model also allows Google to better control costs, component

supply chains, and performance consistency, especially as it scales up Tensor development."

https://techstory.in/googles-upcoming-tensor-chip-maintains-a-connection-to-samsung-even-with-the-transition-to-tsmc/

"Direct infringement under § 271(a) occurs where all steps of a claimed method are performed by or attributable to a single entity…. Section 271(a) is not limited solely to principal-agent relationships, contractual arrangements, and joint enterprise. Rather, to determine direct infringement, the Fed. Circuit consider whether all method steps can be 'attributed to a single entity'." *Akamai Tech. IV* (Fed. Cir. 08/13/15) (en banc). Plaintiff alleged all steps are attributed to Google in Plaintiff's claim that Google is jointly infringing Plaintiff's patented inventions.

**Induced Infringement**

Google has allegedly indirectly infringed valid patent claims of at least Golden's '619 patent; '287 patent; '439 patent; and, '189 patent that discloses a new, improved upon, and useful cell phone in this District and elsewhere in the United States by, among other things, actively inducing the use, offering for sale, selling, or importation of at least the Google Android Open-Source Operating System and induced the "use" of the Google Android "Source Code" (Accused Products). Google's customers (Samsung, etc.) who purchase android devices and components thereof and operate such android devices and components in accordance with Google's instructions directly infringe one or more valid patent claims of at least Golden's '619 patent; '287 patent; '439 patent; and, '189 patent in violation of 35 U.S.C. § 271(b).

Google instructs its customers (Samsung, etc.) through advertisements, user guides or websites. Google is thereby liable for induced infringement of the valid patent claims of at least Golden's '619 patent; '287 patent; '439 patent; and, '189

27

patent that discloses a new, improved upon, and useful cell phone pursuant to 35 U.S.C. § 271(b).

> "At least 1,750 smartphones and other devices run on Android, an open-source operating system. Android began in 2003 as a project of the American technology company Android Inc., to develop an operating system for digital cameras. In 2004 the project changed to become an operating system for smartphones. Android Inc., was bought by the American search engine company Google Inc., in 2005. At Google, the Android team decided to base their project on Linux, an open-source operating system for personal computers."
> https://en.wikipedia.org/wiki/List_of_Android_smartphones

**Contributory Infringement**

Google has allegedly indirectly infringed valid patent claims of at least Golden's '619 patent; '287 patent; '439 patent; and, '189 patent that discloses a new, improved upon, and useful cell phone in this District and elsewhere in the United States by, among other things, contributing to the direct infringement of others, including OEM's like Samsung, with the Google Android Open-Source Operating System and induced the "use" of the Google Android "Source Code" (Accused Products), by making, offering to sell, or selling, in the United States, or importing as components of a Google *"modified"* cell phone, or apparatuses for use in practicing the patented process of making a Google *"modified"* cell phone; constituting material parts of the a patented *"modified"* cell phone invention, knowing the same to be especially made or especially adapted for use in infringement of the '619, '287, '439, and '189 patents, and not staple articles or commodities of commerce suitable for substantial non-infringing use.

For example, the '619, '287, '439, and '189 Accused Google Products include hardware and software [Android Operating System] for implementing at least Samsung's CBRNE-H sensing functionality. These are components of Plaintiff's patented *"modified"* cell phone or apparatuses for use in practicing Plaintiff's patented process. Furthermore, these components are a material part of the Samsung *"modified"* cell phone invention and upon information and belief are not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Google is allegedly liable for contributory infringement of Plaintiff's '619, '287, '439, and '189 patents pursuant to 35 U.S.C. § 271(c).

