**FILED**

January 20, 2026

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ cap

DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 992-7104

Email: atpg-tech@charter.net

| | |
|---|---|
| LARRY GOLDEN, | CIVIL CASE NO: <u>6:2025cv00434-LS</u> |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | **(Infringement under 35 U.S.C § 271(g)** |
| GOOGLE LLC | **(Joint Patent Infringement)** |
| Defendants. | **(Direct Patent Infringement),** |
| | **(Willful Patent Infringement),** |
| | January 15, 2026 |

## PLAINTIFF'S MOTION FOR
## SETTLEMENT

Plaintiff made the proposed settlement offer to the Defendant's attorneys at least twice since the opening of this case. Plaintiff asked the Defendant's attorneys if they would please speak with their client Google concerning the offer and get back with Plaintiff on their client's position.

Plaintiff never received an answer. Therefore, Plaintiff is asking the Court to order Google to pay.

## GOOGLE IS COLLATERAL ESTOPPEL FOR
## RE-LITIGATING SETTLED ISSUES

Twelve Federal Judges repeatedly confirmed Google's arguments that the integration of a CBRNE-H detection capability with a mobile device; infringes Plaintiff's patented CMDC invention.

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Google, LLC,* Case No. 22-1267; determined direct infringement arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court ***again*** concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439,

2

and 9,069,189" ... "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" ... "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straight-forward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent.

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* Case No. 23-0048 that direct infringement arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Golden v. Samsung Electronics America, Inc*. Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024.

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: (1) through the "Android Team Awareness Kit, ATAK," which is "[b]uilt on the Android operating system," involves "plug-ins" and "app specific software," was "[i]nitially created" by the "Air Force Research Laboratory" together with the

"Defense Threat Reduction Agency," and is "available to warfighters throughout the DoD," Appx112 ¶ 55; Appx119, 127; (2) through add-on devices or modifications that utilize the smartphone's built-in camera, Appx111 ¶ 54, Appx124–25; and (3) through nine "standard sensors" which "can be used as 'biosensors,'" Appx126."

"Samsung moved to dismiss Mr. Golden's complaint, arguing that, among other things, Mr. Golden's complaint failed to plausibly state a patent-infringement claim. Appx146–48. More specifically, Samsung argued that Mr. Golden's complaint stated no alleged facts that went beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality. On that basis, Samsung said, there are no plausible allegations Samsung was engaged in directly infringing activities. Appx146–47."

"The district court agreed and dismissed Mr. Golden's complaint with prejudice, concluding, in part, that "[t]he allegations that his patents cover the identified functionalities included in Samsung's products are wholly unsupported and implausible on their face." Golden, 2023 WL 3919466, at *2."

"We reject Mr. Golden's appeal arguments and therefore affirm the district court's dismissal of his complaint."

The Northern District of California Court Judge Haywood S. Gilliam, Jr. in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Government arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss with Leave to Amend" Document 41 Filed 08/10/23; the then presiding Judge Haywood S. Gilliam, Jr. agreed with the Defendant

4

[Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The Northern District of California Court Judge Rita F. Lin in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Gov't arises when there's a combined ATAK software; CBRN plugins; CPU, and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68 Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The United States Court of Appeals; Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 24-2024; determined infringement occurs when a [Google] mobile, consumer, or cellular device is integrated with, or interconnected to, Draper's CBRNE detection capability.

In *Golden v. Google LLC.*, Case No. 24-2024, Dkt. 41; filed 06/25/2025, three Federal Circuit judges again confirm, infringement of Plaintiff's patented CMDC device occurs when a mobile, consumer, or cellular device, is integrated with, or interconnected to a CBRNE detection capability. The Circuit's opinion includes the following:

"We conclude that the district court did not err in finding that Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1;

"Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1; see also *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339,

1346 (Fed. Cir. 2014) (finding no infringement when the accused products "do not infringe without modification—the modification of installing the required software."). Mr. Golden's first theory of infringement requires the ***use of the third-party app*** "ATAK-CIV" for at least two limitations of each asserted claim. App'x 300–302 ¶¶ 56 63; see also App'x 400–407.

