# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 992-7104

Email: atpg-tech@charter.net

NOT SIGNED
FILED

MAR 12 2026

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY GOLDEN, | CIVIL CASE NO: 3:2026cv00831-JD |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | **(Infringement 35 U.S.C § 271(g)** |
| | **(Joint Patent Infringement)** |
| GOOGLE LLC | **(Direct Patent Infringement),** |
| | **(Willful Patent Infringement),** |
| Defendants. | |
| | March 7, 2026 |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## MOTION TO DISMISS

**Defendant's Moton to Dismiss (MTD) Dkt. No. 54 "INTRODUCTION"**

*Defendant:* Defendant's sneaky, underhanded, and devious objective is to disguise a motion for summary judgement under Rule (56) as a motion to dismiss under Rule 12(b)(6). Defendant's unsupported motion to dismiss seeks to resolve this case based on undisputed facts, asserting there is no genuine issue for trial [a summary judgement requirement]. Defendant failed to argue Plaintiff's complaint is legally insufficient. Defendant failed to show that under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff's complaint cannot prevail because:

1. Plaintiff have [not] alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570;
2. Plaintiff have [not] alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted); and,
3. Plaintiff have [not] plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged."

Instead, Defendant's motion to dismiss is based on evidence outside of the complaint [a summary judgement requirement], and Defendant's personal and conclusive opinions on the validity of Plaintiff's patents. Under a motion to dismiss the Defendant relies on the pleadings alone.

The Defendant's motion to dismiss suggest that there are no material facts in dispute and that the moving party is entitled to judgment as a matter of law [a summary judgement requirement]. Which, stands to reason why the Defendant is in opposition to the *prose* Plaintiff amending the complaint if the Court finds any deficiencies.

Another objective of the Defendant's disguised motion for summary judgement is the Defendant's insistence on having Plaintiff's case dismissed under the doctrines of *Res Judicata* and *Kessler*.

In a motion hearing held in the Western District of Texas (WDT) Court on January 22, 2026 in *Golden v. Google, LLC* Case No. 25-0434, Google stated on the record that their objective was to have the case transferred from the WDT to the Northern District of California (NDC) Court *(Exhibit A: Transcript)*.

> "[o]bviously we think there's independent grounds to transfer based on the interest of justice, based on the previous action, the *res judicata* arguments ... The Court: Mr. Warren, let me hear a succinct explanation about your argument with respect to the familiarity of the forum of the law that will govern the case. Did I glean from your moving papers that the law that you're referring to would be law of the case? MR. WARREN: Law of the case or *res judicata*, Your Honor ... MR. WARREN: Unless the Court deems it related to the previous case, which I assume it would, in which case it would go to the judge for the previous case ... THE COURT: Where -- who is that judge? MR. WARREN: It's Judge Lin."

On Feb. 6, 2026 Google filed in the previous case *Golden v. Google, LLC* NDC Case No. 22-5246 a "NOTICE by Google LLC of Administrative Motion to Consider Whether Cases Should Be Related".

Under the California Rules of Court 2026, Rule 3.300. Related cases: (a) Definition of "related case": A pending civil case is related to another pending civil case, or to a civil case that was dismissed with or without prejudice, or to a civil case that was disposed of by judgment, if the cases:

> (1) Involve the same parties and are based on the same or similar claims;
> (2) Arise from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact;
> (3) Involve claims against, title to, possession of, or damages to the same property; or
> (4) Are likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

Judge Rita Lin, the presiding Judge in Plaintiff's previous case *Golden v. Google, LLC* NDC Case No. 22-5246, Dkt. No. 79, issued an ORDER on 2/11/26 that the previous case and the current case *Golden v. Google, LLC* NDC Case No. 26-0831 Dkt. 46, are "*Not Related*". Clerk's notice filed on 2/18/26 in the current case no. 26-0831: "The court has reviewed the motion and determined that no cases are related and no reassignments shall occur." *(Exhibit B)*

The requirements for case(s) to be determined as being related are the same, or nearly the same, as the requirements for a case to be dismissed under the doctrines of *Res Judicata* and *Kessler*. Therefore, when Judge Lin determined the cases are "*not related*", it nullified and rendered moot the Defendant's claims that the current case should be dismissed under the doctrines of *Res Judicata* and *Kessler*.

**Plaintiff:** This is not a complaint, whereby Plaintiff is looking to change any prior decisions; re-litigate any prior decisions, or re-litigate in this current case causes of actions or issues that have already been decided or adjudicated.

Plaintiff believes he have alleged "enough facts to state a claim to relief [damages] that is plausible on its face" *Twombly*, 550 U.S. at 570; alleged facts that give rise to "more than a sheer possibility that the defendant [is liable for the damages sort], has acted unlawfully" *Iqbal*, 556 U.S. at 678; and, plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the [damages sort] misconduct alleged."

