# EXHIBIT D

ORIGINAL

# In the United States Court of Federal Claims

No. 13-307C

Filed: November 30, 2016

**FILED**

**NOV 3 0 2016**

U.S. COURT OF
FEDERAL CLAIMS

*************************************

|  |  |
|---|---|
| LARRY GOLDEN, | * |
| | * |
| Plaintiff, *pro se*, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |
| | * |

28 U.S.C. § 1498(a) (Patent Infringement);
35 U.S.C. § 251 (Reissue); RCFC 12(b)(1)
   (Jurisdiction);
RCFC 12(b)(6) (Failure to State a Claim);
RCFC 12(e) (More Definite Statement);
RCFC 15(a)(2) (Amended Complaint,
   With Court's Leave);
Manual of Patent Examining Procedure
   (9th ed. 2015).

*************************************

**Larry Golden,** Greenville, South Carolina, *pro se.*

**Lindsay Kate Eastman,** United States Department of Justice, Civil Division, Washington, D.C.

## MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION TO DISMISS

**BRADEN,** *Judge.*

## I.    RELEVANT FACTUAL BACKGROUND.[1]

On April 5, 2006, Mr. Larry Golden filed Patent Application No. 11/397,118 ("the '118 Application"), titled "Multi Sensor Detection, Stall To Stop And Lock Disabling System," with the United States Patent and Trademark Office ("USPTO"). 2/12/16 Am. Compl. Ex. B. On June 10, 2008, the '118 Application resulted in the issuance of U.S. Patent No. 7,385,497 ("the '497 Patent"). 2/12/16 Am. Compl. Ex. B.

Several days prior, on June 6, 2008, Mr. Golden filed a continuation-in-part application,[2] No. 12/155,573 ("the '573 Application"), of the '118 Application. 2/12/16 Am. Compl. Ex. C.

---

[1] The facts discussed herein are derived from the May 1, 2013 Complaint ("Compl."); and the February 12, 2016 Amended Complaint ("2/12/16 Am. Compl.") and attached Exhibits A–K ("2/12/16 Am. Compl. Ex. A–K").

[2] "A continuation-in-part is an application filed during the lifetime of an earlier nonprovisional application, repeating some substantial portion or all of the earlier nonprovisional

On December 22, 2009, the '573 Application resulted in the issuance of U.S. Patent No. 7,636,033 ("the '033 Patent"). 2/12/16 Am. Compl. Ex. C.

On January 20, 2010, Mr. Golden filed a continuation application, Application No. 12/657,356 ("the '356 Application"), of the '573 Application. Thereafter, Mr. Golden filed several continuation applications of the '356 Application, resulting in:

- U.S. Patent No. 8,106,752 ("the '752 Patent"), issued on January 31, 2012;
- U.S. Patent No. 8,334,761 ("the '761 Patent"), issued on December 18, 2012;
- U.S. Patent No. 8,531,280 ("the '280 Patent"), issued on September 10, 2013;
- U.S. Patent No. 9,096,189 ("the '189 Patent"), issued on August 4, 2015; and
- Published Patent Application No. 2016-0027273 Al ("the '273 PG-PUB").

2/12/16 Am. Compl. Exs. D, E, F, I.

On March 31, 2011, Mr. Golden filed a reissue application for the '033 Patent that, on January 1, 2013, issued as U.S. Reissue Patent No. RE43,891 ("the '891 Patent").[3] 2/12/16 Am. Compl. Ex. G.

On September 9, 2011, Mr. Golden filed a second reissue application for the '033 Patent. On February 12, 2013, the application resulted in the issuance of U.S. Reissue Patent No. RE43,990 ("the '990 Patent"). 2/12/16 Am. Compl. Exs. G, H.

The patents listed above disclose inventions for the detection and automated isolation of dangerous chemical, biological, and radiological agents in shipping containers, tractor trailers, mail carriers, mail boxes and lockers. *See, e.g.*, 2/12/16 Am. Compl. Ex. B at 2. Mr. Golden is the owner, and sole inventor, of these patents. 2/12/16 Am. Compl. Exs. A–I.

---

application and adding matter not disclosed in the said earlier nonprovisional application." Manual of Patent Examining Procedure ("MPEP") §201.8 (9th ed. 2015).

[3] Under 35 U.S.C. § 251, defective patents may be corrected through a process known as "reissue." Section 251(a) provides:

[w]henever any patent is, through error, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Director shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue.

35 U.S.C. § 251(a).

## II.   PROCEDURAL HISTORY.

On May 1, 2013, Mr. Golden ("Plaintiff") filed a Complaint in the United States Court of Federal Claims alleging that the Government infringed the '990 Patent, based on three solicitations published by the United States Department of Homeland Security ("DHS") seeking to develop technology for sensing biological and chemical substances. Compl. at 1–2. The Complaint alleges that the DHS solicitations directly infringed, infringed under the doctrine of equivalents, or infringed by inducement claims 11, 74 and 81 of the '990 Patent. Compl. at 3.

On August 15, 2013, Plaintiff filed a "Notice of Supplement" that the court considers an Amended Complaint. ECF No. 6.

On September 5, 2013, the Government filed a Motion For A More Definite Statement, pursuant to Rule of the United States Court of Federal Claims ("RCFC") 12(e), requesting that Plaintiff further amend the May 1, 2013 Complaint to incorporate numbered paragraphs, enumerate with particularity the Government devices or processes that allegedly infringe Plaintiff's patents, and identify the party in interest. ECF No. 9.

On September 20, 2013, Plaintiff filed: a Motion To Strike (ECF No. 10); a Motion To Amend Complaint (ECF No. 11); a Motion To Supplement Complaint (ECF No. 14); a Response to the September 5, 2013 Motion For A More Definite Statement (ECF No. 12); and a Motion For Summary Judgment (ECF No. 13).

On October 15, 2013, Plaintiff filed a second Response to the September 5, 2013 Motion For A More Definite Statement that the court considers a Second Amended Complaint. The October 15, 2013 Second Amended Complaint advised the court that Plaintiff is representing himself, not the company ATPG Technology. ECF No. 20.

On October 21, 2013, the court granted the September 10, 2013 Motion For A More Definite Statement, because the May 1, 2013 Complaint, the August 15, 2013 Amended Complaint, and the October 15, 2013 Second Amended Complaint were so vague and ambiguous that the Government could not prepare an informed Answer. ECF No. 21. That same day, the Government filed a Response To Plaintiff's Motion For Summary Judgment. ECF No. 22.

On November 22, 2013, Plaintiff filed a More Definite Statement. ECF No. 24.

On December 20, 2013, the court denied Plaintiff's September 20, 2013 Motion For Summary Judgment, without prejudice, because the Government had not filed an Answer. ECF No. 28.

On December 30, 2013, Plaintiff filed a Motion To Amend And Supplement Pleadings Of The More Definite Statement, pursuant to RCFC 15(a)(2). ECF No. 29.

On January 10, 2014, the Government filed an Answer to the December 30, 2013 Motion To Amend Pleadings. ECF No. 30. The Government treated the December 30, 2013 Motion To Amend Pleadings as filed by leave of court and, therefore, superseding Plaintiff's November 22, 2013 More Definite Statement. ECF No. 30 at n.1.

On February 7, 2014, the court granted the December 30, 2013 Motion to Amend Pleadings and ordered the parties to treat that motion as a Third Amended Complaint, superseding all prior complaints submitted by Plaintiff. ECF No. 32.

On April 30, 2014, DHS filed a petition for *inter partes review* ("IPR") of the '990 Patent before the USPTO Patent Trial and Appeal Board ("PTAB").

On May 28, 2014, Mr. Ha Kung Wong informed the court that he was counsel of record for Plaintiff (ECF No. 42) but, on September 12, 2014, he withdrew (ECF Nos. 49, 50).

On October 8, 2014, the PTAB filed a Decision To Institute IPR of claims 11, 74, and 81 of the '990 Patent. *See Department of Homeland Security v. Golden,* IPR2014-00714, 2014 WL 6999625, at *1 (P.T.A.B. Oct. 8, 2014). With the exception of a sixty-day stay for Plaintiff to seek legal representation, the court did not stay this case while PTAB proceedings were ongoing. The court, however, did not take any substantive action during those proceedings.

*        *        *

On October 1, 2015, the PTAB issued a final decision "grant[ing] Patent Owner's Motion to Amend . . . claims 11, 74, and 81 of the '990 Patent, and den[ying] the Motion to Amend . . . claims 154–156." *See Department of Homeland Security v. Golden,* IPR2014-00714, 2015 WL 5818910, at *17 (P.T.A.B. Oct. 1, 2015). On November 17, 2015, the PTAB denied Plaintiff's request for rehearing. *See Department of Homeland Security v. Golden,* IPR2014-00714, 2015 WL 10381775 (P.T.A.B. Nov. 17, 2015).

On December 22, 2015, the court convened a telephone status conference to discuss how the case should proceed in light of the PTAB's final decision. On December 23, 2015, the court granted Plaintiff leave to file another amended complaint. ECF No. 65.

On February 12, 2016, Plaintiff filed a Fourth Amended Complaint ("2/12/16 Am. Compl.") alleging that, the Government: (1) was liable for the infringement of Plaintiff's '497, '752, '891, '990, and '189 Patents under 28 U.S.C § 1498(a); and (2) violated the Fifth Amendment of the United States Constitution by taking Plaintiff's '497, '033, '752, '761, '280, '891, '990, '189 Patents and related '273 Application, without just compensation. 2/12/16 Am. Compl. at ¶¶ 68–127.

The February 12, 2016 Amended Complaint identifies over thirty devices that were developed or procured, as a result of Government solicitations, Government contracts, or National Science Foundation ("NSF") grants.[4] 2/12/16 Am. Compl. at ¶¶ 68–127. These devices allegedly

---

[4] The relevant devices are: M-Lock; High-Power Electromagnetic System ("HPEMS"); Smartphone Microscope; Biophone; Smartphone Biosensor Cradle; iPhone Biodetector Smartphone; Pathtracker; the Center of Integrated Nanomechanical Systems ("COINS") Nano-Embedded Sensors; Smartphone-Based Rapid Diagnostic Tests; Lockheed Martin K-Max Unmanned Self-flying Helicopter; Boeing MH-6 Little Bird Helicopter; SIN-VAPOR I Smartphone System; Samsung Galaxy s6 Microscope Smartphone; VOCket System; Nett Warrior Smartphone System; Northrop Grumman X-47B UCAS I X-47B Control Display Unit; GammaPix; NFC Samsung Galaxy s6 Smartphone Sensor; Cell-All Synkera MikroKera Ultra;

infringe claims in Plaintiff's '497, '752, '891, '990, and '189 Patents. 2/12/16 Am. Compl. at ¶¶ 68–127.

On April 8, 2016, the Government filed an Answer to the February 12, 2016 Amended Complaint. ECF No. 74.

