# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 992-7104

Email: atpg-tech@charter.net

**FILED**

**APR 24 2026**

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

LARRY GOLDEN,

        Plaintiff,

        v.

GOOGLE LLC

        Defendants.

CIVIL CASE NO: 3:2026cv00831-JD

**JURY TRIAL DEMANDED**

**(Infringement under 35 U.S.C § 271(g)
(Joint Patent Infringement)
(Direct Patent Infringement),
(Willful Patent Infringement),**

April 20, 2026

## PLAINTIFF'S CASE MANAGEMENT STATEMENT

Pursuant to the court order of 01/27/26 [Dkt. 32] and the court order of 02/20/26 [Dkt. 52] in the case of *Golden v. Google, LLC* No. 26-0831, Plaintiff, prose, is submitting this Case Management Statement that is due on April 23, 2026. enclosed initial disclosures pursuant to Northern District of California Civil Local Rule 16-9, based on the information that is reasonably available to Plaintiff without Google' defense.

Google maintained they would get back in touch me Plaintiff. That promise was made on April 10, 2023. Over a week has passed and Plaintiff have not heard back from Google.

**STANDING ORDER FOR ALL JUDGES
OF THE NORTHERN DISTRICT OF CALIFORNIA
CONTENTS STANDING ORDER FOR ALL JUDGES
OF JOINT CASE MANAGEMENT STATEMENT**

All judges of the Northern District of California require identical information in Joint Case Management Statements filed pursuant to Civil Local Rule 16-9. The parties must include the following information in their statement which, except in unusually complex cases, should not exceed ten pages:

**1. Jurisdiction and Service:** The basis for the court's subject matter jurisdiction over plaintiff's claims and defendant's counterclaims, whether any issues exist regarding personal jurisdiction or venue… "Google is quoted as saying in its Motion to Transfer this case from the Western District of Texas: "If the destination venue would have been a proper venue, then '[t]he determination of "convenience" turns on a number of public and private interest factors, none of which can be said to be of dispositive weight." Google is also quoted as saying: "Testifying imposes external costs on *witnesses*, even those willing to testify," and "[t]his factor 'attempts to internalize and minimize' these costs by 'favoring the venue that is more convenient from the perspective of willing *witnesses*.'" Also: "[T]he comparison between the transferor and transferee forums is not altered by the presence of other *witnesses* and documents in places outside both forums." "[W]hen there are numerous *witnesses* in the transferee venue and the only other *witnesses* are far outside the plaintiff's chosen forum; the witness convenience factor favors transfer."

**2. Facts:** A brief statement of the principal factual issues in dispute and a chronology of the facts: Upon information, twelve Federal Judges (three in district courts; nine at the federal circuit) "infer to say"; arriving at a conclusion by reasoning from evidence, that infringement of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices occurs when a mobile,

2

consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability.

Twelve Federal Judges repeatedly affirmed arguments that the integration of a CBRNE-H detection capability with a mobile device; infringes Plaintiff's patented CMDC invention.

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

The Judges further acknowledges that direct infringement arises "***through nine "standard sensors" which "can be used as 'biosensors,'"***", that are located internal the mobile device, satisfies the NDC local rule 3-1(c) for identifying where in the mobile devices the biosensors are found under 35 U.S.C. § 271(a); and, the ***nine "standard sensors" which "can be used as 'biosensors*** are included in Google's manufacture of Plaintiff's patented process abroad for a "*modified cell phone*" that is imported into the United States under 35 U.S.C. § 271(g).

3

> **Apple's Smartphone Biosensors Submitted to the Courts:**
> 1. Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
> 2. Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
> 3. Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
> 4. Microfluidic cassette: Interchangeable cassettes with varying assays
> 5. VIS-NIR spectrometer: Food freshness; Melanoma
> 6. NNAP Electrodes: Toxic metals and Organic pollutants in water
> 7. Optical Waveguide: Pathogens in water and food
> 8. *Back and front camera: Colorimetric analysis; Image analysis*
> 9. Microphone: Voice recording stress levels

Upon information, Plaintiff alleges the Google Pixel Watch infringes Plaintiff's patented "cell phone detection device"; because the Google Pixel Watch, as a detection device, has written support in Plaintiff's patent specifications for a detection capability that is placed 'in, on, upon, or adjacent' the monitoring device.

In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below.

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

The Patent Trials and Appeals Board (PTAB) construed "built-in, embedded", as it relates to the Google Pixel Watch [Plaintiff's patented "cell phone detection

4

device"], as: "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the [Google Pixel Smartphone] device".

