# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 992-7104

Email: atpg-tech@charter.net

**FILED**

**MAY 05 2026**

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

---

LARRY GOLDEN,

        Plaintiff,

        v.

GOOGLE LLC

        Defendants.

---

CIVIL CASE NO: 3:2026cv00831-JD

**JURY TRIAL DEMANDED**

May 04, 2026

## PLAINTIFF'S MOTION FOR RECONSIDERATION OF PLAINTIFF'S GUARANTEED CONSTITUTIONAL RIGHT TO A TRIAL BY JURY

Pursuant to the Seventh Amendment of the United States Constitution Plaintiff has the guaranteed right to a jury trial on issues-of-facts. Patent infringement claims are issues-of-facts to be tried by a jury under the Seventh Amendment Clause of the United States Constitution. [U.S. CONS'T. 7th Amend.]

Beginning in the year 2008 and beyond, Google performed work under an implied authorization and consent for Government in the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative to avoid liability for allegedly infringing Plaintiff's patents; up and until the *Zoltek V* decision of 2012. In that decision the Supreme Court closed the loophole and ruled a third-party

contractor can no longer protect themselves, nor the Government from infringement liability, by simply producing, manufacturing, or assembling at least one part of a patented process abroad.

In 2014, the United States Department of Homeland Security (DHS) and the United States Department of Justice (DOJ); "persons" not authorized to petition to have patents invalidated; in *Golden v. US* CFC 13-307C the DHS and DOJ petitioned the United States Patent Trials and Appeals Board (PTAB), on behalf of its third-party contractors (i.e., Google) to invalidate certain patent claims of Plaintiff's patents. Google waved their right to intervene to protect their interest.

In the PTAB's "Final Written Decision" (Oct. 1, 2015), the PTAB court construed the claim term "built-in, embedded" as "something [that] is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". This construction aligns with Plaintiff's patent specifications written description of "in, on, upon, or adjacent" the monitoring device.

In 2022, on appeal to the U.S. Court of Appeals for the Federal Circuit in *Larry Golden v. Google LLC* Case No. 22-1267, the Federal Circuit concluded: "In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" … "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has

2

made efforts to identify exactly how the accused products meet the limitations of his claims in this chart." The Federal Circuit determined Plaintiff have "identif[ied] exactly how the accused products meet the limitations of his claims …" to prove direct infringement.

In 2024, the U.S. District Court for the Northern District of California, in *Golden v. Google, LLC* Case No. 22-5246 construed the term "modification". The Courts determined that with "modification"; infringement of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device occurs when there's a mobile, consumer, or cellular device that is integrated with, or interconnected to, a CBRNE-H detection capability. Nine Federal Circuit judges have confirmed this infringement theory.

In 2026, in the current case *Golden v. Google LLC* Case No. 26-0831, Plaintiff requested a jury trial to decide if it was Google who modified the "cell phone" under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative; and if the modification was made abroad before Google shipped or imported the "modified" cell phone into the United States.

Therefore, a jury trial is the Courts only next step. There's nothing else to argue or dispute before trial. Two venues have weighed in on construction, the PTAB court and the NDC court; and, the Circuit have issued a preview of direct infringement liability. Google have not disputed or offered any type of affirmative defense to the above issues-of-facts; to be tried by a jury.

### PLAINTIFF'S MOTION FOR RECONSIDERATION

In a motion hearing held on April 30, 2026 in the case of *Golden v. Google*, LLC case no. 26-0831, 'the Court invalidated all of Plaintiff's '287 and '619 patents in their entirety. In a precedential decision, the U.S. Court of Appeals for the Federal Circuit in *Vascular Solutions*, along with related Teleflex companies (collectively

with *Vascular Solutions*, "*Teleflex*") *v. Medtronic*, Inc. defined the concept of "*mutual exclusivity*" in patent claims:

> "The Federal Circuit held that the district court erred when it determined the asserted claims were "*mutually exclusive*" and indefinite. The Federal Circuit rejected the notion that claims in a patent cannot vary in how they describe the disclosed subject matter or that independent claims must be totally consistent with other independent claims."

