# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

## CASE NO: 6:26-cv-00831-LJC

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 992-7104

Email: atpg-tech@charter.net

**SCANNED**

**FILED**

JUN 02 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY GOLDEN,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE, LLC<br><br>Defendant. | **JURY TRIAL DEMANDED**<br><br>**Infringement of a Patented Process under 35 U.S.C. § 154(a)(1) & 35 U.S.C. § 271(g); Shifting of Burden under 35 U.S.C. § 295; Collecting a Reasonable Royalty under 35 U.S.C. § 284; and, Willful Patent Infringement**<br><br>May 30, 2026 |

## PLAINTIFF'S AMENDED COMPLAINT

Pursuant to Judge James Donato's court order, Plaintiff is filing this amended complaint "removing all allegations relating to infringement of U.S. Patent Nos. 10,163,287 and 10,984,619" [Dkt. No. 63] under 35 U.S.C. § 271(a); because the Court believes Plaintiff's complaint "improperly seeks to relitigate claims foreclosed by prior judgements" [Dkt. No. 67].

Although, throughout Plaintiff's complaint Plaintiff repeatedly states he is not attempting to relitigate the prior judgements of twelve Federal Judges who has inferred to say; that with "*modification*", Google's mobile device that is integrated

with, or interconnected to, a CBRNE-H detection capability, infringes Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) device, see *Exhibit A*

In the complaint, Plaintiff made it very clear he does not want to challenge, nor change, the judgements of the twelve Federal Judges. Plaintiff believes the judgements clarifies the 'conditions' for infringement.

The twelve Federal Judges drew their conclusion based on indirect evidence *(Exhibit A)* and reasoning, rather than explicit statements, that Google control the *"modification"* of a common cell phone's integration, or interconnection to a CBRNE-H detection capability with its Google Android Open-Source Operating System [Plaintiff's "transceiver"] that manages Google's wireless communication protocols: Bluetooth, WiFi, cellular, NFC, or GPS, that enables the integration.

> "Qualcomm's role [in the DHS S&T Cell-All initiative] has been to develop a smartphone app and the associated network software for processing data. Smartphone users can download the app from *Google Play* and, eventually, from Apple's iTunes store, so Cell-All will be operational on all phones using either *Google's Android* or Apple's iPhone operating systems".[1]

In the complaint, Plaintiff alleges "Google's intent, while performing work for the Government, with implied authorization or consent to infringe Plaintiff's patents; is to research, develop, manufacture, and commercialized, a *"modified"* cell phone device that is capable of CBRNE-H detection; and which can be used *"ubiquitously"* by at least the 300 million cell phone users that already exist (Qualcomm, 2012) *Exhibit A*

---

[1] Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks Torin Monahana, Jennifer T. Mokosb; Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

Therefore, the Court is correct, it is not necessary to relitigate the subject matter or limitations of Plaintiff's '287 and '619 patents, because Google's infringement theory of "modification before infringement" is covered in Plaintiff's '287 and '619 patents, and twelve Federal Judges issued a final judgement that states, "with *modification*", [Google's] mobile device that is integrated with, or interconnected to, a CBRNE-H detection capability, infringes Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) device. ***Exhibit A***

**Plaintiff's '287 and '619 patents:**

Google's mobile device CPU is design to carry out the operational and functional instructions of the Google android operating system, that manages Google's wireless communication protocols: Bluetooth; Wi-Fi; cellular; NFC; or GPS (All of the listed components are "*native*" to the manufacture of the Google "modified" cell phone.

*Claim 4 of the '287 patent:*
A communication device comprising:
    at least one global positioning system (GPS) connection in communication with the at least one CPU;
    at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;
    at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;
    at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;
    at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and
    at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals [] to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

*Claim 5 of the '287 patent:*
A monitoring device, comprising:
    at least one global positioning system (GPS) connection in communication with the at least one CPU;

3

at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one sensor for chemical, biological, or human detection in communication with the at least one CPU;

one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals [] to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

*Claim 6 of the '287 patent:*

A monitoring equipment, comprising:

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals [] to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

*Claim 1 of the '619 patent:*

A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of:

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

4

whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

2. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of processing operational instructions for at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner.

5. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of at least short-range wireless radio frequency near-field communication (NFC).

6. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

7. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal from at least one of chemical, biological, radiological, nuclear, or explosives detection.

8. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection.

10. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of the operational and functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.

Plaintiff's '287 and '619 patents, claims a communicating, monitoring, detecting, or controlling device that is integrated with, or interconnected to, a CBRNE-H detection capability. *Exhibit A*

Twelve Federal Judges confirmed Google's insisted upon infringement theory of "modification before infringement". What Google failed to disclose is that it is Google who controls the "*modification*" of its mobile devices.

In the complaint Plaintiff alleges Google's "*modified*" cell phones are manufactured, produced, and/or assembled abroad using Plaintiff's patented process; and, Google allegedly infringes Plaintiff's United States patents when the Google "*modified*" cell phones are shipped or imported into the United States. [35 U.S.C. §§ 154(a)(1) & 271(g)]

The Court's next step is to seat a jury to determine the extent of damages.

5

**CONTENTS**

| Page | |
|------|---|
| 9 | CAUSES OF ACTIONS |
| 9 | 35 U.S.C. § 154(a)(1) |
| 10 | 35 U.S.C. § 271(g) |
| 10 | 35 U.S.C. § 295 |
| 11 | 35 U.S.C. § 284 |
| 11 | Willful Patent Infringement |
| 12 | COMPLAINT FOR PATENT INFRINGEMENT |
| 12 | PARTIES |
| 14 | STANDARD FOR REVIEW |
| 14 | JURISDICTION AND VENUE |
| 15 | PATENT ELIGIBILITY AND MUTUAL EXCLUSIVITY |
| 18 | PLAINTIFF'S DEMAND FOR A JURY TRIAL |
| 19 | Damages |
| 21 | Twelve Federal Judges Validates Plaintiff's Infringement Theory |
| 25 | Twelve Federal Judges Identifies Where on the Inside of the Google Devices the Detection Capability is Located |
| 26 | Google's Smartphone Biosensors Submitted to the Courts |
| 27 | Three Administrative Judges at the PTAB Construed the Term *"Built-in, embedded"* to Include a Detection Capability External the Google Devices |
| 29 | GOOGLE *"MODIFIED"* THE "CELL PHONE" FOR INTEGRATION WITH A DETECTION CAPABILITY |

| | |
|---|---|
| 31 | The Cell-All Demonstration Participants and Program Outline |
| 35 | GOOGLE IMPORTS INTO THE UNITED STATES PRODUCTS MADE BY PLAINTIFF PATENTED PROCESS §§ 154(a)(1) & 271(g) |
| 38 | INFRINGEMENT DIFFERENCES BETWEEN SECTIONS 271(a) & 271(g) |
| 41 | GOOGLE ANDROID ECOSYSTEM |
| 43 | GOOGLE / WAYMO'S SELF-DRIVING VEHICLES |
| 45 | *Vehicular Automation *Advanced Driver-Assistance Systems (ADAS) *Software * Perception *Navigation *Applications for Google's Self-Drive Vehicles *Google's Self-Drive Vehicles additional features |
| 49 | COUNT I: Google's "*modified*" Cell Phones |
| 63 | COUNT II: Google's CPU for Apple's "*modified*" Cell Phone |
| 76 | COUNT III: Google's iOS for Apple's "*modified*" Cell Phone |
| 91 | COUNT IV: Google's Megapixel Camera for Google's "*modified*" Cell Phone |
| 107 | COUNT V: Google's GPS for Google's "*modified*" Cell Phone |
| 120 | COUNT VI: Google's Biometric ID for Google's "*modified*" Cell Phone |
| 132 | COUNT VII: Google's Disabling Lock for Google's "*modified*" Cell Phone |
| 145 | COUNT VIII: Google's NFC for Google's "*modified*" Cell Phone |
| 160 | COUNT IX: Google's Watch Series for Google's "*modified*" Cell Phones |

| 179 | COUNT X:<br>Google's Wi-Fi Chips for connecting Google's "*modified*" Cell Phones |
|-----|---|
| 194 | COUNT XI:<br>Google's Wireless Protocols for connecting the Google Watch Series |
| 209 | COUNT XII:<br>Google's Wireless Protocols for connecting Google's "Find My Device" |
| 221 | COUNT XIII:<br>Google's Wireless Protocols for connecting Google's<br>"Android Digital Car Key" |
| 236 | COUNT XIV:<br>Google's Nine "Standard Biosensors" for Google's "*modified*"<br>Cell Phone |
| 253 | COUNT XV:<br>Google's Wireless Protocols for connecting Waymo's Self-Driving Cars |
| 271 | PLAINTIFF'S ALLEGED WILLFUL PATENT INFRINGEMENT |
| 271 | Willful Infringement Requires a Finding of Direct Infringement |
| 272 | Knowledge requirement for Willful Patent Infringement |
| 272 | Under Rule 14(b) |
| 272 | Correspondence and Service of Complaints |
| 273 | Plaintiff's Demand for a Jury Trial to Decide Willfulness |
| 275 | CONCLUSION |
| 277 | PRAYER FOR RELIEF |
| 278 | DEMAND FOR JURY TRIAL |

## CAUSES OF ACTIONS

Plaintiff's amended complaint is made to clarify for the Court, and especially for the Defense the lawful contentions Plaintiff has put forth in this complaint, and to debunk the misdirected and misguided defenses the Defense has filed with this Court in its motion to dismiss. Following are Plaintiff's causes of action; none, of which the Defense have addressed or denied:

- Infringement of a Patented Process under 35 U.S.C. § 154(a)(1);
- Infringement of a Patented Process under 35 U.S.C. § 271(g);
- Shifting of Burden under 35 U.S.C. § 295;
- Collecting a Reasonable Royalty under & 35 U.S.C. § 284; and,
- Willful Patent Infringement.

**35 U.S.C. § 154(a)(1):**

"Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States, and, if the invention is a process, of the right to exclude others from using, offering for sale or selling throughout the United States, or importing into the United States, products made by that process, referring to the specification for the particulars thereof."

On March 14, 2012, the Federal Circuit issued in *Zoltek Corp. v. United States*, No. 2009-5135. Acting *en banc*: "With the full court having vacated its *Zoltek III* decision, the panel addressed the narrower question of whether Lockheed's actions in this case created liability under § 1498(a). The panel voted yes. The panel reasoned that, '[i]f a private party had used Zoltek's patented process to create the resulting product, there would be liability for infringing Zoltek's patent right under 35 U.S.C. § 154(a)(1) and § 271(g). We hold that the Government is subject to the same liability in this case, and that precedent and legislative intent dictate that result.'"

9

**35 U.S.C. § 271(g):**

"Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent…"

Thus, under section 271(g), a party can be liable for infringement for importing into the United States, or selling or using in the United States, a product made by a patented process, *regardless of where the process is performed or where the product was ultimately made*. Congress added section 271(g) to increase protection of U.S. technology industries, specifically the pharmaceutical and biotechnology industries. *See* Kastenmier, *Report to* accompany H.R. 1931 (Apr. 22, 1987). Section 271(g) also sought to conform U.S. patent law to the infringement standards under foreign intellectual-property law. *See* S. Rep. No. 100-83 (1987).

**35 U.S.C. § 295**

"In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds— (1) that a substantial likelihood exists that the product was made by the patented process; and, (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine; the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made."

The Federal Circuit also held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product in question" where the manufacture occurred abroad. *Id*. Part of Congress's solution is laid out in § 295, which shifts the

burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product.

**35 U.S.C. § 284**

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."

Twelve federal judges (nine from the appellate court) were *CORRECT* when they inferred; or came to the conclusion: "infringement of Plaintiff's patents occur when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability". The twelve federal judges were also *CORRECT* in their determination: "the accused devices [] required *"modification"* in order to infringe Plaintiff's patents".

Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery has revealed the defendant Google is responsible for the *"modification"* of a common cell phone to include a CBRNE-H detection capability, and is therefore liable for the misconduct alleged." See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

**Willful Patent Infringement**

For patents, the Supreme Court set the current standard in its 2016 decision in *Halo Electronics, Inc. v. Pulse Electronics, Inc.* The Court described enhanced damages as a "punitive" or "vindictive" sanction reserved for "egregious cases of culpable behavior," using words like "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate."

*Note*: None of the causes of actions listed above have ever been litigated before, therefore a "motion to dismiss" under the doctrines of preclusion is not relevant.

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff alleges the following:

- Infringement of a Patented Process under 35 U.S.C. § 154(a)(1);

- Infringement of a Patented Process under 35 U.S.C. § 271(g);

- Shifting of Burden under 35 U.S.C. § 295;

- Collecting a Reasonable Royalty under & 35 U.S.C. § 284; and,

- Willful Patent Infringement.

This is an action of patent infringement in which plaintiff, Larry Golden ("Golden", "Plaintiff" or "Patent Owner"), hereby asserts the following claims for patent infringement upon shipment or importation of the alleged Google "*modified*" cell phones' described as the "patented process" of Plaintiff's U.S. Patents: [7,385,497]; [8,106,752]; [8,334,761]; [8,531,280]; [RE43,891]; [RE43,990]; [9,096,189]; [9,589,439]; [10,163,287]; [10,984,619]; and [11,645,898]

## THE PARTIES

Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

On information and belief, Google is incorporated in the State of Delaware with a principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043 and does business in this judicial district by, among other things, committing joint (divided) infringement and/or direct—literal patent infringement or infringement under the "doctrine of equivalents"—giving rise to this complaint. Plaintiff also alleges Google's infringement is willful because Google had knowledge of Plaintiff's patents-in-suit and acted with the intent to infringe, since the date of service 10/05/2022 in *Golden v. Google LLC* NDC Case No. 22-5246

12

Google may be served at The Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. Google does business in the State of Texas and in the district.

Google LLC is one of the largest technology companies in the world and conducts product sales, and operations in the District of South Carolina. Google LLC jointly and/or directly, distributes, markets, offers to sell, sells, and/or imports the alleged infringing Google's Tensor Central Processing Units (CPUs) and Google's Tensor Processing Units (TPUs); and Google's Self-Drive Vehicles that comprises Google's Advanced Driver Assistance Systems (ADAS).

Waymo is a subsidiary of Alphabet Inc., Google's parent company. The primary focus of Waymo is developing autonomous vehicle technology. Google initially started the self-driving car project in 2009, which later became Waymo. Waymo benefits from Google's extensive resources and technological expertise. The partnership aims to advance self-driving technology for commercial use and public safety. Waymo operates independently but collaborates with Google on data and AI advancements.

Behind Waymo's operation sits a complex ownership structure. Waymo isn't a scrappy startup — it was born inside Google, spun out under Alphabet, and has since raised more than $27 billion in external and internal capital.

The short answer to who owns Waymo is Alphabet Inc. The Google parent company holds an estimated ~80% of Waymo's equity and retains majority control over the subsidiary's strategic direction. This dominance is structural. Waymo was created inside Google and has never operated independently of Google and Alphabet's financial backing.

Waymo's valuation nearly tripled in under 18 months, jumping from ~$45 billion in October 2024 to $126 billion in February 2026.

## STANDARD FOR REVIEW

Twelve federal judges (nine from the appellate court) stated infringement occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability. Thereby, allegedly infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device; but only when Google modifies the Google *"modified"* cell phone's Android Operating System's connectivity protocols i.e., software apps, Bluetooth, NFC, cellular, internet, GPS, WiFi, etc. of the Google device, in order for the Google *"modified"* cell phone to function as a sensing device for CBRNE-H detection.

Plaintiff has stated a plausible claim for infringement by specifically identifying the Defendant's products and alleging that they perform the same unique function as Plaintiff's patented processes. The Defendant in this case is allegedly liable for infringement of the asserted patents-in-suit under the causes of actions of: 35 U.S.C. § 154(a)(1); 35 U.S.C. § 271(g); 35 U.S.C. § 295; 35 U.S.C. § 284; and, Willful patent infringement.

## JURISDICTION AND VENUE

This is a civil action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(a) and 1338(a).

On May 22, 2017, the U.S. Supreme Court narrowed the scope of proper venue for patent infringement actions for domestic corporations. *See TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, No. 16-341 (May 22, 2017). The *TC Heartland* decision reverses the approach to venue previously adopted by the U.S. Court of Appeals for the Federal Circuit.

The special venue statute for patent infringement actions, 28 U.S.C. § 1400(b), has two provisions permitting venue: "[1] where the defendant resides,

or [2] where the defendant has committed acts of infringement and has a regular and established place of business."

Since the enactment of that statute, the Supreme Court consistently has interpreted Section 1400(b)'s first provision of proper venue— "where the defendant resides". *E.g., Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 226 (1957). As a result, a domestic corporation may now be sued for patent infringement only in its state of incorporation or where it has committed acts of infringement and has a regular and established place of business.

## PATENT ELIGIBILITY AND MUTUAL EXCLUSIVITY

Plaintiff's patents and patent claims asserted in this complaint that describes Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) device as a "mobile, consumer, or cellular device that is integrated with, or interconnected to, a CBRNE-H detection capability, have undergone rigorous and extensive examinations and re-examinations:

In 2006, Plaintiff's patent application's subject matter and patent claims were examined under the "secrecy" provisions ordered by the United States Department of Defense (DOD).

In 2010 – 2013, Plaintiff's patent application's subject matter and patent claims were re-examined under the "reissue" provisions of the United States Patent and Trademark Office (USPTO).

In 2014 – 2015, Plaintiff's patent application's subject matter and patent claims were challenged by the United States Department of Homeland Security (DHS) and the United States Department of Justice (DOJ), in an *Inter Partes Review* (IPR) at the United States Patent Trials and Appeals Board (PTAB), of the United States Patent and Trademark Office (USPTO).

In 2013 – 2021, Plaintiff's patent applications' subject matter, patents' claims, and patents' validity were challenged by the United States Department of Justice (DOJ) in the case of *Golden v. US* CFC Case No. 13-307C.

In 2013 – 2021, Google, who performed work for the Government under an implied "authorization or consent", to provide a modified cell phone capable of CBRNE-H detection, was given eight (8) years to appear in the case to protect its interest by failed to do so. Google is "collateral estoppel" from challenging Plaintiff's patents.

