214. Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include Google's Watch Series, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

215. Upon information, Plaintiff alleges Google *"modified"* the cell phone (i.e., now the Pixel smartphone) device that include "***as an integral part of the Google 'modified' the cell phone***" [IPR trial in *DOJ/DHS v. Golden*]; the Google Pixel Watch Series, which begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

216. Upon information and belief, Plaintiff alleges Google is using Plaintiff's patented process to manufacture and/or produce the Google *"modified"* cell phone, that include Google's Watch Series, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Google *"modified"* cell phone, that include Google's Watch Series, infringement occurs when the combination is shipped or imported into the United States.

"Google is set to shift production of Pixel devices, namely the Google pixel phones and watches, from Vietnam to India as it contends with the US's uncertain global tariff regime, according to reports from the *Economic Times*.

The move is set to affect devices destined for the US market. As part of Trump's new tariff regime, imports from Vietnam face a 46% tariff when entering the US, and goods from China face a 145% tariff. There is a temporary 90-day delay in place, except for the 10% baseline tariffs and those imposed on China.

"Google to move Pixel manufacturing to India as tariffs shift supply chains" was originally created and published by *Investment*

161

*Monitor*, a GlobalData owned brand. India faces a 26% tariff rate, which, despite being higher than before, is almost half of Vietnam's.

That said, the sheer scale of Google's commitment to Indian manufacturing suggests a long-term strategy. If executed well, this could be a turning point for both Google and the Indian smartphone and smartwatch market. Even as Pixel fans eagerly await more details, the future of Pixel in India is increasingly looking brighter than ever." https://piunikaweb.com/2024/05/23/google-doubles-down-on-made-in-india-pixel-strategy-with-foxconn-partnership/

217.    Upon information, Plaintiff is alleging the Google "*modified*" cell phone, that include Google's Watch Series, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the "*modified*" cell phone, that include Google's Watch Series, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

218.    Plaintiff alleges Google's "*modified*" cell phone, that include Google's Watch Series, was first manufactured or produced using Plaintiff's patented process in response to a government request. Google performed work for the Government to "*modify*" a common cell phone, that include Google's Watch Series, and at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Google, as a third-party contractor, could not be sued for infringement.

219.    Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Google before the twelve federal judges weighed in on the infringement theory of "modification before infringement

162

occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. §§ 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

220. Upon information and belief, Google continues to import the Google *"modified"* cell phones, that include Google's Watch Series, into the United States that include *"nine standard sensors that are used as biosensors"*.

**Google's *"nine"* Smartphone Biosensors Submitted to the Courts:**

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

221.   Upon information, twelve Federal Judges infer to say; the Google *"modified"* cell phones that include Google's Watch Series, and include *"nine standard sensors which can be used as biosensors"*, satisfies the patent local rule of identifying where inside the Google *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Google Watch Series, is identified, according to the PTAB's claim term construction of "built-in, embedded"; as being located inside the Google *"modified"* cell phone.

222.   Upon information and belief, Plaintiff alleges Google's *"modification"* of the cell phone, that include Google's Watch Series, begin abroad and continues to this day. Plaintiff also alleges, Google *"modified"* the cell phone, that include Google's Watch Series; while performing work under a government contract was to avoid infringement liability here in the United States under § 271(a); and Google's *"modification"* of the cell phone, that include Google's Watch Series, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Google *"modified"* cell phones, that include Google's Watch Series, are shipped or imported into the United States.

223.   Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful *"modified"* cell phones, that include their own Watch Series, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones

164

is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Watch Series] https://news.ycombinator.com/item?id=28423983

224. Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Google] is accused of using Plaintiff's patented process to manufacture and/or assemble the Google "*modified*" cell phone, that include Google's Watch Series, under 35 U.S.C. §§ 154(a)(1) & 271(g). Google is tasked with presenting evidence to a jury that Google is (1) not using Plaintiff's patented process; or (2) Google is using Plaintiff's patented process but is not shipping or importing the Google "*modified*" cell phones (i.e., Pixel smartphones), that include Google's Watch Series, into the United States.

225. Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Google "*modified*" cell phone, that include Google's Watch Series, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

226. Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Google's "*modified*" cell phone that include Google's Watch Series] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

227. Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was

not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

228.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Google *"modified"* cell phone that include Google's Watch Series was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
>> (1) that a substantial likelihood exists that the product was made by the patented process, and
>>
>> (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

229.    Upon information and belief, Google is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Google *"modified"* cell phones (i.e., Pixel smartphones): Google Nexus One, Nexus S, Galaxy Nexus, Nexus 4, Nexus 5, Nexus 6, Nexus 5X, Nexus 6P, Pixel, Pixel XL, Pixel 2, Pixel 2 XL, Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, Pixel 4a, Pixel 4a 5G, Pixel 5, Pixel 5a 5G, Pixel 6, Pixel 6 Pro, Pixel

6a, Pixel 7, Pixel 7 Pro, Pixel 7a, Pixel 8, Pixel 8 Pro, Pixel 9, Pixel 9a, Pixel 9 Pro, Pixel 9 Pro XL, Pixel 9 Pro Fold, Pixel 10, Pixel 10a, Pixel 10 Pro, Pixel 10 Pro XL, and Pixel 10 Pro Fold; that include the Google Watch Series:

**Google Pixel Watch Models Comparison Table**

| FEATURE | PIXEL WATCH (2022) | PIXEL WATCH 2 (2023) | PIXEL WATCH 3 (2025) |
|---|---|---|---|
| Release Date | October 13, 2022 | October 4, 2023 | October 2025 |
| Operating System | Wear OS 3.5 | Wear OS 4 | Wear OS 5 |
| Processor | Exynos 9110 | Qualcomm Snapdragon W5 | Snapdragon W5 Gen 2 or Tensor G chip |
| RAM / Storage | 2GB RAM / 32GB storage | 2GB RAM / 32GB storage | 2.5GB RAM / 32–64GB |
| Battery Life | ~24 hours | ~24–30 hours (fast charging) | 36+ hours (upgrade) |
| Charging Method | Proprietary magnetic charger | Fast magnetic USB-C charging | Magnetic + wireless (Qi) charging |
| Build Material | Stainless Steel + Gorilla Glass | 100% Rec. Aluminum + Gorilla Glass | Polished aluminum or titanium |
| Water Resistance | 5 ATM (swim-proof) | 5 ATM + IP68 | 5 ATM + IP68 |
| Health Features | **Heart rate, ECG, sleep tracking** | **Heart rate, ECG, skin temp, SpO2, stress** | **All PW2 + blood pressure** |
| AI Features | Basic Google Assistant | Enhanced Assistant, Fitbit AI | Gemini Nano on-device AI |
| Fitbit Integration | Full Fitbit integration | Enhanced with more sensors | Personalized insights + Fitbit Premium |

| FEATURE | PIXEL WATCH (2022) | PIXEL WATCH 2 (2023) | PIXEL WATCH 3 (2025) |
|---|---|---|---|
| Connectivity | Bluetooth, Wi-Fi, LTE (optional) | Bluetooth, Wi-Fi, LTE | Bluetooth 5.3, Wi-Fi 6, LTE/5G |
| Price at Launch | $349 (Wi-Fi), $399 (LTE) | $349 (Wi-Fi), $399 (LTE) | $399+ |

**230.** Upon information, Plaintiff alleges, the United States Department of Homeland Security (DHS) and the United States Department of Justice (DOJ) in *Golden v. US* CFC 13-307C petition the United States Patent Trials and Appeals Board (PTAB) to invalidate certain patent claims of Plaintiff's patents.

In the PTAB's "Final Written Decision" (Oct. 1, 2015) they construed the claim term "built-in, embedded" as "something that is an integral part of the device".

Throughout, this complaint, Plaintiff have pleaded enough facts to support Google's *"modified"* cell phone that "include within" or have "dispose within", a *"modified"* Google camera for CBRNE-H detection; and, a Google *"modified"* cell phone that "incorporate into", or is "connected to", a *"modified"* Google watch for CBRNE-H detection; allegedly infringes the patented process of Plaintiff's invention. [§ 271(g)]

The Google Watch is a component of Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) device, that Google allegedly infringes when Google manufacture, produce, and assemble for shipment; and then imports the patented process into the United States. [§ 271(g)]

In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015.

168

"In the Decision to Institute, we construed certain claim terms." Those constructions are reproduced in the chart below.

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

Plaintiff claims the Google Watch is Google's version of a detection capability that is "built in, embedded"; included within; incorporated into, disposed within; affixed to; connected to; or mounted to another device, such that it is an integral part of the [communication] device, or [monitoring equipment]". This theory aligns with Plaintiff's patent specifications—placed "in, on, upon, or adjacent" the device.

"During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a)" ... "DHS presentations at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center event conveyed that next generation, sensor-embedded phones would roll out gradually over the next few years and, as with cameras in phones, would soon become standard (U.S. Department of Homeland Security, 2011a)." Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks - ScienceDirect

169

| | |
|---|---|
| *PHASE II* **EXTERNAL DECTECTOR UNDER *CELL-ALL*** | |
| **Google's Cell Phone Integration with an "External" CBRNE-H Detection Device** | |
| *"Phase II" – External Detection*  Google's *"modified"* cell phone integrated with an "external" cell phone detection device | The second phase of Cell-All began in 2010 with the goals of creating dozens of competing viable devices and refining the network capabilities of the system. During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). |
| *"Phase II" – External Detection*  Google's *"modified"* cell phone integrated with an "external" cell phone detection device | **Qualcomm's Cell-All Concept**<br>• Phase I<br>  • Establish miniature sensor efficacy<br>  • Discover limitations for cell phone integration<br>  • Develop first generation prototypes<br>  • Proof of concept: Use a development platform to integrate an existing sensor to demonstrate the ability to sense a defined set of agents<br>• Phase II<br>  – Transmit sensor data via 3G and/or Wi-Fi<br>  – Design a multiple sensors network for chemical profiling<br>  – Determine whether the viability of multiple sensor units per phone are possible<br>  – Explore the use of Bluetooth and other external interfaces<br>  – Standardize the sensor platform (internal and external interfaces, software architecture)<br>• Phase III<br>  – Provide a plan for achieving widespread acceptance by Cell-All services by subscribers, cell phone OEMs, wireless carriers, and government agencies |
| *"Phase II" – External Detection*  Google's *"modified"* cell phone integrated with an "external" cell phone detection device | At a September 2011 live test and demonstration of second-generation prototypes at the Los Angeles Fire Department's Frank Hotchkin Memorial Training Center, Synkera's prototype was already on the market and NASA's sensor was awaiting clearance for public release. Therefore, during the second phase of development outlined above, DHS shifted its marketing strategy to stress the personal protection aspect of the project as an approach intended to persuade consumers to buy the associated products (U.S. Department of Homeland Security, 2011a). DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung—with the objective of accelerating the "commercialization of technology developed for government purposes" (U.S. Department of Homeland Security, 2010). |

170

| | |
|---|---|
| *"Phase II"* – *External Detection*<br><br>Google's *"modified"* cell phone integrated with an "external" cell phone detection device | Smartwatches have several sensors and integrated apps that may track vital indicators, identify hazardous chemicals, and provide emergency notifications The smartwatches' built-in sensors and monitoring features enable them to detect possible hazards like excessive levels of poisonous gasses. |
| *"Phase II"* – *External Detection*<br><br>Google's *"modified"* cell phone integrated with an "external" cell phone detection device | Smartwatches can detect subtle physiological changes — such as temperature shifts and heart rate variations — that may indicate early infection before symptoms appear. Smartwatch features that measure heart rates, oxygen levels, fitness levels and sleep quality have been marketed as valuable tools for people who are eager to monitor their health. Smartwatches' health apps and sensors provide enough information to accurately predict when a person has become infected with a disease like COVID-19 or the flu. Here are the sensors Google lists, and their function: The Google Watch include an accelerometer, gyroscope, and barometer, which are used to determine device orientation, user movement, and altitude. The back of all Google Watches is equipped with a Heart Rate Monitor, which projects infrared and green light from light-emitting diodes (LEDs) onto the user's skin and photodiodes measure the varying amount of light reflected. Because blood absorbs green light and reflects red light, the amounts of each type of reflected light are compared to determine heart rate. The Google Watch adjusts the sampling rate and LED brightness as needed. Google added electrical sensors to the Digital Crown and back, allowing the Google Watch to take electrocardiogram (ECG) readings; The consumer device is capable of taking an ECG. A blood oxygen monitor was added to the Google Watch Series, albeit as a "wellness" device not capable of diagnosing a medical condition. The blood oxygen monitor added red LEDs to the back, allowing the watch to determine oxygen levels by measuring blood color. |
| *"Phase II"* – *External Detection*<br><br>Google's *"modified"* cell phone integrated with an "external" cell phone detection device | In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". |

171

| | |
|---|---|
| *"Phase II" – External Detection*<br><br>Google's "*modified*" cell phone integrated with an "external" cell phone detection device | Google watches connect to Google's "*modified*" cell phones primarily to enhance functionality and user experience. Google's watches receive alerts for calls, messages, and app notifications, allowing users to stay informed without checking their phones. Google watches monitor health metrics (e.g., heart rate, steps) and sync this data with smartphone apps for comprehensive health tracking. Google's watches use the "*modified*" cell phone's GPS for accurate location tracking and navigation assistance. Apps on Google's "*modified*" cell phones have corresponding Google watch versions, enabling seamless access to features like fitness tracking. Bluetooth Connectivity: Most Google watches connect via Bluetooth, allowing for a low-energy, stable connection to the smartphones. Google's watches require a companion app on the Google "*modified*" cell phone for setup and to manage settings and updates. This connection significantly expands the capabilities of both devices, making them more useful together than separately. |

Draper's Android Tactical Assault Kit (ATAK) Chemical, Biological, Radiological, and Nuclear (CBRN) plug-ins. ATAK can connect to sensors on many platforms (e.g., smartwatches) and has many plugins that warfighters can download … ATAK provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate). https://www.dvidshub.net/news/printable/367459

231. Plaintiff alleges, Google's Watch Series is included in Google's production process for manufacturing the Google Pixel smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. Google's Watch Series is native to the manufacture of the Google Pixel smartphones, and is a standard component of the Google Pixel smartphone when imported into the United States.

172

232. Plaintiff alleges Google have devoted years to *"modifying"* the cell phone, that include Google's Watch Series, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Google *"modified"* cell phones, that include Google's Watch Series are shipped or imported into the United States.

233. Plaintiff also alleges that when the Google *"modified"* cell phone, that include Google's Watch Series, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Google is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that ***it is an integral part of the device***".

234. Upon information and belief, each individual claim limitation or element that is listed in this section describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Google to manufacture the Google *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

173

235.    Upon information and belief, each individual claim limitation or element that is listed in this section describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

236.    Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for a Google "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

237.    Upon information, prior to Google rolling out its Pixel phone in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included the

174

design for a Google Watch i.e., a multi-sensor detection device, that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

238.  Plaintiff alleges, the Google Watch Series that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures is included in Google's production process for manufacturing the Google Pixel smartphones and smartwatches that Plaintiff alleges infringes, upon importation or shipment, the patented process of Plaintiff's inventions. [§ 271(g)].

239.  Plaintiff alleges, the Google Watch Series that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures, is native to the manufacture of the Google Pixel smartphones, and is a standard component of the Google Pixel smartphone when imported into the United States. The PTAB determined the Google Watch to be a standard component because it falls under the claim term construction of "built-in, embedded", "such that it is an integral part of the Google "*modified*" cell phone.

*Plaintiff's Claim Limitations that Cover the Google "modified" Cell Phone that include Google's Watch Series for External CBRNE-H Detection*

- a plurality of interchangeable detectors for detecting the chemical, biological and radiological agents and compounds and capable of being disposed within the detector [claim 1 of the '497 patent]

- a plurality of interchangeable detectors for detecting the chemical, biological, or radiological agents and compounds and which is capable of being disposed within the detector case [claim 7 of the '497 patent]

- a plurality of interchangeable detectors for detecting the chemical, biological, or radiological agents and compounds and that is capable of being disposed within the detector case [claim 13 of the '497 patent]

- wherein the communication device is designed to be used as a standalone detection system for the detection of [] at least one of the human vitals sensors of; a heart sensor, a nerve sensor, a perspiration sensor, an inflammation sensor, a pulse sensor, a blood pressure sensor, a temperature sensor, a breath sensor, or a radiation sensor. [claim 31 of the '990 patent]

- wherein the multi sensor detection device is capable of being embedded into; placed in, on, or adjacent to a product or area targeted for monitoring. [claim 97 of the '990 patent]

- The multi-sensor detection system [] wherein the cell phone, the smart phone, [] is designed to be used as a standalone detection system for the detection of [] human vitals sensors of: a heart sensor, a nerve sensor, a perspiration sensor, a inflammation sensor, a pulse sensor, a blood pressure sensor, a temperature sensor, a breath sensor, or a radiation sensor. [claim 123 of the '990 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 7 of the '189 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; [claim 7 of the '189 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 8 of the '189 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 9 of the '189 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI); [claim 9 of the '189 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; [claim 13 of the '439 patent]

176

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the monitoring equipment; [claim 14 of the '439 patent]
- comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; [claim 16 of the '439 patent]
- A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents; [claim 16 of the '439 patent]
- a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; [claim 17 of the '439 patent]
- A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising: [claim 17 of the '439 patent]
- A built-in multi sensor detection system for detecting at least two items selected from the group consisting of chemical agent, biological agent, radiological agent, explosive agent, human agent, contraband agent, motion, perimeter, temperature, tampering, theft, or breach, comprising: [claim 18 of the '439 patent]
- a built-in sensor array or fixed detection device into a product that detects items by means of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; [claim 18 of the '439 patent]
- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: [claim 19 of the '439 patent]
- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive,

177

nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; [claim 19 of the '439 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents or compound, comprising: [claim 20 of the '439 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; [claim 20 of the '439 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 21 of the '439 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI); [claim 21 of the '439 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; [claim 22 of the '439 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; [claim 23 of the '439 patent]

- one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; [claim 5 of the '287 patent]

- at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; [claim 6 of the '287 patent]

**240.** Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility

178

that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT X:
### Google's Wi-Fi Chips for connecting Google's *"modified"* Cell Phones

241. Count X incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

242. Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include Google's Wi-Fi Chip, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

243. Upon information, Plaintiff alleges Google *"modified"* the cell phone (i.e., now the Pixel smartphone) device that include Google's Wi-Fi Chip, begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

244. Upon information and belief, Plaintiff alleges Google is using Plaintiff's patented process to manufacture and/or produce the Google *"modified"* cell phone, that include Google's Wi-Fi Chip, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Google *"modified"* cell phone, that include Google's Wi-Fi Chip, infringement occurs when the combination is shipped or imported into the United States.

245. Upon information, Plaintiff is alleging the Google *"modified"* cell phone, that include Google's Wi-Fi Chip, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon

shipment or importation of the *"modified"* cell phone, that include Google's Wi-Fi Chip, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

**246.** Plaintiff alleges Google's *"modified"* cell phone, that include Google's Wi-Fi Chip, was first manufactured or produced using Plaintiff's patented process in response to a government request. Google performed work for the Government to *"modify"* a common cell phone, that include Google's Wi-Fi Chip, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's implied "authorization or consent", Google, as a third-party contractor, could not be sued for infringement.

**247.** Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Google before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. §§ 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

248.    Upon information, twelve Federal Judges infer to say; the Google *"modified"* cell phones that include Google's Wi-Fi Chip, and include *"nine standard sensors which can be used as biosensors"*, satisfies the patent local rule of identifying where inside the Google *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Google's Wi-Fi Chip, is identified and located inside the Google *"modified"* cell phone.

249.    Upon information and belief, Google continues to make, offer for sell, sell, and purportedly import the Google *"modified"* cell phones (i.e., Pixel smartphones), that include Google's Wi-Fi Chip, into the United States; that also include *"nine standard sensors that are used as biosensors"*.

250.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Google *"modified"* cell phone, that include Google's Wi-Fi Chip, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

---

**Google's *"nine"* Smartphone Biosensors Submitted to the Courts**:

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

181

251. Upon information and belief, Plaintiff alleges Google's "*modification*" of the cell phone, that include Google's Wi-Fi Chip, begin abroad and continues to this day. Plaintiff also alleges, Google "*modified*" the cell phone, that include Google's Wi-Fi Chip, while performing work under a government contract, to avoid infringement liability here in the United States under § 271(a); and Google's "*modification*" of the cell phone, that include Google's Wi-Fi Chip, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Google "*modified*" cell phones, that include Google's Wi-Fi Chip, are shipped or imported into the United States.

252. Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own Wi-Fi Chip, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Wi-Fi Chip] https://news.ycombinator.com/item?id=28423983

253. Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Google] is accused of using Plaintiff's patented process to manufacture and/or

assemble the Google "*modified*" cell phone, that include Google's Wi-Fi Chip, under 35 U.S.C. §§ 154(a)(1) & 271(g).  is tasked with presenting evidence to a jury that Google is (1) not using Plaintiff's patented process; or (2) Google is using Plaintiff's patented process but is not shipping or importing the Google "*modified*" cell phones (i.e., Pixel smartphones), that include Google's Wi-Fi Chip, into the United States.

254.    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Google's "*modified*" cell phone that include Google's Wi-Fi Chip] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

255.    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

256.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Google "*modified*" cell phone] was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the
> importation, sale, offer for sale, or use of a product which is made
> from a process patented in the United States, if the court finds—

183

(1) that a substantial likelihood exists that the product was made by the patented process, and

(2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

**257.** Upon information and belief, Google is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Google "*modified*" cell phones (i.e., Pixel smartphones) that include Google's Wi-Fi Chip: Google Nexus One, Nexus S, Galaxy Nexus, Nexus 4, Nexus 5, Nexus 6, Nexus 5X, Nexus 6P, Pixel, Pixel XL, Pixel 2, Pixel 2 XL, Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, Pixel 4a, Pixel 4a 5G, Pixel 5, Pixel 5a 5G, Pixel 6, Pixel 6 Pro, Pixel 6a, Pixel 7, Pixel 7 Pro, Pixel 7a, Pixel 8, Pixel 8 Pro, Pixel 9, Pixel 9a, Pixel 9 Pro, Pixel 9 Pro XL, Pixel 9 Pro Fold, Pixel 10, Pixel 10a, Pixel 10 Pro, Pixel 10 Pro XL, and Pixel 10 Pro

**258.** Upon information, Google's latest Pixel phone introduced a significant shift in the company's approach to wireless connectivity. This move marks a new phase in Google's push to control every aspect of its hardware, extending its in-house chip design beyond processors and modems to local wireless communication.