**Direct Infringement**

The following claims of direct infringement in Plaintiff's amended complaint is plead under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Plaintiff alleges in the amended complaint that Google, without authority makes, uses, offers to sell, or sells Plaintiff's patented central processing units (CPUs) i.e., the Google Tensor CPU/Chipset; Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) devices i.e., Google's *"modified"* cell phones; Plaintiff's patented cell phone detection system i.e., Google's "megapixel" camera with QR reader; Plaintiff's multi-sensor detection device i.e., Google Pixel watches; and Plaintiff's patented stall, stop, and vehicle slow-down system i.e., Google's Advanced Driver-Assistance System (ADAS) for autonomous and driverless vehicles', inventions, within the United States or imports into the United States any of Plaintiff's patented invention's during the term of the patent therefor, infringes the patent. 35 U.S.C. § 271(a).

## DEMAND FOR JURY TRIAL

Plaintiff request a jury trial on all fact issues so triable pursuant to Fed. R. Civ. P. 38. A right guaranteed under the Seventh Amendment of the Constitution.

Plaintiff have also attached as **_Exhibit A_**; a copy of an independent case analysis that outlines and describes the factual issues of this case to be decided by a jury. A few of the factual issues of this case are duplicated below:

- Indirect Infringement: The complaint's primary infringement theory against the accused processors is "joint infringement," which is a theory of direct infringement under 35 U.S.C. § 271(a) (Compl. ¶1). However, the factual allegations—that Google "directs or control[s]" the performance of third parties by providing the Android OS and source code—also contain the elements of knowledge and intent required for a claim of induced infringement under § 271(b) (Compl. ¶¶ 5, 13).

**The Term: "built in, embedded"**

- Context and Importance: This term appears to be central to the dispute, as the complaint's infringement theories rely on combining Google's smartphones with external software (e.g., the ATAK application) or hardware (e.g., NFC tags, external sensors) (Compl. pp. 7-10). The scope of this term will be critical in determining whether a product that requires such post-sale "modification" can be found to infringe the apparatus claims.

- Evidence for a Broader Interpretation: The complaint cites a construction from a prior PTAB decision: "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" (Compl. p. 6). The language "connected to, or mounted to" may support an interpretation that covers external peripherals or software plug-ins that work with the core device.

**The Term: "communication device"**

- Context and Importance: Asserted claims of the '287 and '619 patents are directed to a "communication device." The infringement allegations target Google's Tensor CPUs, which are components within a larger device (Compl. ¶13, ¶25). The construction of "communication device" will be important for determining whether a processor component can, by itself, satisfy the claim limitation, or whether the entire end-user product (e.g., a smartphone) must be the accused instrumentality.

- Evidence for a Broader Interpretation: The patent specifications disclose that the "communication device" can encompass a wide range of products, including cell phones, laptops, and PDAs, suggesting the term is meant to be capacious ('287 Patent, col. 15:5-10). The complaint alleges the CPU is the "brain" of the device, which may support an argument that it is the core of the claimed "device" (Compl. p. 11).

Sincerely,

s/ *Larry Golden*

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(M) 8649927104

Email: atpg-tech@charter.net

## **VERIFICATION**

### **Pursuant to 28 U.S.C. § 1746**

I, Larry Golden, over the age of 18, competent to testify, and having firsthand knowledge of the facts stated herein, do hereby declare, certify, verify, affirm, and state under penalty of perjury under the laws of the United States of America, that the foregoing statements are true, correct, and complete to the best of my understanding, knowledge, and belief, and made in good faith.

Executed and signed this 12th day of January, 2026, with all rights reserved and without recourse and without prejudice; is this "verification" for "Plaintiff's Response to Defendant's Motion to Dismiss Plaintiff's Amended Complaint".

s/ *Larry Golden*

Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
Email: atpg-tech@charter.net
(M) 864-992-7104

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 12th day of January, 2026, a true and correct copy of the foregoing "Plaintiff's Response to Defendant's Motion to Dismiss Plaintiff's Amended Complaint", was served upon the following Defendant via express mail:

> Brian C. Banner (State Bar No. 24059416)
> Valerie Barker (State Bar No. 24087141)
> SLAYDEN GRUBERT BEARD PLLC
> 401 Congress Avenue, Suite 1650
> Austin, Texas, 78701
> +1 (512) 402-3569
> +1 (512) 402-6865
> facsimile bbanner@sgbfirm.com
> vbarker@sgbfirm.com