The burden placed on Plaintiff is Google's persistent fight to get back to the Northern District of California to have their judges overturn a decision they fought so hard and long for. It doesn't make sense to Plaintiff, Google got exactly what they asked for: a final decision that, "infringement of Plaintiff's patented CMDC devices only occurs when there's a mobile, cellular, or consumer device that is integrated with, or interconnected to, a CBRNE-H detection capability."

Google is reaching far outside the boundaries to have Plaintiff's current case dismissed for *res judicata* (issue and claim preclusion) and *Kessler*; it is Google, not Plaintiff, who is seeking to have this case transferred back to the NDC court, a court that lacks the ability to be unbiased, to be retried for the same issues.

Collateral estoppel, also called issue preclusion, is a doctrine in criminal law and civil procedure that prevents a party from re-litigating an issue of fact or law that has already been validly, finally, and necessarily determined in a prior proceeding.

In criminal law, it applies through the Double Jeopardy Clause of the Fifth Amendment, and under *Benton v. Maryland* (1969), binds both federal and state prosecutions via the Fourteenth Amendment's Due Process Clause.

In civil procedure, it is a form of *res judicata* that bars re-litigation of essential issues decided on the merits in a previous case. It includes defensive use (by a defendant to block a plaintiff from re-litigating an issue) and offensive use (by a plaintiff to block a defendant), with courts having discretion over non-mutual offensive use as outlined in *Parklane Hosiery Co. v. Shore* (1979)

In this current case Plaintiff have not, and does not, opposed the decision of twelve federal judges who infer to say: "infringement of Plaintiff's patented CMDC devices occurs when there's a mobile, cellular, or consumer device that is integrated with, or interconnected to, a CBRNE-H detection capability.

The problem for Google arises when Plaintiff demonstrates Google's self-inflected liability for patented infringement that occurs upon importation or shipment of the Google accused instrumentalities; and after importation or shipment the sale of the Google accused instrumentalities into the United States.

## PLAINTIFF'S PATENTED CENTRAL PROCESSING UNIT (CPU) AND PATENTED TRANSCEIVER

Google's mobile transceivers [equivalent to the "built-in, embedded Google android operating system] have evolved significantly since the company's inception, reflecting advancements in technology and changes in user needs.

**Early Developments**

- Google initially focused on software and web services, with mobile technology becoming a priority after the launch of Android in 2008.
- The first Android devices featured basic transceiver technology, primarily for voice and SMS communication.

**Advancements in Technology**

- Over the years, Google has integrated more advanced transceiver technologies into its devices, including support for 4G LTE and later 5G networks.
- The introduction of Google Pixel smartphones in 2016 marked a significant step, as these devices included high-quality mobile transceivers optimized for performance and ***connectivity***.

**Integration with Services**

- Google has developed mobile transceivers that work seamlessly with its services, such as Google Assistant and Google Maps, enhancing user experience.
- The company has also focused on improving the efficiency and battery life of mobile transceivers through software optimizations and hardware advancements.

**Current Trends**

- Google continues to innovate in mobile transceiver technology, focusing on features like enhanced *connectivity*, improved signal processing, and integration with AI for better performance.
- The company is actively involved in the development of new communication standards and technologies, such as 5G and beyond.

**Future Directions**

- Ongoing research and development aim to further enhance mobile transceiver capabilities, including support for emerging technologies like internet of things (IoT) and augmented reality.
- Google's commitment to sustainability may also influence future designs, focusing on energy-efficient transceiver technologies.