Plaintiff is demanding damages for Google's alleged direct infringement, joint (direct) infringement, and direct infringement under the doctrine of equivalents. Plaintiff alleged Google is making, using, selling, or importing certain Google products (i.e., Google's central processing unit, operating system, smartphone, camera, and smartwatch), believed to infringe the patented inventions described in,

and claimed in at least Plaintiff's U.S. Patent Nos. 8,334,761, 10,163,287, 10,984,619, 11,645,898, and RE43,891 asserted in this case.

Plaintiff outlined various means of direct infringement (i.e., direct infringement under 35 U.S.C. §§ 271(a) & 271(g); direct infringement under the doctrine of equivalents; and joint or divided (direct) infringement), that Plaintiff believes Google is liable for the misconduct alleged.

> 35 U.S.C. § 282 (a) Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.
> 35 U.S.C. § 282 (g) Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of process patent.

Plaintiff is seeking to collect damages on the following direct infringement theory: "Google's mobile, consumer, or cellular devices, that are integrated with, or interconnected to, a CBRNE-H detection capability, and Google's mobile, consumer, or cellular devices, that are integrated with, or interconnected to, a stall, stop, or vehicle slow-down capability; allegedly infringes Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) devices".

Judges, since 2015, eleven years, have been given the opportunity to review and issue opinions on Plaintiff's direct infringement theory of "a mobile, consumer, or cellular device, that is integrated with, or interconnected to, a CBRNE-H detection capability allegedly infringes Plaintiff's patented CMDC device. The infringement theory also includes a mobile, consumer, or cellular device, that is integrated with, or interconnected to, a stall, stop, or vehicle slow-down capability. The various courts are:

"In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the Patent Trials and Appeals Board (PTAB) construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

The PTAB decided "built-in, embedded" aligns with Golden's patent specifications—the detectors/sensors and/or the vehicle stall, stop, slow-down capability is placed "in, on, upon, or adjacent" the communication device—while the PTAB's construction of "built-in, embedded" is: "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". [The PTAB also construed "communication device" the same as "monitoring equipment"]. *(Exhibit C)*

The PTAB determined infringement of the Patent Owner's patented CMDC devices occurs when a CBRNE-H detector/sensor, and/or vehicle stall, stop, slow-down capability is placed "in, on, upon, adjacent, built-in, embedded, included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device", such that it is an integral part of Patent Owner's communicating, monitoring, detecting, or controlling, (CMDC) device (i.e., new, improved upon, and useful cell phone, smartphone, laptop, tablet).

Judge Braden, in the United States Court of Federal Claims, *Golden v. United States*, Case No. 13-307C "Memorandum Opinion and Order Denying the Government's Motion to Dismiss, Dkt. 94, filed 11/30/16, fully described how infringement of Plaintiff's patented CMDC device occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability, and a mobile, consumer, or cellular device, that is integrated with, or interconnected to, a stall, stop, or vehicle slow-down capability.

6

"The February 12, 2016 Amended complaint identifies over thirty devices that were developed or procured, as a result of Government solicitations, Government contracts, or National Science Foundation ("NSF") grants. 2/12/16 Am. Compl. at ¶¶ 68-127. The relevant devices are: Smartphone Microscope; Smartphone Biosensor Cradle; iPhone Biodetector Smartphone; Smartphone-Based Rapid Diagnostic Tests; Samsung Galaxy s6 Microscope Smartphone; Cell-All Synkera MikroKera Ultra; iPhone Biodetector Smartphone; ... Lockheed Martin K-Max Unmanned self-flying Helicopter; Boeing MH-6 Little Bird Helicopter; Oshkosh Defense Autonomous Unmanned Ground vehicle TerraMax ... [the Google/Waymo self-driving vehicle allegedly uses the same stall, stop, vehicle slow-down system]

"The February 12, 2016 Amended Complaint's NFC claims also allege sufficient facts to plausibly establish that the use of the accused devices was "with the authorization or consent of the Government." Authorization or consent can be implied from the circumstances... *Hughes Aircraft Co.*, 534 F.2d at 901."

"The relevant [awards] are being used to develop: "a portable smartphone attachment [] to detect viruses and bacteria," ... "[a device] that derives biological signals from your smartphone's accelerometer ... "a cradle and app for the iPhone to make a handheld biosensor that uses the phone's own camera [] to detect any kind of biological molecules or cells," ... a handheld instrument to help contain the spread of Ebola, HIV, Tuberculosis, and Malaia, ... "[a portable device for] real-time detection of explosives, toxicants, and radiation," ...