On June 3, 2016, Plaintiff filed a Motion For Summary Judgment [On] Validity and, on June 8, 2016, Plaintiff filed a Motion For Entry Of Estimated Damages And Accounting Report.

On June 10, 2016 the court convened a telephone status conference. On June 13, 2016, based on the arguments raised during the status conference, the court ordered that the Government file a Motion To Dismiss, and stayed the June 3, 2016 Motion For Summary Judgment and June 8, 2016 Motion For Entry Of Estimated Damages And Accounting Report. ECF No. 85.

On June 24, 2016, the Government filed a Motion To Dismiss Certain Accused Devices ("Gov't Mot."). On July 5, 2016 Plaintiff filed a Response ("Pl. Resp."). On July 18, 2016, the Government filed a Reply ("Gov't Reply").

## III.    STANDARD OF REVIEW.

### A.    Standing.

Federal trial courts have been advised to "decide standing questions at the outset of a case. That order of decision (first jurisdiction then the merits) helps better to restrict the use of the federal courts to those adversarial disputes that Article III defines as the federal judiciary's business." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 111 (1998) (Breyer, J., concurring). The party invoking federal jurisdiction has the burden of proof to satisfy the constitutional requirements of Article III standing. *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990) (holding that the burden is on the party seeking to exercise jurisdiction to clearly allege facts sufficient to establish jurisdiction).

"A patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281; *see also* 35 U.S.C. § 100(d) ("The word 'patentee' includes not only the patentee to whom the patent was issued but also the successors in title to the patentee."); *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1308 (Fed. Cir. 2003) ("[T]his court has determined that in order to assert standing for patent infringement, the plaintiff must demonstrate that it held enforceable title to the patent *at the inception of the lawsuit*.") (emphasis in original).

Biotouch System; iPhone Biodetector Smartphone; Navy Marine Corps Intranet; FLIR identiFINDER R300; AOptix Stratus MX Peripheral; MultiRae Pro Wireless Portable Multi Threat Radiation and Chemical Detector; PositiveID's M-BAND; PositiveID's Firefly DX; 1"x2" Detection Device Samsung Galaxy s6 Smartphone; 2"x2" Detection Device Samsung Galaxy s6 Smartphone; NetS2 SmartShield G300 Radiation Detector Samsung Galaxy s6 Smartphone; NetS2 SmartShield G500 Radiation Detector Samsung Galaxy s6 Smartphone; and the Passport Systems Base Control Unit; Oshkosh Defense Autonomous Unmanned Ground Vehicle TerraMax; and the Variable NODE+Oxa. 2/12/16 Am. Compl. at ¶¶ 68–127.

The standard set forth by the United States Supreme Court over a century ago in *Waterman v. MacKenzie*, 138 U.S. 252 (1891) still governs:

> There can be no doubt that he is "the party interested, either as patentee, assignee, or grantee," and as such entitled to maintain an action at law to recover damages for an infringement; and it cannot have been the intention of [C]ongress that a suit in equity against an infringer to obtain an injunction and an account of profits, in which the court is authorized to award damages, when necessary to fully compensate the plaintiff, and has the same power to treble the damages as in an action at law, should not be brought by the same person.

*Id.* at 260–61 (internal citations omitted).

The February 12, 2016 Complaint alleges that Plaintiff is the sole owner of the '497, '033, '752, '761, '280, '891, '990, and '189 Patents. 2/12/16 Am. Compl. at ¶¶ 6–7. Therefore, Plaintiff has standing to seek an adjudication of the claims alleged in the February 12, 2016 Amended Complaint.

### B.    Jurisdiction.

The United States Court of Federal Claims has jurisdiction to adjudicate claims alleging,

> [that] an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same . . . [seeking] recovery of . . . reasonable and entire compensation for such use and manufacture. . . . [T]he use or manufacture of [a patented] invention by a contractor, a subcontractor, or any person, firm, or corporation *for the Government* and *with the authorization or consent of the Government*, shall be construed as use or manufacture for the United States.

28 U.S.C. § 1498(a) (emphasis added).

Infringing activity is "for the Government" under section 1498(a) if it is "for the benefit of the Government." *Advanced Software Design Corp. v. Federal Reserve Bank of St. Louis*, 583 F.3d 1371, 1378 (Fed. Cir. 2009); *see also Madey v. Duke University*, 413 F. Supp. 2d 601, 607 (M.D.N.C. 2006) ("A use is 'for the Government' if it is 'in furtherance and fulfillment of a stated Government policy' which serves the Government's interests and which is 'for the Government's benefit.'" (quoting *Riles v. Amerada Hess, Corp.*, 999 F. Supp. 938, 940 (S.D. Tex. 1998)). In *Hughes Aircraft Co. v. United States*, 534 F.2d 889 (1976), for example, the court held that a satellite program to advance the military defense and security of the United States was "for the Government." *Id.* at 898.

Moreover, "authorization or consent of the Government," does not need to be expressly stated. *See TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060 (Fed. Cir. 1986) ("[a]uthorization or consent by the Government can be express . . . [or] [i]n proper circumstances, Government

6

authorization can be implied."). Indeed, "authorization or consent . . . may be given in many ways other than by . . . direct form of communication—e.g., by contracting officer instructions, [or] by specifications . . . which impliedly sanction and necessitate infringement[.]" *Hughes Aircraft Co*, 534 F.2d at 901.

The February 12, 2016 Amended Complaint alleges that various nongovernment entities, including a number of corporations and public research universities, infringed the '497, '033, '752, '761, '280, '891, '990, and '189 Patents. Whether the court has jurisdiction over those claims is the subject of this Memorandum Opinion And Order.

### C.    Standard Of Review For *Pro Se* Litigants.

*Pro se* plaintiffs' pleadings are held to a less stringent standard than those of litigants represented by counsel. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (holding that *pro se* complaints, "however inartfully pleaded," are held to "less stringent standards than formal pleadings drafted by lawyers"). The United States Court of Federal Claims traditionally examines the record "to see if [a *pro se*] plaintiff has a cause of action somewhere displayed." *Ruderer v. United States*, 412 F.2d 1285, 1292 (Ct. Cl. 1969). Nevertheless, while the court may excuse ambiguities in a *pro se* plaintiff's complaint, the court "does not excuse [a complaint's] failures." *Henke v. United States*, 60 F.3d 795, 799 (Fed. Cir. 1995). ("The fact that [the plaintiff] acted *pro se* in the drafting of his complaint may explain its ambiguities, but it does not excuse its failures, if such there be.").

A *pro se* plaintiff, however, is not excused from his burden of proving, by a preponderance of the evidence, that the court possesses jurisdiction. *See McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936) ("[The plaintiff] must allege in his pleading the facts essential to show jurisdiction."); *see also Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) ([The *pro se* plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence."). The plaintiff cannot rely solely on allegations in the complaint, but must bring forth relevant, adequate proof to establish jurisdiction. *See Reynolds*, 846 F.3d at 748 ("[I]t was incumbent upon [the *pro se* plaintiff] to come forward with evidence establishing the court's jurisdiction.").

### D.    Standard Of Review For A Motion To Dismiss, Pursuant To RCFC 12(b)(1).

A challenge to the United States Court of Federal Claims' "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion." *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999); see also RCFC 12(b)(1) (allowing a party to assert, by motion, "lack of subject-matter jurisdiction"). When considering a motion to dismiss for lack of subject-matter jurisdiction, the court must take the facts alleged in the complaint as true. *See Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007). The court may consider evidence beyond the pleadings, however, when the motion to dismiss challenges the jurisdictional facts alleged in the complaint. *See Moyer v. U.S.*, 190 F.3d 1314, 1318 (Fed. Cir. 1999). If the court determines that it does not have subject-matter jurisdiction, the court must dismiss the complaint. *See* RCFC 12(b)(1).

**E.      Standard of Review For Motion To Dismiss, Pursuant To RCFC 12(b)(6).**

A claim is subject to dismissal under RCFC 12(b)(6), if it does not provide a basis for the court to grant relief. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56 (2007) ("[A well-pleaded complaint] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." (internal citations omitted)); *see also Lindsay v. United States,* 295 F.3d 1252, 1257 (Fed.Cir.2002) ("A motion to dismiss . . . for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy.").

A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009) (quoting *Twombly,* 550 U.S. at 570).  The allegations contained in a complaint also must indicate to the court that there is "more than a sheer possibility that a defendant has acted unlawfully. *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* To determine whether a complaint states a plausible claim for relief, a court must engage in a context-specific analysis and "draw on its judicial experience and common sense." *Id.* at 678–79.  The court, however, must construe the allegations of the complaint in the light most favorable to the plaintiff. *See Henke v. United States,* 60 F.3d 795, 797 (Fed. Cir.1995).

**IV.     DISCUSSION.**

**A.      The Government's June 24, 2016 Motion To Dismiss The February 12, 2016 Amended Complaint's M-Lock And HPEMS Claims, Pursuant To RCFC 12(b)(6).**

**1.      The Government's Argument.**

The Government argues that, under section 1498(a), a patent owner can sue the United States for patent infringement only if the United States, a contractor, a subcontractor, a person, or a corporation uses or manufactures the patented invention (1) for the Government and (2) with the authorization or consent of the Government. Gov't Mot. at 3.  The February 12, 2016 Amended Complaint alleges that iControl, Inc. ("iControl"), a Government contractor, used and manufactured a device called M-Lock that infringed Plaintiff's '752 and '990 Patents. Gov't Mot. at 3.  The Amended Complaint, however, fails to allege sufficient facts to establish that the Government was directly involved in the manufacture or use of M-Lock or that the device was manufactured for the benefit of the Government. Gov't Mot. at 4.

Similarly, the February 12, 2016 Amended Complaint alleges that Eureka Aerospace, another Government contractor, used and manufactured a device called the High-Powered Electromagnetic System ("HPEMS") that infringed Plaintiff's '891 Patent. Gov't Mot. at 4. Plaintiff alleges that the United States Air Force ("USAF") issued a request related to HPEMS and that the United States Marines ("Marines") are a potential customer of the device, but otherwise fails to allege any manufacture or use "by or for the Government." Gov't Mot. at 4.

Accordingly, the February 12, 2016 Amended Complaint's M-Lock and HPEMS claims do not assert sufficient facts to entitle Plaintiff to a remedy under section 1498(a). Gov't Mot. at 4. Those claims should therefore be dismissed, pursuant to RCFC 12(b)(6). Gov't Mot. at 4.

### 2.    Plaintiff's Response.

Plaintiff argues that the Government's manufacture or use of an infringing device generally results from procurement contracts. Pl. Resp. at 6. Moreover, when purchasing goods and services from a contractor, the Government seeks to acquire the best product without delay and "will not refuse to award a contract on the grounds that the prospective contractor may infringe a patent." Pl. Resp. at 6 (quoting 48 C.F.R. 27.102(b)). Plaintiff does not explicitly apply these rules to the facts alleged in the February 12, 2016 Amended Complaint. But, his argument appears to be that the existence of a contract between the Government and iControl and Eureka Aerospace for the development of infringing devices supports a reasonable inference that the manufacture and use of the devices was "for the Government" and "with the authorization and consent of the Government." 28 U.S.C. § 1498(a).