Upon information, twelve Federal Judges (three in district courts; nine at the federal circuit) "infer to say"; arriving at a conclusion by reasoning from evidence, that infringement of Plaintiff's cell phone detection device occurs when a Google Pixel Smartphone is integrated with, or interconnected to, a Google Pixel Watch CB-H detection capability.

The Judges further acknowledges that direct infringement arises "through three "standard sensors" which "can be used as 'biosensors,'", that are located internal the Google Pixel Watch, satisfies the NDC local rule 3-1(c) for identifying where in (i.e., upon, adjacent, incorporated into, affixed to, connected to, or mounted to another device, such that it is an integral part of the device—PTAB claim term construction for "built-in, embedded"), the Google Pixel Smartphone devices the biosensors are found under 35 U.S.C. § 271(a); and, the three "standard sensors" which "can be used as 'biosensors are included in Google's manufacture of Plaintiff's patented process abroad for a "*modified cell phone*" that is imported into the United States under 35 U.S.C. § 271(g).

In the complaint, Plaintiff also alleges the Google Pixel Watch infringes Plaintiff's multi-sensor detection device, when the Google Pixel Watch functions as a CB-H sensing device that is integrated with, or interconnected to a Google Pixel Smartphone device.

Independent claim 7 of Plaintiff's '189 patent and independent claim 19 illustrates how the Google Pixel Watch functions as a CB-H sensing device that is integrated with, or interconnected to a Google Pixel Smartphone device.

**U.S. Patent No: 9,096,189**

7. A multi-sensor detection system for detecting at least one [] chemical, biological, human, [] comprising:

a plurality of sensors for detecting at least one chemical, biological, [] human [] and capable of being disposed within, on, upon or adjacent a multi sensor detection device;

monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween;

**U.S. Patent No: 9,589,439**

19. A multi-sensor detection system for detecting at least one [] chemical, biological, human, [] comprising:

a plurality of sensors for detecting at least one chemical, biological, [] human, [] capable of being disposed within, on, upon or adjacent a multi-sensor detection device;

monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween;

A multi-path heart rate sensor; from sleep and stress to skin temperature and SpO2; Pixel Watch 4 uses sleep, resting heart rate, and heart rate variability; loss of Pulse Detection may not detect every instance of a loss of pulse and is not intended for users with preexisting heart conditions or those who require cardiac monitoring. The Pixel Watch has a lot of sensors packed into the 41mm frame, such as a heart rate, ECG, and even a blood oxygen sensor. https://9to5google.com/2023/03/01/every-sensor-on-the-pixel-watch/

The Google Android Tactical Assault Kit (ATAK) provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a

6

[Google Pixel Watch] wearable smart-watch that measures a warfighter's vitals (e.g., heart rate). Warfighters can now use ATAK to guide them-selves to safety when confronted with a release of chemical and biological agents and radiological and nuclear threats (CBRN). ATAK can connect to [Draper's CBRNE] sensors on many platforms (e.g., satellites, drones, smartwatches).

Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www. popular-mechanics. com/military/research/a18161/ homeland-security-smartwatch-detect-nuclear-bombs/

**3. Legal Issues:** A brief statement, of the disputed points of law, including reference to specific statutes and decisions: Plaintiff alleged in the complaint Google developed Plaintiff's patented "Transceiver" as the Google Android Open-Source Operating System and went on to create a monopoly on Android app distribution.

"Qualcomm's role has been to develop a smartphone app and the associated network software for processing data. Smartphone users can download the app from *Google Play* and, eventually, from Apple's iTunes store, so Cell-All will be operational on all phones using either *Google's Android* or Apple's iPhone operating systems. When the application is installed, it will ask the user for permission to share sensor readings and location information over the network; then, whenever abnormal chemical levels are detected, the phone will send those data to a network gateway." According to Doug Hoffman, program manager at Qualcomm. Hoffman, D., 2011. Qualcomm Project Presentation. *Cell-All Live Demonstration for Environmental Sensing* (Webcast), September 28. (accessed 17.09.12). As the Qualcomm representative argued: "Let's take advantage of the 300 million cell phones that are out there today. They're always with us".

The goal of the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative, and Google, is to have a means of sensing for CBRNE-

7

H in all places at all times; [ubiquitous] "seeming to be everywhere or in several places at the same time".

There are an estimated "1992" different Brand-models of *Android smartphones* throughout the world. https://en.wikipedia.org/wiki/List_of_Android_ smartphones Plaintiff's "product grouping" strategy preamble for patent claims reads as: "a communication device that is at least a cell phone, PDA, smartphone… grouped together by common features and design similarities". [patent specs.]