The Federal Circuit stated: "The district court's conclusion, in effect, means that (1) claims in [Plaintiff's '287 and '619 patents] cannot vary in the way they claim the disclosed subject matter, and (2) independent claims must be totally consistent with other independent claims. Claiming is not restricted in this way."

It emphasized that the art of patent claiming often involves drafting claims in various ways to encompass different aspects of the disclosed subject matter, as long as each claim informs those skilled in the art about the scope of the invention with reasonable certainty. Claims 1-6 of Plaintiff's '287 patents inform in the following:

1. "smart phone interconnected to a lock for communication therebetween"

2. "smart phone interconnected to at least one of a home lock, a building lock, or a cargo container lock for communication therebetween"

3. "smart phone interconnected to a vehicle lock for communication therebetween"

4. "a transceiver (i.e., operating system) in communication with the at least one CPU"

5. "a transceiver (i.e., operating system) in communication with the at least one CPU"

6. "a transceiver (i.e., operating system) in communication with the at least one CPU"

4

The Federal Circuit instructed the district court to "conduct claim construction on a claim-by-claim basis with the understanding that, at the claim construction stage, the claims are not necessarily '*mutually exclusive*' since 'each independent claim is a different ordered combination of limitations'."

Therefore, when Plaintiff's cases were dismissed for preclusion simply because the same patents were asserted in a previous case, and the individual claims were never examined for infringement or invalidity; makes the dismissal of Plaintiff's '287 and '619 patents improper "since each independent claim is a different ordered combination of limitations".

In Plaintiff's prior litigation the Courts created a loophole for invalidating Plaintiff's patents without meeting the higher "clear and convincing" evidence standard; without submitting invalidity contentions; without a Markman hearing or claim construction. No law supports this type of loophole creation.

The independent patent claims of Plaintiff's '287 and '619 patents define the legal boundaries of Plaintiff's inventions. They determine what is protected, what competitors can and cannot do, and how strong the patent will be over time.

Each dependent claim of Plaintiff's '619 patent adds a feature while still relying on the original claim. This creates multiple layers of protection for Plaintiff's '619 patent. If the broader claims 1 or 11 of Plaintiff's '619 patent is challenged or rejected, the narrower dependent claims may still survive. The dependent claims of Plaintiff's '619 patent also allow Plaintiff (the inventor) to capture variations of the inventions without rewriting entirely new claims. This improves efficiency and strengthens overall protection.

If Plaintiff's independent claims are rejected for being too broad, elements from dependent claims can sometimes be incorporated to narrow it in a Markman hearing and move the case forward. Plaintiff's inventions are not just one version. There are multiple ways to build, use, or modify them.

"(a) In General. — A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity. [35 U.S. Code § 282 - Presumption of validity; defenses]

## Extreme Prejudice

Appellate courts review claims of extreme prejudice by assessing whether pre-trial rulings affected the Plaintiff's right to a fair trial. The standard of review is typically whether the decision was an abuse of discretion and whether the error was likely to have affected the decision.

Extreme prejudice in a legal context refers to a pre-trail decision to remove "all allegations relating to infringement of Plaintiff's U.S. Patent Nos. 10,163,287 and 10,984,619", such that the removal is so unfair that it could prevent a fair trial.

Following are the requirements for "removing all allegations relating to infringement of Plaintiff's U.S. Patent Nos. 10,163,287 and 10,984,619":

- *Final Judgment*: There must be a final judgment on the merits in the prior case for 1- infringement allegations under 35 U.S.C. § 271(g); 2- infringement allegations on Google's Tensor CPU/Chipset under 35 U.S.C. § 271(a); 3- infringement allegations on Google's operating system under 35 U.S.C. § 271(a); and, 4- infringement allegations on Google/Waymo's advanced driver-assistance system (ADAS) under 35 U.S.C. § 271(a). There are no final judgments on the merits of any of the infringement allegations outlined above in the prior case.