In 2022 – 2025, Google failed to adhere to the PTAB's claim term construction of "*built-in, embedded*"; which the PTAB construed as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Google, instead, replaced the PTAB's claim term construction of "*built-in, embedded*" with "modification". Google failed again to inform the Court that Google is allegedly the modifier of the Google "*modified*" cell phone.

In 2026, although Google is "collateral estoppel" from challenging Plaintiff's patents; and especially "collateral estoppel" from challenging Plaintiff's patents on the lower standard of evidence (i.e., preponderance of evidence standard); Google filed a motion to dismiss in this case that was nothing more than another challenge to the validity of Plaintiff's patents under 35 U.S.C. § 101.

> "[a] patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. Anyone challenging the patents validity, must do so on the heightened 'clear and convincing evidence' standard". § 282(a)

Time after time, over the years, and over several of Plaintiff's patents; when the phase "in, on, upon, or adjacent the monitoring equipment", was used to describe the detection capability is placed either inside or outside the monitoring device, the USPTO have always allowed the phase.

Claims are one sentence descriptions, included in a patent, that describe what aspects of the invention are protected by law. There are independent claims and dependent claims. Dependent claims add details to independent claims and are consequently "narrower" than their parent independent claim. The product manufactured by or for the government need only infringe one claim, independent or dependent, to "infringe the entire patent." See *Johns Hopkins University v. CellPro, Inc.*, 152 F3d 1342 (Fed Cir 1998).

In a precedential decision, the U.S. Court of Appeals for the Federal Circuit in *Vascular Solutions*, along with related Teleflex companies (collectively with Vascular Solutions, "Teleflex") *v. Medtronic*, Inc. defined the concept of *"mutual exclusivity"* in patent claims:

> The Federal Circuit held that the district court erred when it determined the asserted claims were *"mutually exclusive"* and indefinite. The Federal Circuit rejected the notion that claims in a patent cannot vary in how they describe the disclosed subject matter or that independent claims must be totally consistent with other independent claims.

The Federal Circuit stated: "The district court's conclusion, in effect, means that (1) claims in a patent cannot vary in the way they claim the disclosed subject matter, and (2) independent claims must be totally consistent with other independent claims. Claiming is not restricted in this way." It emphasized that the art of patent claiming often involves drafting claims in various ways to encompass different aspects of the disclosed subject matter, as long as each claim informs those skilled in the art about the scope of the invention with reasonable certainty.

17

The Federal Circuit instructed the district court to "conduct claim construction on a claim-by-claim basis with the understanding that, at the claim construction stage, the claims are not necessarily '*mutually exclusive*' since each independent claim is a different ordered combination of limitations."

Therefore, when a case is dismissed for preclusion or *Kessler* simply because the same patents was asserted in a previous case, and the individual claims were never examined for infringement, the dismissal is improper "since each independent claim is a different ordered combination of limitations".

In Plaintiff's prior litigation the Courts created a loophole for invalidating Plaintiff's patents without meeting the higher "clear and convincing" evidence standard; without submitting invalidity contentions; without a Markman hearing or claim construction. No law supports this type of loophole creation.

### PLAINTIFF'S DEMAND FOR A JURY TRIAL

Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged throughout this complaint "enough facts to state a claim to relief that is plausible on its face" *Twombly*, 550 U.S. at 570, for Google's alleged infringement of Plaintiff's patented process; whereby, infringement under §§ 154(a)(1) & 271(g) is not predicated on direct infringement of the patented process – a key distinction from application of § 271(a).

Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully" *Iqbal*, 556 U.S. at 678. The Federal Circuit solidified the reach of protection under §§ 154(a)(1) & 271(g) and resolved for the first time the question of whether § 271(g) requires that all steps of a patented process be performed by or at the direction or control of a single entity before infringement liability attaches. As a result of the court's decision, patentees asserted rights under

18

§ 271(g) do not have to prove that a single entity, or one-party exercising direction and control over other entities, was responsible for performing each step of the patented process.

Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal that the defendant is liable for the misconduct alleged." The Federal Circuit also held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product in question" where the manufacture occurred abroad. Part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee has been unable to make a definitive determination on its own. [See 35 U.S.C. § 295].

Patent infringement claims are issues-of-fact tried by a jury under the Seventh Amendment [U.S. CONS'T. 7th Amend]. More than 95% of patent cases are tried by jury. The parties may waive the right to a jury trial and have the court try the case, but such waivers are rare.

**Damages**

Plaintiff is demanding damages for Google's alleged direct infringement under 35 U.S.C. §§ 154(a)(1) & 271(g); direct infringement of Plaintiff's patented "transceiver" under the doctrine of equivalents, and willful infringement, for the unauthorized act of making, using, selling, or importing inventions (i.e., Google's central processing unit, operating system, smartphone, camera, and smartwatch) for Plaintiff's patents that is issued with the presumption of validity (Patent Act § 282).

Damages are a question of fact; thus, a jury will decide damages. The Northern District of California court judge will decide damages if this case is not before a jury. Plaintiff is demanding a jury trial to determine Google's alleged patent infringement damages; and, to recover damages adequate to compensate for the alleged patent infringement. A jury can determine damages, but the presiding judge in this Northern District of California (NDC) court case *Golden v. Google* will determine damages if the case is not heard by a jury.

Plaintiff's alleged damages must be sufficient to compensate for the alleged patent infringement and at least amount to a reasonable royalty for Google's alleged use of Plaintiff's patented processes. Plaintiff allege more consumers start buying Google's alleged infringing products (i.e., Google's central processing unit, operating system, smartphone, camera, or smartwatch) because Plaintiff's patented process has improved them. Therefore, Plaintiff is entitled to those profits that should have belonged to Plaintiff.

The Northern District of California (NDC) court may allow damages in the form of recovery for (1) lost profits, (2) reasonable royalties, and (3) treble damages for Google's alleged willful infringement. This court is tasked with calculating the fair market value of a license for one of the infringing item (i.e., Google's central processing unit, operating system, smartphone, camera, or smartwatch) and then multiply that value by the number of items that infringed.

The Federal Circuit explained under "the concept of 'willfulness' requires the jury to find no more than deliberate or intentional infringement." *Halo Elecs., Inc. v. Pulse Elecs. Inc.*, 579 U.S. 93, 103 (2016). Plaintiff intends to show the jury Plaintiff is entitled to enhanced damages because Plaintiff believes Google's conduct to be "willful, wanton, malicious, bad-faith, deliberate, [intentional], consciously wrong, flagrant, or — indeed — characteristic of a pirate." (quoting *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 136 S.Ct. 1923, 1932 (2016).

**Twelve Federal Judges Validates Plaintiff's Infringement Theory**

Upon information and belief, there's no need for this Court to continue litigating claims made against Google for the alleged infringement of Plaintiff's patents because twelve Federal Judges (three in the district courts; nine at the federal circuit) have determined infringement of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability.

Twelve Federal Judges repeatedly confirmed arguments that the integration of a CBRNE-H detection capability with a mobile device; infringes Plaintiff's patented CMDC invention.

| Judges | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

21

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 22-1267; determined direct infringement arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court *again* concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" … "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straight-forward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent.

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* Case No. 23-0048 that direct infringement arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Golden v. Samsung Electronics America, Inc.* Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024.

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: (1) through the "Android Team Awareness Kit, ATAK," which is "[b]uilt on the Android operating system," involves "plug-ins" and "app specific software," was "[i]nitially created" by the "Air Force Research Laboratory" together with the "Defense Threat Reduction Agency," and is "available to warfighters throughout the DoD," Appx112 ¶ 55; Appx119, 127; (2) through add-on devices or modifications that utilize the smartphone's built-in camera, Appx111 ¶ 54, Appx124–25; and (3) through nine "standard sensors" which "can be used as 'biosensors,'" Appx126."

"Samsung moved to dismiss Mr. Golden's complaint, arguing that, among other things, Mr. Golden's complaint failed to plausibly state a patent-infringement claim. Appx146–48. More specifically, Samsung argued that Mr. Golden's complaint stated no alleged facts that went beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality. On that basis, Samsung said, there are no plausible allegations Samsung was engaged in directly infringing activities. Appx146–47."

"The district court agreed and dismissed Mr. Golden's complaint with prejudice, concluding, in part, that "[t]he allegations that his patents cover the identified functionalities included in Samsung's products are wholly unsupported and implausible on their face." Golden, 2023 WL 3919466, at *2."

"We reject Mr. Golden's appeal arguments and therefore affirm the district court's dismissal of his complaint."

The Northern District of California Court Judge Haywood S. Gilliam, Jr. in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Government arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss with Leave to Amend" Document 41 Filed 08/10/23; the then presiding Judge Haywood S. Gilliam, Jr. agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The Northern District of California Court Judge Rita F. Lin in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Gov't arises when there's a combined ATAK software; CBRN plugins; CPU, and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68 Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The United States Court of Appeals; Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 24-2024; determined infringement occurs when a [Google] mobile, consumer, or cellular device is integrated with, or interconnected to, Draper's CBRNE detection capability.

In *Golden v. Google LLC.*, Case No. 24-2024, Dkt. 41; filed 06/25/2025, three Federal Circuit judges again confirm, infringement of Plaintiff's patented CMDC device occurs when a mobile, consumer, or cellular device, is integrated with, or

24

interconnected to a CBRNE detection capability. The Circuit's opinion includes the following:

"We conclude that the district court did not err in finding that Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1;

"Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1; see also *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding no infringement when the accused products "do not infringe without modification—the modification of installing the required software."). Mr. Golden's first theory of infringement requires the *use of the third-party app* "ATAK-CIV" for at least two limitations of each asserted claim. App'x 300–302 ¶¶ 56 63; see also App'x 400–407.

### Twelve Federal Judges Identifies Where on the Inside of the Google Devices the Detection Capability is Located

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* Case No. 23-0048 that direct infringement arises *"through nine "standard sensors" which "can be used as 'biosensors,'"* Appx126.":

In *Golden v. Samsung Electronics America, Inc.* Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024.

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: [] and (3) *through nine "standard sensors" which "can be used as 'biosensors,'"* Appx126."

25

Samsung admits in the Northern District of California Court in *Golden v. Samsung* Case No. 23-0048; and Google admits in the Northern District of California Court in *Golden v Google* Case No. 22-5246 that Mr. Golden's complaints alleged *"nine standard sensors which can be used as biosensors"*.

Samsung & Google also admits the *"nine standard sensors which can be used as biosensors"*, is found within each of Samsung's and Google's accused instrumentalities. Samsung and Google further admit, it is making, offering for sell, selling, and purportedly importing the Samsung and Google smartphones that include the *"nine standard sensors which can be used as biosensors"* and performs the accused detector/sensor functionality.

If the Circuit had read Plaintiff's pleadings, the Circuit would have realized the Northern District of California court, and the U.S. Court of Appeals for the Federal Circuit; both determined the *"modified"* cell phones of Samsung and Google

---

**Google's Smartphone Biosensors Submitted to the Courts:**

1. Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
2. Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
3. Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
4. Microfluidic cassette: Interchangeable cassettes with varying assays
5. VIS-NIR spectrometer: Food freshness; Melanoma
6. NNAP Electrodes: Toxic metals and Organic pollutants in water
7. Optical Waveguide: Pathogens in water and food
8. Back and front camera: Colorimetric analysis; Image analysis
9. Microphone: Voice recording stress levels

---

include the *"nine standard sensors which can be used as biosensors"*.

26

**Three Administrative Judges at the PTAB Construed the Term *"Built-in, embedded"* to Include a Detection Capability External the Google Devices**

The United States Department of Homeland Security (DHS) and the United States Department of Justice (DOJ) in *Golden v. US* CFC 13-307C petition the United States Patent Trials and Appeals Board (PTAB) to invalidate certain patent claims of Plaintiff's patents.

In the PTAB's "Final Written Decision" (Oct. 1, 2015) construed the claim term "built-in, embedded" as "something that is an integral part of the device".

Throughout, this complaint, Plaintiff have pleaded enough facts to support Google's *"modified"* cell phone that "include within" or have "dispose within", a *"modified"* Google camera for CBRNE-H detection; and, an Google *"modified"* cell phone that "incorporate into", or is "connected to", a *"modified"* Google watch for CBRNE-H detection, directly infringes, and/or infringes under the doctrine of equivalents, Plaintiff's patented CMDC device.

In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015.
"In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below.

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

Following are Plaintiff's patent claims that support his ownership rights to a mobile, consumer, or cellular device (i.e., CMDC device) that is integrated with, or interconnected to [IPR claim construction for the term "built-in, embedded"], a CBRNE-H detection capability.

**U.S. Patent No: 9,096,189**

1. A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising:

at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, [] a cell phone detection device ...;

a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, [] a cell phone detection device ...;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF).

**U.S. Patent No: 9,589,439**

23. A cell phone comprising:

a central processing unit (CPU) for executing and carrying out the instructions of a computer program;

a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device;

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone;

28

whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone at least one of a chemical sensor, a biological sensor …

Plaintiff alleges Google *"modified"* the cell phone to include an internal camera biosensor and an external—to the Google smartphone—Google Pixel Watch for chem/bio detection.

Claim 23 of Plaintiff's '439 patent claims both the internal ("at least one of a chemical sensor, a biological sensor … being disposed within") and an external ("the cell phone detection device … capable of being [] adjacent the cell phone"); detection capability. Google's *"modified"* cell phones are designed to perform these detection functions.

## GOOGLE *"MODIFIED"* THE "CELL PHONE" FOR INTEGRATION WITH A DETECTION CAPABILITY

Google must admit, infringement of Plaintiff's communicating, monitoring, detecting and controlling device is infringed when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability.

Google must also admit, infringement of Plaintiff's communicating, monitoring, detecting and controlling (CMDC) device is infringed when a mobile, consumer, or cellular device is "modified by Google" to enable the integration of, or interconnection with, a CBRNE-H detection capability.

Google's argument is: it is not Google itself who is the party responsible for *"modifying"* the cell phone to function as a CBRNE-H detection device. Google is accused of "making" the alleged infringing *"modified"* cell phone products.

29

The United States impliedly authorized and consented to Google *"modifying"* the cell phone to include a CBRNE-H detection capability. Under the Department of Homeland Security's Science and Technology Directorate (DHS S&T), BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative [published 10/30/2007], Google was impliedly authorized to commercialize (i.e., to use, offer for sell, sell, or import for sell) Plaintiff's patented CMDC device.

> "… biological and chemical sensors could be effectively integrated into common cell phone devices and made available to the American public on a voluntary basis, the Nation could potentially benefit from a sensor network with more than 240M sensors. Through this BAA, HSARPA is seeking to accelerate advances in miniaturized biological and chemical sensing (e.g. laboratories on a chip) with integration into common device(s) and a communication systems concept for large scale multi-sensor networks. This proof of concept should be capable of detecting hazardous biological and/or chemical materials with eventual expansion to the detection of explosive and eventually radiological materials…" "***The proposed concept should develop a miniaturized sensor, device and system…***" [DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*] "Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks – ScienceDirect"

> "[A]s a Qualcomm representative argued: "Let's take advantage of the 300 million cell phones that are out there today. They're always with us" (Hoffman, 2011) … "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a)" … "DHS presentations at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center event conveyed that next generation, sensor-embedded phones would roll out gradually over the next few years and, as with cameras in phones, would soon become standard (U.S. Department of Homeland Security, 2011a)."



**The Cell-All Demonstration Participants and Program Outline**

- John Verrico [Event Host]; Chief of Media Relations, DHS, S&T: Introduction to "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability".

- Chief Corey Rose [Location Host]; Los Angeles Fire Department: Host location for the demonstration of "mobile devices (i.e., cell phones, smartphones, CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability".

- Stephen Dennis, Technical Director for the Homeland Security Research Project Agency (HSARPA) and Project Manager for the "DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*" initiative: *Phase II*

of the *Cell-All* initiative advances the mobile devices (i.e., cell phones, smartphones, or CMDC devices) from devices that include CBRNE sensors "embedded" within the devices (*Phase I*), to mobile devices that include CBRNE detectors and/or sensors remote the mobile devices (i.e., cell phones, smartphones, or CMDC devices). (*Phase II*)

- Dr. Jing Lee, Principal Investigator, NASA Ames Research Center: In partnership with the DHS S&T *Cell-All* team for the development of "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a Chem/Bio medical health detection capability". [NASA acquired a license from the medical industry]

- Debra Deininger, Synkera Technologies, Inc.: In partnership with the DHS S&T *Cell-All* team for the development of "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability". Previous work, through a Small Business Innovation Research (SBIR) project, for the miniaturization of sensors.

- Doug Hoffman, Program Manager, Qualcomm: Qualcomm was awarded the *Cell-All* contract, and designated the prime contractor's position responsible for delivering the improved upon cell phones; that include improved upon CPUs; wireless modems; operating systems; and miniaturized sensors for CBRNE detection.

- Chris Needs, Product & Control Manager, NC4: Middleman service for the for the "DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*" initiative responsible for monitoring, identifying location, notifying, alerting, and transmitting data.

- John Verrico [Event Host]; Chief of Media Relations, DHS, S&T: Setting the scenario for a live demonstration of "mobile devices (i.e., cell phones,

smartphones, or CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability".

- Chief Corey Rose [Location Host]; Los Angeles Fire Department and Chris Needs, Product & Control Manager, NC4; narrates the live demonstration of "mobile devices (i.e., cell phones, smartphones, CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability".

- John Verrico [Event Host]; Chief of Media Relations, DHS, S&T interviews Stephen Dennis, Technical Director for the Homeland Security Research Project Agency (HSARPA) and Project Manager for the "DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*" initiative; post the live demonstration.

- Panel assembled for Q&A: Panel participants are: Chief Corey Rose [Location Host]; Los Angeles Fire Department; Stephen Dennis, Technical Director for the Homeland Security Research Project Agency (HSARPA) and Project Manager for the "DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing*" initiative; Dr. Jing Lee, Principal Investigator, NASA Ames Research Center; Debra Deininger, Synkera Technologies, Inc.; Doug Hoffman, Program Manager, Qualcomm; and, Chris Needs, Product & Control Manager, NC4.

- John Verrico [Event Host]; Chief of Media Relations, DHS, S&T: Closing remarks and thanks to everyone involved in making the live demonstration of "mobile devices (i.e., cell phones, smartphones, or CMDC devices), that are integrated with, or interconnected to, a CBRNE detection capability" a success.

The government's authorization of or consent to a contractor's infringing activity may be express or implied. *TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060

(Fed. Cir. 1986); *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 901 (Ct. Cl. 1976).