*Pixel 10a phone (2026)*

Pixel 10a: Wi-Fi 6E with 2.4GHz, 5GHz, 6GHz, 2x2 MIMO

*Pixel 10 Pro Fold (2025)*

Pixel 10 Pro Fold: Wi-Fi 7 (802.11be) with 2.4GHz, 5GHz, 6GHz, 2x2 MIMO

*Pixel 10 phones (2025)*

Pixel 10 Pro XL: Wi-Fi 7 (802.11be) with 2.4GHz, 5GHz, 6GHz, 2x2 MIMO

Pixel 10 Pro: Wi-Fi 7 (802.11be) with 2.4GHz, 5GHz, 6GHz, 2x2 MIMO

Pixel 10: Wi-Fi 6E (802.11ax) with 2.4GHz, 5GHz, 6GHz, 2x2 MIMO

*Pixel 9a phone (2025)*

Pixel 9a: Wi-Fi 6E with 2.4 GHz + 5 GHz + 6 GHz, 2x2 MIMO

Pixel 9 Pro Fold (2024)

Pixel 9 Pro Fold: India: Wi-Fi 7 (802.11ax) with 2.4G+5GHz + 6GHz, HE160, MIMO: Rest of world: Wi-Fi 7 (802.11/be) with 2.4G+5GHz + 6GHz, 2x2 + 2x2, MIMO

*Pixel 9 phones (2024)*

Pixel 9 Pro XL: US, PR, CA, GB, EU, NO, MY, AU, TW, SG, JP, AT, BE, CH, DE, DK, ES, FI, FR, IE, IT, NL, PT, SE, CZ, PL, RO, HU, SI, SK, EE, LV, LT: Wi-Fi 7 (802.11be) with 2.4GHz+5GHz+6GHz, 2x2 + 2x2 MIMO: IN Wi-Fi 6 (802.11ax) with 2.4GHz+5GHz, HE160, MIMO

Pixel 9 Pro: AT, AU, BE, CA, CH, CZ, DE, DK, EE, ES, EU, FI, FR, GB, HU, IE, IT, JP, LT, LV, MY, NL, NO, PL, PR, PT, RO, SE, SG, SI, SK, TW, US: Wi-Fi 7 (802.11be) with 2.4GHz+5GHz+6GHz, 2x2+2x2 MIMO: IN Wi-Fi 6 (802.11ax) with 2.4GHz+5GHz, HE160, MIMO

Pixel 9: IN Wi-Fi 6 (802.11ax) with 2.4GHz+5GHz, HE160, MIMO: World Wi-Fi 7 (802.11be) with 2.4GHz+5GHz+6GHz, 2x2 + 2x2 MIMO

*Pixel 8a phone (2024)*

Pixel 8a: [US (PR), CA, UK, EU, AU, JP, TW, and SG] Wi-Fi 6E (802.11ax) with 2.4 GHz + 5 GHz + 6 GHz, HE80, MIMO: [IN] Wi-Fi 6 (802.11ax) with 2.4 GHz + 5 GHz, HE80, MIMO

Pixel 8 phones (2023)

Pixel 8 Pro: [US (PR), CA, UK, EU, and AU]: Wi-Fi 7 (802.11be) with 2.4GHz+5GHz+6GHz, 2x2+2x2 MIMO: [JP] Wi-Fi 6E (802.11ax) with 2.4GHz+5GHz+6GHz, 2x2+2x2 MIMO: [TW, SG, and IN]: Wi-Fi 6 (802.11ax) with 2.4GHz+5GHz, HE160, and MIMO

Pixel 8: [US (PR), CA, UK, EU, and AU] Wi-Fi 7 (802.11be) with 2.4GHz+5GHz+6GHz, 2x2+2x2 MIMO: [JP] Wi-Fi 6E (802.11ax) with

2.4GHz+5GHz+6GHz, 2x2+2x2 MIMO; [TW, SG, and IN]: Wi-Fi 6 (802.11ax) with 2.4GHz+5GHz, HE160, and MIMO

*Pixel Fold phone (2023)*

Pixel Fold: [US, UK, DE] Wi-Fi 6E (802.11ax) with 2.4 G+5G Hz+6 GHz, HE160, MIMO: [JP] Wi-Fi 6E (802.11ax) with 2.4 G+5 GHz, HE160, MIMO

*Pixel 7a phone (2023)*

Pixel 7a: US (PR), CA, UK, EU, AU, JP: Wi-Fi 6E (802.11ax) with 2.4GHz+5GHz+6GHz, HE80, MIMO: TW, SG, IN: Wi-Fi 6 (802.11ax) with 2.4GHz+5GHz, HE80, MIMO

*Pixel 7 phones (2022)*

Pixel 7 Pro: US (PR), CA, UK, EU, AU: Wi-Fi 6E (802.11ax) with 2.4GHz+5GHz+6GHz, HE160, MIMO: TW, JP, SG, IN: Wi-Fi 6 (802.11ax) with 2.4GHz+5GHz, HE160, MIMO

Pixel 7: US (PR), CA, UK, EU, AU: Wi-Fi 6E (802.11ax) with 2.4GHz+5GHz+6GHz, HE160, MIMO. TW, JP, SG, IN: Wi-Fi 6 (802.11ax) with 2.4GHz+5GHz, HE160, MIMO

*Pixel 6a phone (2022)*

Pixel 6a: Wi-Fi 6 (802.11ax) and 6E (6GHz) with 2.4G+5GHz+6GHz, HE160, 2X2 MIMO Pixel 6a is Wi-Fi 6E capable

*Pixel 6 phones (2021)*

Pixel 6 Pro: Wi-Fi 6 (802.11ax) and 6E (6GHz) with 2.4G+5GHz+6GHz, HE160, 2X2 MIMO Pixel 6 Pro is Wi-Fi 6E capable

Pixel 6: Wi-Fi 6 (802.11ax) and 6E (6GHz) with 2.4G+5GHz+6GHz, HE160, 2X2 MIMO Pixel 6 is Wi-Fi 6E capable

Newer Google Pixel phones have better Wi-Fi chips. This means faster speeds and more stable connections. Older models may struggle more in crowded areas or with high-bandwidth tasks.

Simply put, Wi-Fi is a wireless network between devices, using short range radio waves. Devices that connect to a Wi-Fi network contain antennas and components that can both transmit

radio signals and receive them, with the radio messages consisting of packets of data.

Many people associate Wi-Fi with Internet access, but Wi-Fi isn't the Internet connection itself. Wi-Fi is one of the ways that a device can establish a connection to other computers or devices, like a router, which has a connection to the Internet that it shares.

Knowing that Google's current range of hardware supports the faster Wi-Fi networking standards is comforting, as you can be assured that your Google Pixel phones will get decent speeds across both the network and from the network's Internet connection.

Even though the terms Wi-Fi and internet are often used interchangeably, the terms refer to two different types of connection. The word internet refers to "wide area network" (WAN). The internet is a globally connected network that links devices worldwide.

Wi-Fi, on the other hand, is a way of connecting devices on a local area network (LAN). Before the days of Wi-Fi, the only way to connect devices to the internet was through individual cables, which was often inconvenient. By creating an individual Wi-Fi network, you can connect laptops, phones, smart devices, and any other enabled devices both to each other and the internet within a home or office using a secure network.

If you see a device that has "with Wi-Fi" on it – or "Wi-Fi only," it means it can connect to the internet through a Wi-Fi network, and only through a Wi-Fi network. On the other hand, if you see "Wi-Fi + Cellular", it means the device can connect to the internet via both Wi-Fi and cellular networks.

187

This distinction is important for devices like tablets and smart hotspots. For instance, a Google device labeled "Wi-Fi + Cellular" can access the internet anywhere there's cellular coverage, while a "Wi-Fi only" requires a Wi-Fi network to connect.

The most effective way to use the Google "*modified*" cell phone (i.e., Google Pixel) for Carbon Monoxide (CO) detection is by employing smart CO detectors. These Google "*modified*" cell phone devices connect to the Wi-Fi network and can send notifications to a Google "*modified*" cell phone through a dedicated app. Steps for enabling the CO detector.

- Purchase a Smart CO Detector: Research and select a smart CO detector compatible with your Pixel phone. Consider factors like battery life, range, and app features. Popular brands include Nest Protect, First Alert Onelink, and Kidde RemoteLync.

- Install the Smart CO Detector: Follow the manufacturer's instructions to install the detector in a central location within your home, ideally near bedrooms.

- Download and Install the Companion App: Download the CO detector's companion app from the Google Play Store onto your Google phone.

- Connect the Detector to your Wi-Fi Network: Use the app to connect the detector to your home's Wi-Fi network. This allows the detector to communicate with your Google Pixel phone.

- Configure Notifications: Set up notifications within the app to receive alerts when the detector senses elevated CO levels. Customize notification settings to your preferences.

Integrating your Google Pixel phone into your CO detection system through the Wi-Fi network offers several benefits:

- Remote Monitoring: Receive alerts on your Pixel phone [Google's *"modified"* cell phone] regardless of your location.

- Immediate Notifications: Be instantly notified of elevated CO levels, giving you critical response time.

- Data Logging: Some systems record CO levels over time, allowing you to identify patterns or potential sources of leaks.

- Integration with Smart Home Systems: Connect your CO detection to other smart home devices for automated responses, such as turning off appliances or opening windows.

- Convenience: Manage and monitor your CO detectors directly from your Google Pixel phone

259. Plaintiff alleges, Google's Wi-Fi Chip is included in Google's production process for manufacturing the Google Pixel smartphones that Plaintiff alleges infringes the patented process of his inventions. [§ 271(g)]. Google's Wi-Fi Chip is native to the manufacture of the Google Pixel smartphones, and is a standard component of the Google Pixel smartphone when imported into the United States.

260. Plaintiff alleges Google have devoted years to *"modifying"* the cell phone, that include Google's Wi-Fi Chip, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Google *"modified"* cell phones, that include Google's Wi-Fi Chips are shipped or imported into the United States.

261. Plaintiff also alleges that when the Google *"modified"* cell phone, that include Google's Wi-Fi Chip, is integrated with, or interconnected to, a CBRNE-H detection

capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Google is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that *it is an integral part of the device*".

262. Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Google to manufacture the Google *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

263. Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

264.  Upon information and belief, each individual claim limitation or element listed in this section that is available for use to manufacture the patented process for a Google "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

265.  Upon information, prior to Google rolling out its Pixel phone in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC devices that included Wi-Fi Chips; enables CBRNE-H detection for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

266.  Plaintiff alleges, Google's Wi-Fi Chip that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures is included in Google's production process for manufacturing the Google Pixel smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)].

**267.** Plaintiff alleges, Google's Wi-Fi Chip that enables a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures, is native to the manufacture of the Google "*modified*" cell phones, and is a standard component of the Google "*modified*" cell phone when imported into the United States. The PTAB determined the Wi-Fi Chip to be a standard component because it falls under the claim term construction of "built-in, embedded", "such that it is an integral part of the Google "*modified*" cell phone.

*Plaintiff's Claim Limitations that Cover the Google "modified" Cell Phone that include Google's Wi-Fi Chip for connecting Google's "modified" Cell Phone*

- wherein the cell phone detector case has a Bluetooth connection, a Wi-Fi connection, a Radio Frequency connection, a cellular connection, a satellite connection, and a GPS connection, all of which is interconnected to the central processing unit (cpu) [claim 21 of the '752 patent]

- receiving signals from and sending signals to at least one of, but not limited to, a cell phone, a smartphone, a PDA, a handheld, a laptop, a desktop, a cellular towel, a satellite, a workstation or monitoring site. [claim 153 of the '990 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; [claim 1 of the '189 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; [claim 3 of the '189 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; [claim 7 of the '189 patent]

- a communication method of at least one of a Bluetooth, Wi-Fi, Wi-Max, Internet,

192

Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), or central processing unit (CPU), used to interconnect the communication device to the monitoring equipment for sending signals thereto and receiving signals therefrom; [claim 1 of the '439 patent]

- monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; [claim 14 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 14 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; [claim 15 of the '439 patent]

- wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with a transmitter, a receiver of the monitoring equipment, or transceivers of the products; [claim 21 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; [claim 22 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 23 of the '439 patent]

- wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with

193

the transmitter or the receiver; [claim 23 of the '439 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 1 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 3 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 4 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 5 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 6 of the '287 patent]

268. Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT XI:

### Google's Wireless Communication Protocols [Bluetooth, cellular, and Wi-Fi] for connecting the Google Watch Series

269.    Count XI incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

270.    Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include Google's Wireless Communication Protocols, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

271.    Upon information, Plaintiff alleges Google *"modified"* the cell phone (i.e., now the Pixel smartphone) device that include Google's Wireless Communication Protocols, begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

272.    Upon information and belief, Plaintiff alleges Google is using Plaintiff's patented process to manufacture and/or produce the Google *"modified"* cell phone, that include Google 's Wireless Communication Protocols, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Google *"modified"* cell phone, that include Google's Wireless Communication Protocols, infringement occurs when the combination is shipped or imported into the United States.

273.    Upon information, Plaintiff is alleging the Google *"modified"* cell phone, that include Google's Wireless Communication Protocols, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Google 's Wireless Communication Protocols, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

274.    Plaintiff alleges Google 's *"modified"* cell phone, that include Google's Wireless Communication Protocols, was first manufactured or produced using

195

Plaintiff's patented process in response to a government request. Google performed work for the Government to "*modify*" a common cell phone, that include Google 's Wireless Communication Protocols, and at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's implied "authorization or consent", Google, as a third-party contractor, could not be sued for infringement.

**275.** Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Google before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. §§ 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed – Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**276.** Upon information, twelve Federal Judges infer to say; the Google *"modified"* cell phones that include Google 's Wireless Communication Protocols, and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local

196

rule of identifying where inside the Google *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Google's Wireless Communication Protocols, is identified and located inside the Google *"modified"* cell phone.

> **Google's *"nine"* Smartphone Biosensors Submitted to the Courts**:
>
> - Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
> - Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
> - Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
> - Microfluidic cassette: Interchangeable cassettes with varying assays
> - VIS-NIR spectrometer: Food freshness; Melanoma
> - NNAP Electrodes: Toxic metals and Organic pollutants in water
> - Optical Waveguide: Pathogens in water and food
> - Back and front camera: Colorimetric analysis; Image analysis
> - Microphone: Voice recording stress levels

277. Upon information and belief, Google continues to make, offer for sell, sell, and purportedly import the Google *"modified"* cell phones (i.e., Pixel smartphones), that include Google's Wireless Communication, into the United States that also include *"nine standard sensors that are used as biosensors"*.

278. Upon information and belief, Plaintiff alleges Google 's *"modification"* of the cell phone, that include Google's Wireless Communication Protocols, begin abroad and continues to this day. Plaintiff also alleges, Google *"modified"* the cell phone, that include Google's Wireless Communication Protocols, while performing work under a government contract was to avoid infringement liability here in the United States under § 271(a); and Google's *"modification"* of the cell phone, that include Google's Wireless Communication Protocols, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was

197

made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Google *"modified"* cell phones, that include Google 's Wireless Communication Protocols, are shipped or imported into the United States.

279.    Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful *"modified"* cell phones, that include their own Wireless Communication Protocols, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Wireless Communication Protocols] https://news.ycombinator.com/item?id=28423983

280.    Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Google] is accused of using Plaintiff's patented process to manufacture and/or assemble the Google *"modified"* cell phone, that include Google's Wireless Communication Protocols, under 35 U.S.C. §§ 154(a)(1) & 271(g). Google is tasked with presenting evidence to a jury that Google is (1) not using Plaintiff's patented process; or (2) Google is using Plaintiff's patented process but is not shipping or importing the Google *"modified"* cell phones (i.e., Pixel smartphones), that include Google's Wireless Communication Protocols, into the United States.

198

281.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Google "*modified*" cell phone, that include Google's Wireless Communication Protocols, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

282.    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Google's "*modified*" cell phone that include Google's Wireless Communication Protocols] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

283.    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

284.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Google "*modified*" cell phone that include Google's Wireless Communication Protocols was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the
> importation, sale, offer for sale, or use of a product which is made
> from a process patented in the United States, if the court finds—

199

(1) that a substantial likelihood exists that the product was made by the patented process, and

(2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

285. Upon information and belief, Google is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Google "*modified*" cell phones (i.e., Pixel smartphones) that include Google's Wireless Communication Protocols: Google Nexus One, Nexus S, Galaxy Nexus, Nexus 4, Nexus 5, Nexus 6, Nexus 5X, Nexus 6P, Pixel, Pixel XL, Pixel 2, Pixel 2 XL, Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, Pixel 4a, Pixel 4a 5G, Pixel 5, Pixel 5a 5G, Pixel 6, Pixel 6 Pro, Pixel 6a, Pixel 7, Pixel 7 Pro, Pixel 7a, Pixel 8, Pixel 8 Pro, Pixel 9, Pixel 9a, Pixel 9 Pro, Pixel 9 Pro XL, Pixel 9 Pro Fold, Pixel 10, Pixel 10a, Pixel 10 Pro, Pixel 10 Pro XL, and Pixel 10 Pro

286. Upon information, Plaintiff alleges, the Google Pixel Watch Series connects through Wi-Fi, Bluetooth, and cellular to communicate with Google's "*modified*" cell phone:

*Wi-Fi*: "A 'Network error' message in the Google Pixel Watch app may indicate that the Google Pixel phone is not connected to Wi-Fi. As long as your Google Pixel Watch's Wi-Fi is on, it'll connect automatically to Wi-Fi networks saved on Google Pixel phone. Make sure the Google Pixel phone is connected to Wi-Fi and then check to ensure Wi-Fi is turned on in the Google Pixel watch's settings:

1. On Google Pixel Watch, swipe down ˅ tap Settings

2. Tap Connectivity ˅ Wi-Fi. If Wi-Fi is set to off, tap the Wi-Fi switch to turn it on.

3. If it doesn't already have a connection, tap Add network.

4. If it requires a password, tap Password. When prompted, enter the password on your watch.

Note: The watch can't connect to Wi-Fi networks that take you to a page before you can connect (for example, Wi-Fi networks at places like hotels or coffee shops). It also can't connect to 5GHz networks.

***Bluetooth***: Follow the steps below to learn how to set up your Google Pixel Watch. You can also upgrade to a new Pixel Watch or connect a new phone to your watch without data loss:

1. Ensure that your phone and watch are sufficiently charged.

2. Turn on Bluetooth on your phone and allow Location permissions.

3. Attach your selected band to your watch and adjust the band for comfort.

4. Install the latest version of the Google Pixel Watch app.

5. Turn on your Google Pixel Watch. Press and hold the crown for about 3 seconds and wait for the screen to light up.

6. To pair, place your watch near a compatible Android phone1 with Bluetooth on.

7. If your phone supports fast pairing, a message will appear on the screen that signals that the pairing process can begin.

8. If your phone doesn't support fast pairing, you can open the Google Pixel Watch app to start the process.

201

9. Follow the on-screen instructions in the app and select Pixel Watch.

10. A matching pairing code shows on both the app and watch.

11. If the codes match, tap Pair. The pairing process will begin and can take a few minutes to complete.

12. If the codes don't match, restart your device and try again.

13. Press and hold the crown for 3 seconds.

14. Scroll and tap Restart.

15. Once the watch restarts, wait until the watch is fully on.

16. Bring the phone and watch together again, then retry the pairing process.

*Cellular*: Google Pixel Watch 4G LTE features

1. Has a direct connection to your cellular network or carrier plan.

2. Shares a number with your phone so notifications and messages are in sync. Tip: Google Pixel Watch LTE doesn't require you to have a new number but you need to set up a separate line. Your watch will have the same number as your phone once you pair them and activate 4G LTE with a compatible carrier.

3. Allows you to make calls and use apps from your watch without your phone.

How to add a Pixel Watch to a cellular plan on your Google Pixel Watch:

1. Swipe down, then tap Settings.

2. Tap Connectivity ⟩ Mobile.

3. Confirm that the status is set to Automatic.

On your phone:

1. Open the Google Pixel Watch app.

2. Tap Connectivity › Mobile network › Connect Google Fi

3. Tap Connect to Fi › Done.

4. A Google Fi profile will be created on your Pixel Watch.

287. Plaintiff alleges, Google's Wireless Communication Protocols is included in Google's production process for manufacturing the Google Pixel smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. Google's Wireless Communication Protocols are native to the manufacture of the Google Pixel smartphones, and is a standard component of the Google Pixel smartphone when imported into the United States.

288. Plaintiff alleges Google have devoted years to *"modifying"* the cell phone, that include Google's Wireless Communication Protocols, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Google *"modified"* cell phones, that include Google's Wireless Communication Protocols of at least GPS, Wi-Fi, cellular, and Bluetooth, are shipped or imported into the United States.

289. Plaintiff also alleges that when the Google *"modified"* cell phone, that include Google's Wireless Communication Protocols, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Google is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in,

embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that *it is an integral part of the device*".

290. Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Google3 to manufacture the Google *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

291. Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

292. Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for a Google *"modified"* cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the

204

patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

293.    Upon information, prior to Google rolling out its Pixel phone in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732*) claiming a CMDC device that included Communication Protocols that enables CBRNE-H detection for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

294.    Plaintiff alleges, Google's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures is included in Google 's production process for manufacturing the Google Pixel smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)].

295.    Plaintiff alleges, Google's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures, is native to the manufacture of the Google Pixel smartphones, and is a standard component of the Google Pixel smartphone when imported into the United States. The PTAB determined the Communication Protocols to be standard component because it falls under the claim

205

term construction of "built-in, embedded", "such that it is an integral part of the Google "*modified*" cell phone.

*Plaintiff's Claim Limitations that Cover the Google "modified" Cell Phone that include Google's Wireless Communication Protocols [Bluetooth, cellular, and Wi-Fi] for connecting the Google Watch Series*

- wherein the cell phone detector case has a Bluetooth connection, a Wi-Fi connection, a Radio Frequency connection, a cellular connection, a satellite connection, and a GPS connection, all of which is interconnected to the central processing unit (cpu) [claim 21 of the '752 patent]

- [t]he multi sensor detection security systems [] receiving signals from and sending signals to at least one of, but not limited to, a cell phone, a smartphone, a PDA, a handheld, a laptop, a desktop, a cellular towel, a satellite, a workstation or monitoring site. [claim 153 of the '990 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; [claim 1 of the '189 patent]

- whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to [] activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; [claim 1 of the '189 patent]

- whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; [claim 2 of the '189 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; [claim 3 of the '189 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband

206

connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; [claim 7 of the '189 patent]

• a communication method of at least one of a Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), or central processing unit (CPU), used to interconnect the communication device to the monitoring equipment for sending signals thereto and receiving signals therefrom; [claim 1 of the '439 patent]

• monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; [claim 14 of the '439 patent]

• at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 14 of the '439 patent]

• at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; [claim 15 of the '439 patent]

• wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with a transmitter, a receiver of the monitoring equipment, or transceivers of the products; [claim 21 of the '439 patent]

• at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; [claim 22 of the '439 patent]

• at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 23 of the '439 patent]

- wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; [claim 23 of the '439 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 1 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 3 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 4 of the '287 patent]

- at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; [claim 4 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 5 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 6 of the '287 patent]

**296.** Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted).

208

Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT XII:

### Google's Wireless Communication Protocols [Bluetooth, GPS, cellular, and Wi-Fi] for connecting Google's "Find My Device"

**297.** Count XII incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

**298.** Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include Google's Wireless Communication Protocols, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

**299.** Upon information, Plaintiff alleges Google *"modified"* the cell phone (i.e., now the Pixel smartphone) device that include Google's Wireless Communication Protocols, begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

**300.** Upon information and belief, Plaintiff alleges Google is using Plaintiff's patented process to manufacture and/or produce the Google *"modified"* cell phone, that include Google's Wireless Communication Protocols, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Google *"modified"* cell phone, that include Google 's Wireless Communication Protocols, infringement occurs when the combination is shipped or imported into the United States.