> s/ *Larry Golden*
>
> Larry Golden, Pro Se
> 740 Woodruff Rd., #1102
> Greenville, South Carolina 29607
> Email: atpg-tech@charter.net
> (M) 864-992-7104

# Exhibit A

**Independent Analysis of "Fact Issues" Retrieved From:**
**https://ai-lab.exparte.com/case/dct/txwd/6:25-cv-00434/doc/analysis/18**

# I. Executive Summary and Procedural Information

- **Parties & Counsel:**
  - **Plaintiff:** Larry Golden (South Carolina)
  - **Defendant:** Google LLC (Delaware)
  - **Plaintiff's Counsel:** Pro Se
- **Case Identification:** 6:25-cv-00434, W.D. Tex., 12/23/2025
- **Venue Allegations:** The complaint alleges that Google does business in the state of Texas and within the Western District, but does not specify facts establishing a "regular and established place of business" in the district as required by contemporary venue standards for patent cases.
- **Core Dispute:** Plaintiff alleges that Defendant's Tensor processors (CPUs and TPUs) and Self-Drive Vehicles infringe five patents related to multi-sensor detection, remote monitoring, and vehicle control systems.
- **Technical Context:** The technologies at issue relate to central processing units for mobile devices and systems for remotely controlling vehicle functions, which are foundational technologies in the global smartphone and autonomous vehicle industries.
- **Key Procedural History:** The complaint references extensive prior litigation between the parties, including cases in the Northern District of California and appeals to the Federal Circuit. These prior cases appear to have established that infringement of some asserted patents requires post-sale "modification" of the accused products by third parties. The complaint also cites a 2015 Inter Partes Review (IPR) proceeding involving a related patent, in which the Patent Trial and Appeal Board (PTAB) construed key claim terms, including "built in, embedded."

**Case Timeline**

| Date | Event |
|------|-------|
| 2006-04-05 | Earliest Priority Date for all Patents-in-Suit |
| 2012-12-18 | U.S. Patent No. 8,334,761 Issues |
| 2013-01-01 | U.S. Patent No. RE43,891 Issues |
| 2015-10-01 | Final Written Decision Issued in IPR2014-00714 |
| 2018-12-25 | U.S. Patent No. 10,163,287 Issues |
| 2021-04-20 | U.S. Patent No. 10,984,619 Issues |
| 2022-10-05 | Alleged Service Date in Prior Litigation (*Golden v. Google*) |

| Date | Event |
|------|-------|
| 2023-05-09 | U.S. Patent No. 11,645,898 Issues |
| 2025-06-25 | Alleged Federal Circuit Decision in *Golden v. Google* |
| 2025-12-23 | Complaint Filing Date |

## II. Technology and Patent(s)-in-Suit Analysis
**U.S. Patent No. 10,163,287 -** *"Multi Sensor Detection, Stall to Stop and Lock Disabling System"*

**The Invention Explained**
- **Problem Addressed:** The patent background describes the persistent threat of terrorist activity and the corresponding need for security protocols that can detect chemical, biological, or radiological hazards and control access to assets like shipping containers and vehicles. ('287 Patent, col. 2:1-20).
- **The Patented Solution:** The invention proposes a system combining multi-threat detection with a remote disabling lock mechanism. The system is centered on a "detector case" that can house various interchangeable sensors and is capable of transmitting a signal to lock or disable a product upon threat detection, while simultaneously alerting a monitoring station. ('287 Patent, col. 3:59-65). For example, Figure 16 illustrates an embodiment where the detection of an explosive (142) in a vehicle (130) triggers signals to a satellite (136) and a monitoring site (138), which can then transmit a "stall to stop" signal (146) back to disable the vehicle. ('287 Patent, Fig. 16).
- **Technical Importance:** The claimed technology integrates remote sensing, wireless communication, and physical asset control to create a proactive, networked security system for assets in transit or storage. ('287 Patent, col. 1:56-62).