**Connectivity / Google Android Operating System**

- "The built-in, embedded Google android operating system, that is equivalent to Plaintiff's patented "transceiver", is designed specifically for Google smartphones' embedded computer systems. These systems aim to enhance functionality and reliability to perform dedicated tasks. One of the key features of the built-in, embedded Google android operating system is connectivity. Connectivity "provides a variety of connections such as cellular, Wi-Fi, Bluetooth,

NFC (Near Field Communication) and others to facilitate the communication of the device with other devices and networks."

Example: "'Google's Fast Pair with Android Auto': With Bluetooth enabled, all you need to do is tap once on your phone screen, and your phone will automatically connect with your car. This allows you to quickly get going with Android Auto where you can navigate, call, chat, listen to media, and more."

[Your phone or tablet is using Android 6.0 or higher. Your phone or tablet has Bluetooth. Location turned on for Android 11 or below. Devices must be within Bluetooth sharing distance and have Wi-Fi enabled. Works with compatible devices. Requires vehicle with Android Auto. Works with compatible devices. Devices sold separately].

## THE GOOGLE TENSOR CPU RUNS THE GOOGLE ANDROID OPERATING SYSTEM

The CPU is a collection of circuits that run the operating system and apps and manage other computer operations. The central processing unit, also known as a CPU, processor, microprocessor, or computer processor, is a small yet crucial piece of hardware found in computing devices such as desktops, smartphones, tablets, and TVs. A central processing unit is the main processor that has the ability to run a machine's applications and operating systems. Since the CPU is in control of the operations of a computer, it's commonly referred to as the "brain" of the computer. A CPU is in almost every electronic device that needs to process information to function, including all kinds of computers and smart devices. Some examples of things that use CPUs include: Computers, Laptops, Tablets, Smartphones, Flat-screen TVs, Digital cameras, Thermostats, and Smartwatches. https://www.coursera.org/articles/central-processing-unit

"Essentially, the [SoC/CPU] is the brain of your smartphone that handles everything from the Android operating system [equivalent to Plaintiff's "transceiver"] to detecting when you press the power off button. SoCs/CPUs connect to other components too, such as cameras … Central Processing Unit (CPU) — The "brains" of the SoC. runs most of the code for the Android OS. [The] CPU is the most commonly used type of processor. It's designed to be highly flexible and suitable for a wide range of tasks. As such, the CPU runs the Android operating system and your apps. Smartphone CPUs often appear in eight-core configurations, with big powerful cores for more demanding applications and smaller power-efficient cores to ensure long battery life. https://www.androidauthority.com/what-is-an-soc-smartphone-chipsets-explained-1051600/

The central processing unit (CPU) is the beating heart of every smartphone, powering its performance and determining its capabilities. The phone platform encompasses the operating system (OS) and the ecosystem it supports. Developed by Google, Android is the most widely used mobile OS globally, offering a customizable user experience and a vast array of apps through the Google Play Store. The CPU is the primary component responsible for executing instructions and tasks within a smartphone. Modern smartphone CPUs strive to strike a balance between performance and energy efficiency. The future of smartphone CPUs is evolving with advancements in artificial intelligence (AI) integration and custom silicon. The platform and CPU of a smartphone form its technological backbone, influencing everything from user experience to app compatibility. https://zakphone.com/phone-cpu/

The Google Tensor/CPU family is related to the Exynos lineup—to the point of sporting Samsung codenames—but mixes standard ARM Cortex CPUs, ARM Mali GPUs, and Samsung modems with custom Google cores, most notably the Tensor NPU. Modern smartphones are communication devices, and a modem is the single most essential component that enables this basic feature. A modem is used to convert wireless signals into data that your phone can understand. Today's smartphone modems integrate 5G, 4G, 3G, and Wi-Fi capabilities in a single unit. And while a majority of smartphone SoCs today feature an integrated modem, there are a few exceptions. the Google Tensor/CPU chips, which use a Samsung modem (an internal core on

the original Tensor, and then an integrated one on the G2 and G3 chips).
https://www.nextpit.com/how-tos/smartphone-socs-
explained#samsungexynossocs

***Claim Term Construction:*** "In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

"In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below.