"Viewed in the light most favorable to Plaintiff, the February 12, 2016 Amended complaint alleges sufficient facts to raise a plausible right of relief under section 1498(a)." *(Exhibit D)*

Google Android Team Awareness Kit (ATAK), also as Google Android Tactical Assault Kit (ATAK), and Android Tactical Assault Kit for Civilian Use (ATAK-CIV) is a Google Android smartphone geospatial infrastructure and military situation awareness app.

The unmanned aerial systems (UASs) will use Draper's novel algorithm to synthesize the data from onboard sensors— including GPS, LiDAR, accelerometer, magnetometer and onboard cameras— and be able to communicate with human operators, centralized command centers, and other teamed UASs. Draper's UAS for CBRN is expected to perform with limited operator interaction. A human operator will be able to override the autonomous agent decisions and redirect or abort the mission, as needed.

Assisting in the development will be Draper's Human Systems Engineering, a team that will help design the tablet interface to support teaming, and Draper's Warfighter Systems, which developed the [A]TAK plug-in that enables Draper's UAS to provide situational awareness at every level—the strategic level, theater level, brigade level and soldier level. "[A]TAK allows you to bridge from the decision maker to tactical execution," said Brian Alligood, Draper's program manager for [A]TAK. https://globalfintechseries.com/ fintech/draper-wins-26m-pentagon-contract-for-remote-cbrn-detection-using-autonomous-teaming-drones/

Twelve Federal Judges repeatedly confirmed arguments that the integration of a CBRNE-H detection capability with a mobile device; infringes Plaintiff's patented CMDC invention.

| Judge(s) | Case Number | Case Title | Court | Dates |
|---|---|---|---|---|
| 3 Fed Cir Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| 1 District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| 3 Fed Cir Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| 1 District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| 1 District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| 3 Fed Cir Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 22-1267; determined direct infringement arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court ***again*** concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" … "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straight-forward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent.

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* Case No. 23-0048 that direct infringement arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Golden v. Samsung Electronics America, Inc.* Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024.

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: (1) through the "Android Team Awareness Kit, ATAK," which is "[b]uilt on the Android operating system," involves "plug-ins" and "app specific software," was "[i]nitially created" by the "Air Force Research Laboratory" together with the "Defense Threat Reduction Agency," and is "available to warfighters throughout the DoD," Appx112 ¶ 55; Appx119, 127; (2) through add-on devices or modifications that utilize the smartphone's built-in camera, Appx111 ¶ 54, Appx124–25; and (3) ***through nine "standard sensors" which "can be used as 'biosensors,'"*** Appx126."

"Samsung moved to dismiss Mr. Golden's complaint, arguing that, among other things, Mr. Golden's complaint failed to plausibly state a patent-infringement claim. Appx146–48. More specifically, Samsung argued that Mr. Golden's complaint stated no alleged facts that went beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality. On that basis, Samsung said, there are no plausible allegations Samsung was engaged in directly infringing activities. Appx146–47."

"The district court agreed and dismissed Mr. Golden's complaint with prejudice, concluding, in part, that "[t]he allegations that his patents cover the identified functionalities included in Samsung's products are wholly unsupported and implausible on their face." Golden, 2023 WL 3919466, at *2."

"We reject Mr. Golden's appeal arguments and therefore affirm the district court's dismissal of his complaint."

The Northern District of California Court Judge Haywood S. Gilliam, Jr. in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Government arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss with Leave to Amend" Document 41 Filed 08/10/23; the then presiding Judge Haywood S. Gilliam, Jr. agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The Northern District of California Court Judge Rita F. Lin in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Gov't arises when there's a combined ATAK software; CBRN plugins; CPU, and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68 Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The United States Court of Appeals; Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 24-2024; determined infringement occurs when a [Google] mobile, consumer, or cellular device is integrated with, or interconnected to, Draper's CBRNE detection capability.

In *Golden v. Google LLC.*, Case No. 24-2024, Dkt. 41; filed 06/25/2025, three Federal Circuit judges again confirm, infringement of Plaintiff's patented CMDC device occurs when a mobile, consumer, or cellular device, is integrated with, or

interconnected to a CBRNE detection capability. The Circuit's opinion includes the following:

"We conclude that the district court did not err in finding that Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1;

"Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1; see also *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding no infringement when the accused products "do not infringe without modification—the modification of installing the required software."). Mr. Golden's first theory of infringement requires the use of the third-party app "ATAK-CIV" for at least two limitations of each asserted claim. App'x 300–302 ¶¶ 56 63; see also App'x 400–407.

The circuit court has held that an apparatus claim directed to a computer that is claimed in functional terms is nonetheless infringed so long as the product [Google's smartphones or smartwatches] is designed "in such a way as to enable a user of that [product] to utilize the function . . ." *Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002). "Where, [] a product includes the structural means for performing a claimed function, it can still infringe "separate and apart" from the operating system that is needed to use the product."