### 3.    The Government's Reply.

The Government replies that Plaintiff did not address "[the Amended Complaint's] failure to state with particularity a cause of action for which relief can be granted relating to the M-Lock Device or the [HPEMS]." Gov't Reply at 2.

### 4.    The Court's Resolution.

#### a.    The Government's June 24, 2016 Motion To Dismiss The February 12, 2016 Amended Complaint's M-Lock Claims, Pursuant To RCFC 12(b)(6), Is Denied.

The Government argues that the M-Lock claims should be dismissed, pursuant to RCFC 12(b)(6), because the February 12, 2016 Amended Complaint does not allege that M-Lock was manufactured for the benefit of the Government. Gov't Mot. at 4. The court disagrees.

Viewed in the light most favorable to Plaintiff, the February 12, 2016 Amended Complaint alleges sufficient facts to raise a plausible right of relief under section 1498(a). *See Iqbal*, 556 U.S. at 677. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. The February 12, 2016 Amended Complaint alleges that DHS, a federal agency, contracted with iControl "for the development[,] commercialization [and purchase] of . . . M-Lock," an automated locking device that contains "a movement sensor, a temperature sensor, a humidity sensor, an infrared sensor, a radioactivity detection sensor, an acoustic sensor, [and/or] a chemical detection sensor." 2/12/2016 Am. Compl. ¶¶ 74–75. The February 12, 2016 Amended Complaint alleges that M-Lock infringes several claims of Plaintiff's '752 and '990 Patents, disclosing inventions that that automatically detect chemical, biological, and radiological agents so that terrorist activity can be prevented. *See* 2/12/16 Am. Compl. Ex. D at 16; *see also* 2 /12/16 Am. Compl. Ex. H at 17. And the February 12, 2016 Amended Complaint alleges that the

infringing device is being used and manufactured without license or legal right. 2/12/2016 Am. Compl. ¶ 75.

Based on the alleged facts, the court can reasonably infer that iControl is a government contractor and that the manufacture and use of M-Lock was "for the benefit of [DHS]." *See Advanced Software Design Corp.*, 583 F.3d at 1378. In light of the allegation that the inventions disclosed in patents '752 and '990 were designed to prevent terrorist activity, it is plausible that iControl manufactured an infringing device for the benefit of DHS to promote national security. *See, e.g., Hughes Aircraft Co.*, 534 F.2d at 898 (finding that the government's participation in a satellite program was "for the Government," because the program was vital to the military defense and security of the United States). Moreover, under section 1498(a), "Government authorization or consent" can be implied by circumstances. *See TVI Energy Corp.*, 806 F.2d at 1060.

In this case, the February 12, 2016 Amended Complaint alleges that DHS contracted with iControl to develop and commercialize M-Lock. This contractual relationship supports a reasonable inference that the Government authorized the manufacture and use of the infringing device.

> ### b. The Government's June 24, 2016 Motion To Dismiss The February 12, 2016 Amended Complaint's HPEMS Claims, Pursuant To RCFC 12(b)(6), Is Denied.

The Government also argues that the February 12, 2016 Amended Complaint's HPEMS claims should be dismissed, because they do not allege that Eureka Aerospace manufactured or used the HPEMS "for the Government." Gov't Mot. at 4. Again, the court does not agree with the Government's contention. The February 12, 2016 Amended Complaint alleges that "as a result of [] contracts with [USAF] . . . for the development and commercialization of the Eureka Aerospace HPEMS, the United States has used, authorized the use, and manufactured, without license or legal right, to Plaintiff's inventions [disclosed in patent '891]." 2/12/16 Am. Compl. ¶ 87. The HPEMS is a device that shoots an electromagnetic pulse so that vehicles can be disabled, without using firearms. *See* 2/12/16 Am. Compl. ¶ 86.

In light of these allegations, the court can reasonably infer that Eureka Aerospace's manufacture and use of the HPEMS advances the military defense and security of the United States and is thus "for the benefit of the Government." *See, e.g., Hughes Aircraft Co.*, 534 F.2d at 898. Moreover, construed in the light most favorable to Plaintiff, the February 12, 2016 Amended Complaint alleges that USAF contracted with Eureka Aerospace to develop and commercialize the HPEMS—sufficient facts to support a reasonable inference that USAF implicitly authorized the manufacture and use of the infringing device. *See TVI Energy Corp.*, 806 F.2d at 1060.[5]

---

[5] While the February 12, 2016 Amended Complaint does not clearly state whether USAF issued a solicitation for the HPEMS or awarded Eureka Aerospace a contract to develop that device, the court must interpret a complaint in the light most favorable to the plaintiff, when ruling on a motion to dismiss, pursuant to 12(b)(6). *See Henke*, 60 F.3d at 797. Therefore, the court reads the February 12, 2016 Amended Complaint to allege that the Government awarded Eureka Aerospace a contract to develop and commercialize the HPEMS.

For these reasons, the court denies the Government June 24, 2016 Motion To Dismiss the February 12, 2016 Amended Complaint's M-Lock and HPEMS claims, pursuant to RCFC 12(b)(6).

**B.    The Government's June 24, 2016 Motion To Dismiss The February 12, 2016 Amended Complaint's National Science Foundation Claims, Pursuant To RCFC 12(b)(1) and 12(b)(6).**

**1.    The Government's Argument.**

The Government contends that, under section 1498(a), "merely funding an activity does not establish the Government's authorization and consent [to manufacture or use an infringing device]." Gov't Mot. at 5. The February 12, 2016 Amended Complaint alleges that the Government funded the development of multiple infringing devices through a series of NSF grants ("NSF claims"), but does not allege any other facts to establish the Government's authorization or consent to the manufacture or use of those devices.[6] Gov't Mot. at 5. Moreover, the February 12, 2016 Amended Complaint does not allege that the NSF-funded devices were used or manufactured "by or for the Government." Gov't Mot. at 5. Therefore, the February 12, 2016 Amended Complaint's NSF claims should be dismissed for failure to state a claim upon which relief can be granted. Gov't Mot. at 5.

The Government also argues—without additional explanation—that the court should dismiss the NSF claims for lack of subject matter jurisdiction. Gov't Mot. at 5.

**2.    Plaintiff's Response.**

Plaintiff responds that "[g]rant related agreements [are] contracts within Tucker Act jurisdiction when all the requisite elements of a contract were present, including a government representative with actual authority to bind the government in contract." Pl. Resp. at 7 (quoting *Pennsylvania Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 790 (2001) ("[g]rant related agreements have been held to be contracts within Tucker Act jurisdiction when all the requisite elements of a contract were present, including a government representative with actual authority to bind the government in contract.")). The February 12, 2016 Amended Complaint's NSF claims facially involve grant related agreements. Pl. Resp. at 8–9. Therefore, the United States Court of Federal Claims has jurisdiction, under the Tucker Act, to adjudicate those claims. Pl. Resp. at 8.

Plaintiff also argues that the Government's award of NSF grants for the development of infringing devices supports a reasonable inference that the manufacture and use of those devices was "for the Government" and "with the authorization and consent of the Government." Pl. Resp. at 10–11.

---

[6] The accused devices are: the Smartphone Microscope, Gov't Mot. at 5; Biophone, Gov't Mot. at 6; Smartphone Biosensor "Cradle", Gov't Mot. at 6; iPhone Biodetector Smartphone, Gov't Mot. at 7; Pathtracker, Gov't Mot. at 7; COINS, Gov't Mot. at 8; and Smartphone-Based Rapid Diagnostic Test Devices, Gov't Mot. at 8.

### 3.   The Government's Reply.

The Government concedes that NSF Research Grant Awards may be treated as contracts to establish jurisdiction under the Tucker Act, but argues that the existence of a contract is not sufficient to establish liability under section 1498(a). Gov't Reply at 2. Section 1498(a) allows a patent holder to sue the Government only if the infringing manufacture or use of the relevant invention was "for the Government" and "with the authorization or consent of the Government." Some courts have found that the terms of a NSF grant can satisfy section 1498(a). Gov't Reply at 2 (citing *McMullen Assoc., Inc. v. State Bd. Of Higher Ed.*, 268 F. Supp. 735 (D. Or. 1967)). The grants at issue in those cases, however, reserved property rights in the infringing device to the Government. Gov't Reply at 2. The February 12, 2016 Amended Complaint does not allege that the Government retained a property right in any of the accused devices and fails to allege any other facts that could plausibly establish that the manufacture or use of the patented invention was "for the Government" and "with the authorization or consent of the Government." Gov't Reply at 2–3.

### 4.   The Court's Resolution.

#### a.   The June 24, 2016 Motion To Dismiss The February 12, 2016 Amended Complaint's National Science Foundation Claims, Pursuant To RCFC 12(b)(1), Is Denied.

Under the Tucker Act, the United States Court of Federal Claims has jurisdiction to adjudicate a claim if the statute, regulation, or constitutional provision that is the basis for that claim "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained," *United States v. Mitchell*, 463 U.S. 206, 217 (1983), and the plaintiff is "within the class of plaintiffs entitled to recover under the statute if the elements of [the] cause of action are established," *Greenlee County, Arizona v. United States*, 487 F.3d 871, 876 (Fed. Cir. 2007). "There is no further jurisdictional requirement that plaintiff make [] additional nonfrivolous allegation[s] that [he] is entitled to relief under the relevant money-mandating source." *Jan's Helicopter Serv., Inc. v. Federal Aviation Agency*, 525 F.3d 1299, 1307 (Fed. Cir. 2008). Instead, "the consequence of a ruling by the court . . . that plaintiff's case does not fit within the scope of the [money-mandating] source . . . is simply [that] plaintiff loses on the merits for failing to state a claim on which relief can be granted." *Fisher v. United States*, 402 F.3d 1167, 1175–76 (Fed. Cir. 2005).

Here, the February 12, 2016 Amended Complaint's NSF claims are based on section 1498(a), a statute that is money-mandating on its face. *See* 28 U.S.C. § 1498(a) ("Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, *the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.*") (emphasis added). Furthermore, Plaintiff is the owner of the United States patents asserted in this case and is therefore entitled to recover under section 1498(a). *See* 28 U.S.C. § 1498(a).

12

Accordingly, the court has jurisdiction to adjudicate the February 12, 2016 Amended Complaint's NSF claims. The Government's June 24, 2016 Motion To Dismiss, pursuant to 12(b)(1), is denied.