Google manages to rake in billions of dollars' worth of revenue from Android every single year. That figure has been rising ever since the operating system's debut in 2008. However, Android is an open-source project — third-party manufacturers like Samsung can modify and use.

The Play Store represents Google's largest and most direct revenue source for Android, and is pre-installed on every single Android-based smartphone and tablet. Google takes a minimum of 15% in exchange for hosting the app and serving it to users; it quickly adds up when you consider that there are over a billion Android devices in use.

Manufacturers that want to include the Play Store have to sign Google's Mobile Application Distribution Agreement (MADA). Among other things, it requires hardware makers to bundle the aforementioned Google apps and the Google Mobile Services (GMS) framework.

Google goes to great lengths to ensure that it stays at the top of the search engine and advertising market. In 2014, the company paid Apple $1 billion to make its search engine the default on every iPhone. Similarly, Google also pays rival web browsers like Firefox hundreds of millions of dollars every single year to maintain its top position. Since Google has so many ventures, it's not easy to drill down exactly how much Android alone contributes to its bottom line.

In 2016, Google asked a judge to redact and seal documents that potentially revealed how much it makes from the Android ecosystem. It stated, "Google does not publicly allocate revenues or profits to Android separate and apart from Google's general business." "*Oracle*'s attorneys estimated that Android had generated a total of $31 billion in revenue and $22 billion in profit. Nearly [] a decade has passed since those filings; so, things have undoubtedly changed since then. Calvin Wankhede, February 12, 2023 *How does Google make money from Android?* https://www. androidauthority.com/how-does-google-make-money-from-android-669008/

The *Epic v. Google* case — the US antitrust lawsuit that found Google's Play Store constitutes an illegal monopoly on Android app distribution — entered a new phase today. At an April 10, 2026 hearing in the Northern District of California, Judge James Donato scheduled a summer evidentiary hearing he described as the "final act" of the case... The final framework for Android app distribution and payments is genuinely unresolved.... The injunction required Google to host rival app stores within Google Play.... The fact that Judge Donato zeroed in on exactly these two issues — fees and distribution — should be on every game developer's radar... Under the October 2024 injunction — which remains in effect — Android developers in the United States can offer alternative purchasing and payment methods outside Google Play Billing... The injunction requires Google to allow rival app stores within Google Play, stop forcing developers to use Google Play Billing, and end exclusivity agreements that restricted competition ... The fee structure for direct-to-consumer transactions on Android is one of the central unresolved issues in the *Epic v. Google* case... https://www.stash.gg/blog/blog-epic-v-google-settlement-update-april-2026

Plaintiff alleges Google's android operating system performs substantially the same function; in substantially the same way; to achieve substantially the same

results, as Plaintiff's patented "transceiver". [direct infringement under the "*doctrine of equivalents*"] Supreme Court in *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605 (1950).

Upon information, Plaintiff alleges Google's Advanced Driver Assistance Systems (ADAS) for its Google/Waymo Self-Drive Cars, directly, or under the doctrine of equivalents, infringes Plaintiff's patented stall, stop, and Vehicle Slow-Down Systems. Google's ADAS are technologies that assist drivers with the safe operation of a vehicle that include the varies ways and means of stalling, stopping, or slowing the vehicle. ADAS may provide adaptive cruise control, assist in avoiding collisions, alert drivers to possible obstacles, warn of lane departure, assist in lane centering, incorporate satellite navigation, provide traffic warnings, provide navigational assistance through smartphones, automate lighting, or provide other features.

Google's autonomous vehicle software generally contains several different modules that work together to enable self-driving capabilities. The perception module ingests and processes data from various sensors, such as cameras, LIDAR, RADAR, and ultrasonic SONAR, to create a comprehensive understanding of the vehicle's surroundings. Furthermore, Google's modern autonomous driving systems increasingly employ sensor fusion techniques that combine data from multiple sensors to improve accuracy and reliability in different environmental conditions.

The Google ADAS perception system is responsible for observing the environment. It must identify everything that could affect the trip, including other vehicles, pedestrians, cyclists, their movements, road conditions, obstacles, and other issues. These applications use various sensors to intervene when the car senses a possible loss of control. The car's control unit can reduce power from the engine and even apply the brakes on individual wheels to prevent the car

10

from understeering or oversteering. Corrects the rate of power steering system to adapt it to vehicles speed and road conditions.