- *Same Parties*: The parties involved in the current case must be the same as those in the previous case. Google as the same party, but with the addition of Alphabet, Inc. and Waymo.

- *Same Cause of Action*: The current claim must arise from the same transaction or occurrence as the prior case. Infringement allegations under 35 U.S.C. § 271(g) was not claimed in the prior case; is claimed in the current case.

- *Opportunity to Litigate*: Parties must have had a full and fair opportunity to litigate the issue in the previous case. In the previous case Plaintiff was limited to proving infringement of Plaintiff's CMDC device occurs when the device is integrated with, or interconnected to, a CBRNE-H detection capability.

- *Public Policy*: Res judicata promotes judicial efficiency and prevents inconsistent judgments. Both Res Judicata (Claim Preclusion) and Collateral Estoppel (Issue Preclusion) require a final judgement on the merits. The previous case and the current case must be related.

> "On September 18, 2025—nine days after the Federal Circuit issued its mandate—Mr. Golden filed a new action in the Western District of Texas. *Golden v. Google* LLC, No. 6:25-cv-00434-LS (W.D. Tex. Sept. 18, 2025). In this new action, Mr. Golden re-asserts claim under the '287 and '619 patents, which the previous action already addressed and resolved, against the same suite of Google products … Google argues the opposite: that res judicata and the Kessler doctrine prevent Mr. Golden's current claims under the '287 and '619 patents … This action and the previous action involve the same parties, Google and Mr. Golden, and overlapping subject matter, Mr. Golden's infringement claims under the '287 and '619 patents … For the foregoing reasons, Google respectfully requests that the Court consider whether *Golden v. Google LLC*, No. No. 3:22-cv-05246-RFL (N.D. Cal. Sept. 14, 2022), is related to *Golden v. Google LLC*, No. 3:26-cv-00831-LJC (N.D. Cal. Sept. 18, 2025)." *Golden v Google, LLC* Case 3:26-cv-00831-LJC Document 39 Filed 02/06/26.

7

"RELATED CASE ORDER. A Motion for Administrative Relief to Consider Whether Cases Should be Related or a Sua Sponte Judicial Referral for Purpose of Determining Relationship (Civil L.R. 3-12) has been filed. The time for filing an opposition or statement of support has passed. As the judge assigned to case 22-cv--05246-RFL" "The court has reviewed the motion and determined that no cases are related and no reassignments shall occur." *Golden v Google, LLC* Case 3:26-cv-00831-LJC Document 46 Filed 02/18/26

Judge James Donato had Plaintiff spend over $2500 hundred dollars to fly out to a motion hearing only to tell Plaintiff the '287 and '619 patents are related: "Plaintiff Golden may file a second amended complaint by June 15, 2026, removing all allegations relating to infringement of U.S. Patent Nos. 10,163,287 and 10,984,619"; thereby, overturning his fellow colleague Judge Rita Lin's ruling that the cases are not related, three and a half months after Judge Lin's ruling was docketed. *Golden v Google, LLC* Case 3:26-cv-00831-JD Document 63 Filed 05/01/26

Once Judge Rita Lin made a final decision that the cases are not related, Google is precluded from dragging the same dispute back into their motion to dismiss. It is extremely prejudicial for this Court to order Plaintiff, because of preclusion, "to remove all allegations relating to the infringement of U.S. Patent 10,163,287 and 10,984,619", while allowing, and granting Google the opportunity to file the same argument that was previously ruled "unrelated" by Judge Rita Lyn.