In *Larson v. United States*, the Claims Court recognized that implied authorization "may be found under the following conditions: (1) the government expressly contracted for work to meet certain specifications; (2) the specifications cannot be met without infringing on a patent; and (3) the government had some knowledge of the infringement." *Larson*, 26 Cl. Ct. at 370 (citing *Bereslavsky v. Esso Standard Oil Co.*, 175 F.2d 148, 150 (4th Cir. 1949); *Carrier Corp. v. United States*, 534 F.2d 244, 247–50 (Ct. Cl. 1976); *Hughes*, 534 F.2d at 897–901).

The DHS S&T pursued what's known as cooperative research and development agreements with four cell phone manufacturers: Qualcomm, LG, Apple, and Samsung. The written agreements, are designed to bring together a private company and a government agency for a specific project, often to accelerate the commercialization of technology developed for government purposes.

Under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative, three teams: Qualcomm, the National Aeronautics and Space Administration (NASA), and Rhevision Technology perfected their specific area of expertise. Qualcomm engineers specialize in miniaturization and know how to shepherd a product to market. Scientists from the Center for Nanotechnology at NASA's Ames Research Center have experience with chemical sensing on low-powered platforms, such as the International Space Station, and technologists from Rhevision have developed an artificial nose—a piece of porous silicon that changes colors in the presence of certain molecules, which can be read spectrographically:

> "Rhevision Technology, a three-year-old San Diego-based
> startup, is developing advanced optical technology that Rhevision
> founder Yu-Hwa Lo invented in his optics laboratory at UC San

Diego. Their concept is to combine Rhevision's optics with a "porous silicon artificial nose" developed in the laboratory of UC San Diego Professor Michael Sailor. The millimeter-sized sensors are based on "nanophase semiconductors" developed by Sailor's group, which are composed of nanoparticles that change color in the presence of certain molecules. Rhevision demonstrated how it has integrated its bio-inspired liquid lens technology with a cell phone camera systems to basically turn a cell phone camera into an extremely high-resolution wireless microscope. Rhevision uses its system to precisely inspect and measure color changes in the chemical sensor and compare the results with known toxic compounds."

"Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded "sleeve" for phones—that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."

"DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung—with the objective of accelerating the 'commercialization of technology developed for government purposes'" (U.S. Department of Homeland Security, 2010).

## GOOGLE IMPORTS INTO THE UNITED STATES PRODUCTS MADE BY PLAINTIFF'S PATENTED PROCESS [35 U.S.C. §§ 154(a)(1) & 271(g)]

Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful *"modified"* cell phones, that include their own central processing units (CPUs), are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own central processing units (CPUs)] https://news.ycombinator.com/item?id=28423983

In *Syngenta Crop Protection LLC v. Willowood LLC, et al.*, the US Court of Appeals for the Federal Circuit held in a case of first impression that infringement liability under 35 U.S.C. § 271(g) does not require a single entity to perform all steps of the patented process. *See* No. 2018-1614 (Fed. Cir. Dec. 18, 2019) (*"Syngenta"*). The Federal Circuit's decision strengthens process claims' usefulness against accused infringers (i.e. Google) who manufacture a patented product [such as the Google Pixel smartphone] abroad and import it into the US. Sections 154(a)(1) & 271(g) identifies acts of infringement use of a patented process:

*35 U.S.C. § 154(a)(1):*
> "Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States, and, if the invention is a process, of the right to exclude others from using, offering for sale or selling throughout the United States, or importing into the United States, products made by that process, referring to the specification for the particulars thereof."

On March 14, 2012, the Federal Circuit issued in *Zoltek Corp. v. United States*, No. 2009-5135. Acting *en banc*: "With the full court having vacated its *Zoltek*

*III* decision, the panel addressed the narrower question of whether Lockheed's actions in this case created liability under § 1498(a). The panel voted yes. The panel reasoned that, '[i]f a private party had used Zoltek's patented process to create the resulting product, there would be liability for infringing Zoltek's patent right under [35 U.S.C.] § 154(a)(1) and § 271(g). We hold that the Government is subject to the same liability in this case, and that precedent and legislative intent dictate that result.'"

*35 U.S.C. § 271(g):*

"Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent..."

Thus, under section 271(g), a party can be liable for infringement for importing into the United States, or selling or using in the United States, a product made by a patented process, ***regardless of where the process is performed or where the product was ultimately made.*** Congress added section 271(g) to increase protection of U.S. technology industries, specifically the pharmaceutical and biotechnology industries. *See* Kastenmier, *Report to* accompany H.R. 1931 (Apr. 22, 1987). Section 271(g) also sought to conform U.S. patent law to the infringement standards under foreign intellectual-property law. *See* S. Rep. No. 100-83 (1987).

*35 U.S.C. § 295*

"In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds— (1) that a substantial likelihood exists that the product was made by the patented process; and, (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine; the product shall be presumed to have been so made, and the burden of establishing that the

product was not made by the process shall be on the party asserting that it was not so made."

The Federal Circuit also held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product in question" where the manufacture occurred abroad. *Id.* Part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product.

## INFRINGEMENT DIFFERENCES BETWEEN SECTIONS 271(a) & 271(g)

In addition, §§ 271(b) and 271(c) define indirect infringement, creating vicarious liability for those who induce or contribute to acts of direct infringement. Although § 271(a) provided strong protection for patent owners against purely domestic infringement, the patent laws did not protect against infringing acts occurring outside of the US. (See § 271(a) ("within the United States").

This gap in protection was highlighted in the US Supreme Court's *Deepsouth Packing Co. v. Laitram Corp.* decision, which held that exporting components of a patented product for assembly abroad did not constitute direct infringement, reasoning that a patented system is made only after final assembly. *See* 406 U.S. 518, 529- 32 (1972). Since final assembly was performed abroad, there could be no infringement under § 271(a).

As world trade and globalization continued to expand in the 1980s and 1990s, it became clear that patent owners in the US were more vulnerable than ever to infringers abroad. In response, US Congress broadened the scope of infringing activities through legislative amendments to the Patent Act, adding §§ 271(f) in 1984 and 271(g) in 1998. *See Kastenmier*, "Section-By-Section Analysis of H.R. 6286,

38

Patent Law Amendments Act of 1984," Congressional Record of October 1, 1984 at H10525 to H10529. Section 271(g) provides that:

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer."

Thus, anyone who imports into the US, or sells or uses in the US, a product made by a patented process – regardless of where the process was performed or where the product was assembled – is liable for infringement.

The district court rejected Syngenta's § 271(g) claims, finding that § 271(g) requires that all steps of the patented process be performed by a single entity. This requirement limits direct infringement liability only to circumstances "where all steps of a claimed method are performed by or attributable to a single entity." The district court believed that the single-entity requirement present for method claims under §§ 271(a) and (b) under cases such as *Limelight* and *BMC* carried over to § 271(g). *See Akamai Techs. v., Limelight Networks, Inc.*, 572 U.S. 915, 921-22 (2014) ("Limelight"); *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1379–81 (Fed. Cir. 2007)

The Federal Circuit reversed. First, the court interpreted § 271(g) as written, explaining that "nothing in this statutory language suggests that liability arises from practicing the patented process abroad. Rather, the focus is only on acts with respect to products resulting from the patented process." *Syngenta* at *23. Accordingly, whether that process is practiced by a single entity is immaterial to the analysis.

Second, the court held that comparison to the language of other parts of § 271 supported its conclusion. The court rejected *Willowood's* extension argument based on § 271(a) and the *Limelight* decision because, as noted above, infringement under

§ 271(g) is not predicated on direct infringement of the patented process – a key distinction from application of § 271(a) to method claims. The court also applied the same logic to distinguish §271(f) from § 271(g), stating that if Congress had wanted to require a single-entity requirement under 271(g) they "knew how to do so" given the single-entity requirement under 271(a) and 271(f).

Third, the Federal Circuit noted that the legislative history demonstrates that Congress did not enact § 271(g) to provide for identical rights to those enjoyed by patentees under § 271(a) with respect to process patents. Rather, Congress made clear that § 271(g) "is prompted by the use of patented processes in other countries followed by the importation of the resulting products into this country" and simply "extend[s] protection to the products" made by such a process.

Therefore, in *Syngenta*, the Federal Circuit further solidified the reach of protection under § 271(g) and resolved for the first time the question of whether § 271(g) requires that all steps of a patented process be performed by or at the direction or control of a single entity before infringement liability attaches. As a result of the court's decision, patentees asserted rights under § 271(g) do not have to prove that a single entity, or one-party exercising direction and control over other entities, was responsible for performing each step of the patented process.

The Federal Circuit also held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product in question" where the manufacture occurred abroad. *Id.* Part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee has been unable to make a definitive

determination on its own. See 35 U.S.C. § 295. The court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process." [*Syngenta*]

In *Bayer AG v. Housey Pharmaceuticals, Inc.*, the defining case for § 271(g) jurisprudence, the Federal Circuit held that to have a claim under § 271(g), an imported product must be physical and tangible *Bayer AG v. Housey Pharmaceuticals, Inc.*, 340 F.3d 1367 (Fed. Cir. 2003). The Federal Circuit in *Bayer* required that an imported product made by a process patented in the U.S. must be physical and tangible to be eligible for an infringement claim under § 271(g). The Federal Circuit added another requirement in *NTP* that the process patent must describe a production process, not a distribution or transmission process.

The subsequent decisions by the district courts of California in *CNET* and *Ormco* remedied the Bayer problem by holding that digital information stored in computer readable media is a physical product covered under § 271(g), thereby circumventing Bayer's physical and tangible requirement and increasing the extraterritorial protection of process claim.

## GOOGLE ANDROID ECOSYSTEM

Google is the "mastermind" to an entire process that includes hundreds of "actors" performing one or more of the required steps, which increases Google's potential liability tremendously. Google's potential liability is an extension from all the Actors in Google's Android Ecosystem performing a required step.

The ecosystem of Android refers to the interconnected elements that form the Android platform, creating a rich environment for developers, users, manufacturers, and other stakeholders. This ecosystem encompasses hardware, software,

41

developers, users, and various services that together contribute to the functioning and growth of the Android platform. These elements depend on each other to provide a seamless and integrated experience for users.



Android's open nature allows for seamless integration with a wide range of devices and services. From smartwatches to cars, Android supports cross-device connectivity and synchronization. Services like Google Assistant offer a unified experience across devices, leveraging machine learning to provide help and personalized interactions.

Android is a universal operating system as it is running on a wide range of devices including from cheaper ones to premium gadgets. Such devices differ in both hardware and screens – they range from low-cost, feature-packed feature phones to high-end, protective tablets and smartphones.

The beating heart of the Android ecosystem lies within the Android Operating System (OS). This powerful and intuitive platform is tailored for touchscreen

devices like smartphones and tablets, offering a wide range of functional intricate computational tasks, with its user-friendly and seamless navigation. The Android OS empowers users to personalize their experience to match their unique preference.

Google Android ecosystem drives commoditization of mobile

As of 2023, there are approximately 3 billion active users of the Android operating system.

- Android share of the global smartphone market, estimated at around 70-75%.
- It is the most widely used mobile operating system worldwide.

## GOOGLE / WAYMO'S SELF-DRIVING VEHICLES

Plaintiff names the Google/Waymo Self-Drive Vehicle as the alleged infringing product instead of listing the individual elements that enables the vehicle to function autonomously or semi-autonomously. Plaintiff will provide enough

factual evidence to show Google's Self-Drive Vehicle cannot function without the inclusion of Plaintiff's stall, stop, or vehicle slow-down system.

Waymo LLC, formerly known as the Google Self-Driving Car Project, is an American autonomous driving technology company headquartered in Mountain View, California. It is a subsidiary of Alphabet Inc., Google's parent company.

The company traces its origins to the Stanford Racing Team, which competed in the 2005 and 2007 Defense Advanced Research Projects Agency (DARPA) Grand Challenges. Google's development of self-driving technology began in January 2009, led by Sebastian Thrun, the former director of the Stanford Artificial Intelligence Laboratory (SAIL), and Anthony Levandowski, founder of 510 Systems and Anthony's Robots. After almost two years of road testing, the project was revealed in October 2010.

In fall 2015, Google provided "the world's first fully driverless ride on public roads ". In December 2016, the project was renamed Waymo and spun out of Google as part of Alphabet.

In October 2020, Waymo became the first company to offer service to the public without safety drivers in the vehicle. Waymo, as of 2025, operates commercial robotaxi services in Phoenix (Arizona), San Francisco (California), Silicon Valley (California), Los Angeles (California), Atlanta (Georgia), Miami (Florida), and Austin (Texas) with new services planned in New York, Washington, D.C., and Tokyo, Japan.

City mapping in preparation for new services, as of July 2025, is taking place in various cities in the United States including, Boston, Nashville, New Orleans, Dallas, Las Vegas, Philadelphia, and San Diego, with pre-mapping preliminary work now in progress in Orlando, Houston, San Antonio. As of April 2025, it offers over 250,000 paid rides per week, totaling over 1M miles mth.

44

Waymo is run by co-CEOs Tekedra Mawakana and Dmitri Dolgov. The company raised US$5.5 billion in multiple outside funding rounds by 2022 and raised $5.6 billion funding in 2024. Waymo has or had partnerships with multiple vehicle manufacturers, including Stellantis, Mercedes-Benz Group AG, Jaguar Land Rover, and Volvo Cars. (References are listed at the end of this complaint)

**Vehicular Automation**

Vehicular automation is using technology to assist or replace the operator of a vehicle such as a car, truck, aircraft, rocket, military vehicle, or boat. Assisted vehicles are semi-autonomous, whereas vehicles that can travel without a human operator are autonomous. The degree of autonomy may be subject to various constraints such as conditions. Autonomy is enabled by advanced driver-assistance systems (ADAS) of varying capacity.

Related technology includes advanced software, maps, vehicle changes, and outside vehicle support.

Autonomy presents varying issues for road, air, and marine travel. Roads present the most significant complexity given the unpredictability of the driving environment, including diverse road designs, driving conditions, traffic, obstacles, and geographical/cultural differences.

Autonomy implies that the vehicle is responsible for all perception, monitoring, and control functions.

**Advanced Driver-Assistance Systems (ADAS)**

ADAS are technologies that assist drivers with the safe operation of a vehicle. ADAS may provide adaptive cruise control, assist in avoiding collisions, alert drivers to possible obstacles, warn of lane departure, assist in lane centering, incorporate satellite navigation, provide traffic warnings, provide navigational

assistance through smartphones, automate lighting, or provide other features. Highway computers would manage the traffic and direct the cars to avoid crashes.

**Software**

Autonomous vehicle software generally contains several different modules that work together to enable self-driving capabilities. The perception module ingests and processes data from various sensors, such cameras, LIDAR, RADAR, and ultrasonic SONAR, to create a comprehensive understanding of the vehicle's surroundings. The localization module uses 3D point cloud data, GPS, IMU, and mapping information to determine the vehicle's precise position, including its orientation, velocity, and angular rate. The planning module takes inputs from both perception and localization to compute actions to take, such as velocity and steering angle outputs. These modules are typically supported by machine learning algorithms, particularly deep neural networks, which enable the vehicle to detect objects, interpret traffic patterns, and make real-time decisions. Furthermore, modern autonomous driving systems increasingly employ sensor fusion techniques that combine data from multiple sensors to improve accuracy and reliability in different environmental conditions.

**Perception**

The perception system is responsible for observing the environment. It must identify everything that could affect the trip, including other vehicles, pedestrians, cyclists, their movements, road conditions, obstacles, and other issues. Various makers use cameras, radar, lidar, sonar, and microphones that can collaboratively minimize errors.

**Navigation**

Navigation systems are a necessary element in autonomous vehicles. The Global Positioning System (GPS) is used for navigation by air, water, and land vehicles, particularly for off-road navigation.

For road vehicles, two approaches are prominent. One is to use maps that hold data about lanes and intersections, relying on the vehicle's perception system to fill in the details. The other is to use highly detailed maps that reduce the scope of real-time decision-making but require significant maintenance as the environment evolves. Some systems crowdsource their map updates, using the vehicles themselves to update the map to reflect changes such as construction or traffic used by the entire vehicle fleet.

Another potential source of information is the environment itself. Traffic data may be supplied by roadside monitoring systems and used to route vehicles to best use a limited road system.

Additionally, modern GNSS enhancement technologies, such as real-time kinematic (RTK) and precise point positioning (PPP), enhance the accuracy of vehicle positioning to sub-meter level precision, which is crucial for autonomous navigation and decision-making.

**Applications for Google's Self-Drive Vehicles include the following:**

- Vehicle tracking system
- Rear-view alarm, to detect obstacles behind.
- Anti-lock braking system (ABS)
- Emergency Braking Assistance (EBA)
- Electronic brake force distribution (EBD)
- Traction control system (TCS)
- Four-wheel drive (AWD)
- Electronic Stability Control (ESC)

47

- Acceleration Slip Regulation (ASR)
- Electronic differential lock (EDL)
- Dynamic steering response (DSR)

These applications use various sensors to intervene when the car senses a possible loss of control. The car's control unit can reduce power from the engine and even apply the brakes on individual wheels to prevent the car from understeering or oversteering. Corrects the rate of power steering system to adapt it to vehicles speed and road conditions.

**Google's Self-Drive Vehicles; additional features include:**

- Adaptive cruise control
- Lane departure warning system
- Assured Clear Distance Ahead
- Adaptive headlamps
- Advanced Automatic Collision Notification
- Intelligent Parking Assist System
- Automatic Parking
- Automotive night vision with pedestrian detection
- Blind spot monitoring
- Driver Monitoring System
- Precrash system
- Safe speed governing
- Traffic sign recognition
- Enhanced or Adaptive cruise control
- Distance control assist
- Automatic emergency braking systems

48

## COUNT I:

### Google's *"modified"* Cell Phones

1. Count I incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for the causes of actions under sections §§ 154(a)(1) & 271(g).

2. Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

3. Upon information, Plaintiff alleges Google *"modified"* the cell phone (i.e., now the Pixel smartphone) device beginning as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

4. Upon information and belief, Plaintiff alleges Google is using Plaintiff's patented process to manufacture and/or produce the Google *"modified"* cell phone under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Google *"modified"* cell phone, infringement occurs when the Google phone is shipped or imported into the United States

5. Upon information, Plaintiff is alleging the Google *"modified"* cell phone infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

6. Plaintiff alleges Google's *"modified"* cell phone was first manufactured or produced using Plaintiff's patented process in response to a government request. Google performed work for the Government to *"modify"* a common cell phone to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing

work "for the Government", with the Government's "authorization or consent", Google, as a third-party contractor, could not be sued for infringement.