**301.** Upon information, Plaintiff is alleging the Google *"modified"* cell phone, that include Google's Wireless Communication Protocols, infringes Plaintiff's patented

process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Google's Wireless Communication Protocols, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

302.    Plaintiff alleges Google's *"modified"* cell phone, that include Google's Wireless Communication Protocols, was first manufactured or produced using Plaintiff's patented process in response to a government request. Google performed work for the Government to *"modify"* a common cell phone, that include Google's Wireless Communication Protocols, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Google, as a third-party contractor, could not be sued for infringement.

303.    Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Google before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. §§ 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |

| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**304.** Upon information, twelve Federal Judges infer to say; the Google *"modified"* cell phones that include Google's Wireless Communication Protocols, and include *"nine standard sensors which can be used as biosensors"*, satisfies the patent local rule of identifying where inside the Google *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Google's Wireless Communication Protocols, is identified and located inside the Google *"modified"* cell phone.

---

**Google's *"nine"* Smartphone Biosensors Submitted to the Courts**:

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

**305.** Upon information and belief, Google continues to make, offer for sell, sell, and purportedly import the Google *"modified"* cell phones (i.e., Pixel smartphones), that include Google 's Wireless Communication Protocols, into the United States that include *"nine standard sensors that are used as biosensors"*.

211

306.    Upon information and belief, Plaintiff alleges Google's "*modification*" of the cell phone, that include Google 's Wireless Communication Protocols, begin abroad and continues to this day. Plaintiff also alleges, Google "*modified*" the cell phone, that include Google's Wireless Communication Protocols, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Google's "*modification*" of the cell phone, that include Google's Wireless Communication Protocols, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Google "*modified*" cell phones, that include Google 's Wireless Communication Protocols, are shipped or imported into the United States.

307.    Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own Wireless Communication Protocols, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Wireless Communication Protocols] https://news.ycombinator.com/item?id=28423983

212

308. Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Google] is accused of using Plaintiff's patented process to manufacture and/or assemble the Google "*modified*" cell phone, that include Google's Wireless Communication Protocols, under 35 U.S.C. §§ 154(a)(1) & 271(g). Google is tasked with presenting evidence to a jury that Google is (1) not using Plaintiff's patented process; or (2) Google is using Plaintiff's patented process but is not shipping or importing the Google *"modified"* cell phones (i.e., Pixel smartphones), that include Google's Wireless Communication Protocols, into the United States.

309. Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Google "*modified*" cell phone, that include Google's Wireless Communication Protocols, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

310. Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Google's *"modified"* cell phone that include Google's Wireless Communication Protocols] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

311. Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

312. Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Google *"modified"*

213

cell phone that include Google's Wireless Communication Protocols was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
>> (1) that a substantial likelihood exists that the product was made by the patented process, and
>>
>> (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

313.    Upon information and belief, Google is allegedly infringing under 35 U.S.C. § 271(g); upon shipment and/or importation into the United States the following Google "*modified*" cell phones (i.e., Pixel smartphones) that include Google's Wireless Communication Protocols: Google Nexus One, Nexus S, Galaxy Nexus, Nexus 4, Nexus 5, Nexus 6, Nexus 5X, Nexus 6P, Pixel, Pixel XL, Pixel 2, Pixel 2 XL, Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, Pixel 4a, Pixel 4a 5G, Pixel 5, Pixel 5a 5G, Pixel 6, Pixel 6 Pro, Pixel 6a, Pixel 7, Pixel 7 Pro, Pixel 7a, Pixel 8, Pixel 8 Pro, Pixel 9, Pixel 9a, Pixel 9 Pro, Pixel 9 Pro XL, Pixel 9 Pro Fold, Pixel 10, Pixel 10a, Pixel 10 Pro, Pixel 10 Pro XL, and Pixel 10 Pro

314.    Upon information, Plaintiff alleges, the Google "Find My Device" app is one of the most important security tools Google offers, helping users locate lost devices,

protect personal data, and stay connected to people and items that matter, even when devices are offline.

"Leveraging billions of Android devices worldwide, the Google "Find My Device" network is about to get a lot more powerful. Much like Apple's network, Google's Find My Device uses Bluetooth signals from other Android devices nearby to locate lost items. With the consent of users, Android devices can "ping" lost gadgets, and their precise location gets sent to the owner—even if the lost device has no internet connection. The more devices that join, the stronger and more reliable this network becomes. Google Pixel phones pack special hardware allowing them to be found [GPS] even when powered off. If the Google Pixel phone dies or is turned off by a thief, the phone can still be tracked.

Google has revamped the Find My Device app with a fresh interface and new functions. Once you open the app, you'll see a list of all your connected devices. This includes your phones, tablets, headphones, and, Bluetooth trackers.

Android Find My Device uses a mix of GPS, Wi-Fi, and cellular network data to track and locate devices remotely. When activated, the device periodically sends its location information to Google's servers. Users can access the service through their Google account to remotely locate, lock, or erase their lost or stolen devices.

The system can pinpoint the device's location on a map using GPS and, in areas with weak signals, estimate its position through Wi-Fi and cell tower triangulation. Even if offline, the service attempts to locate the device using its last known location.

215

Users can track items such as keys, wallet, or luggage using Bluetooth tracker tags from Chipolo and Pebblebee, integrated into the Google Find My Device app. These tags are compatible with both Android and iOS platforms and offer protection against unwanted tracking. Additional Bluetooth tags from Eufy, Jio, Motorola, and others are also available. For items located nearby, a "Find nearby" button will appear to assist in tracking them down. This feature can be used for finding everyday items like wallets or keys when using the Bluetooth tags." https://www.republicworld.com/tech/apps/google-launches-find-my-device-network-for-android-heres-how-it-works

315. Plaintiff alleges, Google's Wireless Communication Protocols is included in Google's production process for manufacturing the Google Pixel smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. Google's Wireless Communication Protocols are native to the manufacture of the Google Pixel smartphones, and is a standard component of the Google Pixel smartphone when imported into the United States.

316. Plaintiff alleges Google have devoted years to *"modifying"* the cell phone, that include Google's Wireless Communication Protocols, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Google *"modified"* cell phones, that include Google's Wireless Communication Protocols of at least GPS, Wi-Fi, cellular, and Bluetooth, are shipped or imported into the United States.

317. Plaintiff also alleges that when the Google *"modified"* cell phone, that include Google's Wireless Communication Protocols, is integrated with, or interconnected

216

to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Google is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that *it is an integral part of the device*".

**318.** Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Google to manufacture the Google *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

**319.** Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

**320.** Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Google "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**321.** Upon information, prior to Google rolling out its Pixel phone in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included Communication Protocols that enables CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

**322.** Plaintiff alleges, Google's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures is included in Google's production process for manufacturing the Google Pixel smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)].

218

**323.** Plaintiff alleges, Google's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures, is native to the manufacture of the Google Pixel smartphones, and is a standard component of the Google Pixel smartphone when imported into the United States. The PTAB determined the Communication Protocols to be standard component because it falls under the claim term construction of "built-in, embedded", "such that it is an integral part of the Google "*modified*" cell phone.

*Plaintiff's Claim Limitations that Cover the Google "modified" Cell Phone that include Google's Communication Protocols for connecting Google's "Find My Device"*

- wherein the cell phone detector case has a Bluetooth connection, a Wi-Fi connection, a Radio Frequency connection, a cellular connection, a satellite connection, and a GPS connection, all of which is interconnected to the central processing unit (cpu) [claim 21 of the '752 patent]

- receiving signals from and sending signals to at least one of, but not limited to, a cell phone, a smartphone, a PDA, a handheld, a laptop, a desktop, a cellular towel, a satellite, a workstation or monitoring site. [claim 153 of the '990 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; [claim 1 of the '189 patent]

- at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; [claim 3 of the '189 patent]

- wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi

219

sensor detection device and transceivers of the products; [claim 7 of the '189 patent]

- a communication method of at least one of a Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), or central processing unit (CPU), used to interconnect the communication device to the monitoring equipment for sending signals thereto and receiving signals therefrom; [claim 1 of the '439 patent]

- monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; [claim 14 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 14 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; [claim 15 of the '439 patent]

- wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with a transmitter, a receiver of the monitoring equipment, or transceivers of the products; [claim 21 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; [claim 22 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; [claim 23 of the '439 patent]

- wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection,

220

broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; [claim 23 of the '439 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 1 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 3 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 4 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 5 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 6 of the '287 patent]

**324.** Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT XIII:
### Google's Wireless Communication Protocols [Bluetooth, and NFC] for connecting Google's "Android Digital Car Key"

221

325.  Count XIII incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

326.  Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include Google's Wireless Communication Protocols, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

327.  Upon information, Plaintiff alleges Google *"modified"* the cell phone (i.e., now the Pixel smartphone) device that include Google's Wireless Communication Protocols, begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

328.  Upon information and belief, Plaintiff alleges Google is using Plaintiff's patented process to manufacture and/or produce the Google *"modified"* cell phone, that include Google's Wireless Communication Protocols, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Google *"modified"* cell phone, that include Google's Wireless Communication Protocols, infringement occurs when the combination is shipped or imported into the United States.

329.  Upon information, Plaintiff is alleging the Google *"modified"* cell phone, that include Google's Wireless Communication Protocols, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Google's Wireless Communication Protocols, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

222

**330.** Plaintiff alleges Google's "*modified*" cell phone, that include Google's Wireless Communication Protocols, was first manufactured or produced using Plaintiff's patented process in response to a government request. Google performed work for the Government to "*modify*" a common cell phone, that include Google's Wireless Communication Protocols, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Google, as a third-party contractor, could not be sued for infringement.

**331.** Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Google before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. §§ 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

332.    Upon information, twelve Federal Judges infer to say; the Google *"modified"* cell phones that include Google's Wireless Communication Protocols, and include *"nine standard sensors which can be used as biosensors"*, satisfies the patent local rule of identifying where inside the Google *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Google's Wireless Communication Protocols, is identified and located inside the Google *"modified"* cell phone.

---

**Google's "*nine*" Smartphone Biosensors Submitted to the Courts:**

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

333.    Upon information and belief, Google continues to make, offer for sell, sell, and purportedly import the Google *"modified"* cell phones (i.e., Pixel smartphones), that include Google's Wireless Communication Protocols, into the United States that include *"nine standard sensors that are used as biosensors"*.

334.    Upon information and belief, Plaintiff alleges Google's *"modification"* of the cell phone, that include Google's Wireless Communication Protocols, begin abroad and continues to this day. Plaintiff also alleges, Google *"modified"* the cell phone, that include Google's Wireless Communication Protocols, while performing work under a government contract is to avoid infringement liability here in the United

224

States under § 271(a); and Google's "*modification*" of the cell phone, that include Google's Wireless Communication Protocols, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Google "*modified*" cell phones, that include Google's Wireless Communication Protocols, are shipped or imported into the United States.

335.   Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own Wireless Communication Protocols, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Wireless Communication Protocols] https://news.ycombinator.com/item?id=28423983

336.   Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Google] is accused of using Plaintiff's patented process to manufacture and/or assemble the Google "*modified*" cell phone, that include Google's Wireless Communication Protocols, under 35 U.S.C. §§ 154(a)(1) & 271(g). Google is tasked with presenting evidence to a jury that Google is (1) not using Plaintiff's patented

225

process; or (2) Google is using Plaintiff's patented process but is not shipping or importing the Google *"modified"* cell phones (i.e., Pixel smartphones), that include Google's Wireless Communication Protocols, into the United States.

337.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Google *"modified"* cell phone, that include Google's Wireless Communication Protocols, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

338.    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Google's *"modified"* cell phone that include Google's Wireless Communication Protocols] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

339.    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

340.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Google *"modified"* cell phone that include Google's Wireless Communication Protocols was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

"In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—

(1) that a substantial likelihood exists that the product was made by the patented process, and

(2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

341. Upon information and belief, Google is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Google "*modified*" cell phones (i.e., Pixel smartphones) that include Google's Wireless Communication Protocols: Google Nexus One, Nexus S, Galaxy Nexus, Nexus 4, Nexus 5, Nexus 6, Nexus 5X, Nexus 6P, Pixel, Pixel XL, Pixel 2, Pixel 2 XL, Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, Pixel 4a, Pixel 4a 5G, Pixel 5, Pixel 5a 5G, Pixel 6, Pixel 6 Pro, Pixel 6a, Pixel 7, Pixel 7 Pro, Pixel 7a, Pixel 8, Pixel 8 Pro, Pixel 9, Pixel 9a, Pixel 9 Pro, Pixel 9 Pro XL, Pixel 9 Pro Fold, Pixel 10, Pixel 10a, Pixel 10 Pro, Pixel 10 Pro XL, and Pixel 10 Pro

342. Upon information, Plaintiff alleges, Google's "*modified*" cell phone include the standard NFC and Bluetooth sensors used to enable the controlling of a vehicle's lock, unlock, and start:

**What is Google [Android] digital car key?**

It's still pretty common for fans to pit iPhones and Google Android devices against each other, even though the platforms are

227

becoming increasingly homogenous. There are still some exclusive features, though -- or if they're not exclusive, there can be different implementations. Apple car key and Google Android digital car key are examples of the latter, since they obviously serve the same basic purpose. There's no dramatic difference -- instead it's mostly a question of compatibility.

Both Apple car key and Google Android digital car key rely on a mix of Bluetooth, NFC (near-field communications), and UWB (ultra-wideband). When UWB is present on both your phone and your car, it enables something called "passive entry" -- your car can unlock automatically based on your presence, start when you sit down, and lock again when you get out.

Apple does have a slight advantage here in that flagship iPhones have included UWB since 2019 -- it took another two years for Google Android to join suit, and even now most supporting Google Android products are high-end devices from Google and Samsung.

When UWB isn't available, you can use NFC. This involves bringing your phone next to embedded readers located in door handles and/or the ignition. It's standard with phone-based car keys, and in some cases, automakers also require it for initial pairing.

With both platforms, Bluetooth enables remote locking and unlocking, as well as other functions like popping a trunk. The similarities extend even to setup. You'll normally be prompted to set up a key via an automaker's app, an email message, or a dashboard display, and follow car-specific instructions to complete pairing. Once that's done, it's just a question of where the key ends up --

228

Google Wallet or Samsung Wallet in the case of Android, or Apple Wallet in the case of iPhones. For UWB- or NFC-based entry, you likely won't have to open these apps again (unless you change security settings), but you'll always have to view your key to trigger Bluetooth controls.

This feature lets users add their car key to the Google Wallet app, then use the wallet app to lock, unlock, and start their car. While specific implementations vary depending on the carmaker, there are a few different ways Google's android digital car key feature can be used:

*Passive entry*: Approach your car with your device, it unlocks, start your car when inside, and walk away from your car with your device, it locks.

*Proximity*: Lock, unlock, and start the car by holding your device close to the door handle or key reader.

*Remotely*: You can use your device to remote lock and unlock your car, and use other features.

With some cars, you can use passive entry to lock, unlock, or start your car with your device. Depending on your car's configuration, it will either unlock automatically as you approach with your device in your pocket or bag, or it will unlock only when you pull the door handle while carrying your device. Once inside, you can start your car.

If your car supports automatic locking, it will lock automatically when you walk away with your device. If your car supports Wallet notifications, you will receive a lock or unlock

229

notification on your Google *"modified"* cell phone device, in addition to any visual or audible confirmations from your car.

With some cars, you lock, unlock, and start the car by holding your device close to the door handle or key reader. To lock or unlock your car, hold your device near the car's door handle. To start your car, place your Google Pixel phone in the car's key reader or hold your Google Watch near the reader. Then, press the car's start button.

To use remote entry on compatible cars, you need to be within *Bluetooth* range of your car.

343. Plaintiff alleges, Google's Wireless Communication Protocols is included in Google's production process for manufacturing the Google Pixel smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. Google's Wireless Communication Protocols are native to the manufacture of the Google Pixel smartphones, and is a standard component of the Google Pixel smartphone when imported into the United States.

344. Plaintiff alleges Google have devoted years to *"modifying"* the cell phone, that include Google's Wireless Communication Protocols, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Google *"modified"* cell phones, that include Google's Wireless Communication Protocols of at least NFC and Bluetooth, are shipped or imported into the United States.

345. Plaintiff also alleges that when the Google *"modified"* cell phone, that include Google's Wireless Communication Protocols, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that

230

Google is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that *it is an integral part of the device*".

346.    Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Google to manufacture the Google *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

347.    Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

> "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

348.    Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Google *"modified"* cell phone, was examined and allowed by the United States

231

Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

> "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**349.** Upon information, prior to Google rolling out its Pixel smartphone in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included Communication Protocols that enables CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

**350.** Plaintiff alleges, Google's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures is included in Google's production process for manufacturing the Google Pixel smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)].

**351.** Plaintiff alleges, Google's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures, is native to the manufacture of the

Google Pixel smartphones, and is a standard component of the Google Pixel smartphone when imported into the United States. The PTAB determined the Communication Protocols to be standard component because it falls under the claim term construction of "built-in, embedded", "such that it is an integral part of the Google *"modified"* cell phone.

*Plaintiff's Claim Limitations that Cover the Google "modified" Cell Phone that include Google's Wireless Communication Protocols [Bluetooth, and NFC] for connecting Google's "Android Digital Car Key"*

- a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom monitoring equipment and a central processing unit (CPU) or a transceiver on the vehicle. [claim 57 of the '891 patent]

- wherein the communication device is designed to be equipped with applications for the locking, disabling a lock, enabling a lock, and unlocking the locks of, but not limited to, containers, vehicles [claim 22 of the '990 patent]

- internal or external automatic/mechanical lock [] device which is mounted, embedded, affixed, or attached to a product for receiving transmission from the communication device to lock, unlock or disable the lock [claim 33 of the '990 patent]

- wherein the cell phone the smart phone, and the cell phone detector case are capable of sending signals to a vehicle's operating equipment systems comprising at least one of an ignition for starting and stopping, a lock for unlocking and locking [claim 107 of the '990 patent]

- wherein the cell phone, the smart phone, [] are designed to be equipped with applications for the locking, disabling a lock, enabling a lock, and unlocking the locks of containers, vehicles, houses and businesses through the use of a smart phone, cell phone, PDA, laptop or desktop. [claim 114 of the '990 patent]

- wherein the cell phone, the smart phone, [] have at least one of a Bluetooth connection, a Wi-Fi connection, a short- and long-range radio frequency connection, a cellular connection, a satellite connection, or a GPS connection. [claim 117 of the '990 patent]

- wherein a communication device, that of a cell phone, smart phone or handheld; capable of sending signals to a vehicle's operating equipment systems of at least one of, but not limited to, [] a lock for unlocking and locking, [] capable of receiving data and diagnostic information of the vehicle's operating equipment systems. [claim 134 of the '990 patent]

- whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock locking devices, activate or deactivate security systems, [], or to activate or deactivate cell phone detection systems; [claim 13 of the '439 patent]

- whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to the lock disabling mechanism that is able to engage, disengage, or disable the lock, activate or deactivate security systems, [] [claim 14 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; [claim 22 of the '439 patent]

- the communication device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks; [claim 22 of the '439 patent]

- a transmitter for transmitting signals and messages to at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock; [claim 1 of the '287 patent]

- a receiver for receiving signals from at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock; [claim 1 of the '287 patent]

- a receiver for receiving signals from at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock; [claim 3 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS

234

connection that is capable of signal communication with the transmitter or the receiver; [claim 3 of the '287 patent]

- the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the manned or unmanned aerial vehicle lock, manned or unmanned ground vehicle lock, or manned or unmanned sea vehicle lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment. [claim 3 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 4 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 5 of the '287 patent]

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or [], send signals to lock or unlock doors, send signals to control components of a vehicle, [] such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 5 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 6 of the '287 patent]

**352.** Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT XIV:

### Google's Nine "Standard Biosensors" for Google's "*modified*" Cell Phone

**353.** Count XIV incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

**354.** Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include Google's Standard Biosensors, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

**355.** Upon information, Plaintiff alleges Google *"modified"* the cell phone (i.e., now the Pixel smartphone) device that include Google's Standard Biosensors, begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

**356.** Upon information and belief, Plaintiff alleges Google is using Plaintiff's patented process to manufacture and/or produce the Google *"modified"* cell phone, that include Google's Standard Biosensors, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Google *"modified"* cell phone, that include Google's Standard Biosensors, infringement occurs when the combination is shipped or imported into the United States.

**357.** Upon information, Plaintiff is alleging the Google *"modified"* cell phone, that include Google's Standard Biosensors, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the *"modified"* cell phone, that include Google's Standard Biosensors, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

236

358. Plaintiff alleges Google's "*modified*" cell phone, that include Google's Standard Biosensors, was first manufactured or produced using Plaintiff's patented process in response to a government request. Google performed work for the Government to "*modify*" a common cell phone, that include Google's Standard Biosensors, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Google, as a third-party contractor, could not be sued for infringement.

359. Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Google before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. § 271(g).

360. Upon information, twelve Federal Judges infer to say; the Google "*modified*" cell phones that include Google's Standard Biosensors, and include "*nine standard sensors which can be used as biosensors*", satisfies the patent local rule of identifying where inside the Google "*modified*" cell phones the detection capability is located. Hereto, the alleged manufactured Google's Standard Biosensors, is identified and located inside the Google "*modified*" cell phone.

361. Upon information and belief, Google continues to make, offer for sell, sell, and purportedly import the Google "*modified*" cell phones (i.e., Pixel smartphones), that include Google's Standard Biosensors, into the United States that include "*nine standard sensors that are used as biosensors*".

362. Upon information and belief, Plaintiff alleges Google's "*modification*" of the cell phone, that include Google's Standard Biosensors, begin abroad and continues to this day. Plaintiff also alleges, Google "*modified*" the cell phone, that include Google's Standard Biosensors, while performing work under a government contract

237

is to avoid infringement liability here in the United States under § 271(a); and Google's "*modification*" of the cell phone, that include Google's Standard Biosensors, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Google *"modified"* cell phones, that include Google's Standard Biosensors, are shipped or imported into the United States.

363. Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful "*modified*" cell phones, that include their own Standard Biosensors, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Standard Biosensors] https://news.ycombinator.com/item?id=28423983

364. Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Google] is accused of using Plaintiff's patented process to manufacture and/or assemble the Google "*modified*" cell phone, that include Google's Standard Biosensors, under 35 U.S.C. §§ 154(a)(1) & 271(g). Google is tasked with presenting evidence to a jury that Google is (1) not using Plaintiff's patented process; or (2) Google is using Plaintiff's patented process but is not shipping or importing

the Google *"modified"* cell phones (i.e., Pixel smartphones), that include Google's Standard Biosensors, into the United States.

365.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Google *"modified"* cell phone, that include Google's Standard Biosensors, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

366.    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Google's *"modified"* cell phone that include Google's Standard Biosensors] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

367.    Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

368.    Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Google *"modified"* cell phone that include Google's Standard Biosensors was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

"In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—

> (1) that a substantial likelihood exists that the product was made by the patented process, and

> (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

**369.** Upon information and belief, Google is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Google "*modified*" cell phones (i.e., Pixel smartphones) that include Google's Standard Biosensors: Google Nexus One, Nexus S, Galaxy Nexus, Nexus 4, Nexus 5, Nexus 6, Nexus 5X, Nexus 6P, Pixel, Pixel XL, Pixel 2, Pixel 2 XL, Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, Pixel 4a, Pixel 4a 5G, Pixel 5, Pixel 5a 5G, Pixel 6, Pixel 6 Pro, Pixel 6a, Pixel 7, Pixel 7 Pro, Pixel 7a, Pixel 8, Pixel 8 Pro, Pixel 9, Pixel 9a, Pixel 9 Pro, Pixel 9 Pro XL, Pixel 9 Pro Fold, Pixel 10, Pixel 10a, Pixel 10 Pro, Pixel 10 Pro XL, and Pixel 10 Pro

**370.** Upon information and belief, Plaintiff claims Twelve Federal Judges "infer to say", (i.e., drawing a conclusion based on indirect evidence and reasoning, rather than explicit statements), that Google's *modification* of a common cell phone to function as a sensing device for CBRNE-H detection, allegedly infringes Plaintiff's patented invention of a communicating, monitoring, detecting, and controlling (CMDC) device.

240

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - 09/08/2022 |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - 06/08/2023 |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - 02/12/2024 |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - 04/03/2024 |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - 04/03/2024 |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - 06/25/2025 |

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent.

The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* Case No. 23-0048 that direct infringement arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Golden v. Samsung Electronics America, Inc.* Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit

Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024.

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: (1) through the "Android Team Awareness Kit, ATAK," which is "[b]uilt on the Android operating system," involves "plug-ins" and "app specific software," was "[i]nitially created" by the "Air Force Research Laboratory" together with the "Defense Threat Reduction Agency," and is "available to warfighters throughout the DoD," Appx112 ¶ 55; Appx119, 127; (2) through add-on devices or modifications that utilize the smartphone's built-in camera, Appx111 ¶ 54, Appx124–25; and (3) through nine "standard sensors" which "can be used as 'biosensors,'" Appx126."

"Samsung moved to dismiss Mr. Golden's complaint, arguing that, among other things, Mr. Golden's complaint failed to plausibly state a patent-infringement claim. Appx146–48. More specifically, Samsung argued that Mr. Golden's complaint stated no alleged facts that went beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality. On that basis, Samsung said, there are no plausible allegations Samsung was engaged in directly infringing activities. Appx146–47."

"The district court agreed and dismissed Mr. Golden's complaint with prejudice, concluding, in part, that "[t]he allegations that his patents cover the identified functionalities included in Samsung's products are wholly unsupported and implausible on their face." Golden, 2023 WL 3919466, at *2."

242

"We reject Mr. Golden's appeal arguments and therefore affirm the district court's dismissal of his complaint."

The Northern District of California Court Judge Haywood S. Gilliam, Jr. in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Government arises when there's a combined ATAK software; CBRN plugins; CPU; and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss with Leave to Amend" Document 41 Filed 08/10/23; the then presiding Judge Haywood S. Gilliam, Jr. agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The Northern District of California Court Judge Rita F. Lin in *Golden v. Google LLC* Case No. 22-5246; determined direct infringement by or for the Gov't arises when there's a combined ATAK software; CBRN plugins; CPU, and a Smartphone.

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68 Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

The United States Court of Appeals; Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 24-2024; determined infringement occurs when a [Google] mobile, consumer, or cellular device is

243

integrated with, or interconnected to, Draper's CBRNE detection capability.

In *Golden v. Google LLC.*, Case No. 24-2024, Dkt. 41; filed 06/25/2025, three Federal Circuit judges again confirm, infringement of Plaintiff's patented CMDC device occurs when a mobile, consumer, or cellular device, is integrated with, or interconnected to a CBRNE detection capability. The Circuit's opinion includes the following:

"We conclude that the district court did not err in finding that Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1;

"Mr. Golden's five infringement "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit." Decision at *1; see also *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding no infringement when the accused products "do not infringe without modification—the modification of installing the required software."). Mr. Golden's first theory of infringement requires the ***use of the third-party app*** "ATAK-CIV" for at least two limitations of each asserted claim. App'x 300–302 ¶¶ 56 63; see also App'x 400–407.

Upon information and belief, Plaintiff alleges that Google's *modification* of a common cell phone to function as a sensing device for CBRNE-H detection, begin as early as 2007 and continuous through this day 30, May, 2016.

244

Upon information and belief, Plaintiff alleges that Google's *modification* of a common cell phone to function as a sensing device for CBRNE-H detection, include nine *"standard sensors"* which can be used as biosensors.

---

**Google's "*nine*" Smartphone Biosensors Submitted to the Courts:**

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

Upon information, twelve Federal Judges "infer to say"; (i.e., arriving at a conclusion by reasoning from evidence), that Google's infringement of Plaintiff's CMDC device occurs when Google's *"modified"* cell phone is integrated with, or interconnected to, nine of Google's standard sensors for the *"modified"* cell phone, and are used as biosensors.

Plaintiff alleges, that Google's nine standard sensors for the *"modified"* cell phone, which are used as biosensors, are *"built-in, embedded"*, in accordance with the PTAB's claim term construction of *"built-in, embedded"*, and satisfies the NDC local rule 3-1(c) for identifying where in the *modified* cell phone the biosensors are found.

245

Upon information, Plaintiff alleges the Google *"modified"* cell phone infringes Plaintiff's patented CMDC device; because the detection capability that is placed 'in, on, upon, or adjacent' the monitoring device. [Patent specifications]. In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below."

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

The Patent Trials and Appeals Board (PTAB) construed "built-in, embedded", as: "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device", [the Google *"modified"* cell phone].

Plaintiff alleges, the Google *"modified"* cell phone device, and, the ***nine "standard sensors" which "can be used as 'biosensors*** are included in Google's manufacture of Plaintiff's patented process abroad for a *"modified cell phone"* that is imported into the United States under 35 U.S.C. § 154(a)(1), and 35 U.S.C. § 271(g).

246

371. Plaintiff alleges, Google's Standard Biosensors is included in Google's production process for manufacturing the Google Pixel smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. Google's Standard Biosensors are native to the manufacture of the Google Pixel smartphones, and is a standard component of the Google Pixel smartphone when imported into the United States.

372. Plaintiff alleges Google have devoted years to *"modifying"* the cell phone, that include Google's Standard Biosensors, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Google *"modified"* cell phones, that include Google's Standard Biosensors, are shipped or imported into the United States.

373. Plaintiff also alleges that when the Google *"modified"* cell phone, that include Google's Standard Biosensors, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Google is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that ***it is an integral part of the device***".

374. Upon information and belief, each individual claim limitation or element that is listed in this section describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Google to manufacture the Google *"modified"* cell phone.

"[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

375. Upon information and belief, each individual claim limitation or element that is listed in this section describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

"[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

376. Upon information and belief, each individual claim limitation or element listed in this section that is available for use to manufacture the patented process for an Google "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

"[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims

248

shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**377.** Upon information, prior to Google rolling out its Pixel smartphone in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732*) claiming a CMDC device that included Standard Biosensors that enables CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

**378.** Plaintiff alleges, Google's Standard Biosensors that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures is included in Google's production process for manufacturing the Google Pixel smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)].

**379.** Plaintiff alleges, Google's Standard Biosensors that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures, is native to the manufacture of the Google Pixel smartphones, and is a standard component of the Google Pixel smartphone when imported into the United States. The PTAB determined the Google's Standard Biosensors to be standard component because it falls under the claim term construction of "built-in, embedded", "such that it is an integral part of the Google "*modified*" cell phone.

*Plaintiff's Claim Limitations that Cover the Google "modified" Cell Phone Design that include Nine "Standard Sensors" which are used as Biosensors*

- a plurality of interchangeable detectors for detecting the chemical, biological and radiological agents and compounds and capable of being disposed within the detector [claim 1 of the '497 patent]

- a plurality of interchangeable detectors for detecting the chemical, biological, or radiological agents and compounds and which is capable of being disposed within the detector case [claim 7 of the '497 patent]

- a plurality of interchangeable detectors for detecting the chemical, biological, or radiological agents and compounds and that is capable of being disposed within the detector case [claim 13 of the '497 patent]

- wherein the communication device is designed to be used as a standalone detection system for the detection of [] at least one of the human vitals sensors of; a heart sensor, a nerve sensor, a perspiration sensor, an inflammation sensor, a pulse sensor, a blood pressure sensor, a temperature sensor, a breath sensor, or a radiation sensor. [claim 31 of the '990 patent]

- wherein the multi sensor detection device is capable of being embedded into; placed in, on, or adjacent to a product or area targeted for monitoring. [claim 97 of the '990 patent]

- The multi-sensor detection system [] wherein the cell phone, the smart phone, [] is designed to be used as a standalone detection system for the detection of [] human vitals sensors of: a heart sensor, a nerve sensor, a perspiration sensor, a inflammation sensor, a pulse sensor, a blood pressure sensor, a temperature sensor, a breath sensor, or a radiation sensor. [claim 123 of the '990 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 7 of the '189 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; [claim 7 of the '189 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 8 of the '189 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 9 of the '189 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI); [claim 9 of the '189 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; [claim 13 of the '439 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the monitoring equipment; [claim 14 of the '439 patent]

- comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; [claim 16 of the '439 patent]

- A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents; [claim 16 of the '439 patent]

- a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; [claim 17 of the '439 patent]

- A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising: [claim 17 of the '439 patent]

- A built-in multi sensor detection system for detecting at least two items selected from the group consisting of chemical agent, biological agent, radiological agent, explosive agent, human agent, contraband agent, motion, perimeter, temperature, tampering, theft, or breach, comprising: [claim 18 of the '439 patent]

- a built-in sensor array or fixed detection device into a product that detects items by means

251

of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; [claim 18 of the '439 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: [claim 19 of the '439 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; [claim 19 of the '439 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents or compound, comprising: [claim 20 of the '439 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; [claim 20 of the '439 patent]

- A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: [claim 21 of the '439 patent]

- a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI); [claim 21 of the '439 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; [claim 22 of the '439 patent]

- at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; [claim 23 of the '439 patent]

- one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; [claim 5 of the '287 patent]

- at least one or more detectors in communication with the art least one CPU for detecting at

252

least one of a chemical, biological, radiological, or explosive agents; [claim 6 of the '287 patent]

380. Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## COUNT XV:
### Google's Wireless Communication Protocols [Bluetooth, and Wi-Fi] for connecting Waymo's Self-Driving Cars

381. Count XV incorporate all the pleadings, patents, and attachments of this complaint that precedes this section for a cause of action under 35 U.S.C. §§ 154(a)(1) & 271(g).

382. Upon information, twelve Federal Judges repeatedly confirmed Plaintiff's CMDC device is infringed when a cell phone, that include Google's Wireless Communication Protocols, is *"modified"* to be integrated with, or interconnected to, a chemical, biological, radiological, nuclear, explosive, or human (CBRNE-H) detection capability.

383. Upon information, Plaintiff alleges Google *"modified"* the cell phone (i.e., now the Pixel smartphone) device that include Google's Wireless Communication Protocols, begin as early as 2007 in response to the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative.

384. Upon information and belief, Plaintiff alleges Google is using Plaintiff's patented process to manufacture and/or produce the Google *"modified"* cell phone,

253

that include Google's Wireless Communication Protocols, under 35 U.S.C. §§ 154(a)(1) & 271(g); and, when Plaintiff's patented process is used to manufacture and/or produce the Google "*modified*" cell phone, that include Google's Wireless Communication Protocols, infringement occurs when the combination is shipped or imported into the United States.

385. Upon information, Plaintiff is alleging the Google "*modified*" cell phone, that include Google's Wireless Communication Protocols, infringes Plaintiff's patented process for his communicating, monitoring, detecting, and controlling (CMDC) device, upon shipment or importation of the "*modified*" cell phone, that include Google's Wireless Communication Protocols, into the United States under 35 U.S.C. §§ 154(a)(1) & 271(g).

386. Plaintiff alleges Google's "*modified*" cell phone, that include Google's Wireless Communication Protocols, was first manufactured or produced using Plaintiff's patented process in response to a government request. Google performed work for the Government to "*modify*" a common cell phone, that include Google's Wireless Communication Protocols, to include at least a CBRNE-H detection capability under the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* initiative. While performing work "for the Government", with the Government's "authorization or consent", Google, as a third-party contractor, could not be sued for infringement.

387. Upon information, Plaintiff believe an action of infringement under 35 U.S.C. §§ 154(a)(1) & 271(g) could not be brought against Google before the twelve federal judges weighed in on the infringement theory of "modification before infringement occurs". Therefore, preclusion and Kessler aren't relevant to the first-time pleadings of this action taken under 35 U.S.C. §§ 154(a)(1) & 271(g).

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three e Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**388.**   Upon information and belief, Plaintiff alleges Google's "*modification*" of the cell phone, that include Google's Wireless Communication Protocols, begin abroad and continues to this day. Plaintiff also alleges, Google "*modified*" the cell phone, that include Google's Wireless Communication Protocols, while performing work under a government contract is to avoid infringement liability here in the United States under § 271(a); and Google's "*modification*" of the cell phone, that include Google's Wireless Communication Protocols, was made abroad to avoid infringement liability under § 271(a) when any part of the patented process was made, or assembled abroad; until *Zoltek V* (2012) when the Federal Circuit ruled that patent infringement occurs if any part of the patented process is made abroad and assembled abroad; or made abroad and assembled in the U.S.; or made in the U.S. and assembled abroad. Plaintiff alleges infringement of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) occurs when the Google "*modified*" cell phones, that include Google's Wireless Communication Protocols, are shipped or imported into the United States.

389.    Upon information, twelve Federal Judges infer to say; the Google *"modified"* cell phones that include Google's Wireless Communication Protocols, and include *"nine standard sensors which can be used as biosensors"*, satisfies the patent local rule of identifying where inside the Google *"modified"* cell phones the detection capability is located. Hereto, the alleged manufactured Google's Wireless Communication Protocols, is identified and located inside the Google *"modified"* cell phone.

---

**Google's *"nine"* Smartphone Biosensors Submitted to the Courts**:

- Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
- Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
- Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
- Microfluidic cassette: Interchangeable cassettes with varying assays
- VIS-NIR spectrometer: Food freshness; Melanoma
- NNAP Electrodes: Toxic metals and Organic pollutants in water
- Optical Waveguide: Pathogens in water and food
- Back and front camera: Colorimetric analysis; Image analysis
- Microphone: Voice recording stress levels

---

390.    Upon information and belief, Google continues to make, offer for sell, sell, and purportedly import the Google *"modified"* cell phones (i.e., Pixel smartphones), that include Google's Wireless Communication Protocols, into the United States that include *"nine standard sensors that are used as biosensors"*.

391.    Upon information and belief, Google, Apple, and Samsung's new, improved upon, and useful *"modified"* cell phones, that include their own Wireless Communication Protocols, are assembled abroad by the same company. Foxconn Technology Group in China, and Foxconn internationally, is a Taiwanese multinational electronics contract manufacturer established in 1974 with

256

headquarters in Tucheng District, New Taipei City, Taiwan. "The company that assembles both Google Pixels and Apple iPhones is Foxconn, formally known as the Hon Hai Technology Group." https://www.androidauthority.com/pixels-iphones-made-by-same-company-3624260/. "Samsung uses the same company to make its [smart]phones, Foxconn, that Apple does to assemble its [smart]phones", [that include their own Wireless Communication Protocols] https://news.ycombinator.com/item?id=28423983

392.    Plaintiff alleges, the burden of proof shifts [§ 295] when the Defendant [Google] is accused of using Plaintiff's patented process to manufacture and/or assemble the Google "*modified*" cell phone, that include Google's Wireless Communication Protocols, under 35 U.S.C. §§ 154(a)(1) & 271(g). Google is tasked with presenting evidence to a jury that Google is (1) not using Plaintiff's patented process; or (2) Google is using Plaintiff's patented process but is not shipping or importing the Google "*modified*" cell phones (i.e., Pixel smartphones), that include Google's Wireless Communication Protocols, into the United States.

393.    Plaintiff alleges, the resulting patented process used to manufacture and/or assemble the Google "*modified*" cell phone, that include Google's Wireless Communication Protocols, infringes under 35 U.S.C. §§ 154(a)(1) & 271(g) when the combination is shipped or imported into the United States.

394.    Upon information, the US Court of Appeals for the Federal Circuit held that applying a single-entity requirement under § 271(g) would impose an undue evidentiary burden on patentees [Plaintiff] that was contrary to the intent of Congress. The legislative history of § 271(g) showed that Congress recognized "the great difficulties a patentee [Plaintiff] may have in proving that the patented process was used in the manufacture of a products [Google's "*modified*" cell phone that include Google's Wireless Communication Protocols] in question" where the manufacture occurred abroad. *Syngenta Crop Protection LLC v. Willowood LLC,*

**395.** Upon information, part of Congress's solution is laid out in § 295, which shifts the burden of proof to the accused infringer to prove that the patented process was not used in manufacturing the accused product if there is a substantial likelihood that the infringing process was used and the patentee [Plaintiff] has been unable to make a definitive determination on its own. *See* 35 U.S.C. § 295.

**396.** Upon information, the court stated that Congress would not have "on the one hand recognized the difficulty in determining how a product [the Google *"modified"* cell phone that include Google's Wireless Communication Protocols was manufactured, and on the other hand concluded that determining who manufactured the product would be an easy exercise so as to require patentees to prove that a single manufacturer practiced the claimed process."

> "In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
> >
> > (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made." [35 U.S.C. § 295]

**397.** Upon information and belief, Google is allegedly infringing under 35 U.S.C. §§ 154(a)(1) & 271(g); upon shipment and/or importation into the United States the following Google *"modified"* cell phones (i.e., Pixel smartphones) that include Google's Wireless Communication Protocols: Google Nexus One, Nexus S, Galaxy

Nexus, Nexus 4, Nexus 5, Nexus 6, Nexus 5X, Nexus 6P, Pixel, Pixel XL, Pixel 2, Pixel 2 XL, Pixel 3, Pixel 3 XL, Pixel 3a, Pixel 3a XL, Pixel 4, Pixel 4 XL, Pixel 4a, Pixel 4a 5G, Pixel 5, Pixel 5a 5G, Pixel 6, Pixel 6 Pro, Pixel 6a, Pixel 7, Pixel 7 Pro, Pixel 7a, Pixel 8, Pixel 8 Pro, Pixel 9, Pixel 9a, Pixel 9 Pro, Pixel 9 Pro XL, Pixel 9 Pro Fold, Pixel 10, Pixel 10a, Pixel 10 Pro, Pixel 10 Pro XL, and Pixel 10 Pro

**398.** Upon information, Plaintiff alleges, Google's "*modified*" cell phone include the standard Wi-Fi and Bluetooth sensors used to enable the controlling of the vehicle's unlock, and stopping:

Google's "*modified*" cell phone devices interact with Waymo's self-driving cars and vans] for ride-hailing, consider the following:

- App Interface: Users book rides through the Waymo app on their mobile devices.
- Location Services: The app uses GPS to determine the user's pickup and drop-off locations.
- Real-Time Updates: Users receive notifications about the car's arrival time and location.
- Vehicle Control: Mobile devices can provide feedback or special requests for the ride.
- Payment Processing: Users can manage payments and track ride costs directly through the app.
- Safety Features: The app includes safety information and emergency contact options for users.

Begin by downloading the Waymo app onto the Google "*modified*" cell phone, which is available at the Google Android store. Once installed, open the app and sign up using your email address, phone number, and a strong password. From there, you'll

259

need to add your payment info—Waymo accepts most major credit and debit cards. The app also asks for some basic personal information, ensuring compliance with local ride-hailing regulations.

Here's the step-by-step game plan to get rolling in a self-driving vehicle:

- Open the App & Set Pickup: Tap on the app and enter your pickup location manually or use geolocation.

- Choose Your Destination: Type in where you'd like to go. The app instantly matches you with a nearby Waymo vehicle if available in your city.

- Select Ride Type: Waymo offers different ride options depending on your area, including solo rides or shared options. You'll see fare estimates here as well.

- Confirm & Wait: Once you confirm, the app sends you real-time tracking and an arrival time for your driverless car.

- Hop In: Waymo cars unlock via the app once they arrive — no keys needed. Don't forget to check the vehicle's license plate and Waymo branding before stepping in.

- Essential Smartphone: The app is essential for booking and unlocking the car, so at least a [Google "modified" cell phone] smartphone is necessary.

- Use the Provided Controls Wisely: The app and vehicle interface let you pause or stop the ride if needed; don't hesitate to use these features if you feel uncomfortable.

260

- Safety Protocols: The car has emergency stop buttons and continuous monitoring by a remote safety team ready to intervene if needed.

The Waymo app interacts with mobile devices via Bluetooth and Wi-Fi:

- The Waymo app connects to your vehicle using Bluetooth for initial pairing and communication.
- Wi-Fi is used for high-speed data transfer, such as downloading maps and software updates.
- The app allows users to request rides, track vehicle location, and manage settings through their mobile device.
- Bluetooth enables secure communication between the app and the vehicle for features like unlocking doors.
- Wi-Fi connectivity ensures a stable connection for real-time updates and navigation assistance.
- Users can also access vehicle diagnostics and performance data through the app when connected.

In January 2014 Google was granted a patent for a transportation service funded by advertising that included autonomous vehicles as a transport method. In late May, Google revealed an autonomous prototype, which had no steering wheel, gas pedal, or brake pedal. In December, Google unveiled a Firefly prototype that was planned to be tested on San Francisco Bay Area roads beginning in early 2015.