**Key Claims at a Glance**
- The complaint asserts independent claims 4, 5, and 6 (Compl. ¶25).
- **Independent Claim 4** recites a "communication device" comprising, among other elements:
  - a central processing unit (CPU)
  - a motion sensor, viewing screen, GPS, and internet/Wi-Fi connection
  - a Bluetooth, cellular, or satellite connection
  - a biometric sensor for authentication
  - one or more detectors for chemical, biological, radiological, or explosive agents
  - a near-field communication (NFC) connection
  - a transmitter or transceiver configured to send signals to monitor or control an external door, vehicle, or building

4

- **Independent Claim 5** recites a similar "monitoring device" that adds a temperature sensor and a sensor for "human detection."
- **Independent Claim 6** recites similar "monitoring equipment" that adds a "light indicator."

**U.S. Patent No. 10,984,619 - *"Multi Sensor Detection, Stall to Stop, and Lock Disabling System"***

**The Invention Explained**
- **Problem Addressed:** As part of the same patent family, the '619 Patent addresses the same problem of preventing terrorist activity through integrated detection and access control systems. ('619 Patent, col. 2:60-65).
- **The Patented Solution:** The invention is claimed as a "communication device" or a "central processing unit" (CPU) capable of processing instructions to perform a wide range of security and control functions. These functions include locking or unlocking the device itself, engaging with a vehicle's systems (e.g., via key-fob or ignition), authenticating users via biometrics, and scanning external sensors. ('619 Patent, col. 15:50-57, col. 17:5-12). Figure 17 shows a cell phone case (150) equipped with sensor units (176) that communicates with a cell phone (152), embodying the concept of an integrated, portable monitoring and control hub. ('619 Patent, Fig. 17).
- **Technical Importance:** The patent claims a programmable processing unit that serves as a convergence point for multi-modal sensor data, biometric authentication, and remote telematics, reflecting a shift toward software-defined security and control systems. ('619 Patent, col. 16:21-28).

**Key Claims at a Glance**
- The complaint asserts independent claims 1 and 11, and dependent claims 2-10 and 12-20 (Compl. ¶13).
- **Independent Claim 1** recites a "communication device" comprising a CPU capable of processing instructions to:
  - lock, unlock, or disable the lock of the communication device
  - activate vehicle functions (start, stall, stop) by engaging with a key-fob or ignition system
  - engage with an unmanned aerial vehicle's operational systems
  - authenticate a user via biometrics
- **Independent Claim 11** recites a "central processing unit (CPU)" itself, capable of processing instructions for a similar set of functions, including biometric authentication, NFC scanning, threat detection, and connecting to the Internet-of-Things (IoT) to control external systems.

**Multi-Patent Capsules**
- **U.S. Patent No. 11,645,898**

- o **Patent Identification:** U.S. Patent No. 11,645,898, *"Multi Sensor Detection, Stall to Stop, and Lock Disabling System,"* issued May 9, 2023.
- o **Technology Synopsis:** This patent describes a pre-programmed system to stall, stop, or slow a vehicle. A central processing unit is configured to execute these actions based on remotely received signals or automatically in response to detected vehicle conditions such as unintended acceleration, lane departure, or the presence of a hazard. ('898 Patent, col. 15:60-67).
- o **Asserted Claims:** Independent claim 1 (Compl. ¶¶ 23, 49).
- o **Accused Features:** The complaint accuses Google's Tensor Processing Units (TPUs) under a joint infringement theory and Google's Self-Drive Vehicles under a direct infringement theory (Compl. ¶¶ 30, 51).
- • **U.S. Patent No. 8,334,761**
- o **Patent Identification:** U.S. Patent No. 8,334,761, *"Multi Sensor Detection, Stall to Stop and Lock Disabling System,"* issued December 18, 2012.
- o **Technology Synopsis:** An earlier patent in the family, this invention describes a system for remotely controlling a vehicle's "stall-to-stop means" or "slowdown means." The system comprises a vehicle adapted to receive a signal from a remote location, which then controls components such as the brake, ignition, or fuel system to halt the vehicle. ('761 Patent, col. 15:4-10).
- o **Asserted Claims:** Independent claim 1 (Compl. ¶35).
- o **Accused Features:** The complaint alleges that Google's Self-Drive Vehicles, which incorporate Advanced Driver Assistance Systems (ADAS), directly infringe the patent (Compl. ¶37).
- • **U.S. Patent No. RE43,891**
- o **Patent Identification:** U.S. Patent No. RE43,891, *"Multi Sensor Detection, Stall to Stop and Lock Disabling System,"* issued January 1, 2013.
- o **Technology Synopsis:** This reissue patent describes a system where a distress signal sent from a communication device (e.g., cell phone) via a network to a monitoring site can trigger commands to be sent back to a vehicle to activate a stall-to-stop system. ('891 Patent, col. 14:1-17).
- o **Asserted Claims:** Independent claims 11 and 44 (Compl. ¶42).
- o **Accused Features:** The complaint alleges that Google's Self-Drive Vehicles incorporating ADAS directly infringe the patent (Compl. ¶44).