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

***Patent Specifications:*** "[a]long with the satellite 136 and the monitoring site 138 can be adapted or incorporated with cell phone towers and satellites for use with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency ***interconnected to a central processing unit (cpu), such as cpu 40, or a transceiver*** and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween."

***Patent Specifications:*** "As shown in FIGS. 1-10, the multi sensor detection [] system 10 includes at least one—and preferably many—detector case 12 ***that can be placed in, on, upon or adjacent the product***…" "The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an

11

opposite rear or back side 30 ... "[C]onnections or contacts that can include an Internet connection 32, a GPS connection 34 and a power connection 36 for a power source." ... "the products grouped into what may be referred to as *Product grouping 2 (sensors)* include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, speed sensors, biometric sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems, detection of humans, detection of contraband, temperature, and shock levels; the products grouped into what may be referred to as *Product grouping 3 (detector case; modified and adapted)* include, but are not limited to, cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, eyeglass, briefcases, detector cases of locks, detector cases of tags, detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to; the products grouped into what may be referred to as *Product grouping 4 (monitoring & communication devices)* include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite cell phones, cell phones, Universal Mobile Telecommunications System (UMTS) phones, personal digital assistants (PDAs), liquid crystal display (LCD) monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds; the products grouped into what may be referred to as *Product grouping 5 (communication methods)* include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite,

Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS), Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS)" ... "the products grouped into what may be referred to as ***Product grouping 7 (authorized person)*** include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel." (Patent Specifications)

## Claim 1 of U.S. Patent No: 9,096,189

**["CPU or transceiver": "transceiver" equivalent to mobile operating system]**

**["CPU or transceiver": cell phone detection device—camera or watch]**

1. A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, ***interconnected to a product for communication therebetween***, comprising:

at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of

plurality product groups based on the categories of a multi-sensor detection device, [] a cell phone detection device, or [];

a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, [], a cell phone detection device, or [];

at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection;

the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and

whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to [] activate or deactivate cell phone detection systems;

*wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories;* [1]

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular

---

[1]    ***Example:*** An authorized person under of at least that of the CIA [product grouping 7]; who owns a communication device of at least that of a PDA [product grouping 4]; who have volunteered and is authorized to receive CBRNE-H signals from sensors internal the communication device [product grouping 2], or external the communication device [product grouping 3]; whereby connectivity is made by at least that of Bluetooth, Wi-Fi, Internet, RF, cellular, etc. [product grouping 5]

connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products;

wherein [] the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF).

### Claim 23 of U.S. Patent No: 9,589,439

### ["CPU or transceiver": cell phone detection device—camera or watch]

23. A cell phone comprising:

a central processing unit (CPU) for executing and carrying out the instructions of a computer program;

a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device;

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection;

the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and

whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals [] to activate or deactivate the cell phone detection device;

at least one of a chemical sensor, a biological sensor, an explosive

15

sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone;

whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone.

### Claim 5 of U.S. Patent No: 10,163,287

**["CPU or transceiver": "transceiver" equivalent to mobile operating system]**

**5.** A monitoring device, comprising:

at least one central processing unit (CPU);

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one sensor for chemical, biological, or human detection in communication with the at least one CPU;

one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and,

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one a chemical

biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

## PLEADING STANDARDS SET FORTH IN *TWOMBLY* AND *IQBAL*

Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

The following claims of infringement in Plaintiff's amended complaint is plead under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

### Infringement Under U.S. Code Section 271(g)

35 U.S. Code Section 271(g) provides that it is an act of infringement to import a product that is made abroad by a U.S. process patent. Prior to the enactment of Section 271(g), a manufacturer [Google] could often avoid infringing a U.S. process patent by performing the patented process overseas and importing the resulting product into the United States. But now, that is an infringing act under 271(g).