Plaintiff will argue that the cell phone was allegedly "*modified*" by Google to function as a CBRNE-H sensing device. Plaintiff will argue that the Google "*modified*" cell phone was "manufactured", and was "suitable for use" as a CBRNE-H sensing device before importation or shipment [§ 271 (g)] into the United States.

Plaintiff will argue that the importation of the Google "*modified*" cell phone, allegedly infringes Plaintiff's patented process [§ 271 (g)]. Plaintiff will argue that after shipment into the United States of the Google Pixel smartphone that is designed

to include as ***standard*** the Google android operating system for integrating or enabling a CBRNE-H detection capability; placed "in, on, upon, adjacent, built-in, embedded, included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the Google Pixel smartphone"; allegedly infringes Plaintiff's United States patent for a communicating, monitoring, detecting, or controlling, (CMDC) device (i.e., a new, improved upon, and useful cell phone; smartphone; laptop; or tablet)

If necessary, Plaintiff is ready with fact and expert witness testimonies to support Plaintiff's claim that Google allegedly performed work under an implied authorization to manufacture for the Government a "*modified*" cell phone that is designed to detect for CBRNE-H [DHS S&T BAA07-10 *Cell-All* initiative; 2007], before importation or shipment into the United States [§ 271 (g)].

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* Case No. 23-0048 that direct infringement arises "***through nine "standard sensors" which "can be used as 'biosensors*,**" Appx126."

> "Mobile phone sensors are embedded components that detect and measure changes in the environment or user interaction such as motion, light, sound, or touch. These sensors convert physical signals into digital data, enabling smartwphones to perform automatic tasks and deliver responsive features seamlessly" https://www.ecaico.com/2025/09/10-essential-smartphone-sensors.html

In *Golden v. Samsung Electronics America, Inc.* Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024. "Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: (3) through nine "standard sensors" [] used as 'biosensors."

Samsung admits that Mr. Golden's complaint filed in the Northern District of California Court in *Golden v. Samsung* Case No. 23-0048 alleged "***nine standard sensors which can be used as biosensors***".

Google admits, and further does not deny, the "nine standard sensors which can be used as biosensors", is found within each of Google's accused instrumentalities [smartphones]. Google further admits, it is making, offering for sell, selling, and purportedly importing the Google Pixel smartphones that include the "nine standard sensors which can be used as biosensors" and performs the accused detector/sensor functionality.

---

**Smartphone Biosensors Submitted to the Courts**:

1. Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
2. Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
3. Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
4. Microfluidic cassette: Interchangeable cassettes with varying assays
5. VIS-NIR spectrometer: Food freshness; Melanoma
6. NNAP Electrodes: Toxic metals and Organic pollutants in water
7. Optical Waveguide: Pathogens in water and food
8. Back and front camera: Colorimetric analysis; Image analysis
9. Microphone: Voice recording stress levels

---

Plaintiff believes Google is fully knowledgeable and aware they are "collateral estoppel" from re-litigating the decision of the Northern District of California case in *Golden v. Google LLC* Case No. 22-5246; "nine standard sensors which can be used as biosensors"; only one sensor is required to satisfy the statute.

This current case no. 26-0831 in the Northern District of California (NDC) court is *Horizontal Stare Decisis* to the previous case no. 22-5246 decision of the Northern District of California (NDC) court's Patent Local Rules': 3.1(c) "identifying specifically where [the chem/bio sensors are] and how each limitation

of each asserted claim is found within each Accused Instrumentality, including for each limitation that such party contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function"; which means as required, Plaintiff has identified what and where inside the Google Pixel smartphone the standard sensor(s) for Chem/Bio detection is located.

Collateral estoppel (CE), known in modern terminology as issue preclusion, is a common law estoppel doctrine that prevents Google from relitigating an issue. One summary is that, "once a court has decided an issue of fact or law necessary to its judgment, that decision ... preclude[s] re-litigation of the issue in a suit on a different cause of action [§ 271 (g)] involving a party to the first case". *San Remo Hotel, L.P. v. City and County of San Francisco, Cal.*, 545 U.S. 323 (2005). Collateral estoppel is an efficiency rule that is meant to save judicial resources by avoiding the re-litigation of issues of fact that have already been litigated.

Plaintiff alleges Google is fully knowledgeable and aware that, under the doctrine of *Vertical Stare Decisis*, the current case *Golden v. Google, LLC* Case No. 26-0831, is bound by the decision made by the nine higher United States Court of Appeals for the Federal Circuit Judges who determine or affirmed the smartphones have at least "nine standard sensors which can be used as biosensors"; only one sensor is required to satisfy the statute.