> **b.    The June 24, 2016 Motion To Dismiss The February 12, 2016 Amended Complaint's National Science Foundation Claims, Pursuant To RCFC 12(b)(6), Is Denied.**

The February 12, 2016 Amended Complaint's NSF claims allege sufficient facts to support a reasonable inference that the manufacture and use of the accused devices was "for the Government." *See Iqbal*, 556 U.S. at 678. The NSF claims allege that the Government awarded research grants to develop portable devices that can: (1) identify dangerous chemical, radiological, and bacterial agents; and (2) track the spread of disease.[7] Based on the alleged facts, it is plausible that the accused devices were used to further the military defense, national security, and public health interests of the United States: policies that the Government has a fundamental interest in advancing. Accordingly, the court can reasonably infer that the use of the NSF-funded devices was "for the Government." *See, e.g., Hughes Aircraft Co.*, 534 F.2d at 898 (finding that the government's participation in a satellite program was "for the Government," because the program was vital to the military defense and security of the United States); *see also Madey*, 413 F. Supp. 2d at 607 (M.D.N.C. 2006) (explaining that a use is "for the Government" if it is in furtherance and fulfillment of a stated Government policy and for the Government's benefit).

The February 12, 2016 Amended Complaint's NSF claims also allege sufficient facts to plausibly establish that the use of the accused devices was "with the authorization or consent of the Government." Authorization or consent can be implied from the circumstances—"e.g., by contracting officer instructions, [or] specifications or drawings which impliedly sanction and necessitate infringement." *Hughes Aircraft Co.*, 534 F.2d at 901. For example, in *TVI Energy Corp.*, the United States Court of Appeals for the Federal Circuit held that the Government impliedly sanctioned the use of a patented invention when it issued a solicitation that required bidders to submit for inspection, and perform live demonstrations of, the accused device. *See TVI Energy Corp.*, 806 F.2d at 1060.

In this case, the relevant NSF grants anticipate that the awardees will develop and test the devices proposed in their applications. *See, e.g.,* NSF Award No. 1444240 ("Annual and Final

---

[7] The relevant NSF grants are being used to develop: "a portable smartphone attachment that can be used to perform sophisticated field testing to detect viruses and bacteria," 2/12/16 Am. Compl. ¶78; "[a device] that derives biological signals from your smartphone's accelerometer . . . [and] [t]his information is useful to base medical diagnoses in real-life conditions and to help track chronic health conditions and effects of therapeutic interventions," 2/12/16 Am. Compl. ¶80; "a cradle and app for the iPhone to make a handheld biosensor that uses the phone's own camera and processing power to detect any kind of biological molecules or cells," 2/12/16 Am. Compl. ¶92; a handheld instrument to help contain the spread of Ebola, HIV, Tuberculosis, and Malaria, 2/12/16 Am. Compl. ¶102; "[a portable device for] real-time detection of explosives, toxicants, and radiation," 2/12/16 Am. Compl. ¶122; "highly sensitive rapid medical diagnostic tests," 2/12/16 Am. Compl. ¶126.

project reports, as required in the NSF Grant Conditions, should document all efforts and outcomes, whether or not they are successful."). Government funding of research that will lead to the development and testing of an accused device supports a reasonable inference that the Government impliedly sanctioned infringing activity.

## V.    CONCLUSION.

For the reasons discussed herein, the Government's June 24, 2016 Motion To Dismiss Certain Devices, pursuant to RCFC 12(b)(1) and 12(b)(6), is denied.

Plaintiff, however, is cautioned that the court's ruling today is based on the standard of review on sufficiency of the pleading alone and is not to be construed as a ruling on the substantive merits of the patent infringement claims alleged in the February 12, 2016 Amended Complaint. The court will convene a telephone status conference in the next few days to discuss a schedule to move this case towards adjudication.

**IT IS SO ORDERED.**

_____
**SUSAN G. BRADEN**
**Judge**

# EXHIBIT E

Paper No. __

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

GOOGLE LLC,
Petitioner,

v.

SMARTWATCH MOBILE CONCEPTS, LLC,
Patent Owner.

————————

Case No. IPR2024-00852
Patent No. 10,362,480

————————

**PETITION FOR *INTER PARTES* REVIEW
UNDER 35 U.S.C. §§ 311-319 AND 37 C.F.R. § 42.1 *et seq.***

# TABLE OF CONTENTS

I.    MANDATORY NOTICES .................................................................................1

    A.    Real Party-In-Interest – § 42.8(b)(1).......................................................1

    B.    Related Matters – § 42.8(b)(2) .................................................................1

        1.    United States Patent & Trademark Office ...................................1

        2.    District Court Matters ..................................................................1

    C.    Counsel and Service Information – § 42.8(b)(3) and (b)(4) .................2

II.    INTRODUCTION ..........................................................................................4

III.    CERTIFICATION OF STANDING ...............................................................5

IV.    TABLE OF GROUNDS ..................................................................................5

V.    THE '480 PATENT ........................................................................................6

VI.    CHALLENGED CLAIMS ..............................................................................7

VII.    PERSON OF ORDINARY SKILL IN THE ART ("POSA")........................8

VIII.    PROSECUTION HISTORY ...........................................................................8

IX.    CLAIM CONSTRUCTION ...........................................................................9

X.    GROUND 1: CLAIMS 1-6 ARE OBVIOUS OVER AGRAFIOTI
    ALONE OR WITH BERNEY.......................................................................11

    A.    Agrafioti (EX1011) ................................................................................11

    B.    Berney (EX1008) ...................................................................................14

    C.    Agrafioti and Berney ..............................................................................16

    D.    Claim 1 ...................................................................................................19

        1.    [1PRE]: "A method for enabling a wearable device user
            to access secured electronic systems".......................................19

        2.    [1A] "placing a wearable device in contact with a user"..........19

            a.    [1A-1] "telecommunications carrier access
                identification module" ................................................... 20

            b.    [1A-2] "a cellular RF communications module" .......... 21

            c.    [1A-3] "a short-range RF communications
                 module"......................................................................... 23

3.  [1B] "achieving secured, short-range RF communication between the wearable device and a secured electronic system"...........................................................................23

4.  [1C] "authenticating the user with at least one of [1C-1] the wearable device,  [and] [1C-2] a remote server via cellular communications...." ......................................25

    a.  [1C-1].............................................................. 26

    b.  [1C-2].............................................................. 27

5.  [1D] "providing the user with access to or through the secured electronic system once authenticated".........................31

6.  [1E] "wherein said wearable device comprises a smartwatch including a microphone and skin illumination and measurement hardware".......................................31

7.  [1F] "wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware"...........................................33

E.  Claim 2 ..................................................................34

    1.  [2E]: "said wearable device includes a GPS module for determining location of the wearable device user with respect to the secured electronic system" ................34

    2.  [2F]: "the step of providing a user access to or through the secured electronic systems is also dependent on the location of the wearable device user" .......................36

F.  Claim 3 ..................................................................37

    1.  [3PRE] – [3D] ..........................................................37

    2.  [3E]: "said wearable device further comprises a registration module"................................................37

    3.  [3F]: "providing a user access to or through the secured electronic system is determined by at least one of the wearable device and the registration module based on at least one of: [3F-1] the user authenticated for access to secured electronic system by the wearable device, ... [3F-3] the user biometrically authenticated for access by remote server, [3F-4] the user granted access based on

location, and [3F-5] the user granted access based on
proximity to a secured electronic system" .................................. 38

G.    Claim 4 ............................................................................. 39

H.    Claim 5 ............................................................................. 39

I.    Claim 6 ............................................................................. 40

XI.    GROUND 2: CLAIMS 1-9 ARE OBVIOUS OVER AGRAFIOTI,
BERNEY, AND LEE ...................................................................... 40

A.    Lee (EX1009) ..................................................................... 40

B.    Agrafioti, Berney, and Lee ................................................. 41

C.    Claims 1-6 ......................................................................... 42

    1.    [1E]/[4A]/[6A] ........................................................ 42

    2.    [1F]/[4B]/[6B] ......................................................... 43

D.    Claim 7 ............................................................................. 43

    1.    [7PRE] .................................................................... 43

    2.    [7A] ........................................................................ 44

    3.    [7B]-[7D] ................................................................ 44

    4.    [7E] ......................................................................... 44

E.    Claim 8 ............................................................................. 45

F.    Claim 9 ............................................................................. 46

XII.   GROUND 3:  CLAIMS 2, 5, 8 ARE OBVIOUS OVER AGRAFIOTI-
JUN .............................................................................................. 46

A.    Jun (EX1010) ..................................................................... 46

B.    Combining Agrafioti and Jun ............................................ 47

C.    Claims 2, 5, 8 .................................................................... 49

    1.    [2E]/[5A]/[8A] ........................................................ 49

    2.    [2F]/[5B]/[8B] ......................................................... 49

XIII.  GROUND 4:  CLAIMS 1-9 ARE OBVIOUS OVER THARAPPEL-
BERNEY ....................................................................................... 50

A.    Tharappel (EX1007) ........................................................... 50

B.    Combining Tharappel and Berney ..................................... 52

C.    Claim 1 ........................................................................................55
    1.    [1PRE] ..............................................................................55
    2.    [1A] ...................................................................................56
        a.    [1A-1] ....................................................................56
        b.    [1A-2] ....................................................................56
        c.    [1A-3] ....................................................................57
    3.    [1B] ...................................................................................57
        a.    Locked Smartphone as SES ...........................................57
        b.    Other Types of SES .....................................................58
        c.    Achieving Secured, Short-Range RF
            Communication ............................................................59
    4.    [1C] ...................................................................................60
        a.    [1C-1] ....................................................................60
        b.    [1C-2] ....................................................................62
        c.    [1C-3] ....................................................................62
    5.    [1D] ...................................................................................63
    6.    [1E] ...................................................................................64
    7.    [1F] ...................................................................................65
D.    Claim 2 ........................................................................................66
    1.    [2PRE]-[2D] ........................................................................66
    2.    [2E] ...................................................................................66
    3.    [2F] ...................................................................................66
E.    Claim 3 ........................................................................................67
    1.    [3PRE]-[3D] ........................................................................67
    2.    [3E] ...................................................................................67
    3.    [3F] ...................................................................................68
F.    Claim 4 ........................................................................................69
G.    Claim 5 ........................................................................................70
H.    Claim 6 ........................................................................................70

I.      Claim 7 ..................................................................................................70

     1.     [7PRE]...................................................................................70

     2.     [7A] .......................................................................................71

     3.     [7B]-[7D] ...............................................................................71

     4.     [7E] .......................................................................................71

J.      Claim 8 ..................................................................................................72

K.      Claim 9 ..................................................................................................72

XIV.  GROUND 5: CLAIMS 1-9 ARE OBVIOUS OVER THARAPPEL-
BERNEY-LEE ......................................................................................................72

A.      Tharappel-Berney-Lee ........................................................................72

B.      Claims 1-9 .............................................................................................74

     1.     [1E]/[4A]/[6A]/[7A] ..............................................................74

     2.     [1F]/[4B]/[6B]/[7C] ..............................................................74

XV.   GROUND 6: CLAIMS 2 AND 4 ARE OBVIOUS OVER
THARAPPEL AND JUN ...................................................................................75

A.      Combining Tharappel and Jun ............................................................75

B.      Claim 2 ..................................................................................................76

     1.     [2PRE]...................................................................................76

     2.     [2A] .......................................................................................76

     3.     [2B] .......................................................................................77

     4.     [2C] .......................................................................................78

     5.     [2D] .......................................................................................79

     6.     [2E] .......................................................................................79

     7.     [2F] .......................................................................................80

C.      Claim 4 ..................................................................................................80

     1.     [4A] .......................................................................................80

     2.     [4B] .......................................................................................80

XVI.  NO BASIS FOR DISCRETIONARY DENIAL ...........................................81

A.      Section 314(a)........................................................................................81

     1.     Potential for Stay.................................................................81

|   | 2. | Timing of Trial | 81 |
|---|---|---|---|
|   | 3. | Litigation Investment | 82 |
|   | 4. | Overlap of Issues | 82 |
|   | 5. | Litigation Defendants | 83 |
|   | 6. | Other Circumstances | 83 |
| B. |   | Section 325(d) | 83 |
|   | 1. | Step One: The Petition Advances Art and Arguments Not Previously Considered. | 83 |
|   | 2. | Step Two: The Office Erred Materially | 84 |

XVII. CONCLUSION ........................................................................... 85

XVIII.    CLAIM LISTING ..................................................................... 88

*user*" as claimed.  Williams, ¶91; EX1001, 6:33-36 (contact includes "placement" on wrist).