Plaintiff's alleges Google directly infringes Plaintiff's central processing unit (CPU) with the Google Tensor CPU/Chipset for its Google Pixel Smartphones; alleges Google jointly infringes Plaintiff's central processing unit (CPU) with the Qualcomm Snapdragon W5 and W5 Gen 2 CPU/Chipset for Google Pixel Watches. See at least Claim 1 of Plaintiff's '619 patent;

1. A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of:

processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;

processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and,

whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

and, alleges Google directly infringes Plaintiff's central processing unit (CPU) with the Google Tensor Processing Unit v5 (TPUv5) CPU/Chipset for Google/Waymo's Self Drive and Autonomous Cars:

Google's Tensor Processing Unit v5 ("TPUv5) chips can process vast amounts of visual data quickly and accurately. This capability is crucial for applications like autonomous vehicles, security systems, and medical imaging, where real-time analysis and decision-making are essential … With its high-performance matrix multiplication units and advanced memory architecture, TPUv5 is well-suited for processing and analyzing vast amounts of visual data in real-time. This capability is

crucial for applications like autonomous vehicles, where the ability to quickly and accurately detect and respond to objects and obstacles in the environment is literally a matter of life and death". https://expertbeacon.com/tpuv5-powering-the-future-of-ai-at-google/ See at least Claim 1 of Plaintiff's '898 patent:

1. A pre-programmed stall, stop, vehicle slow-down system, that comprises at least one central processing unit (CPU), capable of:

processing instructions to stall, stop, or slow-down a vehicle when the vehicle receives a signal from at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, a tablet, a PDA, or a handheld;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle is experiencing unintended acceleration;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle is experiencing lane departure;

processing instructions to stall, stop, or slow-down a vehicle when a collision or crash is detected;

processing instructions to stall, stop, or slow-down a vehicle when at least one of a chemical hazard, a biological hazard, a radiological hazard; a nuclear hazard; or explosives have been detected;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; ...

**4. Motions:** Plaintiff currently has a pending motion to stay this case until Google produce the witnesses Google stated it has, in the Western District of Texas Court to get this case transferred to the Northern District of California.

**5. Amendment of Pleadings:** Plaintiff reserves the right to amend the complaint if the Court finds Plaintiff pleadings insufficient.

**6. Evidence Preservation:** Plaintiff have reviewed the Guidelines Relating to the Discovery of Electronically Stored Information ("ESI Guidelines"). Plaintiff

cannot confirm having met with Google to discuss this matter for Google's failure to get back with Plaintiff.

**7. Disclosures:** Pursuant to the court order of 01/27/26 [Dkt. 32] and the court order of 02/20/26 [Dkt. 52] in the case of *Golden v. Google, LLC* No. 26-0831, Plaintiff submitted his initial disclosures pursuant to FRCP Rule 26(a)(1), based on the information that is reasonably available to Plaintiff.

**8. Discovery:** Plaintiff met with Google by phone on April 10, 2026, where Plaintiff informed Google, Plaintiff expects to receive their discovery documents disclosing Google's defense to Plaintiff's allegations that the Google "*modified*" cell phone is not manufactured abroad and that Google does not infringe Plaintiff's patented process when the Google "*modified*" cell phones are imported into the United States. Plaintiff also informed Google that the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product[s] in question" where the manufacture occurred abroad. Part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product.

**9. Class Actions:** No class action.

**10. Related Cases:** Plaintiff currently have two cases filed in the Western District of Texas Court: *Golden v. Samsung* Case No. 25-0596; and *Golden v. Apple Inc.* Case No. 26-0224.

**11. Relief:** Plaintiff have described how the Google android operating system performs substantially the same function; in substantially the same way; to achieve substantially the same results, as Plaintiff's patented "transceiver". [direct

infringement under the "*doctrine of equivalents*"] Supreme Court in *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605 (1950). Upon information, Plaintiff believes he is responsible for Google's successful journey since 2008 of applying Plaintiff's "product grouping" strategy to enable 1,992 smartphone brands and models to develop on the Google Android Open-Source Operating System Platform. The following chart illustrates how Google's 2008 market cap of 96.93B have grown to a staggering 2026 market cap of 4.08T. Plaintiff is seeking a very percentage of ownership in Google:

### Market Cap History [Annual]

| Date | Market Cap | % Change |
|---|---|---|
| Apr 15, 2026 | 4.08T | 7.97% |
| Dec 31, 2025 | 3.78T | 63.00% |
| Dec 31, 2024 | 2.32T | 32.54% |
| Dec 29, 2023 | 1.75T | 53.10% |
| Dec 30, 2022 | 1.14T | -40.61% |
| Dec 31, 2021 | 1.92T | 62.20% |
| Dec 31, 2020 | 1.19T | 28.34% |
| Dec 31, 2019 | 923.77B | 27.11% |
| Dec 31, 2018 | 726.73B | -0.71% |
| Dec 29, 2017 | 731.90B | 34.00% |
| Dec 30, 2016 | 546.19B | 2.08% |
| Dec 31, 2015 | 535.06B | 48.64% |
| Dec 31, 2014 | 359.98B | -3.95% |
| Dec 31, 2013 | 374.79B | 61.85% |
| Dec 31, 2012 | 231.57B | 10.58% |
| Dec 30, 2011 | 209.41B | 10.14% |
| Dec 31, 2010 | 190.13B | -3.44% |
| Dec 31, 2009 | 196.90B | 103.13% |
| Dec 31, 2008 | 96.93B | -55.24% |

If this case proceeds to trial, Plaintiff intends to ask the jury to return damages incurred by Google for the alleged infringement of Plaintiff's patented process

14

produced abroad and imported into the United States under 35 U.S.C. § 271(g); the alleged infringing Google Pixel Smartphones under 35 U.S.C. § 271(a); the alleged infringing Google Pixel Watches under direct infringement and infringement under the doctrine of equivalents; the alleged infringing Google Tensor CPU/Chipsets made for the Google Pixel Smartphones under 35 U.S.C. § 271(a); the alleged infringing Google Tensor Processing Unitv5 (TPUv5) chips made for the Google/Waymo Self-Drive cars under 35 U.S.C. § 271(a); the alleged infringing Google Advanced Driver Assistance Systems (ADAS) made for the Google/Waymo Self-Drive cars under 35 U.S.C. § 271(a); joint infringement and willful infringement.

**12. Settlement and ADR:** Plaintiff asked on April 10, 2026 Google's defense for the fourth time to deliver a settlement offer to their client Google. Google's defense attorneys simply stated they will get with their client and get back in touch with Plaintiff. Google's defense never got back in touch with Plaintiff. Plaintiff asked for 1% of Google's cash reserves of $126B. Only $1.26B

**13. Consent to Magistrate Judge for All Purposes:** No further consent.

**14. Other References:** No other references.

**15. Narrowing of Issues:** Not at this present time.

**16. Expedited Trial Procedure:** Plaintiff believes this is the type of case that can be handled under the Expedited Trial Procedure, but Google failed to get back in touch with Plaintiff to discuss the issue.

**17. Scheduling:** Plaintiff seeks guidance from the Court on proposed dates for designation of experts, discovery cutoff, hearing of dispositive motions, pretrial conference and trial.

**18. Trial:** Plaintiff seeks his guaranteed right to a Jury trial for Plaintiff's claims of patent infringement that are issues-of-facts to be tried by a jury.

**19. Disclosure of Non-party Interested Entities or Persons:** Not relevant to ProSe Plaintiff.

**20. Professional Conduct:** Plaintiff confirms having reviewed the Guidelines for Professional Conduct for the Northern District of California.

**21.** Such other matters as may facilitate the just, speedy and inexpensive disposition of this matter.

A. Plaintiff served Google his initial disclosures pursuant to FRCP Rule 26(a)(1) on April 13, 2026.

B. It was never the intension of Plaintiff when he introduced the three economic packages for restoring the Nation's economy after the 9/11 attacks for a few companies to monopolize certain industries when manufacturing and assembling Plaintiff's CMDC device i.e., (new, improved upon, and useful cell phone).

C. Google's Android monologizes 9controls and directs) the Operating System platform for 1992 Brands-models; which is unquestionably a violation of antitrust laws. Plaintiff have rights to a high percentage of ownership.

Sincerely,

s/ *Larry Golden*

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(M) 8649927104

Email: atpg-tech@charter.net

16

# **VERIFICATION**

## **Pursuant to 28 U.S.C. § 1746**

I, Larry Golden, over the age of 18, competent to testify, and having firsthand knowledge of the facts stated herein, do hereby declare, certify, verify, affirm, and state under penalty of perjury under the laws of the United States of America, that the foregoing statements are true, correct, and complete to the best of my understanding, knowledge, and belief, and made in good faith.

Executed and signed this 20th day of April, 2026, with all rights reserved and without recourse and without prejudice; is this "verification" for "Plaintiff's Case Management Statement".

s/ *Larry Golden*

Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-992-7104

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 20th day of April, 2026, a true and correct copy of the foregoing "Plaintiff's Case Management Statement", was served upon the following Defendant via express mail:

Matthew Warren

Warren LLP

2261 Market Street, No. 606

San Francisco, CA 94114

Phone: 415-895-2940

Fax: 415-895-2964

Email: matt@warrenllp.com

s/ *Larry Golden*

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-992-7104