**History of Plaintiff's '287 Patent**

The original case *Golden v. Google LLC*, SCDC No. 6:2021cv00244 was filed in the South Carolina District Court on 01/26/2021; alleging Google's joint infringement with Qualcomm, Inc. of Plaintiff's patented central processing unit (CPU) for the Google Pixel 5 smartphone. Plaintiff asserted claim 5 of Plaintiff's '287 patent to illustrate how the mobile smartphone CPU operates as the "brain" of

8

the Google Pixel 5 smartphone for carrying out the operational and functional instructions of the Google android operating system (i.e., Plaintiff's patented "transceiver"). The case was dismissed as being "frivolous".

Plaintiff appealed the case to the U.S. Court of Appeals for the Federal Circuit in *Larry Golden v. Google LLC* Case No. 22-1267. After reviewing the case under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), [a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face]." *Twombly*, 550 U.S. at 570; and, "plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted); the Federal Circuit concluded: "In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. *10,163,287* [the '287 patent], 9,589,439, and 9,069,189" … "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" … "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

The Federal Circuit "vacated and remanded" the lower court case *Larry Golden v. Google LLC* SCDC Case No. 21-0244 back to the lower [District] court because Golden had met all the pleading requirements, and the case was therefore

9

ready for trial, because patent infringement claims are issues-of-facts to be tried by a jury [U.S. CONS'T. 7ᵗʰ Amend.]

After the Federal Circuit's decision, Google immediately discontinued making, using, offering for sell, and selling its Google Pixel 5 smartphone series that included the Qualcomm Snapdragon CPU/Chipset.

Plaintiff filed the remanded case in the United States District Court for the Northern District of California (NDC) in *Golden v. Google, LLC* NDC Case No. 22-5246; Judge Rita Lin presiding. Immediately, Judge Lin begin adjudicating the case on Google's infringement theory of "modification before infringement occurs", while ignoring Plaintiff's claim that Google is allegedly infringing Plaintiff's '287 patent for his patented central processing unit (CPU); and, for his Plaintiff's patented "transceiver" (which performs the same 'function', 'way', 'result' as the Google android operating system), of the Google Pixel smartphones.

To support Plaintiff's claim in *Golden v. Google, LLC* NDC Case No. 22-5246 that Google is allegedly infringing Plaintiff's '287 patent for his patented central processing unit (CPU), and Plaintiff's patented "transceiver" (which performs the same 'function', 'way', 'result' as the Google android operating system); Plaintiff asserted claims 4, 5, and 6 of Plaintiff's '287 patent:

> 4. A communication device comprising:
>     at least one central processing unit (CPU);
>     at least one motion sensor in communication with the at least one CPU;
>     at least one viewing screen for monitoring in communication with the at least one CPU;
>     at least one global positioning system (GPS) connection in communication with the at least one CPU;
>     at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;
>     at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;
>     at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage

10

(unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and,

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

5. A monitoring device, comprising:

at least one central processing unit (CPU);

at least one temperature sensor in communication with the at least one CPU for monitoring temperature;

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device;

at least one sensor for chemical, biological, or human detection in communication with the at least one CPU;

11

one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and,

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

6. A monitoring equipment, comprising:

at least one central processing unit (CPU);

at least one motion sensor in communication with the at least one CPU;

at least one light indicator in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection or Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and,

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

Claims 4, 5, & 6 are issued claims with the presumption of validity that protects Plaintiff's patent right to exclude Google from making, using, offering for sell, or selling its Google Tensor CPUs. Each limitation of each patent claim 4, 5, & 6 of the '287 patent describes the function of the alleged infringing Google Tensor CPU. The last limitation of each patent claim 4, 5, & 6 of the '287 patent describes how the alleged infringing Google Tensor CPU carries out the operational and functional instructions of the Google android operating system (i.e., Plaintiff's patented "transceiver"): "*at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.*"

Plaintiff practically begged Judge Lin to take up Plaintiff's alleged patent infringement claims to a jury. Practically begged Judge Lin not to close the case without considering Plaintiff's patent infringement claim that Google is infringing Plaintiff's patented inventions. Judge Lin closed the case without considering the Federal Circuit's OPINION in *Larry Golden v. Google LLC* Case No. 22-1267. The Judge dismissed Plaintiff's patent infringement claims without allowing Plaintiff the opportunity to present his case to a jury. [U.S. CONS'T. 7th Amend.]