7.      Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Google before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs".

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

8.      Upon information and belief, Plaintiff alleges Google's "*modification*" of the cell phone begin abroad and continues to this day. Plaintiff also alleges, Google "*modified*" the cell phone while performing work under a government contract was to avoid infringement liability here in the United States under § 271(a); and Google's "*modification*" of the cell phone was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or

50

made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Google *"modified"* cell phones are shipped or imported into the United States.

9. Upon information and belief, Google continues to make, offer for sell, sell, and purportedly import the Google *"modified"* cell phones (i.e., Pixel smartphones) into the United States that include *"nine standard sensors that are used as biosensors"*.

10. Upon information, twelve Federal Judges infer to say; the Google *"modified"* cell phones that include *"nine standard sensors which can be used as biosensors"* satisfies the patent local rule of identifying where inside the Google *"modified"* cell phones the detection capability is located.

---

**Google's "*nine*" Smartphone Biosensors Submitted to the Courts:**

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

11. Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful *"modified"* cell phones are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with

51

headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones." https://news.ycombinator.com/item?id=28423983

12.   Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Google] is accused of using Plaintiff's patented process to manufacture and/or assemble the Google "*modified*" cell phone under 35 U.S.C. §§ 154(a)(1) & 271(g); Google is tasked with presenting evidence to a jury that Google is (1) not using Plaintiff's patented process; or (2) Google is using Plaintiff's patented process but is not shipping or importing the Google "*modified*" cell phones (i.e., Pixel smartphones) into the United States.

13.   Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Google "*modified*" cell phone infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the device is shipped or imported into the United States.

14.   Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a product [Google's "*modified*" cell phone] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

15.   Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that

the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

16.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Google *"modified"* cell phone] was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
> >
> > (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

17.    Upon information and belief, Google is allegedly infringing under 35 U.S.C. § 271(g); upon shipment and/or importation into the United States the following Google *"modified"* cell phones (i.e., Pixel smartphones): Google Nexus One, Nexus S, Galaxy Nexus, Nexus 4, Nexus 5, Nexus 6, Nexus 5X, Nexus 6P, Pixel, Pixel XL, Pixel 2, Pixel 2 XL, Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, Pixel 4a, Pixel 4a 5G, Pixel 5, Pixel 5a 5G, Pixel 6, Pixel 6 Pro, Pixel 6a, Pixel 7, Pixel 7 Pro, Pixel 7a, Pixel 8, Pixel 8 Pro, Pixel 9, Pixel 9a, Pixel 9 Pro, Pixel 9 Pro

XL, Pixel 9 Pro Fold, Pixel 10, Pixel 10a, Pixel 10 Pro, Pixel 10 Pro XL, and Pixel 10 Pro Fold.

18.  Plaintiff alleges Google have devoted years to *"modifying"* the cell phone into a new, improved upon, or useful device that infringes upon Plaintiff's patented process for a communication, monitoring, detecting, and controlling (CMDC) device, under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Google *"modified"* cell phones are shipped or imported into the United States.

19.  Plaintiff also alleges that when the Google *"modified"* cell phone is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented process. Plaintiff claims the infringement theory that Google is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

20.  Upon information and belief, each individual claim limitation or element that is listed in this section describes Plaintiff's patented process that is allegedly used by Google to manufacture the Google *"modified"* cell phone under 35 U.S.C. §§ 154(a)(1) & 271(g).

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

**21.**     Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

**22.**     Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for a Google "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**23.**     *Plaintiff's Claim Limitations that Cover the Google "modified" Cell Phone*

- A cell phone comprising: [claim 23 of the '439 patent]

- the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; [claim 23 of the '439 patent]

- the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; [claim 23 of the '439 patent]

- wherein each cell phone [] includes a recharging cradle or seat, a front side, a top, a bottom, and a pair of opposed sides [claim 10 of the '752 patent]

- wherein the cell phone [] monitor includes standard keypad functions and more specialized system use (ring tone, email, photos, texting) functions as well as viewing screens [claim 12 of the '752 patent]

- monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween [claim 15 of the '752 patent]

- a cell phone; cell phone detection system with a plurality of interchangeable and integrable sensors detecting for chemical, biological, radiological, nuclear, explosive, contraband; camera, light and video sensors allow the user to access, review and respond to network cell phone detection systems and view the environment from a cell phone [claim 36 of the '891 patent]

- a communication device that is a cell phone, a smart phone, or a PDA that causes the signal to be sent from the cell phone tower to the vehicle [claim 58 of the '891 patent]

- wherein the communication device is a cell phone or a laptop computer [claim 60 of the '891 patent]

- wherein the communication device monitor includes standard keypad functions and more specialized system use functions that are ring tone, email, photos, and texting; and viewing screens. [claim 13 of the '990 patent]

- wherein the communication device has monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. [claim 17 of the '990 patent]

56

- at least one communication device of a cell phone, a cell phone detector case, a smart phone, a handheld, a PDA, a laptop, a physical interface, or a computer terminal at a monitoring site [claim 33 of the '990 patent]

- wherein each cell phone [] includes an internet connection, a GPS connection, a radio frequency (RF) connection, a recharging cradle or seat, a front side, a top, a bottom, a pair of opposed sides and a central processing unit (cpu). [claim 104 of the '990 patent]

- wherein the cell phone; the smart phone; [] includes standard keypad functions and more specialized system use ring tone, email, photos, and texting functions as well as viewing screens. [claim 105 of the '990 patent]

- wherein the cell phone, the smart phone, [] have monitoring equipment comprising a computer, laptop, notebook, PC, and a cell phone for the receipt and transmission of signals therebetween. [claim 109 of the '990 patent]

- wherein the cell phone, the smart phone, [] have at least one of a Bluetooth connection, a Wi-Fi connection, a short- and long-range radio frequency connection, a cellular connection, a satellite connection, or a GPS connection. [claim 117 of the '990 patent]

- wherein each communication device includes at least one of an internet connection, a GPS connection, a radio frequency (RF) connection, or a central processing unit (cpu). [claim 126 of the '990 patent]

- A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: [claim 1 of the '189 patent]

- Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising: [claim 2 of the '189 patent]

- Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone)

interconnected to a product for communication therebetween, comprising: [claim 3 of the '189 patent]

• comprising a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a built-in sensor array or fixed detection device for communication therebetween; [claim 4 of the '189 patent]

• monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween; [claim 5 of the '189 patent]

• monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween; [claim 6 of the '189 patent]

• monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween; [claim 7 of the '189 patent]

• monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween, [claim 8 of the '189 patent]

• monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween; [claim 9 of the '189 patent]

• a communication device of at least one of a mobile communication device, a mobile communication unit, a portable communication device, portable communication equipment, a wired communication device, a wireless communication device, a monitoring site, a monitoring terminal, a web server, a desktop personal computer (PC), a notebook personal computer (PC), a laptop, a satellite phone, a smart phone, a cell phone, a Universal Mobile

58

Telecommunications System (UMTS) phone, a personal digital assistant (PDA), a liquid crystal display (LCD) monitor, a satellite, or a handheld, interconnected to a monitoring equipment for sending signals thereto and receiving signals therefrom; [claim 1 of the '439 patent]

- A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: [claim 13 of the '439 patent]

- A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: [claim 13 of the '439 patent]

- Monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for communication therebetween, the monitoring equipment comprising: [claim 14 of the '439 patent]

- Monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for communication therebetween, the monitoring equipment comprising: [claim 15 of the '439 patent]

- comprising a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a built-in sensor array or fixed detection device for communication therebetween; [claim 16 of the '439 patent]

- monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for the receipt and transmission of signals therebetween; [claim 17 of the '439 patent]

59

- monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for the receipt and transmission of signals therebetween; [claim 18 of the '439 patent]

- monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween; [claim 19 of the '439 patent]

- monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of signals therebetween, [claim 20 of the '439 patent]

- monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of signals therebetween; [claim 21 of the '439 patent]

- A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal, comprising: [claim 22 of the '439 patent]

- the communication device being at least a fixed, portable or mobile communication device, equipped with at least one wired or wireless sensor for the detection of humans; [claim 22 of the '439 patent]

- the communication device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks; [claim 22 of the '439 patent]

- Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a lock for communication therebetween; the monitoring equipment comprising: [claim 1 of the '287 patent]

60

- Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal, digital assistant (PDA) or smart phone interconnected to a vehicle lock for communication therebetween; the monitoring equipment comprising: [claim 3 of the '287 patent]

- A communication device comprising: [claim 4 of the '287 patent]

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 4 of the '287 patent]

- A monitoring device, comprising: [claim 5 of the '287 patent]

- A monitoring equipment, comprising: [claim 6 of the '287 patent]

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 6 of the '287 patent]

- A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of: [claim 1 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of processing operational instructions for at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner. [claim 2 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal to lock, unlock, or disable the lock of the communication device. [claim 3 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal of at least fingerprint recognition, facial recognition, iris recognition, or

retina recognition. [claim 4 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal of at least short-range wireless radio frequency near-field communication (NFC). [claim 5 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor. [claim 6 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal from at least one of chemical, biological, radiological, nuclear, or explosives detection. [claim 7 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection. [claim 8 of the '619 patent]

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device. [claim 9 of the '619 patent.

- The communication device [], comprising at least a central processing unit (CPU), capable of receiving a signal of the operational and functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory. [claim 10 of the '619 patent]

24.   Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT II:

### Google's Central Processing Unit (CPU) for Google's *"modified"* Cell Phone

25.    Count II incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

26.    Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone that include a central processing unit (CPU) is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

27.    Upon information, Plaintiff alleges Google *"modified"* the cell phone (i.e., now the Pixel smartphone) device that include Google's central processing unit (CPU) begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

28.    Upon information and belief, Plaintiff alleges Google is using Plaintiff's patented process to manufacture and/or produce the Google *"modified"* cell phone, that include Google's central processing unit (CPU), under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Google *"modified"* cell phone, that include Google's central processing unit (CPU), infringement occurs when the combination is shipped or imported into the United States.

29.    Upon information, Plaintiff is alleging the Google *"modified"* cell phone, that include Google's central processing unit (CPU), infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Google's central processing unit (CPU), into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

**30.** Plaintiff alleges Google's "*modified*" cell phone, that include Google's central processing unit (CPU), was first manufactured or produced using Plaintiff's patented process in response to a government request. Google performed work for the Government to "*modify*" a common cell phone, that include Google's central processing unit (CPU), and at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Google, as a third-party contractor, could not be sued for infringement.

**31.** Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Google before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs".

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

32.    Upon information and belief, Plaintiff alleges Google's "*modification*" of the cell phone, that include Google's central processing unit (CPU), begin abroad and continues to this day. Plaintiff also alleges, Google "*modified*" the cell phone, that include Google's central processing unit (CPU), while performing work under a government contract is to avoid infringement liability here in the United States under §§ 154(a)(1) & 271(a); and Google's "*modification*" of the cell phone, that include Google's central processing unit (CPU), was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Google "*modified*" cell phones, that include Google's central processing units (CPUs), are shipped or imported into the United States.

33.    Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own central processing units (CPUs), are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own central processing units (CPUs)] https://news.ycombinator.com/item?id=28423983

34.     Upon information, twelve Federal Judges infer to say; the Google *"modified"* cell phones that include Google's central processing units (CPUs), and include *"nine standard sensors which can be used as biosensors"*, satisfies the patent local rule of identifying where inside the Google *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Google central processing unit (CPU), is identified and located inside the Google *"modified"* cell phone.

35.     Upon information and belief, Google continues to make, offer for sell, sell, and purportedly import the Google *"modified"* cell phones (i.e., Pixel smartphones), that include Google's central processing units (CPUs), into the United States that include *"nine standard sensors that are used as biosensors"*.

---

**Google's *"nine"* Smartphone Biosensors Submitted to the Courts**:

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

36.     Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Google] is accused of using Plaintiff's patented process to manufacture and/or assemble the Google *"modified"* cell phone, that include Google's central processing unit (CPU), under 35 U.S.C. §§ 154(a)(1) & 271(g). Google is tasked with presenting evidence to a jury that Google is (1) not using Plaintiff's patented process; or (2) Google is using Plaintiff's patented process but is not shipping or importing the

Google *"modified"* cell phones (i.e., Pixel smartphones), that include Google's central processing unit (CPU), into the United States.

37.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Google *"modified"* cell phone, that include Google's central processing unit (CPU), infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

38.    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a product [Google's *"modified"* cell phone that include Google's central processing unit (CPU)] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

39.    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

40.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Google *"modified"* cell phone that include Google's central processing unit (CPU)] was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

"In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—

> (1) that a substantial likelihood exists that the product was made by the patented process, and

> (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

**41.**    Upon information and belief, Google is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Google "*modified*" cell phones (i.e., Pixel smartphones) that include Google's central processing units (CPUs):

**42.**    Upon information, the Google CPU/Chipset Series include: The first-generation Tensor CPU/Chipset debuted on the Pixel 6 smartphone series in 2021, and was succeeded by the Tensor G2 CPU/Chipset in 2022, G3 in 2023, G4 in 2024 and G5 in 2025; and, is used with the Google Nexus One, Nexus S, Galaxy Nexus, Nexus 4, Nexus 5, Nexus 6, Nexus 5X, Nexus 6P, Pixel, Pixel XL, Pixel 2, Pixel 2 XL, Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, Pixel 4a, Pixel 4a 5G, Pixel 5, Pixel 5a 5G, Pixel 6, Pixel 6 Pro, Pixel 6a, Pixel 7, Pixel 7 Pro, Pixel 7a, Pixel 8, Pixel 8 Pro, Pixel 9, Pixel 9a, Pixel 9 Pro, Pixel 9 Pro XL, Pixel 9 Pro Fold, Pixel 10, Pixel 10a, Pixel 10 Pro, Pixel 10 Pro XL, and Pixel 10 Pro Fold.

**43.**    Upon information, Google's "*modification*" of the cell phone "production process" begins with what is recognized in the industry as the "brains" of the cell

phone. The central processing unit (CPU), or combination thereof, is considered the "brains" of the *"modified"* cell phone device. Google's *modified* cell phone CPUs carry out the operational and functional instructions of the device's computer program. The Google *modified* cell phone's CPU executes instructions from applications and the operating system. It directs the operation of the processor and coordinates activities between the Google *modified* cell phone's CPU and other components, such as memory and input/output devices.

- Google's *"modified"* cell phone central processing unit (CPU): is considered the "brains" of the mobile device (i.e., smartphone).

- Google's *"modified"* cell phone central processing unit (CPU): executes instructions from applications and the operating system, performing calculations and data manipulation. The mobile device can run multiple applications simultaneously without significant performance degradation.

- Google's *"modified"* cell phone central processing unit (CPU): often feature multiple cores, enabling parallel processing and improved multitasking capabilities.

- Google's *"modified"* cell phone central processing unit (CPU): directs the operation of the processor and coordinates activities between the CPU and other components, such as memory and input/output devices. The Mobile CPU manages data storage and retrieval in RAM, ensuring efficient access to information needed by applications: are designed to optimize power consumption, balancing performance with battery life to enhance user experience in portable devices.

- Google's *"modified"* cell phone central processing unit (CPU): architecture refers to the design and organization of the core components of a CPU. It encompasses the instruction set architecture (ISA), microarchitecture, and the physical implementation of the CPU. The ISA defines the set of instructions that the CPU can execute, while the microarchitecture outlines how these instructions are processed. The physical implementation involves the actual manufacturing process and materials used to create the CPU.

Plaintiff is providing below ten years of Google's CPU/Chipset history to illustrate how Google has continued to produce and manufacture, as a standard component of the Google Pixel Smartphones [Google's *modified* cell phone], Plaintiff's patented process for his patented central processing units for mobile devices.

- Pixel 1 (2016): Launched with Qualcomm Snapdragon 821, focusing on performance and efficiency.
- Pixel 2 (2017): Upgraded to Snapdragon 835, enhancing processing power and battery life.
- Pixel 3 (2018): Continued with Snapdragon 845, improving AI capabilities and camera performance.
- Pixel 4 (2019): Featured Snapdragon 855, introducing advanced gaming and multitasking features.
- Pixel 5 (2020): Shifted to Snapdragon 765G for 5G support, balancing performance and cost.
- Pixel 6 (2021): Introduced Google's custom Tensor chip, optimizing AI and machine learning tasks.

- Pixel 6a (2022): Utilized the same Tensor chip as Pixel 6, maintaining performance in a budget model.
- Pixel 7 (2022): Enhanced Tensor G2 chip, improving efficiency and camera processing.
- Pixel 7a (2023): Continued with Tensor G2, offering mid-range performance with flagship features.
- Pixel 8 (2023): Launched with Tensor G3, focusing on advanced AI features and improved overall performance.
- Pixel 8a (2024): Launched with Tensor G3, focusing on advanced AI features and improved overall performance.
- Pixel 9 (2024): Launched with Tensor G4, focusing on advanced AI features and improved overall performance.
- Pixel 9a (2025): Launched with Tensor G4, focusing on advanced AI features and improved overall performance.
- Pixel 10 (2025): Launched with Tensor G5, focusing on advanced AI features and improved overall performance.
- Pixel 10a (2026): Launched with Tensor G4, focusing on advanced AI features and improved overall performance.

44. Plaintiff alleges Google have devoted years to *"modifying"* the cell phone, that include Google's central processing unit (CPU), into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Google *"modified"* cell phones, that include Google's central processing units (CPUs) are shipped or imported into the United States.