In fall 2015, Google for the first time to non-employees provided a ride in a fully autonomous vehicle in Austin, Texas. The

passenger was a blind man. It was the first entirely autonomous trip on a public road. Google spent $1.1 billion on the project between 2009 and 2015.

In December 2016, the project changed its name to Waymo and spun out of Google as part of Alphabet. The name was derived from "a new way forward in mobility".

In February 2017, Waymo sued Uber and its subsidiary self-driving trucking company, Otto, alleging trade secret theft and patent infringement. The company claimed that three ex-Google employees, including Anthony Levandowski, had stolen trade secrets, including thousands of files, from Google before joining Uber. The alleged infringement was related to Waymo's proprietary lidar technology, Google accused Uber of colluding with Levandowski. Levandowski allegedly downloaded 9 gigabytes of data that included over a hundred trade secrets; eight of which were at stake during the trial. An ensuing settlement gave Waymo 0.34% of Uber stock, the equivalent of $245 million.

In January 2023, The *Information* reported that Waymo staff were among those affected by Google's layoffs of around 12,000 workers. TechCrunch reported that Waymo was set to kill its trucking program.

Google has invested heavily in matrix multiplication and video processing hardware such as the Tensor Processing Unit (TPU) to augment Nvidia's graphics processing units (GPUs) and Intel's central processing units (CPUs) used in Waymo vehicles.

Alphabet CEO Sundar Pichai told Forbes: "The success we're seeing today from Waymo builds on years of cutting-edge AI work

at Google and Alphabet – from transformers, to reinforcement learning, to computer vision – and reflects our ability to deeply invest in solving technology problems for our users and customers," he told Forbes by email. https://www.forbes.com/sites/alanohnsman/2025/09/03/waymo-could-be-a-trillion-dollar-opportunity/

Waymo will begin offering rides in its new purpose-built robotaxi, the Ojai, to select riders in the coming weeks, the Alphabet unit said on Thursday, marking the public debut of the China-built model designed from the ground up for autonomous ride-hailing. The Ojai's base vehicle is built by Zeekr, the premium electric-vehicle brand owned by China's Geely, and shipped to the United States, where Waymo installs its sensors and software. The sixth-generation sensor suite installed in Arizona includes 13 cameras, six radars and four LiDAR units, fewer cameras than the Jaguar I-PACE-based system it replaces. https://eletric-vehicles.com/waymo/waymo-opens-its-china-built-ojai-robotaxi-to-first-riders/

Called the Waymo Ojai, the van is built in China by Zeekr and features a suite of 13 cameras, six radar sensors, and four lidar sensors. Waymo has been operating a fleet of autonomous robotaxis for some time now, first in San Francisco and then expanding last year to Los Angeles, Phoenix, Austin, and Atlanta. Now the Alphabet-owned company is preparing to update its lineup, supplementing its modified Jaguar I-Paces with a new van built by Chinese automaker Zeekr. Built exclusively for Waymo, Zeekr constructs the body of the van in China before shipping it to the U.S., where Waymo fits its software suite and array of sensors.

https://www.caranddriver.com/news/a69938250/waymo-ojai-autonomous-robotaxi-details/

The Waymo Ojai is an autonomous electric van developed as a robotaxi by Waymo, built on a chassis from the Chinese automaker Zeekr and integrated with Waymo's self-driving technology for rider-focused public transportation. Imported to the United States, the vehicle undergoes retrofitting with Waymo's sixth-generation hardware at facilities in Arizona before deployment, enabling expansion of Waymo's commercial robotaxi fleet across multiple markets. Zeekr manufactures the base vans in China before they are shipped to the United States for adaptation. Upon importation, the vehicles are transported to Waymo's integration facility in Mesa, Arizona, operated in partnership with Magna International, where they undergo a retrofitting process to incorporate Waymo's autonomous systems. This U.S. based modification workflow enables efficient scaling of the fleet by combining overseas production efficiencies with domestic customization, allowing completed Ojai vehicles to transition directly into service. https://grokipedia.com/page/Waymo_Ojai

*Waymo Admits to Using Remote Human Operators* (February 2026). At a congressional hearing over autonomous driving systems, Waymo's Chief Safety Officer, Mauricio Peña, acknowledged that the company employs individuals in the Philippines to assist its autonomous vehicles in difficult situations. Despite clarifying that overseas operators only assist and do not control Waymo's vehicles, the disclosure drew pushback from lawmakers about possible cybersecurity vulnerabilities and the company's labor practices.

Though Waymo autonomous vehicles (AV)s are capable of operating autonomously most of the time, the remote assistance (RA)s has a tool to nudge them when they stop on the shoulder of a highway. In this scenario, a US-based agent "could prompt the AV to move forward at 2mph for a short distance at fixed steering angles to exit the travel lane," McNamara says, adding that Waymo cars have never had to use this functionality outside of training.

Waymo's autonomous driving system (ADS) performs substantially the same function; in substantially the same way; to achieve substantially the same results, as Plaintiff's programmed stall, stop, and vehicle slow-down system; and, Plaintiff's remote stall, stop, and vehicle slow-down system.

399. Plaintiff alleges, Google's Wireless Communication Protocols is included in Google's production process for manufacturing the Google Pixel smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)]. Google's Wireless Communication Protocols are native to the manufacture of the Google Pixel smartphones, and is a standard component of the Google Pixel smartphone when imported into the United States.

400. Plaintiff alleges Google have devoted years to *"modifying"* the cell phone, that include Google's Wireless Communication Protocols, into a new, improved upon, or useful device that infringes upon Plaintiff's patented invention of a communication, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g) when the Google *"modified"* cell phones, that include Google's Wireless Communication Protocols of at least Wi-Fi and Bluetooth, are shipped or imported into the United States.

265

401.   Plaintiff also alleges that when the Google *"modified"* cell phone, that include Google's Wireless Communication Protocols, is integrated with, or interconnected to, a CBRNE-H detection capability; it functions as a sensing device that allegedly infringes Plaintiff's patented inventions. Plaintiff claims the infringement theory that Google is violating, aligns with Plaintiff's patent specifications; "the detection capability is placed 'in, on, upon, or adjacent' the monitoring device; and the claim term construction of the Patent Trials and Appeals Board (PTAB): "built-in, embedded" is construed to mean "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that *it is an integral part of the device*".

402.   Upon information and belief, each individual claim limitation or element that is listed below describes Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(g) that is allegedly used by Google to manufacture the Google *"modified"* cell phone.

> "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent" [271(g)]

403.   Upon information and belief, each individual claim limitation or element that is listed below describes the patented process for Plaintiff's patented communicating, monitoring, detecting, controlling, (CMDC) device (i.e., new, improved upon, or useful cell phone, smartphone, laptop, tablet, etc.) under the provisions of 35 U.S.C. § 101.

266

"[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor"; [§ 101]

**404.** Upon information and belief, each individual claim limitation or element listed below that is available for use to manufacture the patented process for an Google "*modified*" cell phone, was examined and allowed by the United States Patent and Trademark Office (USPTO), and the Patent Trials and Appeals Board (PTAB); and is presumed valid upon issue under 35 U.S.C. § 282(a); and anyone challenging the individual claim limitation or element listed below to describe the patented process under 35 U.S.C. §§ 154(a)(1) & 271(g), must do so on the heightened 'clear and convincing evidence' standard". *In Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91 (2011), the Supreme Court ruled that challengers must present clear and convincing evidence to invalidate a patent:

"[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim [§ 282(a)].

**405.** Upon information, prior to Google rolling out its Pixel smartphone in 2008 that did not have fingerprint scanning, Plaintiff filed with the USPTO on Nov. 17, 2004 a Disclosure Document (*Doc. No. 565732)* claiming a CMDC device that included Communication Protocols that enables CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures. Plaintiff's first application filing date is April 5, 2006 (App. # 11/397,118)

**406.** Plaintiff alleges, Google's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical

diagnosis, and enhancing security measures is included in Google's production process for manufacturing the Google Pixel smartphones that Plaintiff alleges infringes the patented process of his invention. [§ 271(g)].

**407.** Plaintiff alleges, Google's Wireless Communication Protocols that has a CBRNE-H detection capability for mitigating terrorist acts, making medical diagnosis, and enhancing security measures, is native to the manufacture of the Google Pixel smartphones, and is a standard component of the Google Pixel smartphone when imported into the United States. The PTAB determined the Communication Protocols to be standard component because it falls under the claim term construction of "built-in, embedded", "such that it is an integral part of the Google "*modified*" cell phone.

*Plaintiff's Claim Limitations that Cover the Google "modified" Cell Phone Design that include Google's Wireless Communication Protocols [Bluetooth, and Wi-Fi] for connecting Waymo's Self-Driving Vehicles*

- wherein the cell phone [] includes telecommunication and radio communication means that are interactive with any type of motive vehicle that includes but is not limited to cars, trucks, vans, SUVs, trains, subways, boats, ships, UAVs, UGVs, and airplanes [claim 13 of the '752 patent]

- a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom monitoring equipment and a central processing unit (CPU) or a transceiver on the vehicle. [claim 57 of the '891 patent]

- wherein the communication device is designed to be equipped with applications for the locking, disabling a lock, enabling a lock, and unlocking the locks of, but not limited to, containers, vehicles [claim 22 of the '990 patent]

- internal or external automatic/mechanical lock [] device which is mounted, embedded, affixed, or attached to a product for receiving transmission from the communication device to lock, unlock or disable the lock [claim 33 of the '990 patent]

- wherein the cell phone the smart phone, and the cell phone detector case are capable of sending signals to a vehicle's operating equipment systems comprising at least one of an ignition for starting and stopping, a lock for unlocking and locking [claim 107 of the '990 patent]

- wherein the cell phone, the smart phone, [] are designed to be equipped with applications for the locking, disabling a lock, enabling a lock, and unlocking the locks of containers, vehicles, houses and businesses through the use of a smart phone, cell phone, PDA, laptop or desktop. [claim 114 of the '990 patent]

- wherein the cell phone, the smart phone, [] have at least one of a Bluetooth connection, a Wi-Fi connection, a short- and long-range radio frequency connection, a cellular connection, a satellite connection, or a GPS connection. [claim 117 of the '990 patent]

- wherein a communication device, that of a cell phone, smart phone or handheld; capable of sending signals to a vehicle's operating equipment systems of at least one of, but not limited to, [] a lock for unlocking and locking, [] capable of receiving data and diagnostic information of the vehicle's operating equipment systems. [claim 134 of the '990 patent]

- whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock locking devices, activate or deactivate security systems, [], or to activate or deactivate cell phone detection systems; [claim 13 of the '439 patent]

- whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to the lock disabling mechanism that is able to engage, disengage, or disable the lock, activate or deactivate security systems, [] [claim 14 of the '439 patent]

- at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; [claim 22 of the '439 patent]

- the communication device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks; [claim 22 of the '439 patent]

- a transmitter for transmitting signals and messages to at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock; [claim 1 of the '287 patent]

269

- a receiver for receiving signals from at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock; [claim 1 of the '287 patent]

- a transmitter for transmitting signals and messages to at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock; [claim 3 of the '287 patent]

- a receiver for receiving signals from at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock; [claim 3 of the '287 patent]

- at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver; [claim 3 of the '287 patent]

- the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the manned or unmanned aerial vehicle lock, manned or unmanned ground vehicle lock, or manned or unmanned sea vehicle lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment. [claim 3 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 4 of the '287 patent]

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 5 of the '287 patent]

- at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or [], send signals to lock or unlock doors, send signals to control components of a vehicle, [] such that the communication device is capable of communicating, monitoring, detecting, and controlling. [claim 5 of the '287 patent]

270

- at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [claim 6 of the '287 patent]

- processing instructions to stall, stop, or slow-down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; [Claim 1 of the '898 Patent]

- stalling, stopping, or slowing down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; [Claim 2 of the '898 Patent]

**408.** Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), Plaintiff have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff have alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff have plead "enough fact[s] to raise a reasonable expectation that discovery and a trial will reveal that the defendant is liable for the misconduct alleged."

## PLAINTIFF'S ALLEGED WILLFUL PATENT INFRINGEMENT

### Willful Infringement Requires a Finding of Direct Infringement First

In the above sections Plaintiff outlined Google's alleged infringement of Plaintiff's patented process for a communicating, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g); also, Google's alleged infringement upon importation under 35 U.S.C. §§ 154(a)(1) & 271(a); and the alleged infringement under the doctrine of equivalents of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(a). Plaintiff believes Google is liable for the misconduct alleged.

**Knowledge requirement for Willful Patent Infringement**

**Under Rule 14(b):** In *Golden v. United States* CFC Case No. 13-307C, Google was listed as a third-party contractor; contracted to commercialized a *"modified"* cell phone capable of CBRNE-H detection. Under Rule 14(b) of the Rules of the United States Court of Federal Claims (RCFC), Google was obligated to make an appearance to protect its interest in the subject matter of the suit. Although Google failed to appear, beginning in year 2008, Google is said to have knowledge of Plaintiff's patented process when Google released its first version of a modified cell phone.

**Correspondence and Service of Complaints:** Plaintiff sent and received from Google correspondence relating to settlement, licensing, cease and desist, etc. in the following:

| Notice | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
|---|---|---|---|---|
| Notice | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Notice | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Notice | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

"Serving a complaint will, in most circumstances, notify the defendant of the asserted patent and the accused conduct … and sufficiently plead a post-filing/post-suit willful infringement claim." *Motion Offense, LLC v. Dropbox, Inc.*, No. 6:23-CV-303-ADA, 2024 BL 297370, at \*3 (W.D. Tex. Aug. 26, 2024) ("*Motion Offense* sufficiently pleaded post-suit willful infringement because the facts pleaded in the FAC satisfy the three Parity factors.

272

As the W.D. Tex. court held in *BillJco*, '[s]erving a complaint will, in most circumstances, notify the defendant of the asserted patent and the accused conduct. So long as the complaint also adequately alleges that the defendant is continuing its purportedly infringing conduct, it will satisfy all three Parity elements and sufficiently plead a post-filing/post-suit willful infringement claim.'") (internal citations omitted); *see Textile Comput. Sys. v. Broadway Nat'l Bank*, 620 F. Supp. 3d 557, 568 (W.D. Tex. 2022); *see BillJco, LLC*, 2022 U.S. Dist. LEXIS 17605, 2022 WL 299733, at *9-10 ("Serving a complaint will, in most circumstances, notify the defendant of the asserted patent and the accused conduct. So long as the complaint also adequately alleges that the defendant is continuing its purportedly infringing conduct, it will satisfy all three Parity elements and sufficiently plead a post-filing/post-suit willful infringement claim."); *see e.g., Atlas Glob. Techs., LLC v. Sercomm Corp.*, 638 F. Supp. 3d 721, 728 (W.D. Tex. 2022)

Patent infringement claims that carry with them knowledge requirements, are fact issues to be decided by a jury [U.S. CONS'T. 7th Amend.] on whether Google had a sufficient amount of knowledge of Plaintiff's patents and patented processes before, and while Google continued its allegedly infringing conduct.

**Plaintiff's Demand for a Jury Trial to Decide Willfulness**

Patent infringement claims are issues-of-facts to be decided by a jury [U.S. CONS'T. 7th Amend.] In this case a jury must decide whether Apple's alleged willful infringement claims are "wanton, malicious, and bad-faith behavior"; deliberate or intentional; or, that there's no willful infringement at all.

Recently, the Federal Circuit, in *SRI Int'l v. Cisco Sys.*, 2020-1685 (Fed. Cir. Sep. 28, 2021), clarified the confusion caused by an earlier remand to the district court, in which the Federal Circuit instructed the district court to determine whether the infringer's conduct met the "wanton, malicious, and bad-faith behavior required

273

for willful infringement." The district court, surprised by this instruction (as was the patent bar), nevertheless proceeded and found the infringer's conduct insufficient to meet this new, heightened standard.

On appeal for the second time, the case returned to the same three-member panel of the Federal Circuit, which clarified that it was not their intent to create a heightened requirement for willful infringement and reiterated the standard for willful infringement summarized last year in *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc., 946 F.3d 1367 (Fed. Cir. 2020)*: "willfulness requires a jury to find no more than deliberate or intentional infringement."

The Federal Circuit explained under "the concept of 'willfulness' requires the jury to find no more than deliberate or intentional infringement." *Halo Elecs., Inc. v. Pulse Elecs. Inc.*, 579 U.S. 93, 103 (2016).

Plaintiff intends to show the jury Plaintiff is entitled to enhanced damages because Google's conduct is allegedly "willful, wanton, malicious, bad-faith, deliberate, [intentional], consciously wrong, flagrant, or — indeed — characteristic of a pirate." (quoting *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 136 S.Ct. 1923, 1932 (2016).

The Northern District of California (NDC) court may allow damages in the form of recovery for (1) lost profits, (2) reasonable royalties, and (3) treble damages for Apple's alleged willful infringement. This court is tasked with calculating the fair market value of a license for one of the infringing acts (alleged infringement of Plaintiff's patented process for a communicating, monitoring, detecting, and controlling (CMDC) device under 35 U.S.C. §§ 154(a)(1) & 271(g); also, Google's alleged infringement upon importation under 35 U.S.C. §§ 154(a)(1) & 271(a); and the alleged infringement under the doctrine of equivalents of Plaintiff's patented process under 35 U.S.C. §§ 154(a)(1) & 271(a). Plaintiff believes Google is liable for the misconduct.

# CONCLUSION

Twelve federal judges (nine from the appellate court) were *CORRECT* when they inferred, or came to the conclusion; infringement of Plaintiff's patents occur when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability. The twelve federal judges were also *CORRECT* in their determination: "the accused original cell phone devices of Google required *"modification"* in order to infringe Plaintiff's patents".

Plaintiff is not arguing against the ruling made in the other Courts. Plaintiff is arguing that the required *"modification"* for the accused Google devices to function as a CBRNE-H sensing device is already complete. In most all cases the enabled Google CBRNE-H sensing device was made before importation; before any offer for sell; and before the selling of the devices. The Defense will argue the Google CBRNE-H sensing device needs additional *"modification"* before infringement of Plaintiff's patented inventions occurs. This is not true.

Plaintiff has stated a plausible claim for infringement upon import of the Google "modified" cell phones, direct infringement and/or infringement under the doctrine of equivalents by specifically identifying the Defendant's products and alleging that they perform the same unique function as Plaintiff's patented inventions. The Defendant in this case is allegedly liable for infringement of the asserted patents-in-suit under 35 U.S.C. §§ 154(a)(1) & 271(g).

Plaintiff chose not to attach claim charts because Plaintiff is not trying to re-litigate any issues that have already been decided in the previous courts. We know how Plaintiff's patents are infringed; what a jury will decide is ***when*** the Google accused devices were manufactured and "suitable for use" as a CBRNE-H sensing device. No other Court have adjudicated this question to a final judgement.

The United States Department of Homeland Security (DHS) and the United States Department of Justice (DOJ) in *Golden v. US* CFC 13-307C petition the

275

United States Patent Trials and Appeals Board (PTAB) to invalidate certain patent claims of Plaintiff's patents.

In the PTAB's "Final Written Decision" (Oct. 1, 2015), the PTAB construed the claim term "built-in, embedded" as "something that is an integral part of the device".

Throughout, this complaint, Plaintiff have pleaded enough facts to support Google's *"modified"* cell phone that "include within" or "dispose within", a CBRNE-H detection capability; and Google's *"modified"* cell phone that "incorporate into", or is "connected to", a CBRNE-H detection capability, infringes upon import, under 35 U.S.C. §§ 154(a)(1) & 271(g), Plaintiff's patented when the Google *"modified"* cell phones are shipped or imported into the United States.

> In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below."

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

> No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain

relevant after the amendment, we see no reason to modify them.

We further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10–11. Based on the record adduced during trial, we see no need to construe any other terms."

Also noted, throughout this document a third-party other than Google cannot "modify" the Google devices without Google's consent and a license to do so. Google also control the upgrades and updates to the its operating systems that keeps the devices functioning as a CBRNE-H sensing device.

## PRAYER FOR RELIEF

Wherefore, Golden respectfully requests that this Court enter:

A.   A judgement in favor of Golden that the Defendant's modification of the cell phone to include a CBRNE-H detection capability infringes Golden patented inventions and the asserted patents-in-suit.

B.   A judgement affirming the decision of twelve federal judges when they determined "infringement of Golden's patents occurs when a mobile, consumer, or cellular device is integrated with, or interconnected to, a CBRNE-H detection capability".

C.   A judgment in favor of Golden that the defendant has infringed under 35 U.S.C. §§ 154(a)(1) & 271(g) by manufacturing Plaintiff's patented process abroad and importing the alleged infringing products into the United States.

D.   A judgment in favor of Golden that the defendant has infringed under 35 U.S.C. §§ 154(a)(1) & 271(g) the patented process of the asserted patents as aforesaid; and grant Plaintiff his request for damages.

E.   A permanent injunction enjoining the defendant, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, and all others acting in active concert or privity therewith from

277

joint and/or direct infringement of the asserted patents as aforesaid pursuant to 35 U.S.C. § 283;

F.    A judgment and order requiring the defendant to pay Golden its damages with pre- and post-judgment interest thereon pursuant to 35 U.S.C. § 284;

G.    As set forth in Golden's preliminary infringement contentions that the Defendant in this case is making, using, offering for sale, selling and/or importing the aforementioned alleged infringing *modified* cell phone devices that have at a minimum, infringed upon import, directly and/or infringed under the doctrine of equivalents, the asserted patents.

H.    According to twelve federal judges, the Defendant is liable for infringement of the patented process of the asserted patents pursuant to 35 U.S.C. §§ 154(a)(1) & 271. The Defendant has caused damage to Golden, which infringement and damage will continue unless and until the Defendant is enjoined.

I.    Any and all further relief to which the Court may deem Golden entitled.

## DEMAND FOR JURY TRIAL

Golden requests a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P. 38. A right guaranteed under the Seventh Amendment of the United States Constitution.

Sincerely,

s/ *Larry Golden*

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(M) 8649927104

Email: atpg-tech@charter.net

## VERIFICATION

### Pursuant to 28 U.S.C. § 1746

I, Larry Golden, over the age of 18, competent to testify, and having firsthand knowledge of the facts stated herein, do hereby declare, certify, verify, affirm, and state under penalty of perjury under the laws of the United States of America, that the foregoing statements are true, correct, and complete to the best of my understanding, knowledge, and belief, and made in good faith.