## III. The Accused Instrumentality

### Product Identification

The complaint identifies two categories of accused instrumentalities:

1. **Processors:** Google's Tensor Central Processing Units (CPU) Series G1-G5 and Tensor Processing Units (TPU) Series TPUv1 through Edge TPU (Compl. ¶¶ 8, 30).
2. **Vehicles:** Google's Self-Drive Vehicles, operated by its subsidiary Waymo LLC, which incorporate Google's Advanced Driver Assistance Systems (ADAS) (Compl. ¶37).

**Functionality and Market Context**

- **Processors:** The complaint characterizes Google's Tensor CPUs as the "brains" of Google's mobile devices, responsible for executing instructions and managing tasks (Compl. p. 11-12). The complaint provides a diagram of the "Google Tensor" chip, illustrating the integration of the CPU, GPU, and TPU, among other components (Compl. p. 11). These processors are positioned as essential hardware within the broader Android ecosystem, which the complaint notes has over three billion active users worldwide (Compl. pp. 19-20). The infringement theory for the processors is based on joint infringement, requiring "modification" by third parties (Compl. ¶25).
- **Vehicles:** The complaint describes Google's Self-Drive Vehicles (Waymo) as autonomous vehicles that utilize ADAS technologies for functions such as adaptive cruise control, collision avoidance, and lane departure warnings (Compl. p. 22). The infringement theory for the vehicles is based on direct infringement, alleging that these ADAS features incorporate the patented "stall, stop, or vehicle slow-down system" (Compl. ¶37).

## IV. Analysis of Infringement Allegations

The complaint references Exhibits A and B, which are described as element-by-element claim charts, but these exhibits were not included with the provided filing (Compl. ¶1). In the absence of claim charts, the infringement theory must be summarized from the narrative allegations in the complaint.

- **'287 and '619 Patents (Processor Infringement):** The complaint advances a theory of "joint infringement" for the asserted claims of the '287 and '619 patents against Google's Tensor CPUs and TPUs (Compl. ¶¶ 25, 13). The central allegation is that the Google processors, as sold, do not meet all limitations of the asserted apparatus claims but must be "modified" by third parties (e.g., app developers, end users) to become infringing (Compl. ¶25). Plaintiff alleges Google is liable for this third-party activity because it "directs or controls" their performance by providing the Android Open-Source Operating System and controlling the "manner or timing" of its source code releases (Compl. ¶¶ 5, 13). The complaint also posits alternative joint infringement theories, including the formation of a "joint enterprise" with the U.S. Government related to Google's public sector contracts (Compl. ¶¶ 4, 15).
- **Identified Points of Contention:**
  - **Scope Questions (Joint Infringement):** The complaint's primary theory for the processor patents hinges on attributing the conduct of third parties to Google. A central legal question will be whether providing an open-source operating system and development tools constitutes