Although the patented process is performed abroad, Section 271(g) is not an extraterritorial application of U.S. patent law. Rather, the act of infringement is the act of importation into the United States. It's also interesting to note that Section 271(g) applies to products made within the United States as well, and the infringing act is the sale or use of the product. Following similar reasoning, a 2019

Federal Circuit case, *Syngenta*, recently clarified that divided infringement is not an issue under 271(g). In other words, the patented process can be performed by multiple entities, and implication of the product can still infringe 271(g). Part of the Federal Circuit's rationale was that the infringing act is the act of importation, not performance of the patented process.

Even if Google performed the patented process, but all of the steps of that process occurred as the Google product passes from one factory to another during manufacture, the importer or seller [Google] of the final product can still be held liable, because the infringing act is the importation, and the infringing product is defined as being made by the patented process.

There are two key exceptions to Google's alleged 271(g) liability that are expressly provided for by the statute: First, the Google product is not infringing if, after performing the patented process, the Google product is materially changed by subsequent processes. Google have not presented or provided evidence into this case of any Google products that have been materially changed by subsequent processes.

The second statutory exception provides that the Google product is not infringing if, after being made by the patented process, it becomes a trivial and nonessential component of another product.

There's another statute that Congress passed relating to proving infringement of a process patent, found under 35 U.S.C. Section 295. Plaintiff recently filed infringement allegations based on 271(g), while giving notice of the relevance of Section 295. Section 295 is a burden-shifting provision under which, if Plaintiff can prove, (1) a substantial likelihood exists that the Google product was made by the patented process, and, (2) Plaintiff made a reasonable effort to determine the process actually used, but was unable to so determine, the Plaintiff gets a presumption that the patented process was used.

Plaintiff alleges Google imports without authority into the United States products (Google Pixel phones, Google Pixel watches, and Google Tensor CPU/Chipsets) that are made by Plaintiff's process patents in the United States.

**Joint Infringement**

Google is liable for Samsung's performance of a method step if it (1) "contracts with Samsung to perform one or more steps of a claimed method," (2) "the actors (Google and Samsung) form a joint enterprise," or (3) Google "conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance;" which are questions of fact. TechStory below:

"Google is preparing to launch its next-generation Tensor G5 processor with the upcoming Pixel 10 series. While the Tensor G5 marks a significant departure from past models by being fabricated by TSMC instead of Samsung Foundry, the relationship between Google and Samsung is far from over. In fact, the new chip and the Pixel 10 hardware as a whole still carries the unmistakable fingerprints of Samsung, despite headlines suggesting a full break.

Since 2021, Google's custom Tensor chips have been co-developed and manufactured by Samsung using its foundry and IP. However, Google has reportedly decided to move production to TSMC, the world's leading chip fabricator, starting with the Tensor G5 … TSMC's cutting-edge fabrication nodes are known for their power efficiency and performance, and Google appears eager to leverage these strengths.

Despite the change in fabrication, the Tensor G5 will still rely on a Samsung component critical to mobile performance its modem.

Leaks suggest that the Pixel 10 Pro, powered by Tensor G5, will use Samsung's Exynos 5400 5G modem, the same hardware used in earlier Tensor chips and in Samsung's own Exynos 2400 platform found in the Galaxy S24 series.

Rather than a clean break from Samsung, Google seems to be pursuing a hybrid approach diversifying suppliers while maintaining continuity in proven areas like modem technology and memory. This hybrid model also allows Google to better control costs, component supply chains, and performance consistency, especially as it scales up Tensor development."

https://techstory.in/googles-upcoming-tensor-chip-maintains-a-connection-to-samsung-even-with-the-transition-to-tsmc/

"Direct infringement under § 271(a) occurs where all steps of a claimed method are performed by or attributable to a single entity…. Section 271(a) is not limited solely to principal-agent relationships, contractual arrangements, and joint enterprise. Rather, to determine direct infringement, the Fed. Circuit consider whether all method steps can be 'attributed to a single entity'." *Akamai Tech. IV* (Fed. Cir. 08/13/15) (en banc). Plaintiff alleged all steps are attributed to Google in Plaintiff's claim that Google is jointly infringing Plaintiff's patented inventions.