A court engages in *vertical stare decisis* when it applies precedent from a higher court. For example, if the Northern District of California (NDC) Court adhered to a previous ruling from the U.S. Court of Appeals for the Federal Circuit, that would be *vertical stare decisis*. The decisions of higher courts take precedence over the decisions of lower courts—is deeply entrenched in the American legal system. This idea is part of what makes the Supreme Court "supreme."

Google failed to address these fact issues in its motion to dismiss.

The question before this Court is how many more times do Plaintiff have to prove his case at the pleading stage? "[a]s the Federal Circuit made clear a few years ago in *Nalco Co. v. Chem-Mod, LLC*, a plaintiff "need not 'prove its case at the pleading stage.'" The Federal Rules of Civil Procedure do not require a plaintiff to plead facts establishing that each element of an asserted claim is met. Indeed, the Federal Circuit previously explained in *Disc Disease Sols. Inc. v. VGH Sols., Inc.* that a plaintiff must only give the alleged infringer fair notice of infringement. Nothing much has changed with the Federal Circuit's approach to pleading infringement since these two 2018 decisions; the appellate court was forced to chastise and reverse [] lower court [] for "simply requiring too much" of *Bot M8* with respect to its infringement allegations against Sony."

Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged." If the Court believe otherwise, Plaintiff is petitioning the Court to amend his complaint.

*Alice:* This Court is reminded that 35 U.S.C. 101 is not the sole tool for determining patentability; 35 U.S.C. 112, 35 U.S.C. 102, and 35 U.S.C. 103 will provide additional tools for ensuring that the claim meets the conditions for patentability. As the Supreme Court made clear in *Bilski*, 561 U.S. at 602, 95 USPQ2d at 1006:

> "The § 101 patent-eligibility inquiry is only a threshold test. Even if an invention qualifies as a process, machine, manufacture, or composition of matter, in order to receive the Patent Act's protection, the claimed invention must also satisfy "the conditions and requirements of this title." § 101. Those requirements include that the invention be novel, see § 102, nonobvious, see § 103, and fully and particularly described, see § 112."

It is clear the Defendant is attempting to invalidate Plaintiff's patent claims in its motion to dismiss. But, as stated above, this Court is bound by an enormous

amount of Supreme Court precedence: The Supreme Court, in its *Microsoft Corp. v. i4i Limited Partnership* decision, reaffirmed the longstanding principle that a party challenging the validity of a patent must present "clear and convincing" evidence of invalidity.

The Supreme Court first established this heightened burden in the 1934 case of *Radio Corp. of America v. Radio Engineering Labs, Inc.* 293 U.S. 1 (1934). There, the Supreme Court held that invalidation required "clear and cogent evidence" to overturn an issued patent. The Patent Act later codified this heightened burden in 35 U.S.C. § 282, explaining that a patent "shall be presumed valid."

Because abstract ideas, laws of nature, and natural phenomenon "are the basic tools of scientific and technological work", the Supreme Court has expressed concern that monopolizing these tools by granting patent rights may impede innovation rather than promote it. See *Alice Corp.*, 573 U.S. at 216, 110 USPQ2d at 1980; *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71, 101 USPQ2d 1961, 1965 (2012). However, the Court has also emphasized that an invention is not considered to be ineligible for patenting simply because it involves a judicial exception. *Alice Corp.*, 573 U.S. at 217, 110 USPQ2d at 1980-81 (citing *Diamond v. Diehr*, 450 U.S. 175, 187, 209 USPQ 1, 8 (1981)). See also *Thales Visionix Inc. v. United States*, 850 F.3d. 1343, 1349, 121 USPQ2d 1898, 1902 (Fed. Cir. 2017) ("That a mathematical equation is required to complete the claimed method and system does not doom the claims to abstraction.").

Accordingly, the Court has said that integration of an abstract idea, law of nature or natural phenomenon into a practical application may be eligible for patent protection. See, e.g., *Alice*, 573 U.S. at 217, 110 USPQ2d at 1981 (explaining that "in applying the §101 exception, we must distinguish between patents that claim the 'buildin[g] block[s]' of human ingenuity and those that integrate the building blocks into something more" (quoting *Mayo*, 566 U.S. at 89, 110 USPQ2d at 1971) and

17

stating that *Mayo* "set forth a framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts"); *Mayo*, 566 U.S. at 80, 84, 101 USPQ2d at 1969, 1971 (noting that the Court in *Diamond v. Diehr* found "the overall process patent eligible because of the way the additional steps of the process integrated the equation into the process as a whole,"