### a.    [1A-1] "telecommunications carrier access identification module"

Agrafioti's wearable communicates with client computers 102-105 over a wireless network 108.  EX1011, [0044]-[0049], [0117], Fig. 1 (below).



Fig. 1.  "[W]ireless network 108 may include virtually any wireless communication mechanism by which information may travel between client computers 103-105,

***biometric device 106***, and another computer network." EX1011, [0049] (also discussing "cellular" communication such as 2G/3G/4G/5G for network 108).

Agrafioti ([0042]) describes using mechanisms implemented by modules within client computers 103-105 (e.g., mobile identification number, electronic serial number) to "uniquely identify themselves" on network 108. POSAs would have understood that the same mechanisms could beneficially be included in biometric device 106 to uniquely identify itself on the same network. These "uniquely" identifying mechanisms within Agrafioti's wearable are "*telecommunications carrier access identification module[s]*" as claimed. EX1001, Abstract, 2:21-34, 4:4-15; Williams, ¶¶92-94.

        **b.**    **[1A-2] "a cellular RF communications module"[10]**

Agrafioti's wearable device has radios, transceivers, and/or antennae enabling communication with other devices. EX1011, [0095], [0105], [0113]-[0115], Figs. 4A-4B (annotated below); Williams, ¶¶95-96.

---

[10] "RF communications" means "radio frequency communications." EX1001, 5:33; EX1041; Williams, ¶95.



FIG. 4A

FIG. 4B

For example, wearable 400 includes high bandwidth radio transceivers 410 that use "high bandwidth mechanisms such as Wi-Fi, or the like" to "communicate with various devices," including "biometric servers and cloud services." EX1011, [0117]. The transceiver may be coupled to a dipole or other antenna "to facilitate the transmission and reception of wireless signals." EX1011, [0104]. The wearable communicates with biometric servers and cloud services (e.g., server 116) via networks 108 and 110, where network 108 may employ 2G/3G/4G/5G "*radio* access for *cellular* systems." EX1011, [0049], Fig. 1. Therefore, POSAs would have understood that the wearable's high bandwidth radio transceivers 410 alone or coupled with antenna(e) comprise a "*cellular RF communications module*" as

Thus, Agrafioti teaches multiple ways of authenticating the user "*with the wearable*" as claimed. Williams, ¶106.

### b.    [1C-2]

Agrafioti teaches authenticating the user by remote server in two ways. Williams, ¶¶107-115.

**(1) User Authentication Through Biometric Authentication Server.**

Agrafioti describes a "*remote server*," e.g., biometric authentication server 116, which "may be implemented using one or more cloud instances in one or more cloud networks." EX1011, [0053], [0180], Fig. 1 (excerpt below); Williams, ¶¶108-111.



The user's biometric profile may be stored alternatively or additionally in this biometric authentication server. EX1011, [0211]; Williams, ¶¶109-110. Agrafioti thus describes embodiments in which the wearable transmits biometric data acquired by the wearable's sensors to biometric authentication server 116 for user authentication. EX1011, [0044]-[0045], [0052]-[0053].

The wearable communicates with biometric authentication server 116 via wireless network 108 and network 110. EX1011, [0047]-[0050], Fig. 1. Wireless network 108 includes 2G/3G/4G/5G "radio access for cellular systems" (EX1011, [0049]) which is supported by the wearable's modules that meet [1A-1]-[1A-2] as

preauthenticated user identity to other devices and systems," including access points. EX1011, [0055], [0146]-[0149], [0152], [0160]-[0162].

The wearable communicates with the AAD via "radios/transducers," and the AAD may be one of client computers 103-105 with which the wearable communicates over network 108 (including cellular communications supported by the wearable's modules that meet [1A-1]-[1A-2] as discussed *supra* §§X.D.2.a-X.D.2.b). EX1011, [0039], [0093]; Williams, ¶¶112-115. POSAs would therefore have understood that the corresponding authentication satisfies [1C-2]. Williams, ¶115.

### 5. [1D] "providing the user with access to or through the secured electronic system once authenticated"

Agrafioti describes granting the user access to an "access point" (i.e., the SES as claimed) after authenticating the user. EX1011, [0107], [0148], [0154]-[0163], Fig. 8 (showing authorization followed by enabling user access to one or more access points); Williams, ¶¶116-117. Thus, Agrafioti's method provides the user access to the SES "*once authenticated*," as claimed. Williams, ¶117.

### 6. [1E] "wherein said wearable device comprises a smartwatch including a microphone and skin illumination and measurement hardware"

Agrafioti describes a "wristwatch" wearable ([0044]) and teaches that the wearable includes a microphone and recognizes voice commands ([0035], [0105]-[0109], [0122]), may include high and low frequency radio transceivers, GPS and

– 31 –

other sensors, and can send and receive signals including cellular signals (e.g., via network 108) ([0038], [0044]-[0050], [0092]-[0097]).  Williams, ¶118.  POSAs would have understood that a wristwatch wearable as described in Agrafioti is a "*smartwatch*" including a microphone as claimed. Williams, ¶118.

Agrafioti teaches that the wristwatch wearable may include "photoplethysmogram sensors" and discusses near infrared sensors, light sensors, and optical sensors.  EX1011, [0122].  POSAs would have understood that photoplethysmogram ("PPG") sensors, infrared sensors, light sensors, and optical sensors are types of skin illumination measurement sensors—i.e., "*skin illumination and measurement hardware*"—because they emit light (or other optical output) and measure a response to that light/illumination. Williams, ¶119.

Agrafioti teaches that the biometric wearable device (e.g., smart wristwatch) performs biometric authentication via pulse detection ([0108], [0116]).  POSAs would have understood that PPG was a common and conventional implementation of pulse detection typically involving emitting infrared, red, or green-light from a light source and measuring the light's reflection, transmission, or variation with a sensor (e.g., a photodetector).  *See* Williams, ¶¶120-121; EX1030, 283-84 (PPG pulse sensing using "reflection from or transmission through the tissue"); EX1031, 829-30 (PPG pulse monitoring using "a light source to illuminate the skin tissue, and

Wearable 40 is "any smart device capable of voice audio, media, or data exchanges" (3:14-20), including a watch or bracelet (3:58-61). Wearable 40 has biometric authentication capabilities. EX1007, 2:28-29; 3:58-61; Williams, ¶¶170-171.

Wearable 40 and smartphone 20 communicate "via a secure network 50." EX1007, 2:26-27, Fig. 1. Smart device 20 and wearable 40 include "respective wireless adapters 41 and 21" that include "wireless communication circuitry" such as Wi-Fi, Bluetooth, NFC, satellite, and/or any cellular technologies (including "3G/4G/5G/nG"). EX1007, 4:50-5:30; Williams, ¶172.

Both smart device 20 and wearable 40 "include respective biometric sensors 29 and 49 for sensing" user "biological characteristics," including but not limited to "voice patterns, speech," fingerprints, palm prints, and "pulse features." EX1007, 6:31-41; Williams, ¶173. Biometric sensors 29, 49 are any suitable sensor for sensing the desired biological characteristic (e.g., "a pulse sensor" to sense pulse features). EX1007, 6:41-49; Williams, ¶173. Wearable 40 includes "biometric authentication module 42" (2:28-29), which allows the user to "authenticate[] to the wearable device based on" one or multiple user-specific biometric credentials (4:16-25). EX1007, 2:24-45; Williams, ¶173.

Smart device 20 includes enrollment module 28, which allows the user to enroll his/her biometric characteristic "to enable biometric authentication." EX1007, 3:61-4:15, 2:46-55. In some embodiments, after authenticating the user

even under a narrower interpretation of SES, Tharappel-Berney satisfies [1PRE]. *See* §§X.D.1, X.D.3; Williams, ¶184.

### 2.    [1A]

Tharappel-Berney satisfies [1A] because Tharappel-Berney's "***wearable device***…can be worn by a user" in contact with ("by attachment to") a user's "body part." EX1007, 3:14-20, 14:15-19, 14:49-50, Fig. 3B. Tharappel-Berney's wearable can be a bracelet or watch, which POSAs understood (and Berney corroborates) to be worn in contact with the user. Williams, ¶185; EX1008, [0032] ("a sensor…on the back of watch 100…could read body temperature" or "vein patterns on the wearer's wrist").

#### a.    [1A-1]

Tharappel-Berney satisfies [1A-1] via the wearable's "subscriber identity module (SIM) I/F 1030." Williams, ¶186; EX1007, 15:28-32, 16:51-55, 17:35-39, 19:12-45. According to the '480 patent, a "SIM" is a claimed "*telecommunications carrier access identification module*." EX1001, Abstract ("A wearable device can include a telecommunications carrier identification module (e.g., SIM)."), 2:21-34, 4:4-14; Williams, ¶186.

#### b.    [1A-2]

Tharappel-Berney's wearable includes Tharappel's "wireless adapter[]," including circuitry for communications via "***cellular*** technologies (e.g., 3G/4G/5G/nG), other ***radio frequencies*** …and/or any other networking protocols

*Supra* §XIII.B. Tharappel-Berney's "wireless transactions" are the ***exact same types*** of SESes expressly discussed in the '480 patent. EX1001, 2:60-3:3 (providing examples of SESes: "secured entry barriers (e.g., doors, gates, safes)," payment mechanisms (e.g., vending machines, parking meters), point-of-sale (POS)); Williams, ¶194.