**Plaintiff's '287 and '619 Patents' Process under 35 U.S. Code § 271(g)**

There are multiple ways Plaintiff can build, use, or modify the independent and dependent patent claims of Plaintiff's '619 patent. This Court assumes Plaintiff's '619 patent is asserted in this current case to prove infringement, when in fact it is needed to show how remote communication—wireless technology is not an

"abstract idea"; it is asserted to rebuke Google's Expert Declaration in *Google LLC, Petitioner, v. Smartwatch Mobile Concepts, LLC, Patent Owner*. Case No. IPR2024-00852, Patent No. 10,362,480. The Expert demonstrates how wireless technology is not an abstract idea, and how it is used to connect, for instance, the Google Pixel Watch to the Google Pixel Smartphone, or the Google/Waymo Self-Drive Vehicle to the Google Pixel Smartphone with the use of Bluetooth technology.

The independent patent claims of Plaintiff's '287 and '619 patents, that was removed from this case for no apparent reason other than Google somehow believes the two patents nullifies or invalidates Plaintiff's forty-six patent claims that describes Plaintiff's patented process for modified cell phones; define the legal boundaries of Plaintiff's inventions. They determine what is protected, what competitors can and cannot do, and how strong the patent will be over time.

Each dependent claim of Plaintiff's '619 patent adds a feature while still relying on the original claim. This creates multiple layers of protection for Plaintiff's '619 patent. If the broader claims 1 or 11 of Plaintiff's '619 patent is challenged or rejected, the narrower dependent claims may still survive. The dependent claims of Plaintiff's '619 patent also allow Plaintiff (the inventor) to capture variations of the inventions without rewriting entirely new claims. This improves efficiency and strengthens overall protection.

If Plaintiff's independent claims are rejected for being too broad, elements from dependent claims can sometimes be incorporated to narrow it in a Markman hearing and move the case forward. Plaintiff's inventions are not just one version. There are multiple ways to build, use, or modify them.

"(a) In General. — A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed

14

valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity. [35 U.S. Code § 282 - Presumption of validity; defenses]

Removing Plaintiff's '619 patent diminishes Plaintiff's expert testimonies on wireless technology and improperly invalidates Plaintiff's patents used to demonstrate how Bluetooth wireless technology is used to connect, for instance, the Google Pixel Watch to the Google Pixel Smartphone, or the Google/Waymo Self-Drive Vehicle to the Google Pixel Smartphone. Plaintiff's '619 patent claims:

1. A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of:

processing instructions to lock, unlock, or disable the lock of the communication device;

processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;

processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;

processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;

processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and,

15

whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

2. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of processing operational instructions for at least a personal computer (PC), a cellphone, a smartphone, [], or a handheld scanner.

3. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal to lock, unlock, or disable the lock of the communication device.

4. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition.

5. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of at least short-range wireless radio frequency near-field communication (NFC).

6. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal from at least chemical sensor, biological sensor, motion sensor, biometric sensor, [], or human sensor.

7. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal from at least one of chemical, biological, radiological, nuclear, or explosives detection.

8. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection.

9. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device.

10. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of the operational and functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.

11. A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of:

processing instructions to lock, unlock, or disable the lock of the communication device;

processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;

processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicles ignition system;

processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;

16

processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and,

whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, and [] providing feedback of the execution, and storing the feedback into memory.

12. The central processing unit (CPU) of claim 11, capable of processing operational instructions for at least one of a personal computer (PC), a cellphone, a         smartphone,         a         laptop,         or         a         handheld         scanner.