45. Plaintiff also alleges that when the Google *"modified"* cell phone, that include Google's central processing unit (CPU), is integrated with, or interconnected to, a

CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented processes. Plaintiff claims the infringement theory that Google is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

46.    Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Google to manufacture the Google *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

47.    Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

48.    Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for a

Google "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**49.** *Plaintiff's Claim Limitations that Cover the Google "modified" Cell Phone that include Google's central processing unit (CPU)*

- wherein each communication device includes at least one of an internet connection, a GPS connection, a radio frequency (RF) connection, or a central processing unit (cpu). [claim 12 of the '990 patent]

- wherein each communication device includes at least one of an internet connection, a GPS connection, a radio frequency (RF) connection, or a central processing unit (cpu). [claim 55 of the '990 patent]

- at least one communication device of a cell phone, a cell phone detector case, a smart phone, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site, and wherein the communication device has a central processing unit (cpu) [claim 125 of the '990 patent]

- at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; [claim 1 of the '189 patent]

- at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; [claim 2 of the '189 patent]

- at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; [claim 13 of the '439 patent]

- at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; [claim 14 of the '439 patent]

- at least one of a central processing unit (CPU), a network processor, or a microprocessor for executing and carrying out the instructions of a computer program or application which is specifically targeted at the networking application domain, for communication between the monitoring equipment and at least one of a multi-sensor detection device, []; [claim 15 of the '439 patent]

- at least one of a central processing unit (CPU), a network processor, or a front-end processor for communication between a host computer and other devices; [claim 22 of the '439 patent]

- wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long range radio frequency (RF) connection, or short-range radio frequency (RF) connection, capable of signal communication with the transmitter of the communication device, the receiver of the communication device, or the central processing unit (CPU). [claim 22 of the '439 patent]

- a central processing unit (CPU) for executing and carrying out the instructions of a computer program; [claim 23 of the '439 patent]

- at least one of a central processing unit (CPU), a network processor, or a front-end processor for communication between the monitoring equipment and the lock; [claim 1 of the '287 patent]

- at least one of a central processing unit (CPU), a network processor, or a front-end processor for communication between the monitoring equipment and the lock; [claim 3 of the '287 patent]

- at least one central processing unit (CPU); [claim 4 of the '287 patent]

- at least one central processing unit (CPU); [claim 5 of the '287 patent]

- at least one central processing unit (CPU); [claim 6 of the '287 patent]

- A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: [claim 11 of the '619 patent]

- The central processing unit (CPU) [], capable of processing operational instructions for at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner. [claim 12 of the '619 patent]

- The central processing unit (CPU) [], capable of processing operational instructions to lock, unlock, or disable the lock of the communication device. [claim 13 of the '619 patent] The central processing unit (CPU) [], capable of processing operational instructions of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition [claim 14 of the '619 patent].

- The central processing unit (CPU) [], capable of processing operational instructions from short-range wireless radio frequency near-field communication (NFC). [claim 15 of the '619 patent]

- The central processing unit (CPU) [], capable of processing operational instructions from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor. [claim 16 of the '619 patent]

- The central processing unit (CPU) [], capable of processing operational instructions from at least chemical, biological, radiological, nuclear, or explosives detection. [claim 17 of the '619 patent]

- The central processing unit (CPU) [], capable of processing operational instructions through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection. [claim 18 of the '619 patent]

- The central processing unit (CPU) [], capable of processing operational instructions of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device. [claim 19 of the '619 patent]

- The central processing unit (CPU) [], capable of processing operational instructions of functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory. [claim 20 of the '619 patent]

50. Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT III:

### Google's Operating System for Google's *"modified"* Cell Phone

51. Count III incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

52. Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include an operating system, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

53. Upon information, Plaintiff alleges Google *"modified"* the cell phone (i.e., now the Pixel smartphone) device that include Google's android operating system

begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

54. Upon information and belief, Plaintiff alleges Google's android operating system performs substantially the same function; in substantially the same way; to achieve substantially the same results, [doctrine of equivalents] as Plaintiff's patented "transceiver". Supreme Court in *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605 (1950).

55. Upon information and belief, Plaintiff alleges Google is using Plaintiff's patented process to manufacture and/or produce the Google "*modified*" cell phone, that include Google's android operating system, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Google "*modified*" cell phone, that include Google's android operating system, infringement occurs when the combination is shipped or imported into the U.S.

56. Upon information, Plaintiff is alleging the Google "*modified*" cell phone, that include Google's android operating system, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the "*modified*" cell phone, that include Google's android operating system, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

57. Plaintiff alleges Google's "*modified*" cell phone, that include Google's android operating system, was first manufactured or produced using Plaintiff's patented process in response to a government request. Google performed work for the Government to "*modify*" a common cell phone, that include Google's android operating system, and at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Google, as a third-party contractor, could not be sued for infringement.

58.     Upon information and belief, Plaintiff alleges Google's "*modification*" of the cell phone, that include Google's android operating system, begin abroad and continues to this day. Plaintiff also alleges, Google "*modified*" the cell phone, that include Google's android operating system, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Google's "*modification*" of the cell phone, that include Google's android operating system, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Google *"modified"* cell phones, that include Google's android operating systems, are shipped or imported into the United States.

59.     Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Google before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs".

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |

| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**60.** Upon information, twelve Federal Judges infer to say; the Google *"modified"* cell phones that include Google's android operating systems, and include *"nine standard sensors which can be used as biosensors"*, satisfies the patent local rule of identifying where inside the Google *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Google android operating system, is identified and located inside the Google *"modified"* cell phone.

> **Google's *"nine"* Smartphone Biosensors Submitted to the Courts**:
>
> - Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
> - Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
> - Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
> - Microfluidic cassette: Interchangeable cassettes with varying assays
> - VIS-NIR spectrometer: Food freshness; Melanoma
> - NNAP Electrodes: Toxic metals and Organic pollutants in water
> - Optical Waveguide: Pathogens in water and food
> - Back and front camera: Colorimetric analysis; Image analysis
> - Microphone: Voice recording stress levels

**61.** Upon information and belief, Google continues to make, offer for sell, sell, and purportedly import the Google *"modified"* cell phones (i.e., Pixel smartphones), that include Google's android operating systems, into the United States that include *"nine standard sensors that are used as biosensors"*.

**62.** Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful *"modified"* cell phones, that include their own operating systems, are assembled abroad by the same company. Foxconn Technology Group in China,

and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own operating systems] https://news.ycombinator.com/item?id=28423983

63.    Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Google] is accused of using Plaintiff's patented process to manufacture and/or assemble the Google "*modified*" cell phone, that include Google's android operating system, under 35 U.S.C. §§ 154(a)(1) & 271(g). Google is tasked with presenting evidence to a jury that Google is (1) not using Plaintiff's patented process; or (2) Google is using Plaintiff's patented process but is not shipping or importing the Google "*modified*" cell phones (i.e., Pixel smartphones), that include Google's android operating system, into the United States.

64.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Google "*modified*" cell phone, that include Google's android operating system, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

65.    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Google's "*modified*" cell phone that

80

include Google's android operating system] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

66.   Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

67.   Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Google *"modified"* cell phone that include Google's android operating system was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
> >
> > (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

68.   Upon information and belief, Google is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the

following Google *"modified"* cell phones (i.e., Pixel smartphones) that include Google's android operating system:

69.    Upon information, Google's *"modified"* cell phone devices that carries as standard, at least that of the Google android operating system that Plaintiff alleges is equivalent to Plaintiff's patented "transceivers". The Google android operating system(s) include; Android 1.0, Android 2.0, Android 3.0, Android 4.0, Android 5.0, Android 6.0, Android 7.0, Android 8.0, Android 9.0, Android 10.0, Android 11.0, Android 12.0, Android 13.0, Android 14.0, Android 15.0, and Android 16.0. that are running on: Google Nexus One, Nexus S, Galaxy Nexus, Nexus 4, Nexus 5, Nexus 6, Nexus 5X, Nexus 6P, Pixel, Pixel XL, Pixel 2, Pixel 2 XL, Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, Pixel 4a, Pixel 4a 5G, Pixel 5, Pixel 5a 5G, Pixel 6, Pixel 6 Pro, Pixel 6a, Pixel 7, Pixel 7 Pro, Pixel 7a, Pixel 8, Pixel 8 Pro, Pixel 9, Pixel 9a, Pixel 9 Pro, Pixel 9 Pro XL, Pixel 9 Pro Fold, Pixel 10, Pixel 10a, Pixel 10 Pro, Pixel 10 Pro XL, and Pixel 10 Pro Fold.

70.    Upon information, the Google *"modified"* cell phone android operating system manages hardware such as the Google *"modified"* cell phone central processing unit (CPU). It provides connections such as: cellular, Wi-Fi, Bluetooth, NFC, and communication with other devices.

Wi-Fi: enables connection to local networks and internet.
Cellular: supports mobile data through 3G, 4G, and 5G networks.
Bluetooth: facilitates short-range communication with other devices.
NFC: allows for contactless transactions and data exchange.

Upon information, the Google *"modified"* cell phone android operating system, performs substantially the same function; in substantially the same way; to achieve substantially the same results as Plaintiff's new, improved upon, and useful "transceiver". In *Graver Tank & Mfg. Co. v. Linde Air Prods., Inc.*, the U.S. Supreme Court

held that a patentee may invoke this doctrine to proceed against the producer of a device if it performs substantially the same function in substantially the same way to obtain the same result. This is often referred to as the *Graver Tank* "triple identity" test for equivalence.

To better understand the equivalency of the production process, features, and functions of the Google android operating system to the Plaintiff's patented transceiver invention, Plaintiff have provided relative bullet points for the Google android operating system and Plaintiff's patented transceiver, below:

*Google android operating system*

• Google's processors are custom-designed CPUs that optimize performance and efficiency.

• Optimized Architecture: Android operating system is designed to work seamlessly with Google's custom ARM-based CPUs, maximizing performance and efficiency.

• Resource Management: The android operating system efficiently manages CPU resources, allocating tasks to ensure smooth multitasking and responsiveness.

• Power Efficiency: Android operating system incorporates power-saving features that help extend battery life while maintaining CPU performance.

• Hardware Integration: Close integration between android operating system and hardware allows for optimized performance in graphics, processing, and machine learning tasks.

• Security Features: Android operating system utilizes hardware-based security features, such as the Secure Enclave, to protect sensitive data processed by the CPU.

- Regular Updates: Google frequently updates android operating system to enhance compatibility and performance with new CPU architectures and features.

- Google's approach to CPU scheduling plays a critical role in delivering the seamless, high-performance experience that users expect across Google android operating system.

- Android operating system software is tightly integrated with the CPU architecture to ensure optimal performance and energy efficiency. The CPU architecture in Pixel phones has significantly evolved over the years.

- Android operating system is an open operating system that runs on hundreds of android devices with ARM-based processors (CPUs).

- A key feature of the Google android operating system operating system is the Assisted GPS. The Pixel phones utilize an inbuilt Assisted GPS chip for location detection. This provides a quick and accurate approximation of the user's location based on satellite information.

*Plaintiff's patented transceiver invention [specifications]*

- 46 is used as a stand-alone scanner … 46 includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu 40…

- wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, or a transceiver…

- FIG. 19 is a perspective view of [] the present invention illustrating the use of a GPS satellite in conjunction with the [] monitoring equipment to relay commands and signals to the cpu or transceiver…

- a central processing unit (cpu), such as cpu 40, or a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones…

84

- A CPU or a transceiver 202 is programmed to receive signals from the cell phone tower 190 and/or to a GPS satellite 204...

- GPS satellite 204 locates and communicates [] signal 212 with the CPU or transceiver...

- The monitoring equipment 138 then transmits a signal 214 to the cell phone tower 190 that communicates with the transceiver 202 and/or CPU [] to initiate or execute any commands...

- GPS satellite 204 that in turn communicates via another signal 224 with the CPU and/or transceiver 202

Android operating system is included in Google's production process for manufacturing the Google Pixel smartphones that Plaintiff alleges infringes the patented process for his invention. See 35 U.S.C. §§ 154(a)(1) & 271(g). The Google android operating system is native to the manufacture of the Google Pixel smartphones, and is a standard component of the Google Pixel smartphone when imported into the United States.

A mobile operating system acts as the vital bridge connecting physical hardware to digital software. It tells the processor to open an app, commands the battery to allocate power. Without this middleman, the Pixel phone would be completely unable to process requests or run the applications users rely on daily. Google handles all development and updates internally.

A Pixel phone rarely works in isolation. The android operating system connects directly to a massive digital marketplace and a broader network of connected devices. This tight integration ensures that managing software, syncing files, and connecting accessories happens with minimal friction.

85

The android operating system stands as a highly secure, exceptionally user-friendly operating system that serves as the absolute foundation of the Pixel phone. It provides a heavily protected environment where millions of people can communicate, work, and manage their daily tasks with confidence. Biometric security measures, such as facial ID and fingerprint ID, ensure that only an authorized user can unlock the device.

71. Beyond simply operating a smartphone, this software connects with watches, tablets, and computers, android OS creates a unified experience that keeps users connected and completely immersed in the Google ecosystem. The core features of android OS are a gesture-based user interface that allows connectivity across various Pixel phones, and the Google Pixel Watch series.

72. Plaintiff alleges Google have devoted years to *"modifying"* the cell phone, that include Google's android OS, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Google *"modified"* cell phones, that include Google's android OS are shipped or imported into the United States.

73. Plaintiff also alleges that when the Google *"modified"* cell phone, that include Google's android OS, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Google is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to,

connected to, or mounted to another device, such that it is an integral part of the device".

74.    Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Google to manufacture the Google *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

75.    Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

76.    Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for a Google *"modified"* cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. § 271(g), must do so on the heightened 'clear and

convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**77.** *Plaintiff's Claim Limitations that Cover the Google "modified" Cell Phone that include Google's Android Operating System / ["transceiver"]*

- a communication link is present of at least one of a Wi-Fi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom monitoring equipment and a central processing unit (CPU) or a transceiver on the vehicle. [claim 22 of the '891 patent]

- a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom monitoring equipment and a central processing unit (CPU) or a transceiver on the vehicle. [claim 35 of the '891 patent]

- a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom monitoring equipment and a central processing unit (CPU) or a transceiver on the vehicle. [claim 57 of the '891 patent]

- wherein the monitoring equipment communicates automatically with the transceiver upon receipt of the signal caused by the distress signal [claim 69 of the '891 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long

and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; [claim 1 of the '189 patent]

- wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF). [claim 1 of the '189 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or long and short-range radio frequency (RF) connection is in signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products. [claim 2 of the '189 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; [claim 7 of the '189 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or long and short-range radio frequency (RF) connection is in signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products. [claim 8 of the '189 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products; [claim 9 of the '189 patent]

- wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short-range radio frequency (RF)

connection is capable of signal communication with the transmitter, the receiver of the communication device, or transceivers of the products; [claim 13 of the '439 patent]

- wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency (RF), and short-range radio frequency (RF). [claim 13 of the '439 patent]

- wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short-range radio frequency (RF) connection is in signal communication with the transmitter, the receiver of the monitoring equipment, or transceivers of the products. [claim 14 of the '439 patent]

- wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, for signal communication with the transmitter, the receiver of the monitoring equipment, or transceivers of the products; [claim 15 of the '439 patent]

- wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products; [claim 19 of the '439 patent]

- wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency, and short-range radio frequency (RF). [claim 19 of the '439 patent]

- wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with a transmitter, a receiver of the monitoring equipment, or transceivers of the products; [claim 21 of the '439 patent]

90

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 4 of the '287 patent]

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 5 of the '287 patent]

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 6 of the '287 patent]

78.    Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT IV:
### Google's Megapixel Camera for Google's *"modified"* Cell Phone

91

79.   Count IV incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

80.   Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include a megapixel camera, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

81.   Upon information, Plaintiff alleges Google *"modified"* the cell phone (i.e., now the Pixel smartphone) device that include Google's Megapixel Camera begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

82.   Upon information and belief, Plaintiff alleges Google is using Plaintiff's patented process to manufacture and/or produce the Google *"modified"* cell phone, that include Google's Megapixel Camera, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Google *"modified"* cell phone, that include Google's Megapixel Camera, infringement occurs when the combination is shipped or imported into the United States.

83.   Upon information, Plaintiff is alleging the Google *"modified"* cell phone, that include Google's Megapixel Camera, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Google's Megapixel Camera, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

84.   Plaintiff alleges Google's *"modified"* cell phone, that include Google's Megapixel Camera, was first manufactured or produced using Plaintiff's patented process in response to a government request. Google performed work for the Government to *"modify"* a common cell phone, that include Google's Megapixel

92

Camera, and at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Google, as a third-party contractor, could not be sued for infringement.

85.     Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Google before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. §§ 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

86.     Upon information and belief, Plaintiff alleges Google's "*modification*" of the cell phone, that include Google's Megapixel Camera, begin abroad and continues to this day. Plaintiff also alleges, Google "*modified*" the cell phone, that include Google's Megapixel Camera, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and

Google's "*modification*" of the cell phone, that include Google's Megapixel Camera, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Google "*modified*" cell phones, that include Google's Megapixel Cameras, are shipped or imported into the United States.

87.   Upon information, twelve Federal Judges infer to say; the Google "*modified*" cell phones that include Google's Megapixel Camera, and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Google "*modified*" cell phones the detection capability is located. Hereto, the alleged manufactured Google Megapixel Camera, is identified and located inside the Google "*modified*" cell phone.

---

**Google's "*nine*" Smartphone Biosensors Submitted to the Courts:**

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

88.    Upon information and belief, Google continues to make, offer for sell, sell, and purportedly import the Google *"modified"* cell phones (i.e., Pixel smartphones), that include Google's Megapixel Cameras, into the United States that include *"nine standard sensors that are used as biosensors"*.

89.    Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful *"modified"* cell phones, that include their own megapixel cameras, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own megapixel cameras] https://news.ycombinator.com/item?id=28423983

90.    Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Google] is accused of using Plaintiff's patented process to manufacture and/or assemble the Google *"modified"* cell phone, that include Google's android operating system, under 35 U.S.C. §§ 154(a)(1) & 271(g). Google is tasked with presenting evidence to a jury that Google is (1) not using Plaintiff's patented process; or (2) Google is using Plaintiff's patented process but is not shipping or importing the Google *"modified"* cell phones (i.e., Pixel smartphones), that include Google's Megapixel Cameras, into the United States.