Executed and signed this 30th day of May, 2026, with all rights reserved and without recourse and without prejudice; is this "verification" for "Plaintiff's Amended Complaint".

s/ *Larry Golden*

Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-992-7104

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 30th day of May, 2026, a true and correct copy of the foregoing "Plaintiff's Amended Complaint", was served upon the following Defendant via express mail:

Matthew S. Warren

WARREN, LLP

2261 Market Street, No. 606

San Francisco, California 94114

Phone: (415) 895-2940

Fax: (415) 895-2964

Email: 26-831@cases.warrenllp.com

s/ *Larry Golden*

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-992-7104

281

# Exhibit A

Google's intent, while performing work for the Government, with implied authorization or consent to infringe Plaintiff's patents; was and is, to research, develop, manufacture, and commercialized, a *"modified"* cell phone device that is capable of CBRNE-H detection; and which can be used *"ubiquitously"* by at least the 300 million cell phone users that already exist (Qualcomm, 2012)

> "Qualcomm's role [in the DHS S&T Cell-All initiative] has been to develop a smartphone app and the associated network software for processing data. Smartphone users can download the app from **Google Play** and, eventually, from Apple's iTunes store, so Cell-All will be operational on all phones using either **Google's Android** or Apple's iPhone operating systems".[1]

---

[1] Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks Torin Monahana, Jennifer T. Mokosb; Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

## THE GOVERNMENT'S "LANGUAGE OF INTENT" TO COMBINE GOLDEN'S PATENTED INVENTIONS—COMBINATIONS

In addition to a detailed description of the combined efforts of all third-party contractors, the "language of intent", wherever necessary to show the Government has "authorized and consented" to combining components of Golden's patented combination, is included in the government solicitation(s), awards, and contracts. An example of the "language of intent", to combine the combined components of Golden's patented combination is recognized in the DHS *Cell-All* initiative; the DoD DTRA *ATAK* initiative; and the DoD "JPEO-CBRND" initiative.

### DHS S&T "*Cell-All*" [Past "Language of Intent" to Combine]

Spearheaded by the Department of Homeland Security's (DHS) Science and Technology Directorate (S&T), Cell-All aims to equip your cell phone with a sensor capable of detecting deadly chemicals … "Our goal is to create a lightweight, cost-effective, power-efficient solution," says Stephen Dennis, Cell-All's program manager:

> In 2007, S&T called upon the private sector to develop concepts of operations. To this end, three teams from Qualcomm, the National Aeronautics and Space Administration (NASA), and Rhevision Technology are perfecting their specific area of expertise. Qualcomm engineers specialize in miniaturization and know how to shepherd a product to market. Scientists from the Center for Nanotechnology at NASA's Ames Research Center have experience with chemical sensing on low-powered platforms, such as the International Space Station. And technologists from Rhevision have developed an artificial nose—a piece of porous silicon that changes colors in the presence of certain molecules, which can be read spectrographically … Similarly, S&T is pursuing what's known as cooperative research and development agreements with four cell phone manufacturers: Qualcomm, LG, Apple, and Samsung. These written agreements, which bring together a private company and a government agency for a specific project, often accelerate the commercialization of technology developed for government purposes. *The Department of Homeland Security's (DHS) 2007.*

Qualcomm, the primary contractor for the *Cell-All* initiative, role has been to develop a smartphone app [CPU/Chipset] and the associated network software for processing data. Smartphone users can download the app from Google Play and, from Apple's iTunes store, so *Cell-All* will be operational on all phones using either Google's Android operating systems or Apple's iPhone operating systems.

### DoD DTRA ATAK [Current "Language of Intent" to Combine]

Another example of the "language of intent", to combine the components of Golden's patented combination is recognized in the DoD DTRA initiative [the current case]. The Android

2

Team Awareness Kit (ATAK) is an Android smartphone geospatial infrastructure and military situation awareness app for Google, Samsung, LG, Qualcomm, etc. ATAK has a CBRNE plugin architecture which allows developers to add functionality. This extensible plugin architecture that allows enhanced capabilities for specific mission sets. [Draper Laboratory, Inc.]

In September 2015, Defense Advanced Research Projects Agency (DARPA) reported that ATAK was used in a successful demonstration of the Persistent Close Air Support Program, and is in use by thousands of users. In 2018, the United States Air Force (USAF) Security Forces deployed ATAK at Eglin AFB, Florida. The Android Team Awareness Kit or TAK is currently used by thousands of Department of Homeland Security (DHS) personnel, along with other members of the Homeland Security Enterprise including state and local public safety personnel. TAK has supported the rescue of over 2,000 people during disaster response for seven major hurricanes (Harvey, Irma, Maria, Florence, Lane, Michael, and Dorian). The capability is also regularly used during public safety operations and national security special events like United Nations General Assembly meetings and the Super Bowl.

ATAK has various end-user versions: ATAK - Civilian (ATAK-CIV); ATAK - Government (ATAK-GOV); and, ATAK - Military (ATAK-MIL). This initiative combines Golden's patented CMDC device, CPU, and Multi-Sensor Detection device.

## DoD "JPEO-CBRND" [Future "Language of Intent" to Combine]

Another example of the "language of intent", to combine the components of Golden's patented combination is recognized in the DoD JPEO-CBRND initiative [a future case for filing]. The Joint Program Executive Office for Chemical, Biological, Radiological, and Nuclear Defense (JPEO-CBRND) is a component of the U.S. Department of Defense's Chemical and Biological Defense Program, the JPEO-CBRND protects the entire Joint Force – Army, Navy, Air Force, Marines, Coast Guard, and First Responders – through the advanced development of CBRN defense capabilities.

Four Joint Project Managers (JPM) provide oversight for the portfolios, including JPM CBRN Protection, JPM CBRN Medical, JPM CBRN Sensors and JPM CBRN Special Operations Forces. Two Joint Project Leads (JPL) focus on CBRN defense enabling biotechnologies and CBRN integration. The JPLs provide portfolio-wide enabling support across the JPEO-CBRND.

3

Draper Laboratory has been awarded a $26 million (all options) contract by the U.S. Department of Defense (DOD) to further expand the capabilities of its unmanned autonomous systems (UAS) software to perform chemical, biological, radiological and nuclear (CBRN) reconnaissance missions in collaborative teams and in degraded operating environments.

Draper's UAS on a CBRN reconnaissance mission includes a TAK-enabled consumer device. Draper will advance its system under an effort at JPEO-CBRND called CSIRP, which stands for CBRN Sensor Integration on Robotic Platforms. Additional enhancements to the system will include advances in CBRN sensors.

The autonomous software on the aerial unmanned platform will be designed to operate with the command-and-control user interface for the U.S. Army's Nuclear, Biological and Chemical Reconnaissance Vehicle (NBCRV) Stryker platform currently being developed by Teledyne FLIR. Both the autonomous SkyRaider and the new sensor payloads will be designed to operate with the command-and-control user interface for the US Army's Nuclear, Biological and Chemical Reconnaissance Vehicle (NBCRV) Stryker platform.

Draper will integrate communications with the TAK platform, enabling the unmanned systems to send images to a mobile device (i.e., smartphone, laptop) and overlay the locations of detected objects of interest on an aerial map for human team members, all in real-time.

A major focus for Draper is to extend its air-ground teaming architecture to link multiple systems into a mesh network. With mesh, every autonomous vehicle; the aerial (UAV), ground (UGV), and maritime (USV), becomes an access point and relays messages among themselves.

The UASs will use Draper's novel algorithm to synthesize the data from onboard sensors including GPS, LiDAR, accelerometer, magnetometer and onboard cameras, and be able to communicate with human operators, centralized command centers, and other teamed UASs.

The DoD and Draper have combined Golden's patented stall, stop, and vehicle slow-down system for controlling the operational systems of an unmanned aerial vehicle (UAV) in the DoD JPEO-CBRND initiative.

Golden provides additional patent claims not already asserted in this current case, but are relevant to the future case, whereby DoD JPEO-CBRND is defendant. This initiative combines Golden's patented CMDC device, CPU, Multi-Sensor Detection device; and stall, stop, slow-down system for autonomous vehicles.

4

## TWO JUDGES IN THE U.S. COURT OF FEDERAL CLAIMS CONFIRMS THE GOVERNMENT UNLAWFULLY TOOK A COMPULSORY, NON-EXCLUSIVE LICENSE TO INFRINGE GOLDEN'S PATENTED INVENTIONS

**Judge Braden**

Judge Braden, in the United States Court of Federal Claims, *Golden v. United States*, Case No. 13-307C "Memorandum Opinion and Order Denying the Government's Motion to Dismiss, Dkt. 94, filed 11/30/16, fully described when a product is considered "manufactured" and is "suitable for use". In *FastShip, LLC v. United States*, the U.S. Court of Appeals for the Federal Circuit held that to be "manufactured" under 28 U.S.C. Section 1498, an accused product must include each claim limitation so it is "suitable for use".

"The February 12, 2016 Amended complaint identifies over thirty devices that were developed or procured, as a result of Government solicitations, Government contracts, or National Science Foundation ("NSF") grants. 2/12/16 Am. Compl. at ¶¶ 68-127. The relevant devices are: M-Lock; High-Power Electromagnetic System ("HPEMS"); Smartphone Microscope; Biophone; Smartphone Biosensor Cradle; iPhone Biodetector Smartphone; Pathtracker; the Center of Integrated Nanomechanical Systems ("COINS") Nano-Embedded Sensors; Smartphone-Based Rapid Diagnostic Tests; Lockheed Martin K-Max Unmanned Self-flying Helicopter; Boeing MH-6 Little Bird Helicopter; SIN-VAPOR I Smartphone System; Samsung Galaxy s6 Microscope Smartphone; VOCket System; Nett Warrior Smartphone System; Northrop Grumman X-47B UCAS I X-478 Control Display Unit; GammaPix; NFC Samsung Galaxy s6 Smartphone Sensor; Cell-All Synkera MikroKera Ultra; Biotouch System; iPhone Biodetector Smartphone; Navy Marine Corps Intranet; FLIR identiFINDER R300; AOptix Stratus MX Peripheral; MultiRae Pro Wireless Portable Multi Threat Radiation and Chemical Detector; PositiveID's M-BAND; PositiveID's Firefly DX; 1"x2" Detection Device Samsung Galaxy s6 Smartphone; 2"x2" Detection Device Samsung Galaxy s6 Smartphone; NetS2 SmartShield G300 Radiation Detector Samsung Galaxy s6 Smartphone; NetS2 SmartShield G500 Radiation Detector Samsung Galaxy s6 Smartphone; and the Passport Systems Base Control Unit; Oshkosh Defense Autonomous Unmanned Ground Vehicle TerraMax; and the Variable NODE+Oxa. 2/72/76 Am. Compl. at, ¶¶ 68-127."

"The February 12, 2016 Amended Complaint's NFC claims also allege sufficient facts to plausibly establish that the use of the accused devices was "with the authorization or consent of

5

the Government." Authorization or consent can be implied from the circumstances, "e.g., by contracting officer instructions, [or] specifications or drawings which impliedly sanction and necessitate infringement." *Hughes Aircraft Co.*, 534 F.2d at 901. For example, in *TVI Energy Corp.*, the [] Federal Circuit held that the Government impliedly sanctioned the use of a patented invention when it issued a solicitation that required bidders to submit for inspection, and perform live demonstrations of, the accused device. *See TVI Energy Corp.,806 F.2d at 1060*."

Government funding of research that will lead to the development and testing of an accused device supports a reasonable inference that the Government impliedly sanctioned infringing activity.

"The relevant [awards] are being used to develop: "a portable smartphone attachment that can be used to perform sophisticated field testing to detect viruses and bacteria," 2/12/16 Am. Compl. ¶78; "[a device] that derives biological signals from your smartphone's accelerometer … [and] [t]his information is useful to base medical diagnoses in real-life conditions and to help track chronic health conditions and effects of therapeutic interventions," 2/12/16 Am. Compl. ¶80; "a cradle and app for the iPhone to make a handheld biosensor that uses the phone's own camera and processing power to detect any kind of biological molecules or cells," 2/12116 Am. Compl. ¶92; a handheld instrument to help contain the spread of Ebola, HIV, Tuberculosis, and Malaia, 2/12/16 Am. Compl. ¶102; "[a portable device for] real-time detection of explosives, toxicants, and radiation," 2/12/16 Am. Compl. ¶122; "highly sensitive rapid medical diagnostic tests," 2/12/16 Am. Compl. ¶126."

"Viewed in the light most favorable to Plaintiff, the February 12, 2016 Amended complaint alleges sufficient facts to raise a plausible right of relief under section 1498(a). See *Iqbal*, 556 U.S. at 677. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." "For the reasons discussed herein, the Government's June 24, 2016 Motion to Dismiss Certain Devices, pursuant to RCFC 12(b)(1) and 12(b)(6), is denied."

**Judge Bruggink**

Judge Bruggink, in *Larry Golden v. The United States*, CFC Case No. 13-307C-EGB "*ORDER*" Dkt 215 Filed 02/26/21 Pages 5-7 of 7. Below Judge Bruggink confirmed infringement occurs when Golden's patented inventions are combined.

6

"Plaintiff also alleges his "communicating, monitoring, detecting, and controlling ("CMDC") device is commercialized in the form of an improved cell phone, smartphone, smartwatch, laptop, or tablet … the CMDC devices that were developed for, manufactured and commercialized by third-party government contractors, Apple, Samsung, and LG, []" … a claim chart that purports to identify features of devices alleged to be part of the DHS Cell-All initiative…

"As to defendant's argument that plaintiff's current infringement allegations are too "vague as to the nature of the Cell-All project []," we disagree. In alleging infringement of his patented CMDC technology, plaintiff attached a lengthy series of "claim charts" illustrating allegations of how the government, and third parties at the government's behest, are infringing certain of his patents' claims."

"In exhibit 7 [], plaintiff's claim chart illustrates instances of alleged infringement of the '189 patent, '287 patent, '439 patent, '497 patent, and the '752 patent. He includes separate charts for a device manufactured by LG, one by Apple, and Samsung. The next chart in exhibit 7 explains why he believes that the Cell-All initiative resulted in the manufacture of these devices for DHS … Mr. Golden is alleging that the government caused the manufacture of all of these devices or caused these devices to use his technology."

| Judge(s) | Case | Judgement |
|---|---|---|
| CFC Judge Braden | Golden v. USA No. 13-307C Dkt. 94 filed *11/30/16* | "The February 12, 2016 Amended complaint identifies over thirty devices that were developed [], as a result of Government solicitations, [] contracts. or [] ("NSF") grants … The relevant devices. are: iPhone Biodetector Smartphone; Samsung Galaxy s6 Smartphone Sensor; Cell-All Synkera MikroKera Ultra; Oshkosh Defense Autonomous Unmanned Ground Vehicle TerraMax; and the Variable NODE+Oxa CBRNE sensors…" |
| CFC Judge Bruggink | Golden v. USA No. 13-307C Closed *11/10/21* | "He goes on to include pictures of examples, which show the additional sensors added or affixed to the phones. They are not native to the devices as manufactured by Apple or Samsung. Unable to find a sensing component in the accused devices … Unexplained is how [] the government is on the hook for the private parties' products." |

7

**SINCE JUDGE BRUGGINK'S DECISION IN *GOLDEN v. US* CASE NO. 13-307C; TWELVE FEDERAL JUDGES DETERMINED THE UNITED STATES INFRINGED GOLDEN'S PATENTED INVENTIONS COMBINATIONS**

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Judge Bruggink | 1:2013cv00307 | Golden v. USA | U.S. Court of Federal Claims | 05/01/2013 - *11/10/2021* |

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| Three Appellate Judges | 2024cvpri02024 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 07/01/2024 - *06/25/2025* |

**The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 22-1267; determined Direct Infringement by or for the Government, arises when there's a combined ATAK Software; CBRN Plugins; CPU; and Smartphone**

The Federal Circuit in *Larry Golden v. Google LLC* Case No. 22-1267 "vacated and remanded" the lower court case *Larry Golden v. Google LLC* Case No. 21-0244 back to the lower [District] court because Golden had met all the pleading requirements, and was therefore ready for trial. The original case *Golden v. Google LLC*, SCDC No. 6:2021cv00244 was filed in

8

the South Carolina District Court on 01/26/2021. The case was dismissed as being "frivolous". Golden appealed the case to the U.S. Court of Appeals for the Federal Circuit.

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 disclosed in "Discussion" that the Circuit reviewed the case "under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), [a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face]." *Twombly*, 550 U.S. at 570; and, "plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted)

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 took notice that "in the patent context, th[e] court has explained that a plaintiff need not "plead facts establishing that each element of an asserted claim is met," *In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)), but must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged." *Id.* at 1341 (alteration in original) (quoting *Twombly*, 550 U.S. at 556)".

| Literal Infringement (Precedence) | Literal Infringement (Fed. Cir. *Golden v. Google*) |
|---|---|
| Literal infringement means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. To literally infringe a patent, the accused system, method, etc. must include each limitation of a claim. E.g., *Southwall* (Fed. Cir. 05/10/95) To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly. *Becton Dickinson* (Fed. Cir. 12/13/90). "Infringement, both literal and under the doctrine of equivalents, is an issue of fact."); *Cobalt Boats* (Fed. Cir. 05/31/19) "patent infringement is an issue of fact, tried by a jury" [U.S. CONST. amend. VII] | "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the [] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart.…" |

9

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court *again* concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" ... "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" ... "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

Although the Federal Circuit did not specifically say "'without a doubt', Google's smartphone products that include the ATAK software and CBRN plugin sensors are literally and/or under the doctrine of equivalents, infringing Golden's patents asserted in the case", the Federal Circuit imply to say under the "clear and convincing evidence" standard, Google's smartphone products that include the ATAK software and CBRN plugin sensors are more likely than not, directly infringing Golden's patents asserted in the case.

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent. See the chart below:

**The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* that Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; CPU; and Smartphone**

In *Golden v. Samsung Electronics America, Inc.* Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024.

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: (1) through the "Android Team Awareness Kit, ATAK," which is "[b]uilt on the Android operating system," involves "plug-ins" and "app specific software," was "[i]nitially created" by the "Air Force Research Laboratory"

10

together with the "Defense Threat Reduction Agency," and is "available to warfighters throughout the DoD," Appx112 ¶ 55; Appx119, 127; (2) through add-on devices or modifications that utilize the smartphone's built-in camera, Appx111 ¶ 54, Appx124–25; and (3) through nine "standard sensors" which "can be used as 'biosensors,'" Appx126."

"Samsung moved to dismiss Mr. Golden's complaint, arguing that, among other things, Mr. Golden's complaint failed to plausibly state a patent-infringement claim. Appx146–48. More specifically, Samsung argued that Mr. Golden's complaint stated no alleged facts that went beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality. On that basis, Samsung said, there are no plausible allegations Samsung was engaged in directly infringing activities. Appx146–47."

"The district court agreed and dismissed Mr. Golden's complaint with prejudice, concluding, in part, that "[t]he allegations that his patents cover the identified functionalities included in Samsung's products are wholly unsupported and implausible on their face." Golden, 2023 WL 3919466, at *2."

"We reject Mr. Golden's appeal arguments and therefore affirm the district court's dismissal of his complaint."

**The Northern District of California Court Judge Haywood S. Gilliam, Jr. in Case No. 22-5246; determined Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; CPU; and Smartphone**

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss with Leave to Amend" Document 41 Filed 08/10/23; the then presiding Judge Haywood S. Gilliam, Jr. agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

**The Northern District of California Court Judge Rita F. Lin in Case No. 22-5246; determined Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; CPU, and Smartphone**

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68 Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant [Google] that the Google Pixel devices

11

could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

**Claim 1 U.S. Patent No: 11,645,898**

**"Consumer / Mobile / Cellular Device Integration with a Detection Capability"**

1.    This invention incorporates all the pleadings and attachments of this complaint that precedes this section which alleges the Government "used or manufactured" Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device—" invention— independent claim 1 of his '898 patent'.

2.    Upon information and belief, the United States has in the past, and continues to "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device "without license of the owner thereof or lawful right to use or manufacture the same" [28 U.S.C. § 1498(a)] without paying "reasonable and entire compensation".

3.    According to this United States Court of Federal Claims: "[U]nder § 1498(a), a patent owner who successfully proves infringement is entitled to "reasonable and entire compensation". Like the definition of infringement, the remedies available to a patentee are limited by § 1498(a)'s roots in eminent domain, not tort." *Leesona Corp. v. United States*, 599 F.2d 958, 964 (Ct. Cl. 1979) ("The theory for recovery against the government for patent infringement is not analogous to that in litigation between private parties …") "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

4.    According to this United States Court of Federal Claims: [W]hen the government has infringed, it is deemed to have 'taken' the patent license under an eminent domain theory, and compensation is the just compensation required by the Fifth Amendment."). "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

5.    Upon information and belief, the United States Court of Federal Claims; the United States District Court for the Northern District of California; and the United States Court of Appeals for the Federal Circuit has confirmed the infringement of Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device, that occurs when there's an integration of a consumer, mobile, or cellular device with a detection capability. Therefore, the

12

Government's unlawful takings of a compulsory, non-exclusive, license to infringe Golden's independent claim 1 of his '898 patent' is inevitable.

6.      Upon information and belief, the Government has in the past, and continues to unlawfully "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., consumer, mobile, or cellular device integration with a detection capability). The alleged Government infringement of independent claim 1 of Golden's '898 patent', is found in the following Government initiative(s):

- Consumer devices (Laptop; Tablet, etc.): "use or manufacture" for the United States Department of Defense's Joint Program Executive Office for Chemical, Biological, Radiological, and Nuclear Defense (DoD JPEO-CBRND)

7.      Upon information and belief, "[t]he proper measure in eminent domain is what the owner has lost, not what the taker has gained," and in § 1498(a) what is taken from the patent owner is a compulsory nonexclusive license to use or manufacture the patented invention. Id. at 969 (citing *United States v. Chandler-Dunbar Co.*, 299 U.S. 53, 76 (1913)). As such, in § 1498 actions, "reasonable and entire compensation" is the exclusive remedy for patent infringement under § 1498(a) and is akin to just compensation under the Fifth Amendment of the Constitution. *"Intellectual Property Suits in the United States Court of Federal Claims"*; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

## Claim 1 of U.S. Patent No: 10,984,619
## "Consumer / Mobile / Cellular Device Integration with a Detection Capability"

8.      This invention incorporates all the pleadings and attachments of this complaint that precedes this section which alleges the Government "used or manufactured" Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device—" invention— independent claim 1 of his '619 patent'.

9.      Upon information and belief, the United States has in the past, and continues to "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device "without license of the owner thereof or lawful right to use or manufacture the same" [28 U.S.C. § 1498(a)] without paying "reasonable and entire compensation".

13

10.    According to this United States Court of Federal Claims: "[U]nder § 1498(a), a patent owner who successfully proves infringement is entitled to "reasonable and entire compensation". Like the definition of infringement, the remedies available to a patentee are limited by § 1498(a)'s roots in eminent domain, not tort." *Leesona Corp. v. United States*, 599 F.2d 958, 964 (Ct. Cl. 1979) ("The theory for recovery against the government for patent infringement is not analogous to that in litigation between private parties …") "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1; Also, Published on the American Bar Association's website.