"direction or control" sufficient to establish joint infringement under the standard set in *Akamai Techs., Inc. v. Limelight Networks, Inc.*, or if it is merely arms-length cooperation. The complaint itself quotes prior judicial opinions in cases involving the same plaintiff which found that the accused products "do not infringe without modification" (Compl. p. 17).

o **Technical Questions (Vehicle Infringement):** For the vehicle-related patents ('761, '891, and parts of '898), the complaint alleges direct infringement by Google's Self-Drive Vehicles (Compl. ¶¶ 37, 44, 51). A key evidentiary question will be whether the ADAS functionalities in Waymo vehicles perform the specific steps of the claimed "stall, stop, or vehicle slow-down system," particularly with respect to activation by a remote command signal as described in the patents. A footnote in the complaint states that "Google's Self-Drive Vehicle can function without the inclusion of Plaintiff's stall, stop, or vehicle slow-down system," which may raise questions regarding the essentiality and operation of the accused features (Compl. p. 24, fn. 1).

## V. Key Claim Terms for Construction

- **The Term:** "built in, embedded"
  - o **Context and Importance:** This term appears to be central to the dispute, as the complaint's infringement theories rely on combining Google's smartphones with external software (e.g., the ATAK application) or hardware (e.g., NFC tags, external sensors) (Compl. pp. 7-10). The scope of this term will be critical in determining whether a product that requires such post-sale "modification" can be found to infringe the apparatus claims.
  - o **Intrinsic Evidence for Interpretation:**
    - ▪ **Evidence for a Broader Interpretation:** The complaint cites a construction from a prior PTAB decision: "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" (Compl. p. 6). The language "connected to, or mounted to" may support an interpretation that covers external peripherals or software plug-ins that work with the core device.
    - ▪ **Evidence for a Narrower Interpretation:** The complaint also cites prior court orders finding no infringement "without modification," suggesting those courts adopted a narrower view that the claimed functionality must be present at the time of sale (Compl. p. 17). The phrase "integral part of the device" from the PTAB construction itself could also be argued to support a narrower scope, requiring a more permanent and essential connection than simply installing an app.
- **The Term:** "communication device"
  - o **Context and Importance:** Asserted claims of the '287 and '619 patents are directed to a "communication device." The infringement allegations target Google's Tensor CPUs, which are components within a larger

device (Compl. ¶13, ¶25). The construction of "communication device" will be important for determining whether a processor component can, by itself, satisfy the claim limitation, or whether the entire end-user product (e.g., a smartphone) must be the accused instrumentality.

- o **Intrinsic Evidence for Interpretation:**
  - **Evidence for a Broader Interpretation:** The patent specifications disclose that the "communication device" can encompass a wide range of products, including cell phones, laptops, and PDAs, suggesting the term is meant to be capacious ('287 Patent, col. 15:5-10). The complaint alleges the CPU is the "brain" of the device, which may support an argument that it is the core of the claimed "device" (Compl. p. 11).
  - **Evidence for a Narrower Interpretation:** The asserted claims recite a list of other components (e.g., biometric sensor, motion sensor, GPS) as being part of the "communication device" ('287 Patent, Claim 4). This may support an argument that the term requires a single, integrated apparatus containing all the recited elements, rather than just the processor that enables their function.

## VI. Other Allegations

- **Indirect Infringement:** The complaint's primary infringement theory against the accused processors is "joint infringement," which is a theory of direct infringement under 35 U.S.C. § 271(a) (Compl. ¶1). However, the factual allegations—that Google "directs or control[s]" the performance of third parties by providing the Android OS and source code—also contain the elements of knowledge and intent required for a claim of induced infringement under § 271(b) (Compl. ¶¶ 5, 13).
- **Willful Infringement:** The complaint alleges willful infringement based on pre-suit knowledge of the patents (Compl. p. 1). The basis for this allegation is Google's alleged knowledge of the patents-in-suit from at least October 5, 2022, the service date in a prior litigation, *Golden v. Google LLC*, NDC Case No. 22-5246 (Compl. ¶39, ¶46, ¶53). The complaint alleges that Google continued to release new products despite this knowledge (Compl. ¶39).