**Induced Infringement**

Google has allegedly indirectly infringed valid patent claims of at least Golden's '619 patent; '287 patent; '439 patent; and, '189 patent that discloses a new, improved upon, and useful cell phone in this District and elsewhere in the United States by, among other things, actively inducing the use, offering for sale, selling, or importation of at least the Google Android Open-Source Operating System and induced the "use" of the Google Android "Source Code" (Accused

Products). Google's customers (Samsung, etc.) who purchase android devices and components thereof and operate such android devices and components in accordance with Google's instructions directly infringe one or more valid patent claims of at least Golden's '619 patent; '287 patent; '439 patent; and, '189 patent in violation of 35 U.S.C. § 271(b).

Google instructs its customers (Samsung, etc.) through advertisements, user guides or websites. Google is thereby liable for induced infringement of the valid patent claims of at least Golden's '619 patent; '287 patent; '439 patent; and, '189 patent that discloses a new, improved upon, and useful cell phone pursuant to 35 U.S.C. § 271(b).

> "At least 1,750 smartphones and other devices run on Android, an open-source operating system. Android began in 2003 as a project of the American technology company Android Inc., to develop an operating system for digital cameras. In 2004 the project changed to become an operating system for smartphones. Android Inc., was bought by the American search engine company Google Inc., in 2005. At Google, the Android team decided to base their project on Linux, an open-source operating system for personal computers."
> https://en.wikipedia.org/wiki/List_of_Android_smartphones

**Contributory Infringement**

Google has allegedly indirectly infringed valid patent claims of at least Golden's '619 patent; '287 patent; '439 patent; and, '189 patent that discloses a new, improved upon, and useful cell phone in this District and elsewhere in the United States by, among other things, contributing to the direct infringement of others, including OEM's like Samsung, with the Google Android Open-Source Operating System and induced the "use" of the Google Android "Source Code"

(Accused Products), by making, offering to sell, or selling, in the United States, or importing as components of a Google *"modified"* cell phone, or apparatuses for use in practicing the patented process of making a Google *"modified"* cell phone; constituting material parts of the a patented *"modified"* cell phone invention, knowing the same to be especially made or especially adapted for use in infringement of the '619, '287, '439, and '189 patents, and not staple articles or commodities of commerce suitable for substantial non-infringing use.

For example, the '619, '287, '439, and '189 Accused Google Products include hardware and software [Android Operating System] for implementing at least Samsung's CBRNE-H sensing functionality. These are components of Plaintiff's patented *"modified"* cell phone or apparatuses for use in practicing Plaintiff's patented process. Furthermore, these components are a material part of the Samsung *"modified"* cell phone invention and upon information and belief are not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Google is allegedly liable for contributory infringement of Plaintiff's '619, '287, '439, and '189 patents pursuant to 35 U.S.C. § 271(c).

**Direct Infringement**

The following claims of direct infringement in Plaintiff's amended complaint is plead under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Plaintiff alleges in the amended complaint that Google, without authority makes, uses, offers to sell, or sells Plaintiff's patented central processing units (CPUs) i.e., the Google Tensor CPU/Chipset; Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) devices i.e., Google's *"modified"* cell phones; Plaintiff's patented cell phone detection system i.e., Google's "megapixel" camera with QR reader; Plaintiff's multi-sensor detection device i.e., Google Pixel watches;

and Plaintiff's patented stall, stop, and vehicle slow-down system i.e., Google's Advanced Driver-Assistance System (ADAS) for autonomous and driverless vehicles', inventions, within the United States or imports into the United States any of Plaintiff's patented invention's during the term of the patent therefor, infringes the patent. 35 U.S.C. § 271(a).