The Supreme Court has long distinguished between principles themselves (which are not patent eligible) and the integration of those principles into practical applications (which are patent eligible). See, e.g., *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 80, 84, 101 USPQ2d 1961, 1968-69, 1970 (2012) (noting that the Court in *Diamond v. Diehr* found "the overall process patent eligible because of the way the additional steps of the process integrated the equation into the process as a whole," but the Court in *Gottschalk v. Benson* "held that simply implementing a mathematical principle on a physical machine, namely a computer, was not a patentable application of that principle"). Similarly, in a growing body of decisions, the Federal Circuit has distinguished between claims that are "directed to" a judicial exception (which require further analysis to determine their eligibility) and those that are not (which are therefore patent eligible), e.g., claims that improve the functioning of a computer or other technology or technological field. See *Diamond v. Diehr*, 450 U.S. 175, 209 USPQ 1 (1981); *Gottschalk v. Benson*, 409 U.S. 63, 175 USPQ 673 (1972). See, e.g., MPEP § 2106.06(b) (summarizing *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 118 USPQ2d 1684 (Fed. Cir. 2016), *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 120 USPQ2d 1091 (Fed. Cir. 2016), and other cases that were eligible as improvements to technology or computer functionality instead of being directed to abstract ideas).

Plaintiff was curious to know what exactly is the abstract idea of "driving hazards patent claims", so Plaintiff decided to Google the term. Plaintiff strolled the

page and clicked on "How to avoid driving safety hazards patent retrieval—Eureka"
https://eureka.patsnap.com/list-patents-avoid-driving-safety-hazards

Sixty-nine (69) results appeared; following is a list of patents for avoiding driving safety hazards, retrieved from the site and presented in this case to illustrate "driving hazards claims" are not abstract ideas as Defendant alleges.

1. Driving behavior analysis and warning system and method thereof
2. Vehicle device based on infrared sensing gesture recognition
3. Method for increasing speech recognition rate and electronic device
4. Gesture recognition method based on coordinate conversion
5. Networking operation dispatching system for railway vehicles based on electronic intervals
6. Automatic driving control method and device, vehicle and storage medium
7. Method and system of data communication of wireless reconnection of locomotive
8. Skidproof ventilated cushion
9. Vehicle and control method and device for adjusting driving seat and rearview mirror
10. Ramp-parking automatic parking system and control method thereof

Defendant is attempting to also invalidate Plaintiff's patents because Defendant believe Plaintiff's patents are patent-ineligible subject matter. In other words, Defendant believes there's nothing "new" or "novel" about Plaintiff's invention(s). Defendant states: "[t]he driving hazards claims are patent-ineligible. Humans have been slowing and stopping vehicles in response to driving hazards since *the first horse-drawn carriages*."

Plaintiff was issued patent rights for a "pre-programmed stall, stop, vehicle slow-down system, that comprises at least one central processing unit (CPU), capable of: "processing instructions to stall, stop, or slow-down a vehicle when at least one of a chemical hazard, a biological hazard, a radiological hazard; a nuclear hazard; or explosives have been detected". [claim 1 of Plaintiff's '898 patent].

It is necessary (incumbent) for Google as a duty or responsibility to this Court to produce evidence that the first horse-drawn carriages have a pre-programmed stall, stop, vehicle slow-down systems, that comprises at least one central processing unit (CPU), capable of: "processing instructions to stall, stop, or slow-down a vehicle when at least one of a chemical hazard, a biological hazard, a radiological hazard; a nuclear hazard; or explosives have been detected".

It is necessary because, according to horsejournal.com: "[t]he earliest form of a "carriage" (from Old Northern French meaning to carry in a vehicle) was the chariot in Mesopotamia around 3,000 BC.  It was nothing more than a two-wheeled basin for a couple of people and pulled by one or two horses." https://www.horsejournals.com/popular/history-heritage/history-horse-drawn-carriage

In *UTTO Inc. v. Metrotech Corp.*, the US Court of Appeals for the Federal Circuit reversed the US District Court for the Northern District of California's dismissal of patent infringement claims under Federal Rule of Civil Procedure (FRCP) 12(b)(6), holding that the district court's analysis was inadequate on the motion to dismiss record and required additional claim construction proceedings to further consider the patent specification and the role, if any, for extrinsic evidence (Oct. 18, 2024).

Plaintiff believes *discovery* will inform the Court on whether the Google/ Waymo Self-Drive Vehicle will stop or continue its route when approaching a truck carrying fuel that has just exploded [explosives hazard]; will stop or continue its route when the fuel from the exploded truck burst into a ball of fire [chemical hazard]; and, will inform the Court on whether the Google/Waymo Self-Drive Vehicle will stop or continue its route when approaching the remains of the driver of the truck and his/her work partner scattered over the highway [biological hazard]. These may only be, as Mr. Williams stated, a "*vehicle*-related hazard"; but if the

Google/Waymo autonomous [self-drive] vehicle needed to stop or avoid, as Mr. Williams stated, a "terrorist-related hazard".