### c.    Achieving Secured, Short-Range RF Communication

Tharappel-Berney's "wearable device 40 communicates with a smart device 20 via a ***secure*** network 50." EX1007, 2:24-45, 4:16-49 ("When the user authenticates to the wearable device ... the wearable device establishes a ***secure*** wireless connection."), Fig. 5 (Step 502), Fig. 7 (similar). In one embodiment, "network 50 represents a Bluetooth™ ***secure*** wireless connection between wearable device 40 and smart device 20." EX1007, 5:28-30; Williams, ¶195; *see* §X.D.2.c (Bluetooth is short-range RF communication). Tharappel-Berney's wearable would connect with Berney's "wireless transaction" devices (parking meter, point-of-sale, secure entry device/system) in the same manner. Williams, ¶195; EX1008, [0036]-[0038].

Thus, Tharappel-Berney satisfies [1B]. Williams, ¶195.

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

GOOGLE LLC,
Petitioner,

v.

SMARTWATCH MOBILE CONCEPTS, LLC,
Patent Owner.

_____

Case No. IPR2024-00852
Patent No. 10,362,480

_____

**DECLARATION OF DAVID H. WILLIAMS**

Google Exhibit 1003
Google v Smartwatch

## TABLE OF CONTENTS

I. PERSONAL AND PROFESSIONAL BACKGROUND ...................................1

II. MATERIALS REVIEWED AND CONSIDERED ...........................................8

III. MY UNDERSTANDING OF PATENT LAW ................................................9

    A. Anticipation ..........................................................................................11

    B. Obviousness..........................................................................................11

IV. PERSON OF ORDINARY SKILL IN THE ART ("POSA").........................14

V. BACKGROUND OF THE TECHNOLOGY ..................................................16

    A. Form Factors.........................................................................................17

    B. Location Services .................................................................................19

    C. Biometric Sensors and Associated Applications...................................22

    D. User Authentication..............................................................................24

VI. THE '480 PATENT ......................................................................................26

    A. Introduction to '480 Patent...................................................................26

    B. Prosecution History of the '480 Patent.................................................28

    C. The Challenged Claims ........................................................................28

VII. CLAIM INTERPRETATION .......................................................................30

    A. "at least one of" ...................................................................................30

    B. Other Matters of Claim Interpretation..................................................32

VIII. GROUND 1: CLAIMS 1-5 ARE OBVIOUS OVER AGRAFIOTI ALONE OR WITH BERNEY ......................................................................32

    A. Agrafioti (EX1011)...............................................................................32

    B. Berney (EX1008)..................................................................................38

    C. Combining Agrafioti and Berney ..........................................................40

    D. Claim 1 .................................................................................................43

        1. [1PRE]: "A method for enabling a wearable device user to access secured electronic systems"......................................................43

        2. [1A] "placing a wearable device in contact with a user"....................43

            a. [1A-1] "said wearable device including a telecommunications carrier access identification module" ........44

i

b.   [1A-2] "a cellular RF communications module" ........................46

c.   [1A-3] "said wearable device including...a short-range RF communications module" ...........................................48

3.   [1B] "achieving secured, short-range RF communication between the wearable device and a secured electronic system" .........49

4.   [1C] "authenticating the user with at least one of [1C-1] the wearable device, [and] [1C-2] a remote server via cellular communications" .................................................................52

a.   [1C-1] "the wearable device" .....................................52

b.   [1C-2] "a remote server via cellular communications supported by the telecommunications carrier access identification module and the cellular RF communications module" ...................................................................53

i.   User Authentication Through Biometric Authentication Server. .........................................54

ii.  User Authentication Through the AAD .............................55

5.   [1D] "providing the user with access to or through the secured electronic system once authenticated" .................................58

6.   [1E] "wherein said wearable device comprises a smartwatch including a microphone and skin illumination and measurement hardware" .......................................................................60

7.   [1F] "and wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware" .......................................................................62

E.  Claim 2 ....................................................................................63

1.   Location ................................................................................63

2.   [2E]: "said wearable device includes a GPS module for determining location of the wearable device user with respect to the secured electronic system" ...........................................65

3.   [2F] "the step of providing a user access to or through the secured electronic systems is also dependent on the location of the wearable device user" .....................................................67

F.  Claim 3 ....................................................................................69

ii

1.  [3PRE] – [3D] ...........................................................................69

2.  [3E] "said wearable device further comprises a registration module" ..........................................................................................69

3.  [3F]: "providing a user access to or through the secured electronic system is determined by at least one of the wearable device and the registration module based on at least one of: [3F-1] the user authenticated for access to secured electronic system bythe wearable device, … [3F-4] the user granted access based on location, and [3F-5] the user granted access based on proximity to a secured electronic system" .........................................70

G.  Claim 4 [PRE] The method of claim 2, [A] wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware, [B] wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware. ...........................................71

H.  Claim 5 [PRE] The method of claim 1, [A] wherein said wearable device further comprises a GPS module for determining location of the wearable device user with respect to secured electronic systems, and [B] wherein access to the secured electronic systems is dependent on the location of the wearable device user in relationship to the secured electronic systems. .........................................71

I.  Claim 6 [PRE] The method of claim 3, [A] wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware, [B] wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware. ...........................................72

IX.  GROUND 2: CLAIMS 1-9 ARE OBVIOUS OVER AGRAFIOTI, BERNEY, AND LEE ......................................................................................72

A.  Lee (EX1009) ...........................................................................................72

B.  It Would Have Been Obvious to Combine Agrafioti, Berney, and Lee73

C.  Claims 1-6 .................................................................................................74

1.  [1E] ("wherein said wearable device comprises a smartwatch including a microphone and skin illumination and measurement

hardware" / [4A] ("wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware") / [6A] ("wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware") ......75

2. [1F] ("wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware") / [4B] ("wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware") / [6B] ("wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware") ............................................................................76

D. Claim 7 ........................................................................................77

1. [7PRE] "A method for enabling a smartwatch user to access secured electronic systems" ...............................................................77

2. [7A] "placing a smartwatch in contact with a user, the smartwatch including a registration module, a short-range RF communications module, a microphone, and skin illumination and measurement hardware" ...............................................................77

3. [7B]-[7D] "achieving secured, short-range RF communication between the smartwatch and a secured electronic system"; [7C] "authenticating the user with at least one of the smartwatch and the secured electronic system using at least one biometric obtained from at least one of the microphone and the skin illumination and measurement hardware"; [7D] "providing the user with access to or through the secured electronic system once authenticated" ...............................................................78

4. [7E] "a subscriber identification module (SIM) and a cellular communications module, wherein authentication of the user is also achievable by accessing a remote server via cellular communications supported by the SIM and the cellular communications module and matching the at least one biometric" ...............................................................78

E. Claim 8 ........................................................................................79

1.  [8A] "wherein the smartwatch wearable device includes a GPS module for determining location of the smartwatch user with respect to the secured electronic system";  [8B] "wherein the step of providing a user access to or through the secured electronic systems is also dependent on a location of the smartwatch user with respect to a location of the secured electronic system" ...............................................................................79

F.  Claim 9 "The method of claim 8, wherein providing a user access to or through the secured electronic system is determined by the registration module based on at least one of: [1] user authentication for access to secured electronic system by smartwatch, [2] user biometric authentication by a wireless carrier, [3] user biometric authentication by remote server, [4] user location, and [5] user proximity to a secured electronic system." ...............................................80

X.  GROUND 3:  CLAIMS 2, 5, 8 ARE OBVIOUS OVER AGRAFIOTI-........80

A.  Jun (EX1010)........................................................................................80

B.  Combining Agrafioti and Jun ..............................................................81

C.  Claims 2, 5, 8.......................................................................................83

1.  [2E] ("wherein said wearable device includes a GPS module for determining location of the wearable device user with respect to the secured electronic system")/ [5A] ("wherein said wearable device further comprises a GPS module for determining location of the wearable device user with respect to secured electronic systems")/ [8A] (wherein the smartwatch wearable device includes a GPS module for determining location of the smartwatch user with respect to the secured electronic system").......83

2.  [2F] ("wherein the step of providing a user access to or through the secured electronic systems is also dependent on the location of the wearable device user")/ [5B] ("wherein access to the secured electronic systems is dependent on the location of the wearable device user in relationship to the secured electronic systems") / [8B] ("wherein the step of providing a user access to or through the secured electronic systems is also dependent on a location of the smartwatch user with respect to a location of the secured electronic system") .......................................................84

XI.  GROUND 4:  CLAIMS 1-9 ARE OBVIOUS OVER THARAPPEL-BERNEY ..............................................................................................................84

A. Tharappel (EX1007) ................................................................................84

B. Combining Tharappel and Berney ...........................................................87

C. Claim 1 ...................................................................................................90

   1.  [1PRE] "A method for enabling a wearable device user to access secured electronic systems" ......................................................90

   2.  [1A] "placing a wearable device in contact with a user" ...................91

      a.  [1A-1] "said wearable device including a telecommunications carrier access identification module" ........91

      b.  [1A-2] "a cellular RF communications module" .......................91

      c.  [1A-3] "said wearable device including…a short-range RF communications module" ..........................................................92

   3.  [1B] "achieving secured, short-range RF communication between the wearable device and a secured electronic system" .........94

      a.  Locked Smartphone as SES: ......................................................94

      b.  Other Types of SES .....................................................................95

      c.  Achieving Secured, Short-Range RF Communication: ..............95

   4.  [1C] "authenticating the user with at least one of [1C-1] the wearable device, [1C-2] a remote server…, and [1C-3] the secured electronic system via the secured, short-range RF communication" .....................................................................96

      a.  Authenticating with Wearable ([1C-1]) .....................................96

      b.  Authenticating with a Remote Server via Cellular Communications ([1C-2]) ...........................................................98

      c.  Authenticating with SES via Secured, Short-Range RF Communication ([1C-3]) .............................................................99

   5.  [1D] "providing the user with access to or through the secured electronic system once authenticated" ...............................................100

   6.  [1E] "wherein said wearable device comprises a smartwatch including a microphone and skin illumination and measurement hardware" ..........................................................................................101

   7.  [1F] "and wherein authentication of the user is based on biometric information obtained from the user via at least one of

the microphone and the skin illumination and measurement hardware" ....................................................................103

D. Claim 2 ....................................................................103

   1.  [2PRE]-[2D] ....................................................................103

   2.  [2E] "said wearable device includes a GPS module for determining location of the wearable device user with respect to the secured electronic system" ....................................................................104

   3.  [2F] "the step of providing a user access to or through the secured electronic systems is also dependent on the location of the wearable device user" ....................................................................105

E. Claim 3 ....................................................................107

   1.  [3PRE]-[3D] ....................................................................107

   2.  [3E] "said wearable device further comprises a registration module" ....................................................................107

   3.  [3F] "providing a user access to or through the secured electronic system is determined by at least one of the wearable device and the registration module based on at least one of: [3F-1] the user authenticated for access to secured electronic system by the wearable device, ... [3F-4] the user granted access based on location, and [3F-5] the user granted access based on proximity to a secured electronic system" ....................................................................108

F. Claim 4 "[PRE] The method of claim 2, [A] wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware, [B] wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware." ....................................................................109