13. The central processing unit (CPU) of claim 11, capable of processing operational instructions to lock, unlock, or disable the lock of the communication                                                                                   device.

14. The central processing unit (CPU) of claim 11, capable of processing operational instructions of at least fingerprint recognition, facial recognition, iris recognition,                          or                          retina                          recognition.

15. The central processing unit (CPU) of claim 11, capable of processing operational instructions from short-range wireless radio frequency near-field communication                                                                                   (NFC).

16. The central processing unit (CPU) of claim 11, capable of processing operational instructions from at least chemical sensor, biological sensor, motion sensor,     biometric     sensor,     signature     sensor,     or     human     sensor.

17. The central processing unit (CPU) of claim 11, capable of processing operational instructions from at least chemical, biological, radiological, nuclear, or                          explosives                          detection.

18. The central processing unit (CPU) of claim 11, capable of processing operational instructions through at least a Bluetooth, a Wi-Fi, a satellite, a cellular,                     or                     GPS                     connection.

19. The central processing unit (CPU) of claim 11, capable of processing operational instructions of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection

device,        or        another        communication        device.
   20. The central processing unit (CPU) of claim 11, capable of processing
operational instructions of functional execution of instructions; capable of
providing feedback of the execution; and, capable of storing the feedback into
memory.

To support Plaintiff's claim in *Golden v. Google, LLC* NDC Case No. 26-0831 that Google is producing or manufacturing Plaintiff's '287 patent process under 35 U.S. Code § 271(g) for his patented central processing unit (CPU), and Plaintiff's patented "transceiver", which performs substantially the same 'function'; in substantially the same 'way'; to achieve substantially the same 'result' as the Google android operating system; and how the Google android operating system manages Bluetooth connections, Plaintiff asserted independent claims 4, 5, and 6 of Plaintiff's '287 patent;

4. A communication device comprising:
    at least one central processing unit (CPU);
    at least one of a Bluetooth connection, a cellular connection, [] in communication with the at least one CPU;
    at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to [] a vehicle, [] send signals to lock or unlock doors, send signals to control components of a vehicle, [] such that the communication device is capable of communicating, monitoring, detecting, and controlling.

5. A monitoring device, comprising:
    at least one central processing unit (CPU);
    at least one of a Bluetooth connection, a cellular connection, [] in communication with the at least one CPU;
    at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to [] a vehicle, [] send signals to lock or unlock doors, send signals to control components of a vehicle, [] such that the communication device is capable of communicating, monitoring, detecting, and controlling.

6. A monitoring equipment, comprising:
    at least one central processing unit (CPU);
     at least one of a Bluetooth connection, a cellular connection, [] in communication with the at least one CPU;
    at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to [] a vehicle, [] send signals to lock or unlock doors, send signals to control components of a vehicle, [] such that the

communication device is capable of communicating, monitoring, detecting, and controlling.

and, also asserted independent claims 1, and 11; and dependent claims 8, and 18 of Plaintiff's '619 patent for connecting the Google/Waymo Self-Driving vehicle.

1. A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of:
processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle []
processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle[]
processing instructions received through at least one of a Bluetooth, []

8. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal through at least a Bluetooth, connection.

11. A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of:
processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle []
processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle[]
processing instructions to activate a lock, unlock, []; a start, stall, stop, or disabling vehicle means by engaging the operational systems []
processing instructions received through at least one of a Bluetooth,
processing instructions to connect the communication device to the [] vehicle's computer [] system, []
whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution,

18. The central processing unit (CPU) of claim 11, capable of processing operational instructions through at least a Bluetooth, [] connection.

Wireless technologies such as Bluetooth, Wi-Fi, NFC, and others have become essential for seamless communication between devices. Whether pairing a wireless smartwatch, or connecting to the Google/Waymo Self-Driving vehicle, the Google operating system (OS) plays a pivotal role in managing these wireless connections effectively and securely.