91.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Google *"modified"* cell phone, that include Google's Megapixel Camera, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

92.    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under §§ 154(a)(1) & 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Google's *"modified"* cell phone that include Google's Megapixel Camera] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

93.    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

94.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Google *"modified"* cell phone that include Google's Megapixel Camera was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
> >
> > (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

95.   Upon information and belief, Google is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Google "*modified*" cell phones (i.e., Pixel smartphones) that include Google's megapixel cameras: Google Nexus One, Nexus S, Galaxy Nexus, Nexus 4, Nexus 5, Nexus 6, Nexus 5X, Nexus 6P, Pixel, Pixel XL, Pixel 2, Pixel 2 XL, Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, Pixel 4a, Pixel 4a 5G, Pixel 5, Pixel 5a 5G, Pixel 6, Pixel 6 Pro, Pixel 6a, Pixel 7, Pixel 7 Pro, Pixel 7a, Pixel 8, Pixel 8 Pro, Pixel 9, Pixel 9a, Pixel 9 Pro, Pixel 9 Pro XL, Pixel 9 Pro Fold, Pixel 10, Pixel 10a, Pixel 10 Pro, Pixel 10 Pro XL, and Pixel 10 Pro Fold.

96.   Upon information, in *Syngenta*, the Federal Circuit solidified the reach of protection under § 271(g) and resolved for the first time the question of whether § 271(g) requires that all steps of a patented process be performed by or at the direction or control of a single entity (Google) before infringement liability attaches. As a result of the court's decision, patentees asserted rights under § 271(g) do not have to prove that a single entity (Google), or one-party exercising direction and control over other entities (i.e., Rhevision), was responsible for performing each step of the patented process.

The Federal Circuit also held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee may have in proving that the patented process was used in the manufacture of a product in question" where the manufacture occurred abroad. *Id.* Part of Congress's solution is laid

out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product.

The Google Megapixel camera is included in Google's production process for manufacturing the Google Pixel smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. The Google megapixel camera is native to the manufacture of the Google Pixel smartphones, and is a standard component of the Google "*modified*" cell phone when imported into the United States.

*Phase I* specifications of the Department of Homeland Security's Science and Technology Directorate (DHS S&T), BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative [published 10/30/2007]; requires Google modify the Google android operating system for managing CBRNE-H detection.

Google entered into an "implied" agreement with the Government (DHS S&T) to integrate the CBRNE-H internal sensors that was being developed by at least the awarded third-party contractors of the *Cell-All* initiative: Rhevision; SeaCoast; NASA; Qualcomm; and Synkera.

Upon information and belief, Google "*modified*" the cell phone with camera(s) equipped to detect for CBRNE-H. Under the *Cell-All* initiative Rhevision developed an artificial nose—a piece of porous silicon that changes colors in the presence of certain molecules, which can be read spectrographically:

> "Rhevision Technology, [] develop[ed] advanced optical technology that Rhevision founder Yu-Hwa Lo invented in his optics laboratory at UC San Diego. Their concept is to combine Rhevision's optics with a "porous silicon artificial nose" developed in the laboratory of [] Professor Michael Sailor. The millimeter-sized sensors are based on "nanophase semiconductors" [], which are composed of nanoparticles that

98

change color in the presence of certain molecules. ***Rhevision [] integrated its bio-inspired liquid lens technology with a cell phone camera systems to basically turn a cell phone camera into an extremely high-resolution wireless microscope.*** Rhevision uses its system to precisely inspect and measure color changes in the chemical sensor; compare the results with known toxic compounds."

| **PHASE I: INTERNAL SENSOR OF THE *CELL-ALL* INITIATIVE** | |
|---|---|
| **Google's "Modified" Cell Phone include Camera(s) for CBRNE-H Detection** | |
| *"Phase I"- Internal Sensor*<br><br>Google's *"modified"* cell phone with its *"modified"* cell phone camera | Under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative, Rhevision demonstrated how it has integrated its bio-inspired liquid lens technology with a cell phone camera systems to basically turn a cell phone camera into an extremely high-resolution wireless microscope. Rhevision uses its system to precisely inspect and measure color changes in the chemical sensor and compare the results with known toxic compounds. |
| *"Phase I"- Internal Sensor*<br><br>Google's *"modified"* cell phone with its *"modified"* cell phone camera | Google's *"modified"* cell phone devices, have built-in QR scanners in the camera app, so you don't need a separate app. Simply point the camera at the code, and it should work instantly. Google's *"modified"* cell phone camera QR codes can be integrated with CBRNE (chemical, biological, radiological, nuclear, and explosives) detectors and/or sensors to enhance data sharing and operational efficiency. One of the benefits of integration is real-time data access. QR codes can link to live data from CBRNE sensors, providing immediate access to critical information. Scanning a QR code can simplify the process of retrieving sensor data, making it accessible to personnel without specialized training. QR codes can be printed on CBRNE equipment, allowing quick access to emergency protocols. |

| | |
|---|---|
| *"Phase I"- Internal Sensor*<br><br>Google's *"modified"* cell phone with its *"modified"* cell phone camera | Google's *"modified"* cell phone-based biosensors are rapidly redefining how the world conducts medical diagnostics, enable precise, real-time detection of biological and chemical agents. Google's *"modified"* cell phone devices have a platform in biosensing ecosystems: facilitating the proliferation of biosensors that capitalize on Google's *"modified"* cell phones' camera optics, wireless connectivity, and computational power. Optical biosensors utilize the Google *"modified"* cell phone cameras and LED flashes to detect visual changes in assays, particularly in colorimetric or fluorescent formats. Images taken by a conventional Google cell phone camera can be modified using deep learning algorithms to improve their spatial resolution, signal-to-noise ratio, and color response. |
| *"Phase I"- Internal Sensor*<br><br>Google's *"modified"* cell phone with its *"modified"* cell phone camera | Google's *"modified"* cell phone cameras megapixel camera, smaller than the head of a pencil eraser captures the image from the array of nanopores in the silicon chip. "The beauty of this technology is that the number of sensors contained in one of the arrays is determined by the *pixel* resolution of the cell phone camera. With the megapixel resolution found in cell phone cameras today, the camera can easily probe a million different spots on the silicon sensor simultaneously. So, users don't need to wire up a million individual sensors," Sailor said. "We only need one. This greatly simplifies the manufacturing process because it allows us to piggyback on all the technology development that has gone into making cell phone cameras lighter, smaller, and cheaper." |
| *"Phase I"- Internal Sensor*<br><br>Google's *"modified"* cell phone with its *"modified"* cell phone camera | Radiation incidents on Google's *"modified"* cell phone cameras. Complementary Metal Oxide Semiconductor (CMOS) sensor creates a signal which can be isolated from a visible light signal to turn the *"modified"* cell phone into a radiation detector. Google's *"modified"* cell phone have CMOS cameras that have been widely adopted throughout the world, which makes them potentially useful as tools for monitoring radiation exposure while traveling in an aircraft. Google's *"modified"* cell phone cameras have advanced features, such as accelerated camera *pixel* intensity, higher image quality, and greater rapidity. These features allow Google's *"modified"* cell phone to be especially useful in detecting radiation. |

| | |
|---|---|
| *"Phase I"- Internal Sensor*<br><br>Google's *"modified"* cell phone with its *"modified"* cell phone camera | Google's *"modified"* cell phone camera sensors: Google's *"modified"* cell phone cameras can capture high-resolution images, which can be analyzed for specific biomarker detection. Various applications utilize machine learning and image processing to identify biomarkers in biological samples, such as blood or saliva. Glucose Monitoring: Google's *"modified"* cell phone apps can analyze images of blood samples to estimate glucose levels. Skin Analysis: 's *"modified"* cell phone cameras can detect skin conditions or changes that may indicate health issues, such as dehydration or vitamin deficiencies. Google's *"modified"* cell phone cameras can diagnose diseases by analyzing images of bodily fluids or tissues. |
| *"Phase I"- Internal Sensor*<br><br>Google's *"modified"* cell phone with its *"modified"* cell phone camera | David Breslauer is a graduate student at the University of California, Berkeley, and has developed a fluorescence microscope for portable diagnostics using a cell phone with a built-in camera. Cell phone with built-in camera. The cell phone that is used should at least be able to zoom in and out manually and focus. Using Google cell phone cameras modified as inexpensive microscopes. |

Twelve Federal Judges identifies where on the inside of the Google devices the front and back camera biosensors are located

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* Case No. 23-0048 that direct infringement arises ***"through nine "standard sensors" which "can be used as 'biosensors,'"*** Appx126.": "In *Golden v. Samsung Electronics America, Inc.* Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024. "Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: [] and (3) ***through nine "standard sensors" which "can be used as 'biosensors,'"*** Appx126." Google uses the same type of sensors in their Google *"modified"* cell phones for biosensor detection.

**97.** Plaintiff alleges Google have devoted years to *"modifying"* the cell phone, that include Google's Megapixel Camera, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Google *"modified"* cell phones, that include Google's Megapixel Camera are shipped or imported into the United States.

**98.** Plaintiff also alleges that when the Google *"modified"* cell phone, that include Google's Megapixel Camera, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Google is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

**99.** Upon information and belief, each individual claim limitation or element that is listed in this section describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Google to manufacture the Google *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

**100.** Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

**101.** Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for a Google "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**102.** *Plaintiff's Claim Limitations that Cover the Google "modified" Cell Phone that include Google's Megapixel Camera [cell phone detection device / one of the nine standard biosensors]*

- a multi sensor detection system with a plurality of [] integrable sensors detecting for chemical, biological, radiological, nuclear, explosive, human, contraband; camera, light and video sensors allow the user to access, review and respond to network multi sensor detection systems and view the environment from a cell phone, PDA, handheld, laptop, desktop, workstation or monitoring site; [claim 1 of the '280 patent]

- a cell phone detection system with a plurality of [] integrable sensors detecting for chemical, biological, radiological, nuclear, explosive, contraband; camera, light and video sensors allow the user to access, review and respond to network cell phone detection systems and view the environment from a cell phone, PDA, handheld, laptop, desktop, workstation or monitoring site [claim 1 of the '280 patent]

- a cell phone; cell phone detection system with a plurality of interchangeable and integrable sensors detecting for chemical, biological, radiological, nuclear, explosive, contraband; camera, light and video sensors allow the user to access, review and respond to network cell phone detection systems and view the environment from a cell phone [claim 36 of the '891 patent]

- wherein the communication device has a plurality of sensors for detecting the chemical, biological, [] compounds which is capable of being disposed within each communication device. [claim 26 of the '990 patent]

- wherein the multi sensor detection device is capable of being embedded into; placed in, on, or adjacent to a product or area targeted for monitoring. [claim 97 of the '990 patent]

- wherein the multi sensor detection device is interconnected with a camera; light and video sensors to allow the user to view the environment from a cell phone, smart phone, PDA, handheld, laptop, desktop, workstation or monitoring site. [claim 102 of the '990 patent]

- wherein the cell phone, the smart phone, [] have a plurality of indicator lights [] corresponding to one chemical, biological, [] agent [] capable of being disposed within the cell phone, the smart phone [claim 119 of the '990 patent]

- a built-in, embedded multi sensor detection system for monitoring products with a plurality integrable sensors detecting for at least one of chemical, biological, []; [claim 145 of the '990 patent]

- a cell phone; cell phone detection system for monitoring with a plurality [] integrable sensors detecting for at least one of chemical, biological, []; [claim 145 of the '990 patent]

- further including a camera, light and video sensor to allow the user to access, review and respond to network multi sensor detection systems and view the environment from at least one of a cell phone, a smartphone, a PDA, a handheld, a laptop, a desktop, a workstation or monitoring site. [claim 146 of the '990 patent]

- A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, [] human, [] agents; [claim 4 of the '189 patent]

- comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, [], a human sensor, [] [claim 4 of the '189 patent]

- A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, [], comprising: [claim 5 of the '189 patent]

- a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, [] a human sensor, []; [claim 5 of the '189 patent]

- wherein the built-in, multi sensor detection device is built in [] monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop); [claim 6 of the '189 patent]

- a built-in sensor array or fixed detection device into a product that detects items by means of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, [], a human sensor, []; [claim 6 of the '189 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; [claim 7 of the '189 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; [claim 8 of the '189 patent]

105

- interconnected with a camera; light and video sensors to allow the user to view the environment from at least one of a cell phone, smart phone, PDA, handheld, laptop, desktop, workstation or monitoring site. [claim 12 of the '189 patent]

- comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, [] a human sensor, []; [claim 16 of the '439 patent]

- A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents; [claim 16 of the '439 patent]

- a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; [claim 17 of the '439 patent]

- A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising: [claim 17 of the '439 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents or compound, comprising: [claim 20 of the '439 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; [claim 20 of the '439 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 21 of the '439 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI); [claim 21 of the '439 patent]

106

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; [claim 22 of the '439 patent]
- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; [claim 23 of the '439 patent]
- at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; [claim 5 of the '287 patent]

103. Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT V:

**Google's Global Positioning System (GPS) for Google's "*modified*" Cell Phone**

104. Count V incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

105. Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include a GPS Receiver, is "*modified*" to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

106. Upon information, Plaintiff alleges Google "*modified*" the cell phone (i.e., now the Pixel smartphone) device that include Google's GPS Receiver begin as early

as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

107.   Upon information and belief, Plaintiff alleges Google is using Plaintiff's patented process to manufacture and/or produce the Google "*modified*" cell phone, that include Google's GPS Receiver, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Google "*modified*" cell phone, that include Google's GPS Receiver, infringement occurs when the combination is shipped or imported into the United States.

108.   Upon information, Plaintiff is alleging the Google "*modified*" cell phone, that include Google's GPS Receiver, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the Google "*modified*" cell phone, that include Google's GPS Receiver, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

109.   Plaintiff alleges Google's "*modified*" cell phone, that include Google's GPS Receiver, was first manufactured or produced using Plaintiff's patented process in response to a government request. Google performed work for the Government to "*modify*" a common cell phone, that include Google's GPS Receiver, and at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Google, as a third-party contractor, could not be sued for infringement.

110.   Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Google before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. §§ 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

111.    Upon information and belief, Plaintiff alleges Google's "*modification*" of the cell phone, that include Google's GPS Receiver, begin abroad and continues to this day. Plaintiff also alleges, Google "*modified*" the cell phone, that include Google's GPS Receiver, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Google's "*modification*" of the cell phone, that include Google's GPS Receiver, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Google "*modified*" cell phones, that include Google's GPS Receivers, are shipped or imported into the United States.

**112.** Upon information, twelve Federal Judges infer to say; the Google *"modified"* cell phones that include Google's GPS Receivers, and include *"nine standard sensors which can be used as biosensors"*, satisfies the patent local rule of identifying where inside the Google *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Google's GPS Receiver, is identified and located inside the Google *"modified"* cell phone.

---

**Google's *"nine"* Smartphone Biosensors Submitted to the Courts**:

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

**113.** Upon information and belief, Google continues to make, offer for sell, sell, and purportedly import the Google *"modified"* cell phones (i.e., Pixel smartphones), that include Google's GPS Receivers, into the United States that include *"nine standard sensors that are used as biosensors"*.

**114.** Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful *"modified"* cell phones, that include their own Global Positioning System (GPS), are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels

110

and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Global Positioning System (GPS)] https://news.ycombinator.com/item?id=28423983

115. Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Google] is accused of using Plaintiff's patented process to manufacture and/or assemble the Google "*modified*" cell phone, that include Google's GPS Receiver, under 35 U.S.C. §§ 154(a)(1) & 271(g). Google is tasked with presenting evidence to a jury that Google is (1) not using Plaintiff's patented process; or (2) Google is using Plaintiff's patented process but is not shipping or importing the Google "*modified*" cell phones (i.e., Pixel smartphones), that include Google's GPS Receiver, into the United States.

116. Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Google "*modified*" cell phone, that include Google's GPS Receiver, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

117. Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a product [Google's "*modified*" cell phone that include Google's GPS Receiver] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

118. Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was

not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

119.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Google *"modified"* cell phone that include Google's GPS Receiver was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
> >
> > (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

120.    Upon information and belief, Google is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Google *"modified"* cell phones (i.e., Pixel smartphones) that include Google's GPS Receiver: Google Nexus One, Nexus S, Galaxy Nexus, Nexus 4, Nexus 5, Nexus 6, Nexus 5X, Nexus 6P, Pixel, Pixel XL, Pixel 2, Pixel 2 XL, Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, Pixel 4a, Pixel 4a 5G, Pixel

5, Pixel 5a 5G, Pixel 6, Pixel 6 Pro, Pixel 6a, Pixel 7, Pixel 7 Pro, Pixel 7a, Pixel 8, Pixel 8 Pro, Pixel 9, Pixel 9a, Pixel 9 Pro, Pixel 9 Pro XL, Pixel 9 Pro Fold, Pixel 10, Pixel 10a, Pixel 10 Pro, Pixel 10 Pro XL, and Pixel 10 Pro Fold.

**121.**    Upon information, Plaintiff describes the Global Positioning System, as:



The satellite-based navigation system made up of a network of 24 satellites placed into orbit by the U.S. Department of Defense. GPS was originally intended for military applications, but in the 1980s, the government made the system available for civilian use.

GPS satellites circle the earth twice a day in a very precise orbit and transmit signal information to earth. GPS receivers take this information and use triangulation to calculate the user's exact location. Essentially, the GPS receiver compares the time a signal was transmitted by a satellite with the time it was received. The time difference tells the GPS receiver how far away the satellite is. Now, with distance measurements from a few more satellites, the receiver can determine the user's position and display it on the unit's electronic map.

GPS receivers used to be standalone devices, but now they are built    into    the    most    basic    of    Google's    smartphones    and

smartwatches. The Google "*modified*" cell phone models use A-GPS -- or "Assisted GPS" -- which in basic terms accesses an intermediary server when it is not possible to connect directly via satellite -- indoors, for example -- and this server provides the nearest satellite with additional information to make it possible to more accurately determine a user's position.

Google explains that the Pixel 3G and all later models also use "wi-fi hotspots and cellular towers to get the most accurate location fast" when GPS is not the most convenient method of location detection. The Pixel 3GS and later Pixel models additionally have an integrated digital compass to also provide the direction one is facing, which is quite useful when combined with mapping software. With the inclusion of the original Pixel phone, Pixel models can provide real-time navigation assistance.

122. Plaintiff alleges Google have devoted years to "*modifying*" the cell phone, that include Google's GPS Receiver, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Google "*modified*" cell phones, that include Google's GPS Receiver are shipped or imported into the United States.