11.    According to this United States Court of Federal Claims: [W]hen the government has infringed, it is deemed to have 'taken' the patent license under an eminent domain theory, and compensation is the just compensation required by the Fifth Amendment."). "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

12.    Upon information and belief, the United States Court of Federal Claims; the United States District Court for the Northern District of California; and the United States Court of Appeals for the Federal Circuit has confirmed the infringement of Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device, that occurs when there's an integration of a consumer, mobile, or cellular device with a detection capability. Therefore, the Government's unlawful takings of a compulsory, non-exclusive, license to infringe Golden's independent claim 1 of his '619 patent' is inevitable.

13.    Upon information and belief, the Government has in the past, and continues to unlawfully "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., consumer, mobile, or cellular device integration with a detection capability). The alleged Government infringement of independent claim 1 of Golden's '619 patent', is found in the following Government initiative(s):

- Consumer or Mobile devices (Laptop; Tablet, iPhone, Android Phone, etc.): "use or manufacture" for the United States Department of Defense's Defense Threat Reduction Agency Android Tactical Assault Kit Chemical, Biological, Radiological, and Nuclear Plug-in Sensors (DoD DTRA-ATAK CBRNE)

14.    Upon information and belief, "[t]he proper measure in eminent domain is what the owner has lost, not what the taker has gained," and in § 1498(a) what is taken from the patent owner is a

14

compulsory nonexclusive license to use or manufacture the patented invention. Id. at 969 (citing *United States v. Chandler-Dunbar Co.*, 299 U.S. 53, 76 (1913)). As such, in § 1498 actions, "reasonable and entire compensation" is the exclusive remedy for patent infringement under § 1498(a) and is akin to just compensation under the Fifth Amendment of the Constitution. "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

**Claim 5 U.S. Patent No: 10,163,287**

**"Consumer / Mobile / Cellular Device Integration with a Detection Capability"**

15.     This invention incorporates all the pleadings and attachments of this complaint that precedes this section which alleges the Government "used or manufactured" Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device—" invention—independent claim 5 of his '287 patent'.

16.     Upon information and belief, the United States has in the past, and continues to "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device "without license of the owner thereof or lawful right to use or manufacture the same" [28 U.S.C. § 1498(a)] without paying "reasonable and entire compensation".

17.     According to this United States Court of Federal Claims: "[U]nder § 1498(a), a patent owner who successfully proves infringement is entitled to "reasonable and entire compensation". Like the definition of infringement, the remedies available to a patentee are limited by § 1498(a)'s roots in eminent domain, not tort." *Leesona Corp. v. United States*, 599 F.2d 958, 964 (Ct. Cl. 1979) ("The theory for recovery against the government for patent infringement is not analogous to that in litigation between private parties …") "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

18.     According to this United States Court of Federal Claims: [W]hen the government has infringed, it is deemed to have 'taken' the patent license under an eminent domain theory, and compensation is the just compensation required by the Fifth Amendment."). "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

15

19.     Upon information and belief, the United States Court of Federal Claims; the United States District Court for the Northern District of California; and the United States Court of Appeals for the Federal Circuit has confirmed the infringement of Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device, that occurs when there's an integration of a consumer, mobile, or cellular device with a detection capability. Therefore, the Government's unlawful takings of a compulsory, non-exclusive, license to infringe Golden's independent claim 5 of his '287 patent' is inevitable.

20.     Upon information and belief, the Government has in the past, and continues to unlawfully "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., consumer, mobile, or cellular device integration with a detection capability). The alleged Government infringement of independent claim 5 of Golden's '287 patent', is found in the following Government initiative(s):

- Mobile or Cellular devices (iPhone, Android Phone, Cell Phone, PDA, etc.): "use or manufacture" for the United States Department of Homeland Security's Science and Technology Directorate Broad Agency Announcement 07-10 *Cell-All Ubiquitous Chemical and Biological Sensing* (DHS S&T "*Cell-All*")

21.     Upon information and belief, "[t]he proper measure in eminent domain is what the owner has lost, not what the taker has gained," and in § 1498(a) what is taken from the patent owner is a compulsory nonexclusive license to use or manufacture the patented invention. Id. at 969 (citing *United States v. Chandler-Dunbar Co.*, 299 U.S. 53, 76 (1913)). As such, in § 1498 actions, "reasonable and entire compensation" is the exclusive remedy for patent infringement under § 1498(a) and is akin to just compensation under the Fifth Amendment of the Constitution. "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

### Claim 23 U.S. Patent No: 9,589,439
### "Consumer / Mobile / Cellular Device Integration with a Detection Capability"

22.     This invention incorporates all the pleadings and attachments of this complaint that precedes this section which alleges the Government "used or manufactured" Golden's

16

"Communicating, Monitoring, Detecting, and Controlling (CMDC) Device—" invention—independent claim 23 of his '439 patent'.

23.      Upon information and belief, the United States has in the past, and continues to "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device "without license of the owner thereof or lawful right to use or manufacture the same" [28 U.S.C. § 1498(a)] without paying "reasonable and entire compensation".

24.      According to this United States Court of Federal Claims: "[U]nder § 1498(a), a patent owner who successfully proves infringement is entitled to "reasonable and entire compensation". Like the definition of infringement, the remedies available to a patentee are limited by § 1498(a)'s roots in eminent domain, not tort." *Leesona Corp. v. United States*, 599 F.2d 958, 964 (Ct. Cl. 1979) ("The theory for recovery against the government for patent infringement is not analogous to that in litigation between private parties …") "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

25.      According to this United States Court of Federal Claims: [W]hen the government has infringed, it is deemed to have 'taken' the patent license under an eminent domain theory, and compensation is the just compensation required by the Fifth Amendment."). "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

26.      Upon information and belief, the United States Court of Federal Claims; the United States District Court for the Northern District of California; and the United States Court of Appeals for the Federal Circuit has confirmed the infringement of Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device, that occurs when there's an integration of a consumer, mobile, or cellular device with a detection capability. Therefore, the Government's unlawful takings of a compulsory, non-exclusive, license to infringe Golden's independent claim 23 of his '439 patent' is inevitable.

27.      Upon information and belief, the Government has in the past, and continues to unlawfully "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., consumer, mobile, or cellular device integration with a detection capability). The alleged Government infringement of independent claim 23 of Golden's '439 patent', is found in the following Government initiative(s):

17

- Samsung Galaxy "Fingertip Heart Rate Monitor" (monitoring device)
- Samsung Galaxy interconnected to the "Samsung Gear S2 Smartwatch" (detection device)
- Samsung Galaxy (communicating device) and Samsung Gear S2 smartwatch (detection device) interconnected to the Yale Assure Lock (controlling device)
- Samsung Galaxy (communicating device) and "Samsung SmartThings Hub" (communicating device - interface-gateway) interconnected to the Yale Assure Lock (controlling device)
- Samsung Galaxy (communicating device) and Samsung Gear S2 (detection device) interconnected to the "Volkswagen Car-Net e-Remote" (controlling - locking device)

28.    Upon information and belief, "[t]he proper measure in eminent domain is what the owner has lost, not what the taker has gained," and in § 1498(a) what is taken from the patent owner is a compulsory nonexclusive license to use or manufacture the patented invention. Id. at 969 (citing *United States v. Chandler-Dunbar Co.*, 299 U.S. 53, 76 (1913)). As such, in § 1498 actions, "reasonable and entire compensation" is the exclusive remedy for patent infringement under § 1498(a) and is akin to just compensation under the Fifth Amendment of the Constitution. "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

**Claim 22 U.S. Patent No: 9,589,439**

**"Consumer / Mobile / Cellular Device Integration with a Detection Capability"**

29.    This invention incorporates all the pleadings and attachments of this complaint that precedes this section which alleges the Government "used or manufactured" Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device—" invention— independent claim 22 of his '439 patent'.

30.    Upon information and belief, the United States has in the past, and continues to "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device "without license of the owner thereof or lawful right to use or manufacture the same" [28 U.S.C. § 1498(a)] without paying "reasonable and entire compensation".

18

31.     According to this United States Court of Federal Claims: "[U]nder § 1498(a), a patent owner who successfully proves infringement is entitled to "reasonable and entire compensation". Like the definition of infringement, the remedies available to a patentee are limited by § 1498(a)'s roots in eminent domain, not tort." *Leesona Corp. v. United States*, 599 F.2d 958, 964 (Ct. Cl. 1979) ("The theory for recovery against the government for patent infringement is not analogous to that in litigation between private parties …") "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

32.     According to this United States Court of Federal Claims: [W]hen the government has infringed, it is deemed to have 'taken' the patent license under an eminent domain theory, and compensation is the just compensation required by the Fifth Amendment."). "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

33.     Upon information and belief, the United States Court of Federal Claims; the United States District Court for the Northern District of California; and the United States Court of Appeals for the Federal Circuit has confirmed the infringement of Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device, that occurs when there's an integration of a consumer, mobile, or cellular device with a detection capability. Therefore, the Government's unlawful takings of a compulsory, non-exclusive, license to infringe Golden's independent claim 22 of his '439 patent' is inevitable.

34.     Upon information and belief, the Government has in the past, and continues to unlawfully "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., consumer, mobile, or cellular device integration with a detection capability). The alleged Government infringement of independent claim 22 of Golden's '439 patent', is found in the following Government initiative(s):

- Apple's iPhone / iPad Camera Biosensor for Facial & Heart Rate Monitor (monitoring device)
- Apple's iPhone and the iPad interconnected to the Apple Watch (detection device)
- Apple's iPhone / iPad (monitoring equipment); Apple Watch (detection device); interconnected to the August Smart Lock (controlling device)

19

- Apple's iPhone / iPad (monitoring equipment); Apple Watch (detection device); Apple's HomeKit; August Connect (communicating device); interconnected to the August Smart Lock (locking device)

- Apple's iPhone / iPad (monitoring equipment); Apple Watch (detection device); interconnected to Ford's MyFord Mobile App (controlling device)

35.    Upon information and belief, "[t]he proper measure in eminent domain is what the owner has lost, not what the taker has gained," and in § 1498(a) what is taken from the patent owner is a compulsory nonexclusive license to use or manufacture the patented invention. Id. at 969 (citing *United States v. Chandler-Dunbar Co.*, 299 U.S. 53, 76 (1913)). As such, in § 1498 actions, "reasonable and entire compensation" is the exclusive remedy for patent infringement under § 1498(a) and is akin to just compensation under the Fifth Amendment of the Constitution. *"Intellectual Property Suits in the United States Court of Federal Claims"*; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

**Claim 20 U.S. Patent No: 9,589,439**
**"Consumer / Mobile / Cellular Device Integration with a Detection Capability"**

36.    This invention incorporates all the pleadings and attachments of this complaint that precedes this section which alleges the Government "used or manufactured" Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device—" invention— independent claim 20 of his '439 patent'.

37.    Upon information and belief, the United States has in the past, and continues to "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device "without license of the owner thereof or lawful right to use or manufacture the same" [28 U.S.C. § 1498(a)] without paying "reasonable and entire compensation".

38.    According to this United States Court of Federal Claims: "[U]nder § 1498(a), a patent owner who successfully proves infringement is entitled to "reasonable and entire compensation". Like the definition of infringement, the remedies available to a patentee are limited by § 1498(a)'s roots in eminent domain, not tort." *Leesona Corp. v. United States*, 599 F.2d 958, 964 (Ct. Cl. 1979) ("The theory for recovery against the government for patent infringement is not analogous to that in litigation between private parties …") *"Intellectual Property Suits in the*

20

*United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

39.     According to this United States Court of Federal Claims: [W]hen the government has infringed, it is deemed to have 'taken' the patent license under an eminent domain theory, and compensation is the just compensation required by the Fifth Amendment."). "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

40.     Upon information and belief, the United States Court of Federal Claims; the United States District Court for the Northern District of California; and the United States Court of Appeals for the Federal Circuit has confirmed the infringement of Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device, that occurs when there's an integration of a consumer, mobile, or cellular device with a detection capability. Therefore, the Government's unlawful takings of a compulsory, non-exclusive, license to infringe Golden's independent claim 20 of his '439 patent' is inevitable.

41.     Upon information and belief, the Government has in the past, and continues to unlawfully "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., consumer, mobile, or cellular device integration with a detection capability). The alleged Government infringement of independent claim 20 of Golden's '439 patent', is found in the following Government initiative(s):

- Qualcomm / NASA *"Cell-All"*: Apple iPhone CBRNE detection
- "Kromek D3S-NET": Apple iPhone CBRNE detection
- Biomeme "two3" Mobile Thermocycler: Apple iPhone for Bio/Chem detection
- Smartphone-operated "LAMP box": Apple iPhone for Bio/Chem detection
- Alluviam LLC HazMasterG3: Apple iPhone CBRNE detection
- FePhone Point-of-Care: Apple iPhone for Bio/Chem detection
- NutriPhone Lab-on-a-Chip: Apple iPhone for Bio/Chem detection
- FeverPhone: Apple iPhone for Bio/Chem detection
- Solar Thermal PCR Test: Apple iPhone for Bio/Chem detection
- Lab-on-a-Drone: Apple iPhone for Bio/Chem detection

42.   Upon information and belief, "[t]he proper measure in eminent domain is what the owner has lost, not what the taker has gained," and in § 1498(a) what is taken from the patent owner is a compulsory nonexclusive license to use or manufacture the patented invention. Id. at 969 (citing *United States v. Chandler-Dunbar Co.*, 299 U.S. 53, 76 (1913)). As such, in § 1498 actions, "reasonable and entire compensation" is the exclusive remedy for patent infringement under § 1498(a) and is akin to just compensation under the Fifth Amendment of the Constitution. *"Intellectual Property Suits in the United States Court of Federal Claims"*; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

### Claim 19 U.S. Patent No: 9,589,439
### "Consumer / Mobile / Cellular Device Integration with a Detection Capability"

43.   This invention incorporates all the pleadings and attachments of this complaint that precedes this section which alleges the Government "used or manufactured" Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device—" invention—independent claim 19 of his '439 patent'.

44.   Upon information and belief, the United States has in the past, and continues to "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device "without license of the owner thereof or lawful right to use or manufacture the same" [28 U.S.C. § 1498(a)] without paying "reasonable and entire compensation".

45.   According to this United States Court of Federal Claims: "[U]nder § 1498(a), a patent owner who successfully proves infringement is entitled to "reasonable and entire compensation". Like the definition of infringement, the remedies available to a patentee are limited by § 1498(a)'s roots in eminent domain, not tort." *Leesona Corp. v. United States*, 599 F.2d 958, 964 (Ct. Cl. 1979) ("The theory for recovery against the government for patent infringement is not analogous to that in litigation between private parties …") *"Intellectual Property Suits in the United States Court of Federal Claims"*; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

46.   According to this United States Court of Federal Claims: [W]hen the government has infringed, it is deemed to have 'taken' the patent license under an eminent domain theory, and compensation is the just compensation required by the Fifth Amendment."). *"Intellectual*

*Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

47.     Upon information and belief, the United States Court of Federal Claims; the United States District Court for the Northern District of California; and the United States Court of Appeals for the Federal Circuit has confirmed the infringement of Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device, that occurs when there's an integration of a consumer, mobile, or cellular device with a detection capability. Therefore, the Government's unlawful takings of a compulsory, non-exclusive, license to infringe Golden's independent claim 19 of his '439 patent' is inevitable.

48.     Upon information and belief, the Government has in the past, and continues to unlawfully "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., consumer, mobile, or cellular device integration with a detection capability). The alleged Government infringement of independent claim 19 of Golden's '439 patent', is found in the following Government initiative(s):

- EAGER: Mobile-Phone Based Single Molecule Imaging for DNA
- INSPIRE Track 2: Public Health Nanotechnology and Mobility (PHeNoM) (CMDC device)
- PFI: BIC Human-Centered Smart-Integration of Mobile Imaging and Sensing (CMDC device)
- EFRI-BioFlex: Cellphone-Based Digital Immunoassay Platform (CMDC device)
- "Multimode Smartphone Biosensor" for Bio/Chem detection
- EAGER: Lab-in-a-Smartphone for Bio/Chem detection
- PFI-BIC "Pathtracker: Smartphone-based for Mobile Infectious Disease Detection -
- I-Corps: Ultra-Sensitive Lateral Flow Reporters / Lab-on-Phone Platform for Bio/Chem detection
- Smartphone (iPhone) Microscope for Bio/Chem detection
- Smartphone (iPhone) Biosensor "Cradle" for Bio/Chem detection
- AOptix Stratus MX Peripheral for the Apple (iPhone) Smartphone (fingerprint and iris imaging)
- PositiveID - Boeing / M-Band Apple (iPhone) Smartphone (fingerprint and facial detection)

23

- Samsung Galaxy "Microscope" Smartphone for Bio/Chem detection

49.     Upon information and belief, "[t]he proper measure in eminent domain is what the owner has lost, not what the taker has gained," and in § 1498(a) what is taken from the patent owner is a compulsory nonexclusive license to use or manufacture the patented invention. Id. at 969 (citing *United States v. Chandler-Dunbar Co.*, 299 U.S. 53, 76 (1913)). As such, in § 1498 actions, "reasonable and entire compensation" is the exclusive remedy for patent infringement under § 1498(a) and is akin to just compensation under the Fifth Amendment of the Constitution. "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

**Claim 17 U.S. Patent No: 9,589,439**
**"Consumer / Mobile / Cellular Device Integration with a Detection Capability"**

50.     This invention incorporates all the pleadings and attachments of this complaint that precedes this section which alleges the Government "used or manufactured" Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device—" invention— independent claim 17 of his '439 patent'.

51.     Upon information and belief, the United States has in the past, and continues to "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device "without license of the owner thereof or lawful right to use or manufacture the same" [28 U.S.C. § 1498(a)] without paying "reasonable and entire compensation".

52.     According to this United States Court of Federal Claims: "[U]nder § 1498(a), a patent owner who successfully proves infringement is entitled to "reasonable and entire compensation". Like the definition of infringement, the remedies available to a patentee are limited by § 1498(a)'s roots in eminent domain, not tort." *Leesona Corp. v. United States*, 599 F.2d 958, 964 (Ct. Cl. 1979) ("The theory for recovery against the government for patent infringement is not analogous to that in litigation between private parties …") "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

53.     According to this United States Court of Federal Claims: [W]hen the government has infringed, it is deemed to have 'taken' the patent license under an eminent domain theory, and

24

compensation is the just compensation required by the Fifth Amendment."). "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

54.     Upon information and belief, the United States Court of Federal Claims; the United States District Court for the Northern District of California; and the United States Court of Appeals for the Federal Circuit has confirmed the infringement of Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device, that occurs when there's an integration of a consumer, mobile, or cellular device with a detection capability. Therefore, the Government's unlawful takings of a compulsory, non-exclusive, license to infringe Golden's independent claim 17 of his '439 patent' is inevitable.

55.     Upon information and belief, the Government has in the past, and continues to unlawfully "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., consumer, mobile, or cellular device integration with a detection capability). The alleged Government infringement of independent claim 17 of Golden's '439 patent', is found in the following Government initiative(s):

- "VOCket System" / "Nett Warrior" Smartphone System for CBRNE detection
- GammaPix for Android Smartphones for CBRNE detection
- "Biotouch System" / "Nett Warrior" Smartphone System for Bio/Chem detection
- MultiRae Pro Wireless Portable Multi Threat Radiation and Chemical Detector

56.     Upon information and belief, "[t]he proper measure in eminent domain is what the owner has lost, not what the taker has gained," and in § 1498(a) what is taken from the patent owner is a compulsory nonexclusive license to use or manufacture the patented invention. Id. at 969 (citing *United States v. Chandler-Dunbar Co.*, 299 U.S. 53, 76 (1913)). As such, in § 1498 actions, "reasonable and entire compensation" is the exclusive remedy for patent infringement under § 1498(a) and is akin to just compensation under the Fifth Amendment of the Constitution. "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

**Claim 16 U.S. Patent No: 9,589,439**
**"Consumer / Mobile / Cellular Device Integration with a Detection Capability"**

57.     This invention incorporates all the pleadings and attachments of this complaint that precedes this section which alleges the Government "used or manufactured" Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device—" invention— independent claim 16 of his '439 patent'.

58.     Upon information and belief, the United States has in the past, and continues to "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device "without license of the owner thereof or lawful right to use or manufacture the same" [28 U.S.C. § 1498(a)] without paying "reasonable and entire compensation".

59.     According to this United States Court of Federal Claims: "[U]nder § 1498(a), a patent owner who successfully proves infringement is entitled to "reasonable and entire compensation". Like the definition of infringement, the remedies available to a patentee are limited by § 1498(a)'s roots in eminent domain, not tort." *Leesona Corp. v. United States*, 599 F.2d 958, 964 (Ct. Cl. 1979) ("The theory for recovery against the government for patent infringement is not analogous to that in litigation between private parties …") "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

60.     According to this United States Court of Federal Claims: [W]hen the government has infringed, it is deemed to have 'taken' the patent license under an eminent domain theory, and compensation is the just compensation required by the Fifth Amendment."). "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

61.     Upon information and belief, the United States Court of Federal Claims; the United States District Court for the Northern District of California; and the United States Court of Appeals for the Federal Circuit has confirmed the infringement of Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device, that occurs when there's an integration of a consumer, mobile, or cellular device with a detection capability. Therefore, the Government's unlawful takings of a compulsory, non-exclusive, license to infringe Golden's independent claim 16 of his '439 patent' is inevitable.

62.     Upon information and belief, the Government has in the past, and continues to unlawfully "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., consumer, mobile, or cellular device integration with a

26

detection capability). The alleged Government infringement of independent claim 16 of Golden's '439 patent', is found in the following Government initiative(s):

- NRL: SIN-VAPOR / Smartphone System for CBRNE detection
- iPhone "Biodetector" Smartphone for CBRNE detection
- FLIR: identiFINDER R300 / Smartphone System for radiation detection

63.   Upon information and belief, "[t]he proper measure in eminent domain is what the owner has lost, not what the taker has gained," and in § 1498(a) what is taken from the patent owner is a compulsory nonexclusive license to use or manufacture the patented invention. Id. at 969 (citing *United States v. Chandler-Dunbar Co.*, 299 U.S. 53, 76 (1913)). As such, in § 1498 actions, "reasonable and entire compensation" is the exclusive remedy for patent infringement under § 1498(a) and is akin to just compensation under the Fifth Amendment of the Constitution. "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

## Claim 15 U.S. Patent No: 9,589,439
### "Consumer / Mobile / Cellular Device Integration with a Detection Capability"

64.   This invention incorporates all the pleadings and attachments of this complaint that precedes this section which alleges the Government "used or manufactured" Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device—" invention— independent claim 15 of his '439 patent'.