## VII. Analyst's Conclusion: Key Questions for the Case

- A central legal issue will be one of **attributed liability:** can the act of providing an open-source operating system and hardware platform (the Android ecosystem) satisfy the "direction or control" standard for joint infringement under *Akamai*, or will the court view the relationship between Google and third-party developers/users as arms-length cooperation that does not give rise to liability for direct infringement?
- A key issue of **claim scope** will be whether the court construes the asserted "apparatus" claims as requiring all elements to be present in the accused product at the time of sale, or whether infringement can be based on post-sale "modification" by end-users, which would align with the plaintiff's joint

infringement theory but may blur the line between apparatus and method claims.

- For the vehicle patents, a core evidentiary question will be one of **functional operation:** does the accused ADAS in Google's Self-Drive Vehicles perform the specific "stall, stop, or vehicle slow-down" functions as recited in the claims, particularly concerning the capability to be activated by a remote command, or is there a fundamental mismatch in the intended and actual operation of the accused systems?

RDC 07

S2324K504179-18

**PRIORITY MAIL EXPRESS®**

**PRIORITY MAIL EXPRESS®**

**FLAT RATE ENVELOPE**
ONE RATE ■ ANY WEIGHT

Schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP



PS10001000006


**UNITED STATES POSTAL SERVICE®**

**CUSTOMER USE ONLY**
FROM: (PLEASE PRINT)  PHONE 864 288-5605

LARRY GOLDEN
740 WOODRUFF RD.
#1102
GREENVILLE, SC 29607

**DELIVERY OPTIONS (Customer Use Only)**
SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.
Delivery Options
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT)  PHONE 512 402
U.S. DISTRICT COURT FOR THE WESTERN DIST
OF TEXAS — WACO DIVISION
CASE NO: 25-0434-LS
800 FRANKLIN AVE., ROOM 380
WACO, TEXAS
ZIP + 4® (U.S. ADDRESSES ONLY)
7 6 7 0 1 - ___ ___

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.



EI 908 310 780 US

**RECEIVED**
JAN 14 2026
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

**RECEIVED**
JAN 14 2026
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF
BY _____ DEPUTY CLERK

**PAYMENT BY ACCOUNT (if applicable)**
USPS® Corporate Acct. No.        Federal Agency Acct. No. or Postal Service™ Acct. No.

**ORIGIN (POSTAL SERVICE USE ONLY)**

| PO ZIP Code | Day ☐ ☐ | Scheduled Delivery Date (MM/DD/YY) | Postage |
|---|---|---|---|
| 29616 | ☐ Military ☐ DPO | 1/15/19 | $ 33.40 |

| Date Accepted (MM/DD/YY) | Scheduled Delivery Time | Insurance Fee | COD Fee |
|---|---|---|---|
| 1/12/26 | ☑ 6:00 PM | $ | $ |

| Time Accepted | | Return Receipt Fee | Live Animal Transportation Fee |
|---|---|---|---|
| 10:51 | ☐ AM ☐ PM | $ | $ |

| Special Handling/Fragile | Sunday/Holiday Premium Fee | Total Postage & Fees |
|---|---|---|
| $ | $ | $ 33.40 |

| Weight | ☐ Flat Rate | Acceptance Employee Initials |
|---|---|---|
| 9 lb. 60 ozs. | | m |  $ 33.40 |

**DELIVERY (POSTAL SERVICE USE ONLY)**

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | ☐ AM ☐ PM | |
| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
| | ☐ AM ☐ PM | |

LABEL 11-B, MAY 2021        PSN 7690-02-000-9996

◄ **PEEL FROM THIS CORNER**

EP13F October 2023
OD: 12 1/2 x 9 1/2


PAPER POUCH
how2recycle.info

 


**UNITED STATES POSTAL SERVICE®**

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express® shipments. Misuses may be a violation of federal law. This package is not for resale. EP13F © U.S. Postal Service; October 2023; All rights reserved.