## PROPOSED SETTLEMENT

Plaintiff started two companies in 2006: ATPG Technology LLC [for profit] was set up to receive revenue from my patented devices and stimulus packages; and, ATPG Corporation [not-for-profit] was set up to accept 50% of ATPG Technology LLC's revenue.

ATPG Corporation was actually set-up as a corporation for reparations. The funds from the corporation were to be directed toward stimulating the Black community: schools, housing, health care, business development, banks, scholarships, debt relief, prison reform, legal representation etc.

The Government and the 30 companies listed in the chart below, performing the work under Government contracts [express and/or implied authorization] and who is benefiting from Plaintiff's patented inventions and stimulus packages, has managed, to this point, to destroy all possibility of developing this phase of the stimulus packages. ***20% of $62T is $12.4T in damages, whereby $11.12T (90%) for reparations. 10% goes to ATPG Technology, LLC (1.28T)***

### Estimated Total Revenues Between Years 2010 - 2026

| COMPANY | REVENUE | COMPANY | REVENUE |
|---------|---------|---------|---------|
| Apple | 4.5T | Twitter | .5T |
| Samsung | 3.5T | Meta-Facebook | .9T |
| LG | .9T | Nissan | 1.6T |

| Qualcomm | .5T | | Mazda | .3T |
|---|---|---|---|---|
| AT&T | 2.6T | | BMW | 1.8T |
| Verizon | 2.2T | | Mercedes-Benz | 1.5T |
| T-Mobile | .8T | | Honda | 1.9T |
| Google | 2.5T | | Toyota | 4.4T |
| Charter Com. | .6T | | Tesla | .4T |
| Microsoft | 2.2T | | Intel | 1.2T |
| Ford | 2.5T | | Amazon | 4.5T |
| FCA US | 1.0T | | Best Buy | .7T |
| GM | 2.5T | | Walmart | 8.6T |
| Volkswagen | 4.5T | | United States | Est. 3 - 5T |

Plaintiff retrieved annual reported revenues (i.e., Macrotrends, etc.) for the above companies for years 2010-2022 plus estimated years 2023-2026. The above chart displays the estimated total revenue for that time period for each company that makes, uses, offers for sell, or sells Golden's patented inventions.

The total for all companies listed is estimated at: **$62 Trillion dollars**. *20% of $62T is $12.4T in damages, whereby $11.12T (90%) for reparations. 10% goes to ATPG Technology, LLC (1.28T)*

**Google's Numbers**

Google failed to acknowledge or claim Google have been performing work for the Government, with the authorization and consent of the Government; which means Google have waived its right to claim immunity for any liability of patent infringement.

Google is allegedly and potentially liable in this case for joint infringement, direct infringement, induced infringement, contributory infringement, infringement upon importation, and willful infringement

The total estimated revenue for Google between the years 2010 thru 2026 is: **$2.5 Trillion dollars** (Macrotrends). ***20% of $2.5T is $500B in damages.***

Golden offered Google a settlement of $1.26B, which is only 1% of Google's cash reserve of an estimated $126 billion dollars.

Sincerely,

*s/ Larry Golden*

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(M) 8649927104

Email: atpg-tech@charter.net

## **VERIFICATION**

### **Pursuant to 28 U.S.C. § 1746**

I, Larry Golden, over the age of 18, competent to testify, and having firsthand knowledge of the facts stated herein, do hereby declare, certify, verify, affirm, and state under penalty of perjury under the laws of the United States of America, that the foregoing statements are true, correct, and complete to the best of my understanding, knowledge, and belief, and made in good faith.

Executed and signed this 15th day of January, 2026, with all rights reserved and without recourse and without prejudice; is this "verification" for "Plaintiff's Motion for Settlement".