*Discovery* will also inform the Court if the Google/Waymo Self-Drive Vehicle will adjust for an allowable "lane departure" when approaching the incident without the intervention of an occupant in the Self-Drive Vehicle, or without a monitor who "*remotely communicates*" with the Self-Drive Vehicle from a monitoring site, to either stop, stall, or slow-down the vehicle.

The Defendant relies on the "human" interaction factor with the horse-drawn carriage to perform the same functions as Plaintiff's patented invention and Google/ Waymo's Self-Drive Vehicle: Defendant states: "[r]eacting to hazards [is a] fundamental human activity, performed by infants to elders since *the dawn of time*" [the beginning of time, of the universe, of the world, of mankind] ... "unintended movements caused by external effects," insofar as they seek "to patent what humans have done *for millennia*." [millennia—a period of a thousand years].

Again, it is necessary for Google to provide the Court with evidence of infants to elders [humans] performing the same functions as Plaintiff's patented invention and Google/ Waymo's Self-Drive Vehicles, since the dawn of time, and the millennia, with electronic stability control, anti-lock brakes, blind spot information systems, lane departure warning, adaptive cruise control, traction control, automotive imaging, LiDAR, radar, image processing, computer vision, telemetry, and in-car networking.

If the Defendant fail to produce evidence "since the beginning of time" and the "millennia", Defendant's motion to dismiss should be denied.

***Google's Hypocritical Behavior:*** Google's argument in its motion to dismiss Plaintiff's amended complaint is "the communication claims are 'directed to the abstract idea of communicating over a network for device interaction'"; while

simultaneously petitioning the Patent Trials and Appeals Board (PTAB) to invalidate Smartwatch Mobile Concepts, LLC's 'non-abstract ideas' of patent claims for "communication over a network" in Case No. IPR2024-00852 Patent No. 10,362,480. *(Exhibit E- includes excerpts from Google's 'Expert Declaration')*

> "a remote server via cellular communications supported by the telecommunications carrier access identification module and the cellular RF communications module" as claimed" … "Wearable 40 and smartphone 20 communicate "via a secure network 50." EX1007, 2:26-27, Fig. 1. Smart device 20 and wearable 40 include "respective wireless adapters 41 and 21" that include "wireless communication circuitry" such as Wi-Fi, Bluetooth, NFC, satellite, and/or any cellular technologies (including "3G/4G/5G/nG"). EX1007" … "including circuitry for communications via "cellular technologies (e.g., 3G/4G/5G/nG), other radio frequencies …and/or any other networking protocols "wireless adapter" with at least "3G" "cellular technologies" is a "cellular RF communications module" … "wireless communication circuitry also includes Bluetooth and NFC modules, which are types of claimed "short-range RF communications modules." EX1007

"for using "[a] wearable electronic device" to provide "users" with "secure, convenient access to multiple smart electronic devices," including smartphones. EX1007" … allows an authenticated wearable device user to "interact with" and "control" a secured (e.g., locked) smartphone" … "[c]ommunication of biometric credentials from the smart device to the wearable via secure wireless connection is a "secured, short-range RF communication between the wearable" and the smartphone" … "system and methods for providing "secure, convenient access to multiple smart electronic devices," including smartphones. EX1007"

Google acknowledges in its motion to dismiss that Plaintiff's "communication over a network", that according to Google is an "abstract idea"; and Smartwatch Mobile Concepts, LLC's "communication over a network", that according to Google is ***not*** an "abstract idea"; performs substantially the same function, in substantially the same way, to achieve substantially the same results. (***Exhibit F: Patent Claims Asserted in this Current Case***) Below, Defendant is quoted as saying:

> "Figure 18 illustrates "the incorporation of a GPS satellite, a monitoring site and a cell phone tower for communicating to and with an electronic device such as a laptop computer or a cell phone for transmitting signals to a vehicle for activating an onboard stall-to-stop device for bringing the vehicle to a halt." *Id.* at 7:12-18. According to the specification, the communication can use "either a satellite and/or a cell phone tower 190 to transmit and receive signals and commands among each other and to a vehicle," and explains that "[a] wide range of events can trigger and initiate the stall-to-stop system and the locking or lock disabling system and mechanism, and the event doesn't have to be limited to the detection of a bomb or a chemical, biological, or radiological agent, element, or compound." *Id.* at 13:19-21, 13:24-29. The specification explains that the envisioned vehicle communications are achieved using generic "equipment" such as "[a] CPU or a transceiver 202 is programmed to receive signals from the cell phone tower 190 and/or to a GPS satellite," and "telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site." *Id.* at 13:43-44, 13:15-18. The specification thus confirms that the claims are directed to the idea of communicating over a network for device interaction" …

### *Google Android for "communicating over a network"—Connectivity*

Google Android is an operating system based on a modified version of the Linux kernel and other open-source software, designed primarily for touchscreen-based mobile devices such as smartphones and tablet computers. Android has historically been developed by a consortium of developers known as the Open Handset Alliance, but its most widely used version is primarily developed by Google. First released in 2008, Android is the world's most widely used operating system; it is the most used operating system for smartphones, and also most used for tablets; the latest version, released on June 10, 2025, is Android 16. At its core, the operating system is known as the Google 'Android Open-Source Project' (AOSP).