G. Claim 5 "[PRE] The method of claim 1, [A] wherein said wearable device further comprises a GPS module for determining location of the wearable device user with respect to secured electronic systems, and [B] wherein access to the secured electronic systems is dependent on the location of the wearable device user in relationship to the secured electronic systems." ....................................................................110

H. Claim 6 "[PRE] The method of claim 3, [A] wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware, [B] wherein

authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware.” ......................................110

I.  Claim 7 ........................................................................................110

1.  [7PRE] “A method for enabling a smartwatch user to access secured electronic systems” ................................................110

2.  [7A] “placing a smartwatch in contact with a user, the smartwatch including a registration module, a short-range RF communications module, a microphone, and skin illumination and measurement hardware” ...............................................111

3.  [7B] achieving secured, short-range RF communication between the smartwatch and a secured electronic system; [7C] authenticating the user with at least one of the smartwatch and the secured electronic system using at least one biometric obtained from at east one of the microphone and the skin illumination and measurement hardware; [7D] providing the user with access to or through the secured electronic system once authenticated; and ...................................................111

4.  [7E] “a subscriber identification module (SIM) and a cellular communications module, wherein authentication of the user is also achievable by accessing a remote server via cellular communications supported by the SIM and the cellular communications module and matching the at least one biometric” ............................................................................112

J.  Claim 8 “[PRE] The method of claim 7, [A] wherein the smartwatch wearable device includes a GPS module for determining location of the smartwatch user with respect to the secured electronic system, and [B] wherein the step of providing a user access to or through the secured electronic systems is also dependent on a location of the smartwatch user with respect to a location of the secured electronic system.” ............................................113

K.  Claim 9 “The method of claim 8, wherein providing a user access to or through the secured electronic system is determined by the registration module based on at least one of: [1] user authentication for access to secured electronic system by smartwatch, [2] user biometric authentication by a wireless carrier, [3] user biometric

authentication by remote server, [4] user location, and [5] user
proximity to a secured electronic system." ...........................................113

XII. GROUND 5: CLAIMS 1-9 ARE OBVIOUS OVER THARAPPEL-
BERNEY-LEE.................................................................................................114

    A. Tharappel-Berney-Lee..............................................................................114

    B. Claims 1-9.................................................................................................115

        1. [1E] ("wherein said wearable device comprises a smartwatch
including a microphone and skin illumination and measurement
hardware") / [4A] (wherein said wearable device further
comprises a smartwatch including a microphone and skin
illumination and measurement hardware") / [6A] ("wherein said
wearable device further comprises a smartwatch including a
microphone and skin illumination and measurement hardware")
/ [7A] ("placing a smartwatch in contact with a user, the
smartwatch including a registration module, a short-range RF
communications module, a microphone, and skin illumination
and measurement hardware")............................................................116

        2. [1F] ("wherein authentication of the user is based on biometric
information obtained from the user via at least one of the
microphone and the skin illumination and measurement
hardware") / [4B] ("wherein authentication of the user is based
on biometric information obtained from the user via at least one
of the microphone and the skin illumination and measurement
hardware") / [6B] ("wherein authentication of the user is based
on biometric information obtained from the user via at least one
of the microphone and the skin illumination and measurement
hardware") / [7C] ("authenticating the user with at least one of
the smartwatch and the secured electronic system using at least
one biometric obtained from at least one of the microphone and
the skin illumination and measurement hardware") .........................116

XIII.GROUND 6: CLAIMS 2 AND 4 ARE OBVIOUS OVER
THARAPPEL AND JUN ...............................................................................117

    A. Combining Tharappel and Jun...................................................................117

    B. Claim 2 ......................................................................................................118

        1. [2PRE] "A method for enabling a wearable device user to
access secured electronic systems" ..................................................118

2.  [2A] "placing a wearable device in contact with a user, said wearable device including [1] a telecommunications carrier access identification module, [2] a cellular RF communications module, and [3] a short-range RF communications module" ...........119

3.  [2B] "achieving secured, short-range RF communication between the wearable device and a secured electronic system" .......119

4.  [2C] "authenticating the user with at least one of [1] the wearable device, [2] a remote server via cellular communications supported by the telecommunications carrier access identification module and the cellular RF communications module, and [3] the secured electronic system via the secured, short-range RF communication" ..............................120

5.  [2D] "providing the user with access to or through the secured electronic system once authenticated" ...............................................121

6.  [2E] "wherein said wearable device includes a GPS module for determining location of the wearable device user with respect to the secured electronic system" ...........................................................122

7.  [2F] "wherein the step of providing a user access to or through the secured electronic systems is also dependent on the location of the wearable device user" ...............................................................123

C.  Claim 4 ...........................................................................................124

1.  [4A] "wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware" ....................................................................124

2.  [4B] "wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware" .........................................................................................124

XIV. CONCLUSION ...........................................................................................124

CLAIM LISTING ...........................................................................................127

Excerpts from Googles Expert DECLARATION OF DAVID H WILLIAMS

UNITED STATES PATENT AND TRADEMARK OFFICE _____ BEFORE THE PATENT TRIAL AND
APPEAL BOARD _____ GOOGLE LLC, Petitioner, v. SMARTWATCH MOBILE CONCEPTS, LLC,
Patent Owner. _____ Case No. IPR2024-00852 Patent No. 10,362,480 _____
DECLARATION OF DAVID H WILLIAMS

88. POSAs would have reasonably expected success in combining Agrafioti and Berney. Both Agrafioti
and Berney describe a wearable device with a GPS receiver having similar form factors (e.g., watches)
and describe similar platforms (including processors, memory, biometric readers, and antennas).

97. Bluetooth communications and near field communication (NFC) are examples of "short-range RF
communications" as claimed. EX1001, 2:6-10 ("short range radio frequency" communications include
"Bluetooth" and "NFC"), 5:22-25, 6:23-24 (similar) 6:41-45 (similar); EX1014, (US 2010/0178866), [0002]
[0003] ("[N]ear field communication covers various short-range techniques and technologies which
enable wireless communication.")

98. Agrafioti's biometric wearable includes a low bandwidth radio transceiver 412, which "may represent
components for communicating using low power, shorter range radio systems such as, Blue Tooth, ...NFC,
...the like, or combination[s] thereof."

100. Agrafioti discloses the same type of secured, short-range RF communication between a wearable
biometric device and "access points." Agrafioti, [0030], [0166] (explaining that explains that the
"transmission of entry authorization signals from the preauthorized wearable biometric device to the
desired access point ... is preferably accomplished wirelessly," for example, by "Bluetooth, WIFI, NFC, or
the like"). For example, the wearable may send a "control signal...to a physical or logical access point that
may enable the user to unlock or access the access point." "The control signal may be a binary encoded
sequence transmitted wired or wirelessly using but not limited to Bluetooth, near field communication
or Wifi."

129. Agrafioti's biometric wearable includes a GPS transceiver 422, which "may represent the radios, hardware, and instructions (e.g., software) for receiving geo-location." Agrafioti, [0121],[0109], [0112]-[0115].

144. Lee describes a wrist wearable such as a watch with contact sensors "for authenticating a user based on a wrist vein pattern." Lee, [0003]. Wrist contact sensor have an array of illuminators and sensors on a surface of the wrist device that is opposite the user's wrist when the device is worn by the user. Lee, [0031]. "The illuminators [] produce illumination in the infrared spectrum which directed into the skin of the palmar side of the wrist." Lee, [0031]; [0036]. The wrist contact sensor obtains "digital data representing the wrist vein pattern for the user." Lee, [0003]. The user's wrist vein pattern is compared to stored wrist vein pattern information to authenticate the user. Lee, [0005], [0070] ("The authentication software …compares the digital data presenting the wrist vein pattern with digital data representing one or more reference wrist vein patterns.").

146. POSAs would have had such motivation to implement Agrafioti's wearable itself and/or as modified in view of Berney (as discussed Section VIII.C) to obtain vein patterns based on Lee's teachings. Both options are collectively discussed herein as "Agrafioti-Berney-Lee." POSAs would have reasonably expected success in incorporating Lee's array of illuminators into Agrafioti Berney-Lee at least because Agrafioti, Berney, and Lee all describe a wearable device having similar form factors (e.g., watches) and describe similar platforms (processors, memory, biometric readers, and antennas).

151. Agrafioti-Berney-Lee additionally implements Lee's teaching that its array of illuminators is illuminated (e.g., one at a time) to illuminate skin of the wrist proximate the illuminators. Lee, [0036]-[0037]. Lee's wearable uses data from its sensors to generate reference user wrist vein pattern data and then authenticates users by matching the sensed wrist vein data to the reference data using pattern recognition signal processing software. Lee, [0038], [0058].

165. POSAs would have reasonably expected success in modifying Agrafioti's system and method to include Jun's GPS-based techniques, at least because GPS location technology and authentication methods were well understood by POSAs and used in wearables long before the '480's priority date.

172. Wearable 40 and smartphone 20 communicate "via a secure network 50." Tharappel, 2:26-27; Fig. 1. Smart device 20 and wearable 40 include "respective wireless adapters 21 and 41" that include "wireless communication circuitry" such as Wi-Fi, Bluetooth, NFC, satellite, and/or any cellular technologies ("including '3G/4G/5G/nG'"). Tharappel, 4:50-5:30.

173. Both smart device 20 and wearable 40 "include respective biometric sensors 29 and 49 for sensing" user "biological characteristics," including but not limited to "voice patterns, speech, fingerprints … hand features, palm prints, and pulse features." Tharappel, 6:31-41. Biometric sensors 29 and 49 can include any suitable biometric sensor for sensing the desired biological characteristic, such as "a pulse sensor … to sense pulse features."

181. POSAs would have reasonably expected success in implementing the above-described Tharappel-Berney combination, e.g., with the system described in Tharappel, (e.g., device 20, wearable 40, and accompanying circuitry), including because Tharappel and Berney disclose similar form factors (e.g., watches) and describe similar platforms (including processors, memory, biometric readers, and antennas) for a wearable.

182. Both Berney and Tharappel describe wearable devices that include a GPS component and perform user authentication. Tharappel, 19:18-44; Berney, [0029], [0040]. Thus, POSAs would have expected success in implementing proximity authentication with GPS backup in Tharappel's wearable based on Berney's teachings. Such a modification could be implemented with software modifications to use GPS location data for authentication. Further, both GPS location technology generally and location-based authentication methods were well understood by POSAs at that time.

186. Tharappel-Berney satisfies [1A-1] via the wearable's "subscriber identity module (SIM) I/F 1030" (Tharappel, 19:27), which is part of "processor 1000" within Tharappel's wearable 40 (Tharappel, 15:28-32, 16:51-55, 17:35-39, 19:12-45). According to the '480 patent, a "SIM" is an example of the claimed "telecommunications carrier access identification module." EX1001, Abstract ("A wearable device can include a telecommunications carrier identification module (e.g., SIM)."), 2:21-34, 4:4-14.