The most common wireless technologies managed by Google's operating systems include: Bluetooth; Wi-Fi; Near Field Communication (NFC); and Cellular Networks. The Google Operating System Manages Bluetooth Connections

**Google/Waymo Bluetooth Connection**

To have the doors unlock automatically: On iOS, make sure you've allowed Waymo to use Bluetooth (and that Bluetooth is on) and on Google Android, allow "Nearby devices". Go to Account > Preferences > Unlock automatically to turn it on or off. The car will unlock as you approach it. https://support.google.com/waymo/answer/15535517?hl=en

Waymo One is a ride-hailing service where you simply tap on your Google phone and a car arrives without a driver. Once you download it and set up your account, you're just a few taps away from summoning your ride. https://reviewed.app/app/waymo-one/

Unlocking the Google/Waymo Self-Drive vehicle: You can tap Unlock in the app when the car arrives or you can set the doors to unlock automatically as you approach the car.

To have the doors unlock automatically: On iOS, make sure you've allowed Waymo to use Bluetooth (and that Bluetooth is on) and on Android, allow Nearby devices: 1- Open the Waymo app; 2- Go to the Account tab; 3- Select Preferences, then turn on Unlock automatically.

Once the setting is turned on, the car will unlock as you approach it. When you're ready to go, tap Start ride. Don't forget to buckle up. If needed, you can also access the vehicle's trunk. https://support.google.com/waymo/answer/11020106?hl=en

20

## CONCLUSION

Re-instating Plaintiff's '287 and '619 patents is necessary because there's no final judgement of non-infringement on Google's Tensor CPU/Chipset; no final judgement of non-infringement on Google's Android Operating System; no final judgement of non-infringement on Google's Advanced Driver-Assistance System (ADAS); and no final judgement of non-infringement on Google's Pixel Smartphone connecting through Bluetooth to the Google Pixel Watch and the Google/Waymo Self-Driving vehicle, where the allegations of infringement was asserted against Plaintiff's '287 and '619 patents.

A jury trial should have been this Court's next step. There's nothing else to argue or dispute before trial on whether Google manufactured Plaintiff's patented process abroad and imported the devices into the United States. Two venues have weighed in on construction, the PTAB court and the NDC court; and, the Circuit have issued a preview of direct infringement liability. Google have not disputed or offered any type of affirmative defense to Plaintiff's allegations of infringement under 35 U.S. Code § 271(g) to be tried by a jury. [U.S. CONS'T. 7th Amend.]

Sincerely,

s/ *Larry Golden*

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(M) 8649927104

Email: atpg-tech@charter.net

21

## VERIFICATION

## Pursuant to 28 U.S.C. § 1746

I, Larry Golden, over the age of 18, competent to testify, and having firsthand knowledge of the facts stated herein, do hereby declare, certify, verify, affirm, and state under penalty of perjury under the laws of the United States of America, that the foregoing statements are true, correct, and complete to the best of my understanding, knowledge, and belief, and made in good faith.

Executed and signed this 4th day of May, 2026, with all rights reserved and without recourse and without prejudice; is this "verification" for "Plaintiff's Motion for Reconsideration of Plaintiff's Guaranteed Constitutional Rights to a Trial by Jury".

s/ *Larry Golden*

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-992-7104

22

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 4th day of May, 2026, a true and correct copy of the foregoing "Plaintiff's Motion for Reconsideration of Plaintiff's Guaranteed Constitutional Rights to a Trial by Jury", was served upon the following Defendant via express mail:

> Matthew Warren
>
> Warren LLP
>
> 2261 Market Street, No. 606
>
> San Francisco, CA 94114
>
> Phone: 415-895-2940
>
> Fax: 415-895-2964
>
> Email: matt@warrenllp.com

> s/ *Larry Golden*
>
> Larry Golden, Pro Se
>
> 740 Woodruff Rd., #1102
>
> Greenville, South Carolina 29607
>
> atpg-tech@charter.net
>
> 864-992-7104