123. Plaintiff also alleges that when the Google "*modified*" cell phone, that include Google's GPS Receiver, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Google is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term

114

construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

124. Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. § 271(g) that is allegedly used by Google to manufacture the Google *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

125. Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

126. Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Google *"modified"* cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed in this section to

describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**127.** *Plaintiff's Claim Limitations that Cover the Google "modified" Cell Phone that include Google's GPS Locating and Tracking*

- can be adapted, modified or designed to include a global positioning system (GPS) receiver adapted for communication with at least one satellite. [claim 45 of the '891 patent]

- further including a global positioning system (GPS) receiver adapted for communication with at least one satellite [claim 64 of the '891 patent]

- wherein the at least one satellite or the at least one cell phone tower is capable of signal communication with the transceiver on the vehicle [claim 65 of the '891 patent]

- wherein the distress signal is a signal that gives the location of the vehicle. [claim 70 of the '891 patent]

- wherein the product includes at least one of a built-in, embedded internet component, a global positioning (GPS) component, a navigation component, a tracking component, a cellular component, a satellite component, a short- and long-range radio frequency component, radio frequency (RF) sensor, radio frequency (RF) transceiver, Wi-Fi, antenna, Bluetooth, or interface/gateway component. [claim 78 of the '990 patent]

- wherein the multi sensor detection device is capable of transmitting identification data, location data, speed data, environment data, power data, and sensor data. [claim 95 of the '990 patent]

- wherein the cell phone, the smart phone, [] have at least one of a Bluetooth connection, a Wi-Fi connection, a short- and long-range radio frequency connection, a cellular connection, a satellite connection, or a GPS connection. [claim 117 of the '990 patent]

- [t]he multi sensor detection security systems [] including a global positioning system (GPS) receiver adapted for communication with at least one satellite. [claim 152 of the '990 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; [claim 1 of the '189 patent]

- whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; [claim 7 of the '189 patent]

- whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; [claim 8 of the '189 patent]

- whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or from a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; [claim 9 of the '189 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 13 of the '439 patent]

- at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; [claim 19 of the '439 patent]

- whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-

117

range radio frequency; causes a signal to be sent to the monitoring equipment that includes at least one of location data or sensor data; [claim 19 of the '439 patent]

- at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom; or at least one satellite capable of transmitting signals to the monitoring equipment; [claim 20 of the '439 patent]

- whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and/or sensor data; [claim 20 of the '439 patent]

- at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment; [claim 21 of the '439 patent]

- whereupon a signal sent to a receiver of the multi-sensor detection device for detecting the agents of the item of interest causes a signal that includes at least one of location data or sensor data to be sent to the monitoring equipment; [claim 21 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; [claim 22 of the '439 patent]

- whereupon a signal sent to the receiver of at least one of a multi-sensor detection device, a cell phone detection device, or a locking device from a satellite or a cell phone tower or through at least one of a Bluetooth connection, a WiFi connection, an internet connection, a cellular connection, a GPS connection, a short range radio frequency (RF) connection, or a long range radio frequency (RF) connection, causes a signal that includes at least one of location data or sensor data to be sent to the communication device; [claim 22 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 23 of the '439 patent]

- wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF)

118

connection, or GPS connection is capable of signal communication with the transmitter or the receiver; [claim 23 of the '439 patent]

- a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone [claim 23 of the '439 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 1 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 3 of the '287 patent]

- at least one global positioning system (GPS) connection in communication with the at least one CPU; [claim 4 of the '287 patent]

- at least one global positioning system (GPS) connection in communication with the at least one CPU; [claim 5 of the '287 patent]

- at least one global positioning system (GPS) connection in communication with the at least one CPU; [claim 6 of the '287 patent]

128. Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

119

## COUNT VI:

## Google's Biometric Authentication for Google's *"modified"* Cell Phone

129.   Count VI incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

130.   Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include biometric authentication, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

131.   Upon information, Plaintiff alleges Google *"modified"* the cell phone (i.e., now the Pixel smartphone) device that include Google's biometric authentication begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

132.   Upon information and belief, Plaintiff alleges Google is using Plaintiff's patented process to manufacture and/or produce the Google *"modified"* cell phone, that include Google's biometric authentication, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Google *"modified"* cell phone, that include Google's biometric authentication, infringement occurs when the combination is shipped or imported into the U.S.

133.   Upon information, Plaintiff is alleging the Google *"modified"* cell phone, that include Google's biometric authentication, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Google's biometric authentication, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

134.   Plaintiff alleges Google's *"modified"* cell phone, that include Google's biometric authentication, was first manufactured or produced using Plaintiff's

120

patented process in response to a government request. Google performed work for the Government to "*modify*" a common cell phone, that include Google's biometric authentication, of at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Google, as a third-party contractor, could not be sued for infringement.

**135.** Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Google before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. § § 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**136.** Upon information and belief, Plaintiff alleges Google's "*modification*" of the cell phone, that include Google's biometric authentication, begin abroad and continues to this day. Plaintiff also alleges, Google "*modified*" the cell phone, that

121

include Google's biometric authentication, while performing work under a government contract is to avoid infringement liability here in the United States under §§ 154(a)(1) & 271(a); and Google's *"modification"* of the cell phone, that include Google's biometric authentication, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Google *"modified"* cell phones, that include Google's biometric authentication, are shipped or imported into the United States.

**137.**    Upon information and belief, Google continues to make, offer for sell, sell, and purportedly import the Google *"modified"* cell phones (i.e., Pixel smartphones), that include Google's biometric authentication, into the United States that include *"nine standard sensors that are used as biosensors"*.

---

**Google's *"nine"* Smartphone Biosensors Submitted to the Courts**:

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

138.    Upon information, twelve Federal Judges infer to say; the Google *"modified"* cell phones that include Google's biometric authentication, and include *"nine standard sensors which can be used as biosensors"*, satisfies the patent local rule of identifying where inside the Google *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Google's biometric authentication, is identified and located inside the Google *"modified"* cell phone.

139.    Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful *"modified"* cell phones, that include their own biometric authentication, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own biometric authentication] https://news.ycombinator.com/item?id=28423983

140.    Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Google] is accused of using Plaintiff's patented process to manufacture and/or assemble the Google *"modified"* cell phone, that include Google's biometric authentication, under 35 U.S.C. §§ 154(a)(1) & 271(g). Google is tasked with presenting evidence to a jury that Google is (1) not using Plaintiff's patented process; or (2) Google is using Plaintiff's patented process but is not shipping or importing the Google *"modified"* cell phones (i.e., Pixel smartphones), that include Google's biometric authentication, into the United States.

141.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Google *"modified"* cell phone, that include Google's biometric

123

authentication, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

142. Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Google's *"modified"* cell phone that include Google's biometric authentication] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

143. Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

144. Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Google *"modified"* cell phone that include Google's biometric authentication was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and

124

(2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

**145.** Upon information and belief, Google is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Google "*modified*" cell phones (i.e., Pixel smartphones) that include Google's biometric authentication are: Google Nexus One, Nexus S, Galaxy Nexus, Nexus 4, Nexus 5, Nexus 6, Nexus 5X, Nexus 6P, Pixel, Pixel XL, Pixel 2, Pixel 2 XL, Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, Pixel 4a, Pixel 4a 5G, Pixel 5, Pixel 5a 5G, Pixel 6, Pixel 6 Pro, Pixel 6a, Pixel 7, Pixel 7 Pro, Pixel 7a, Pixel 8, Pixel 8 Pro, Pixel 9, Pixel 9a, Pixel 9 Pro, Pixel 9 Pro XL, Pixel 9 Pro Fold, Pixel 10, Pixel 10a, Pixel 10 Pro, Pixel 10 Pro XL, and Pixel 10 Pro Fold.

**146.** Upon information, Plaintiff alleges, Google Pixel's fingerprint and facial recognition technology, consider the following points:

- Initial Launch (2016): The first Google Pixel introduced a rear-mounted fingerprint sensor for secure unlocking and authentication.
- Pixel 2 (2017): Enhanced fingerprint recognition speed and accuracy, maintaining the rear sensor design.
- Pixel 3 (2018): Continued use of fingerprint sensors; facial recognition was not included, focusing on fingerprint security.
- Pixel 4 (2019): Introduced advanced facial recognition technology, allowing for secure unlocking and payments.

- Pixel 5 (2020): Returned to a rear fingerprint sensor, citing user preference for reliability over facial recognition.

- Pixel 6 (2021): Launched with an under-display fingerprint sensor, aiming for a sleeker design while improving biometric security.

- Pixel 7 (2022): Continued refinement of the under-display fingerprint sensor, enhancing speed and accuracy.

- The Pixel 8 and Pixel 8 Pro also utilize the 2D Face Unlock system. While Google may have refined the algorithms and improved the accuracy, the underlying technology remains the same as on the Pixel 7 series. Again, it's important to note that this is designed for unlocking your device.

- Google's Tensor processing chips and machine learning are what enable the Pixel 10, Pixel 10 Pro, Pixel 10 Pro XL, Pixel 10 Pro Fold, Pixel 9 series, Pixel 9 Pro Fold, and Pixel 8 series (not the first Pixel Fold) to have secure Face Unlock

- Software Updates: Regular updates have improved fingerprint recognition performance across multiple Pixel models.

- Privacy Focus: Google emphasizes user privacy and data security in its biometric implementations.

- Future Developments: Ongoing research into more advanced biometric technologies, including potential improvements in facial recognition.

Fingerprint unlock has been available on Android for about a decade now, and Apple has also offered it since 2013's iPhone 5S. But while the iPhone moved over to "Face ID" a few years ago, fingerprint sensors are still the name of the game on Android, they're

126

just now found underneath the display. Which one is "better" really comes down to a matter of preference, but we almost never see any smartphones integrate both solutions.

That's largely because it's cost-prohibitive to do both properly. A fingerprint sensor is, of course, a hardware component that's dedicated to recognizing your fingerprint. It serves no other purpose than that. Over on the iPhone (and Google's Pixel 4 series), a series of cameras, sensors, and an IR projector serve to ensure facial recognizable is not only accurate, but reliable and secure. Anyone can do facial recognition with just a camera.

147. When Plaintiff was drafting his patent specifications and patent claims for his patented CMDC device (i.e., new, improved upon, and useful cell phone), Plaintiff included, to complete the "utility or usefulness requirement" of his patented CMDC device; the functionality of Biometric Authentication to enhance security measures.

148. Prior to Google rolling out its Google Pixel smartphone in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732*) claiming a CMDC device that included a biometric fingerprint identifier to enhance security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

149. Plaintiff alleges, Google's biometric fingerprint scanner is included in Google's production process for manufacturing the Google Pixel smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. The Google biometric fingerprint scanner is native to the manufacture of the Google Pixel smartphones, and is a standard component of the Google Pixel smartphone when imported into the United States.

150. Plaintiff alleges Google have devoted years to *"modifying"* the cell phone, that include Google's biometric authentication, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Google *"modified"* cell phones, that include Google's biometric authentication are shipped or imported into the United States.

151. Plaintiff also alleges that when the Google *"modified"* cell phone, that include Google's biometric authentication, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Google is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

152. Upon information and belief, each individual claim limitation or element that is listed in this section describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Google to manufacture the Google *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

153. Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented

communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

154. Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for a Google "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below that describes the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

155. *Plaintiff's Claim Limitations that Cover the Google "modified" Cell Phone that include Google's Biometric Authentication*

- wherein the automatic/mechanical lock disabler is designed to be used with or without biometrics for authentication and identification, thereby allowing access to the product by authorized, trained and equipped individuals and preventing access to the product by unauthorized, untrained, and equipped individuals [claim 34 of the '752 patent]

129

- wherein the communication device is designed to be used with or without biometrics for authentication and identification, with at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse or signature, thereby allowing access to the product by authorized, trained, and equipped individuals [claim 30 of the '990 patent]

- wherein the multi sensor detection device is capable of transmitting biometric and authentication data including, but is not limited to, fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse and signature. [claim 99 of the '990 patent]

- wherein the cell phone, the smart phone, [] designed to be used with biometrics for authentication and identification, with at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse or signature, thereby allowing access to the product by authorized, trained, and equipped individuals and preventing access to the product by unauthorized, untrained, and unequipped individuals. [claim 122 of the '990 patent]

- further including biometrics of at least one of, but not limited to fingerprints, iris, signature and voice to prevent entry or exit of unauthorized persons. [claim 147 of the '990 patent]

- wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; [claim 1 of the '189 patent]

- wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; [claim 7 of the '189 patent]

- capable of transmitting biometric and authentication data include, but is not limited to, at least one of fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse and signature. [claim 10 of the '189 patent]

- wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; [claim 13 of the '439 patent]

- wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; [claim 16 of the '439 patent]

- wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; [claim 19 of the '439 patent]

- the communication device being equipped with biometrics that incorporates at least one of a fingerprint recognition or a face recognition to at least one of gain access to the device or to prevent unauthorized use; [claim 22 of the '439 patent]

- wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; [claim 23 of the '439 patent]

- at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; [claim 1 of the '287 patent]

- at least one of a fingerprint recognition, voice recognition, face recognition, hand

131

geometry, retina scan, iris scan, or signature recognition system; [claim 3 of the '287 patent]

- at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device; [claim 4 of the '287 patent]

- at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; [claim 5 of the '287 patent]

- at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device; [claim 6 of the '287 patent]

156.    Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT VII:

### Google's Disabling Locking Mechanism for Google's "*modified*" Cell Phone

157.    Count VII incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

158.    Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include a disabling lock, is "*modified*" to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

159.    Upon information, Plaintiff alleges Google "*modified*" the cell phone (i.e., now the Pixel smartphone) device that include Google's disabling locking mechanism begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

**160.** Upon information and belief, Plaintiff alleges Google is using Plaintiff's patented process to manufacture and/or produce the Google "*modified*" cell phone, that include Google's disabling locking mechanism, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Google "*modified*" cell phone, that include Google's disabling locking mechanism, infringement occurs when the combination is shipped or imported into the United States.

**161.** Upon information, Plaintiff is alleging the Google "*modified*" cell phone, that include Google's disabling locking mechanism, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Google's disabling locking mechanism, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

**162.** Plaintiff alleges Google's *"modified"* cell phone, that include Google's disabling locking mechanism, was first manufactured or produced using Plaintiff's patented process in response to a government request. Google performed work for the Government to "*modify*" a common cell phone, that include Google's disabling locking mechanism, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Google, as a third-party contractor, could not be sued for infringement.

**163.** Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Google before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. §§ 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

164. Upon information and belief, Google continues to make, offer for sell, sell, and purportedly import the Google *"modified"* cell phones (i.e., Pixel smartphones), that include Google's disabling locking mechanism, into the United States that include *"nine standard sensors that are used as biosensors"*.

---

**Google's *"nine"* Smartphone Biosensors Submitted to the Courts:**

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

165. Upon information, twelve Federal Judges infer to say; the Google *"modified"* cell phones that include Google's disabling locking mechanism; and, include *"nine standard sensors which can be used as biosensors"*, satisfies the patent local rule of identifying where inside the Google *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Google's disabling locking mechanism, is identified and located inside the Google *"modified"* cell phone.

166. Upon information and belief, Plaintiff alleges Google's *"modification"* of the cell phone, that include Google's disabling locking mechanism, begin abroad and continues to this day. Plaintiff also alleges, Google *"modified"* the cell phone, that include Google's disabling locking mechanism, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Google's *"modification"* of the cell phone, that include Google's disabling locking mechanism, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Google *"modified"* cell phones, that include Google's disabling locking mechanism, are shipped or imported into the United States.

167. Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful *"modified"* cell phones, that include their own disabling lock, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group."

135

https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own disabling lock] https://news.ycombinator.com/item?id=28423983

168.    Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Google] is accused of using Plaintiff's patented process to manufacture and/or assemble the Google "*modified*" cell phone, that include Google's disabling locking mechanism, under 35 U.S.C. §§ 154(a)(1) & 271(g). Google is tasked with presenting evidence to a jury that Google is (1) not using Plaintiff's patented process; or (2) Google is using Plaintiff's patented process but is not shipping or importing the Google "*modified*" cell phones (i.e., Pixel smartphones), that include Google's disabling locking mechanism, into the United States.

169.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Google "*modified*" cell phone, that include Google's disabling locking mechanism, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

170.    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Google's "*modified*" cell phone that include Google's disabling locking mechanism] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC, et al.*

171.    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that

the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

172.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Google *"modified"* cell phone that include Google's disabling locking mechanism] was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
> >
> > (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

173.    Upon information and belief, Google is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Google *"modified"* cell phones (i.e., Pixel smartphones) that include Google's disabling locking mechanism: Google Nexus One, Nexus S, Galaxy Nexus, Nexus 4, Nexus 5, Nexus 6, Nexus 5X, Nexus 6P, Pixel, Pixel XL, Pixel 2, Pixel 2 XL, Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, Pixel 4a, Pixel 4a 5G, Pixel 5, Pixel 5a 5G, Pixel 6, Pixel 6 Pro, Pixel 6a, Pixel 7, Pixel 7 Pro,

137

Pixel 7a, Pixel 8, Pixel 8 Pro, Pixel 9, Pixel 9a, Pixel 9 Pro, Pixel 9 Pro XL, Pixel 9 Pro Fold, Pixel 10, Pixel 10a, Pixel 10 Pro, Pixel 10 Pro XL, and Pixel 10 Pro Fold.

**174.** Upon information, Plaintiff alleges, if the authorized person is locked out of their phone after too many failed unlock attempts, the authorized user can reset it using Google Find My Device (Android), Samsung Find My Mobile (Samsung), or iTunes/Finder (iPhone Recovery Mode). If remote unlocking isn't an option, a manual factory reset via Recovery Mode will wipe the phone and remove the lock screen. The authorized user should be aware that a factory reset erases all data unless the user has a backup.

Google today detailed the latest device theft protection features for Android across stronger authentication and enhanced recovery tools.

"Failed Authentication Lock" will lock your screen "after repeated failed authentication attempts in your apps and settings." This functionality was introduced last year, but Google is now giving it a "dedicated enable/disable toggle" alongside Theft Detection Lock and Offline Device Lock. You can find it (on Pixel) in Settings > Security & privacy > Device unlock > Theft protection on Android 16+.

Additionally, Google is "increasing the lockout time after failed [PIN, pattern, or password] attempts" to make it harder for a thief to guess your screen lock. However, Android will no longer count identical incorrect guesses to your retry limit "to ensure you aren't locked out by mistake (by a curious child, for instance)." This translates to "protection from brute force guessing [getting] roughly 1 order of magnitude stronger [than] it was at launch."