65.   Upon information and belief, the United States has in the past, and continues to "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device "without license of the owner thereof or lawful right to use or manufacture the same" [28 U.S.C. § 1498(a)] without paying "reasonable and entire compensation".

66.   According to this United States Court of Federal Claims: "[U]nder § 1498(a), a patent owner who successfully proves infringement is entitled to "reasonable and entire compensation". Like the definition of infringement, the remedies available to a patentee are limited by § 1498(a)'s roots in eminent domain, not tort." *Leesona Corp. v. United States*, 599 F.2d 958, 964 (Ct. Cl. 1979) ("The theory for recovery against the government for patent infringement is not analogous to that in litigation between private parties …") "*Intellectual Property Suits in the*

27

*United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

67.    According to this United States Court of Federal Claims: [W]hen the government has infringed, it is deemed to have 'taken' the patent license under an eminent domain theory, and compensation is the just compensation required by the Fifth Amendment."). "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

68.    Upon information and belief, the United States Court of Federal Claims; the United States District Court for the Northern District of California; and the United States Court of Appeals for the Federal Circuit has confirmed the infringement of Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device, that occurs when there's an integration of a consumer, mobile, or cellular device with a detection capability. Therefore, the Government's unlawful takings of a compulsory, non-exclusive, license to infringe Golden's independent claim 15 of his '439 patent' is inevitable.

69.    Upon information and belief, the Government has in the past, and continues to unlawfully "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., consumer, mobile, or cellular device integration with a detection capability). The alleged Government infringement of independent claim 15 of Golden's '439 patent', is found in the following Government initiative(s):

- MIT: "NFC" Samsung Galaxy Smartphone Sensor for CBRNE detection
- Navy Marine Corps Intranet (NMCI) Network - Samsung Galaxy (communication network for CBRNE monitoring)

70.    Upon information and belief, "[t]he proper measure in eminent domain is what the owner has lost, not what the taker has gained," and in § 1498(a) what is taken from the patent owner is a compulsory nonexclusive license to use or manufacture the patented invention. Id. at 969 (citing *United States v. Chandler-Dunbar Co.*, 299 U.S. 53, 76 (1913)). As such, in § 1498 actions, "reasonable and entire compensation" is the exclusive remedy for patent infringement under § 1498(a) and is akin to just compensation under the Fifth Amendment of the Constitution. "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

28

**Claim 14 U.S. Patent No: 9,589,439**

**"Consumer / Mobile / Cellular Device Integration with a Detection Capability"**

71.     This invention incorporates all the pleadings and attachments of this complaint that precedes this section which alleges the Government "used or manufactured" Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device—" invention— independent claim 14 of his '439 patent'.

72.     Upon information and belief, the United States has in the past, and continues to "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device "without license of the owner thereof or lawful right to use or manufacture the same" [28 U.S.C. § 1498(a)] without paying "reasonable and entire compensation".

73.     According to this United States Court of Federal Claims: "[U]nder § 1498(a), a patent owner who successfully proves infringement is entitled to "reasonable and entire compensation". Like the definition of infringement, the remedies available to a patentee are limited by § 1498(a)'s roots in eminent domain, not tort." *Leesona Corp. v. United States*, 599 F.2d 958, 964 (Ct. Cl. 1979) ("The theory for recovery against the government for patent infringement is not analogous to that in litigation between private parties …") *"Intellectual Property Suits in the United States Court of Federal Claims"*; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

74.     According to this United States Court of Federal Claims: [W]hen the government has infringed, it is deemed to have 'taken' the patent license under an eminent domain theory, and compensation is the just compensation required by the Fifth Amendment."). *"Intellectual Property Suits in the United States Court of Federal Claims"*; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

75.     Upon information and belief, the United States Court of Federal Claims; the United States District Court for the Northern District of California; and the United States Court of Appeals for the Federal Circuit has confirmed the infringement of Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device, that occurs when there's an integration of a consumer, mobile, or cellular device with a detection capability. Therefore, the Government's unlawful takings of a compulsory, non-exclusive, license to infringe Golden's independent claim 14 of his '439 patent' is inevitable.

76. Upon information and belief, the Government has in the past, and continues to unlawfully "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., consumer, mobile, or cellular device integration with a detection capability). The alleged Government infringement of independent claim 14 of Golden's '439 patent', is found in the following Government initiative(s):

- "Cell-All" Rhevision & SeaCoast: Samsung Galaxy for CBRNE detection
- Navy Marine Corps Intranet (NMCI) Network of detection devices - Samsung Galaxy
- 1"x2" Detection Device (DD) for CBRNE detection; Samsung Galaxy Smartphone -
- NetS² SmartShield G500 Radiation Detector Samsung Galaxy Smartphone
- "Kromek D3S-ID": A Standalone Isotope ID (biometric device)

77. Upon information and belief, "[t]he proper measure in eminent domain is what the owner has lost, not what the taker has gained," and in § 1498(a) what is taken from the patent owner is a compulsory nonexclusive license to use or manufacture the patented invention. Id. at 969 (citing *United States v. Chandler-Dunbar Co.*, 299 U.S. 53, 76 (1913)). As such, in § 1498 actions, "reasonable and entire compensation" is the exclusive remedy for patent infringement under § 1498(a) and is akin to just compensation under the Fifth Amendment of the Constitution. "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

## Claim 13 U.S. Patent No: 9,589,439
### "Consumer / Mobile / Cellular Device Integration with a Detection Capability"

78. This invention incorporates all the pleadings and attachments of this complaint that precedes this section which alleges the Government "used or manufactured" Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device—" invention—independent claim 13 of his '439 patent'.

79. Upon information and belief, the United States has in the past, and continues to "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device "without license of the owner thereof or lawful right to use or manufacture the same" [28 U.S.C. § 1498(a)] without paying "reasonable and entire compensation".

30

80.    According to this United States Court of Federal Claims: "[U]nder § 1498(a), a patent owner who successfully proves infringement is entitled to "reasonable and entire compensation". Like the definition of infringement, the remedies available to a patentee are limited by § 1498(a)'s roots in eminent domain, not tort." *Leesona Corp. v. United States*, 599 F.2d 958, 964 (Ct. Cl. 1979) ("The theory for recovery against the government for patent infringement is not analogous to that in litigation between private parties …") "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

81.    According to this United States Court of Federal Claims: [W]hen the government has infringed, it is deemed to have 'taken' the patent license under an eminent domain theory, and compensation is the just compensation required by the Fifth Amendment."). "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

82.    Upon information and belief, the United States Court of Federal Claims; the United States District Court for the Northern District of California; and the United States Court of Appeals for the Federal Circuit has confirmed the infringement of Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device, that occurs when there's an integration of a consumer, mobile, or cellular device with a detection capability. Therefore, the Government's unlawful takings of a compulsory, non-exclusive, license to infringe Golden's independent claim 13 of his '439 patent' is inevitable.

83.    Upon information and belief, the Government has in the past, and continues to unlawfully "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., consumer, mobile, or cellular device integration with a detection capability). The alleged Government infringement of independent claim 13 of Golden's '439 patent', is found in the following Government initiative(s):

- PositiveID / "Firefly DX" Samsung Galaxy Smartphone for detecting CBRNE
- "Biotouch" Samsung Galaxy for detecting bio-hazards
- Samsung Galaxy "BioPhone" for detecting bio-hazards
- "COINS" Nano-Embedded Sensors for Smartphones CBRNE detection
- Variable's "NODE+Oxa" for the Apple (iPhone) Smartphone CBRNE detection
- Smartphone-Based Rapid Diagnostic Tests for CBRNE detection

31

- Navy Marine Corps Intranet (NMCI) Network - Apple iPad
- Apple iPAD Tablet Boeing MH-6 Little Bird Helicopter
- "TOUGHBOOK 31" Laptop Passport Systems Inc. Base Control Unit (BCU)
- "TOUGHBOOK 31" Laptop K-Max Self-flying Helicopter

84.    Upon information and belief, "[t]he proper measure in eminent domain is what the owner has lost, not what the taker has gained," and in § 1498(a) what is taken from the patent owner is a compulsory nonexclusive license to use or manufacture the patented invention. Id. at 969 (citing *United States v. Chandler-Dunbar Co.*, 299 U.S. 53, 76 (1913)). As such, in § 1498 actions, "reasonable and entire compensation" is the exclusive remedy for patent infringement under § 1498(a) and is akin to just compensation under the Fifth Amendment of the Constitution. "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

**Claim 1 U.S. Patent No: 9,096,189**
**"Consumer / Mobile / Cellular Device Integration with a Detection Capability"**

85.    This invention incorporates all the pleadings and attachments of this complaint that precedes this section which alleges the Government "used or manufactured" Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device—" invention— independent claim 1 of his '189 patent'.

86.    Upon information and belief, the United States has in the past, and continues to "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device "without license of the owner thereof or lawful right to use or manufacture the same" [28 U.S.C. § 1498(a)] without paying "reasonable and entire compensation".

87.    According to this United States Court of Federal Claims: "[U]nder § 1498(a), a patent owner who successfully proves infringement is entitled to "reasonable and entire compensation". Like the definition of infringement, the remedies available to a patentee are limited by § 1498(a)'s roots in eminent domain, not tort." *Leesona Corp. v. United States*, 599 F.2d 958, 964 (Ct. Cl. 1979) ("The theory for recovery against the government for patent infringement is not analogous to that in litigation between private parties …") "*Intellectual Property Suits in the*

32

*United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

88.    According to this United States Court of Federal Claims: [W]hen the government has infringed, it is deemed to have 'taken' the patent license under an eminent domain theory, and compensation is the just compensation required by the Fifth Amendment."). "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

89.    Upon information and belief, the United States Court of Federal Claims; the United States District Court for the Northern District of California; and the United States Court of Appeals for the Federal Circuit has confirmed the infringement of Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device, that occurs when there's an integration of a consumer, mobile, or cellular device with a detection capability. Therefore, the Government's unlawful takings of a compulsory, non-exclusive, license to infringe Golden's independent claim 1 of his '189 patent' is inevitable.

90.    Upon information and belief, the Government has in the past, and continues to unlawfully "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., consumer, mobile, or cellular device integration with a detection capability). The alleged Government infringement of independent claim 1 of Golden's '189 patent', is found in the following Government initiative(s):

- "Cell-All": Synkera MikroKera Ultra CBRNE detection
- 2"x2" Detection Device (DD) Samsung Galaxy Smartphone CBRNE detection
- NetS² SmartShield G300 Radiation Detector Samsung Galaxy Smartphone

91.    Upon information and belief, "[t]he proper measure in eminent domain is what the owner has lost, not what the taker has gained," and in § 1498(a) what is taken from the patent owner is a compulsory nonexclusive license to use or manufacture the patented invention. Id. at 969 (citing *United States v. Chandler-Dunbar Co.*, 299 U.S. 53, 76 (1913)). As such, in § 1498 actions, "reasonable and entire compensation" is the exclusive remedy for patent infringement under § 1498(a) and is akin to just compensation under the Fifth Amendment of the Constitution. "*Intellectual Property Suits in the United States Court of Federal Claims*"; Vol. 10 No. 1, Also, Published on the American Bar Association's website.

33

**Plaintiff's U.S. Patents are: [11,645,898]; [10,984,619];**
**[10,163,287]; [9,589,439]; and [9,096,189]**
**"Consumer / Mobile / Cellular Device Integration with a Detection Capability"**

92.     This invention incorporates all the pleadings and attachments of this complaint that precedes this section which alleges the Government "used or manufactured" Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device—" invention— defined in Golden's '898, '619, '287, '439, and '189 patents; without license or lawful right to do so. § 1498(a).

93.     Upon information and belief, the United States has in the past, and continues to "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device "without license of the owner thereof or lawful right to use or manufacture the same" [28 U.S.C. § 1498(a)] without paying "reasonable and entire compensation".

94.     Upon information and belief, the United States Court of Federal Claims; the United States District Court for the Northern District of California; and the United States Court of Appeals for the Federal Circuit has confirmed the infringement of Golden's "Communicating, Monitoring, Detecting, and Controlling (CMDC) Device, that occurs when there's an integration of a consumer, mobile, or cellular device with a detection capability. Therefore, the Government's unlawful takings of a compulsory, non-exclusive, license to infringe Golden's '898, '619, '287, '439, and '189 patents' are inevitable.

95.     Upon information and belief, the Government has in the past, and continues to unlawfully "use or manufacture" Golden's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., consumer, mobile, or cellular device integration with a detection capability). The alleged Government infringement of Golden's '898, '619, '287, '439, and '189 patents', is described in the following Government initiative(s):

96.     Significant advancements in mobile technology have occurred since September 11, 2001, both in the advancement of the devices and the infrastructures that support them. For example, mobile devices like the Android™ and iPad® can now operate equally and seamlessly via traditional cellular networks, as well as with infrastructure/ad hoc wireless networks.

97.     The Defense Advanced Research Projects Agency (DARPA) has launched a program known as the Transformative Apps Program. The purpose of this program is to place the correct

34

mobile applications into the hands of warfighters. To facilitate this, a military application store is being created to promote collaboration between developers and users in the field.

98.    Another DoD initiative is Connecting Soldiers to Digital Applications (CSDA), sponsored by the Army Capabilities Integration Center (ARCIC) and the Army CIO/G6, with support from the Army Training and Doctrine Command (TRADOC) deputy commanding general for Initial Military Training, and other Army organizations. The purpose of this initiative is to determine the value of giving soldiers applications on mobile devices [ARMY]. During Phase One of the initiative the Army experimented with several types of smart phones to evaluate the effectiveness and usefulness of various mobile applications in the field. Devices tested included the Apple iPhone®, Google Android™ devices, and Microsoft Windows Mobile™ phones [C4ISR]. On these devices, applications were tested which covered a wide range of functions.

99.    DoD is also starting to integrate chemical and biological sensors into mobile devices. Researchers from the University of California, San Diego have developed a miniature chemical sensor which can detect harmful gas in the air and automatically send the information about the type and transmitting range of the gas. The chemical sensor is a silicon chip with hundreds of independent miniature sensors. These can identify the molecule of specific toxic gas and then report on it.

100.    2013: Smartphones and Handheld Devices for Defense and Homeland Security Strategies, Plans, Challenges & Opportunities Symposium:

- "U.S. Coast Guard Smartphones Needs, Challenges & Opportunities" Rear Admiral Robert E. Day, Jr., Assistant Commandant for Command, Control, Communications, Computers & Information Technology, (C4IT) & Director, Coast Guard Cyber Command, Pre-Commissioning Detachment, U.S. Coast Guard.

- "DoD Mobile Strategy" Mr. Mark Norton, Senior Engineer, Department of Defense, Office of the Chief Information Officer, Office of the Under Secretary of Defense (CIO/OSD).

- "Update on Spectrum Sharing for Mobile Devices at the Tactical Edge" Mr. Julius Knapp, Chief Engineer, Office of Engineering and Technology, Federal Communications Commission (FCC).

35

- "Secure Smartphone Computing, Needs and Opportunities for a Secure yet Mobile Platform" Mr. Keith Trippie, Executive Director, Enterprise System Development, Office of the Chief Information Officer, Department of Homeland Security (DHS).

- "DISA's Strategic Mobility Vision" Mr. Gregory Youst, Chief Mobility Engineer, Technology and Integration Division, Chief Technology Officer, Defense Information Systems Agency (DISA) (invited).

- "Content-Based Mobile Edge Networking (CBMEN)" Dr. Keith Gremban, PhD., Program Manager, Content Based Mobile Edge Networking (CBMEN), Defense Advanced Research Project Agency (DARPA).

- "Transformative Apps Program" Mr. Doran Michaels, Program Manager, Transformative Apps, DARPA.

- "Windshear II Update" Mr. John-Isaac Clark, Chief Innovation Officer, Thermopylae Sciences & Technology & Mr. Lenwood Washington, Senior Systems Engineer, Mission Integration Directorate, Acquisition and Engineering, National Reconnaissance Office (NRO).

- "Advancements in Mobile Devices for Chem-Bio Detection and Characterization" Dr. Calvin CHUE, PhD., Research Biologist, U.S. Army Research, Development and Engineering Command (RDECOM).

- "ADAPT Unattended Ground Sensor Using Android Operating System and Original Design Manufacturers" Mr. Mark Rich, Program Manager, Strategic Technology Office, DARPA.

**101.** 2013: "The U.S. Department of Defense confirmed in a statement on Friday that Apple's iOS 6 mobile operating system is secure enough to connect to secure Pentagon networks."

**102.** 2013: "The U.S. Department of Defense confirmed in a statement on Friday that Apple's iOS 6 mobile operating system is secure enough to connect to secure Pentagon networks."

**103.** 2013: "Samsung's potential government deal signals new era for mobile security: Samsung may be ready to sign deals with the FBI and the U.S. Navy. Analysts say the news is proof that mobile in the enterprise has arrived. Samsung is close to inking a deal with the FBI and the U.S. Navy for mobile devices."

104.    2013: "National Institute of Standards and Technology (NIST), which examines and tests mobile devices and technologies for security clearance, granted the Apple software FIPS 140-2 certification (Level 1) last Friday. This approves iPhones and iPads running the software in conjunction with the U.S. government's lowest level of national security clearance."

105.    2013: "The U.S. Department of Defense announced today that it was further dropping its exclusive BlackBerry contract and opening all of its mobile communications networks to Apple, Google, and other device makers. 'The Department of Defense is taking a leadership role in leveraging mobile device technology by ensuring its workforce is empowered with mobile devices,' Defense Department Chief Information Officer Teri Takai said in a statement today."

106.    2013: "Samsung recently received the nod from the Pentagon for any Samsung device protected by the Knox security software, which includes the Galaxy S4 and other compatible tablets."

107.    2013: "For the first time, Apple's push into federal use opens up the U.S. government and military to competition for device procurement in the mobile space."

108.    2014: "The mobile device management system–MDM–began operating Jan. 31as a control system through which approved devices must operate to get access to Defense Department networks. The MDM enforces security policies by blocking or permitting certain functions on smartphones and tablets."

109.    2014: "By opening its networks to Samsung and Apple devices, Defense Information Systems Agency (DISA) intends to broaden the variety of mobile computers that troops and civilian Defense Department employees can use in the field, on bases, in offices and elsewhere to receive and send information and work almost anywhere at any time."

110.    2014: "Samsung has announced that five of its Galaxy devices have been approved for the U.S government's Defense Information System Agency (DISA) products list. The devices include the Galaxy S4, Galaxy S4 Active, Galaxy Note 3, the Galaxy Note Pro 12.2 and the Galaxy Note 10.1 2014 Edition. All of them are using Android 4.4 (KitKat) along with Samsung's KNOX secure workspace platform, which includes system-level encryption for enterprise-based apps."

111.    2014: "The United States Air Force is replacing 5000 legacy BlackBerry smartphones with Apple's iPhone, and eventually all of their BlackBerry users will have to make the changeover. The announcement, reported by Defense News, comes as the future of BlackBerry

37

within the Department of Defense is debated, with the chips seeming to fall on the side of transitioning away from a network supporting a mish-mash of BlackBerry 6 and 7 devices to a mix of modern devices — though apparently without BlackBerry 10 in that mix."

112.    2015: "Navy Plans for Android and iOS Devices. The Navy Enterprise Networks (NEN) Program Office is making progress on plans to transition to more modern mobile devices. Early users will be able to choose between the iPhone 5c and 5s, but the Navy wants to be as flexible as possible and allow users to pick the devices that will work best for them, and plans to approve a wider range of devices. Approval to use the iPhone 6 and iPad Air is expected in Jan. or Feb. 2015, and approval to use Samsung Android phones and tablets is expected in March."

113.    2016: "This fiscal year Marines will receive Samsung smart phones that make calling for fire support easier, quicker and more accurate. The Target Handoff System Version 2, or THS V.2, is a portable system designed for use by dismounted Marines to locate targets, pinpoint global positioning coordinates and call for close air, artillery and naval fire support using secure digital communications."

114.    2016: "Both the LG Electronics G5 and V10 received a security certification from the U.S. Defense Information Systems Agency, as well as a certification by the National Information Assurance Partnership, which administers independent tests to see if the devices are reliable and secure. The two newer LG smartphone models have joined the select list of official devices that can be used by Department of Defense employees, according to the handset manufacturer and a DOD website. LG's older models, the G3 and G4 also received DISA certifications. The phones come equipped with LG's encryption technology from 2013, LG GATE. The advanced tech has secure email options, supports Virtual Private Network (VPN), and can remotely wipe the phone's memory."

115.    2016: "Use of Mobile Technology for Information Collection and Dissemination": A DACS Technology Assessment Report: The Data & Analysis Center for Software (DACS) was one of several United States Department of Defense (DoD) sponsored Information Analysis Centers (IACs), administered by the Defense Technical Information Center (DTIC). It was managed by the U.S. Air Force Research Laboratory (AFRL) and operated by Quanterion Solutions Inc. under a long-term DoD contract. The website is no longer available and was replaced by https://www.csiac.org/ DACS Report Number 518055: Contract FA1500-10-D-0010; Prepared for the Defense Technical Information Center; Prepared By: Chet Hosmer, Chief

38

Scientist; Carlton Jeffcoat, Vice President, Cyber Security Division; Matt Davis, Malware Analyst; Wetstone/Allen Corporation of America; 10400 Eaton Place; Fairfax, VA 22030; Thomas McGibbon, DACS Director; Quanterion Solutions Inc. 100 Seymour Road Utica, NY 13502. (Paragraphs 79-84 below were taken from the Report)

116.    Mobile technology is increasingly being utilized as a tool for information dissemination and collection across the Government. The Department of Defense (DoD), Department of Homeland Security (DHS), Intelligence communities, and law enforcement are among those agencies utilizing mobile technology for information management. The primary mobile devices being utilized are the iPad®, iPhone®, Android™, and Windows Mobile™. The open architecture of these devices is advantageous for rapid application development and release.

117.    New mobile technologies such as the iPhone®, iPad®, Android™ and similar devices have revolutionized the way information can be distributed. In the past, mobile devices such as Personal Data Assistants (PDAs) primarily focused on data storage and display. Today, an increasingly large number of devices are focusing not only on data storage and display, but also on communication and processing. As a result, organizations have begun leveraging mobile technology as a means of information dissemination. These organizations include, but are not limited to, Government organizations such as the Department of Defense (DoD), the United States Army, the Department of Homeland Security (DHS), and a number of critical infrastructure organizations.

*Note:* THIS EXHIBIT IS NOT AN ILLUSTRATION FOR RELITIGATING ANY ISSUES. THIS EXHIBIT DO, HOWEVER, DESCRIBE PLAINTIFF'S PATENTED PROCESS FOR A "*MODIFIED*" CELL PHONE DEVICE.