_s/ Larry Golden_

Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
Email: atpg-tech@charter.net
(M) 864-992-7104

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 15th day of January, 2026, a true and correct copy of the foregoing "Plaintiff's Motion for Settlement", was served upon the following Defendant via express mail:

> Brian C. Banner (State Bar No. 24059416)
> Valerie Barker (State Bar No. 24087141)
> SLAYDEN GRUBERT BEARD PLLC
> 401 Congress Avenue, Suite 1650
> Austin, Texas, 78701
> +1 (512) 402-3569
> +1 (512) 402-6865
> facsimile bbanner@sgbfirm.com
> vbarker@sgbfirm.com


> s/ *Larry Golden*
> Larry Golden, Pro Se
> 740 Woodruff Rd., #1102
> Greenville, South Carolina 29607
> Email: atpg-tech@charter.net
> (M) 864-992-7104



*Retail*

U.S. POSTAGE PAID
PME
GREENVILLE, SC 29
JAN 15, 2026

76701

**$33.40**

RDC 07

S2324K504191-33

 **UNITED STATES POSTAL SERVICE** ®

**PRIORITY MAIL EXPRESS** ®



EI 908 310 793 US

C 96

**CUSTOMER USE ONLY**

FROM: (PLEASE PRINT)     PHONE ( 864 ) 912-7104

LARRY GOLDEN
740 WOODRUFF RD.
#1102
GREENVILLE, SC 29607

**RECEIVED**

JAN 20 2026

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____ DEPUTY CLERK

**DELIVERY OPTIONS (Customer Use Only)**

☑ **SIGNATURE REQUIRED** *Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.*

Delivery Options
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
   *Refer to USPS.com® or local Post Office™ for availability.*

TO: (PLEASE PRINT)     PHONE ( )

U.S. DISTRICT COURT FOR THE WESTERN
DISTRICT OF TEXAS – WACO DIVISION
CASE No: 25-0434
800 FRANKLIN AVE, ROOM 380
WACO, TEXAS
ZIP + 4® (U.S. ADDRESSES ONLY)

7 6 7 0 1 - ___ ___ ___ ___

- For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
- $100.00 insurance included.

**PEEL FROM THIS CORNER**

USPS.COM/PICKUP

**PAYMENT BY ACCOUNT (if applicable)**

| USPS® Corporate Acct. No. | Federal Agency Acct. No. or Postal Service™ Acct. No. |
|---|---|

**ORIGIN (POSTAL SERVICE USE ONLY)**

| ☐ 1-Day | ☐ 2-Day | ☐ Military | ☐ DPO |
|---|---|---|---|

| PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage |
|---|---|---|
| 29615 | 1/20/26 | $33.40 |

| Date Accepted (MM/DD/YY) | Scheduled Delivery Time | Insurance Fee | COD Fee |
|---|---|---|---|
| 1/15/26 | ☐ 6:00 PM | $ | $ |

| Time Accepted | | Return Receipt Fee | Live Animal Transportation Fee |
|---|---|---|---|
| 433 ☐ AM ☑ PM | | | |

| Special Handling/Fragile | Sunday/Holiday Premium Fee | Total Postage & Fees |
|---|---|---|
| $ | $ | 33.40 |

| Weight | | Acceptance Employee Initials |
|---|---|---|
| ___ lbs. ___ ozs. | ☐ Flat Rate | |

**DELIVERY (POSTAL SERVICE USE ONLY)**

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | ☐ AM ☐ PM | |

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | ☐ AM ☐ PM | |

LABEL 11-B, MAY 2021     PSN 7690-02-000-9996

**TERNATIONAL USE**

**LABEL HERE**

...cluded for domestic
...stinations.

...de $100 of insurance

...equest.

...t APO/FPO/DPO and

...r complete details.

...ns. For details regarding
... Mail Manual at

*http://pe.usps.com.*

⁺Money Back Guarantee for U.S. destinations only.

WHEN USED INTERNATIONALLY, A CUSTOMS DECLARATION LABEL MAY BE REQUIRED.