The source code for Android is open-source: "it is developed in private by Google, with the source code released publicly when a new version of Android is released." Google publishes most of the code (including network and telephony stacks) under the non-copyleft Apache License version 2.0. which allows modification and redistribution. The license does not grant rights to the "Android" trademark, so device manufacturers and wireless carriers have to license it from Google under individual contracts.

In addition to smartphones, Android also powers tablets. The integration of Android across multiple android devices enhances the overall user experience, allowing seamless synchronization and functionality across most android devices.

Google Android's integration into wearable devices, such as smartwatches, has significantly enhanced their functionality and user experience. These wearables offer features such as health monitoring, notifications, and seamless connectivity with other devices, making them an essential part of the Android ecosystem. The ability to sync with smartphones and tablets ensures users can stay connected and manage their digital life efficiently.

Beyond wearables, Android is also a key player in the Internet of Things (IoT) space, powering devices like smart TVs, digital cameras, and more. This widespread adoption highlights the versatility and adaptability of Android OS, enabling it to meet the demands of various hardware components and use cases.

Google Android Automotive serves as a primary platform for automotive infotainment systems, allowing both pre-installed and third-party applications to operate seamlessly. This platform promotes customization and scalability, enabling manufacturers to tailor infotainment features using a shared codebase and existing development resources. Unlike Google Android Auto, which connects a smartphone to a vehicle, Android Automotive operates directly on the vehicle's hardware as a full-stack infotainment platform. This integration allows for a more robust and consistent user experience, leveraging a decade's worth of development and compatibility with automotive-specific features. Android Automotive ensures security and offers developer tools inherent to Android, making it an attractive option for device manufacturers looking to enhance their vehicles' infotainment systems. This innovative approach continues to expand the reach and influence of Android OS across various industries.

Google Android's cellular communication system is a complex ecosystem that enables mobile devices to connect to cellular networks, transmit data, and maintain communication services. At the heart of this system is the Radio Interface Layer (RIL), a critical component that bridges the gap between the Android operating system and the cellular modem hardware. The Android cellular connectivity system represents a sophisticated yet flexible architecture that enables seamless mobile network communication. Android also supports different types of connectivity for GSM, CDMA, Wi-Fi, Bluetooth, etc. for telephonic conversation or data transfer.

While acknowledging that "patent eligibility can be determined at the Rule 12(b)(6) stage," the court warned that "[t]his is true only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." Further, *Aatrix* reiterated that the second step of *Alice* can present "subsidiary fact questions which must be resolved by a jury" *Aatrix Software* at 1121 (Fed. Cir. 2018).

Joint infringement claims are issues of facts to be decided by a jury [U.S. CONS'T. 7th Amend.] This motion to dismiss is Google's inexcusable way of depriving Plaintiff of his Seventh Amendment right to a Jury Trial.

Google's motion to dismiss is dependent on Plaintiff being too ignorant to understand what he himself has invented; or the Court being to unconcern to read a *Pro Se* Plaintiff's pleadings.

At the Court's discretion Plaintiff will amend the complaint in view of any deficiencies in Plaintiff's pleadings identified by the court.

Sincerely,

s/ *Larry Golden*

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(M) 8649927104

Email: atpg-tech@charter.net

## VERIFICATION

### Pursuant to 28 U.S.C. § 1746

I, Larry Golden, over the age of 18, competent to testify, and having firsthand knowledge of the facts stated herein, do hereby declare, certify, verify, affirm, and state under penalty of perjury under the laws of the United States of America, that the foregoing statements are true, correct, and complete to the best of my understanding, knowledge, and belief, and made in good faith.

Executed and signed this 7th day of March, 2026, with all rights reserved and without recourse and without prejudice; is this "verification" for "Plaintiff's Response to Defendant's Motion to Dismiss".

s/ *Larry Golden*

Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-992-7104

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 7th day of March, 2026, a true and correct copy of the foregoing "Plaintiff's Response to Defendant's Motion to Dismiss", was served upon the following Defendant via express mail:

>Matthew Warren
>Warren LLP
>2261 Market Street, No. 606
>San Francisco, CA 94114
>Phone: 415-895-2940
>Fax: 415-895-2964
>Email: matt@warrenllp.com

>s/ *Larry Golden*
>
>Larry Golden, Pro Se
>740 Woodruff Rd., #1102
>Greenville, South Carolina 29607
>atpg-tech@charter.net
>864-992-7104