188. Tharappel's wearable includes Tharappel's "wireless adapter[]" including circuitry for communications via "cellular technologies (e.g., 3G/4G/5G/nG, etc.), other radio frequencies…and/or

any other networking protocols that facilitate wireless communications." Tharappel, 4:50-5:8, Fig. 1, 5:9-30 ("the wireless connection may also include any cellular wireless"), 19:27 45 (wearable device processor 1000 includes "3G/4G modem 1075"). Tharappel Berney's "wireless adapter" with at least "3G" "cellular technologies" is a "cellular RF communications module," as claimed. See, e.g., EX1001, 5:31-37 (discussing cellular RF communications module using GSM or CDMA); EX1024, U.S. Patent No. 8,825,011, 7:48-50 (corroborating that 3G cellular used CDMA); EX1025, U.S. Patent No. 8,781,475, 6:36 (corroborating that 3G wireless used "CDMA/GSM").

189. In addition to the "cellular communications module" (e.g., wireless adapter configured for 3G/4G/5G/nG cellular communication), Tharappel Berney's wireless adapter's wireless communication circuitry also includes Bluetooth and NFC modules, which are types of claimed "short-range RF communications modules." Tharappel, 4:50-59, 19:27-45 (wearable device processer may include "BluetoothTM"), 5:9-15 (discussing connection via "Bluetooth™"), Fig. 1, 5:28-30 ("[N]etwork 50 represents a BluetoothTM secure wireless connection between wearable device 40 and smart device 20."); EX1001, 2:6-10 ("short range radio frequency, and/or line of sight communications standards" include "Bluetooth" and "NFC"), 5:22-25, 6:23-24 (similar) 6:41-45 (similar); EX1024, U.S. Patent Publication No. 2010/0178866, [0002]-[0003] ("[N]ear field communication covers various short-range techniques and technologies which enable wireless communication."), [0013] (Bluetooth a short range communication technology)).

190. The wearable can include these modules alongside (i.e., in addition to) the circuitry for "cellular technologies" discussed §VIII.D.2.b ([1A-2]). Tharappel, 4:50-5:5 ("The wireless communications may be inclusive of wireless technologies…, cellular technologies…, other radio frequencies (e.g., near field communications (NFC),…and/or any other networking protocols that facilitate wireless communications."), 5:9-30 ("the wireless connection" may include "BluetoothTM" and "may also include any cellular wireless…connection"). It also would have been obvious to implement Tharappel-Berney's wearable to include both near field and cellular wireless communication, to support different use cases and enhance flexibility. EX1029, U.S. Patent No. 7,889,085, 4:1-5, 5:10 14; EX1035, U.S. Patent No. 8,111,589, 24:63-25:20 33:5-22; EX1036, U.S. Patent No. 8,467,272, 8:11-21; 26:34-37.

239. Based on Lee, POSAs would have had reasons to modify Tharappel Berney to incorporate Lee's wrist-vein-pattern biometric authentication techniques discussed above in section IX.A (resulting in

"Tharappel-Berney-Lee"). ... POSAs also would have understood that including Lee's biometric authentication methods would further Tharappel's goal of providing "secure, convenient access to" multiple smart devices. Tharappel, 3:55-58.

241. Tharappel, Berney, and Lee each have similar form factors (e.g., watches) and describe similar platforms (including processors, memory, biometric readers, and antennas). Lee, Fig. 4A, [0045]-[0046]; Tharappel; Figs. 10-11, 19:13-14; Berney, Fig. 6, ¶[0026], [0028]-[0029], [0038]-[0039]. For example, Tharappel, Berney, and Lee each describe a wearable that authenticates a user with biometric data before providing the user access to secured (e.g., locked) data or areas. Further, both biometric sensors generally and biometric-based authentication methods were well understood by POSAs by the '480 patent's claimed priority date.

244. Tharappel Berney-Lee uses the gathered vein pattern data to authenticate by using Lee's "authentication software" to correlate the gathered vein pattern data with "reference wrist vein patterns." Lee, [0058]-[0059].

245. POSAs would have had reasons to implement (in Tharappel's system) Jun's GPS-location proximity-detection access control (e.g., door unlocking) technique discussed above in section X.A (resulting in "Tharappel-Jun"). Tharappel and Jun each describe a wearable device having a GPS receiver that performs user authentication before granting access to a locked or secured system. Tharappel, 2:16-23, 4:37-41, 19:18-44;

247. POSAs would have reasonably expected success in modifying Tharappel's wearable to include Jun's GPS-based authentication, at least because GPS location technology and authentication methods were well understood by POSAs long before the '480's invention date.

249. Tharappel-Jun includes Tharappel's method modified in view of Jun, which includes using a wearable for biometric and other types (e.g., location based) of user authentication.

# EXHIBIT F

Plaintiff asserted five (5) patents in this current case: consisting of nine (9) independent claims; twenty-four (24) dependent claims; and forty-three (43) patent claim limitations.

In view of the five (5) patents asserted in this current case: consisting of nine (9) independent claims; twenty-four (24) dependent claims; and forty-three (43) patent claim limitation; "hazard" only appears in one limitation.  [Claim 1 of Plaintiff's '898 patent]

## U.S. Patent No: 8,334,761

### "Remote Controlled Stall-To-Stop Vehicle Slowdown System"

1. A vehicle adapted for receipt of a signal from a remote location to remotely control the vehicles' stall-to-stop means or vehicle slowdown means, comprising:

at least one of a brake, a foot peddle, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;

an electrical system in electrical communication with at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a computer system in signal transmission communication with at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means;

a receiver in computer communication with the computer system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means; and

wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

wherein a user determines that the vehicle has been stolen and in response initiates a distress signal communication over a communication network that causes communication between the vehicle and the remote location and that then causes the at least one control signal to be sent from the remote location via the communication network that includes at least one of a cell phone tower and a satellite.

## U.S. Patent No: 11,645,898

### "CPU Processing Instructions for Pre-Programmed Stall, Stop,
### Vehicle Slow-Down System"

1. A pre-programmed stall, stop, vehicle slow-down system, that comprises at least one central processing unit (CPU), capable of:

processing instructions to stall, stop, or slow-down a vehicle when the vehicle receives a signal from at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, a tablet, a PDA, or a handheld;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle receives a signal from at least one of cellular, satellite, or radio-frequency (RF);

processing instructions to stall, stop, or slow-down a vehicle when the vehicle is experiencing unintended acceleration;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle is experiencing lane departure;

processing instructions to stall, stop, or slow-down a vehicle when a collision or crash is detected;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle has been reported as stolen;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle has moved outside a pre-programmed designated perimeter;

***processing instructions to stall, stop, or slow-down a vehicle when at least one of a chemical hazard, a biological hazard, a radiological hazard; a nuclear hazard; or explosives have been detected;***

processing instructions to stall, stop, or slow-down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; and,

wherein, when the central processing unit (CPU) processes instructions to stall, stop, or slow-down a vehicle, a distress signal is sent to at least one of a monitoring site, a control center, or is recorded for storage.

### U.S. Patent No: RE43,891

### "Pre-Programmed Vehicle Stall-to-Stop with Brake Override System"

11. A vehicle adapted for receipt of a signal from a remote location to control the vehicle's stall-to-stop means or vehicle slowdown means, comprising:

at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;

an electrical system in electrical communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means to stall or slow down the vehicle;

a receiver in computer communication with the computer system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means to stall or slow down the vehicle; and

wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

wherein the at least one control signal is sent due to unauthorized use of the vehicle, and wherein an originating first signal that eventually causes the at least one control signal to be sent is generated upon initial verification of the unauthorized use of the vehicle;

at least one mobile, portable, or fixed device capable of sending the at least one control signal from the remote location that is of electromagnet pulse, electrostatic discharge, microwave beam or radio frequency, to disable the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and horsepower of the motor.

44. A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising:

an electrical system in electrical communication with at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;

a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means;

a receiver in computer communication with the computer system and adapted to receive at least one control signal in response to one of the vehicle's operating systems for monitoring the vehicle's condition upon exceeding a pre-programmed vehicle operating system parameter from the pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means such that the speed of the vehicle is initially decreased immediately after activation of the means upon initial receipt of the at least one control signal; and

wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor.

47. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a brake override system for stopping or slowing a vehicle experiencing unintended acceleration.

48. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a pre-crash system for stopping or slowing a vehicle to prevent a crash.

49. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a reverse acceleration slow-down system for stopping or slowing a vehicle traveling in reverse.

50. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a stabilization system for stopping or slowing a vehicle to prevent a vehicle turnover.

51. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a lane departure system for stopping or slowing a vehicle to prevent or minimize accidents when the vehicle begins to move out of its lane.

53. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as an adjusted cruise control system for stopping or slowing a vehicle to prevent a crash.

### U.S. Patent No: 10,163,287

### "Monitoring Equipment comprising a Central Processing Unit (CPU)"

4. A communication device comprising:

at least one central processing unit (CPU);

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and,

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

5. A monitoring device, comprising:

at least one central processing unit (CPU);

at least one temperature sensor in communication with the at least one CPU for monitoring temperature;

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device;

at least one sensor for chemical, biological, or human detection in communication with the at least one CPU;

one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and,

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

6. A monitoring equipment, comprising:

at least one central processing unit (CPU);

at least one motion sensor in communication with the at least one CPU;

at least one light indicator in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection or Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and,

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

### U.S. Patent No: 10,984,619

### "CMDC Device—CPU for Processing Functional and Operational Instructions"

1. A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of:

processing instructions to lock, unlock, or disable the lock of the communication device;

processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;

processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;

processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;

processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and,

whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

2. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of processing operational instructions for at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner.

3. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal to lock, unlock, or disable the lock of the communication device.

4. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition.

5. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of at least short-range wireless radio frequency near-field communication (NFC).

6. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

7. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal from at least one of chemical, biological, radiological, nuclear, or explosives detection.

8. The communication device of claim 1, comprising at least a central processing unit

(CPU), capable of receiving a signal through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection.

9. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device.

10. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of the operational and functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.

11. A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of:

processing instructions to lock, unlock, or disable the lock of the communication device;

processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;

processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;

processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;

processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and,

whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

12. The central processing unit (CPU) of claim 11, capable of processing operational instructions for at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner.

13. The central processing unit (CPU) of claim 11, capable of processing operational instructions to lock, unlock, or disable the lock of the communication device.

14. The central processing unit (CPU) of claim 11, capable of processing operational instructions of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition.

15. The central processing unit (CPU) of claim 11, capable of processing operational instructions from short-range wireless radio frequency near-field communication (NFC).

16. The central processing unit (CPU) of claim 11, capable of processing operational instructions from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

17. The central processing unit (CPU) of claim 11, capable of processing operational instructions from at least chemical, biological, radiological, nuclear, or explosives detection.

18. The central processing unit (CPU) of claim 11, capable of processing operational instructions through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection.

19. The central processing unit (CPU) of claim 11, capable of processing operational instructions of the communication device connection to the internet or internet-of-things (IoTs)

platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device.

20. The central processing unit (CPU) of claim 11, capable of processing operational instructions of functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.