138

Finally, on Android 16+, Google expanded Identity Check (which asks for biometrics when you're performing sensitive actions outside of trusted places) to "cover all features and apps that use the Android Biometric Prompt." This includes the Google Password Manager and third-party banking apps.

On Android 10+, android.com/lock now lets you set an optional security question before a lost or stolen device is Remote Locked. An attacker spending 15 minutes with your Pixel now only gets 7 guesses instead of 36, and the delays ramp up faster from there. https://9to5google.com/2026/01/27/android-failed-authentication-lock/

"If you own a Pixel 3 or newer model running Android 10 or later, Google's official Pixel Update and Software Repair tool can help unlock your Pixel phone if you've forgotten your pattern, password, or PIN. This tool is designed to update and reinstall software for a Pixel phone or tablet. It also allows for a complete Pixel factory reset, letting you remove all screen locks and regain access." https://www.appgeeker.com/android-unlock/unlock-google-pixel-forgot-pattern.html

175. When Plaintiff was drafting his patent specifications and patent claims for his patented CMDC device (i.e., new, improved upon, and useful cell phone), Plaintiff included, to complete the "utility or usefulness requirement" of his patented CMDC device; the functionality of a Disabling Locking Mechanism to enhance security measures.

176. Prior to Google rolling out its Pixel in 2008 that did not have a disabling locking mechanism, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure

Document (*Doc. No. 565732*) claiming a CMDC device that included a Disabling Locking Mechanism to enhance security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

177.    Plaintiff alleges, Google's Disabling Locking Mechanism is included in Google's production process for manufacturing the Google Pixel smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. The Google Disabling Locking Mechanism is native to the manufacture of the Google Pixel smartphones, and is a standard component of the Google Pixel smartphone when imported into the United States.

178.    Plaintiff alleges Google have devoted years to *"modifying"* the cell phone, that include Google's disabling locking mechanism, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Google *"modified"* cell phones, that include Google's disabling locking mechanisms are shipped or imported into the United States.

179.    Plaintiff also alleges that when the Google *"modified"* cell phone, that include Google's disabling locking mechanism, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Google is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

180.    Upon information and belief, each individual claim limitation or element that is listed in this section describes Plaintiff's patented process under 35 U.S.C. §§

154(a)(1) & 271(g) that is allegedly used by Google to manufacture the Google *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

181. Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

182. Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for a Google *"modified"* cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

"[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

183. *Plaintiff's Claim Limitations that Cover the Google "modified" Cell Phone that include Google's Disabling Locking Mechanism*

- an automatic/mechanical lock disabler interconnected to the cpu and which is mounted to a lock on a product for receiving transmission from the cpu to lock or disable the lock on the product to prevent access to the product by unauthorized, untrained and unequipped individuals [claim 1 of the '497 patent]

- an automatic/mechanical lock disabler interconnected to the cpu and that is mounted to a lock on a product for receiving signal transmissions from the cpu to lock or disable the lock on the product thereby preventing access to the product by unauthorized, untrained, and unequipped individuals [claim 7 of the '497 patent]

- an automatic/mechanical lock disabler interconnected to the cpu and which is mounted to a lock on a product for receiving a signal transmission from the cpu to lock or disable the lock on the product thereby preventing access to the product by unauthorized, untrained, and unequipped individuals [claim 13 of the '497 patent]

- wherein the communication device is designed to be equipped with a radio frequency (RF) chip for the locking, disabling a lock, enabling a lock, and unlocking the locks of, but not limited to, containers, vehicles [claim 23 of the '990 patent]

- a lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; [claim 2 of the '189 patent]

142

- wherein the monitoring equipment is equipped with a lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (to make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; [claim 8 of the '189 patent]

- capable of sending signals thereto and receiving signals therefrom to engage (lock), disengage (unlock) and disable (make unavailable) a lock after a specific number of tries that is interconnected to the multi sensor detection system or monitoring equipment. [claim 9 of the '189 patent]

- a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; [claim 14 of the '439 patent]

- wherein the monitoring equipment is equipped with a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (to make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; [claim 20 of the '439 patent]

- a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries; [claim 1 of the '287 patent]

- the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the remote lock, electrical lock, mechanical lock, or automatic

143

lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment. [claim 1 of the '287 patent]

- a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries; [claim 3 of the '287 patent]

- at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; [claim 4 of the '287 patent]

- at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; [claim 5 of the '287 patent]

- at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; [claim 6 of the '287 patent]

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, [], send signals to lock or unlock doors, send signals to control components of a vehicle, [] such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 6 of the '287 patent]

**184.** Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

144

## COUNT VIII:

### Google's Near-Field Communication (NFC) for Google's *"modified"* Cell Phone

185.  Count VIII incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

186.  Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include NFC, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

187.  Upon information, Plaintiff alleges Google *"modified"* the cell phone (i.e., now the Pixel smartphone) device that include Google's Near-Field Communication (NFC) begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

188.  Upon information and belief, Plaintiff alleges Google is using Plaintiff's patented process to manufacture and/or produce the Google *"modified"* cell phone, that include Google's Near-Field Communication (NFC), under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Google *"modified"* cell phone, that include Google's Near-Field Communication (NFC), infringement occurs when the combination is shipped or imported into the United States.

189.  Upon information, Plaintiff is alleging the Google *"modified"* cell phone, that include Google's Near-Field Communication (NFC), infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Google's Near-Field Communication (NFC), into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

145

**190.** Plaintiff alleges Google's "*modified*" cell phone, that include Google's Near-Field Communication (NFC), was first manufactured or produced using Plaintiff's patented process in response to a government request. Google performed work for the Government to "*modify*" a common cell phone, that include Google's Near-Field Communication (NFC), and at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Google, as a third-party contractor, could not be sued for infringement.

**191.** Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Google before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. §§ 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**192.** Thus, under section 271(g), a party can be liable for infringement for importing into the United States, [], a product made by a patented process, *regardless of where the process is performed or where the product was ultimately made*. Congress added section 271(g) to increase protection of U.S. technology industries, [] *See* Kastenmier, *Report to* accompany H.R. 1931 (Apr. 22, 1987). Section 271(g) also sought to conform U.S. patent law to the infringement standards under foreign intellectual-property law. *See* S. Rep. No. 100-83 (1987).

**193.** Upon information, twelve Federal Judges infer to say; the Google *"modified"* cell phones that include Google's Near-Field Communication (NFC), and include *"nine standard sensors which can be used as biosensors"*, satisfies the patent local rule of identifying where inside the Google *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Near-Field Communication (NFC), is identified and located inside the Google *"modified"* cell phone.

---

**Google's *"nine"* Smartphone Biosensors Submitted to the Courts**:

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

**194.** Upon information and belief, Google continues to make, offer for sell, sell, and purportedly import the Google *"modified"* cell phones (i.e., Pixel smartphones),

147

that include Google's Near-Field Communication (NFC), into the United States that include "*nine standard sensors that are used as biosensors*".

**195.** Upon information and belief, Plaintiff alleges Google's "*modification*" of the cell phone, that include Google's Near-Field Communication (NFC), begin abroad and continues to this day. Plaintiff also alleges, Google "*modified*" the cell phone, that include Google's Near-Field Communication (NFC), while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Google's "*modification*" of the cell phone, that include Google's Near-Field Communication (NFC), was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Google "*modified*" cell phones, that include Google's Near-Field Communication (NFC), are shipped or imported into the United States.

**196.** Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own NFC, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn,

that Apple does to assemble its [smart]phones", [that include their own NFC] https://news.ycombinator.com/item?id=28423983

197. Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Google] is accused of using Plaintiff's patented process to manufacture and/or assemble the Google "*modified*" cell phone, that include Google's Near-Field Communication (NFC), under 35 U.S.C. §§ 154(a)(1) & 271(g). Google is tasked with presenting evidence to a jury that Google is (1) not using Plaintiff's patented process; or (2) Google is using Plaintiff's patented process but is not shipping or importing the Google *"modified"* cell phones (i.e., Pixel smartphones), that include Google's Near-Field Communication (NFC), into the United States.

198. Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Google "*modified*" cell phone, that include Google's Near-Field Communication (NFC), infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

199. Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a product [Google's *"modified"* cell phone that include Google's Near-Field Communication (NFC)] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

200. Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

149

**201.** Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Google *"modified"* cell phone that include Google's Near-Field Communication (NFC) was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
> >
> > (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

**202.** Upon information and belief, Google is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Google *"modified"* cell phones (i.e., Pixel smartphones) that include Google's Near-Field Communication (NFC): Google Nexus One, Nexus S, Galaxy Nexus, Nexus 4, Nexus 5, Nexus 6, Nexus 5X, Nexus 6P, Pixel, Pixel XL, Pixel 2, Pixel 2 XL, Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, Pixel 4a, Pixel 4a 5G, Pixel 5, Pixel 5a 5G, Pixel 6, Pixel 6 Pro, Pixel 6a, Pixel 7, Pixel 7 Pro, Pixel 7a, Pixel 8, Pixel 8 Pro, Pixel 9, Pixel 9a, Pixel 9 Pro, Pixel 9 Pro XL, Pixel 9 Pro Fold, Pixel 10, Pixel 10a, Pixel 10 Pro, Pixel 10 Pro XL, and Pixel 10 Pro Fold.

**203.** Upon information, Plaintiff alleges, Google Pixel phones with NFC capability utilize electromagnetic induction to enable communication between devices within close proximity, typically within 4 centimeters. This technology represents a subset of Radio Frequency Identification (RFID) systems, operating specifically at 13.56 MHz frequency. Unlike traditional RFID systems that primarily support one-way communication, NFC enables bidirectional data exchange, making it ideal for interactive applications.

NFC is based on the RFID protocols. The main difference to RFID is that an NFC device can act not only as a reader, but also as a tag (card emulation mode). In peer-to-peer mode, it is also possible to transfer information between two NFC devices. Because of the short-read range limitations, NFC devices have to be in very close proximity - usually no more than a few centimeters. That's why NFC is often used for secure communications. Below is an article that explains why Plaintiff chose NFC over that of RFID for his patented CMDC device:

RFID Signals can Detonate Bombs in Cargo Containers: But How Serious is the Vulnerability? August 10, 2011 Homeland Security Today

"In the fall of 2007, a handful of officials from the Department of Homeland Security (DHS) were invited to attend a live demonstration of how a bomb hidden inside a commercial cargo container could be detonated by a homemade radio frequency identification (RFID) container tracking tag operating at a frequency that was mandated by the federal government for cargo containers within US port environments.

A cargo container RFID electronic tag, or seal, contains an electronic reader that receives a port's RFID signal that prompts the container's RFID tag to transmit to port authorities' data regarding the cargo that's been encoded on its RFID tag. But as the demonstration

151

showed, it also can be used to close an electronic circuit when it receives a corresponding RF from a port RFID sender/receiver, thereby detonating the bomb.

Indeed. In the November, 2007 test, an RF receiver tuned to pick up a required US port RFID reader frequency triggered the small explosive that had been placed inside the empty container.

What's important about the demonstration is that the homemade RF receiver was operating at a frequency that not only was mandated to be used within port environs, but also was mandated to be made public despite the fact that "the process of selecting a frequency for container security was contentious," Homeland Security Today was told by Powers Global Holdings, Inc. Chairman, a former FBI agent who worked with CBP on border related security issues while in Laredo, Texas."

Healthcare organizations leverage Google Pixel phones with NFC capability for patient identification and medical device tracking. The technology enables secure, contactless access to patient records while maintaining HIPAA compliance through encrypted data transmission.

Point-of-care testing (POCT) devices play a crucial role as tools for disease diagnostics, and the integration of biorecognition elements with electronic components into these devices widens their functionalities and facilitates the development of complex quantitative assays. Unfortunately, biosensors that exploit large conventional IgG antibodies to capture relevant biomarkers are often limited in terms of sensitivity, selectivity, and storage stability, considerably restricting the use of POCT in real-world applications. Therefore, we used nanobodies as they are more suitable for fabricating electrochemical biosensors with near-field

communication (NFC) technology. Moreover, a flow-through microfluidic device was implemented in this system for the detection of C-reactive protein (CRP), an inflammation biomarker.

In recent years, near-field communication (NFC) technology has become widespread in the field of electrochemical sensors, enhancing their functionality and ease of use since enables wireless communication and data transfer at close proximity, simplifying sensor setup, calibration, and data retrieval. This technology allows seamless data exchange between sensors and mobile devices, providing users with an effective way to collect and analyze electrochemical data in real time. Herein, we present a smartphone-controlled NFC potentiostat integrated with a flow-through electrochemical microfluidic device via wireless communication and with the data-display conversion on Google smartphones.

The trajectory of phones with NFC capability continues toward greater integration and expanded functionality. iOS 18.1's open-source programming capabilities represent a pivotal moment for NFC technology adoption, enabling developers to create more sophisticated and customized solutions.

Emerging applications include smart home automation, where NFC tags trigger complex device interactions, and enhanced supply chain management systems that provide real-time tracking and authentication capabilities.

The combination of Google's development framework, expanding device compatibility, and growing ecosystem of NFC-enabled applications creates unprecedented opportunities for businesses and developers. As Google Pixel phones with NFC

capability become increasingly sophisticated, the potential for creating meaningful, contactless experiences continues to grow.

Google *"modified"* the cell phones to include an NFC reader/writer built-in, which allows the user to tap the back of the phone to another NFC-enabled device, be that a payment terminal, door lock, Bluetooth device, or a simple NFC tag.

Radio-frequency near-field communication have 'written description' in Plaintiff's patent specifications. When Plaintiff was drafting his patent specifications and patent claims for his patented CMDC device (i.e., new, improved upon, and useful cell phone), Plaintiff included, to complete the "utility or usefulness requirement" of his patented CMDC device; the functionality of a short-range wireless technology 'near-field communication' to enhance security measures.

Prior to Google rolling out its Pixel in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included a short-range wireless technology 'near-field communication' to enhance security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

204. Google's short-range wireless technology 'near-field communication' is included in Google's production process for manufacturing the Google Pixel smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. The Google short-range wireless technology 'near-field communication' is native to the manufacture of the Google Pixel smartphones, and is a standard component of the Google Pixel smartphone when imported into the United States.

205.  Plaintiff alleges, Google's Near-Field Communication (NFC) is included in Google's production process for manufacturing the Google Pixel smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. Google's Near-Field Communication (NFC) is native to the manufacture of the Google Pixel smartphones, and is a standard component of the Google Pixel smartphone when imported into the United States.

206.  Plaintiff alleges Google have devoted years to *"modifying"* the cell phone, that include Google's Near-Field Communication (NFC), into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Google *"modified"* cell phones, that include Google's Near-Field Communication (NFC) are shipped or imported into the United States.

207.  Plaintiff also alleges that when the Google *"modified"* cell phone, that include Google's Near-Field Communication (NFC), is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Google is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

208.  Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Google to manufacture the Google *"modified"* cell phone.

155

"[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

209. Upon information and belief, each individual claim limitation or element that is listed in this section describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

"[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

210. Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Google "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

"[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims

shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

211. *Plaintiff's Claim Limitations that Cover the Google "modified" Cell Phone that include Google's Near-field Communication (NFC) [short-range RF]*

- wherein the cell phone detector case has a [] Radio Frequency connection, [], all of which is interconnected to the central processing unit (cpu) [claim 21 of the '752 patent]

- wherein a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom the monitoring equipment and a central processing unit (CPU) [claim 72 of the '891 patent]

- wherein the communication device includes telecommunication, telematics, long and short-range radio frequency communication means [claim 14 of the '990 patent]

- wherein the communication device is designed as readers for barcodes will allow a reader to scan a barcode of a product or object and get more information about it [claim 24 of the '990 patent]

- wherein the product includes at least one of a built-in, embedded internet component, a global positioning (GPS) component, a navigation component, a tracking component, a cellular component, a satellite component, a short- and long-range radio frequency component, radio frequency (RF) sensor, radio frequency (RF) transceiver, Wi-Fi, antenna, Bluetooth, or interface/gateway component. [claim 78 of the '990 patent]

- wherein the cell phone, the smart phone, [] have at least one of a Bluetooth connection, a Wi-Fi connection, a short- and long-range radio frequency connection, a cellular connection, a satellite connection, or a GPS connection. [claim 117 of the '990 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; [claim 1 of the '189 patent]

- at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of a chemical agent, a biological agent, a radiological agent, a nuclear agent, or an explosive agent which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment. [claim 3 of the '189 patent]

- at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the chemical agent, the biological agent, the radiological agent, the explosive agent, the human agent, the contraband agent, the motion, the perimeter, the temperature, the tampering, the theft, and the breach which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment. [claim 6 of the '189 patent]

- whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; [claim 8 of the '189 patent]

- at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the explosive agent, the nuclear agent, the contraband agent, the chemical agent, the biological agent, the human agent, or the radiological agent which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment. [claim 9 of the '189 patent]

- at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of a chemical agent, a biological agent, a radiological agent, a nuclear agent, or an explosive agent which allows [] (RF) data to be at least one of received or transmitted between the tag and the monitoring equipment. [claim 15 of the '439 patent]

- at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the chemical agent, the biological agent, the radiological agent, the explosive agent, the human agent, the contraband agent, the motion, the perimeter, the temperature, the tampering, the theft, and the breach which allows radio frequency (RF) data to be received and/or transferred between the tag and the monitoring equipment. [claim 18 of the '439 patent]

- whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and/or sensor data; [claim 20 of the '439 patent]

- at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the explosive agent, the nuclear agent, the contraband agent, the chemical agent, the biological agent, the human agent, or the radiological agent which allows radio frequency (RF) data to be received and/or transferred between the tag and the monitoring equipment. [claim 21 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; [claim 22 of the '439 patent]

- the communication device being capable of wireless near-field communication (NFC) which allows radio frequency (RF) data to be at least one of received or transferred between the communication device and at least one tag that is read by the communication device; [claim 22 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 23 of the '439 patent]

- wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; [claim 23 of the '439 patent]

- a short-range radio frequency (RF) connection that is near-field communication (NFC); [claim 1 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim

159

1 of the '287 patent]

- a short-range radio frequency (RF) connection that is near-field communication (NFC); [claim 3 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 3 of the '287 patent]

- at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; [claim 4 of the '287 patent]

- at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; [claim 5 of the '287 patent]

- at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; [claim 6 of the '287 patent]

212. Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

### COUNT IX:

### Google's Watch Series for Google's "*modified*" Cell Phones

213. Count IX incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).